Tab 1

cited by the appellants are inapplicable because each involved the birth of a "stillborn": see *Mathison v. Hofer* (1984), 27 Man. R. 41 (Q.B.), and *Dehler v. Ottawa Civic Hosp.* (1979), 25 O.R. (2d) 748, 101 D.L.R. (3d) 686, affirmed 29 O.R. (2d) 677, 117 D.L.R. (3d) 512*n*.

[9] We also note that the issues raised in *Dobson v. Dobson*, [1999] 2 S.C.R. 753, 174 D.L.R. (4th) 1, are not relevant to the questions placed before the Motions Judge. This is one of those cases where the law has been well established for nearly a century. If the legislators or insurance companies had intended to exclude a child en ventre sa mère from the ambit of provisions governing dependent relatives they should have expressly said so. Accordingly, the appeal is dismissed with costs of $1,000 awarded to the respondent.

*Appeal dismissed.*

---

### 369413 Alberta Ltd. et al. v. Pocklington

[Indexed as: Gainers Inc. v. Pocklington Holdings Inc.]

Court File No. 9603-0215-AC

*Alberta Court of Appeal*
*Côté and Fruman JJ.A. and Rooke J. (ad hoc)*

*Heard: May 2, 2000*
*Judgment rendered: November 21, 2000*

**Torts — Interference with contractual relations — Director transferring assets from company prior to creditor's attempt to call outstanding loan — Loan agreement with company requiring consent of creditor prior to disposal of assets except in ordinary course of business — Creditor suing director for intentionally inducing breach of contract — Director acting without legal advice and indifferent to breach — Director acting in own interests and not interests of debtor company — Contract breached — Transfer not made in ordinary course of business — Proof of director's intent demonstrated — Plea of justification failed — Judgment for plaintiff.**

A creditor sought to call the loan it had transacted with a company, but discovered that a day earlier, the sole director and shareholder of the company had transferred a valuable asset from the debtor company to another of his companies at substantially less than market value. The transaction was structured as a transfer of shares through a subsidiary shell company to avoid the restrictions on the ability of companies to provide financial assistance to related companies. The loan agreement had provided that the debtor company would not dispose of its assets without the

DOMINION LAW REPORTS    **194 D.L.R. (4th)**

prior written consent of the creditor except in the ordinary course of business. The creditor had not been informed of the transaction and had not consented to it. The creditor brought an action against the defendant director and shareholder for intentionally inducing the debtor company to breach the loan agreement, asking for the return of the asset or monetary damages. The trial judge decided that the loan agreement had not been breached, because assets did not include shares in a subsidiary, and alternatively, that if the shares were assets, the transfer fell within the ordinary course of business. The creditor appealed to the Alberta Court of Appeal.

**Held**, the appeal should be allowed.

The defendant director and shareholder had caused the breach of the loan agreement by transferring the shares without the consent of the creditor. The agreement required the creditor's consent for the disposition of any assets actually owned by the debtor company whether or not through a subsidiary. The shares were assets, and their transfer was not in the ordinary course of business because they were sold for a nominal sum in a rare and non-arm's length transaction when the company was in fatal financial difficulty. The requisite element of intention could be proven by showing that the breach was a reasonable or foreseeable consequence of the transfer, or alternatively that the defendant completed the transfer recklessly and was wilfully blind to its consequences, or was indifferent to whether it caused a breach. In this case, the defendant intended to cause the breach. He executed the documents to complete the transfer of shares to his own company. He had the means to make appropriate inquiries before embarking on the transaction, but chose to act without legal advice and showed clear indifference to the breach. The defendant's plea of justification, that he was merely serving the interests of the company by breaking its contractual commitments, failed. The defendant had admitted acting only in his own personal interests, with no benefit to the debtor company. By the time of the appeal, it was no longer possible to return the shares, so monetary damages should be assessed at large. The value of the shares had increased since the date of breach, and the quantum should be calculated at the time of trial as the fair market value of the assets less the value of registered encumbrances.

**Cases referred to**

*85956 Holdings Ltd. v. Fayerman Brothers Ltd.* (1986), 25 D.L.R. (4th) 119, 32 B.L.R. 204, [1986] 2 W.W.R. 754, 46 Sask. R. 75, 36 A.C.W.S. (2d) 258 — **refd to**

*Allen v. Flood*, [1898] A.C. 1 — **refd to**

*Atcheson v. College of Physicians and Surgeons (Alberta)* (1994), 21 C.C.L.T. (2d) 166, [1994] 6 W.W.R. 239, 18 Alta. L.R. (3d) 105, (1994), 148 A.R. 395, 45 A.C.W.S. (3d) 1166 — **refd to**

*Aubrett Holdings Ltd. v. Canada*, [1998] G.S.T.C. 17, 98 G.T.C. 2083 — **refd to**

*Bank of Nova Scotia v. Gaudreau* (1984), 27 B.L.R. 101, 4 P.P.S.A.C. 158, 48 O.R. (2d) 478 — **refd to**

*British Industrial Plastics Ltd. v. Ferguson*, [1940] 1 All E.R. 479 — **refd to**

*Cawley & Co. (Re)* (1889), 42 Ch. 209 — **refd to**

*Clarke v. Rossburger* (2000), 50 B.L.R. (2d) 73, 254 A.R. 30, 92 A.C.W.S. (3d) 666 — refd to

*Cotter v. General Petroleums Ltd.*, [1950] 4 D.L.R. 609, [1951] S.C.R. 154 — refd to

*Countrywide Banking Corp. Ltd. v. Dean*, [1998] A.C. 338 — refd to

*De Jetley Marks v. Greenwood (Lord)*, [1936] 1 All E.R. 863 — refd to

*Ed Miller Sales & Rentals Ltd. v. Caterpillar Tractor Co.* (1996), 69 C.P.R. (3d) 143, 30 C.C.L.T. (2d) 1, [1996] 9 W.W.R. 449, 127 W.A.C. 81, 41 Alta. L.R. (3d) 217, 187 A.R. 81, 64 A.C.W.S. (3d) 1241; leave to appeal to S.C.C. refused 72 C.P.R. (3d) vi, 160 W.A.C. 400n, 209 A.R. 400n, 215 N.R. 159n — refd to

*Estevan Credit Union Ltd. v. Dyer* (1997), 146 D.L.R. (4th) 490, 32 B.L.R. (2d) 300, 47 C.B.R. (3d) 208, [1997] 8 W.W.R. 49, 155 Sask. R. 186, 70 A.C.W.S. (3d) 1093 — refd to

*Exchange Telegraph Co. v. Gregory & Co.*, [1896] 1 Q.B. 147 — refd to

*Ford Motor Credit Co. of Canada Ltd. v. Centre Motors of Brampton Ltd.* (1982), 137 D.L.R. (3d) 634, 2 P.P.S.A.C. 63, 38 O.R. (2d) 516 — refd to

*Fraser v. Board of Trustees of Central United Church* (1982), 38 O.R. (2d) 97 — refd to

*Gainers Inc. v. Pocklington Holdings Inc.* (2000), 220 W.A.C. 373, 81 Alta. L.R. (3d) 17, 255 A.R. 373, 97 A.C.W.S. (3d) 234 — refd to

*Gallen v. Allstate Grain Co.* (1984), 9 D.L.R. (4th) 496, 25 B.L.R. 314 sub nom. *Gallen v. Butterley*, 53 B.C.L.R. 38; leave to appeal to S.C.C. refused [1984] 1 S.C.R. v, 56 N.R. 233, sub nom. *Allstate Grain Co. v. Guichon* — refd to

*Garry v. Sherritt Gordon Mines Ltd.* (1987), 45 D.L.R. (4d) 22, 42 C.C.L.T. 241, [1988] 1 W.W.R. 289, 59 Sask. R. 104, 7 A.C.W.S. (3d) 134 — refd to

*Goldsoll v. Goldman*, [1914] 2 Ch. 603; affd [1915] 1 Ch. 292 — refd to

*Hawrish v. Bank of Montreal* (1969), 2 D.L.R. (3d) 600, [1969] S.C.R. 515, 66 W.W.R. 673 — refd to

*Imperial Oil Ltd. v. C & G Holdings Ltd.* (1989), 62 D.L.R. (4th) 261, 78 Nfld. & P.E.I.R. 1, 17 A.C.W.S. (3d) 520 — apld

*Jackson v. Trimac Industries Ltd.*, [1993] 2 W.W.R. 209, 6 Alta. L.R. (3d) 225, 134 A.R. 321, 37 A.C.W.S. (3d) 671; vard [1994] 8 W.W.R. 237, 73 W.A.C. 42, 20 Alta. L.R. (3d) 117, 155 A.R. 42, 49 A.C.W.S. (3d) 886 — refd to

*Levy-Russell Ltd. v. Tecmotiv Inc.* (1994), 54 C.P.R. (3d) 161, 13 B.L.R. (2d) 1, 46 A.C.W.S. (3d) 1386; supplementary reasons 54 C.P.R. (3d) 161, 13 B.L.R. (2d) 1 at p. 233, 47 A.C.W.S. (3d) 1164 — refd to

*Lumley v. Gye* (1853), 118 E.R. 749, 2 El. & Bl. 216 — refd to

*MacKenzie Financial Corp. v. McRae* (1998), 81 O.T.C. 321, 84 A.C.W.S. (3d) 393 — refd to

*McFadden v. 481782 Ontario Ltd.* (1984), 27 B.L.R. 173, 5 C.C.E.L. 83, 47 O.R. (2d) 134, 26 A.C.W.S. (2d) 200 — apld

*Pacific Mobile Corp. (Re)* (1985), 16 D.L.R. (4th) 319, [1985] 1 S.C.R. 290, 55 C.B.R. (N.S.) 32, 57 N.R. 63, sub nom. *Robitaille v. American Biltrite (Canada)* — refd to

*Parks West Mall Ltd. v. Jennett* (1996), 28 C.C.L.T. (2d) 1, [1996] 4 W.W.R. 87, 110 W.A.C. 45, 36 Alta. L.R. (3d) 44, 178 A.R. 45, 59 A.C.W.S. (3d) 632; supplementary reasons 116 W.A.C. 239, 38 Alta. L.R. (3d) 423, 181 A.R. 239, 62 A.C.W.S. (3d) 59; leave to appeal to S.C.C. refused 135 W.A.C. 179n, 193 A.R. 179n — refd to

*Posluns v. Toronto Stock Exchange* (1964), 46 D.L.R. (2d) 210, [1964] 2 O.R. 547; affd 53 D.L.R. (2d) 193, [1966] 1 O.R. 285; affd 67 D.L.R. (2d) 165, [1968] S.C.R. 330 — **refd to**

*Quinn v. Leathem*, [1901] A.C. 495 — **refd to**

*Royal Bank of Canada v. Wilton* (1995), 123 D.L.R. (4th) 266, [1995] 6 W.W.R. 285, 89 W.A.C. 261, 28 Alta. L.R. (3d) 1, 165 A.R. 261, 54 A.C.W.S. (3d) 86 [leave to appeal refused 126 D.L.R. (4th) vii, [1995] 2 S.C.R. viii, 116 W.A.C. 80n, 181 A.R. 80n, 195 N.R. 160n] — **refd to**

*Roynat Inc. v. Ron Clark Motors Ltd.* (1991), 1 P.P.S.A.C. (2d) 191, 26 A.C.W.S. (3d) 1170 — **refd to**

*Scanlon v. Castlepoint Development Corp.* (1992), 99 D.L.R. (4th) 153, 29 R.P.R. (2d) 60, 11 O.R. (3d) 744, 59 O.A.C. 191, 37 A.C.W.S. (3d) 563; leave to appeal to S.C.C. refused 102 D.L.R. (4th) vii, [1993] 2 S.C.R. x, 32 R.P.R. (2d) 160n, 64 O.A.C. 320n, 157 N.R. 400n — **refd to**

*Simpson v. Consumers' Assn. of Canada* (1999), 41 C.C.E.L. (2d) 179, 99 C.L.L.C. ¶210-036, 86 A.C.W.S. (3d) 893 — **refd to**

*South Wales Miners' Federation v. Glamorgan Coal Co.*, [1905] A.C. 239 — **refd to**

*Swiss Bank v. Lloyds Bank*, [1979] Ch. 548; revd [1982] A.C. 584; affd [1982] A.C. 604 — **refd to**

*Thomson (D.C.) & Co. Ltd. v. Deakin*, [1952] Ch. 646 — **refd to**

*Unilux Manufacturing Co. v. Prime Boilers Inc.* (1990), 32 C.P.R. (3d) 493, 74 O.R. (2d) 270, 20 A.C.W.S. (3d) 1131 — **refd to**

*Vale v. I.L.W.U., Local 508* (1979), 12 B.C.L.R. 249, 9 C.C.L.T. 262, [1979] 5 W.W.R. 231 — **refd to**

*Z-Mark International Inc. v. Leng Novak Blais Inc.* (1996), 12 O.T.C. 33, 65 A.C.W.S. (3d) 326; affd 122 O.A.C. 341, 88 A.C.W.S. (3d) 1109 — **refd to**

**Statutes referred to**

*Business Corporations Act*, S.A. 1981, c. B-15

    s. 2(2)(a)
    s. 2(4)
    s. 42
    s. 117(1)(a)

**Authorities referred to**

Fleming, J.G., *The Law of Torts*, 8th ed. (Sydney: Law Book Co., 1992)

*Gower's Principles of Modern Company Law*, 6th ed. by P.L. Davies and D.D. Prentice (London: Sweet & Maxwell, 1997)

Klar, L.N., *Tort Law*, 2nd ed. (Scarborough, Ont.: Carswell, 1996)

Richardson, W.A., "Making an End Run Around the Corporate Veil: The Tort of Inducing Breach of Contract" (1984-85), 5 Adv. Q. 103

*New Shorter Oxford English Dictionary*, 4th ed. (Oxford: Clarendon Press, 1993)

APPEAL from a judgment of Clarke J., 35 Alta. L.R. (3d) 348, 179 A.R. 91, 59 A.C.W.S. (3d) 639, and 37 Alta. L.R. (3d) 248, 180 A.R. 392, 61 A.C.W.S. (3d) 174, dismissing an action for intentionally inducing breach of a contract.

*N. J. Pollock*, Q.C., and *D. J. Wilson*, for appellants.
*W. J. Kenny*, Q.C., and *S. J. Hammel*, for respondent.

The judgment of the court was delivered by

[1] FRUMAN J.A.:—Gainers was in deep financial trouble. Negotiations with the Province of Alberta, its largest creditor, had collapsed. The day before Alberta called Gainers' loans and began to seize its assets, Peter Pocklington, the sole director and beneficial shareholder of Gainers, transferred a valuable asset from Gainers to a company he owned. The transfer, made without Alberta's knowledge or consent, placed the asset beyond Alberta's reach. Complaining that the transaction breached its loan agreement with Gainers, Alberta sued Pocklington for intentionally inducing Gainers to breach that contract. The trial judge decided that the transfer did not breach the loan agreement and dismissed the action. I would allow the appeal.

FACTS

[2] Pocklington purchased Gainers, a meat-packing company, in 1978. His personal corporate empire consisted of several companies, including Pocklington Financial Corporation, Pocklington Holdings Inc. and Pocklington Foods Inc. In September 1985, Pocklington Foods acquired the shares of Gainers, and was Gainers' sole shareholder until October 6, 1989, when Alberta seized the shares. Pocklington also owned Gainers Properties Inc., which owned all Gainers' land, plants, machinery and equipment. After September 1987, Pocklington was the sole director of both Gainers companies.

[3] Gainers' union began a long and bitter strike in 1986. Gainers then began to experience substantial losses: more than $10 million in 1986, $14 million in 1987 and $17 million in 1989. Pocklington and Alberta negotiated a $67 million bail-out consisting of a $55 million loan guarantee in favour of another Gainers' creditor, Lloyds Bank, and a $12 million term loan. In return, Alberta was granted a secured charge against all Gainers' and Gainers Properties' assets, both existing and after-acquired. In addition, all Gainers' shares were escrowed in favour of Alberta. The terms of this arrangement were documented in a lengthy Master Agreement and scheduled collateral security documents, effective September 25, 1987.

[4] By the end of May 1989, Gainers had defaulted on both the Master Agreement and its loan agreement with Lloyds Bank. After another round of negotiations, the parties hammered out a 90-day standstill arrangement. Under this agreement, Lloyds Bank and Alberta agreed not to realize on their security if a complicated chain of conditions were met. Essentially, Alberta agreed to give up $5 million of security it held on Gainers Properties' assets, in favour of Lloyds Bank. Pocklington would make up this $5 million by a guarantee to Alberta for that amount, secured by a $5 million first mortgage on lands in Calgary and Edmonton, known as the Carma Lands.

[5] It is the last step, the $5 million mortgage on the Carma Lands, that forms the backdrop for this action. At the time the deal was negotiated, the Carma Lands were owned by another Pocklington company, Hartford Properties Inc. That company would have had to guarantee Gainers' loan and grant the mortgage to Alberta. However, s. 42 of the Alberta *Business Corporations Act*, S.A. 1981, c. B-15 ("*ABCA*"), restricted the ability of companies to provide financial assistance to related companies, and the parties were concerned that Hartford Properties would be unable to meet the statutory requirements. The transaction was therefore structured using a shell company, 350151 Alberta Ltd. Gainers acquired the shares of 350151; 350151 acquired the Carma Lands from Hartford Properties for $1.9 million; 350151 issued a promissory note to Hartford Properties for that amount; 350151 then granted a guarantee to Alberta; and finally, 350151 secured the guarantee by a $5 million mortgage in Alberta's favour registered against the Carma Lands. These arrangements were documented in a Standstill Agreement and accompanying collateral security documents, effective August 8, 1989.

[6] Further defaults occurred; further attempts to negotiate proved fruitless. On October 4, 1989, one day before Alberta gave notice of its intention to exercise its rights under its various security agreements, Pocklington signed a Gainers director's resolution transferring the 350151 shares from Gainers to his own company, Pocklington Holdings, for $100. The $100 payment for the shares was not tendered until November 13, 1989, and was never accepted by Gainers. On October 6, 1989, Alberta exercised its rights under its

various security documents, began to realize on Gainers' assets, and became the sole shareholder of Gainers. Because Pocklington Holdings had not guaranteed Gainers' debts, Pocklington Holdings' assets, including the newly acquired 350151 shares, could not be seized by Alberta.

[7] Alberta contends that the transfer of the 350151 shares from Gainers to Pocklington Holdings breached its original loan agreement with Gainers, the Master Agreement. Under s. 13.03(l), Gainers agreed not to sell or otherwise dispose of its assets without the prior written consent of Alberta, except in the ordinary course of business. Alberta was neither informed of the share transfer before it took place, nor was its written consent to the transfer requested. It sued Pocklington for intentionally inducing Gainers to breach the loan agreement, asking for the return of the 350151 shares to Gainers or, alternatively, for monetary damages.

TRIAL JUDGMENT

[8] The trial judge decided that the Master Agreement had not been breached [reported 35 Alta. L.R. (3d) 348]. He began his analysis by considering the Standstill Agreement. Noting that Alberta was granted a mortgage and charge which it still had at the time of the trial, he concluded that Alberta "got what it was entitled to under the Agreement, it still has what it was entitled to under the Standstill Agreement and it is not entitled to the return of the lands or the shares of 350151" (AB I at 1269-70) [35 Alta. L.R. (3d) at para. 67]. Although he found the terms of the Standstill Agreement to be clear and unambiguous, he considered evidence concerning "the genesis of the transaction, the background and its context", which he determined supported his interpretation of the Master Agreement (AB I at 1271-72).

[9] The trial judge then turned to the specific provisions of the Master Agreement. In order to decide whether a breach had occurred, it was his view that he had to decide whether the "assets" which were subject to the disposition restriction in s. 13.03(l) included the 350151 shares. In order to do so, the trial judge also considered s. 12.02(r) of the Master Agreement, which required Gainers to advise Alberta of any change in the ownership of any subsidiary.

[10] Noting that "assets" was not a defined term in the Master Agreement, the trial judge decided that if "assets" in s. 13.03(l) were defined to include shares in a subsidiary, s. 12.02(r) would be meaningless: Alberta would not need to be given notice of a change in ownership of a subsidiary under s. 12.02(r) because its consent would already have been elicited under s. 13.03(l). Therefore, in order to give full force and effect to both sections, the 350151 shares could not be considered assets, and the 350151 share transfer should fall under s. 12.02(r) alone, requiring notice to Alberta, but not its consent (AB I at 1274-75). The trial judge decided there had been no breach of contract, but did not specifically address whether the notice requirement had been met.

[11] Finally, the trial judge determined that even if the 350151 shares were "assets", the share transfer fell within the "ordinary course of business" exception found in s. 13.03(l). He decided that in August of 1989, one of the normal activities being carried out by Gainers, through Pocklington, "was continuing attempts to secure the necessary financing to permit Gainers to continue to operate" (AB I at 1275) [35 Alta. L.R. (3d) at para. 73]. Because the trial judge found that obtaining financing was in the ordinary course of Gainers' business, and the acquisition of the 350151 shares and grant of the mortgage on the Carma Lands were necessary to obtain financing, he concluded that the movement of the shares out of Gainers was also in the ordinary course of its business (AB I at 1276).

[12] Having determined there was no breach, the trial judge did not consider the other elements required to prove the tort of inducing breach of contract, and dismissed Alberta's claim. Pocklington filed a counterclaim to the original action. The dismissal of his counterclaim was not appealed.

ELEMENTS OF INDUCING BREACH OF CONTRACT

[13] In order to find that a defendant intentionally induced a breach of contract, seven elements must be established:

i)   the existence of a contract;

ii)  knowledge or awareness by the defendant of the contract;

iii) a breach of the contract by a contracting party;

iv)  the defendant induced the breach;

v)    the defendant, by his conduct, intended to cause the breach;

vi)   the defendant acted without justification; and

vii)· the plaintiff suffered damages.

See *Ed Miller Sales & Rentals Ltd. v. Caterpillar Tractor Co.*
(1996), 41 Alta. L.R. (3d) 217 (C.A.); and *Jackson v. Trimac
Industries Ltd.* (1993), 6 Alta. L.R. (3d) 225 (Q.B.), varied on other
grounds (1994), 20 Alta. L.R. (3d) 117.

[14] The first two elements were admitted. In fact, Pocklington
was a party to the Master Agreement and had signed it both in his
personal and corporate capacities. As Pocklington was the sole
director of Gainers, and signed the director's resolution which trans-
ferred the shares, the fourth element was also not contentious. The
other four elements were, and are, in issue.

BREACH OF THE MASTER AGREEMENT

*Are the 350151 shares "assets"?*

[15] Loan agreements are comprehensive documents designed to
protect lenders. In addition to setting out the terms of advances, use
of proceeds, security, and repayment, they frequently restrict the
debtor company's operations. Typically this is done with positive
covenants, which obligate a company to do things, and negative
covenants, which prohibit a company from engaging in certain
activities. Loan agreements are not noted for their brevity. Because
the lender attempts to contemplate and deal with possible future
situations, they are often "over-drafted". It is therefore not unusual
to find broad, repetitive and overlapping positive and negative
covenants, as well as clauses that tend to be somewhat generic. It is
in this light that loan agreements must be interpreted.

[16] Article XII of the Master Agreement contained a long list of
positive covenants, including s. 12.02(*r*) which required Gainers to
advise Alberta "of any change in the ownership of any subsidiary, affil-
iate or related company of [Gainers] . . . or of the change in the
composition of any joint venture or partnership in which [Gainers] . . .
has been involved" (AB XIII at 2590-91). Negative covenants were
included in Article XIII, including s. 13.03(l) which provided that
Gainers, without the prior written consent of Alberta, would not "sell
or otherwise dispose of [its] assets . . . by conveyance, transfer . . . or
otherwise, except in the ordinary course of business" (AB XIII at 2600).

[17] It is not correct to say that interpreting s. 13.03(l) to include shares of a subsidiary would make s. 12.02(*r*) meaningless. In fact, the two sections address different factual situations, which comfortably co-exist in the corporate world. Section 13. 03(l) required Alberta's consent for the sale or disposition of any of Gainers' assets, which would cover the disposition of shares it actually owned in any company, whether or not it was a subsidiary. By contrast, s. 12.02(*r*) required Gainers to give notice of any change in the ownership structure of a subsidiary, affiliate or related company, which would primarily address ownership changes by shareholders other than Gainers.

[18] Under the *ABCA*, a subsidiary company is one that is "controlled by [an]other [body corporate] . . ." (s. 2(4)). Control does not require ownership of 100% of the shares. In fact, all that is needed is enough voting shares to elect directors, 50% + 1 share (s. 2(2)(*a*)). Therefore, a company could be controlled by Gainers, and be its subsidiary, even though the other 50% − 1 share were owned by someone else. It is changes in the ownership of shares belonging to these other shareholders that s. 12.02(*r*) was primarily intended to address. This interpretation is reinforced by the words which followed, requiring notice of any "change in the composition of any joint venture or partnership in which [Gainers] . . . has been involved".

[19] Although ss. 12.02(*r*) and 13.03(l) applied to different situations, the sections narrowly overlapped when Gainers disposed of shares it owned in a subsidiary company. A court must strive to harmonize apparently conflicting terms in a contract: *Cotter v. General Petroleums Ltd.*, [1951] S.C.R. 154 at 158, [1950] 4 D.L.R. 609. But whenever possible, effect is to be given to all the terms of contracts and none are to be rejected as having no meaning: *Scanlon v. Castlepoint Development Corp.* (1993), 11 O.R. (3d) 744 at 770, 776, 99 D.L.R. (4th) 153 (C.A.); leave to appeal refused [1993] 2 S.C.R. x, 102 D.L.R. (4th) vii. In this case there is no direct or indirect conflict between the two sections which would permit a court to qualify their meaning; instead the sections complement each other. Dispositions of Gainers' own shares in its subsidiaries, like the disposition of any other asset, would be subject to the consent requirement in s. 13.03(l). By obtaining Alberta's consent under that

section, Gainers would coincidentally satisfy the requirement for giving notice under s. 12.02(*r*).

[20] As the two sections apply to different situations and do not conflict, there is no reason to restrict the meaning of the word "assets" from its normal dictionary sense, "a thing . . . of use or value": *The New Shorter Oxford English Dictionary*, 4th ed., *s.v.* "asset". Accordingly, the 350151 shares were "assets" whose transfer was subject to the negative covenant in s. 13.03(1). Because Gainers did not obtain Alberta's consent to the transfer, as the section required, Gainers breached s. 13.03(1) unless the sale of the shares was in the ordinary course of its business.

*"Ordinary Course of Business"*

[21] Courts are required to undertake a broad and case-specific analysis of the ordinary course of a particular company's business, for it is considered unwise to attempt a comprehensive definition: *Robitaille v. American Biltrite (Canada)*, [1985] 1 S.C.R. 290 at 291, 16 D.L.R. (4th) 319 *sub nom. Re Pacific Mobile Corp.* The analysis is to be achieved through an objective examination of the usual type of activity in which the business is engaged, followed by a comparison of that general activity to the specific activity in question. The transaction "must fall into place as part of the undistinguished common flow of business carried on, calling for no remark and arising out of no special or peculiar situation": *Aubrett Holdings Ltd. v. Canada*, [1998] G.S.T.C. 17 (T.C.C.).

[22] In order to determine whether a transaction was in the ordinary course of a company's business, a court must consider all the circumstances which were known, or ought reasonably to have been known, by the parties at the time: *Ford Motor Credit Co. of Canada Ltd. v. Centre Motors of Brampton Ltd.* (1983), 38 O.R. (2d) 516, 137 D.L.R. (3d) 634 (H.C.J.). Courts have identified a number of factors which may be taken into account:

(i)    The nature and significance of the transaction: it ought to be one that a manager might reasonably be expected to carry out on the manager's own initiative without making prior reference back or subsequent report to superior authorities, such as the board of directors or the shareholders: *Roynat Inc. v. Ron Clark Motors Ltd.* (1991), 1 P.P.S.A.C. (2d) 191 (Ont. Gen. Div.) at 197;

and *85956 Holdings Ltd. v. Fayerman Brothers Limited*, [1986] 2 W.W.R. 754, 25 D.L.R. (4th) 119 (Sask. C.A.);

(ii) The value of any asset sold: the disposition should have been made with proper regard to its value: *Estevan Credit Union Ltd. v. Dyer*, [1997] 8 W.W.R. 49, 146 D.L.R. (4th) 490 (Sask. Q.B.); and *Ford*, *supra*;

(iii) The quantity of assets sold: the transaction ought not to resemble a liquidation of assets: *Fayerman*, *supra*;

(iv) The reason for the transaction: it ought not to have occurred as a response to financial difficulties or in suspicious circumstances: *Ford*, *supra*, and *Countrywide Banking Corpn. Ltd. v. Dean*, [1998] A.C. 338 (P.C.); and

(v) The intent of the transaction: neither its intent nor its effect should have been to undermine bank security: *Ford*, *supra*.

To this list I would add:

(vi) The frequency of the type of transaction: an unusual or isolated transaction might be viewed differently from a routine one; and

(vii) The arm's length nature of the transaction: a transaction between a company and a party with whom it is related should receive careful scrutiny.

[23] While a reviewing court will defer to a trial judge's fact findings, a determination that a transaction was in the ordinary course of a company's business is a mixed question of fact and law. A failure to consider the appropriate factors constitutes reviewable error. In this case a consideration of the evidence in the context of the relevant factors leads to the conclusion that the 350151 share transfer was not in the ordinary course of Gainers' business.

[24] The parties agreed that Gainers' ordinary business was "the slaughter of cattle and hogs, the processing and sale of beef and pork products, and other food products": Agreed Statement of Facts, para. 34 (AB XX at 4187). Pocklington also acknowledged that Gainers was not in the business of holding or developing land or trading in the shares of corporations that did so (AB 739:4-10). It follows that Gainers originally acquired the 350151 shares to permit it to continue to operate its livestock slaughtering and meat processing business, not because it was in the financing, land development or share trading business.

[25] The shares of 350151 were a significant asset. The transfer was a material transaction requiring authorization from the board of directors and was not one that a manager had the authority to conduct. The shares were sold for a nominal sum, $100, which not only was less than their market value, but was not tendered until more than a month later. Although characterized by the trial judge as part of a financing arrangement, the disposition appears to be quite the opposite.

[26] While money frequently flowed between Gainers and various Pocklington companies, a transfer of assets was rare. The 350151 share transfer was unusual. It was also a non-arm's length transaction because the assets were transferred to a company owned by Pocklington, Gainers' sole director and beneficial shareholder. Pocklington signed the transfer agreement, share certificates and the Gainers, Pocklington Holdings and 350151 board resolutions authorizing the transfer, in his capacity as sole director of all three companies.

[27] The disposition involved an asset transfer which was restricted by the Master Agreement. Although Alberta had previously been advised of and its prior consent sought for asset dispositions involving the sale of land (AB 1097:24-36; 860), the transfer of shares (AB XVI at 3187, para. 4) and the potential sale of assets of a division of Gainers (AB 810:6-9; 843:12-16), Alberta knew nothing about this transaction before it was completed. Even the possibility of such a transfer had never been discussed with Alberta (AB 1089:39-40).

[28] Finally, the transaction occurred when Gainers was in fatal financial difficulty. The timing of the transaction was suspicious and not a mere coincidence, as Pocklington originally implied (AB 1053:39-1054:2). Pocklington had notice in late September 1989 that Alberta intended to act on its security (AB 1087:44-1088:23; 740:6-13). He admitted that negotiations with Alberta actually collapsed on October 3 or 4, 1989, the same day the shares were transferred (AB 1092:29-1093:11).

[29] This leads to the irresistible conclusion that the transfer of the 350151 shares was not in the ordinary course of Gainers' livestock slaughtering and meat processing business. There is also a practical business reason for this conclusion. Lenders rely on covenants which

restrict the disposition of assets outside the ordinary course of a company's business, to preserve the assets for the benefit of the creditors. That reliance is especially heavy when a debtor company teeters on the brink of insolvency and the temptation to divest looms large. Yet, according to the interpretation Pocklington advances, as a company's financial woes deepen and it redoubles its efforts to find financing, the ordinary course of its business magically expands to include financing transactions and everything connected to them. As a result, seriously troubled companies are permitted to shed significant assets without their creditor's consent, although solvent companies are not. This has a paradoxical effect: just when the creditor's reliance on the negative covenant is strongest, the restriction on the company's ability to dispose of its assets disappears. Such an interpretation of "ordinary course of business" makes little commercial sense.

*The Standstill Agreement and Parol Evidence*

[30] Pocklington contends that, regardless of the interpretation of s. 13.03(l), the transfer ought not to be considered a breach because all the parties knew Alberta was to obtain only a mortgage, the 350151 shares were to be transferred back and therefore, the transfer formed part of the overall agreement between the parties. Both Pocklington and Robert Lloyd testified on this point (AB 1051:29-43; 812:42-813:22; 813:38-41; 814:34-44; 815:23-24). Lloyd, a lawyer with 20 years' experience, originally practised with the Ogilvie and Company law firm, Pocklington's lawyers, but in 1984 began to work for Pocklington and had an office in the Pocklington Financial offices (AB 776:29-777:2).

[31] The Master Agreement was a lengthy and comprehensive document, containing 70 pages of finely printed clauses and 23 schedules. Attempting to reduce the parties' deal to writing, the Master Agreement provided that "[t]his Agreement . . . constitutes the entire agreement amongst the parties hereto and cancels and supersedes all prior agreements, undertakings, declarations or representations, written or verbal, in respect thereof" (AB XIII at 2615, s. 21.09). It established a hierarchy in the case of conflicts, stating that "[i]n case of any conflict between the provisions of the Security or any other agreements made pursuant hereto and this Agreement, the provisions of this Agreement shall govern . . ." (AB XIII at 2614,

s. 21.04). Anticipating possible amendments it stipulated that "[n]o amendment or modification of this Agreement shall be effective unless the same shall be in writing and signed by each of the parties hereto" (AB XIII at 2614, s. 21.06).

[32] Section 13.03(1) of the Master Agreement restricted dispositions of assets, requiring Alberta's consent. If Pocklington's contention is correct, one might have expected the Standstill Agreement to have expressly permitted the transfer of the 350151 shares to Pocklington after the mortgage was granted.

[33] The Standstill Agreement did nothing of the kind. While it clearly contemplated that 350151, a subsidiary of Gainers, would own the Carma Lands and grant a mortgage on them collateral to its guarantee of Gainers' obligations to Alberta (AB XVI at 3185), it made no provision for the transfer-back of the 350151 shares after the mortgage was granted. By contrast, the Standstill Agreement made express provision for Pocklington to transfer his shares in Gainers Property to Pocklington Foods and stated: "Alberta hereby consents, pursuant to the Master Agreement, to the transfer of shares . . ." (AB XVI at 3187, s. 4). The Standstill Agreement went on to confirm the applicability of the covenants contained in the Master Agreement, by acknowledging that "the Master Agreement is not amended, modified or altered in any manner except as expressly set forth herein" (AB XVI at 3190, s. 13).

[34] Given these clear provisions, in order to find that the transfer of the 350151 shares to Pocklington was permitted, the court would have to consider parol evidence. The trial judge partly based his interpretation of the Master Agreement on the genesis, background and context of the Standstill Agreement. He decided that interpreting "assets" to include the 350151 shares was "completely contrary to what was intended by the Standstill Agreement" (AB I at 1275). The trial judge also based his conclusion, in part, on his finding that Alberta was entitled to a mortgage under the Standstill Agreement, and that is what it received. The issue, however, is not whether Alberta received what it was entitled to under the Standstill Agreement, but whether the Master Agreement was breached. It was.

[35] In this case the Standstill Agreement, by its express terms, confirmed the Master Agreement. There was no ambiguity, absurdity,

contradiction, or significant lack of clarity in the relevant parts of the written agreements, nor did the factual matrix indicate that the written documents did not embody all the terms of the agreement. The parol evidence rule therefore precluded the admission of evidence of intention to contradict the terms of the Master Agreement: *Hawrish v. Bank of Montreal*, [1969] S.C.R. 515 at 518, 2 D.L.R. (3d) 600; *Gainers Inc. v. Pocklington Holdings Inc.* (2000), 255 A.R. 373 (C.A.) at 376-78; and *Gallen v. Allstate Grain Co. Ltd.* (1984), 9 D.L.R. (4th) 496 (B.C.C.A.) at 506-507; leave to appeal refused: *Allstate Grain Co. Ltd. v. Guichon*, [1984] 1 S.C.R. v.

[36] Even if parol evidence were admissible in this case, Pocklington faces an insurmountable obstacle: the evidence does not support his contention that the parties agreed that the shares would be transferred back. The so-called plan to transfer the shares was not a certainty: Pocklington "presumed" (AB 1051:42) and Lloyd, "belie[ved]" (AB 812:46) that it was. Lloyd could not recall whether this "understanding" had ever been verbally communicated (AB 814:38-39). He was merely "under the impression" that this plan had been the "object of the exercise" (AB 814:39-41). Pocklington provided even clearer testimony when he admitted that Alberta had never known anything about this transfer: "[i]t was never discussed going in. It was never discussed going out" (AB 1089: 39-40). As the planned transfer-back was never given voice, the so-called evidence is silent parol, and perhaps wishful parol at that.

[37] The transfer of the 350151 shares to Pocklington without Alberta's consent breached s. 13.03(l) of the Master Agreement.

INTENT

*The Law*

[38] In order to find liability, a plaintiff must demonstrate that the defendant had an "intent" to induce the breach of contract. The intent component of the tort is the most difficult to understand. Malicious motive, unlawful conduct, hatred or intention to harm are not required elements of intent: *Allen v. Flood*, [1898] A.C. 1 (H.L.(E.)); *Parks West Mall Ltd. v. Jennett* (1996), 36 Alta. L.R. (3d) 44 (C.A.) at 49; and *Atcheson v. College of Physicians and Surgeons (Alberta)*, [1994] 6 W.W.R. 239 (Alta. Q.B.) at 246. However, what is required is less clear. The requisite intent has been described with "loose, vague and conflicting statements" that sometime appear to be irreconcilable: *Ed Miller Sales*, *supra*, at 230.

[39] Originally, the tort required the breach to be the result of wilful, deliberate and direct conduct which the defendant knew or hoped would result in a violation of the plaintiff's contractual rights. See for example, *Lumley v. Gye* (1853), 118 E.R. 749, 2 El. & Bl. 216 (Q.B.); and *Quinn v. Leathem*, [1901] A.C. 495 (H.L.(I.)).

[40] However, courts soon recognized that intent can also be inferred when the consequences of the conduct were a necessary or reasonably foreseeable result, because "people are presumed to intend the reasonable consequences of their acts": *South Wales Miners' Federation v. Glamorgan Coal Company*, [1905] A.C. 239 (H.L.(E.)) at 244. In *Posluns v. Toronto Stock Exchange and Gardiner* (1965), 46 D.L.R. (2d) 210 (Ont. H.C.) at 267; affirmed (1966), 53 D.L.R. (2d) 193 (C.A.); affirmed [1968] S.C.R. 330, 67 D.L.R. (2d) 165, the court held that liability would attach if the defendant's conduct resulted in the breach of a contract "of which it was or ought to have been aware". The intention to bring about a breach of contract need not be the primary object; it is sufficient if the interference is necessarily incidental to attaining the defendant's primary objective: *Fraser v. Board of Trustees of Central United Church* (1983), 38 O.R. (2d) 97 (H.C.J.) at 103; and *Bank of Nova Scotia v. Gaudreau* (1985), 48 O.R. (2d) 478 (H.C.J.).

[41] Intention can also be established when the defendant was reckless or wilfully blind to a breach. The defendant need not have actually known the precise terms of the contract or that his object only could be accomplished through breach of the contract. "If — turning a blind eye — he went about it regardless of whether it would involve a breach, he will be treated just as if he had knowingly procured it": J.G. Fleming, *The Law of Torts*, 8th ed. (Sydney: Law Book Co., 1992) at 694.

[42] Turning a blind eye may include situations in which the defendant failed to seek advice or employ the means available to obtain the necessary knowledge. For example, in *Royal Bank of Canada v. Wilton* (1995), 165 A.R. 261, 123 D.L.R. (4th) 266 (C.A.), the defendant was uncertain about the enforceability of a contract, had the "means of knowledge" to determine if a legitimate contract existed, but made no efforts to seek advice. This court found the defendant liable because he deliberately chose not to acquire the information, but proceeded on the basis that the contract was unenforceable. Similarly, when there are competing legal interpretations

and the defendant adopts an interpretation which will interfere with the plaintiff's rights, the defendant "must at least show that he was advised and honestly believed that he was legally entitled to take that course": *Swiss Bank v. Lloyds Bank*, [1979] Ch. 548 at 580 (Ch.D.); reversed on other grounds [1982] A.C. 584 (C.A.); affirmed [1982] A.C. 604 (H.L.(E.)).

[43] If the defendant acted under a *bona fide* belief that contractual rights would not be infringed, liability will not be found even though the belief turned out to be mistaken. But for a mistaken belief to be *bona fide*, rather than the result of recklessness or wilful blindness, some basis for the belief must exist, and some reasonable effort must have been made by the defendant to learn the truth. In *British Industrial Plastics Ltd. v. Ferguson*, [1940] 1 All E.R. 479 (H.L.(E.)), defendants who had made the effort to seek advice were not found liable even though their belief was described as "illogical". In *Z-Mark International Inc. v. Leng Novak Blais Inc.* (1996), 12 O.T.C. 33 (Gen. Div.), appeal dismissed (1999), 122 O.A.C. 341, a defendant made inquiries and obtained assurances and a warranty. The court found that the defendant had no reason to doubt the assurance or the warranty and therefore the defendant was not knowingly or recklessly indifferent to a breach of contract.

[44] In some cases a distinction is drawn between direct interference, for which the breach must be a foreseeable or reasonable consequence of the conduct, and indirect interference, for which the breach must be a necessary or substantially certain consequence. See, for example, L.N. Klar, *Tort Law*, 2nd ed. (Scarborough: Carswell, 1996) at 498 and 507; Fleming, *supra*, at 694; *D.C. Thomson & Co. Ltd. v. Deakin*, [1952] Ch. 646 (C.A.); *Bank of Nova Scotia, supra*; *Garry v. Sherritt Gordon Mines Ltd.*, [1988] 1 W.W.R. 289, 45 D.L.R. (4d) 22 (Sask. C.A.); and *Atcheson, supra*.

[45] As this case involves direct interference, this distinction does not arise. Pocklington, as the director of Gainers, executed the documents to complete the transfer of the 350151 shares to his own company. The transfer caused Gainers to breach s. 13.03(l) of the Master Agreement, which prohibited dispositions of assets without Alberta's consent. Therefore, if the breach was a reasonable or foreseeable consequence of that transfer, or alternatively, if Pocklington completed the transfer recklessly, was wilfully blind to

its consequences, or was indifferent as to whether or not it caused a breach, the necessary intent element for the tort will be met.

*The Evidence*

[46] The trial judge did not consider the intent component of the tort and did not assess the trial evidence in that light. The parties were aware of the intent element, pleaded it, adduced evidence of intent at trial, and argued it, both before the trial judge and extensively at the appeal hearing. This court has the alternative of reviewing the evidence and making a determination whether the intent component is met, which was the parties' clear preference, or sending the case back to the trial court. An appellate court is in no position to weigh competing evidence, or assess credibility. However, in this case it is possible to make a determination about intent by considering and accepting the evidence adduced by Pocklington.

[47] Pocklington insisted that he continued to own the Carma Lands (AB 1051:19-23; 1093:17-20), that he was entitled to get back his mortgage at the end of the 90-day standstill period (AB 1089:31-33; 1094:6-11), and that the Master Agreement was irrelevant to the share transfer (AB 1089:40-41; 1097:43-46). Although he personally signed the Gainers' director's resolution transferring the shares, as well as the 350151 share certificates, he denied knowing whether he was getting the shares or the land back: ". . . the only thing I realized at the time was that I was getting back my mortgage that I had put up for the 90-day standstill" (AB 1095:4-6). It is clear from Pocklington's evidence that he entertained a flawed view of the financing arrangements with Alberta.

[48] Any businessman with Pocklington's experience should know that commercial lenders do not extend credit to companies in dire financial straits on the security of a mortgage, then, when the borrower defaults, hand back the mortgage and willingly accept any loss. Pocklington's assertions are plainly wrong. Further, his contention that the transaction was all part of the deal he negotiated with Alberta was contradicted by his own admission that he "never discussed taking back the shares in 350151 or the Carma Lands with anyone from the Crown" (AB 1089:43-45). Pocklington cannot sidestep the intent component of the tort by adopting an untenable and unrealistic view of the transaction, and an unreasonable interpretation of the agreements.

DOMINION LAW REPORTS

[49] Pocklington's evidence demonstrates he did not care whether his actions constituted a breach. He admitted that he was acting in his own interests and that he had no loyalty to Gainers (AB 742:17-37). He acknowledged that he was trying to defeat the entirety of the mortgage (AB 1094:5-11; 1095:4-6; 1052:46-1053:10; 1096:29-30). It is not much of a defence to a charge of intentionally breaching the Master Agreement to show that Pocklington intended to breach the Standstill Agreement instead.

[50] Nevertheless, intent to breach the Master Agreement must be proven. The Master Agreement is a lengthy and complicated document, bristling with covenants and replete with schedules. It is by no means an easy document to analyze or interpret. It would have been possible for the trial judge to conclude that a breach of s. 13.03(1) of the Master Agreement was a reasonably foreseeable consequence of the transfer of the 350151 shares. Because of the manner in which the case was presented at trial, such a conclusion would involve findings of credibility. This court, however, is in no position to make those findings, and intent cannot be found on that basis.

[51] But that does not end the inquiry. Prudent business people, concerned about honouring contractual commitments, make appropriate inquiries before embarking on transactions that involve complex legal documents. Consulting legal counsel may not be necessary in every case, but the circumstances here cry out for legal advice: negotiations with Alberta had collapsed and Pocklington knew that realization of the loan was imminent; Gainers was insolvent with no equity left in the company; Gainers' assets and shares were secured and its business activities were restricted by binders full of loan and security agreements; and Gainers' sole beneficial shareholder proposed to transfer a valuable asset to himself for nominal consideration, signing the resolutions as sole director. Pocklington, both personally and in his capacity as a director of Gainers, had an obligation to obtain legal advice about the propriety of the transaction. If he failed to do so, or ignored the legal advice he received, he proceeded at his peril.

[52] The record contains statements by Pocklington that he would have relied on Lloyd (AB 1052:11-13), and by Lloyd that he never told Pocklington that the transaction could not be done (AB 875:3-5). But absent from the record is any evidence that Lloyd was asked by

Pocklington or volunteered to give a solid legal opinion or obtain independent legal advice that the transfer of the 350151 shares would not violate the Master Agreement. Although at trial Lloyd testified to his view that the share transfer did not violate the agreement (AB 814:31-32; 875:23-28), there is no suggestion that, at the time of the transfer, he objectively assessed the risks of proceeding and fairly communicated his observations to Pocklington. Instead, the record shows that Pocklington demanded that Lloyd do what was necessary to get the land back (AB 1052:32-34; 1093:18-20), and that Lloyd did as he was directed (AB 874:39-875:1).

[53] The share transfer documents were prepared by Ogilvie and Company, "on instructions received from Gainers Inc. on the 3rd day of October, 1989" (AB XVIII at 3606), just as negotiations with Alberta collapsed. They were signed the next day. Lloyd was uncertain whether Ogilvie and Company brought s. 13.03(l) to Pocklington's attention. At first he acknowledged this had occurred:

> Q    . . . And, sir, I take it that you're also aware that your firm drew Article 13.03(l) to Mr. Pocklington's attention at the time the shares were transferred from Gainers to Pocklington Holdings Inc.?
>
> A    I think that's correct. I think that there was — these — these sections were — now, I think that's correct. [AB 862:24-31]

Later, he changed his mind:

> A    I think that there were discussions with respect to the people at Ogilvie about them and I'd — I'm not certain — I'm not that certain in fact — I can't recall whether or not Mr. Pocklington was specifically directed to the sections or not. [AB 874:23-28]

[54] Correspondence from Ogilvie and Company provides some clarification. On November 15, 1989, after Alberta got wind that the shares had been transferred, its counsel wrote Ogilvie and Company asking for details. Alberta's counsel referred to a possible breach of s. 13.03(l) of the Master Agreement, noting that Alberta's consent had not been obtained, and that the transfer was not in the ordinary course of Gainers' business (AB XVIII at 3586-87).

[55] Ogilvie and Company responded by letter dated November 16, 1989, which stated:

> We are also able to advise you that our firm raised with our client the exact provision of the Master Agreement which your letter raises [s. 13.03(l)], however *our client takes the view* that the transaction is not off side the terms of the Master Agreement. [AB XVIII at 3606, para. 3] [Emphasis added.]

[56] The clear implication of Ogilvie and Company's carefully worded letter is that either the lawyers did not share their clients' views, or they were invited to keep their legal advice to themselves. Pocklington nevertheless signed the documents to give effect to the share transfer, and retained the shares despite Alberta's early protests and Ogilvie and Company's apparent reservations. He had the means of knowledge, but chose to act without legal advice. Pocklington was wilfully blind to the consequences of his actions and showed clear indifference to the breach. The intent component of the tort is satisfied.

JUSTIFICATION

[57] In some situations, a defendant's plea of justification may avoid liability: *South Wales Miners' Federation, supra*, and *Quinn, supra*. The defence of justification is available when the defendant caused the breach while acting under a duty imposed by law. The issue in each case is whether, upon consideration of the relative significance of all the factors, the defendant's conduct should be tolerated despite its detrimental effect on the interests of others: *Fleming, supra*, at 657.

[58] Directors of companies owe duties to the corporation; they are obliged both at common law and under statute to act in the best interests of the company: *Re Cawley & Co.* (1889), 42 Ch. 209 (C.A.) at 233. For example, s. 117(1)(a) of the *ABCA* provides: "Every director and officer of a corporation in exercising his powers and discharging his duties shall act honestly and in good faith with a view to the best interests of the corporation . . .".

[59] Therefore, when the interests of the company are best served by breaking its contractual commitments, the director's act of inducement is justified because it is "taken as a duty": *De Jetley Marks v. Greenwood (Lord)*, [1936] 1 All E.R. 863 (K.B.) at 873; and *Imperial Oil Ltd. v. C & G Holdings Ltd.* (1989), 62 D.L.R. (4th) 261 (Nfld. C.A.). The rationale for this defence is that a director acting in compliance with a duty imposed by law should not be personally liable because the director's act induced a breach of the company's contract.

[60] But if the director is not complying with that duty, the rationale for relieving personal liability disappears. Although the director may have acted in the name of the company, justification is not

available as a defence. See W.A. Richardson, "Making an End Run Around the Corporate Veil: The Tort of Inducing Breach of Contract" (1984-85), 5 Advocates' Q. 103.

[61] For example, in *McFadden v. 481782 Ontario Ltd.* (1984), 47 O.R. (2d) 134 (H.C.J.) at 146-47, the court found that the defendant directors were liable when "[t]hey sought to feather their own nest, rather than that of the company they were under a duty to serve." In transferring corporate funds to themselves, they were acting with a view to their own best interests rather than the corporation's. Therefore, they were not acting "under a compulsion of a duty", justification was not available as a defence, and the directors were personally liable for inducing a breach of contract. Similarly, immunity did not extend to directors who took advantage of their office to commit a tort for their own ends: *Jackson, supra.*

[62] But who bears what burden of proof? The Newfoundland Court of Appeal cautioned against unduly limiting the justification defence available to directors in *Imperial Oil, supra.* Marshall J.A. observed that requiring directors to justify their corporate actions to third parties in order to obtain immunity from personal suit would open the corporate affairs of a company to third party scrutiny, erode established concepts of separate corporate status and impair the efficiency of the corporate entity. He stated that "[e]ven when a director has not acted *bona fide*, therefore, there must exist some factor additional to the knowledge upon which he or she acts to justify a finding of wrongful inducement." He went on to suggest that liability may depend on proof by the plaintiff "that the dominating purpose of the director's act was aimed at depriving the aggrieved party of the benefits of the contract": at 266.

[63] In order to succeed under the *Imperial Oil* test, a plaintiff must prove that the director knew the legal rights of others would be jeopardized by the director's actions, and intended to deprive the aggrieved party of contractual benefits. Although proof of malice is not required, the *Imperial Oil* test ratchets up the intent element, making it closer to the formulation of the tort that existed more than a century ago, at the time of *Lumley, supra*, and *Quinn, supra.* Rigorously applied in direct interference cases, proof that the breach was a necessary or foreseeable result of the director's conduct seems to be insufficient to establish liability. Similarly, the *Imperial Oil* test

appears to preclude liability for a director who acted recklessly or was wilfully blind to a breach.

[64] The concerns expressed in *Imperial Oil* are not misplaced. In order to protect the fine fabric of the corporate veil, courts should refrain from requiring directors to prove the legitimate corporate purpose motivating their actions. However, courts also should not condone inappropriate conduct by automatically placing a difficult onus on a plaintiff, by reason only that the defendant director owed legal duties to the company whose contract he had a hand in breaching. Some balance is required.

[65] Although justification is a defence to the tort, the burden is fairly placed on the plaintiff to prove the director was not acting in the best interest of the corporation, and therefore stepped out from under the protective umbrella of the director's corporate duties. If a director wishes the plaintiff to prove more, in my view the director must at least demonstrate that some legitimate interest of the corporation could have been served by the conduct. This information is well within the director's knowledge and a requirement to demonstrate it on a *prima facie* basis, rather than to prove it on a balance of probabilities, does not unduly open the company's business to third party scrutiny.

[66] If the court concludes the director's conduct is capable both of serving the interests of the corporation and of achieving some less worthy purpose, the court should go on to consider whether the plaintiff has proven that the director's act was aimed at depriving the aggrieved party of the benefits of the contract. But where, as in *McFadden, supra,* it is readily apparent that the conduct could only be intended for the director's own benefit and not the company's, the court need not address the director's dominating concern. In such direct interference cases, proof of intent as it has developed through the case law, and proof that the director was not acting in the best interests of the corporation, will be sufficient to ground liability.

[67] In this case Pocklington acquired a valuable asset for nominal consideration at the expense of Gainers' creditors. Since Gainers was insolvent at that time, its creditors' interests were the interests of the company: L.C.B. Gower, *Gower's Principles of Modern Company Law*, 6th ed. (London: Sweet & Maxwell, 1997) at 603; and *Levy-Russell Ltd. v. Tecmotiv Inc.* (1994), 13 B.L.R. (2d) 1 (Ont.

Gen. Div.) at 189-90. Promoting the interests of one shareholder at the expense of the creditors is not in the best interests of the company: *Levy-Russell* at 169. A director who pursues these objectives is not acting in furtherance of his corporate duty, and there is no justification for his deeds.

[68] Pocklington has not demonstrated any legitimate business interest of Gainers that could have been served by the 350151 share transfer. In fact, he candidly admitted he was acting only in his own interests, with no benefit to Gainers (AB 742:16-37):

Q    I am talking about on October the 4th when Gainers sold the shares —

A    To me?

Q    — in the numbered company to Pocklington Holdings Inc.?

A    Right.

Q    Was there any benefit to Gainers in that transaction?

A    I guess I was more interested in my own personal well-being than Gainers' well-being at that particular date. I felt, as I said, by that time a lot of my trust had left my partners called the government.

Q    All right, so you were acting —

A    In short, I realized that I was getting screwed by them.

Q    You were acting to further the interests of PHI and yourself and you weren't too concerned with Gainers at that time?

A    My loyalty to Gainers had been squeezed at that time.

[69] By transferring the 350151 shares to his own company, Pocklington was not discharging his legal duty to act honestly and in good faith with a view to the best interests of Gainers; he was acting solely in his own interests. As no legitimate interest of Gainers could possibly be served by the transaction, the court need not go on to consider whether Pocklington's act was aimed at depriving Alberta of the benefits of its contract. Pocklington's position as director cannot provide justification for his actions.

## DAMAGES

### The Damage Element

[70] In order to find liability for the tort of inducing breach of contract, Alberta must show that it suffered damages. Proof of damages is an element of the tort. Once all the elements have been found, and liability has been established, the court goes on to calculate the quantum of damages.

[71] Pocklington contends that Alberta suffered no damages, because at the time the shares were transferred, 350151's liabilities exceeded the value of its assets, making the shares worthless. Pocklington's argument ignores the fact that most of 350151's debt was owed to Alberta or to Lloyds Bank, whose interest Alberta acquired. But even if there had been no equity in the 350151 shares, Gainers' ownership of the shares would have been of considerable value to Alberta. Since Alberta came to own all Gainers' shares, it also would have controlled 350151, Gainers' subsidiary. Alberta could therefore have consented to the foreclosure against the Carma Lands on behalf of 350151, saving considerable time and litigation expense. These damages are not theoretical. At the appeal hearing, Alberta indicated that it had not realized on the Carma Lands mortgage and the litigation is ongoing.

[72] The damage element of the tort is met.

*Quantum of Damages*

[73] Having established liability, the quantum of damages must be assessed.

[74] Pocklington contends that damages must be confined to losses which existed on the date of the breach. In fact, damages are to be assessed "at large": *Exchange Telegraph Co. v. Gregory & Co.*, [1896] 1 Q.B. 147 (C.A.) at 153. A court can award the damages it deems appropriate, which are a matter of impression, not addition, and can be inferred from the circumstances: *Goldsoll v. Goldman*, [1914] 2 Ch. 603 (Ch.D.); affirmed [1915] 1 Ch. 292 (C.A.); and *Vale v. International Longshoremen's & Warehousemen's Union, Local 508* (1979), 9 C.C.L.T. 262 (B.C.C.A.) at 271. The court must assess a global figure approximating the harm it thinks the plaintiff has suffered: *Simpson v. Consumers' Assn. of Canada* (1999), 41 C.C.E.L. (2d) 179 (Ont. Gen. Div.) at 260.

[75] Given this broad latitude, it is not surprising that the date for establishing damages remains flexible. While a court may choose to assess damages that existed on the date of the breach, it instead may elect to compensate the plaintiff for losses that occurred in the years following the breach: *Unilux Manufacturing Co. v. Prime Boilers Inc.* (1990), 74 O.R. (2d) 270 (H.C.J.); and *Clarke v. Rossburger* (2000), 50 B.L.R. (2d) 73 (Alta. Q.B.).

[76] When Alberta started this action it sought the return of the 350151 shares to Gainers or, alternatively, monetary damages. Returning the shares would have been simplest and would have undone the breach of contract. That remedy was possible at the time of the trial, but the parties indicated at the appeal hearing that this was no longer the case. Damages equivalent to the value of the shares must therefore be awarded.

[77] Establishing the date for the calculation of damages involves judicial discretion, based on the facts and circumstances. Pocklington has wrongfully withheld and had the benefit of the 350151 shares since 1989. In the last decade, the value of 350151's primary asset, the Carma Lands, has increased. It would be inequitable to value the damages at the date of the breach, allowing all the post-breach gain to accrue to Pocklington. The quantum of damages must therefore be calculated as the value of the 350151 shares at the time of the trial.

[78] Because 350151 had only one asset, the Carma Lands, assessment of the value of the 350151 shares is relatively simple. The calculation begins with the fair market value of the Carma Lands, from which are deducted any liabilities owed by 350151 in respect of the Carma Lands. The starting point is the trial judge's finding that the Carma Lands were worth $6.6 million (AB I at 1264).

[79] At the time of the trial, a number of encumbrances were registered against the Carma Lands. Alberta Treasury Branches had registered a mortgage in the face amount of $1.6 million to secure a personal obligation of Pocklington. The agreement by which 350151 acquired the Carma Lands from Hartford Properties provided that 350151 "has not assumed any liability under or with respect to the ATB Mortgage . . ." and that if 350151 were required to make payment, any amounts paid would be set off against the balance owing to Hartford Properties for the purchase price of the Carma Lands (AB XVIII at 3604, s. 2). Since 350151 is not responsible for paying the ATB mortgage, it may be ignored.

[80] The other mortgages registered against the Carma Lands consisted of a financial guarantee in favour of Lloyds Bank for $1.5 million, which Alberta has acquired, and the $5 million mortgage in favour of Alberta. Alberta indicated at the appeal hearing that to date nothing has been realized on the mortgages registered against the

Carma Lands, and provided an undertaking that it would not pursue Pocklington personally for any amounts realized on the mortgages. While Alberta's ability to collect against Pocklington must be restricted to avoid double recovery, for the purpose of calculating damages the amount of these mortgages may also be ignored.

[81] The remaining liability is the amount owing to Hartford Properties for the purchase of the Carma Lands. 350151 acquired the Carma Lands from Hartford Properties on August 10, 1989 for $1.9 million, payable by a promissory note (AB XVIII 3604, s. 1) which, at the time of trial, had not been paid. On September 27, 1989, Pocklington, in his capacity as director of 350151 and Hartford Properties, signed a second agreement which added a price adjustment clause to the original purchase agreement (AB XVII 3469-70). The clause provided:

> 6. It is the intention of the parties that the Lands be transferred at their fair market value. Should, however, any competent taxing authority at any time issue or propose to issue any assessment or assessments that impose or would impose any liability for tax on the basis that the fair market value of the Lands is other than the amount set forth herein and if the directors of the parties or a competent court or tribunal agree with such a revaluation and all appeal rights have been exhausted or times for appeal have expired without appeals having been taken *or should the directors of the parties otherwise determine* that the fair market value is other than the amount set forth herein, the purchase price shall be adjusted nunc pro tunc pursuant to the provisions of this paragraph to reflect the agreed upon fair market value and all necessary adjustments, amendments to the Note, payments and repayments as may be required shall forthwith be made between the parties. [Emphasis added.]

[82] The purchase price of the Carma Lands was subsequently adjusted to $3.2 million by a price adjustment agreement between Hartford Properties and 350151 dated February 23, 1993, which Pocklington signed as director of both companies. The preamble to the agreement read: "The Directors of the parties hereto have determined that the fair market value of the lands sold thereunder is other than the amount set forth in the Agreement": (AB XVIII 3684-85, clause C). There was no reference in the agreement to a tax assessment, nor was any evidence of an actual or proposed assessment adduced at trial.

[83] Pocklington contends that the emphasized words in clause 6 gave him authority to change the purchase price if he, as a director of 350151, agreed with himself, as a director of Hartford Properties, that the fair market value of the Carma Lands was something other

than $1.9 million. Clause 6 does not support this interpretation. It provided that the actual or proposed issuance of a tax assessment was the precondition for a price adjustment. If this clause had given the companies an unrestricted licence to change the purchase price, it would not have been prefaced by the requirement of a tax authority assessment. Alternatively, the blanket provision would have appeared in a separate clause, or at least been separated by a comma. As Pocklington led no evidence to show that any tax authority issued or proposed to issue an assessment with respect to the Carma Lands, the threshold requirement for a readjustment of the purchase price was not met, and the price adjustment was invalid.

[84] Even if the price adjustment clause could be interpreted to give the directors free reign to adjust the purchase price, as Pocklington argues, the second sentence of clause 6 must nevertheless be read with the first. The directors' ability to adjust the purchase price was circumscribed by the requirement that the Carma Lands be transferred at their fair market value. "Fair market value" is usually defined as "the highest price that would be obtainable (a) in an open and unrestricted market, (b) in a transaction between informed, prudent parties acting at arm's length from one another, and under no compulsion to act": *MacKenzie Financial Corp. v. McRae* (1998), 81 O.T.C. 321 (Gen. Div.). Pocklington bore the burden of establishing that the fair market value of the Carma Lands on August 10, 1989, the date of the transfer, was $3.2 million rather than the sale price of $1.9 million. He did not present evidence at trial, such as an arm's length offer to purchase or an independent appraisal, which would meet the requirements of the fair market value definition and support the higher value. When asked about the price change, Pocklington stated he knew little about it (AB 1053:35-37). Lloyd mentioned an appraisal showing a higher value (AB 815:4-10), but no such appraisal was entered in evidence. Alberta, however, called an expert assessor as a witness, who testified that the fair market value of the Carma Lands on October 4, 1989, approximately two months after the transfer, was $2.2 million (AB 615-24). As the weight of evidence does not support a finding that the fair market value of the Carma Lands was $3.2 million, the alleged price adjustment is invalid, and the balance owing in respect of the purchase price is $1.9 million.

[85] Other factors must be considered in assessing damages. These also involve the exercise of judicial discretion. Although the August 10, 1989 promissory note issued by 350151 to Hartford Properties provided for interest at a rate of 12% per annum to be payable on the principal amount of the note after August 10, 1991 (AB XVIII 3604, s. 1), no interest was paid. It is not appropriate that the accrued interest be calculated and treated as a liability, to be deducted from the damages payable by Pocklington. Pocklington has had the use and control of the Carma Lands; Alberta has not. Pocklington was in a position to repay the note when it came due and avoid the interest; Alberta was not. It would be inequitable to charge Alberta for the accrued interest. However, equity also dictates that Pocklington should be given credit for any amounts spent between 1989 and the time of trial to improve the Carma Lands, thereby contributing to their increase in value. No evidence of any such expenditures was adduced at trial.

[86] Damages therefore are assessed at the $6.6 million value of the Carma Lands, less the $1.9 million balance owing, for a total of $4.7 million. Because the 350151 shares were valued at the date of the trial, it is not appropriate to order prejudgment interest on this amount.

SUMMARY

[87] The appeal is allowed.

[88] Pocklington intentionally induced Gainers to breach s. 13.03(l) of the Master Agreement. He is personally liable to pay $4.7 million to Alberta as damages. To avoid double recovery, and in accordance with representations made by Alberta at the appeal hearing, any amount Alberta recovers by successfully realizing on the mortgages registered against the Carma Lands must be deducted from the amount owed by Pocklington in respect of damages. Similarly, any amounts recovered against Pocklington in respect of this damage award will reduce the amount that Alberta may realize on the mortgages registered against the Carma Lands.

[89] Alberta is entitled to its costs, both for the trial and the appeal.

*Appeal allowed; judgment for plaintiff.*