Tab 2

Westlaw.

Not Reported in F.Supp.                                                                     Page 1

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

▷
Benham Jewelry Corp. v. Aron Basha Corp.
S.D.N.Y.,1997.

United States District Court, S.D. New York.
BENHAM JEWELRY CORPORATION and J.D.
Finesse, Inc. d/b/a/ Linea Aurea, Plaintiffs,
v.
ARON BASHA CORPORATION, Defendant.
Aron Basha, Aron Basha Corporation,
Counterclaimants
v.
Benham Jewelry Corporation, J.D. Finesse, Inc.
d/b/a/ Linea Aurea, and Katherine Tess Jewelry,
Counterclaim Defendants
**No. 97 Civ. 3841(RWS).**

Oct. 14, 1997.

Levisohn, Lerner, Berger, and Langsam, New York
City, by Thomas M. Furth, Peter L. Berger, Jane P.
Linowitz, for plaintiff.
Gottlieb Rackman and Reisman, New York City, by
George Gottlieb, Amy B. Goldsmith, for defendant
Aron Basha Corporation.
Tess Jewelry, Amster Rothstein and Ebenstein, New
York City, by Nancy Dodderidge, for counterclaim
defendant Katherine.
SWEET, J.
**\*1** Defendants and counterclaim plaintiffs Aron
Basha and Aron Basha Corporation ("Basha") have
moved for a preliminary injunction precluding
Plaintiffs Benham Jewelry Corporation ("Benham"
), J.D. Finesse, Inc. d/b/a/ Linea Aurea ("Finesse"),
and Katherine Tess Jewelry ("Tess") (collectively "
Counterclaim Defendants") from manufacturing or
selling certain baby shoe pendants ("baby shoe
pendants" or "pendants") which infringe Basha's
copyright. Basha has also moved for recall of any
infringing baby shoe sold by the Counterclaim
Defendants to their customers and for expedited
discovery.

For the reasons set forth below, the motions are
granted.

### *Parties*

Basha is a corporation organized and existing under
the laws of the State of New York with a place of
business on 680 Madison Avenue, New York, New
York. Basha is owned by Aron Basha, and is in the
business of designing and marketing fine jewelry,
both wholesale and retail.

Finesse is a corporation organized and existing
under the laws of the State of New York, with
offices at 576 Fifth Avenue, New York, New York.
Finesse is a manufacturer and distributor of
diamonds, gold and jewelry. Through the entity
Linea Aurea, Finesse distributes jewelry to stores
around the United States. Finesse is owned and run
by Robert Etessami ("Robert Etessami" or "Robert"
). Linea Aurea is managed by Robert Etessami's
brother, Kevin Etessami, ("Kevin Etessami" or "
Kevin").

Tess is a company with a principal office located at
11 Middlesex Road, Great Neck, New York 11021.
Tess is owned and run by Katherine Tess Etessami,
who is married to Robert Etessami.

Benham is a corporation organized and existing
under the laws of the State of New York, with
offices at 23 West 47th Street, New York, New
York 10036. Benham is in the business of the
manufacture and the distribution of jewelry at the
wholesale level. Jerry Fox ("Fox") is Benham's
sales manager.

### *Prior Proceedings*

On May 27, 1997, Benham and Finesse filed a
declaratory judgment action, seeking a
determination that: (a) Basha's copyright

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.    Page 2

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

registration of its baby shoe pendants was invalid; (b) Basha's pendant designs are merely variants of designs long available in the marketplace; (c) Behnam's baby shoe pendant were not copied from any of Basha's designs and were not substantially similar; (d) Finesse's baby shoe pendants were not copies of Basha's designs and were not substantially similar.

On May 28, 1997, Basha filed its answer to the declaratory judgment action, asserting counterclaims for violation of federal copyright and trademark laws, injury to business reputation and dilution of trademark under the New York General Business Law, and common law unfair competition. Also on May 28, 1997, Basha filed the instant motion for a preliminary injunction and temporary restraining order, precluding Behnam and Finesse from manufacturing, displaying or selling infringing baby shoe pendants. On May 29, 1997, this Court granted a three day temporary restraining order, preventing the defendants from displaying or selling any infringing baby shoe pendants at the JCK trade show in Las Vegas, held from May 28 to June 3, 1997.

**\*2** On June 16, 17, 18 and 19, the Court held an evidentiary hearing regarding the preliminary injunction. On June 24 and June 25, the Court received additional papers from Basha and Finesse, at which time the motion was considered fully submitted.

*Findings of Fact*

### I. Basha's Acquisition of Rights in Baby Shoe Pendants Designed by Staurino Fratelli

Basha has been in the jewelry business since 1959. He formed Aron Basha Corporation in 1991 to sell fine jewelry at the retail and wholesale levels. Basha's retail business is located on Madison Avenue in Manhattan. Since December 1996, Basha has held a license for the exclusive distribution of baby shoe pendants manufactured by Staurino Fratelli, an Italian jewelry design firm, and has owned the United States copyright for the pendants. At the wholesale level, Basha sells only Staurino Fratelli baby shoe pendants and accessories that complement the pendants. Basha also offers Staurino Fratelli baby shoe pendants for retail sale. The pendants are made from 18 karat gold, and 18 karat gold, and come in three basic shapes: (a) with a bow set on a band across the toe; (b) with a strap across the instep and a band across the toe; (c) with a strap across the instep and no band. The shoes are made of 14 karat gold or silver. Some are ornamented with french enamel in bright pastel colors and/or precious stones in various arrangements. The price of the pendants ranges from $900 to $3,600, depending on the number of diamonds set in the shoe, and the intricacy of the ornamentation.

The pendants were designed by Staurino Fratelli, an Italian firm in the business of the design, manufacture and wholesale of fine jewelry. The baby shoe pendants were first designed in April of 1994, after discussions of the concept between Luigi Staurino, David Staurino and a designer named Barbara Dragoni ("Dragoni"). Luigi Staurino instructed Dragoni to design baby shoe pendants in a specific shape, using bows or straps and colorful ornamentation. After Dragoni drafted the design, David Staurino created the first sample in plaster and then in wax. He spent two months adjusting the proportions of the original design as to length, width, and the use of a bow or strap, as well as ornamentation with precious stones and/or french enamel. Neither Dragoni nor David Staurino consulted actual baby shoes in designing the baby shoe charms.

Staurino Fratelli began marketing the baby shoe pendants in June 1994 at the Vicenza jewelry trade show in June 1994.[FN1] Subsequently, the baby shoes were prominently displayed in the window showcases at the Staurino Fratelli booth in all the major jewelry trade shows. Each of the baby shoe pendants are made according to the shapes and proportions established in the original model. Although the shoes are sold individually, Staurino Fratelli consistently advertises and displays the shoes in a group in order to create a strong impression of the design.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                                    Page 3

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

FN1. The major jewelry trade shows include: the Vicenza trade show, (the " Vicenza show"), which attracts a worldwide attendance and is held three times a year; the Valenza trade show, (the "Valenza show"), which occurs twice a year; the Basel trade show, (the "Basel show"), which attracts worldwide attendance and occurs once a year. (Collectively, the "major trade shows.")

*3 Staurino Fratelli advertised its baby shoes widely in the following magazines: Valenza Gioielli, an Italian trade magazine for jewelry, in March and April 1995, February, March and April 1996, and January 1997; Vogue Gioielli in December 1995, December 1996 and April 1997; and Vicenza Magazine in June 1996 and June 1997. These magazines are shipped to members to the jewelry trade, buyers coming to exhibitions and a number of shops around the world. Staurino Fratelli has spent approximately $100,000 on advertising.

As a result of their advertisements and trade show displays, Staurino Fratelli has received telephone orders from the United States, South America and the Far East. The first sales of Staurino Fratelli's baby shoe pendants were made to Japanese and British companies in August of 1994. Staurino Fratelli obtained a patent for their baby shoe pendant designs from the Italian Government on July 23, 1996. As a result of the number of pieces sold, the income accruing from these sales, and the amount of money invested in advertising, the baby shoe charms are now the most important product made by Staurino Fratelli.

Basha first saw Staurino Fratelli's baby shoes pendants at the Vicenza show in June 1995. Although Basha has attended the major jewelry trade shows since 1993, he had never noticed any other baby shoe pendants. Basha bought ten to fifteen baby shoe pendants from Staurino Fratelli for retail sale in his shop in 1995 and 500 pendants in 1996.

On December 23, 1996, Basha entered an agreement with Staurino Fratelli for the exclusive right to sell its baby shoe pendants in the United

States. On December 26, 1996, Basha obtained copyright registration for the baby shoe pendants.

The registration application stated that the registered work, entitled "It's Shoe Time", is a jewelry design authored by Staurino Fratelli first published in November of 1994. The application was accompanied by one of Basha's photographic advertisements depicting twelve different versions of Staurino Fratelli's baby-shoe pendant, six with bows and six with straps, and each ornamented differently with diamonds, french enamel or both.[FN2]

FN2. In detail, the pendants depicted in the deposit photograph may be described as follows: (a) four pendants in enamel-covered gold with straps and bands, and seven diamonds set on the toe; (b) four pendants in enamel-covered gold with a diamond-covered bow set on a diamond-covered band across the toe; (c) two pendants, one in gold, one in silver, with a bow set on a band, entirely covered with precious stones; (d) one pendant made of silver with a strap, no band, and diamonds covering the toe only; (e) one pendant in enamel-covered gold with a diamond-covered strap across the instep, a band across the toe.

Basha displays the baby shoes prominently in the window of his Madison Avenue store. He has advertised the shoes in national magazines such as Manhattan File, Hampton magazine, Vogue Gioielli, W, Town and Country, and Parenting. Basha also mailed approximately 3,000 postcards to customers of American Express, displaying a photograph of the baby shoe pendants. The advertisements identify the pendants as baby shoes " designed exclusively for Aron Basha by Staurino Fratelli." Basha spent over $150,000 on advertising the pendants. In response to his advertisements, Basha has received numerous phone orders for the baby shoe pendants. So far in 1997, he has sold 1,200 to 1,500 pendants.

In early 1997, Basha became aware of baby shoe pendants offered for sale by Finesse d/b/a Linea

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                      Page 4

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Aurea, Tess and Behnam. Basha immediately instructed his counsel to send cease and desist letters to each of the alleged infringers. [FN3] The letter was sent to Tess on May 2, 1997, to Finesse on May 14, 1997, and to Behnam on May 13, 1997. On May 29, 1997 Basha obtained a temporary restraining order from this court, prohibiting Finesse, Tess and Behnam from displaying any infringing baby shoe pendants at the JCK Jewelry Trade Show which taking place in Las Vegas from May 28 to June 3, 1997, (the "Las Vegas show").

> FN3. Basha sent an additional warning to other participants in the Las Vegas show, advising that Basha's baby shoe line of jewelry products was protected by copyright. Basha also placed an advertisement in National Jeweler magazine, which is distributed to the jewelry trade twice a month, warning against infringement of Basha's copyright in the "It's Shoe Time" line of baby shoe jewelry. The warning included the photograph of the baby shoes pendant which was deposited with the copyright registration.

*4 Once at the Las Vegas show, Basha inspected the Finesse d/b/a Linea Aurea booth to determine whether they were abiding by the temporary restraining order issued by this Court prohibiting display or sale of infringing baby shoe pendants. In the Linea Aurea display window, Basha saw six baby shoe pendants which were made of gold, with straps or bows and a band across the toe, covered with two colors of french enamel and set with diamonds. In short, the pendants closely resembled his own.

Basha also obtained an invoice from Behnam which indicated that, despite the restraining order, baby shoe pendants had been offered for sale and ordered by a customer.

## II. Infringement by Finesse d/b/a Linea Aurea

Finesse and Linea Aurea appear to have copied

Basha's pendants by importing baby shoe pendants from another Italian company which copied the Staurino Fratelli design, and by using the imported copies to manufacture its own pendants.[FN4]

> FN4. Before relating the circumstances which establish this inference, it may be helpful to describe the two processes by which the imported baby shoe pendant could be copied.
>
> In first process, called the "lost wax" process, the model maker uses the finished piece as a physical design, and sculpts a wax model, excluding any stones set in the finished piece. The wax model is given to a caster, who attaches the model to a tree, a wax rod that holds the model in place.
>
> Model and tree are placed within a steel cylinder which is set onto a rubber base, the tree fixed into a hole in the rubber base. The caster then pours plaster of paris, which is called the "investment", around the wax model and tree. After the plaster sets, the wax model and tree are burned out of the plaster, and silver is poured into the plaster. The investment is broken open, leaving a silver model of the pendant attached to a silver rod. The silver model is filed and cleaned. If the product is to be finely crafted, the caster will drill holes in the silver cast to allow stone settings to be soldered into it at a future point. If it is not to be a fine piece of work, the caster will drill holes in the silver casting and solder in settings so that the settings will become part of the next version of the model. The caster then makes a rubber mold of the silver model by placing raw rubber in a frame, and placing the silver model between the layers of rubber. The rubber is vulcanized and cut into two halves, which become the two halves of the mold. Molten wax is shot into the rubber mold, and the investment process is repeated. The resulting plaster mold can be used to cast the finished pieces in gold, brass or silver. The size of the copy will vary according to the skill of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 5

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

the model-maker in carving wax, and according to variables in the vulcanizing process.

The second method is called the "knock off" method. In this process any stones would be removed and the original pendant might also be silver-plated to add thickness for later filing and polishing of the copy. The original is then attached to a sprue, a rod, and placed within layers of raw rubber which is vulcanized. The lost wax process is then utilized to create a silver model and a plaster mold. The finished casts are filed and polished, and stones are set. The dimensions of the copy would be smaller than those of the original.

In 1996 Kevin Etessami imported five to ten baby shoe pendants manufactured by an Italian jewelry manufacturer, Mario Della Carbonare, also called MDC (the "MDC baby shoe pendants"), which had been found to be infringing copies of Staurino Fratelli's designs by a trade fair jury at the Vicenza show in June of 1996. The trade fair jury is an organization that polices the use of jewelry designs at trade shows. The jury found the MDC shoes to be infringing copies, and ordered MDC to remove the pieces from their exhibit and the show catalogue and to cease any sales of the pieces. David Staurino later learned that, although MDC had removed the baby shoes from their window display, they had continued to offer the shoes for sale.[FN5] In September of 1996, Finesse, through Linea Aurea, purchased these pendants from MDC and began to sell the imported MDC baby shoe pendants in the United States.

> FN5. Staurino Fratelli sent MDC a warning letter dated July 4, 1996, directing MDC to cease production, exhibition or sales of its baby shoe jewelry, and, according to David Staurino, continues to pursue its claim against MDC in Italy.

The Etessamis also unsuccessfully attempted to import the actual Staurino Fratelli pendants. In January of 1997, Kevin Etessami visited the Staurino Fratelli booth at the Vicenza trade show with his sister-in-law Katherine Tess and expressed an interest in marketing the Staurino Fratelli baby shoe pendants in the United States. Etessami did not mention that he was already importing the MDC baby shoe pendants. David Staurino informed Etessami that the exclusive agreement with Aron Basha prevented Staurino Fratelli from selling the shoes to other American distributors. Etessami then remarked that he might distribute the shoes in the Far East and South America, and placed an order for four models. Katherine Tess also ordered some baby shoe pendants for her personal use. Two weeks later, Staurino Fratelli sent Etessami a letter declining to ship his order because it conflicted with agreements with other Staurino Fratelli distributors in the Far East, South America, as well as the agreement with Basha in the United States.

As regards the Etessamis manufacture of pendants in the United States, conflicting testimony was heard as to whether the Etessamis copied the MDC copy of Staurino Fratelli's design, or whether they used pendant designs which had been created independently of the Staurino Fratelli designs to manufacture their pendants.

*5 Robert Etessami testified that in late 1984, he had seen a photograph of a baby shoe pendant in Sotheby's catalogue, and asked a designer named Mario Archangel ("Archangel") to create a baby shoe pendant design of baby shoe pendants. Between 1984 and 1996, the resulting models were not used.

Archangel testified that he was approached by Robert Etessami in 1984 to design a baby shoe pendant based on a photograph in a Sotheby's catalogue. Archangel created thirteen drawings based on the Sotheby's photograph, and nine silver models based on the drawings. He gave the drawings and models to Robert Etessami in 1985. Archangel had no further conversations with Robert regarding baby shoes until the fall of 1996, when Robert called and told Archangel that Finesse had imported some baby shoe pendants from Italy and intended to produce pendants from the baby shoe models made in 1985.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 6

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Kevin and Robert Etessami testified that the Archangel models were used to manufacture Linea Aurea's pendants in 1996. However, the weight of testimony by both the Etessamis is lessened by their self-interest in proving independent creation of the pendants. Moreover, certain discrepancies in other parts of Kevin Etessami's testimony further weakened his credibility.[FN6]

> FN6. For example, Kevin Etessami testified that he saw Basha's expert witness, Isaac Ainetchi, at the Las Vegas show with Basha. However, Ainetchi established that during the show he was not in Las Vegas.

Daniel Baez, the mold-maker employed by Kevin Etessami testified that he made baby shoe pendant molds for the Etessamis sometime before December, 1996. However, he could not positively identify the Archangel models as the basis for those molds. Baez also testified that one of the models from which molds were made for the Etessamis has been lost since February or March, 1997.

The pendants created from this missing model closely resemble one of the imported MDC pendants which in turn appear to be a copy of Staurino Fratelli's designs. Staurino Fratelli makes a gold pendant with a diamond-covered bow set on a diamond-covered band across the toe. The MDC pendant is made of gold, with a plain bow set on a diamond-covered band across the toe. The Linea Aurea pendant is made of gold, with a diamond-covered bow set on a diamond-covered band across the toe. All three pendants are very similar in their rounded proportions and size. The Linea Aurea pendant is very slightly smaller than the MDC pendant. The similarity between the MDC pendant and the Linea Aurea pendant raises the inference that the Linea Aurea pendants were manufactured by copying the MDC pendant rather than using models made by Archangel.

According to testimony of an expert in the jewelry business, a credible and qualified witness, the Linea Aurea pendant was copied from the MDC pendant. The smaller size of the Linea Aurea pendant would

result from the copying process, during which the copy of the baby shoe would lose 10 percent of its weight and mass.

The production of Linea Aurea's U.S. manufactured baby shoe pendants was completed sometime between August or September and December of 1996. Kevin Etessami first sold the U.S. manufactured pieces in December of 1996. He first displayed the pieces at a jewelry trade show in Orlando in early February of 1997. Etessami testified that he has sold approximately $100,000 worth of baby shoe pendants, both imported and U.S. made, between September 1996 and May 1997.

*6 In May 1997, the Etessamis published an advertisement for Linea Aurea jewelry in the brochure for the Las Vegas Show. The photograph in Linea Aurea's ad included two baby shoe pendants, one of which was the MDC pendant. On May 14, Finesse received a cease and desist letter from Basha. After issue of the temporary restraining order from this Court, Kevin Etessami removed the MDC shoes from his display at the Las Vegas show, but he continued to display the Linea Aurea made baby shoe pendants. As described above, the displayed pendants closely resembled those carried by Basha.

### III. Infringement by Katherine Tess Jewelry

Tess sells accessories and jewelry in a business which she began in Great Neck Long Island two years ago. As set forth above, in January 1997, Tess visited the Staurino Fratelli both at the Vicenza show with her brother-in-law, Kevin Etessami. During the visit Tess attempted to purchase several Staurino Fratelli pendants as part of Kevin Etessami's larger order. However, when Kevin's order was canceled, Tess' order was also not filled.

In January or February of 1997, Tess saw one of Basha's promotional postcards depicting baby shoe pendants. In March or April 1997, Tess obtained 29 baby shoe pendants from Kevin Etessami and prepared a post card to advertise her own business. Kevin Etessami testified that eight of the shoes

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 7

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

depicted in the postcard were made from Archangel models, and thirteen of the shoes were made from the model lost by the mold-maker, Daniel Baez. The remaining eight pendants were purchased from an Italian supplier, who was also the supplier of the MDC pendants.

Tess' postcard resembled Basha's in the arrangement of the pendants. Both postcards show a thick chain across the top linking the pendants. Both carry the name of the business in fancy script above the chain. Both display an array of other pendants below the chain, although Basha's pendants are linked by a fine gold chain and Tess' pendants are not. The cards are also approximately the same size, although Tess' is slightly narrower.

The individual pendants depicted in Tess' postcard, which she obtained from Linea Aurea, also resemble pendants depicted in Basha's postcard:
(a) sixteen of Tess' pendants are made of enamel-covered gold, with a diamond-covered bow and contrasting color on toe and heel; several of Basha's pendants meet that same description;
(b) three of Tess' pendants are made of enamel-covered gold, with a diamond-covered strap, and a gold band across the toe; several of Basha's pendants do as well;
(c) two of Tess' pendants have a diamond-covered strap and a plain gold or silver surface; none of the pendants in Basha's postcard meet that description, but Basha does carry such a pendant;

(d) three of Tess' pendants have a bow set on a band across the toe and are completely covered with diamonds, or are covered with diamonds on the bow and toe only; several of Basha's pendants have a bow set on a band and are completely covered with diamonds, although none are covered with diamonds on the bow and toe only.

*7 On May 2, 1997 Tess received a warning letter from Basha regarding infringement of his copyright in the baby shoe pendants and of his advertisement design. In response, Tess entered an agreement with Basha that she would no longer offer baby shoe pendants for sale.

*V. Behnam's Infringement*

Jerry Fox, the sales manager of Behnam jewelry responsible for developing a new baby shoe product for Behnam, testified that he first thought of marketing baby shoe pendants in 1996 as a result of a trend in baby jewelry. Fox had attended the Vicenza show in January of 1996 and the Basel show in April of 1996 at which Staurino Fratelli baby shoe pendants were prominently displayed. Behnam does not itself manufacture jewelry, but contracts with model makers and casters outside the firm. In September of 1996 Fox asked a designer named Christine Szeto to create baby shoe pendants, and gave her some sketches he had made. Fox's sketches were not presented into evidence and he did not know whether Szeto used the sketches or other sources to create her designs. Behnam did not make Szeto available for testimony. Moreover, there were several differences between the Szeto designs and some of the finished Behnam baby shoes. For example, one Szeto design depicted a metal bow and stones set around the opening of the baby shoe, but the corresponding finished Behnam pendant had stones set in the bow, but not at the opening. This latter arrangement of stones more closely resembles the Staurino Fratelli design than designs by Szeto. Finally, no testimony from the model-maker or caster of the maker of the Behnam shoes was offered which would establish the use of the Szeto designs.

Behnam's first sales of the baby shoes were to Macy's of California in November of 1996. All its shoes were made in 14 karat gold and the average retail selling prices of Behnam's shoes was about $199.

In April of 1997, Behnam sent a mailing of approximately 6,000 postcards depicting six of its baby shoe pendants. A comparison of the pendants in the Behnam postcard to those carried by Basha reveal a strong resemblance, as follows:
(a) two of Behnam's pendants are made of gold, with a bow set on a band across the toe, and diamonds covering both bow and band, one with an emerald set in the center of the bow; Basha offers a gold baby shoe pendant with a bow set on a band across the toe, with diamonds covering bow and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

band;

(b) two of Behnam's pendants are made of gold, with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe, four in a cluster on the right hand side, and three set in a triangle pattern on the left hand side; Basha offers a gold pendant with a diamond-covered strap across the instep, a band across the toe, and diamonds set on the toe in the identical pattern, although Basha's pendant is also covered with french enamel in two colors;

(c) one of Behnam's pendants is made of gold, with a strap across the instep and diamonds covering the toe; Basha offers a gold pendant with a strap across the instep and diamonds covering the toe;

*8 (d) one of Behnam's pendants is made of gold, with a diamond-covered strap across the instep and a band on the toe; Basha offers a pendant made of gold with a diamond-covered strap across the instep, although there is no band on the toe.

Finally, Behnam's pendants are similarly proportioned and approximately the same size as those carried by Basha.

On May 13, 1997, Behnam received a cease and desist letter from Basha's attorneys, directing it to stop marketing its baby shoe pendants and to send all records to Basha's counsel. After learning of the temporary restraining order issued by this Court, Fox directed the Behnam staff at the Las Vegas show to remove display photographs and printed material regarding the shoes, and to remove the shoe pendants themselves from the showcase. However, an order form from Behnam dated June 1, 1997, the period of the Las Vegas show, lists six different types of baby shoe pendants which were ordered by one of Behnam's customers.

### VI. Affect of Infringement on Basha

Basha had received numerous complaints from his customers and authorized retailers regarding the presence of "knock-offs" being sold in the marketplace at a lower price than Basha's baby shoe pendants. The baby shoe pendants marketed by Finesse, Tess and Behnam are manufactured with

gold of lesser quality, fewer precious stones and their design is less intricate and detailed. Basha reports that consumers who are familiar with his baby shoes will believe that Basha has gone into the lower market business, and that the confusion and complaints caused by the alleged infringement has reduced his business by 30 percent. Several exclusive retailers have informed him that they will not market his baby shoe pendants if knock-offs are generally available in the marketplace.

### Conclusions of Law

Basha has asserted his request for injunctive relief based on his counterclaim for copyright infringement and has not pressed or briefed his claims for trade dress infringement, dilution or unfair competition. Injunctive relief against a putative infringer should be granted when the moving party shows: (1) either (a) likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships tipping decidedly in plaintiff's favor; and (2) likelihood of irreparable injury. *Richard Feiner and Company, Inc. v. Turner Entertainment Co., MGM/UAU,* 98 F.3d 33, 34 (2d Cir.1996); *Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.,* 25 F.3d 119, 122 (2d Cir.1994); *Topps Company, Inc. v. Gerrit J. Verburg Co.,* No. 96 Civ. 7302, 1996 WL 719381 (S.D.N.Y. Dec.13, 1996).

### I. Basha has Demonstrated Likelihood of Success in His Infringement Claim

In order to establish a claim for copyright infringement, a plaintiff must show ownership of a valid copyright and the defendant's infringement by unauthorized copying. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.),* 71 F.3d 996, 1002 (2d Cir.1995); *Fisher-Price,* 25 F.3d at 122-23; *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 139 (2d Cir.1992); *Roger v. Koons,* 960 F.2d 301, 306 (2d Cir.1992). To prove infringement, a plaintiff must demonstrate that (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 9

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

defendant's work and the protectible elements of plaintiff's. *Fisher-Price,* 25 F.3d at 122-23; *Laureyssens,* 964 F.2d at 140.

### A. Basha's Copyright is Valid and Basha has Standing to Bring an Infringement Action as to All Staurino Fratelli Pendants

**\*9** Apart from certain exceptions not applicable here, a copyright claimant must obtain a registration from the United States before bringing suit for copyright infringement. 17 U.S.C.A. § 411 (West 1996); *Pristine Industries, Inc. v. Hallmark Cards, Inc.,* 753 F.Supp. 140, 148 (S.D.N.Y.1990) (valid federal copyright registration is a necessary element of infringement action).

Basha obtained a single registration for the baby-shoe pendants. The application stated that the work is a jewelry design entitled "It's Shoe Time ", authored by Staurino Fratelli and first published in November of 1994. The application was accompanied by a photograph depicting twelve different baby shoe pendants.

The Copyright statute permits registration of multiple related works under a single copyright application.[FN7] 17 U.S.C.A. § 408(c) (West 1996). Single registration of multiple works was established in the 1976 amendment to § 408(c) in order to encourage authors to seek copyright registration. The House Report to the 1976 amendment states:

> FN7. The section states in relevant part: The Register of Copyrights is authorized to specify by regulation the administrative classes into which works are to be placed for purposes of deposit and registration, and the nature of the copies or phonorecords to be deposited in the various classes specified. The regulation may require or permit, for particular classes, ... a single registration for a group of related works. 17 U.S.C.A. § 408(c)(1) (West 1996).

The provision empowering the Register to allow a number of related works to be registered together as a group represents a needed and important liberalization of the law now in effect. At present the requirement for separate registrations where related works or parts of a work are published separately has created administrative problems and has resulted in unnecessary burdens and expenses on authors and other copyright owners. In a number of cases the technical necessity for separate applications and fees has caused copyright owners to forego copyright altogether. Examples of cases where these undesirable and unnecessary results could be avoided by allowing a single registration include ... *a group of related jewelry designs* ...
House Report on the 1976 Amendment of the Copyright Act, H.R.Rep. No. 1476, 94th Cong., 1st Sess. (1976) *reprinted in* 17 U.S.C.A. § 408 at 466 (West 1996) (emphasis added). The regulation governing single registration, set forth in 37 C.F.R. § 202.3, states in relevant part:
(i) *Registration as a single work.* (1) For the purpose of registration on a single application and upon payment of a single registration fee, the following shall be considered a single work: (A) in the case of published works: All copyrightable elements that are otherwise recognizable as self-contained works, that are included in a single unit of publication, and in which the copyright claimant is the same ...

37 C.F.R. § 202.3(b)(3)(i)(A) (1996).

The Counterclaim Defendants assert that, because the baby shoe pendants are sold separately, they are not eligible for registration as a single work. They cite two cases in support of this position: *Tabra Inc. v. Treasured Paradise Designs, Inc.,* 15 U.S.P.Q.2d 1234 (N.D.Cal.1990) and *Bruce & Company v. B.H. MultiCom. Corp.,* ---F.Supp.---- No. 96 Civ. 8083, 964 F.Supp. 265, 1997 WL 277998 (N.D.Ill. May 15, 1997). However, both cases turn on the question of relatedness of design rather than any evidence that the designs at issue were sold as a single unit.

**\*10** In *Tabra,* the plaintiff's copyright was found invalid because the jewelry designs were not related works; the issue of publication as a "single unit"

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                          Page 10

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
(Cite as: Not Reported in F.Supp.)

was not even raised. The plaintiff in *Tabra* included 250 jewelry designs in six separate copyright registrations, grouped by year only, without any attempt to connect the jewelry by distinguishing characteristics. The court found that the jewelry pieces covered by each of these registrations were a "conglomeration of designs" not necessarily bear any resemblance to each other: "The only apparent relationship is that many pieces are earrings and have a primitive look." *Tabra,* 15 U.S.P.Q.2d at 1237. In contrast, Basha registered twelve closely related designs in its single application. All the pieces are baby shoe pendants shaped according to the specific dimensions created by Staurino Fratelli.

In *Black,* the defendant moved for summary judgment on the grounds that the plaintiff had defectively registered a group of unrelated rings in a single application. The Court agreed that the identifying materials submitted with the registration depicted "a conglomeration of ring designs which bear no resemblance to each other." *Black,* 964 F.Supp. 265, 1997 WL 277998 at *4. The plaintiff countered that the relatedness requirement set forth in 17 U.S.C. § 408(c) was satisfied because "the works are included in a 'single unit of publication' . . . [where] the rings are offered for sale together as a line and appear together in their marketing material . . ." The court found that "[w]hether the rings are sold separately or together as a line and whether that is sufficient" presented an issue of material fact, and denied summary judgment. *Id.* The court's reasoning in *Black* does not establish that group sale is a condition precedent for single registration of related works. Rather, the court considered without deciding whether "single unit of publication" would be an adequate proxy for the relatedness requirement of § 408(c). *Id.*

One other case has addressed the validity of a single registration for multiple related works. In *Original Appalachian Artworks v. Toy Loft,* 489 F.Supp. 174 (N.D.Ga.1980), *aff'd,* 684 F.2d 821 (11th Cir.1982), the plaintiff brought an infringement action regarding a group of soft sculpture dolls registered under the title "The Little People". Like Basha's baby-shoe pendants, the assorted dolls were variations on the same basic design. Although they were sold individually, the dolls were marketed as a single line. The plaintiff corporation would ship its dolls with written information suggesting the manner in which the dolls should be displayed and sold. The court found that the single registration number established a valid copyright for all of the plaintiff's doll designs:

The court has ... concluded that the defendants have infringed plaintiff's copyright ... In reaching this conclusion, the court notes that the plaintiff's copyright registration number VA 35-804 is sufficient to cover all of the differently-styled " Little People" that the plaintiff is presently manufacturing. *See* 37 C.F.R. 202.3(b)(3).

*11 *Id.* at 180.

Like the dolls in *Original Appalachian,* Basha's baby shoe pendants are marketed as a single line. Basha consistently displays the pendants in a group in his shop window and advertisements. The pendants are variations on the same basic design; they are related by size, shape, proportion, use of bows or straps, or ornamentation with diamonds or french enamel. Thus, the pendants satisfy the relatedness requirement of § 408(c), and, as in *Original Appalachian,* this relatedness in appearance permits single registration of multiple works.

This conclusion comports with the purpose of § 408(c), which has been "consistently described as a 'permissive' registration provision". Jane C. Ginsburg, *Copyright for the Nineties,* (4th ed.1993) at 381. The language and legislative history of the statute indicates that the only requirement for single registration of multiple works is "relatedness." There is no evidence in legislative history or case law that the "published in a single unit" language in 37 C.F.R. § 202.3 is meant to constitute an additional condition precedent to valid registration. [FN8] In fact, this conclusion is contradicted by the House Report on the 1976 amendment of 17 U.S.C. § 408(c), which explicitly states that the purpose of the amended section is to eliminate the " requirement of separate registrations where related works ... are published separately", thereby encouraging registration of such works as related jewelry designs. H.R.Rep. No. 1476 *reprinted in*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                              Page 11

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

17 U.S.C.A. § 408 at 466. If the works satisfy the requirement of relatedness, as in the case of the Basha's baby-shoe pendants, an additional requirement that the works also be "published in a single unit" would undermine the purpose of the statute.

> FN8. The regulatory language appears to have been drafted in order to protect copyrightable elements included in multi-media works, such as movies and computer games. *See* 2 Melville B. Nimmer, *Nimmer on Copyright,* § 7.18[C][3] (1994) & n. 26 (noting that certain courts have "accorded too much weight to the formality of registration").

Counterclaim defendants also contend that not all of Basha's pendants are covered by the copyright, because the photograph which Basha appended to his application only included twelve versions of the shoe. A copyright registrant is required to submit two complete copies of the best edition of the work within three months after the date of such publication. 17 U.S.C.A. § 407(a) (West 1996):

The requirement of *complete* copies ... means that the copies as deposited must be fully as complete in all elements ... as were the copies theretofore published. Thus if only a ... portion of the published work is deposited (such as the first of several published chapters) this will not comply with the statutory requirement of complete copies.

2 *Nimmer,* § 7.17[E][2][a] at 7-183 (1991) (emphasis in original).[FN9]

> FN9. If the work is unwieldy, the registrant may deposit identifying material instead of copies. *Id.* § 408(c); House Report 1476 *reprinted in* 17 U.S.C.A. § 408 at 466; 2 *Nimmer,* § 7.17[E][2][e].

Failure to deposit a complete copy of the work does not forfeit copyright protection, but it is a prerequisite for bringing an infringement action. *Whimsicality, Inc. v. Rubie's Costume Co., Inc.,* 891 F.2d 452, 453 (2d Cir.1989); *Fonar Corporation v.*

*Magnetic Resonance Plus, Inc.,* 920 F.Supp. 580, 513 (S.D.N.Y.1996). However, errors contained in copyright registration, if committed without deceptive intent, are harmless and do not invalidate the copyright. *Thomas Wilson & Co. v. Irving J. Dorfman, Co.,* 433 F.2d 409, 412 (2d Cir.1970) (failure of second copyright application to refer to first, while "potentially more serious", would not bar copyright protection because made innocently); *Gund, Inc. v. Swank, Inc.,* 673 F.Supp. 1233, 1237 (S.D.N.Y.1987) (error in date of creation and failure to refer to stuffed lion as derivative work not fatal to standing to bring action); *Data General Corp. v. Grumman Systems Support Corp.,* 825 F.Supp. 340 (D.Mass.1993) (several clerical errors in deposit copy of software program not fatal to standing to bring action); *See also* 2 *Nimmer,* § 7.20 (discussing long history of courts permitting plaintiff to bring infringement action where errors in registration were unaccompanied by fraud.) Thus, Basha's copyright in the pendants omitted from the deposit photograph is valid, and because there is no evidence that Basha submitted the photograph with an intent to deceive, his standing to bring this action is intact as to all pendants.

### *B. Evidence of Actual Copying*

*12 A plaintiff in a copyright infringement action may prove actual copying either by direct evidence, or by indirect evidence showing the defendant's access to the copyrighted work and similarities that are probative of copying between the works termed "probative similarity". *Fisher-Price,* 25 F.3d at 123; *Laureyssens,* 964 F.2d at 140.

Access is established either by demonstrating that (1) the infringed work has been widely disseminated, or (2) a particular chain of events exists by which the alleged infringer might have gained access to the copyrighted work. *Repp v. Webber,* 892 F.Supp. 552, 556-57 (S.D.N.Y.1995). The term "probative similarity" is used to distinguish the analysis used to determine whether copying occurred from the substantial similarity analysis used to determine whether that copying constitutes infringement.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 12

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Probative similarity analysis requires consideration of the entire work, while substantial similarity analysis requires comparison only of the protected features. *Fisher-Price,* 25 F.3d at 123 (citing Alan Latman, *Probative Similarity as Proof of Copying: Toward Dispelling Some Myths in Copyright Infringement,* 90 Colum.L.Rev. 1187, 1214 (1990) ); *Kurt S. Adler, Inc. v. World Bazaars, Inc.,* 897 F.Supp. 92, 93 (S.D.N.Y.1995); *Tienshan, Inc. v. C.C.A. International,* 895 F.Supp. 651, 656 (S.D.N.Y.1995); 3 *Nimmer,* § 13.03 [[[A], at 13-29 (1996).

### 1. Actual Copying by Finesse

As to one particular gold and diamond bowed pendant, direct evidence was presented that Finesse d/b/a Linea Aurea copied Staurino Fratelli's design. The Etessamis acknowledged importing baby shoe pendants manufactured by MDC in Italy, which a jewelry trade show jury had found to be copies of Staurino Fratelli's design. After importing MDC pendants, Linea Aurea themselves manufactured baby shoe pendants. Although the Etessamis maintained that they had used models created in 1985 by the designer Archangel to manufacture their pendants, they had lost the model used to create one particular line of pendants and their mold-maker could not recall whether he had used the Archangel model to manufacture those pendants. Comparison of the Linea Aurea pendant made from this missing model and an MDC pendant reveals an almost identical appearance; both are made of gold, with a diamond-covered bow set on a band across the toe, and are similarly proportioned, although the Linea Aurea shoe is very slightly smaller than the MDC shoe. Both of these pendants are almost identical to one made by Staurino Fratelli. A reliable expert witness testified that the Linea Aurea gold pendant was copied from the MDC pendant, which would result in a slightly smaller size.

As to the rest of Linea Aurea's pendants, indirect evidence of copying by Linea Aurea was provided by a demonstration of access and probative similarity. Linea Aurea had access to the baby shoe pendants both in Europe and the United States.

Since 1994 Staurino Fratelli has displayed its baby shoe pendants at all the major European trade shows, as well as in extensive advertising in European and specifically Italian jewelry trade magazines. Both Etessamis attended several of the European shows. The Etessamis also receive the trade magazines cayrrying Staurino Fratelli's advertisements. [FN10] Kevin Etessami visited the Staurino Fratelli Booth at the Vicenza show in January 1997 and ordered several baby shoes. The Etessamis also had access to the baby shoe pendants in the United States through Basha's displays at trade shows and advertisements in various magazines and postcards. This evidence supports a determination that the Etessamis had access to the Staurino Fratelli designs. *See Kurt S. Adler,* 897 F.Supp. at 93-94 (finding access established by the display at two trade shows attended by defendant).

> FN10. Although Robert Etessami denied having seen any ads for Staurino Fratelli baby shoe pendants, his testimony carries less weight because he is a self-interested witness.

**\*13** Probative similarity has been established between Basha's pendants and those produced by Linea Aurea as follows:

(a) one of Basha's pendants is a gold shoe with a diamond-covered bow set on a diamond-covered band across the toe. Linea Aurea imported a pendant made by MDC which is gold, with a diamond-covered bow set on a plain band across the toe. Linea Aurea also manufactured a gold shoe pendant with a diamond-covered bow set on a diamond-covered band across the toe. Both the imported MDC pendant and Linea Aurea manufactured pendant are similar in proportion to the Basha pendant, albeit slightly smaller in size. The MDC pendant carries its trademark inside on the sole of the shoe. The Linea Aurea manufactured pendant carries a mark designating its gold content also inside on the sole. The Basha shoe also has a trademark stamped inside on the sole of the shoe, albeit slightly closer to the heel;

(b) one of Basha's pendants is made of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 13

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

enamel-covered gold and has a diamond-covered bow set on a diamond-covered band running across the toe. The toe of the shoe is covered in red french enamel, and black enamel covers the sides and back. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of enamel-covered gold. The bow is white french enamel, with a diamond set on the center knot. The toe of the shoe is covered in red french enamel and dark blue enamel covers the sides and back. There is no markstamped inside the shoe.

(c) one of Basha's pendants is made of plain gold with a diamond-covered strap across the instep. There is no band or ornamentation on the toe. A trademark is stamped on the inside sole of the shoe towards the heel. The Linea Aurea pendant is also made of gold with a diamond-covered strap across the instep. There is a plain gold band across the toe. There is no trademark stamped on the inside sole.

(d) one of Basha's pendants is made of enamel-covered gold and has a diamond-covered strap across the instep and a gold band across the toe. Black enamel covers the toe, and white covers the sides and back. There is a trademark stamped on the inside sole near the heel. The Linea Aurea pendant is made of enamel-covered gold with a silver strap across the instep and blue enamel on the toe, sides and back. There is a trademark stamped on the inside sole near the heel.

In general, the Linea Aurea pendants are similarly proportioned as the Basha pendants, and follow two of the three basic variations established in Staurino Fratelli's designs, either bow set on a band across the toe, or strap across the instep with a band across the toe. Besides the differences noted above, the Linea Aurea pendants are smaller in size. However, the sum of the many similarities is sufficiently probative to conclude that Linea Aurea actually copied its pendants.

Linea Aurea attempts to rebut Basha's prima facie case of actual copying by asserting that its pendants were made from designs independently created by Archangel in 1984. "If the plaintiff meets its

burden of establishing access and similarity, the defendant must then come forward with credible evidence of independent creation to negative the inference of copying." *Arrow Novelty Company Inc. v. ENCO National Corp.,* 393 F.Supp. 157, 160 (S.D.N.Y.1974) *aff'd* 515 F.2d 504 (2d Cir.1975). However, "even with such evidence from the defendant, there may be such substantial similarity that no other explanation other than copying is reasonably possible." *Novelty Textile Mills Inc. v. Joan Fabrics Corp.,* 558 F.2d 1090, 1092 n. 2 (2d Cir.1977); *Imperial Textile Co. of New York, Inc. v. Amitex Fabrics Inc.,* 682 F.Supp. 18, 19 (S.D.N.Y.1987); *Arrow Novelty,* 393 F.Supp. at 160 . 3 Nimmer, § 13.01[B] at 13-13.

**\*14** In *Imperial Textile,* the defendant presented several witnesses who testified that it had independently created its fabric design, which contained the same pattern and colors as the plaintiff's most successful design. The court accepted the defendant's contention that the source of its pattern came from in-house fabrics the defendant already had on hand, but rejected the defendant's conception that the spacing concept, size, selection of colors and arrangement of the pattern were the result of independent creation. The court based its rejection on strong evidence of access and a similarity so close that "to conclude otherwise would be to find coincidence that defies belief." *Imperial Textile,* 682 F.Supp. at 19. The facts in the instant case are similar. While the Etessamis may have used Archangel's models for the basic slipper used in the baby shoe pendants, the ornamentation with french enamel in bright colors, and diamonds arranged on bow or strap, are too similar to the design choices made by Staurino Fratelli to be mere coincidence. The Etessamis did not decide to use Archangel's models until after Kevin Etessami began importing the MDC copies of Staurino Fratelli's design. Moreover, the Etessamis have never produced those of Archangel's designs which differ from the Staurino Fratelli designs, such as a bootie version, a slipper without a strap or bow, and a slipper with a bow on the side of the strap. This chain of circumstances weakens the Etessamis assertions of independent creation, and re-establishes the conclusion that Linea Aurea's pendants were created to imitate Staurino Fratelli's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 14

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

designs.

### 2. Actual Copying by Tess

Copying by Tess was established by indirect evidence of access and probative similarity. Evidence of access included Tess' visit to the Staurino Fratelli booth at the Vicenza show in January 1997 with her brother in law Kevin Etessami, when she attempted to order Staurino Fratelli baby shoe pendants at that time. Also, Tess admitted seeing Basha's promotional postcard sometime in January or February 1997. It is also probable that Tess would have seen Basha's advertisements in various magazines.

In March or April 1997, Tess produced a promotional postcard that resembled Basha's both in design and in the individual shoes depicted. She obtained baby shoe pendants from Kevin Etessami and arranged them within the photograph in a chain across the top of the picture, as Basha had done in his postcard. She inserted her business' name above the chain in fancy script similar to that used by Basha. Tess' postcard is almost identical in size and shape to Basha's. While the shoes in the bottom half of Tess' postcard are loosely grouped, rather than linked by a fine gold chain as in Basha's, this difference does not outweigh the similarity between Tess' other design decisions and the choices used by Basha. Moreover, 21 of the 28 pendants in Tess' postcard were manufactured by Linea Aurea, and these pendants closely resembled Basha's.

### 3. Actual Copying by Behnam

*15 Copying by Behnam was also established by indirect evidence. Behnam obtained access to Basha's pendants when Fox attended the Vicenza show in January 1996 and the Basel show in April 1996 and read the catalogues produced for those trade fairs. While Fox denied reading some of the magazines in which the Basha pendants were advertised, he acknowledged that it was his job to keep abreast of trends in the jewelry trade. Given the pervasive advertising of the pendants by both Basha in the United States and Staurino Fratelli in Europe, it is unlikely that Fox could have failed to note their designs. Finally, Behnam used six pendants for a promotional mailing which closely resembled Basha's shoes. Because not all of Behnam's pendants are similar to those of Basha, the choice of those which most closely resemble the Staurino Fratelli designs raises the inference that Behnam had access to Basha's ads and was attempting to benefit from the popularity of his pendants.

As detailed above, probative similarity has been established between the six Behnam pendants depicted in the post card and Basha's pendants, as follows:

(a) several of Basha's pendants are made of enamel-covered gold with a diamond-covered strap across the instep, contrasting colors of enamel on toe and back, and seven diamonds set in the enamel on its toe, four in a cluster on the right and three scattered on the left. Behnam has two pendant with a diamond-covered strap across the instep and diamonds arranged in an identical manner to the stones on Basha's pendants, although Behnam's pendants are not coated with enamel, and one is silver rather than gold;

(b) one of Basha's pendants is made of gold with a diamond-covered bow set on a diamond-covered band across the toe. Behnam has two gold pendants with a diamond-covered bow, although there is no band across the toe, and one of the pendants has a colored stone set in the center knot of the bow;

(c) one of Basha's pendants is made of gold, with a plain strap across the instep and diamonds covering the toe only. Behnam also carries a gold pendant with a plain strap across the instep and a diamond-covered toe;

(d) one of Basha's pendants is gold with a diamond-covered strap across the instep and no decoration on the toe. Behnam carries a pendant made of gold with a diamond-covered strap and a plain gold band across the toe.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

Finally, both Basha's and these six of Behnam's pendants are similar in their rounded proportions, although the Behnam pendants are slightly smaller and have a circular opening rather than an oval opening, as in the Basha pendants. This evidence of access and similarity leads to a conclusion that the six shoes depicted in Behnam's postcard were copied from Staurino Fratelli's design. [FN11]

> FN11. The other 42 Behnam pendants differ from Basha's because of their smaller size, different ornamentation or both.

Behnam attempts to rebut this conclusion with the defense of independent creation, but its evidence is unpersuasive. Behnam did not offer testimony by the designer, "the one person who knows first hand whether [the pendants] were copied." *Tienshan,* 895 F.Supp. At 658. Behnam's witness, Fox, testified that he provided sketches of baby shoes to a designer, but could not assert from first hand knowledge that the designer had used only his sketches when preparing her drawings. The details of Behnam's pendants differed from the details in the designer's drawings, but resembled the details in Staurino Fratelli's pieces. As set forth above, Fox had ample opportunity to observe the Staurino Fratelli pendants at trade shows and in Basha's advertisements. It is not unlikely that his designer, also a member of the jewelry trade, would have had equal access to Staurino Fratelli's designs.

### C. Substantial Similarity

**\*16** Once actual copying is established, Basha must show that "the copying amounts to an improper appropriation by demonstrating that substantial similarity to protected material exists between the two works." *Laureyssens,* 964 F.2d at 140. Analysis of substantial similarity requires a "sharper focus" than that of probative similarity, for it includes only the protectible elements of the two works. *Fisher Price,* 25 F.3d at 123. "That is, the plaintiff must show that the defendant appropriated the plaintiff's particular means of expressing an idea, not merely that he expressed the same idea."

This determination is not an exact science. *Id.*

In most cases the test for substantial similarity is the "ordinary observer test", which determines whether an ordinary lay observer would recognize the alleged copy as having been appropriated from the copyrighted work. *Knitwaves,* 71 F.3d at 1002 (citing *Folio Impressions,* 937 F.2d at 766); *Laureyssens,* 964 F.2d at 141 (citing *Peter Pan Fabrics, Inc. v.. Martin Weiner Corp.,* 274 F.2d 487, 489 (2d Cir.1960) (L.Hand., J.)). Where, as here, the works contain both protected and unprotected elements, the Second Circuit applies the "discerning ordinary observer test", which examines similarity between the protectible elements of the plaintiff's work and the copy. *Knitwaves,* 71 F.3d at 1002; *Fisher-Price,* 25 F.3d at 123; *Laureyssens,* 964 F.2d at 141; *Tienshan,* 895 F.Supp. at 657. However, the Second Circuit cautions that in applying the more discerning inquiry, district courts should compare "the works' total concept and feel." *Knitwaves,* 71 F.3d at 1003, (citing *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 358, 362, 111 S.Ct. 1282, 113 L.Ed.2d 358).

There is a tension between the discerning ordinary observer test, which requires extraction and comparison only of protectible elements, and the *Knitwaves* court's direction that a determination of substantial similarity should rely on the work's " total concept and feel." *See M.H. Segan Limited Partnership v. Hasbro, Inc.,* 924 F.Supp. 512, 520 (S.D.N.Y.1996) ("Although the [more discerning ordinary observer test] requires that the Court exclude unprotectible ideas ... it must examine the ' total concept and feel' of the executed works.") At the root of these conflicting values is a concern that extraction of protectible elements would eliminate protection for works which are an original compilation of unprotected elements which, as the Supreme Court made clear, should be included under the aegis of the copyright statute. *Feist,* 499 U.S. at 358. As the *Knitwaves* court observed, if extracting only protectible elements was taken to its logical conclusion, "[courts] might have to decide that there can be no originality in a painting because all colors of paint have been used somewhere in the past." *Knitwaves* 71 F.3d at 1003. To avoid this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 16

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

extreme, this Court must strike a balance between extraction of protected elements and consideration of overall look and feel when applying the discerning ordinary observer test:

*17 Through *Knitwaves,* the Second Circuit has recently reconfirmed that the more discerning ordinary observer test is not an invitation to dissect a work into its constituent elements or features. The works as a whole must be compared to each other.

*M.H. Segan,* 924 F.Supp. at 521.

The question of substantial similarity is largely answered by the comparison conducted in the probative similarity analysis. *Tienshan,* 895 F.Supp. at 658. However, it is necessary to identify the protectible elements of Basha's pendants. *Id.* Staurino Fratelli created three basic designs of baby shoe pendant: one with a bow set on a band running across the toe; one with a strap across the instep and a band running across the toe; one with a strap and no band across the toe. The proportions of the shoe were specifically adjusted to be round, even bulbous, with an ovoid opening to the shoe, creating an overall look of chubbiness. Protectible elements are found in Staurino Fratelli's different arrangements of the ornamentation with french enamel and diamonds, such as the setting of diamonds on strap or bow and band, the use of contrasting colors of french enamel on toe and sides, and the pattern of the seven stones on the toe. *See, Knitwaves,* 71 F.3d 1004 (finding selection of leaves and squirrels as dominant design elements, fall palette of colors, and arrangement of elements into pattern to be protectible); *Tienshan,* 895 F.Supp. at 658-59 (finding placement on box of text, trademark, logo and photographs of actual plates and bowls to be protectible); *Saban Entertainment, Inc. v. 222 World Corp.,* 865 F.Supp. 1047, 1051 (S.D.N.Y.1994) (features in Power Ranger cartoon characters rarely found in combination distinguish them from generic masked heroic figures).

As set forth above, comparison of Linea Aurea's pendants to those sold by Basha reveals a close resemblance in protected features as well as overall look and feel. The shoes are almost identical in size and shape. Linea Aurea's shoes also incorporate two of the three basic variations established by Staurino Fratelli. Linea Aurea's shoes are ornamented similarly to those carried by Basha, for example, Linea Aurea coats its shoes with french enamel and insets diamonds on the band and strap. Even the choice of colors for the enamel is similar. While the Linea Aurea shoes are slightly smaller, they closely resemble Basha's pendants in their rounded proportions. In sum, sufficient similarities exist in both protectible elements and in the "total concept and feel" that a discerning observer would conclude that one was the copy of another.

As set forth above, comparison of Behnam's line of pendants to the Basha pendants reveals substantial similarity in six of Behnam's 48 pendants. These include the two pendants with the seven stones arranged on the toe, the two pendants with diamond-covered bows on the toe, the pendant with a plain strap across the instep and diamonds covering the toe, and the pendant with the diamond-covered strap across the instep.

### D. Merger Defense: Idea/Expression

*18 Both Linea Aurea and Behnam contend that Staurino Fratelli's expression of baby shoes is merged with the idea of baby shoes, and is therefore unprotectible, and that the similarities between their pendants and those of Basha/Staurino Fratelli are common to any execution of the idea of baby shoes. Citing *Herbert Rosenthal Jewelry Corporation v. Kalpakian,* 446 F.2d 738 (9th Cir.1971). In *Rosenthal,* the court ruled that despite evidence of actual copying and substantial similarity between the jeweled bee pins created by plaintiff and defendant, no infringement had occurred, because " the idea and its expression appear to be indistinguishable" and the similarities observed were "inevitable from the use of jewel-encrusted bee forms in both." *Id.* at 742. According to this doctrine, "[t]he idea and expression will coincide when the expression provides nothing new or additional over the idea," *Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corporation,* 562 F.2d 1157, 1168 (2d Cir.1977),

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 17

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

however, "[t]he complexity and artistry of the expression of an idea will separate it from even the most banal idea." *Id.*

While there is no dispute that the simple idea of baby shoe pendant is unprotectible, "from an artistic standpoint, there is, indeed, a virtually infinite variety of ways to express the idea of [baby shoes]." *Kurt S. Adler,* 897 F.Supp. at 95. In the instant case, Staurino Fratelli has designed a version of a baby shoe pendant which is more complex and artistic than the banal idea of baby shoe pendants. David Staurino testified that he spent two months adjusting the exact size, style and proportions of the pendant. He then designed several specific ornamentations of the shoe, using diamonds, french enamel, gold and silver. These specific choices as to size, shape, proportion, and ornamentation constitute an artistic expression of a baby shoe pendant beyond its stereotypical features. In sum, the Staurino Fratelli pendants contain far more than the "dash of originality" needed to provide copyright protection. *Tienshan,* 895 F.Supp. at 658 (citing *Rogers,* 960 F.2d at 307).

Moreover, the Counterclaim Defendants' own evidence undercuts their claims of idea/expression merger. First, Defendants produced an actual baby shoe and a silver baby shoe ornament to establish that Staurino Fratelli merely used the basic idea of a baby shoe, but, in fact, the shoe and ornament differed in design from the pendants made by Staurino Fratelli: both sported both strap and bow; neither included a band across the toe. Second, the drawings by the defendants' own designers contained variations on a baby shoe which do not appear in Staurino Fratelli's designs, such as a bootie, a sneaker, a slipper without bow or strap, and a strapped instep with a bow on the side. In light of these many alternative versions of baby shoe design, the Counterclaim Defendants merger defense must fail.

**\*19** For the reasons set forth above, Basha has demonstrated a likelihood of success on the merits in its claim of copyright infringement.

### *II. Irreparable Harm*

Where a plaintiff makes out a prima facie case of copyright infringement, irreparable injury can be presumed. *Fisher-Price,* 25 F.3d at 123; *Kurt S. Adler,* 897 F.Supp. at 96; *Tienshan,* 895 F.Supp. at 659; *Golden Bear,* 27 U.S.P.Q.2d at 1552. As explained by the Second Circuit:
[T]his is because the confusion created in the marketplace will damage the copyright holder in incalculable and incurable ways ... confusion may cause purchasers to refrain from buying either product and to turn to those of other competitors. Furthermore, if an infringer's product is of poor quality, a more lasting but not readily measurable injury may be inflicted on the plaintiff's reputation in the market.

*Fisher-Price,* 25 F.3d at 124 (internal quotations and ellipses omitted). Basha presented testimony to support this presumption; customers and authorized retailers have complained about the presence of "knock-off" versions being sold in the marketplace at a lower price, and several exclusive retailers have informed him that they will not market his baby shoe pendants if the presence of knock-offs continues. Linea Aurea, Tess and Behnam have not presented any evidence to rebut this presumption.

### *IV. Motion for Recall*

Basha requests an order directing the Counterclaim Defendants to recall all infringing pendants sold to customers. Linea Aurea claims that it has sold 100,000 baby shoe pendants since September 1996. Behnam has not provided a figure of its total sales, although the figure would have to be adjusted to include only those shoes which have been determined to be substantially similar to the Staurino Fratelli pendants.

"[T]he imposition of a recall requirement is well within the district court's broad powers as a court of equity." *Perfect Fit Industries, Inc. v. Acme Quilting Co. Inc.,* 646 F.2d 800, 805 (2d Cir.1981). A district court must consider the likely burden and expense of a recall to the defendant, and balance that burden against the benefit that would accrue to the plaintiff. *Id.* at 807. In this case, the burden to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 18

Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078
**(Cite as: Not Reported in F.Supp.)**

the Counterclaim Defendants in recalling existing stock ordered by other jewelry businesses would not be unduly burdensome. The Counterclaim Defendants need only write a letter to its wholesale customers and pay the cost of the return for customers who comply. *Id.* The recall of wholesale orders would significantly benefit Basha, who has testified that he risks losing customers if the infringing shoes are disseminated in the general marketplace.

However, the recall order will not apply to existing stock ordered by individual customers for personal use. *Eve of Milady v. Impression Bridal, Inc.,* 957 F.Supp. 484, 491 (S.D.N.Y.1997). In *Eve of Milady,* the court issued a recall order as to infringing bridal gowns which had been ordered by retailers, but not as to gowns which had been ordered by individual customers because "such an order would be a source of immediate prejudice to the brides who had planned to wear the defendants' dresses at their weddings." *Id.* In the instant case, the baby shoe pendants are likely presents for new parents, and recall would impose prejudice to the individual customers who have already formed sentimental associations between the pendants and their babies. Recall to individual customers would also impose a greater burden on the Counterclaim Defendants.

### V. Motion for Expedited Discovery

**\*20** Basha also moves for expedited discovery pursuant to Rules 30(a), 33(a) and 34(a) of the Federal Rules of Civil Procedure in order to discover the full nature of each counterclaim defendant's infringing activities. District Courts have broad power to permit expedited discovery in appropriate cases, see Rules 26(d), 33(a) and 34(b), Fed.R.Civ.P., and such discovery is routinely granted in actions involving infringement and unfair competition. *See, e.g., Revlon Consumer Products Corp. v. Jennifer Leather Broadway,* 858 F.Supp. 1268, 1269 (S.D.N.Y.1994), *aff'd without opinion,* 57 F.3d 1062 (2d Cir.1995); *Francis S. Denney, Inc. v. I.S. Lab, Inc.,* 737 F.Supp. 247, 248 (S.D.N.Y.1990). Basha's discovery motion will be granted.

### Conclusion

For the reasons set forth above, and pending a trial on the merits of this action, it is hereby ordered that J.D. Finesse d/b/a Linea Aurea, Katherine Tess Inc. and Behnam are enjoined from manufacturing or selling any baby shoe pendants which are substantially similar to the Staurino Fratelli pendants licensed to Aron Basha. It is also ordered that Behnam and Finesse recall infringing pendants which have been sold to its wholesale customers.

Basha's motion for expedited discovery regarding the full nature of each Counterclaim Defendant's infringing and improper activities is also hereby granted.

It is so ordered.

S.D.N.Y.,1997.
Benham Jewelry Corp. v. Aron Basha Corp.
Not Reported in F.Supp., 1997 WL 639037 (S.D.N.Y.), 45 U.S.P.Q.2d 1078

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 3

Westlaw.

Not Reported in N.Y.S.2d                                                                    Page 1

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

▷
Doubleclick, Inc. v. Henderson
N.Y.Co.Ct.,1997
Only the Westlaw citation is currently available.
NOT APPROVED BY REPORTER OF
DECISIONS FOR REPORTING IN STATE
REPORTS. NOT REPORTED IN N.Y.S.2d.
     Supreme Court, New York County, New York.
               DOUBLECLICK, INC.,
                         v.
     David HENDERSON, Jr., Jeffrey A. Dickey, and
       Alliance Interactive Networks, Defendants.
                    **No. 116914/97.**

                    Nov. 7, 1997.

Orrick, Herrington & Sutcliffe, LLP (Michael
Carlinsky, Anthony Carabba, Jr., René Kathawala,
of counsel), New York City, for plaintiff.
Pollack & Greene LLP (Kennard M. Goodman,
Michael E. Green, of counsel), New York City, for
defendant.
DeGRASSE, J.:
**\*1**  In this action alleging, *inter alia,*
misappropriation of trade secrets, unfair
competition, and breach of employees' duty of
loyalty, plaintiff DoubleClick, Inc. ("DoubleClick")
moves for a preliminary injunction to bar its former
employees, defendants David Henderson, Jr. ("
Henderson") and Jeffrey A. Dickey ("Dickey")
from engaging in business activities in competition
with DoubleClick.


                         FACTS

                    A. *The Parties*

DoubleClick is engaged in the relatively new and
fast-growing business of selling advertising on the
Internet. Headquartered in New York City,
DoubleClick was formed in 1996 from the merger

of two entities engaged in Internet advertising, a
division, known as DoubleClick, of the advertising
agency Bozell, Jacobs, Kenyon & Eckhardt, Inc. ("
Bozell"), and a company known as the Internet
Advertising Network.

DoubleClick has two sets of clients: web sits and
advertisers. It has entered into agreements with a
network of approximately 75 popular web sites to
sell advertising space on the sites. DoubleClick
and the web sites split the advertising revenue
generated by DoubleClick's efforts.

Advertisers also pay DoubleClick for access to its
network of web sites. By negotiating a single
contract with DoubleClick an advertiser can have its
ad shown on all of the web sites in the DoubleClick
network without having to enter into negotiations
with each web site. Advertisers may also choose to
focus their advertisements on certain web sites in
the DoubleClick network.

Advertisements at web sites frequently appear as "
banners" which a viewer may "click on" to learn
about a product. A banner is a link to a web site
maintained by the company selling the product.
For example, when an individual visits a web site
devoted to fly fishing, perhaps to seek out
information on local fishing conditions, she would
likely pass through pages in the web site that
included banners for companies making rods, reels,
and other paraphernalia associated with the sport, as
well as banners for non-fishing products, such as
sport utility vehicles, aimed at a larger group of
which fly fishers are a subset. If this person so
chose, she could then click on the banner for a
given company to learn more about its products.

Among the services that DoubleClick has developed
are a proprietary advertisement delivery system that
distributes advertisements to web sites in its
network in a matter of milliseconds, a system that
causes certain ads to appear when a user uses
certain search terms, and a number of technologies

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                    Page 2

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

designed to gauge the effectiveness of the advertisements. DoubleClick also claims a competitive advantage by virtue of the quality of its network, which it claims includes a number of the most-visited web sites.

DoubleClick claims to have generated significant proprietary information concerning its sales and marketing strategies, financial projections and results, requirements of its advertisers, and the success of its clients' ads. It also generated a business plan in 1996 that sets forth its long-term goals and strategies ("DoubleClick 1996 Business Plan"). This document was shown to venture capital firms. DoubleClick contends that these various categories of information are all trade secrets.

**\*2** There is evidence in the record that the Internet advertising business is an extremely competitive one, with a variety of companies using different software and sales techniques to maximize the effectiveness of its clients' advertising.

Defendant Dickey was hired in October 1995 by Poppe, Tyson, a subsidiary of Bozell, to work for the original DoubleClick. As Vice President of Business Development Dickey worked on a variety of matters for DoubleClick out of its California offices. Dickey was sufficiently senior that he had access to most of the information that DoubleClick claims herein is confidential, including its 1996 Business Plan, its revenue projections, plans for future projects, pricing and product strategies, and its various databases with information concerning DoubleClick's clients. When he was hired Dickey entered into an agreement with Bozell to maintain the confidentiality of information provided by its clients, and a covenant not to compete for Bozell's clients for one year after leaving Bozell. The parties dispute whether either agreement is applicable to the events described in the complaint.

Defendant Henderson came to DoubleClick in March 1996, partly on Dickey's recommendation, as Vice President of North American Advertising Sales. Based in DoubleClick's headquarters in New York City, he was responsible for hiring, training and managing DoubleClick's sales force.

Henderson was a member of DoubleClick's management team and the company's highest paid employee. Henderson had access to all the allegedly confidential company information that Dickey was privy to, and in addition was given highly confidential documents when he attended DoubleClick's management and Board of Directors meetings. These documents were distributed to DoubleClick's top managers at the beginning of the meetings and then collected at the end. They concerned, *inter alia,* summaries of operations, revenue and expense analyses, analytical summaries of financial indicators, and other highly confidential information. Like Dickey, Henderson entered into a confidentiality agreement with Bozell upon his employment. Henderson did not enter into a covenant not to compete.

*B. Henderson's and Dickey's Plans to Leave DoubleClick and Start Their Own Internet Advertising Business*

Henderson alleges in his affidavit that he gradually became dissatisfied with the way that DoubleClick was run, and that his dissatisfaction came to a head when he was offered a job in early 1997 by America Online ("AOL"), an on-line service. Henderson took AOL's offer of employment to DoubleClick's CEO, Kevin O'Connor, who made a counter-offer which Henderson accepted. Henderson alleges that DoubleClick failed to comply with the terms of their agreement. By the "early summer" of 1997, Henderson "came to the conclusion that DoubleClick was not going to provide me with the long-term career opportunities I had expected when I joined the company the previous year." (Affidavit of David Henderson ["Henderson Aff."], sworn to October 3, 1997, ¶ 42.)

**\*3** In July 1997 Henderson and Dickey both attended an industry-wide trade conference in Colorado. At the conference they discussed their dissatisfaction with DoubleClick's direction and resolved to start their own company, Alliance Interactive Network ("Alliance"). Upon their return to their respective offices, Dickey and Henderson began to take steps to make their company a reality, including drafting a business

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                    Page 3

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
(Cite as: Not Reported in N.Y.S.2d)

plan, seeking out investors and customers, and entering into discussions with at least one other DoubleClick employee.

According to his affidavit, Kevin Ryan, DoubleClick's President, received a tip on September 2, 1997 that Henderson and Dickey were planning on leaving DoubleClick to start their own Internet advertising company. Ryan and O'Connor went to Henderson's office the next day and confronted him with this allegation, which Henderson did not deny. Ryan and O'Connor fired Henderson on the spot and instructed him to remove his personal property from the office.

Ryan confiscated Henderson's laptop computer. Information retrieved from this laptop's hard drive, including saved e-mail messages, a draft of Alliance's business plan, and other strategic documents, provides much of the evidence offered in support of plaintiff's motion.[FN1]

> FN1. DoubleClick personnel also confiscated Dickey's laptop. Plaintiff contends that it was unable to access any files from this computer because Dickey " booby-trapped" it to delete files if someone tried to access the files without the proper password. Dickey contends that the laptop was simply a "lemon" that had crashed several times before, and that DoubleClick personnel could have easily forestalled the erasure of files caused by the machine's malfunction.

### DISCUSSION

In order to demonstrate that it is entitled to a preliminary injunction DoubleClick must show a probability of success on the merits, danger of irreparable injury in the absence of a preliminary injunction and a balance of the equities in its favor. (*Aetna Ins. Co. v. Capasso,* 75 N.Y.2d 860; CPLR 6312.) The Legislature added a new subdivision (c) to CPLR 6312 effective January 1, 1997, to make clear that the existence of an issue of fact on a motion for a preliminary injunction is not, standing alone, a sufficient basis for denying a preliminary

injunction. This amendment was designed to overcome the language of several judicial opinions that held that a preliminary injunction must be denied whenever the party opposing the motion demonstrates that the facts are in "sharp dispute." ( *Cf. BR Ambulance Service, Inc. v. Nationwide Nassau Ambulance,* 150 A.D.2d 745.)

### A. *Likelihood of Success on the Merits*

DoubleClick has asserted numerous claims against the defendants. In arguing that it is likely to succeed on the merits DoubleClick leads with its claims that defendants misappropriated trade secrets, engaged in unfair competition, and breached their duty of loyalty. As discussed below, DoubleClick has demonstrated that it is likely to succeed on these three claims, and it is therefore unnecessary to consider plaintiff's remaining claims.

### 1. Misappropriation of Trade Secrets

The elements of a cause of action for misappropriation of trade secrets are that 1) plaintiff possesses a trade secret and 2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means. (*See Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173.)

**\*4** The parties agree that the courts of this state have adopted the definition of trade secret set forth in the Restatement of Torts: "any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." (Restatement of Torts, § 757, comment b; *see Ashland Management v. Janien,* 82 N.Y.2d 395, 407.)

The Restatement lists several factors to be considered in evaluating a claim of trade secrecy:
(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                                    Page 4

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

business] to guard the secrecy of the information; (4) the value of the information to [the business] and [its] competitors; (5) the amount of effort or money expended by [the business] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

(Restatement of Torts § 757, comment b.)

As top executives at DoubleClick, Dickey and particularly Henderson had access to highly sensitive information regarding the company, including its revenue projections, plans for future projects, pricing and product strategies, and databases containing information collected by DoubleClick concerning its clients. defendants do not seriously dispute that they had access to this array of information, nor that the information could be of great use to any competitor of DoubleClick.

Defendants argue instead that the information that DoubleClick seeks to protect is not kept confidential by DoubleClick and is actually published on DoubleClick's own web site. Therefore, defendants argue, the information cannot qualify as a trade secret. This assertion is not borne out by the record. The web site describes DoubleClick's business in generalities; it does not contain the proprietary information generated by DoubleClick specified in plaintiff's papers as trade secrets.

For example, information concerning the quantity and quality of visits to advertisements posted on the various web sites that make up DoubleClick's network is not provided by DoubleClick's own web sites. Nor is information concerning DoubleClick's actual financial arrangements with its clients provided. Defendants make much of the fact that DoubleClick's "rate card", i.e. prices charged to advertisers, is posted on the web site. However, DoubleClick states that pricing in the Internet advertising business is "deal driven" and tailored to the needs of individual clients. Defendants' own business plan for Alliance supports this assertion. (Affidavit of Wenda Harris Millard, sworn to October 14, 1997 at ¶¶ 27-30, Exh. A.)

There is substantial evidence in the record that defendants misappropriated DoubleClick's trade secret information in derogation of their duties as DoubleClick employees.[FN2]

> FN2. As employees of DoubleClick defendants owed their employer a duty not to divulge confidential information, therefore it is not necessary to determine the viability of the confidentiality agreements and Dickey's covenant not to compete. "Even in the absence of a contract restriction, a former employee is not entitled to solicit customers by fraudulent means, the use of trade secrets, or confidential information." (*Support Systems Assocs., Inc. v. Tavolacci,* 135 A.D.2d 704, 706.)
> If any event these agreements do not on their face unambiguously apply to the events at issue herein. The agreements were with DoubleClick's former corporate home, Bozell, and Bozell's subsidiaries. It is not clear that the parties intended DoubleClick to succeed in Bozell's interest once it became independent of Bozell. Indeed, DoubleClick admits that it had circulated new confidentiality agreements to its employees once it became independent of Bozell. Dickey and Henderson had not signed their new confidentiality agreements when they were fired. (Affidavit of Kevin Ryan, sworn to September 18, 1997, 26.) Additionally, the confidentiality agreements protect only information designated as confidential by Bozell's clients, not information generated by Bozell.

**\*5** Dickey and Henderson were privy to the actual rates charged DoubleClick's clients. A document copied from Henderson's computer, titled " Stakeholder Positioning Analysis," gives rise to a strong inference that Dickey and Henderson were prepared to use this confidential information to compete directly for DoubleClick's web site clients. This document refers to DoubleClick's "margin" also known as "site share", which is the percentage

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                                                              Page 5

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

shares that DoubleClick and a client web site split from advertising revenues. The Stakeholder Positioning Analysis indicates that defendants intended to advise Alta Vista, DoubleClick's largest client, that DoubleClick's percentage share of advertising revenues generated at the Alta Vista web site is too high. (*See* Affidavit of Kevin O'Connor, sworn to September 18, 1997 (" O'Connor Aff.") Exhibit 9.

In his affidavit, Henderson states that the Stakeholder Positioning Analysis was merely a strategic exercise, and that he and Dickey had decided not to pursue such an aggressive strategy in wooing DoubleClick's clients. However, Henderson states only "that I agreed to take the high road by not making disparaging remarks about DoubleClick." (Henderson Aff. ¶ 54.) Tellingly, he does not state in his affidavit that he will not use DoubleClick's margin information. At the least, the Stakeholder Positioning Analysis demonstrates that defendants have sensitive proprietary information regarding DoubleClick's pricing, and have at least contemplated using such information to compete against their former employer.

Additionally, the draft Alliance business plan found on Henderson's computer discloses the number of visits to various web sites in the DoubleClick Network and the current sales for each site. Plaintiff claims that this information is confidential, and defendants have brought fourth no evidence to refute this claim. Defendants do not assert that this information is published on DoubleClick's web site or made public in any way. It is undisputed that the draft Alliance business plan was e-mailed to a person whom plaintiff characterizes, without contradiction from defendants, as "an industry consultant with ties to DoubleClick's competitors." (O'Connor Aff. ¶ 18.)

DoubleClick's confidential information about its pricing and customers constitutes trade secrets. Based on evidence of actual misappropriation of this information, DoubleClick has adequately demonstrated likelihood of success on the merits on its misappropriation of trade secrets claim. (*E.g. Support Systems Assocs., Inc. v. Tavolacci,* 135 A.D.2d 704, 706; *Advanced Magnification Systems*

*of Oneonta, N.Y. Ltd. v. Minuteman Optical Corp.,* 135 A.D.2d 889; *Webcraft Technologies, Inc. v. McCaw,* 674 F Supp 1039.) [FN3]

> FN3. DoubleClick offers an e-mail message off of Henderson's computer in which Henderson states that he "cut and pasted" DoubleClick's 1996 Business Plan to create Alliance's draft business plan. (O'Connor Aff., Exh. 1.) The parties spend a good deal of time arguing whether DoubleClick's 1996 Business Plan should be considered a trade secret. The extent to which the DoubleClick Plan was distributed to its employees and potential investors, and hence whether the document was kept sufficiently confidential by DoubleClick to qualify as a trade secret, cannot be resolved on the record before the court. Moreover, even if the DoubleClick Plan *does* qualify as a trade secret the record is unclear as to whether the plan was actually misappropriated by defendants. Henderson states that he only used the "format" of the DoubleClick plan, implying that he did not crib its substance. (Henderson Aff. ¶ 55.)

This finding is bolstered by the fact that there is a high probability of "inevitable disclosure" of trade secrets in this case. Injunctive relief may issue where a former employee's new job function will inevitably lead her to rely on trade secrets belonging to a former employer. In *Lumex Inc. v. Highsmith* (919 F Supp 624 [EDNY 1996] ) the court granted an injunction preventing a management representative from working with a competitor of plaintiff. The court held that the former employee would likely disclose plaintiff's trade secrets "to aid his new employer and his own future.... [Defendant] was privy to the top secret Cybex product, business and financial information. He cannot eradicate these secrets from his mind." ( *Id.* at 631; *PepsiCo Inc. v. Redmond,* 54 F.3d 1262, 1269.)

*6 In the instant case it appears to the court that the defendants will inevitably use DoubleClick's trade

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                      Page 6

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

secrets. Like the executive in *Lumex,* the centrality of Henderson and Dickey in DoubleClick's operations makes it unlikely that they could " eradicate [DoubleClick's] secrets from [their] mind." (*Lumex supra,* 919 F Supp at 631.) Moreover, the actual use of DoubleClick's trade secrets described above, and other actions discussed below, demonstrate defendants' cavalier attitude toward their duties to their former employer. This gives rise to a reasonable inference that they would use DoubleClick's confidential information against it.

For the above-stated reasons, DoubleClick has demonstrated that it is likely to succeed on its misappropriation of trade secrets claim.

### 1. Duty of Loyalty

It is well-established in the law of this state that an employee "is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties." (*Lamdin v. Broadway Surface Adv. Corp.,* 272 N.Y. 133.) While an employee may secretly incorporate a competitive business prior to his departure, he must not "use his principal's time, facilities or proprietary secrets to build the competing business." (*Maritime Fish Products Inc. v. World Wide Fish Products, Inc.,* 100 A.D.2d 81, 88, *appeal dismissed* 63 N.Y.2d 675; *see 7th Sense, Inc. v. Liu,* 220 A.D.2d 215.)

While Henderson tries to minimize his use of DoubleClick's facilities and time by stating that he did much of his work for Alliance while on vacation in August, it is clear that he used the company computer and e-mail service to build Alliance. While the parties dispute which portions of the DoubleClick 1996 Business Plan were used in drafting Alliance's business plan, defendants do not deny that they used this DoubleClick document, even if it was only for formatting purposes, to further their own plans to launch Alliance. There is also evidence that defendants used DoubleClick's spread sheets to draft projected spreadsheets for Alliance. Additionally, Henderson does not deny that he engaged in some Alliance-related activities

during company time.

Henderson admits that he and Dickey met with a potential client on behalf of DoubleClick and after making a presentation on behalf of DoubleClick then made a presentation regarding Alliance. (Henderson Aff. ¶ 58.) The solicitation of an employee's planned competitive business constitutes a breach of the duty of loyalty. (*E.g. Maritime Fish,* 100 A.D.2d at 89-90.)

Additionally, plaintiff has offered e-mail dated September 2, 1997, from Henderson's computer that demonstrates that Henderson solicited financing for Alliance from Match Logic, one of DoubleClick's competitors, in exchange for 2000 hours of " consulting time" from Alliance. While the precise content of this proposed "consulting" is not clear from the record, it is problematic that Henderson and Dickey would begin advising a DoubleClick competitor so soon after leaving DoubleClick given defendants' access to, and use of, DoubleClick's trade secrets. The e-mail indicates that Match Logic was sufficiently worried about defendants' activities to require that they indemnify Match Logic as part of the deal. (O'Connor Aff. Exh. 5.)

*7 These facts demonstrate that plaintiff is likely to succeed on the merits of its claim sounding in breach of the duty of loyalty.

### 3. Unfair Competition

A claim of unfair competition will lie where a former employee misappropriates and exploits confidential information belonging to her former employer in abuse of her relationship of trust. (*E.g. Comprehensive Community Development Corp. v. Lehach,* 223 A.D.2d 399; *Advanced Magnification Instruments, supra,* 135 A.D.2d 889.) The facts recited above that tend to show that Dickey and Henderson engaged in misappropriation of trade secrets and breached their duty of loyalty to DoubleClick also show that plaintiff is likely to succeed on the merits of this claim as well.

### B. *Irreparable Harm*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                    Page 7

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

Irreparable harm is presumed, where, as here, trade secrets have been misappropriated. (*Lumex, supra,* 919 F Supp at 628.) Defendants have offered nothing to rebut this presumption.

Even absent the presumption, plaintiff has demonstrated that they have no compunction against using DoubleClick's business information to compete against it. The damage that could be inflicted upon DoubleClick by defendants' exploitation of their intimate knowledge of DoubleClick's proprietary information is impossible to quantify in dollar terms. Accordingly, an injunction is the appropriate remedy.

### C. Balance of Equities

Plaintiff had demonstrated that the balance of equities tips in its favor. DoubleClick operates in a competitive and fast-changing business environment where the use of its proprietary information could cause it real harm. Defendants have not demonstrated that DoubleClick has acted tortiously against them or is otherwise without "clean hands."

By contrast, equity does not favor the employee who seeks to breach his fiduciary duties to his former employer. (*See Kaufman v. International Business Machines Corp.,* 97 A.D.2d 925, 926, *aff'd* 61 N.Y.2d 930.) Here, there is substantial evidence that defendants 1) used DoubleClick's proprietary information to prepare for the launch of Alliance and to position it to compete with DoubleClick, 2) worked on their plans for their new company during working hours at DoubleClick and used resources given to them by DoubleClick to do so, and 3) sought customers and financing for Alliance without regard to their duties to their current employer. Plaintiff has been able to marshall these facts without the benefit of discovery.

Dickey and Henderson are correct that the broad preliminary injunction sought in the complaint would effectively bar them from working in any capacity selling or placing advertising on the Internet, or from even working for a company that engaged in a marginal way in the Internet advertising business. However, apart from

references to the fact that Dickey and Henderson are apparently the only bread winners in single-income families, defendants have done nothing to demonstrate what financial hardship they would suffer if the injunction were imposed.

**\*8** In any event, the injunction set forth below is more narrowly drawn than the preliminary injunction sought in the complaint.

### REMEDY

The parties spend little time in their papers discussing the tailoring of a preliminary injunction. In its reply papers plaintiff scales back its proposed injunction to one "enjoining defendants for a period of at least twelve months from launching a competitive business or from working for a direct competitor of DoubleClick." (Plaintiff's Reply Memorandum of Law at 2.) This language is not sufficiently tailored. Both defendants have previously worked for companies placing advertisements in other media. Plaintiff's proposed injunction would prevent Dickey and Henderson for working for such a company if it engaged in Internet advertising even as a marginal part of its business. There can be no objection to defendants working for companies that engage in advertising in an array of media, including the Internet, so long as they do not get involved in the company's Internet advertising projects.

Moreover, the one-year period sought by plaintiff is too long. Given the speed with which the Internet advertising industry apparently changes, defendants' knowledge of DoubleClick's operation will likely lose value to such a degree that the purpose of a preliminary injunction will have evaporated before the year is up. Accordingly, the preliminary injunction issued below shall expire after six months from the date of this opinion. Plaintiff may for good cause move to extend the life of the preliminary injunction.

It is hereby ORDERED that:

Defendants are enjoined, for a period of six months from the date of this opinion, from launching any

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.Y.S.2d                                                                                    Page 8

Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)
**(Cite as: Not Reported in N.Y.S.2d)**

company, or taking employment with any company, which competes with DoubleClick, where defendants' job description(s) or functions at said company or companies include providing any advice or information concerning any aspect of advertising on the Internet. A company shall be presumed to compete with DoubleClick if it provides advertising software, advertising services, or a mix of advertising software and advertising services, to any entity seeking to advertise on the Internet, or to any web site seeking advertisers.

Nothing herein shall be construed to prevent defendants from working for any employer that competes with DoubleClick, so long as defendants' job description(s) or functions with such employer do not include providing advice or information concerning any aspect of advertising on the Internet.

Defendants are also enjoined, for a period of six months from the date of this opinion, from providing any advice or information concerning any aspect of advertising on the Internet to any third parties who 1) work for defendants' employer(s), or 2) provide or promise to provide any of the defendants with valuable consideration for the advice or information, or 3) share or promise to share any financial interest with any of the defendants.

The parties shall agree to an expedited discovery schedule that shall provide for, *inter alia,* the completion of depositions of Henderson and Dickey, and of two representatives of plaintiff chosen by defendants, within 60 days of the date of this opinion. Other depositions and discovery shall be completed within 5 months of the date of this opinion.

**\*9** The foregoing constitutes the decision and order of the court.

N.Y.Co.Ct.,1997
DoubleClick Inc. v. Henderson
Not Reported in N.Y.S.2d, 1997 WL 731413 (N.Y.Sup.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.