Tab 4

Douglas and others v Hello! Ltd and others (No 2)

COURT OF APPEAL (CIVIL DIVISION)

*[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487*

**HEARING-DATES:** 18 May 2005

18 May 2005

**CATCHWORDS:**

Equity -- Breach of confidence -- Confidential information -- Publication of unauthorised photographs -- Celebrity couple entering into agreement with magazine for authorised wedding photographs -- Rival magazine publishing unauthorised wedding photographs -- Freedom of expression -- Respect for private and family life -- Whether publication in breach of confidence -- Human Rights Act 1998, s 12, Sch 1, Pt I, arts 8, 10.

**HEADNOTE:**

In proceedings arising out of the publication in England and Wales by Hello! magazine of unauthorised photographs of the wedding reception, in New York, of the first and second claimants, who were very well-known film stars, the judge treated the rights to respect for private and family life and to freedom of expression conferred by arts 8 and 10 of the European Convention for the Protection of Human Rights and Fundamental Freedoms 1950 (as set out in Sch 1 to the Human Rights Act 1998) as absorbed into the action for breach of confidence. He held that the first and second claimants were entitled to damages and a perpetual injunction against Hello! on the grounds that the publication of the unauthorised photographs by Hello! constituted a breach of confidence, effectively because the reception had been a private event; that the third claimant, OK! magazine, which had had a contract with the first and second claimants giving it the exclusive right to publish photographs of the wedding reception, was entitled to damages from Hello! on substantially similar grounds; but that OK!'s case against Hello! in so far as it was based on deliberate interference with the business of OK!, or conspiracy to injure either by lawful, or by unlawful, means (the economic torts), failed. At a separate hearing on quantum, the judge awarded the first and second claimants damages of £3,750 each for the distress occasioned by the publication of the unauthorised photograph; £7,000 between them for the cost and inconvenience of having to deal hurriedly with the selection of the authorised photographs to enable them to be published in OK! no later than the publication of the unauthorised photographs in Hello!; and nominal damages for breach of the Data Protection Act 1998. The judge awarded OK! £1,026,706, representing his assessment of its loss of profit from the exploitation of the authorised photographs attributable to the publication of the unauthorised photographs and £6,450 in respect of wasted costs. All the parties appealed. Hello! contended that the judge had been wrong to conclude that the first and second claimants were entitled to any relief; and had been wrong to conclude that OK! had a cause of action, based on confidence, as a result of the publication of the unauthorised photographs. If Hello! succeeded in establishing that it was not liable to OK! in confidence, OK! argued that Hello! was none the less liable to it on the basis of one or more of the economic torts. If Hello! was liable to the first and second claimants, but not to OK!, the claimants contended that the damages awarded to the first and second claimants should be equivalent to the licence fee which they would have negotiated with Hello! for the publication of the unauthorised photographs in Hello! Hello! relied, inter alia, on the defence that under the law of New York it had owed no duty of confidence in relation to the photographs, and on the argument that the claimants' claim involved a restriction on Hello!'s right to freedom of expression within art 10 of the convention as such was required to be 'prescribed by law', but that at the time of the decision to publish, the relevant law was so uncertain that it had not been possible to predict that publication would be held to be unlawful.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Held -- (1) Photographs of the wedding had portrayed aspects of the first and second claimants' private life, and fell within the protection of the law of confidentiality, as extended to cover private or personal information. While the law of the place where the events to which private information related could be relevant to the question of whether there was a reasonable expectation that those events would remain private, the law of New York clearly entitled the first and second claimants to have arranged for their wedding to take place in circumstances designed to ensure that events at the wedding remained private, at least so far as photographic detail was concerned. The effect of the OK! contract was not to preclude the first and second claimants' right to contend that their wedding was a private occasion and thus protected by the law of confidence. There was an important potential distinction between the law relating to private information and that relating to other types of confidential information in that it was not necessarily true of photographs giving private information of a personal nature that once they had been widely published it might serve no useful purpose to prohibit further publication. Nor was it right to treat a photograph simply as a means of conveying factual information. It was wrong to suppose that a person who authorised publication of selected personal photographs taken on a private occasion would not reasonably feel distress at the publication of unauthorised photographs taken on the same occasion. To the extent that an individual authorised photographs taken on a private occasion to be made public, the potential for distress at the publication of other, unauthorised, photographs, taken on the same occasion, would be reduced. That would be very relevant when considering the amount of any damages. The agreement that authorised photographs could be published would not, however, provide a defence to a claim, brought under the law of confidence, for the publication of unauthorised photographs. Moreover, the law of confidence protected confidential or private information which was capable of commercial exploitation, although the information did not fall to be treated as property that could be owned and transferred, and in relation to the first and second claimants' claim in respect of damage, by publication of unauthorised photographs in England and Wales, to their commercial interest in the information about their wedding, the law of New York again had no relevance. Hello! had known that the first and second claimants had taken steps, permitted by the law of New York, intended to ensure that their wedding was a private occasion and that no unauthorised photographs were taken or published. It also knew that the first and second claimants had expected commercially to exploit their private wedding by the publication of authorised photographs. Hello! had deliberately obtained photographs that it knew were unauthorised and had published them to the detriment of the first and second claimants. Accordingly, Hello!'s appeal against the judgment in favour of the first and second claimants based on privacy and commercial confidence would be dismissed.

(2) OK! was not in a position to invoke against Hello! any right to commercial confidence in relation to the details of the wedding or the photographic images portraying them. The grant to OK! of the right to use the approved photographs was no more than an exclusive licence to exploit those photographs commercially for a nine month period. That licence did not carry with it any right to claim, through assignment or otherwise, the benefit of any other confidential information vested in the first and second claimants, nor the right to sue a third party for infringement of a right vested in the licensor to object to the publishing of other photographs of that event. The first and second claimants had retained a residual right of privacy in the details of their wedding not portrayed by the official photographs and it had been in the interests of OK! that they should protect that right so that OK! would be in a position to publish the only photographs which the public would be able to see. OK!'s complaint was not that Hello! had published images which it had been given the exclusive right to publish, but that Hello! had published other images, which no one with knowledge of their confidentiality had any right to publish. Those photographs invaded the area of privacy which the first and second claimants had chosen to retain and it was they, who had the right to protect that area of privacy or confidentiality. Accordingly, Hello!'s appeal against the judgment in favour of OK! based on commercial confidence would be allowed.

(3) The restriction on Hello!'s right to freedom of expression could not be attacked on the ground that it had not been prescribed by law of sufficient certainty. It had been reasonably foreseeable to Hello!, when they decided to proceed with publication, that that developing area of English law might result in their being held to have infringed the first and second claimants' rights of privacy or confidence. If at the time of publication English law had been insufficiently clear to satisfy the requirements of providing protection to privacy in a manner 'prescribed by law' the proper course for the court had been to attempt to bring English law into compliance with the convention, even if that

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

was at the cost of a restriction of Hello!'s art 10 rights by findings which, up to that moment, could not have been said to have been 'prescribed by law'.

(4) The gist of all the economic torts was the intentional infliction of economic harm. Intention to inflict harm was very different from knowledge that economic harm would follow as a result of incidental consequences of conduct, when those consequences were not necessary steps in achieving the object of the conduct and were unsought. OK! had failed to establish that Hello! had the requisite intention, and accordingly, its cross-appeal based on the economic torts would be dismissed.

(5) A notional licence fee was not the right basis on which to assess the first and second claimants' damages. They had not complained of the loss of the opportunity to earn money, would never have agreed to any of the unauthorised photographs being published, and having sold the exclusive right to publish photographs would not have been in a position to grant a licence to Hello! Accordingly, the cross-appeal on damages would be dismissed.

Decision of Lindsay J [2003] 3 All ER 996 reversed in part.

## CASES-REF-TO:

A v B (a company) [2002] EWCA Civ 337, [2002] 2 FCR 158, [2002] 2 All ER 545, [2003] QB 195, [2002] 3 WLR 542, [2002] 1 FLR 1021.
Acrow (Automation) Ltd v Rex Chainbelt Inc [1971] 3 All ER 1175, [1971] 1 WLR 1676, CA.
A-G v Guardian Newspapers Ltd (No 2) [1988] 3 All ER 545, [1990] 1 AC 109, [1988] 3 WLR 776, HL.
Allen & Hanbury Ltd v Generics (UK) Ltd [1986] RPC 203, CA.
Allen v Flood [1898] AC 1, [1895-9] All ER Rep 52, HL.
Associated British Ports v Transport and General Workers' Union [1989] 3 All ER 796, [1989] 1 WLR 939, HL.
Australian Broadcasting Corp v Lenah Game Meats Pty Ltd [2002] 2 LRC 86, Aus HC.
Barretts & Baird (Wholesale) Ltd v Institute of Professional Civil Servants [1987] IRLR 3.
Boardman v Phipps [1966] 3 All ER 721, [1967] 2 AC 46, [1966] 3 WLR 1009, HL.
Bourgoin SA v Ministry of Agriculture, Fishery and Foods [1985] 3 All ER 585, [1986] QB 716, [1985] 3 WLR 1027, CA.
Brekkes Ltd v Cattel [1971] 1 All ER 1031, [1972] Ch 105, [1971] 2 WLR 647, CA.
Campbell v Mirror Group Newspapers Ltd [2004] UKHL 22, [2004] 2 All ER 995, [2004] 2 WLR 1232.
Cheticamp Fisheries Co-operative Ltd v Canada (1995) 123 DLR (4th) 121, Nova Scotia CA.
Coco v A N Clarke (Engineers) Ltd [1969] RPC 41.
Cream Holdings Ltd v Banerjee [2004] UKHL 44, [2004] 4 All ER 617, [2004] 3 WLR 918.
Creation Records Ltd v News Group Newspapers Ltd [1997] EMLR 444.
Crofter Hand Woven Harris Tweed Co Ltd v Veitch [1942] 1 All ER 142, [1942] AC 435, HL.
D v L [2003] EWCA Civ 1169, [2004] EMLR 1, CA.
Daily Mirror Newspapers Ltd v Gardner [1968] 2 All ER 163, [1968] 2 QB 762, [1968] 2 WLR 1239, CA.
Dimbleby & Sons Ltd v National Union of Journalists [1984] 1 All ER 751, [1984] 1 WLR 427, HL.
Douglas v Hello! Ltd [2001] 2 All ER 289, [2001] QB 967, [2001] 2 WLR 992, CA.
Dunlop v Woollahra Municipal Council [1981] 1 All ER 1202, [1982] AC 158, [1981] 2 WLR 693, PC.
General Tire and Rubber Co v Firestone Tyre and Rubber Co Ltd [1975] 2 All ER 173, [1975] 1 WLR 819, HL.
Gilbert v Star Newspaper Co Ltd (1894) 51 TLR 4.
Hadmor Productions Ltd v Hamilton [1982] 1 All ER 1042, [1983] 1 AC 191, [1982] 2 WLR 322, HL.
Hellewell v Chief Constable of Derbyshire [1995] 4 All ER 473, [1995] 1 WLR 804.
Indata Equipment Supplies Ltd (t/a Autofleet) v ACL Ltd [1998] 1 BCLC 412, CA.
ISSAC Oren v Red Box Toy Factory Ltd [1999] FSR 785.
Kaye v Robertson [1991] FSR 62, CA.
Kitechnology BV v Unicor GmbH [1994] ILPr 568, CA.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Kuwait Oil Tanker Co SAK v Al Bader [2000] 2 All ER (Comm) 271, CA.
Les Editions Vice-Versa Inc v Aubry (1998) 5 BHRC 437, Can SC.
Lonrho Ltd v Shell Petroleum Co Ltd (7 March 1981, unreported), CA.
Lonrho Ltd v Shell Petroleum Co Ltd (No 2) [1981] 2 All ER 456, [1982] AC 173, [1981] 3 WLR 33, HL.
Lonrho plc v Fayed [1989] 2 All ER 65, [1990] 2 QB 479, [1989] 3 WLR 631, CA; rvsd in part [1991] 3 All ER 303, [1992] 1 AC 448, [1991] 3 WLR 188, HL.
Lumley v Gye (1853) 2 E & B 216, [1843-60] All ER Rep 208.
McManus v Beckham [2002] EWCA Civ 939, [2002] 4 All ER 497, CA.
Merkur Island Shipping Corp v Laughton [1983] 2 All ER 189, [1983] 2 AC 570, [1983] 2 WLR 778, HL.
Metall und Rohstoff AG v Donaldson Lufkin & Jenrette Inc [1989] 3 All ER 14, [1990] 1 QB 391, CA.
Millar v Bassey [1994] EMLR 44, CA.
Mogul Steamship Co Ltd v McGregor Gow & Co (1889) 23 QBD 598, CA.
Mustad (O) & Son v S Allcock & Co Ltd and Dosen [1963] 3 All ER 416, [1964] 1 WLR 109n, HL.
National Phonograph Co Ltd v Edison-Bell Consolidated Phonograph Co Ltd [1908] 1 Ch 335, [1904-7] All ER Rep 116, CA.
OBG Ltd v Allan [2005] EWCA Civ 106, [2005] 2 All ER 602, CA.
Peck v UK (2003) 13 BHRC 669, ECt HR.
Prince Albert v Strange (1849) 1 Mac & G 25, 41 ER 117.
Quinn v Leathem [1901] AC 495, [1900-3] All ER Rep 1, HL.
RCA Corp v Pollard [1982] 3 All ER 771, [1983] Ch 135, [1982] 3 WLR 1007, CA.
Saltman Engineering Co Ltd v Campbell Engineering Co Ltd [1963] 3 All ER 413n, CA.
Shelley Films Ltd v Rex Features Ltd [1994] EMLR 134.
South Wales Miners' Federation v Glamorgan Coal Co Ltd [1905] AC 239, [1904-7] All ER Rep 211, HL.
Spencer (Earl) v UK (1998) 25 EHRR CD 105, E Com HR.
Stjerna v Finland (1994) 24 EHRR 194, ECt HR.
Sunday Times v UK (1979) 2 EHRR 245, [1979] ECHR 6538/74, ECt HR.
SW v UK (1995) 21 EHRR 363, [1995] ECHR 20166/92, ECt HR.
Theakston v MGN Ltd [2002] EWHC 137 (QB), [2002] All ER (D) 182 (Feb).
Thomson (D C) & Co Ltd v Deakin [1952] 2 All ER 361, [1952] Ch 646, CA.
Three Rivers DC v Bank of England (No 3) [1996] 3 All ER 558; affd [1999] 4 All ER 800n, [2003] 2 AC 1, [2000] 2 WLR 15, CA; affd in part [2000] 3 All ER 1, [2003] 2 AC 1, [2000] 2 WLR 1220, HL.
Torquay Hotel Co Ltd v Cousins [1969] 1 All ER 522, [1969] 2 Ch 106, [1969] 2 WLR 289, CA.
Van Camp Chocolates Ltd v Aulsebrooks Ltd [1984] 1 NZLR 354, NZ CA.
Venables v News Group Newspapers Ltd, Thompson v News Group Newspapers Ltd [2002] 1 FCR 333, [2001] 1 All ER 908, [2001] Fam 430, [2001] 2 WLR 1038, [2001] 1 FLR 791.
Verliere v Switzerland (App no 41953/98) (admissibility decision, 28 June 2001), ECt HR.
Von Hannover v Germany (2004) 16 BHRC 545, ECt HR.
Wainwright v Home Office [2003] UKHL 53, [2003] 4 All ER 969, [2004] 2 AC 406, [2003] 3 WLR 1137.
X and Y v Netherlands (1985) 8 EHRR 235, ECt HR.

## INTRODUCTION

Appeal and cross appeal

The defendant, Hello! Ltd (Hello!), appealed against the decisions of Lindsay J on 11 April 2003 ([2003] EWHC 786 (Ch), [2003] 3 All ER 996) and on 7 November 2003 ([2003] EWHC 2629 (Ch), [2004] IP & T 710) awarding damages of £14,750 in favour of the first and second claimants, Michael Douglas and Catherine Zeta-Jones, and £1,033,156 in favour of Northern & Shell plc (OK!) in their action against Hello! and others for breach of confidence. The appeal against the award to the first and second claimants was in respect of liability only; the appeal against the award to OK! Was in respect of liability and quantum. The claimants cross appealed in respect of the liability of Hello!

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

to OK! and as to the proper assessment of the damages awarded to the first and second claimants. The facts are set out in the judgment of the court.

**COUNSEL:**

James Price QC and Giles Fernando for the appellants; Desmond Browne QC and David Sherborne for the respondents.

**PANEL:** LORD PHILLIPS OF WORTH MATRAVERS MR, CLARKE, NEUBERGER LJJ

**JUDGMENTBY-1:** LORD PHILLIPS OF WORTH MATRAVERS MR

**JUDGMENT-1:**

LORD PHILLIPS OF WORTH MATRAVERS MR: This is the judgment of the court, to which all members have contributed.

THE BACKGROUND

The basic facts

[1] Hello! Ltd (Hello!), the publishers of Hello! magazine, appeal against awards of damages made by Lindsay J in favour of Mr Michael Douglas and his wife Ms Catherine Zeta-Jones (the Douglases), and Northern & Shell Plc (OK!), the publishers of OK! magazine. The appeal against the award of £14,600 in favour of the Douglases is in respect of liability only; the appeal against the award of £1,033,156 in favour of OK! is in respect of liability and quantum. The Douglases and OK! contingently cross-appeal; the issues raised on the cross-appeals concern the liability of Hello! Ltd to OK!, and the damages awarded to the Douglases.

[2] The complex factual and procedural history of this matter is fully and clearly set out at [1]-[179] of Lindsay J's judgment on liability, which is reported as Douglas v Hello! Ltd (No3) [2003] EWHC 786 (Ch), [2003] 3 All ER 996. We shall limit ourselves to the essential facts necessary to determine the issues raised before us.

[3] On 18 November 2000, Mr Douglas and Ms Zeta-Jones, who were and are very well-known film stars, were married at the Plaza Hotel, New York. As soon as the couple's engagement was announced in early 2000, there was intense interest in this event from certain sections of the media; in particular, from the publishers of OK! and Hello! magazines. As the judge said, at [12], both those magazines 'provide a regular diet of photographs and text about royal, but, more usually, entertainment, sporting, and social celebrities, with photographs taking precedence over text'. Most of those photographs are posed, and many of those that are not will have been taken with the consent of their subjects. As the judge said (at [15]), the two magazines are 'plainly keen rivals in the same market', and they each had an average weekly circulation in the United Kingdom of just over 450,000 copies.

[4] Both publishers approached the Douglases with a view to obtaining the exclusive right to publish photographs of the wedding reception. The Douglases decided, with a view to reducing what Ms Zeta-Jones called 'the media frenzy', that they would grant that right to one publisher. According to Mr Douglas, they regarded this course as 'the best way to control the media and to protect our privacy'. After some negotiations, they entered into a contract with OK! (the OK! contract) on 10 November, eight days before the wedding.

[5] In its preamble, the OK! contract referred to 'the publication of an article, including story and photographs (collectively "the Article") relating to the Wedding'. By cl 1, OK! agreed to pay £500,000 each to Mr Douglas (therein 'MKD'), and to Ms Zeta-Jones (therein 'CZJ'). By cl 2, it was agreed that—

'MKD and CZJ hereby transfer to OK! the exclusive right to publish . . . the Photographs (as defined in paragraph 6

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

below) and the text referred to herein from the date of the Wedding and for nine months thereafter.'

[6] By cl 3, OK! were permitted to publish 'the approved Article' in OK! magazine. By cll 4 and 5, Mr Douglas and Ms Zeta-Jones respectively agreed that OK! would have, for the nine month period referred to, 'the exclusive right . . . to consent to use' all photographs and other likenesses of the Douglases in relation to the wedding. By cl 6, the Douglases were to hire a photographer at their own expense 'to take colour photographs of the Wedding ("the Photographs")'. They also agreed to-

'use their best endeavours to ensure that no other media . . . shall be permitted access to the Wedding, and that no guests or anyone present at the Wedding . . . shall be allowed to take photographs.'

The Douglases also undertook to 'use their best efforts' to ensure that their guests did not publish any details of the wedding.

[7] By c 7, the Douglases agreed that they would procure 'joint ownership of all copyright in the Photographs', and that their selection of the approved photographs would be provided to OK! by 22 November 2000. OK! agreed that they would only publish photographs approved by the Douglases. Clause 8 was concerned with the rights and obligations of the parties in relation to the text of an intended article and interview with the Douglases about the wedding, to be published in OK! magazine. Clause 9 entitled OK! to determine the contract if 'the Photographs . . . are not of sufficient quality or quantity for a feature of this significance'.

[8] By cl 12, the Douglases agreed not to authorise the publication of any photographs of the wedding for the period of nine months, without the prior consent of OK!. Under cl 13, if any unlicensed third party used any photograph (or other likeness of the Douglases) in connection with the wedding, OK! agreed, if so requested by the Douglases, to 'pursue all necessary legal action to cause such third party to cease such infringement'. Clauses 14 and 15 provided for a sharing between OK! and the Douglases of any sum over £1m received by OK! 'from all sources from the exploitation of the Article'.

[9] By cl 16, the Douglases undertook to-

'take all reasonable means to provide such security (approved by OK! magazine) during the entirety of the Wedding proceedings . . . as is necessary to ensure that third party media . . . and/or members of the public . . . are unable to obtain access . . . in order to minimise photographs . . . of the Wedding . . . being made available to third party media.'

Clause 17 contained a confidentiality provision, and cl 18 stated that the contract was governed by Californian law.

[10] The Douglases had sent out invitations to the reception to around 120 family members, a large number of personal friends, and many celebrities. The invitations included a politely worded statement which made it clear that no photographs were to be taken. The Douglases also hired appropriate photographers for the event. They duly took steps to ensure that there were tight security arrangements at the hotel on 18 November. Indeed, well before 18 November, there were security staff in place. On 17 November, the day before the wedding, entry cards were delivered to each of the 350 wedding guests, with a view to ensuring, by means of a coded marking on each card, that, so far as possible, no unauthorised person got in.

[11] The guests began arriving at the hotel at about 7.30pm in the evening of 18 November. There were speeches, entertainers, music, and dancing. The cake was cut at midnight, and the reception ended around 5.30am on the morning of 19 November. Although the event appeared to have been an unqualified success, it transpired that a paparazzo, Mr Rupert Thorpe, had infiltrated the reception, and surreptitiously taken photographs, including some of the bride and groom (together and separately). How this happened has still not been explained, at least in these proceedings.

[12] Mr Thorpe then contacted another paparazzo, Mr Philip Ramey, who was based in California, with a view to selling the 15 photographs that he had surreptitiously taken. They included six ('the unauthorised photographs'), which

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

were, in due course, thought to be of sufficient interest and quality to publish. These six photographs were described by the judge in these terms, at [76]:

'The photograph of the bride going down the aisle towards the wedding ceremony on the arm of her father cuts off all of him but his arm. Two show the bride eating, one of which has the groom holding the fork down into her mouth. In one she playfully holds up a cake knife at her husband. In one taken from a very low level she dances, but not with the groom. Another, hopelessly out of focus, shows the bride and groom kissing. The bride's dress is shown to a greater or lesser extent in all six, and parts of the very elaborate wedding cake are visible in three.'

[13] Mr Ramey immediately approached potential purchasers, including Hello!. Negotiations between Mr Ramey, in California, and Ms Sue Neal, then employed by Hello! as a picture editor in London, were quickly concluded. At some point during 19 November, with the authority of her superiors in Madrid, Ms Neal agreed to pay £125,000 for the exclusive right to publish the unauthorised photographs in Hello! magazine in the UK, and in its sister publications in Spain and in France. The judge had little difficulty in concluding that both Mr Ramey and Hello! would, or at least ought to, have known of the OK! contract, and of the sort of terms it would have included (in particular, with regard to exclusivity), as well as of the elaborate security procedures to prevent intrusion and unauthorised photography at the reception.

[14] The staff of Hello! magazine then started to prepare for the next edition on the basis that it would include the unauthorised photographs. Meanwhile, OK! learnt that unauthorised photographs had been taken and were on the market. The Douglases were informed, and were, according to their evidence, not surprisingly 'shocked'. On learning that Hello! had bought, and were intending to publish, the unauthorised photographs, the Douglases and OK! (the claimants) applied for, without notice to Hello!, and obtained from Buckley J, an interlocutory injunction on 20 November. This injunction, which restrained Hello! from publishing photographs of the wedding, was continued by Hunt J the following day, after a hearing, at which Hello!, as well as the claimants, were represented.

[15] Hello! appealed, and, after a hearing over two days, the Court of Appeal (Brooke, Sedley and Keene LJJ) announced, a little before 5 pm on 23 November, that the appeal would be allowed, and the interlocutory injunction lifted. Reasoned judgments were given later, on 21 December 2000, and are reported at Douglas v Hello! Ltd [2001] 2 All ER 289, [2001] QB 967.

[16] It subsequently transpired that some of the evidence put before the Court of Appeal on behalf of Hello! was seriously inaccurate. First, the draft statement of their publishing director, which was put before the court even though she had declined to sign it, stated that Hello! were unaware that unauthorised photographs were intended to be taken. In fact, they were aware that an attempt would be made to take clandestine photographs, although they had not in any way commissioned, or even agreed to purchase, any such photographs. Secondly, the Marquesa de Varela, who frequently supplied features to Hello! magazine, signed a manufactured letter to support the story in which she said that it was her company, Neneta Overseas Ltd, which had sold the unauthorised photographs to Hello!. This was an invention, whose iniquity is reinforced by the fact that it is persisted in at trial even to the extent of the production of false apparently supportive invoices. Thirdly, the third defendant, Senor Sanchez Junco, the editor in chief of Hello! magazine (and controlling shareholder in Hello!'s parent company), stated that he had no previous contact with the providers of unauthorised photographs. As Lindsay J subsequently found, Senor Sanchez would have known this would have been understood to be a reference to the Marquesa, and, as so understood, this was untrue.

[17] In anticipation of the possibility that they would be able to publish the unauthorised photographs, Hello! had finalised the 639th issue of their magazine to include them (including one on the front cover). That issue of Hello! magazine was distributed to newsagents on 23 November, and was available to be purchased by the public throughout the United Kingdom on and after 24 November.

[18] OK! had originally intended to publish the authorised photographs over two issues, its 242nd and 243rd, which were respectively due to come out on 30 November and 6 December in London, and a day later in the rest of the United

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Kingdom.  However, on discovering the existence of the unauthorised photographs, they decided to bring the publication forward.  This meant that the selection of photographs was an exercise carried out by the Douglases 'in some haste', rather than being 'a leisurely, unhurried and pleasant process' to quote from the judgment (at [89]).  As the judge found, the need for expedition resulted in expense, which would not otherwise have been incurred.

[19] As a consequence, a large number of the authorised photographs were included in the 241st edition of OK! magazine, with one of those photographs, a full family wedding group, on the front cover.  Although this edition bore the date of 1 December, it 'went on public sale on the very same day as Hello!'s issue 639', to quote from [133].  The balance of the authorised photographs was published in the next edition of OK! magazine, with a close-up of the bride and groom on the cover, which came out on 2 December.

[20] On the same day that OK! magazine published many of the authorised photographs and Hello! magazine published the six unauthorised ones, 24 November 2000, the Sun newspaper published five of the unauthorised photographs, and the Daily Mail newspaper published a reproduction of the front cover of Hello! magazine (ie one of the unauthorised photographs).  The following day, the Daily Mail published four of the unauthorised photographs.

[21] The judge accepted the evidence of Hello! magazine's London editor, Ms Koumi, that 'it was totally untrue that permission had been given to the Sun', or indeed to the Daily Mail, to republish the Douglas wedding pictures' (at [138]).  In answer to requests made on behalf of those two newspapers, just after the injunction had been lifted, Ms Koumi had said that they could reproduce the front cover of issue 639, but no other photographs in the magazine.  The editor of the Sun had been told earlier by Ms Koumi that he might be able to use the other unauthorised photographs, but she made it clear that he could not do so on 23 November, when, according to the judge, 'it was . . . not too late for the Sun to have withdrawn from its print run any pictures from the inside of Hello! which the Sun had proposed to use' (at [134]).

[22] Meanwhile, the proceedings developed.  The claimants had initially wanted only injunctive relief, but, in light of the discharge of the interlocutory injunction, they also sought damages.  Further defendants, including Senor Sanchez Junco, were joined in addition to Hello!, and this entailed a further visit to the Court of Appeal.  The pleadings on each side were amended on a number of occasions, disclosure was given, and witness statements exchanged.

[23] There was then an application by the claimants to debar the defendants, including Hello!, from defending the claim, on the grounds of their deceit (including the lies to the Court of Appeal), their failure to give proper disclosure (which included allegations of destruction of documents), and the unreliability of some of their evidence.  That application came before Sir Andrew Morritt V-C, who, on 27 January 2003, dismissed it, although he strongly criticised the way in which Hello! and many of its employees had conducted the litigation- see at [2003] EWHC 55 (Ch), [2003] 1 All ER 1087n. (It is right to add that some of those criticisms were expressly disclaimed by Lindsay J at [103] and [127]-[128] of his judgment, after having heard and seen fuller evidence than was available to the Vice-Chancellor.)

[24] Very shortly thereafter, on 3 February 2003, the case came on for hearing, on liability only, before Lindsay J.  The hearing lasted 25 days, and the judge gave an impressive and full judgment on 11 April 2003.  Although other points were dealt with in his judgment, it is enough for present purposes to summarise the judge's conclusions as follows:

-- He found that the Douglases were entitled to damages and a perpetual injunction against Hello!, on the grounds that the publication of the unauthorised photographs in this jurisdiction by Hello! constituted a breach of confidence, effectively because the reception was a private event.

-- He found that OK! were entitled to damages from Hello! on substantially similar grounds, albeit that the breach of confidence was, so far as they were concerned, more in the nature of a trade secret.

-- He rejected OK!'s case against Hello! in so far as it was based on what we shall call economic torts, namely deliberate interference with the business of OK!, or conspiracy to injure either by lawful, or by unlawful, means.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

[25] There was a subsequent hearing on the issue of quantum, resulting in a further judgment on 7 November 2003. In that judgment (the quantum judgment), Lindsay J rejected the argument that the Douglases were entitled to damages calculated on the basis of a notional licence fee, but he indicated that, if that had been the proper basis, he would have assessed the notional fee at £125,000. He awarded the Douglases damages on a different basis, namely, (a) £3,750 each for the distress occasioned by the publication of the unauthorised photographs, (b) £7,000 between them for the cost and inconvenience of having to deal hurriedly with the selection of the authorised photographs to enable them to be published in OK! magazine no later than the publication of the unauthorised photographs in Hello! magazine, and (c) nominal damages of £50 each for breach of the Data Protection Act 1998. The judge awarded OK! £1,026,706, representing his assessment of their loss of profit from the exploitation of the authorised photographs (essentially as a result of a much more modest increase in circulation than would otherwise have been enjoyed by the 241st and 242nd issues of OK! magazine) attributable to the publication of the unauthorised photographs on 24 November 2000. He also awarded OK! £6,450 in respect of wasted costs.

The issues raised on this appeal

[26] First, Hello! contend that the judge was wrong to conclude that the Douglases were entitled to any relief. This contention is premised on the proposition that, whether one puts their case in terms of confidence or privacy, the Douglases had no cause of action against Hello! as a result of the publication of the unauthorised photographs. Secondly, Hello! argue that the judge was also wrong when he decided that OK! had a cause of action, based on confidence, as a result of the publication of the unauthorised photographs.

[27] Thirdly, if Hello! succeed in establishing that they are not liable to OK! in confidence, OK! argue that, contrary to the judge's conclusion, Hello! are none the less liable to them on the basis of one or more of the economic torts. For reasons which will be explained when dealing with this part of the appeal, this argument depends on the Douglases maintaining their judgment against Hello!.

[28] The fourth and fifth issues relate to damages. Hello! argue that, if they are liable to OK!, the judge erred, when assessing the effect on OK!'s profits, in taking into account the effect, not merely of the publication of the unauthorised photographs in Hello! magazine, but also of the publication of some of these in the Sun and the Daily Mail. Finally, if Hello! are liable to the Douglases, but not to OK!, the claimants contend that the damages awarded to the Douglases should be equivalent to the licence fee which they would have negotiated with Hello! for the publication of the unauthorised photographs in Hello! magazine, and that the judge's assessment of that fee at £125,000 was too low.

The judgment on liability

[29] The judgment on liability was 90 pages in length, the first 50 of which were devoted to the facts. The judge then identified the different kinds of claim advanced on the basis of these facts. For present purposes the following are relevant:

-- On the basis that the wedding was private, the Douglases claim for breach of confidence, a duty, in that circumstance, owed only to them.

-- Further, or alternatively, on the basis that the wedding was an event which was exploited for gain, all three claimants claim for breach of confidence, their case being that photographic representation of the events was, in effect, a commercial or trade secret.

-- In the further alternative, the Douglases claim for breach of their right to privacy.

-- All claimants claim that there was deliberate interference by the defendants with their trade or businesses, by unlawful means.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

-- All claimants claim that there was a conspiracy by the defendants to injure them by unlawful means.

-- All claimants claim there was a conspiracy by the defendants with the predominant purpose of injuring them.

[30] The judge dealt first with the two claims based on the law of confidence. He considered the recent development of this area of the law that has been stimulated by the Human Rights Act 1998. He set out the principles that he drew from the authorities in relation to what he described as 'personal or individual confidence'. He then went on to give consideration to what he described as 'commercial confidence'. He concluded that the authorities suggested that the benefit of a commercial confidence can be shared with and enforced by the original confider and another or others, where the facts require that such others should be protected.

[31] In an important step in his reasoning the judge said (at [196]):

'I see it as appropriate to examine the applicability of the law of confidence on the basis that the claimants had here a valuable trade asset, a commodity the value of which depended, in part at least, upon its content at first being kept secret and then of its being made public in ways controlled by Miss Zeta-Jones and Mr Douglas for the benefit of them and of the third claimant. I quite see that such an approach may lead to a distinction between the circumstances in which equity affords protection to those who seek to manage their publicity as part of their trade or profession and whose private life is a valuable commodity and those whose is not but I am untroubled by that; the law which protects individual confidences and a law of privacy may protect the latter class and provide no reason to diminish protection for the former. So far as concerns OK!, the right to exclusivity of photographic coverage of the wedding was, in contrast with the nature of the confidence as to the first and second claimants, even more plainly a right in the nature of a trade secret.'

[32] The judge considered a number of defences raised to the claims and rejected them. These included the contention that the question of whether what took place at the wedding was confidential was governed by the law of New York and the contention that any rights of confidentiality were lost as a result of the publication of the authorised photographs by OK!

[33] The judge's conclusion in relation to confidence appears at [228]:

'In my judgment, and first regarding the claimants' case as one of either commercial confidence or of a hybrid kind in which, by reason of it having become a commodity, elements that would otherwise have been merely private became commercial, I find the Hello! defendants to have acted unconscionably and that, by reason of breach of confidence, they are liable to all three claimants to the extent of the detriment which was thereby caused to the claimants respectively.'

[34] The description of the confidence identified by the judge as 'hybrid' was appropriate. The Douglases had claimed damages under two heads: (1) for invasion of their privacy; and (2) for damage to their commercial interest in information about their wedding. Their contention was that they were commercially exploiting information about their wedding in such a way as to preserve residual confidentiality, or privacy, in relation to it. Selected photographs would be made public, disclosing that part of the private information that the Douglases were content should be conveyed to the public. No other images would be made available to the public.

[35] The judge appears to have accepted that this was a legitimate approach. He held at [52]:

'. . . the notion of an exclusive contract as a means of reducing the risk of intrusion by unauthorised members of the media and hence of preserving the privacy of a celebrity occasion is a notion that can reasonably be believed in as a potentially workable strategy to achieve such ends.'

[36] When the judge came to assess damages, he made an award under each head. He awarded Mr Douglas and Ms Zeta-Jones £3,750 each, for distress at the publication of the unauthorised photographs. This can only have been on the basis that those photographs had invaded their privacy. He awarded them a further £7,000 jointly for the labour and

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

expense of expediting the selection of photographs that were to be provided under their contract with OK!. This can only have reflected damage, or the cost of mitigating damage, to their commercial interest in the information about their wedding.

[37] The judge dealt shortly with the question of whether the Douglases could bring a separate claim under the law of privacy. He held that in this case the law of confidence provided them with an adequate remedy. Were that not the case it would have been for Parliament, not the court, to fill the gap.

[38] So far as the claims for interference with business and conspiracy to injure, the judge held that the necessary elements in these causes of action were not all made out. We shall consider his reasoning in greater detail later in this judgment.

THE ISSUES IN RELATION TO CONFIDENCE AND PRIVACY: THE PRINCIPLES

Introductory

[39] Mr Price QC, on behalf of Hello, submitted that it was not possible to approach this case, as the judge had done, on the premise that the rights involved were of a hybrid kind, being both personal and commercial. Different principles applied to the two different types of right.

[40] So far as the Douglases' claim was concerned, the right that they invoked was a personal right in the nature of a privacy right. It was a right which would be infringed by publication of photos of the wedding if, but only if, such publication would be highly offensive to a reasonable person. The right was not transferable. In so far as the Douglases had such a right it was lost once they entered into an agreement with OK! under which that which they could have kept private was to be made public. Furthermore, any damages for infringement of this right could only reflect the values protected by the legal principle, that is privacy values.

[41] So far as OK!'s claim was concerned, they claimed to have enjoyed a right of commercial confidence, transferred to them under their contract with the Douglases. The law recognised no such right in respect of what went on at the wedding and no such right could be transferred to OK!. Alternatively, if such a right did exist, it ceased on publication by OK! of the authorised photographs, which placed the information alleged to be confidential in the public domain.

[42] Mr Price advanced separate defences based upon New York law. The unauthorised photographs were taken by Mr Thorpe in New York. Any duty of confidence on the part of Hello! could only be based on knowledge that Mr Thorpe owed a duty of confidence in relation to the photographs. Under the law of New York Mr Thorpe owed no such duty. It followed that Hello! owed no duty of confidence either to the Douglases or to OK!.

[43] It is convenient to consider the issues in relation to the Douglases' claim separately from those in relation to OK!'s claim. The issues in relation to the Douglases' claim are as follows:

-- (Disregarding the effect of the OK! contract) did the law of confidence protect information about the wedding as being private information? If so,

-- Did the OK! contract destroy that protection?

-- Did the law of confidence protect the Douglases' commercial interest in the information about their wedding?

[44] The issues in relation to OK!'s claim are as follows:

-- Did the OK! contract have the effect of extending to OK! the protection of the law of confidence in respect of the information about the wedding? If so

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

-- Was that protection lost when OK! published the authorised photographs?

[45] There is one issue common to both claims. Is this area of the law so uncertain that it cannot be invoked to justify interference with Hello!'s freedom of expression?

[46] These issues fall to be considered in a context in which English law is rapidly developing. The enactment of the Human Rights Act 1998 provoked a lively discussion of the impact that it would have on the development of a law protecting privacy. The government has made it clear that it does not intend to introduce legislation in relation to this area of the law, but anticipates that the judges will develop the law appropriately, having regard to the requirements of the Convention-see the comment of Lord Irvine LC in the course of the debate on the Human Rights Bill 583 HL Official Report (5th series) col 771 (24 November 1997) and the submissions of the United Kingdom in Earl Spencer v UK (1998) 25 EHRR CD 105. The courts have not accepted this role with whole-hearted enthusiasm. Before turning to consider recent developments in this area of the law, we propose to consider two seminal questions. (1) What obligation does the Convention impose on the United Kingdom in relation to the protection of privacy? (2) What obligation is placed on the courts in respect of the protection of privacy?

The United Kingdom's Convention obligation in respect of privacy

[47] We are not the first to acknowledge the assistance to be derived from Gavin Phillipson's lucid article, Transforming Breach of Confidence? Towards a Common Law Right of Privacy under the Human Rights Act (2003) 66 MLR 726. He observes (at 729) that the Strasbourg jurisprudence provides no definite answer to the question of whether the Convention requires states to provide a privacy remedy against private actors. That is no longer the case. In Von Hannover v Germany (2004) 16 BHRC 545 the European Court of Human Rights gave judgment in respect of a series of complaints by Princess Caroline of Monaco. They all related to press photographs of her that had been taken in public places. She contended that these infringed her privacy and had sought a remedy in a series of actions in the German courts, which had been unsuccessful. She alleged that these decisions of the German courts infringed her art 8 right to respect for her private and family life. The European Court of Human Rights agreed (para 57):

'The court reiterates that although the object of art 8 is essentially that of protecting the individual against arbitrary interference by the public authorities, it does not merely compel the state to abstain from such interference: in addition to this primarily negative undertaking, there may be positive obligations inherent in an effective respect for private or family life. These obligations may involve the adoption of measures designed to secure respect for private life even in the sphere of the relations of individuals between themselves (see, mutatis mutandis, X and Y v Netherlands (1985) 8 EHRR 235 at para 23; Stjerna v Finland (1994) 24 EHRR 194 at para 38; and Verliere v Switzerland (App no 41953/98) (admissibility decision, 28 June 2001)). That also applies to the protection of a person's picture against abuse by others . . .'

[48] The European Court went on at para 72 to state that the relevant German statute should have been interpreted narrowly by the German courts 'to ensure that the state complies with its positive obligation under the convention to protect private life and the right to control the use of one's own image'.

[49] It follows that the European Court has recognised an obligation on member states to protect one individual from an unjustified invasion of private life by another individual and an obligation on the courts of a member state to interpret legislation in a way which will achieve that result.

What obligation is placed on the courts in respect of the protection of privacy?

[50] Some, such as the late Professor Sir William Wade, in Wade and Forsyth Administrative Law (8th edn, 2000) p 983, and Jonathan Morgan, in Privacy, Confidence and Horizontal Effect:' Hello' Trouble [2003] CLJ 443, contend that the Human Rights Act 1998 should be given 'full, direct, horizontal effect'. The courts have not been prepared to go this far. In Wainwright v Home Office [2003] UKHL 53 at [30], [2003] 4 All ER 969 at [30], [2004] 2 AC 406 Lord Hoffmann observed that whether the law of confidence should be extended so as to protect privacy was a question

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

which 'must wait for another day', but he went on to hold that there could be no question of the courts adopting 'some high level principle of privacy'. In Campbell v Mirror Group Newspapers Ltd [2004] UKHL 22, [2004] 2 All ER 995, [2004] 2 WLR 1232 Lord Nicholls of Birkenhead observed at [11] that-

'In this country, unlike the United States of America, there is no over-arching, all-embracing, cause of action for "invasion of privacy" . . . But protection of various aspects of privacy is a fast developing area of the law, here and in some other common law jurisdictions.'

[51] Lord Nicholls went on to describe the way in which the law of breach of confidence has been adapted to embrace one aspect of invasion of privacy, the wrongful disclosure of private information, commenting at [14]: 'The essence of the tort is better encapsulated now as misuse of private information.' A little later in his speech he said:

'[17] The time has come to recognise that the values enshrined in arts 8 and 10 are now part of the cause of action for breach of confidence. As Lord Woolf CJ has said, the courts have been able to achieve this result by absorbing the rights protected by arts 8 and 10 into this cause of action: see A v B (a company) [2002] EWCA Civ 337 at [4], [2002] 2 All ER 545 at [4], [2003] QB 195. Further, it should now be recognised that for this purpose these values are of general application. The values embodied in arts 8 and 10 are as much applicable in disputes between individuals or between an individual and a non-governmental body such as a newspaper as they are in disputes between individuals and a public authority.

[18] In reaching this conclusion it is not necessary to pursue the controversial question whether the convention itself has this wider effect. Nor is it necessary to decide whether the duty imposed on courts by s 6 of the 1998 Act extends to questions of substantive law as distinct from questions of practice and procedure. It is sufficient to recognise that the values underlying arts 8 and 10 are not confined to disputes between individuals and public authorities. This approach has been adopted by the courts in several recent decisions, reported and unreported, where individuals have complained of press intrusion.'

[52] Baroness Hale said that the Human Rights Act 1998 did not create any new cause of action between private persons. Nor could the courts invent a new cause of action to cover types of activity not previously covered. But where there is a cause of action the court, as a public authority, must act compatibly with both parties' Convention rights.

[53] We conclude that, in so far as private information is concerned, we are required to adopt, as the vehicle for performing such duty as falls on the courts in relation to Convention rights, the cause of action formerly described as breach of confidence. As to the nature of that duty, it seems to us that ss 2, 3, 6 and 12 of the Human Rights Act 1998 all point in the same direction. The court should, in so far as it can, develop the action for breach of confidence in such a manner as will give effect to both art 8 and art 10 rights. In considering the nature of those rights, account should be taken of the Strasbourg jurisprudence. In particular, when considering what information should be protected as private pursuant to art 8, it is right to have regard to the decisions of the European Court. We cannot pretend that we find it satisfactory to be required to shoe-horn within the cause of action of breach of confidence claims for publication of unauthorised photographs of a private occasion.

The law of confidence

[54] We now turn to consider the law of confidence as it has developed up to this point. We start with Prince Albert v Strange (1849) 1 Mac & G 25, 41 ER 1171. Prince Albert obtained an injunction restraining the defendant from publishing a catalogue of etchings made by himself and Queen Victoria. One ground for the grant of this equitable remedy was that the information in the catalogue must have been obtained by breach of trust, confidence or contract. The information in question was personal, not commercial, although the defendant intended to make money out of it, and Lord Cottenham LC remarked that 'privacy is the right invaded'.

[55] We can advance well over a century to Coco v A N Clarke (Engineers) Ltd [1969] RPC 41, a case in which Megarry J analysed three elements of breach of confidence as established by the authorities up to that point in time.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

First the information had to be 'of a confidential nature'. In explaining this phrase Megarry J first cited the statement of Lord Greene MR in Saltman Engineering Co Ltd v Campbell Engineering Co Ltd [1963] 3 All ER 413n that it must not be 'something which is public property and public knowledge'. This is not the clearest of definitions. It seems to us that information will be confidential if it is available to one person (or a group of people) and not generally available to others, provided that the person (or group) who possesses the information does not intend that it should become available to others. Megarry J went on to hold that 'whether it is described as originality or novelty or ingenuity or otherwise, I think that there must be some product of the human brain which suffices to confer a confidential nature upon the information'. While this may have been an appropriate statement on the facts before him, it is plainly not of general application, as the Spycatcher litigation demonstrates.

[56] The second requirement was that the information must have been communicated by the confider to the confidant in circumstances of confidence. As to this requirement, Megarry J advanced the following test (at 48):

'. . . if the circumstances are such that any reasonable man standing in the shoes of the recipient of the information would have realised that upon reasonable grounds the information was being given to him in confidence, then this should suffice to impose on him the equitable obligation of confidence.'

The third requirement was that there had to be an unauthorised use of the information to the detriment of the confider. We would observe that the essential feature creating the duty of confidence was the circumstances in which the information was communicated from the confider to the confidant.

[57] The information that was the subject matter of Coco's case was technical information of value for commercial purposes. It was held not to be of a confidential nature as it was already in the public domain.

[58] In A-G v Guardian Newspapers Ltd (No 2) [1988] 3 All ER 545, [1990] 1 AC 109 Lord Goff of Chieveley observed that an obligation of confidence could arise even where the information in question had not been confided by a confider to a confidant. He said:

'I realise that, in the vast majority of cases, in particular those concerned with trade secrets, the duty of confidence will arise from a transaction or relationship between the parties, often a contract, in which event the duty may arise by reason of either an express or an implied term of that contract. It is in such cases as these that the expressions "confider" and "confidant" are perhaps most aptly employed. But it is well settled that a duty of confidence may arise in equity independently of such cases; and I have expressed the circumstances in which the duty arises in broad terms, not merely to embrace those cases where a third party receives information from a person who is under a duty of confidence in respect of it, knowing that it has been disclosed by that person to him in breach of his duty of confidence, but also to include certain situations, beloved of law teachers, where an obviously confidential document is wafted by an electric fan out of a window into a crowded street, or where an obviously confidential document, such as a private diary, is dropped in a public place, and is then picked up by a passer-by.' (See [1988] 3 All ER 545 at 658-659, [1990] 1 AC 109 at 281.)

[59] Lord Goff went on to say that he had deliberately avoided the fundamental question whether, contract apart, the duty lay simply 'in the notion of an obligation of conscience arising from the circumstances in or through which the information was communicated or obtained'. We would observe that the reference to an obviously confidential document might be said to have begged the question of what made the document confidential. We would also observe that in Lord Goff's examples the nature of the information, together possibly with the form in which it was recorded, coupled with the circumstances in which it came to the notice of the person fixed with the duty of confidence, were such as to lead a reasonable person to conclude that the information in question was private.

[60] Lord Goff also deliberately avoided the question of whether confidential information might be regarded as property, a question of particular importance in the context of the appeal before us.

[61] The potential that Lord Goff's analysis had for protecting private information that was not recorded in a

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

document was not immediately appreciated. In Kaye v Robertson [1991] FSR 62 journalists had gained unauthorised access to the hospital bedside of a celebrity recovering from a brain injury and taken photographs of his appearance to which he was in no condition to consent. The Court of Appeal held that the law provided no protection for the photographic information so obtained. It was not even argued that the law of confidence could provide a remedy.

[62] The significance of Lord Goff's approach was, however, appreciated by Laws J who, in Hellewell v Chief Constable of Derbyshire [1995] 4 All ER 473 at 476, [1995] 1 WLR 804 at 807, made the following obiter observation:

'If someone with a telephoto lens were to take from a distance and with no authority a picture of another engaged in some private act, his subsequent disclosure of the photograph would, in my judgment, as surely amount to a breach of confidence as if he had found or stolen a letter or diary in which the act was recounted and proceeded to publish it. In such a case, the law would protect what might reasonably be called a right of privacy, although the name accorded to the cause of action would be breach of confidence. It is, of course, elementary that, in all such cases, a defence based on the public interest would be available.'

[63] The first detailed analysis of the impact of the Human Rights Act on the protection of privacy afforded by English law and, in particular, the law of confidence, was that carried out by the Court of Appeal when discharging the interlocutory injunction which had been granted in this case-reported at [2002] 1 FCR 289, [2001] 2 All ER 289. Brooke LJ concluded, on the facts as they then appeared, that the unauthorised photographs had been taken by someone at the wedding, that is on a private occasion, who was under a duty of confidence, so that they constituted 'confidential information' under established principles. He went on to consider the possibility that the photographs had been taken by an intruder with whom no relationship of trust or confidence had been established, remarking that in that eventuality the court would have to explore the law relating to privacy when it was 'not bolstered by considerations of confidence'.

[64] Brooke LJ went on to consider authorities involving invasion of privacy in England, in the Commonwealth and at Strasbourg, and concluded that it was a difficult question whether the Human Rights Act 1998 required the English courts to develop a law of privacy, but one that he was not obliged to solve.

[65] Sedley LJ posed the same question, but gave it a more affirmative answer. He concluded ([2002] 1 FCR 289 at [110]): 'We have reached a point at which it can be said with confidence that the law recognises and will appropriately protect a right of personal privacy.' He went on (at [125]) to conclude that there was a powerfully arguable case on the existing authorities that the Douglases had a right of privacy that English law would recognise and, where appropriate, protect. Furthermore, s 12 of the Human Rights Act 1998 expressly required the court to have regard to art 10 of the Convention and this, necessarily, brought 'into the frame' art 8.

[66] Keene LJ considered that developments in the law of breach of confidence gave the claimants at least an arguable claim. He remarked (at [166]):

'The nature of the subject matter or the circumstances of the defendant's activities may suffice in some instances to give rise to liability for breach of confidence. That approach must now be informed by the jurisprudence of the Convention in respect of article 8. Whether the resulting liability is described as being for breach of confidence or for breach of a right to privacy may be little more that deciding what label is to be attached to the cause of action, but there would seem to be merit in recognising that the original concept of breach of confidence has in this particular category of cases now developed into something different from the commercial and employment relationships with which confidentiality is mainly concerned.'

[67] The court discharged the injunction on the basis that the OK! contract had substantially weakened the Douglases' claim to relief based on invasion of privacy and that damages or an account of profits was likely to provide an adequate remedy should breach of duty be established at the trial.

[68] Perhaps the most dramatic use of the law of confidence to protect privacy occurred within weeks of the interlocutory decision in this case. In Venables v News Group Newspapers Ltd, Thompson v News Group Newspapers

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Ltd [2002] 1 FCR 333, [2001] 1 All ER 908 Dame Elizabeth Butler-Sloss P granted injunctions against the whole world restraining the disclosure of any information that might lead to the identification of the murderers of James Bulger after their release from prison. The President held that, taking into account the Convention, the law of confidence could extend to cover the injunctions sought. Disclosure of the information in question might lead to grave, and possibly fatal, consequences for the claimants. This factor not merely rendered the information confidential, but outweighed the freedom of expression that would otherwise have underpinned the right of the press to publish the information.

[69] A remarkable feature of this decision was that the nature of the information alone gave rise to the duty of confidence regardless of the circumstances in which the information might come to the knowledge of a person who might wish to publish it.

[70] In A v B (a company) [2002] EWCA Civ 337, [2002] 2 FCR 158, [2002] 2 All ER 545 the Court of Appeal had to consider an application to set aside an interim injunction preventing the first defendant newspaper from publishing details of the claimant's sexual relationships with the second defendant and a woman to whom he was not married. The injunction had been granted on the ground that the information was confidential and subject to the protection of art 8 of the Convention and there was no public interest in publication that enabled the defendant's rights of freedom of expression to prevail.

[71] In introducing the judgment of the court, Lord Woolf CJ said (at [4]):

'The application for interim injunctions have now to be considered in the context of arts 8 and 10 of the European Convention for the Protection of Human Rights and Fundamental Freedoms. These articles have provided new parameters within which the court will decide, in an action for breach of confidence, whether a person is entitled to have his privacy protected by the court or whether the restriction of freedom of expression which such protection involves cannot be justified. The court's approach to the issues which the application raise has been modified because, under section 6 of the 1998 Act, the court, as a public authority, is required not to act "in a way which is incompatible with a Convention right". The court is able to achieve this by absorbing the rights which articles 8 and 10 protect into the long-established action for breach of confidence. This involves giving a new strength and breadth to the action so that it accommodates the requirements of those articles.'

[72] Lord Woolf then laid down guidelines which a court should follow when considering a similar application. These include the proposition that in the great majority of, if not all, situations where the protection of privacy is justified in relation to events after the Human Rights Act 1998 came into force, an action for breach of confidence will provide the necessary protection. As to interests capable of being subject to a claim for privacy, these will usually be obvious. A duty of confidence will arise whenever the party subject to the duty is in a situation where he knows or ought to know that the other person can reasonably expect his privacy to be protected. If there is an intrusion in a situation where a person can reasonably expect his privacy to be respected then that intrusion will be capable of giving rise to an action for breach of confidence unless the intrusion can be justified.

[73] Lord Woolf went on to deal with the circumstances where a person can and cannot reasonably expect details of his sexual activities to be treated as confidential. This was a matter that later fell for consideration by Ouseley J in Theakston v MGN Ltd [2002] EWHC 137 (QB), [2002] All ER (D) 182 (Feb) and, in the nature of things, is likely to call for consideration not infrequently in the future. Having regard to the facts of the present case this is not an area that we need explore. We would simply observe that to date the English courts appear to have taken a less generous view of the protection that the individual can reasonably expect in respect of his or her sexual activities than has the Strasbourg court.

[74] The most recent and authoritative consideration that has been given to this area of the law is to be found in the speeches of the House of Lords in Campbell's case. Naomi Campbell brought proceedings for breach of confidence in respect of an article in the Mirror newspaper which disclosed that she was a drug addict, and was attending meetings of Narcotics Anonymous. Details were given as to the frequency of these meetings and the article was illustrated by

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

photographs of her on the doorstep of a building where such a meeting had just taken place. The photographs had been taken covertly from a car by a freelance photographer who had been employed by the newspaper for this purpose.

[75] Miss Campbell did not complain of the publication of the fact that she was a drug addict. She accepted that, because she had gone on record as saying that she did not take drugs, the press served a legitimate public interest in putting the record straight. She complained, however, that the information about her attendance at Narcotics Anonymous was private information that the Mirror had disclosed in breach of confidence. As to the photographs, Miss Campbell expressly did not complain that it was a breach of confidence to publish these on the ground that they had been taken covertly. Her complaint was that the information depicted by the photographs formed part of the private information which the Mirror had no justification for publishing.

[76] Miss Campbell succeeded at first instance. She lost in the Court of Appeal on the ground that the information that she alleged was private was information that it was legitimate for the Mirror to publish, being peripheral to the central story that she was a drug addict and published in order to portray her in a favourable light. The House of Lords, by a majority or three to two, took a different view. The details of Miss Campbell's treatment with Narcotics Anonymous, together with the photographs, constituted private information the publication of which amounted to what used to be called a breach of confidence. While the House divided on the application of the law to the facts, there was no significant disagreement as to the relevant principles of law.

[77] We have already referred to Lord Nicholls's statement that the essence of the tort was better encapsulated as a misuse of private information. That statement was preceded by the following passage ([2004] 2 All ER 995 at [14]):

'Now the law imposes a "duty of confidence" whenever a person receives information he knows or ought to know is fairly and reasonably to be regarded as confidential. Even this formulation is awkward. The continuing use of the phrase "duty of confidence" and the description of the information as "confidential" is not altogether comfortable. Information about an individual's private life would not, in ordinary usage, be called "confidential". The more natural description today is that such information is private.'

[78] Later at [21] Lord Nicholls commented: 'Essentially the touchstone of private life is whether in respect of the disclosed facts the person in question had a reasonable expectation of privacy.' He drew attention to the distinction between identifying whether information is private and identifying whether it is proportionate to prevent disclosure of such information, having regard to the competing Convention right of freedom of expression. He suggested that the test of whether disclosure would be 'highly offensive to a reasonable person' , advanced by Gleeson CJ when considering the test of what is private in Australian Broadcasting Corp v Lenah Game Meats Pty Ltd [2002] 2 LRC 86 at para 42, was more relevant to the latter issue.

[79] Lord Hoffmann identified two developments of the law of confidence. The first was the recognition of the artificiality of distinguishing between confidential information obtained through a violation of a confidential relationship and similar information obtained in some other way. The second was the acceptance, under human rights instruments such as art 8 of the Convention, of the privacy of personal information as something worthy of protection in its own right. As to the latter there was no logical ground for affording a person less protection against a private individual than against the state. In the result (para 51):

'Instead of the cause of action being based upon the duty of good faith applicable to confidential personal information and trade secrets alike, it focuses upon the protection of human autonomy and dignity-the right to control the dissemination of information about one's private life and the right to the esteem and respect of other people.'

[80] Lord Hope of Craighead (para 85) approved Lord Woolf CJ's statement in A v B that a duty of confidence will arise whenever the party subject to the duty is in a situation where he knows or ought to know that the other person can reasonably expect his privacy to be protected. He considered that Gleeson CJ's test was useful where there was room for doubt, but (para 96)-

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

'If the information is obviously private, the situation will be one where the person to whom it relates can reasonably expect his privacy to be respected. So there is normally no need to go on and ask whether it would be highly offensive for it to be published.'

[81] Baroness Hale held that the cause of action of breach of confidence had within its scope what has been termed 'the protection of the individual's informational autonomy'. Where the person publishing the information knows or ought to know that there is a reasonable expectation that the information in question will be kept confidential the threshold is reached when the court will have to balance the claimant's interest in keeping the information private against the countervailing interest of the recipient in publishing it (para 137). Lord Carswell at para 166 observed that it was not necessary to apply Gleeson CJ's test. It was sufficiently established by the nature of the material that it was private information which attracted the duty of observing the confidence in which it was imparted to the respondents.

[82] Some of the comments that we have cited underline the validity of Lord Nicholls's observation that the use of the phrase 'duty of confidence' and the description of private information as 'confidential' are not altogether comfortable. What the House was agreed upon was that the knowledge, actual or imputed, that information is private will normally impose on anyone publishing that information the duty to justify what, in the absence of justification, will be a wrongful invasion of privacy. The House was also agreed that, when art 8 and art 10 are both engaged, one does not start with the balance tilted in favour of art 10.

'Private information'

[83] Megarry J in Coco's case identified two requirements for the creation of a duty of confidence. The first was that the information should be confidential in nature and the second was that it should have been imparted in circumstances importing a duty of confidence. As we have seen, it is now recognised that the second requirement is not necessary if it is plain that the information is confidential, and for the adjective 'confidential' one can substitute the word 'private'. What is the nature of 'private information'? It seems to us that it must include information that is personal to the person who possesses it and that he does not intend shall be imparted to the general public. The nature of the information, or the form in which it is kept, may suffice to make it plain that that the information satisfies these criteria.

Photographic information

[84] This action is about photographs. Special considerations attach to photographs in the field of privacy. They are not merely a method of conveying information that is an alternative to verbal description. They enable the person viewing the photograph to act as a spectator, in some circumstances voyeur would be the more appropriate noun, of whatever it is that the photograph depicts. As a means of invading privacy, a photograph is particularly intrusive. This is quite apart from the fact that the camera, and the telephoto lens, can give access to the viewer of the photograph to scenes where those photographed could reasonably expect that their appearances or actions would not be brought to the notice of the public.

[85] The intrusive nature of photography is reflected by the various media codes of practice. It is also recognised by the authorities. In Theakston's case Ousley J refused an injunction restraining publication of a verbal depiction of the claimant's activities in a brothel. He granted, however, an injunction restraining the publication of photographs taken of these activities. He held ([2002] All ER (D) 182 (Feb) at [78]):

'The authorities cited to me showed that the courts have consistently recognised that photographs can be particularly intrusive and have showed a high degree of willingness to prevent the publication of photographs, taken without the consent of the person photographed but which the photographer or someone else sought to exploit and publish. This protection extended to photographs, taken without their consent, of people who exploited the commercial value of their own image in similar photographs, and to photographs taken with the consent of people but who had not consented to that particular form of commercial exploitation, as well as to photographs taken in pubic or from a public place of what could be seen if not with a naked eye, then at least with the aid of powerful binoculars. I concluded that

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

this part of the injunction involved no particular extension of the law of confidentiality and that the publication of such photographs would be particularly intrusive into the claimant's own individual personality. I considered that even though the fact that the claimant went to the brothel and the details as to what he did there were not to be restrained from publication, the publication of photographs taken there without his consent could still constitute an intrusion into his private and personal life and would do so in a peculiarly humiliating and damaging way. It did not seem to be remotely inherent in going to a brothel that what was done inside would be photographed, let alone that any photographs would be published.'

[86] In D v L [2003] EWCA Civ 1169 at [23], [2004] EMLR 1 at [23] Waller LJ remarked:

'A court may restrain the publication of an improperly obtained photograph even if the taker is free to describe the information which the photographer provides or even if the information revealed by the photograph is in the public domain. It is no answer to the claim to restrain the publication of an improperly obtained photograph that the information portrayed by the photograph is already available in the public domain.'

[87] In Von Hannover v Germany the European Court remarked ((2004) 16 BHRC 545 at para 59):

'Although freedom of expression also extends to the publication of photos, this is an area in which the protection of the rights and reputation of others takes on particular importance. The present case does not concern the dissemination of "ideas", but of images containing very personal or even intimate "information" about an individual. Furthermore, photos appearing in the tabloid press are often taken in a climate of continual harassment which induces in the person concerned a very strong sense of intrusion into their private life of even of persecution.'

[88] In Campbell's case, although Naomi Campbell made no complaint that the publication of her photographs itself constituted a breach of confidence, both Lord Hope and Baroness Hale placed particular weight on the intrusive nature of photographs. Lord Hope said ([2004] 2 All ER 995 at [123]):

'Miss Campbell could not have complained if the photographs had been taken to show the scene in the street by a passer-by and later published simply as street scenes. But these were not just pictures of a street scene where she happened to be when the photographs were taken. They were taken deliberately, in secret, and with a view to their publication in conjunction with the article. The zoom lens was directed at the doorway of the place where the meeting had been taking place. The faces of others in the doorway were pixelated so as not to reveal their identity. Hers was not, the photographs were published and her privacy was invaded.'

[89] Lord Hope had earlier held applicable the reasoning of the Supreme Court of Canada in Les Editions Vice-Versa Inc v Aubry (1998) 5 BHRC 437. The court had held that publication in a magazine of an unauthorised photograph of a 17-year old girl sitting on the steps of a public building had violated her right to respect for private life conferred under art 5 of the 'Quebec Charter' of Human Rights and Freedoms.

[90] Baroness Hale was not prepared to go this far. She said that by themselves the photographs would not have been objectionable, contrasting the law of England with that applied in the Vice-Versa case. She held the photographs objectionable because ((1998) 5 BHRC 437 at para 155):

'A picture is "worth a thousand words" because it adds to the impact of what the words convey; but it also adds to the information given in those words. If nothing else, it tells the reader what everyone looked like; in this case it also told the reader what the place looked like.'

[91] With this summary of English law, we turn to the issues raised by the facts of this case.

THE DOUGLASES' CLAIM

Disregarding the OK! contract, did the law of confidence protect information about the wedding as private

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

information?

[92] We should make clear at the outset that the only issue on liability was whether the photographs published by Hello! infringed rights of confidence or privacy enjoyed by the Douglases. As the judge recorded, Hello! did not seek to argue that it was in the public interest that they should publish the unauthorised photographs or that their art 10 rights of freedom of expression outweighed any rights of confidence or privacy that the Douglases enjoyed.

[93] The judge found ([2003] 3 All ER 996 at [66]):

'To the extent that privacy consists of the inclusion only of the invited and the exclusion of all others, the wedding was as private as was possible consistent with it being a socially pleasant event.'

He further found that Mr Thorpe took the unauthorised photographs surreptitiously in circumstances where he was well aware that his presence at the wedding was forbidden. Finally the judge found that those responsible for purchasing the unauthorised photographs on behalf of Hello! were aware that the taking of the photographs would have involved at least a trespass or some deceit or misrepresentation on the photographer's part.

[94] Had the wedding taken place in England, and putting on one side the effect of the OK! contract, only an affirmative answer could be given to the question of whether those acting for Hello! knew that the information depicted by the unauthorised photographs was fairly and reasonably to be regarded as confidential or private.

[95] Applying the test propounded by the House of Lords in Campbell's case, photographs of the wedding plainly portrayed aspects of the Douglases' private life and fell within the protection of the law of confidentiality, as extended to cover private or personal information. Does it make any difference that the wedding took place in New York?

The effect of the law of New York

[96] It was not suggested that s 9(1) of the Private International Law (Miscellaneous Provisions) Act 1995 is applicable to this case, but we have none the less considered that question. That section governs the choice of law for determining issues relating to tort. The Douglases' claim in relation to invasion of their privacy might seem most appropriately to fall within the ambit of the law of delict. We have concluded, however, albeit not without hesitation, that the effect of shoe-horning this type of claim into the cause of action of breach of confidence means that it does not fall to be treated as a tort under English law, see Kitechnology BV v Unicor GmbH [1994] ILPr 568 at para 40, and more generally Clerk and Lindsell on Torts (18th edn, 2000) at footnotes 2 and 3 to para 27-001. Nor has anyone suggested that the facts of this case give rise to a cause of action in tort under the law of New York (see below). Accordingly we have concluded that the parties were correct to have no regard to s 9(1) of the 1995 Act.

[97] Dicey and Morris on the Conflict of Laws (13th edn, 2000) vol II suggest somewhat tentatively, at para 34-029 and following, that a claim for breach of confidence falls to be categorised as a restitutionary claim for unjust enrichment and that the proper law is the law of the country where the enrichment occurred. While we find this reasoning persuasive, it does not solve the problem on the facts of this case. Even if the Douglases' claim for invasion of their privacy falls to be determined according to principles of English law, these may themselves require consideration of the law of New York. That indeed is the case advanced on behalf of Hello!

[98] The judge held that the conscience of Hello! was tainted, so far as the use of the unauthorised photographs were concerned, by a number of matters. They knew of the security precautions taken by the Douglases to prevent unauthorised photography. They knew of OK!'s exclusive contract. They knew that the unauthorised photographs must have been taken surreptitiously and have involved at least a trespass by the photographer. In these circumstances he brushed aside arguments advanced by Hello! based on the law of New York in half of a single paragraph (at [211]):

'Then these defendants say there was no wrong done by the law of the place, New York, but, firstly, I cannot see how Mr Thorpe can fail to be regarded as other than having been at least a trespasser by the law of New York and it has

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

certainly not been demonstrated to me that he was not. Secondly, so long as the conscience of the publishers of Hello! is tainted, as I have held it to be, I fail to see how Thorpe's innocence of any breach of local law, even had that been proved to me, should assist them.'

[99] The judge's finding that Mr Thorpe must at least have been a trespasser under the law of New York was not challenged. Hello!'s argument, as advanced before us, was as follows. The information in the unauthorised photographs can only have attracted the protection of the law of confidence (1) as a consequence of the subject matter of the photographs or (2) as a result of the circumstances in which they were taken. So far as the subject matter was concerned, this could only attract protection if it was, itself, of a nature that would be highly offensive to a reasonable person of ordinary sensibilities. That was not this case. It followed that to establish that the information was protected, the Douglases had to rely upon the circumstances in which the information was published. As to these, the relevant circumstances were events in New York, and the implication of those events had to be considered according to the law of New York. Under the law of New York there would have been no inhibition upon Mr Thorpe publishing the photographs which he had taken. Hello!, having derived the photographs from Mr Thorpe, could be no worse off. Although the judge made no express finding on the point, we understand that it was common ground that, had the unauthorised photographs been published by Mr Thorpe in New York, or sold by Mr Thorpe to Hello! and published by Hello! in New York, no actionable wrong would have been committed.

[100] We do not consider that the law of New York has any direct application on the facts of this case. The cause of action is based on the publication in this jurisdiction and the complaint is that private information was conveyed to readers in this jurisdiction. The test of whether the information was private so as to attract the protection of English law must be governed by English law. That test, as established by Campbell's case, is whether Hello! knew or ought to have known that the Douglases had a reasonable expectation that the information would remain private. Where the events to which the information relates take place outside England-in this instance in New York-the law of the place where they take place may none the less be relevant to the question of whether there is a reasonable expectation that the events will remain private.

[101] If, in the present case, the law of New York had provided that any member of the public had a right to be present at a wedding taking place in a hotel and to take and publish photographs of that wedding, then photographs of the wedding would be unlikely to have satisfied the test of privacy. That was not the case, however. The law of New York clearly entitled the Douglases to arrange for their wedding to take place in circumstances designed to ensure that events at the wedding remained private, at least so far as photographic detail was concerned. The fact that photographs taken in violation of that privacy might have been published with impunity in New York has no direct bearing on whether the information fell to be treated as private and confidential in England. The question of whether, if unauthorised photographs of the wedding had actually been published in New York, privacy and confidentiality in England would have been destroyed is a different question, and one relevant to the next question that we have to address.

[102] To summarise our conclusion at this stage: disregarding the effect of the OK! contract, we are satisfied that the Douglases' claim for invasion of their privacy falls to be determined according to the English law of confidence. That law, as extended to cover private and personal information, protected information about the Douglases' wedding.

The effect of the OK! contract

[103] Hello!'s argument, as advanced by Mr Price, is that, once the Douglases had committed themselves by the OK! contract to putting before the public photographs of their wedding, it was no longer possible for them to advance a claim that events at their wedding were private or confidential. Thereafter, publication of other photographs of that event could not possibly infringe art 8 of the Convention or give rise to a claim for breach of confidence.

[104] We have seen that the first element of breach of confidence identified by Megarry J in Coco's case was that the information had to be 'of a confidential nature', as opposed to being public property and public knowledge. The

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Spycatcher litigation concerned republication in English newspapers of extracts from a book, published without legal restraint in Australia and elsewhere, which had been written by a former member of the British secret service in breach of contract and confidence applicable under English law. In that litigation, which culminated in the decision of the House of Lords in A-G v Guardian Newspapers Ltd (No 2) [1988] 3 All ER 545, [1990] 1 AC 109, it was held, after much discussion, that the protection of the law of confidence had been lost as a result of the information coming into the public domain. Care must be exercised in applying that decision generally, for there is a special principle of law which precludes the state from asserting breach of confidence where it cannot be shown that this is in the public interest.

[105] In general, however, once information is in the public domain, it will no longer be confidential or entitled to the protection of the law of confidence, though this may not always be true: see Gilbert v Star Newspaper Co Ltd (1894) 51 TLR 4 and Creation Records Ltd v News Group Newspapers Ltd [1997] EMLR 444 at 456. The same may generally be true of private information of a personal nature. Once intimate personal information about a celebrity's private life has been widely published it may serve no useful purpose to prohibit further publication. The same will not necessarily be true of photographs. In so far as a photograph does more than convey information and intrudes on privacy by enabling the viewer to focus on intimate personal detail, there will be a fresh intrusion of privacy when each additional viewer sees the photograph and even when one who has seen a previous publication of the photograph, is confronted by a fresh publication of it. To take an example, if a film star were photographed, with the aid of a telephoto lens, lying naked by her private swimming pool, we question whether widespread publication of the photograph by a popular newspaper would provide a defence to a legal challenge to repeated publication on the ground that the information was in the public domain. There is thus a further important potential distinction between the law relating to private information and that relating to other types of confidential information.

[106] Nor is it right to treat a photograph simply as a means of conveying factual information. A photograph can certainly capture every detail of a momentary event in a way which words cannot, but a photograph can do more than that. A personal photograph can portray, not necessarily accurately, the personality and the mood of the subject of the photograph. It is quite wrong to suppose that a person who authorises publication of selected personal photographs taken on a private occasion, will not reasonably feel distress at the publication of unauthorised photographs taken on the same occasion.

[107] There is a further point. The objection to the publication of unauthorised photographs taken on a private occasion is not simply that the images that they disclose convey secret information, or impressions that are unflattering. It is that they disclose information that is private. The offence is caused because what the claimant could reasonably expect would remain private has been made public. The intrusion into the private domain is, of itself, objectionable. To the extent that an individual authorises photographs taken on a private occasion to be made public, the potential for distress at the publication of other, unauthorised, photographs, taken on the same occasion, will be reduced. This will be very relevant when considering the amount of any damages. The agreement that authorised photographs can be published will not, however, provide a defence to a claim, brought under the law of confidence, for the publication of unauthorised photographs. It follows that we do not accept Mr Price's submission that the effect of the OK! contract precluded the Douglases' right to contend that their wedding was a private occasion and, as such, protected by the law of confidence.

[108] This conclusion endorses that reached by Sedley LJ, who held at the interlocutory stage that the Douglases-

'were careful by their contract to retain a right of veto over publication of OK !'s photographs in order to maintain the kind of image which is professionally and no doubt also personally important to them. This element of privacy remained theirs and Hello!'s photographs violated it.'

[109] Keene LJ was less positive about this point. He concluded that it was arguable that a limited degree of privacy remained vested in the Douglases so that they could validly complain of the loss of control over the photographs to be published, leading to damage to their image because of unflattering photographs. We agree that the Douglases were entitled to complain about the unauthorised photographs as infringing their privacy on the ground that

these detracted from the favourable picture presented by the authorised photographs and caused consequent distress.

[110] The judge awarded £3,750 to each of the Douglases in respect of the distress caused by the unauthorised photographs, a very modest sum in the context of this litigation. No challenge is made to the amount of damages awarded and so we see no ground for interfering with this head of damage.

Did the law of confidence protect the Douglases' commercial interest in information about their wedding?

[111] The other head of damages awarded to the Douglases related to the labour and expense of editing the selection of photographs that were to be provided under the contract with OK!. This head of damage could only be justified in so far as it represented compensation for interference with the Douglases' commercial exploitation of their wedding. We agree with Mr Price that this head of claim had nothing to do with interference with private life. It was based on an assertion that the Douglases had a commercial interest in making public information about their wedding, which they were entitled to protect. The judge accepted that the information of what took place at the wedding was similar to a trade secret which the Douglases were entitled to exploit and to keep confidential until exploited. Hello! contend that no such right is known to English law. Whether the law recognises such a right is of importance not merely in relation to the £7,000 damages awarded to the Douglases for interference with their right, but because OK!'s much greater award of damages was premised on a finding that this right was shared with them.

[112] The judge, at [196], held that the law of confidence protects 'those who seek to manage their publicity as part of their trade or profession and whose private life is a valuable commodity'. If this statement is correct the law treats information about a celebrity's private life as a trade secret and grants an injunction against publication of such information, or damages in respect of it, not because of the distress which the invasion of privacy causes but because of the commercial damage caused by infringing the celebrity's monopoly right to make such information public. Two questions arise. Was the judge correct to recognise that English law affords protection to private information on this basis? If so, is the protection afforded in respect of events which take place in another jurisdiction?

[113] Recognition of the right of a celebrity to make money out of publicising private information about himself, including his photographs on a private occasion, breaks new ground. It has echoes of the droit a l'image reflected in art 9 of the French Code Civil and the German cause of action that Professor Markesinis describes as the 'tort of publicity claim'-see 'Concerns and Ideas About the Developing English Law of Privacy (And How Knowledge of Foreign Law Might Be of Help)' (2004) 52 American Journal of Comparative Law 133 at 176. Despite the comment of Rozenberg in Privacy and the Press (2004) p 228, we do not see this as any reason to draw back. We can see no reason in principle why equity should not protect the opportunity to profit from confidential information about oneself in the same circumstances that it protects the opportunity to profit from confidential information in the nature of a trade secret. It is helpful at this point to consider how far English law has gone in this direction.

[114] There is cogent authority that supports the proposition that equity will protect trade secrets that have been divulged in breach of a confidential relationship. See for example Saltman Engineering Co Ltd v Campbell Engineering Co Ltd [1963] 3 All ER 413n and O Mustad & Son v S Allcock & Co Ltd and Dosen [1963] 3 All ER 416, [1964] 1 WLR 109n. The question raised by this appeal is the extent to which similar protection will be afforded to other types of valuable information which is acquired, not by breach of a confidential relationship, but by some form of unauthorised intrusion into a situation of privacy.

[115] In Prince Albert v Strange (1849) 1 Mac & G 25, 41 ER 1171 the Lord Chancellor relied both on Prince Albert's property in the etchings and in the fact that they were private when holding that he was entitled to prevent the publication of information about them in the form of a catalogue. Had Prince Albert himself been intending to publish such information for profit, we doubt if the Lord Chancellor would have been any the less inclined to afford him a remedy.

[116] In Gilbert's case, WS Gilbert obtained an injunction restraining publication of confidential information about

the plot of his new comic opera, asserting that such publication was calculated to cause him economic injury. In Shelley Films Ltd v Rex Features Ltd [1994] EMLR 134 the High Court granted an interlocutory injunction restraining publication of photographs conveying information about details of a forthcoming film, which those making it had taken reasonable steps to keep secret for obvious commercial reasons. In granting the injunction on the grounds, among others, of an arguable case in confidence, Mr Martin Mann QC, the deputy high court judge, accurately observed:

'. . . whether or not equity imposes an obligation to keep information confidential depends upon a great many factors often unique to the case in which it is said to do so. However, most cases will have certain common constituents, namely, the existence of a body of information which a plaintiff wishes to keep confidential for the protection of some lawful interest of his, a defendant coming into possession of such information in circumstances in which he actually knows (or is fixed by operation of law with knowledge of) or ought as a reasonable person to know the plaintiff intends to be kept confidential, a detriment actual or potential to the plaintiff from publication, the non-availability of such information to the public and the absence of any public interest in disclosure.'

[117] The Creation Records case was another interlocutory decision in which the issue was whether the facts disclosed an arguable breach of confidence. Those facts were that a pop group had posed at a specially devised scene, consisting of a white Rolls Royce in the swimming pool of a hotel and incorporating various other props. The object of the exercise was to take a photograph to be used as a record cover. The defendants commissioned a freelance photographer to take photographs of the scene. Lloyd J granted an injunction restraining the publication of these photographs on the ground that it was well arguable that the nature of the operation together with the imposition of security measures made the occasion one of confidentiality, at any rate as regards photography.

[118] These decisions are of no more than persuasive authority and some of them have not been without critics. We consider, however, that they reflect the following principles. Where an individual (the owner) has at his disposal information which he has created or which is private or personal and to which he can properly deny access to third parties, and he reasonably intends to profit commercially by using or publishing that information, then a third party who is, or ought to be, aware of these matters and who has knowingly obtained the information without authority, will be in breach of duty if he uses or publishes the information to the detriment of the owner. We have used the term 'the owner' loosely.

[119] We have concluded that confidential or private information, which is capable of commercial exploitation but which is only protected by the law of confidence, does not fall to be treated as property that can be owned and transferred. We shall explain our reasons for this conclusion when we deal with OK!'s claim.

[120] It remains to consider whether, in so far as the Douglases' claim is in respect of damage to their commercial interest in the information about their wedding, the law of New York has any greater relevance than it has in relation to their claim for invasion of their privacy. We have concluded that it does not. The Douglases' claim is for damage done to their commercial interests in this country by publication of the unauthorised photographs in this country. Our reasoning in relation to the claim for invasion of privacy applies equally in respect of this head of claim. The Douglases had taken steps, permitted under the law of New York, which were intended to ensure that their wedding was a private occasion and that no unauthorised photographs were taken or published. Hello! knew this. Hello! also knew that the Douglases expected commercially to exploit their private wedding by the publication of authorised photographs. Hello! deliberately obtained photographs that they knew were unauthorised and published them to the detriment of the Douglases. This renders them liable for breach of confidence under English law.

[121] For these reasons the appeal against the judgment in favour of the Douglases is dismissed.

OK!'S CLAIM IN CONFIDENCE

Did the OK! contract extend to OK! the protection of the law of confidence in respect of the information about the wedding?

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

[122] Lindsay J recorded (at [187]):

'The Hello! defendants accept, of course, that trade secrets can be sold and it is common enough in commercial confidence cases for the benefit of the confidentiality to be shared with others. The confidentiality of a trade secret, for example, may be shared between, and enforceable by, the inventor and the manufacturer to whom he had granted licence for the secret to be turned to account.'

[123] The judge cited in support of these propositions Gilbert's case and Mustad's case. He continued, referring to the latter decision:

'The report is not entirely clear as it sometimes speaks of Dosen having acquired information whilst in "their service", ie that of Mustad, yet speaks also of what Dosen had learned in the service of his "former master", a reference to Thoring & Co. The better view, as it seems to me, is that Dosen was never in Mustad's employ and never acquired the relevant knowledge whilst in Mustad's employ. On that footing the case shows that the benefit of a confidence can pass, in that case by purchase from the liquidator of Thoring, and, if that is so, then it is hard to see why it should not be shared between and be enforceable by co-owners or by a successor in title, at any rate where the defendant knew or could be taken to have known of the co-ownership or sharing before acting in breach and where all entitled to the confidence assert it.'

[124] Mr Price challenged this part of the judge's reasoning. He drew an analogy between the wedding and a dramatic performance, in which the Douglases were the performers. He submitted that the rights of the performers in respect of unauthorised photographic or sound reproduction of their live performances were accorded limited statutory protection under Pt II of the Copyright, Designs and Patents Act 1988. Under the 1988 Act these performers' rights were 'non-property rights' and could not be assigned or transmitted to third parties–see s 192A. It would be very strange if, by expressly prohibiting filming, recording or photography, performers could place themselves in a position to create rights to prohibit reproductions of their live performances, assignable to and enforceable by third parties. It would be equally strange if those taking part in a wedding were in such a position.

[125] We observe that under ss 185 and 186 of the 1988 Act a person to whom a performer has granted the exclusive right to photograph his performance receives a right which he can enforce against third parties. It seems to us that the nature of the contractual rights conferred on OK! by the Douglases requires careful analysis before any analogies are drawn with the position of performers.

[126] The starting point is to consider the nature of the rights enjoyed by the Douglases. As we have already indicated, their interest in the private information about events at the wedding did not amount to a right of intellectual property. Their right to protection of that interest does not arise because they have some form of proprietary interest in it. If that were the nature of the right, it would be one that could be exercised against a third party regardless of whether he ought to have been aware that the information was private or confidential. In fact the right depends upon the effect on the third party's conscience of the third party's knowledge of the nature of the information and the circumstances in which it was obtained.

[127] Lord Upjohn accurately summarised the position in Boardman v Phipps [1966] 3 All ER 721 at 759, [1967] 2 AC 46 at 127-128, when he said:

'The true test is to determine in what circumstances the information has been acquired. If it has been acquired in such circumstances that it would be a breach of confidence to disclose it to another then courts of equity will restrain the recipient from communicating it to another. In such cases such confidential information is often and for many years has been described as the property of the donor, the books of authority are full of such references: knowledge of secret processes, "know-how", confidential information as to the prospects of a company or of someone's intention or the expected results of some horse race based on stable or other confidential information. But in the end the real truth is that it is not property in any normal sense but equity will restrain its transmission to another if in breach of some

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

confidential relationship.'

[128] The judge treated the information about the wedding rather as if it were property when he referred to its benefit being 'shared between and . . . enforceable by co-owners or by a successor in title'. We shall consider the two decisions upon which the judge relied as showing that the benefit of confidential information could be transferred.

[129] In Gilbert's case the claim for an injunction restraining disclosure of the plot of Mr Gilbert's libretto was initially brought by Mr Gilbert alone. The basis of the claim was that the plot must have been disclosed to the Star in breach of confidence and of an implied contractual term by an actor or employee at the theatre. The judge required the manager of the theatre to be joined as a plaintiff on the ground that the contracts of employment were with him, rather than with Mr Gilbert. This decision supports the proposition that, where the benefit of confidential information is shared between A and B, B can claim that disclosure of that information will constitute a breach of a duty of confidence owed to B. However, the significance of the case is complicated by the fact that the existence of a contract imposing a duty of confidentiality between B and the supplier of the information to the Star was considered by the judge to be of critical importance. Further, it was a first instance case merely concerned with the grant of an interlocutory injunction.

[130] The facts of Mustad's case were complex, but can for present purposes be simplified. Mr Dosen worked for a company T under a contract of employment that included an undertaking to keep confidential information acquired at work. T went into liquidation and Mustad bought T's business, including the benefit of trade secrets and pledges of secrecy. Dosen then went to work for Allcock. Mustad obtained an injunction restraining Dosen from communicating to Allcock information acquired when working for T. This decision supports the proposition that a purchaser of confidential information can restrain disclosure of that information in breach of confidence, but again the picture is complicated by the fact that the benefit of Dosen's contractual obligation not to disclose the information was purchased by Mustad.

[131] The facts of the present case are very different from those of the two cases relied upon by Lindsay J. The material provisions of the OK! contract ,which we have set out in detail at [5]-[9] above, had the following effect:

-- The Douglases would procure the taking of colour photographs of the wedding wherever and whenever they chose ('the official photographs') (cl 6).

-- The Douglases would procure that they became joint owners of all copyright and any other rights in the official photographs (cl 7).

-- The Douglases would provide OK! with approved, and where necessary retouched, photographs, selected from the official photographs ('the approved photographs') (cl 7).

-- The Douglases would transfer to OK! the exclusive rights to publish the approved photographs or to authorise others to do so, world wide, for a period of nine months (cl 2).

-- The Douglases would transfer to OK! the exclusive right for a period of nine months to consent to use their names, voices, signatures, photographs or likenesses in connection with the wedding for advertising purposes (cll 4 and 5).

-- The Douglases would use their best efforts to ensure that neither the media nor anyone else should take wedding photographs (cll 6 and 16).

-- The Douglases would not, for a period of nine months, authorise publication of any other of the official photographs without prior approval from OK! (cl 12).

-- If any third party not licensed by OK! should use one of the Douglases' name, voice, signature, photograph or likeness in connection with the wedding, OK! would, at the written request the Douglases, where possible, pursue all