[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

necessary legal action to cause such third party to cease such infringement (cl 13).

[132] It can thus be seen that the OK! contract did not purport to transfer to or share with OK! the right to use, or even know of, any photographic information about the wedding other than the approved photographs released to OK! by the Douglases for publication pursuant to cl 7, the copyright of which was vested in the Douglases. OK! were given an exclusive licence to publish, and to authorise others to publish, these photographs for a period of nine months.

[133] The Douglases retained to themselves those of the official photographs which they did not choose to have published. They undertook not to authorise the publication of these. They also undertook to use their best endeavours to see that no other photographs of the wedding were taken.

[134] The grant to OK! of the right to use the approved photographs was no more than a licence, albeit an exclusive licence, to exploit commercially those photographs for a nine month period. This licence did not carry with it any right to claim, through assignment or otherwise, the benefit of any other confidential information vested in the Douglases. In Allen & Hanbury Ltd v Generics (UK) Ltd [1986] RPC 203 at 246 Lord Diplock said that a licence 'passes no proprietary interest in anything; it only makes an action lawful which would otherwise have been unlawful'.

[135] As Jacob J pointed out in ISSAC Oren v Red Box Toy Factory Ltd [1999] FSR 785 at para 28, some statutes expressly give an exclusive licensee of intellectual property the right to sue an infringer. The Copyright, Designs and Patents Act 1988 is an example (see [124] and [125] above). In the absence of such a statutory provision a mere exclusive licence to use authorised photographs of an event does not carry with it the right to sue a third party for infringement of a right vested in the licensor to object to the publishing of other photographs of that event.

[136] We have recognised that the Douglases retained a residual right of privacy, or confidentiality, in those details of their wedding which were not portrayed by those of the official photographs which they released. It was in the interests of OK! that the Douglases should protect that right, so that OK! would be in a position to publish, or to authorise the publication of, the only photographs that the public would be able to see of the wedding. On analysis, OK!'s complaint is not that Hello! published images which they had been given the exclusive right to publish, but that Hello! published other images, which no one with knowledge of their confidentiality had any right to publish. The claimants themselves argued that 'the unauthorised photographs were taken at different moments to the authorised ones, showed different and informal incidents at the reception, and were naturally much less posed'. These photographs invaded the area of privacy which the Douglases had chosen to retain. It was the Douglases, not OK!, who had the right to protect this area of privacy or confidentiality. Clause 10 of the OK! contract expressly provided that any rights not expressly granted to OK! were retained by the Douglases. The claim successfully advanced by the Douglases in this litigation is at odds with OK!'s claim.

[137] For these reasons we conclude that the judge was wrong to hold that OK! was in a position to invoke against Hello! any right to commercial confidence in relation to the details of the wedding or the photographic images portraying these.

The effect of the publication of the photographs in OK! magazine

[138] If we are wrong in our conclusions that OK! had no right of commercial confidence in the information portrayed by Hello!'s photographs, this can only be on the basis that the photographs published by Hello! fell within a generic class of commercially confidential information to which OK! were party and which OK! were entitled to protect. On that premise we propose to consider the effect of the fact that, as a result of OK! advancing the publication date of the first edition of OK! magazine to carry photographs of the wedding, these photographs were published on the same day as the unauthorised photographs were published in Hello! magazine. Mr Price argued that the publication of the photographs in OK! magazine brought the confidential information that they portrayed into the public domain, so that this was no longer capable of giving rise to a duty of confidence.

[139] Mr Desmond Browne QC advanced more than one answer to Mr Price's argument. He relied upon the fact

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

that the unauthorised photographs were 'quite different in nature to the authorised ones', which simply underlined his difficulty in showing that his clients, OK!, had any rights in respect of the subject matter of the unauthorised photographs. More pertinently he questioned the application to photographs of the proposition that information loses protection of the law of confidence once it is in the public domain. His most cogent submission was that, when Hello! published the unauthorised photographs, the photographs in OK! magazine were not truly in the public domain. They were not widely available to the public. OK! could properly have expected to be able to control when to publish the authorised photographs and they could not lose the protection of the law of confidentiality until they were so widely available to the public that they no longer retained any commercial value capable of exploitation.

[140] We have already questioned the application of the 'public domain' test to photographs in the context of invasion of privacy. Where the claimant's interest is a commercial interest in the exploitation of information by the publication of photographs, the legal effect of prior publication of similar information is particularly difficult to analyse. We do not, however, consider that the facts of this case raise a problem. If, contrary to the conclusion we have reached, OK! were entitled to enjoy the exclusive benefit of publishing photographs of the wedding until their photographs had been put into the public domain, we are in no doubt that Hello! jumped the gun in publishing the unauthorised photographs when they did. This was also the view of the judge. Hello! did not wait until OK!'s photographs were in the public domain before publishing their own. They took steps which, but for the reaction of OK!, would have resulted in their publishing their photographs first in breach of OK!'s rights. In an attempt to mitigate the damage that this would do, OK! rushed forward the publication of their own photographs, but did no more than achieve approximately simultaneous publication with Hello!. We agree with the judge that OK!'s action had not, by the time of Hello!'s publication, had the effect of destroying such rights of confidentiality as OK! had.

Legal certainty

[141] This point remains alive in relation to that part of the judgment that awarded damages to the Douglases which we have upheld.

[142] Mr Price's arguments in relation to legal certainty were as follows. The claimants' claims involved a restriction on Hello!'s freedom of expression. Article 10(2) of the Convention required that any such restriction should be 'prescribed by law'. When Hello! took the decision to publish the unauthorised photographs the relevant law was so uncertain that it was not possible to predict that publication would be held to be unlawful. The four cases from which the judge chiefly drew his exposition of the modern law in relation to personal confidence all post dated publication of the relevant issue of Hello! magazine. It followed that there was, at that time, no relevant restriction on publication 'prescribed by law'. In these circumstances, for the court to hold that by publishing the unauthorised photographs Hello! committed a breach of duty owed to the claimants would be in conflict with art 10.

[143] In support of this submission Mr Price relied upon well established principles of Strasbourg jurisprudence, founded on this passage of the judgment of the European Court of Human Rights in Sunday Times v UK (1979) 2 EHRR 245 at para 49:

'In the Court's opinion, the following are two of the requirements that flow from the expression "prescribed by law". First, the law must be adequately accessible: the citizen must be able to have an indication that is adequate in the circumstances of the legal rules applicable to a given case. Second, a norm cannot be regarded as a "law" unless it is formulated with sufficient precision to enable the citizen to regulate his conduct: he must be able-if need be with appropriate advice-to foresee, to a degree that is reasonable in the circumstances, the consequences which a given action may entail. These consequences need not be foreseeable with absolute certainty: experience shows this to be unattainable. Again, whilst certainty is highly desirable, it may bring in its train excessive rigidity and the law mush be able to keep pace with changing circumstances. Accordingly, many laws are inevitably couched in terms which, to a greater or lesser extent, are vague and whose interpretation and application are questions of practice.'

[144] Lindsay J dealt with this argument in a single sentence at [212]: 'I am not conscious of having extended but

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

merely of having applied the law.' That is not an answer to the point if the law which he applied had only been established by decisions which pre-dated his judgment but post-dated the publication of the relevant edition of Hello! magazine.

[145] Mr Browne submitted that the Strasbourg jurisprudence did not preclude developments of English common law that were reasonably foreseeable. He relied, in particular, on observations of the European Court of Human Rights in SW v UK (1995) 21 EHRR 363. That case involved two applicants, each of whom had been convicted of raping his wife. Theirs had been the first cases in which the English courts had recognised that there was no general immunity available to a husband against a charge of raping his wife. They contended that their convictions involved a retroactive change in the law which violated art 7(1) of the Convention.

[146] The court held at para 36:

'However clearly drafted a legal provision may be, in any system of law, including criminal law, there is an inevitable element of judicial interpretation. There will always be a need for elucidation of doubtful points and for adaptation to changing circumstances. Indeed, in the United Kingdom, as in the other Convention States, the progressive development of the criminal law through judicial lawmaking is a well-entrenched and necessary part of legal tradition. Article 7 of the Convention cannot be read as outlawing the gradual clarification of the rules of criminal liability through judicial interpretation from case to case, provided that the resulting development is consistent with the essence of the offence and could reasonably be foreseen.'

The court went on to conclude at para 43 that the decision of the House of Lords withdrawing the husband's immunity was no more than continuing 'a perceptible line of case law development' which had 'reached a stage where judicial recognition of the absence of immunity had become a reasonably foreseeable development of the law'.

[147] Had the claimants' application for an interlocutory judgment in this case succeeded, it would have been possible for Hello! to have prevented the publication of the edition containing the unauthorised photographs. When the injunction was refused, they decided to proceed with the publication. At that moment, it is not clear whether the Court of Appeal gave any indication as to their reasons for refusing the injunction. We do not believe, however, that the court's reaction to the arguments advanced on behalf of the claimants can have left Hello! confident that the claimants would not establish a valid claim in law. Applying the reasoning of the European Court in SW v UK, we conclude that it was reasonably foreseeable to Hello!, when they decided to proceed with the publication, that this developing area of English law might result in their being held to have infringed the Douglases' rights of privacy or confidence.

[148] There is a further point. This case involves a conflict between the art 8 right of respect for private and family life and the art 10 right of freedom of expression. The Convention only permits restrictions of either right where 'prescribed by law'. In Spencer v UK the applicants complained that United Kingdom law had failed to protect the art 8 rights of Countess Spencer after a newspaper had published a photograph of her, taken with a telephoto lens, in the grounds of a clinic. The Commission ruled the application inadmissible on the ground that the courts, through the common law system in the United Kingdom, should be permitted to develop existing rights in respect of breach of confidence by way of interpretation so as to cover the breach of privacy that had taken place.

[149] In Peck v UK (2003) 13 BHRC 669 the applicant complained, among other things, of the lack of a domestic remedy against infringement of his right to respect for private life in relation to facts that occurred before the Human Rights Act 1998 came into effect. He had been photographed in a public place by closed circuit television with a knife in his hands after attempting to commit suicide and the film had been released to the media and widely published. The government argued that the facts involved an area of the law which had been, and would continue to be developed by the courts and that the Strasbourg jurisprudence, which had had an important impact on these developments, would have an even more important impact with the coming into effect of the Human Rights Act 1998. The European Court was not persuaded. It found that it was unlikely that the domestic courts would have afforded the applicant a remedy at the relevant time had an action been brought for breach of confidence.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

[150] If one postulates that, at the time of the publication by Hello! of the unauthorised photographs, English law was insufficiently clear to satisfy the requirements of providing protection to privacy in a manner 'prescribed by law', the court was on the horns of a dilemma. If it gave a decision which developed the law so as to provide a protection to respect for privacy 'prescribed by law', it risked infringing Hello!'s art 10 rights. If, however, it ruled that the law was insufficiently clear to provide a remedy, it perpetuated the infringement of the Douglases' art 8 rights. It seems to us that in this situation the proper course for the court to attempt to bring English law into compliance with the Convention, even if this was at the cost of a restriction, in the instant case, of Hello!'s art 10 rights by findings which, up to that moment, could not be said to have been 'prescribed by law'.

[151] For all these reasons, we dismiss Hello!'s attack on the judgment below on the ground that it imposed a restriction on Hello!'s right to freedom of expression that was not prescribed by law of sufficient certainty.

OK!'S CLAIM BASED ON ECONOMIC TORTS: UNLAWFUL INTERFERENCE WITH BUSINESS

Introduction

[152] Having held that OK! were entitled to damages from Hello! for breach of confidence, it was not strictly necessary for the judge to decide whether there was any other tortious basis of liability. However, in the light of the conclusion set out above that OK! are not entitled to damages for breach of confidence, it becomes necessary to consider whether there is any other basis of liability. Before the judge OK! put their case in a number of ways, although it is only necessary for us to refer to three, which the judge identified at [180](vi), (viii) and (ix) of his judgment. They were (so far as relevant) unlawful interference with the business of OK!, conspiracy to injure OK! by unlawful means and conspiracy to injure OK! with the predominant purpose of doing so.

[153] There are two types of conspiracy to injure, namely conspiracy to injure by lawful means and conspiracy to injure by unlawful means. In Kuwait Oil Tanker Co SAK v Al Bader [2000] 2 All ER (Comm) 271 at 311-312 (para 108) this court defined them as follows:

'(1) A conspiracy to injure by lawful means is actionable where the claimant proves that he has suffered loss or damage as a result of action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him, where the predominant purpose is to injure the claimant. (2) A conspiracy to injure by unlawful means is actionable where the claimant proves that he has suffered loss or damage as a result of unlawful action taken pursuant to a combination or agreement between the defendant and another person or persons to injure him by unlawful means, whether or not it is the predominant purpose of the defendant to do so.'

[154] In formulating those principles, the court had particular regard to Lonrho Ltd v Shell Petroleum Co Ltd (No 2) [1981] 2 All ER 456, [1982] AC 173 and Lonrho plc v Fayed [1991] 3 All ER 303, [1992] 1 AC 448: see para 109. The distinction between the two types of conspiracy was put thus by Lord Bridge in Lonrho plc v Fayed [1991] 3 All ER 303 at 309-310, [1992] 1 AC 448 at 465-466:

'Where conspirators act with the predominant purpose of injuring the plaintiff and in fact inflict damage on him, but do nothing which would have been actionable if done by an individual acting alone, it is in the fact of their concerted action for that illegitimate purpose that the law, however anomalous it may now seem, finds a sufficient ground to condemn their action as illegal and tortious. But when conspirators intentionally injure the plaintiff and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests; it is sufficient to make their action tortious that the means used were unlawful.'

[155] It is no longer alleged that the predominant purpose of Hello! was at any stage to injure OK!. That is scarcely surprising in the light of the judge's conclusion of fact that Hello!'s purpose was to protect its own interests (see below). As to their case that Hello! are liable for damages for conspiracy to injure them by unlawful means, OK! accept that the allegation of conspiracy adds nothing to their case that Hello! are liable for a tort which the editors of Clerk and Lindsell on Torts (cited above) describe in para 24-88 as 'unlawful interference with economic and other interests' and

which we will call 'unlawful interference' for short. The argument before us has proceeded on the premise that the test of intention is the same in the two torts and we have concluded that this common ground is correct.

[156] We propose therefore to focus primarily on the ingredients of the tort of unlawful interference and their application to the facts of this case. In para 24-88 of Clerk and Lindsell the editors say: 'There exists a tort of uncertain ambit which consists in one person using unlawful means with the object and effect of causing damage to another.' It is not in dispute that the tort of unlawful interference exists but the parties are not agreed as to its precise ingredients. In particular they do not agree as to the nature of the 'unlawful means' required or as to the requirement of 'object and effect' in this context. In this latter regard there is an issue as to whether it is necessary to show that the defendant acted with the object or purpose of injuring the claimant and/or that the defendant's acts were in some sense aimed or directed at the claimant. It is, however, common ground (1) that some mens rea or intention to injure is required and (2) that it is not necessary to show that the predominant purpose or intention of the defendant was to injure the claimant.

[157] Before focusing on those questions it is convenient to set out the case for OK! as it has been put in this appeal, in the light of our conclusions on privacy and confidentiality and of the findings of fact made by the judge as to the state of Hello!'s knowledge. OK!'s case is that in all the circumstances the judge should have held that the tort of unlawful interference with OK!'s business was made out on the basis that the publication of the unauthorised photographs was an unlawful act, that, in publishing them, Hello! intended to injure OK! and that OK! suffered loss and damage as a result.

[158] The judge accepted that the publication was indeed an unlawful act and that it amounted to unlawful means. He said at [249] that, if he had found the intent to injure made out, he would have held the intent to be to injure by the unlawful means of publishing the unauthorised photographs in breach of obligations of confidence owed to all the claimants and by way of contravention of the Data Protection Act 1998. It is not necessary for us to consider the Data Protection Act 1998 for, in the light of our conclusions as to privacy and confidence, the part of [249] principally relied upon by OK! is the judge's conclusion that the publication was in breach of obligations of confidence owed to the Douglases. Mr Browne submits that the publication of the unauthorised photographs in breach of the Douglases' rights of privacy amounts to a sufficient unlawful act or unlawful means for the purposes of the tort of unlawful interference. We will return to this point below in the light of submissions made by Mr Price on behalf of Hello! but will first consider OK!'s case on intention.

Intention: OK!'s case

[159] There are a number of contenders for the test of the state of mind that amounts to an 'intention to injure' in the context of the tort that we have described as 'unlawful interference'. These include the following: (a) an intention to cause economic harm to the claimant as an end in itself; (b) an intention to cause economic harm to the claimant because it is a necessary means of achieving some ulterior motive; (c) knowledge that the course of conduct undertaken will have the inevitable consequence of causing the claimant economic harm; (d) knowledge that the course of conduct will probably cause the claimant economic harm; (e) knowledge that the course of conduct undertaken may cause the claimant economic harm coupled with reckless indifference as to whether it does or not. A course of conduct undertaken with an intention that satisfies test (a) or (b) can be said to be 'aimed', 'directed', or 'targeted' at the claimant. Causing the claimant economic harm will be a specific object of the conduct in question. A course of conduct which only satisfies test (c) cannot of itself be said to be so aimed, directed or targeted, because the economic harm, although inevitable, will be no more than an incidental consequence, at least from the defendant's perspective. None the less, the fact that the economic harm is inevitable (or even probable) may well be evidence to support a contention that test (b), or even test (a), is satisfied.

[160] Whatever test is adopted, it is not sufficient for the claimant to show that it was reasonably foreseeable that the claimant would or might suffer damage as a result of his act. As much of the discussion in Three Rivers DC v Bank of England (No 3) [2000] 3 All ER 1, [2003] 2 AC 1 shows, albeit in the context of the tort of misfeasance in public office, there is an important conceptual and factual difference between a tort, like negligence or breach of duty, which

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

requires merely that the loss or damage should be reasonably foreseeable and a tort, which requires actual knowledge (or subjective recklessness) as to the consequences.

[161] OK!'s case, as advanced by Mr Browne, can be summarised as follows.

-- The judge should have found that Hello! had the deliberate object of causing economic harm to OK! (ie that test (a) or (b) was satisfied) and that this amounted in law to the necessary intention to injure. Alternatively:

-- The judge found, or should have found, that Hello! knew that their conduct would inevitably, or alternatively probably, cause economic harm to OK! (ie that test (c) or (d) was satisfied) and that this amounted in law to the necessary intention to injure. Alternatively:

-- The judge found, or should have found, that Hello! knew that their conduct might cause OK! economic harm, acted with reckless indifference as to whether they did or not (ie that test (e) was satisfied) and that this amounted in law to the necessary intention to injure.

[162] In support of these submissions Mr Browne relies upon the judge's findings as to Hello!'s state of mind and we propose to set these out before turning to the express findings that the judge made in respect of Hello!'s intention.

Intention: the judge's findings

[163] The state of mind of Hello! depends largely, if not entirely, upon the state of mind of Senor Sanchez Junco, who is also the third defendant. He is a director and controlling shareholder of the second defendant, Hola SA, which publishes Hello! magazine in the United Kingdom. The judge made these findings as to the state of knowledge of Senor Sanchez Junco in paras 79, 80 and 81 of his judgment:

'79. As he set about arranging the unauthorised photographs into a lay-out for an issue of Hello!, Senor Sanchez Junco well knew that OK! had obtained an exclusive contract for coverage of the Douglas wedding. He knew of Ramey's reputation and the kind of work that Ramey handled and the intrusive systems which paparazzi such as Ramey employed. It was a kind of journalism he and Hello! did not like, he said, and usually tried to avoid.

At least a part of the reasons for Senor Sanchez Junco's insistence that Ramey should not be commissioned in advance, was in my judgment, that he, as a cautious man, was uncomfortable in being seen, as a commission would involve, to be procuring the sort of unpredictable and possibly unlawful activity that a paparazzo of Ramey's reputation might get up to. Whilst he would not have known of the specific language used, Sr Sanchez Junco knew that a feature of OK!'s "exclusive" would have been that security arrangements were required by contract so far as was reasonable to ensure that only those invited or duly employed would be present at the wedding and that no photographs were to be taken other than the authorised ones. For example, Hello!'s own pleaded exclusive contract for coverage of the wedding of Gloria Hunniford required reasonable security to be enforced. Such arrangements had to be contemplated by those in the trade as an inevitable concomitant of an "exclusive", certainly where as much as £1m was at stake.

80. It was obvious to him that the photographs were unauthorised. He said in cross-examination that he had no doubt but that the person who did the photographs was trying to hide himself. He was then asked:

"Mr Tugendhat: Did you ask Mr Ramey any questions about how the photographs were taken?

Witness: No.

Mr Tugendhat: Is that because you did not care whether they were taken legally or illegally?

Witness: No, it was because I didn't want any information. I didn't want to know anything about it. I wasn't curious about it. I didn't want to know."

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Similarly, to Mr Luke, co-ordinating Editor in Madrid, it was a matter of indifference how the photographs had been obtained.

Senor Sanchez Junco knew from his contacts with Mr Burry that the Douglases had been insisting on control over what photographs would be released and his own proposals to Mr Burry of May 2000 had accordingly offered the Douglases full picture approval rights.

81. In my judgment Senor Sanchez Junco knew and ought to have known, as he selected the unauthorised photographs for publication, that what he was doing would or might significantly diminish the benefits which OK! would otherwise derive from its exclusive contract with the Douglases, that it would deny the Douglases the picture approval which he knew they wanted and which he would have expected them to have procured in their contract with OK! and that the taking of the unauthorised photographs, which he had been careful not to commission, would have involved at least a trespass or some deceit or misrepresentation on the photographer's part in order for the photographer to overcome the security arrangements which, in outline, he knew or must be taken to have known to have been in place at a wedding which he had no reason to think was other than private. It was obvious, agreed Sue Neal, Hello!'s Picture Editor at the time, that the photographs had been taken by someone 'who had no business to be there.'

Mrs Cartwright's evidence was that they had to have been taken surreptitiously.' (My emphasis.)

[164] Set against the judge's findings of knowledge must be his express findings as to the intention of Senor Sanchez Junco and thus of Hello!. The judge set out Senor Sanchez Junco's evidence in some detail between [245] and [248]. Given the importance of the evidence to this part of case, especially to the submissions made by Mr Price, we set out [245]-[248] here:

'[245] As for the relevant intent of the Hello! defendants, in practical terms it is either to be found in Senor Sanchez Junco or it does not exist. As to his intent, his written evidence said:

"I want to state categorically that there was never an intention to cause damage to any of the claimants-to the first two claimants because we have always treated them in Hello! with deference and sympathy, in accordance with the magazine style. In our 60-year history we have never tried to damage anyone. Therefore, we would not want to do it to people whom we have always treated fairly and objectively in our reports portraying them in the best possible light. With respect to OK! we took it for granted that, without a doubt, they would have a great editorial success, as they had a great exclusive and consequently, the magazine would be sold under excellent conditions as was the case. Our main purpose was to inform our readers about an event which had been publicised all over the media for weeks before the wedding, which shows that this wedding was of interest for the United Kingdom. We did not wish to disappoint our readers. It was never our aim or intention to damage the third claimant, our prime motivation was only to give our readers information on the wedding of two celebrities, about whom, without doubt, our readers expected to read in Hello!. Other consideration was to defend the interests of our magazine and keep our place in the market. There was little or no monetary incentive in publishing these photographs because the increase in sales was not likely to compensate the costs incurred in purchasing the photographs, changing the edition and airlifting a proportion of the copies from Spain into the United Kingdom. However, this is something that every publisher must be prepared to do from time to time and it is a matter of professional pride and an investment in the goodwill of the publication's readership."

[246] In his oral evidence Senor Sanchez Junco disavowed having acted in revenge against the Douglases for his not getting the exclusive he so wished; rather he wanted, despite losing the exclusive, to publish an edition that would interest his readers, the event being one which had captured the imagination of the public. His act, he said, was not of revenge but of salvage. He denied having the intention of spoiling OK!'s sales adding: ": my motive was never to spoil the exclusive of OK!. I repeat, I wanted to defend as far as I could my publication . . ." Mr Tugendhat put this to him:

"What I am suggesting to you is that in all of this you were driven by your anger and you were intending to do as

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

much damage as you could both to the Douglases and to the publishers of OK!"

Senor Sanchez Junco:

"No. My priority was to save my publication after having, in the light of a very important big loss, and that is that of the exclusive, and I didn't think of the possible damage that I could inflict on Hello! [sic] or the Douglases because the photographs, I never thought that these photographs could be considered to be damaging for the Douglases and that is because photographs published in that way were unlikely to damage the authorised exclusive."

[247] Then, referring to an argument which I hold to be not unreasonable, namely that poor photographs in one of the rival magazines could in fact increase the sales of the other which covered the event in a better way, he added, of such a case:

"In some cases it encourages it. It has happened to me many times and I've never considered it to be that it was a damage which-certainly not a serious one. This supposed damage which I was supposed to have wanted to inflict on OK! wasn't even, in my opinion, clear damage. Maybe it could even help out its exclusive. In any event, I sold a few more, and I believe that OK! sold its exclusive very well."

Ms Koumi, too, gave evidence that poor photographs of an event in one of the rival magazines could increase the sales of the rival that has better ones (though I am not to be taken to be holding that was in fact the case here).

[248] Mr Luke, in close contact with Senor Sanchez Junco in Madrid was asked the question: "How common, to your recollection, are spoilers by Hello! of OK! exclusives?" Mr Luke:

"It is a bit of a misnomer. I would not call it a spoiler because in the case of . . . If we go back to the Zeta-Jones wedding, it was the event of the year. It is like one had to cover the outbreak of war because-or would not cover it because Churchill had given his exclusive interview to the Express. We had to cover it in some way. I think 'spoiler' is a bit of a misnomer. It is something we have to cover, and if photographs become available you publish them. This is not an attack on your competition, this is because our readers want to know about these events so you go ahead and publish them. If those photographs are made available by an orang utan with a Polaroid, well you publish them.'"

[165] That was the judge's summary of the evidence given on behalf of Hello! as to what their intentions were. The judge then expressed his conclusion thus:

'[249] I have not found Senor Sanchez Junco or Mr Luke to be reliable as witnesses but I do accept the evidence they gave on this subject. Whilst I recognise that for a defendant to act out of self-interest does not, of itself, disprove that he had no intent to injure another, here I find on the evidence that there was no intent to injure by unlawful means because there was no intent to injure at all . . .'

The judge added at [260] that no intent of any of the defendants other than Senor Sanchez Junco was proved and that he did not hold Senor Sanchez Junco to have had 'any intent to injure the Douglases'. Although the judge was there referring specifically to the Douglases, it is plain that his conclusion was the same vis-a-vis OK!.

Intention: conclusions in relation to the judge's findings

[166] Paragraphs [245]-[249] are fatal to Mr Browne's argument that test (a) or (b) set out in [159] above was satisfied. The judge plainly found that Hello! had not aimed, directed or targeted their conduct at OK! They had no specific object to cause economic harm to OK!. Mr Browne, on behalf of OK!, sought to challenge the judge's findings of fact in this appeal. He argued that the judge was wrong to hold that Hello! did not have the subjective intention, in the sense of object or purpose, of causing injury to OK!. However, the judge heard and considered an enormous body of evidence including oral evidence and reached the clear conclusion set out in [249]. This court will very rarely interfere with a judge's conclusions of fact in such circumstances. There was ample evidence upon which the judge

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

could properly reach the conclusion which he did, and in our judgment there is no basis upon which we could properly interfere with that conclusion. It follows that the first way in which OK! put their case on intention is not made out.

[167] We turn to the second way in which OK! put their case, namely that Hello! knew their conduct would inevitably, or alternatively probably, cause economic harm to OK! The key part of the judge's findings is in the opening words of para 81, where the judge expressly held that Senor Sanchez Junco-

'knew and ought to have known, as he selected the unauthorised photographs for publication, that what he was doing would or might significantly diminish the benefits which OK! would otherwise derive from its exclusive contract with the Douglases . . .'

The judge was not there stating either what was reasonably foreseeable or what Senor Sanchez Junco 'knew or ought to have known', but what he 'knew and ought to have known' (our emphasis). The judge was setting out his conclusion as to Senor Sanchez Junco's actual state of mind, namely that he knew that publication would or might injure OK! because it would or might diminish the benefits which OK! would otherwise derive from the contract.

[168] This finding has to be read, however, with the evidence which the judge accepted, which he set out at [245]-[248]. When this approach is adopted it becomes impossible to argue that the judge held, or should have held, that Hello! knew that their conduct would, either inevitably or even probably, cause economic harm to OK!. The judge's finding amounts to no more than Hello! knew that their conduct might cause economic harm to OK!. Once again this is a finding of primary fact with which we cannot properly interfere. It follows that the second way in which OK! put their case on intention is not made out.

[169] We turn to the third way in which Mr Browne puts OK!'s case on intention. The judge's findings of fact were, we consider, sufficient to satisfy test (e). Hello! knew that their conduct might cause economic harm, to OK! and their attitude to this risk can properly be described as reckless indifference. The critical question is whether this attitude of mind was, in law, sufficient to constitute 'intention to injure' in the context of the tort of unlawful interference. A crucial stepping stone in Mr Browne's argument in support of test (e) is his contention that the authorities firmly establish the validity of test (d). It is, indeed, a short step from knowledge that conduct will cause harm to knowledge that conduct may cause harm, coupled with reckless indifference as to whether it does. In advancing test (d) as his starting point, Mr Browne relies particularly on three authorities: Bourgoin SA v Ministry of Agriculture, Fishery and Foods [1985] 3 All ER 585, [1986] QB 716; Lonrho plc v Fayed [1991] 3 All ER 303, [1992] 1 AC 448 and the Kuwait Oil Tanker case. The first of these is a case on misfeasance in public office, the second a case on unlawful interference and the third a case on conspiracy to injure by unlawful means.

[170] One of the problems with this part of the case is that OK! have sought to expand the way in which their case is put before us, as compared with the way in which it was put before the judge. This can be seen both from the way in which the judge approached the relevant principles and from the way in which he approached the evidence in the passages we have quoted.

[171] The judge considered the principles relevant to the tort of unlawful interference at [242]-[244] on liability, just before he set out his findings of fact as to Senor Sanchez Junco's intention. Before doing so he first considered briefly the tort of interference with contractual relations, quoted a passage from the judgment of Slade LJ in RCA Corp v Pollard [1982] 3 All ER 771 at 784, [1983] Ch 135 at 156, in which Slade LJ was referring only to that tort, and held (in our view correctly) that there was here no interference with the contractual relations between the Douglases and Hello!.

[172] The judge observed at [243] that OK! must prove an intention to injure by unlawful means and said in [244] that, although the role of intent is not always described in the same terms in the authorities, it was appropriate to accept the Clerk and Lindsell formulation (quoted above) that the tort consists in one person using unlawful means with the object and effect of causing damage to another. He observed that that was the case being made by OK! and thus the

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

formulation that Hello! were being required to answer. It was in that context that, having concluded at [249] that Hello! had no intent to injure at all, he held that OK!'s claim under this head failed. It is we think clear therefore that the judge was asking himself whether OK! satisfied the Clerk and Lindsell test, that is whether it was the object of Hello! to injure OK!. He held that it was not.

[173] Mr Browne contended that the judge did not consider whether intention can be established without the necessity to prove object or purpose. This is correct but the judge is not to be criticised in any way for that because the case was not put before him in the way in which it has been put before us. The argument based upon the Bourgoin case, Lohnro plc v Fayed and the Kuwait Oil Tanker case was advanced for the first time in detail before us and, although it is said in Hello!'s skeleton argument that it is not open to OK! to advance it, both sides made detailed submissions about it and we can see no injustice to Hello! in allowing the point to be taken now. It is less clear that the same is true of the development of that argument based upon the proposition that the relevant intention can be established by proof of subjective recklessness. We decided that we would consider Mr Browne's submissions on the basis that, should we be minded to accept them, we would first afford Mr Price the opportunity to advance further submissions in response to them.

Intention: our approach to the law

[174] In considering this area of the law of tort, we have found much assistance in Hazel Carty's valuable book entitled An Analysis of the Economic Torts published in 2001. We also wish to pay tribute to the article entitled 'Intentional Infliction of Harm by Unlawful Means' by Philip Sales and Daniel Stilitz in (1999) 115 LQR 411. They suggest that the tort would more aptly be called intentional infliction of harm by unlawful means. We agree.

[175] As Hazel Carty shows, there are a number of disparate economic torts which have differing characteristics and do not all fall to be approached in the same way. Thus care must be taken in concluding that because intention has a particular meaning in the context of one of the torts it necessarily has the same meaning in others. This can be seen, for example, by reference to the two torts of conspiracy to injure to which we have already referred. Both conspiracy to injure by lawful means and conspiracy to injure by unlawful means require intention to injure but it is common ground that the former requires proof that the defendant's predominant purpose is to injure the defendant, whereas the latter does not.

[176] It does not follow from the fact that predominant purpose must be established in the former case that it is necessary or sufficient to establish that a purpose was to injure in the latter case. It may be necessary or sufficient to do so but whether it is or not cannot be deduced from cases of lawful means conspiracy. At [260], the judge said this in the context of unlawful means conspiracy:

'This is not an area of the law where it can be assumed that a person intends the natural and probable consequences of his actions or omissions (see Crofter Hand Woven Harris Tweed Co Ltd v Veitch [1942] 1 All ER 142 at 149, [1942] AC 435 at 444 per Viscount Simon LC) so that for this conspiracy to succeed an intent to harm the Douglases on the part of the Hello! defendants is required to be proved.'

If the judge was saying that Viscount Simon was expressing any view about intention in an unlawful means conspiracy, we respectfully disagree because the Veitch case involved a lawful means conspiracy where, by contrast with an unlawful means conspiracy, it is common ground that a predominant object or purpose to injure is required.

[177] As we have explained, the argument before us proceeded on the reasonable premise that the test of intention in the tort of unlawful interference is the same as the test in relation to unlawful means conspiracy. There is no agreement that the same is true in relation to the torts of interference with contractual rights and misfeasance in public office. We intend to consider first cases on unlawful interference and unlawful means conspiracy, then cases on interference with contractual rights. Then, after turning to see what assistance, if any, is to be derived from cases on misfeasance in public office, we will express our conclusions.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Intention: cases on unlawful interference and unlawful means conspiracy

[178] The line of authority starts with Mogul Steamship Co Ltd v McGregor Gow & Co (1889) 23 QBD 598. The plaintiff shipowners claimed damages on the ground that they had been shut out from profitable China trade by the conspiracy of the defendants, who had formed a conference from which the plaintiffs were excluded. The claim failed. Bowen LJ summarised the law as follows:

'No man, whether trader or not, can however justify damaging another in his commercial business by fraud or misrepresentation. Intimidation, obstruction and molestation are forbidden; so is the intentional procurement or violation of individual rights, contractual or other, assuming always that there is no just cause for it . . . but the defendants have been guilty of none of these acts. They have done nothing more against the plaintiffs than pursue to the bitter end a war of competition waged in the context of their own trade. To the argument that a competition so pursued ceases to have a just cause or excuse when there is ill-will or a personal intention to harm it is sufficient to reply (as I have already pointed out) that there was here no personal intention to do any other than such as was necessarily involved in the desire to attract to the defendant's ships the entire tea freights of the ports.'

[179] Allen v Flood [1898] AC 1, [1895-9] All ER Rep 52 involved a demarcation dispute. The defendant, on behalf of a group of ironworkers, persuaded their employers to desist from employing the plaintiff shipwrights. This involved no breach of contract. The plaintiffs alleged that this conduct gave rise to liability in tort on the ground that the defendant had maliciously induced the employers to act as they did. The action failed. Lord Watson held ([1898] AC 1 at 96, [1895-9] All ER Rep 52 at 69):

'There are in my opinion two grounds only upon which a person who procures the act of another can be made legally responsibly for its consequences. In the first place he will incur liability if he knowingly and for his own ends induces that other person to commit an actionable wrong. In the second place when the act induced is within the right of the immediate actor and is therefore not wrongful in so far as he is concerned, it may yet be to the detriment if a third party; and in that case according to the law laid down by the majority in Lumley v Gye ((1853) 2 E & B 216, [1843-60] All ER Rep 208), the inducer may be held liable if he can be shown to have procured his object by the use of illegal means directed against that third party.' (Our emphasis.)

[180] Allen's case was distinguished in Quinn v Leathem [1901] AC 495, [1900-3] All ER Rep 1. The House of Lords upheld a decision of the Irish Court of Appeal that a conspiracy 'wrongfully and maliciously' to induce customers and servants of the plaintiff not to deal with him was actionable on proof of damage. Lord Shand explained the difference between the two cases as follows ([1901] AC 495 at 514, [1900-3] All ER Rep 1 at 11):

'As to the vital distinction between Allen v Flood and the present case, it may be stated in a single sentence. In Allen v Flood the purpose of the defendant was by the acts complained of to promote his own trade interest, which it was held he was entitled to do, although injurious to his competitors, whereas in the present case, while it is clear there was combination, the purpose of the defendants was "to injure the plaintiff in his trade as distinguish from the intention of legitimately advancing their own interest."'

Other members of the House made the point that in Allen's case there was no question of conspiracy or of coercion.

[181] The distinction between the two types of tortious conspiracy was drawn by the House of Lords in the Crofter Hand case where a trade embargo was held not to be tortious because the predominant purpose of the conspirators was to protect their own interests, not to damage the plaintiffs. The embargo had involved no illegality and Lord Wright ([1942] 1 All ER 142 at 158, [1942] AC 435 at 462) drew a distinction between such a conspiracy and one to do 'acts in themselves wrongful'. The mental element necessary to constitute the latter type of conspiracy tortious was not, however discussed. It was a matter to which Lord Denning MR gave specific consideration in Lonrho Ltd v Shell Petroleum Co Ltd (7 March 1981, unreported).

[182] Lonrho had been a supplier of oil to Southern Rhodesia and had had to cease this profitable business when

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

the United Kingdom imposed sanctions on that country. It alleged that Shell had conspired unlawfully to break the sanctions, thereby prolonging the illegal regime in Southern Rhodesia and causing economic damage to Lonrho. The Court of Appeal held that this gave rise to no cause of action. Lord Denning MR said:

'So this point of law arises directly: Is an agreement to do an unlawful act actionable at the suit of anyone who suffers damage from it which is reasonably foreseeable? Even though the agreement is not directed at him, nor done with intent to injure him? In discussing this point of law I put aside the many modern cases on conspiracy-in which there is an agreement by two or more to do a lawful act. It is now settled by the House of Lords that such an agreement is actionable if it is done with the predominant motive of injuring the plaintiff and does in fact injure him: see Crofter Hand Woven Harris Tweed Co Ltd v Veitch [1942] 1 All ER 142 at 149, [1942] AC 435 at 445, where Lord Simon LC said: "Liability must depend on ascertaining the predominant purpose. If that predominant purpose is to damage another person and damage results, that is tortuous conspiracy." Here we are concerned with a different problem altogether. It is an agreement by two or more to do an unlawful act . . . I think there is a cause of action when it is remembered that the tort is a conspiracy to injure. I would suggest that a conspiracy to do an unlawful act-when there is no intent to injure the plaintiff and it is not aimed or directed at him-is not actionable, even though he is damaged thereby. But if there is an intent to injure him then it is actionable. The intent to injure may not be the predominant motive. It may be mixed with other motives. In this context, when the agreement is to do an unlawful act, we do not get into the "quagmire of mixed motives", as Lord Simon LC described them in Crofter Hand Woven Harris Tweed Co Ltd v Veitch ([1942] 1 All ER 142 at 149, [1942] AC 435 at 445). It is sufficient if the conspiracy is aimed or directed at the plaintiff, and it can reasonably be foreseen that it may injure him, and does in fact injure him. That is what Parker J thought. I agree with him.'

[183] In the House of Lords counsel for Lonrho is reported ([1982] AC 173 at 180) as advancing the following argument in relation to the mental element of the tort:

'The question of conspiracy assumes no breach of contract, no private rights arising out of breach of the sanctions Orders and no allegations of intention to injure. All that is alleged is actual knowledge that damage would be suffered. A conspiracy to do an unlawful act which is carried into effect and causes reasonably foreseeable damage is actionable as a conspiracy although the act may not have been tortuous in itself. There is conspiracy where an unlawful act is done pursuant to agreement. Here there was actually knowledge that the acts done would cause damage to the appellants. The appellants have pleaded that the historical development of the tort of conspiracy from the crime of conspiracy indicates that a combination or agreement to do an act unlawful in itself gives a cause of action if it results in foreseeable damage.'

[184] Lord Diplock ([1981] 2 All ER 456 at 464, [1982] AC 173 at 189) first considered conspiracy to injure where no unlawful means were employed:

'The civil tort of conspiracy to injure the plaintiff's commercial interests where that is the predominant purpose of the agreement between the defendants and of the acts done in execution of it which caused damage to the plaintiff, must I think be accepted by this House as too well-established to be discarded however anomalous it may seem today.'

He then considered the question of whether it was necessary to establish an intention to injure where the conspiracy involved action that contravened penal law. He held:

'This House, in my view, has an unfettered choice whether to confine the civil action of conspiracy to the narrow field to which alone it has an established claim or whether to extend this already anomalous tort beyond those narrow limits that are all that common sense and the application of the legal logic of the decided cases require. My Lords, my choice is unhesitatingly the same as that of Parker J and all three members of the Court of Appeal. I am against extending the scope of civil tort of conspiracy beyond acts done in execution of an agreement entered into by two or more persons for the purpose not of protecting their own interests but of injuring the interests of the plaintiff.'

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

[185] One of the cases upon which Mr Browne particularly relies involved a subsequent claim by Lonrho. The subject matter of the litigation was the battle to purchase the share capital of the House of Fraser which owned Harrods. In Lonrho plc v Fayed [1989] 2 All ER 65, [1990] 2 QB 479 Lonrho alleged that the Fayed brothers had perpetrated a fraud on the Secretary of State, thereby securing permission to buy the company without a reference to the Monopolies and Mergers Commission and preventing Lonrho from buying the company. In the Court of Appeal Lonrho did not pursue a claim for tortious conspiracy, accepting that this required a predominant intention to injure them. They did, however, pursue a claim for unlawful interference, appealing against an order striking out this claim. The appeal succeeded.

[186] Dillon LJ said ([1989] 2 All ER 65 at 69, [1990] 2 QB 479 at 488-489):

'It is submitted to us that, even with this tort, it must, as with the tort of conspiracy, have been the predominant purpose of the tortfeasor to injure the victim rather than to further the tortfeasor's own financial ends. I do not accept that. It would be inconsistent with the way Lord Diplock treated this tort and the tort of conspiracy differently in his speech in Lonrho Ltd v Shell Petroleum Co Ltd (No 2) and in Hadmor Productions Ltd v Hamilton [1982] 1 All ER 1042 at 1052-1053, [1983] 1 AC 191 at 228-229. No predominant purpose to injure is required where the tortuous act relied on is injury by wrongful interference with a third party's contract with the victim or by intimidation of a third party to the detriment of the victim, nor should it in my view be required where the wrongful interference has been by the practice of fraud on a third party, aimed specifically at the plaintiff, as it was put by Oliver LJ in RCA Corp v Pollard [1982] 3 All ER 771 at 780, [1983] Ch 135 at 151 . . .

It also has to be proved by a plaintiff who seeks to rely on this tort, as Mr Beveridge conceded for Lonrho, that the unlawful act was in some sense directed against the plaintiff or intended to harm the plaintiff. The origin of those phrases is the oft quoted passage in the speech of Lord Watson in Allen v Flood [1898] AC 1 at 96, [1895-9] All ER Rep 52 at 69, which was applied by the majority of this court (Buckley and Kennedy LJJ) in National Phonograph Co Ltd v Edison-Bell Consolidated Phonograph Co Ltd [1908] 1 Ch 335, [1904-7] All ER Rep 116. In that case the fraud was clearly directed against the plaintiff.'

Ralph Gibson LJ ([1989] 2 All ER 65 at 72, [1990] 2 QB 479 at 492) also referred to 'the nature of the intention that is required to satisfy the requirement that the conduct be "directed against" the plaintiffs'.

[187] Woolf LJ ([1989] 2 All ER 65 at 73, [1990] 2 QB 479 at 494) said:

'So far as conspiracy is concerned, there is good reason for requiring that predominant intent should be an ingredient of the tort. Great difficulty would, in my view, arise if a requirement of predominant intent to injure were to be introduced into the tort with which we are concerned here. This tort is not based upon any agreement, but interference, and frequently it will be fully appreciated by a defendant that a course of conduct that he is embarking upon will have a particular consequence to a plaintiff and the defendant will have decided to pursue that course of conduct knowing what the consequence will be. Albeit that he may have no desire to bring about that consequence in order to achieve what he regards as his ultimate ends, from the point of view of the plaintiff, whatever the motive of the defendant, the damage which he suffers will be the same. If a defendant has deliberately embarked upon a course of conduct, the probable consequences of which to the plaintiff he appreciated, I do not see why the plaintiff should not be compensated.'

[188] In the House of Lords, Lonrho revived their claim for unlawful means conspiracy, arguing that there was no need to show that the predominant purpose of the conspiracy was to injure the plaintiff. It was enough to show that the defendants knew and intended that the plaintiff would be injured, albeit that their primary purpose was to benefit themselves. Lord Bridge of Harwich gave the only speech, with which the other members of the House agreed. He rejected the submission advanced by the Fayeds that Lord Diplock had held in Lonrho Ltd v Shell that, in an unlawful means conspiracy, there must be a predominant purpose to injure the plaintiff. After considering the authorities, he summarised the law as follows ([1991] 3 All ER 303 at 309-310, [1992] 1 AC 448 at 465-466):

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

'Where conspirators act with the predominant purpose of injuring the plaintiff and in fact inflict damage on him, but do nothing which would have been actionable if done by an individual acting alone, it is in the fact of their concerted action for that illegitimate purpose that the law, however anomalous it may now seem, finds a sufficient ground to condemn their action as illegal and tortuous. But when conspirators intentionally injure the plaintiff and use unlawful means to do so, it is no defence for them to show that their primary purpose was to further or protect their own interests; it is sufficient to make their action tortuous that the means used were unlawful.'

[189] Lord Bridge added ([1991] 3 All ER 303 at 312, [1992] 1 AC 448 at 468):

'In the Metall case [1989] 3 All ER 14, [1990] 1 QB 391 Slade LJ, delivering the judgment of the court, whilst expressly disclaiming any intention to construe Lord Diplock's speech as if it were a statute, nevertheless subjected it to a detailed textual analysis leading to the conclusion that it laid down a rule of law that the tort of conspiracy to injure required proof in every case not merely of an intention to injure the plaintiff but also that injury to the plaintiff was the predominant purpose of the conspiracy.

My Lords, I am quite unable to accept that Lord Diplock or the other members of the Appellate Committee concurring with him, of whom I was one, intended the decision in Lonrho Ltd v Shell Petroleum Co Ltd to effect, sub silentio, such a significant change in the law as it had been previously understood. The House, as is clear from the parties' printed cases, which we have been shown, had never been invited to take such a step. Moreover, to do so would have been directly contrary to the view of Lord Denning MR expressed in the judgment which the House was affirming and inconsistent with the dicta in which Lord Diplock described as "Viscount Simon LC's now classic speech in Crofter Hand Woven Harris Tweed Co Ltd v Veitch [1942] 1 All ER 142 at 146, [1942] AC 435 at 439" (see [1981] 2 All ER 456 at 463, [1982] AC 173 at 188). I would overrule the Metall case in this respect.

It follows from this conclusion that Lonrho's acceptance that the pleaded intention on the part of the defendants to cause injury to Lonrho was not the predominant purpose of their alleged unlawful action is not necessarily fatal to the pleaded cause of action in conspiracy and therefore affords no separate ground for striking out that part of the pleading.'

[190] In neither Lonrho v Shell nor Lonrho v Fayed was the House of Lords considering what constitutes a sufficient intention for the purpose of establishing an unlawful means conspiracy claim. Nor indeed was this court in Associated British Ports v Transport and General Workers' Union [1989] 3 All ER 796, [1989] 1 WLR 939, but we note that Stuart-Smith LJ said ([1989] 3 All ER 796 at 818-819, [1989] 1 WLR 939 at 966) that the essence of the tort was 'deliberate and intended damage'. Moreover both he and Neill LJ ([1989] 3 All ER 796 at 806, [1989] 1 WLR 939 at 952) quoted the passage in the judgment of Dillon LJ in Lonrho v Fayed, where he said that it must be proved that the unlawful act was in some way directed at the plaintiff, without expressing any doubt as to its correctness. Butler-Sloss LJ referred to Daily Mirror Newspapers Ltd v Gardner [1968] 2 All ER 163, [1968] 2 QB 762, Acrow (Automation) Ltd v Rex Chainbelt Inc [1971] 3 All ER 1175, [1971] 1 WLR 1676 and Brekkes Ltd v Cattel [1971] 1 All ER 1031, [1972] Ch 105, and said ([1989] 3 All ER 796 at 813, [1989] 1 WLR 939 at 960) that in those three cases it could be shown that the defendant had the object and intention to injure the plaintiff.

[191] Assistance is, we think, also to be found in the approach of the New Zealand Court of Appeal in Van Camp Chocolates Ltd v Aulsebrooks Ltd [1984] 1 NZLR 354, where the plaintiffs sued for interference with their business by unlawful means, namely breach of confidence. A preliminary point of law was argued as to the nature of the intent to injure the plaintiffs necessary to establish the tort. The court said:

'In principle, as we see it, an attempt to harm a plaintiff's economic interests should not transmute the defendant's conduct into a tort actionable by the plaintiff unless that intent is a cause of his conduct. If the defendant would have used the unlawful means in question without that intent, and if that intent would not have led him to act as he did, the mere existence of the purely collateral and extraneous malicious motive should not make all the difference. The essence of the tort is deliberate interference with the plaintiff's interests by unlawful means. If the reasons which actuate the defendant to use unlawful means are wholly independent of a wish to interfere with the plaintiff's business, such

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

interference being no more than an incidental consequence foreseen by and gratifying to the defendant, we think that to impose liability would be to stretch the tort too far.' (My emphasis.)

[192] Henry J cited those observations with approval in Barretts & Baird (Wholesale) Ltd v Institute of Professional Civil Servants [1987] IRLR 3 at 6 (para 28), although it should be noted that, in so far as he said that the defendant must have injury to the plaintiff as his predominant purpose, he went too far. Further, as Hazel Carty points out in her book at p 107, the Court of Appeal in Nova Scotia asserted that the harm 'must be directed at the plaintiff' in Cheticamp Fisheries Co-operative Ltd v Canada (1995) 123 DLR (4th) 121 at 132.

[193] We turn to the decision of this court in the Kuwait Oil Tanker case. The appeal related to huge awards of damages against defendants who had conspired fraudulently to divert into their own pockets income that should have accrued to the claimant company. Counsel for the defendants raised the question of whether the necessary intention to injure had been established, leading to the following passage in the judgment ([2000] 2 All ER (Comm) 271 at 315-316):

'120. Mr Brodie submitted that, in order to succeed, the claimant must prove that the particular defendant and the other conspirator or conspirators intended to injure the claimant and that such an intention could not be inferred from the acts themselves. For the reasons already given we accept the submission that such an intention must be proved, as held by the House of Lords in the two Lonrho cases. We cannot, however, accept the second part of the submission. In many contexts it will be necessary in order to prove intention to ask the court to infer the relevant intention from the primary facts. We can see no reason why there should be a special rule of evidence in this situation. On the contrary, in the case of most conspiracies to injure by tortious means it will be clear from the acts of the conspirators that they must have intended to injure the claimant. In the case of a conspiracy to defraud by wholesale misappropriation it would be absurd to argue that the conspirators did not intend just that.

121. Mr Brodie was not able to produce any authority in support of his proposition. We are not surprised. An example of such an inference being drawn in a similar field is in Bourgoin SA v Minister of Agriculture, Fisheries and Food [1985] 3 All ER 585 at 624, [1986] QB 716 at 777 Oliver LJ said, in a part of his judgment with which both Parker and Nourse LJJ agreed: . . .

"If an act is done deliberately and with knowledge of the consequences, I do not think that the actor can say that he did not 'intend' the consequences or that the act was not 'aimed' at the person who, it is known, will suffer them."

The facts of the instant case are good example. On the judge's findings of fact the defendants' principal purpose was no doubt to line their own pockets, but they cannot be heard to say that they did not intend to injure the claimants or that their acts were not aimed at the claimants. In all the circumstances we are unable to accept Mr Brodie's submissions under this head.'

Intention: interference with contractual rights

[194] The tort of interference with contractual rights overlaps with the torts of unlawful interference and unlawful means conspiracy. The classic form of this tort consists of directly inducing a third party to break his or her contract with the claimant, as in Lumley v Gye (1853) 2 E & B 216, [1843-60] All ER Rep 208. In such a case there is no requirement for the inducement to involve unlawful means. Where, however, the inducement is achieved indirectly, unlawful means are an element of the tort. For present purposes the important questions are what the authorities indicate in relation to the mental element of the tort and whether those authorities should be applied to the tort of wrongful interference.

[195] In South Wales Miners' Federation v Glamorgan Coal Co Ltd [1905] AC 239, [1904-7] All ER Rep 211 the House of Lords made it plain that malice, in the form of ill-will, was not required for this tort. It sufficed that the defendants knowingly and intentionally procured a violation of the plaintiffs' legal rights. In Thomson (D C) & Co Ltd v Deakin [1952] 2 All ER 361, [1952] Ch 646 the defendant union was alleged to have indirectly prevented a supplier

from performing its contract to supply paper to the plaintiffs by inducing its members to withdraw their services from the supplier. Lord Evershed MR first considered the tort of directly inducing a breach of contract and remarked ([1952] 2 All ER 361 at 367, [1952] Ch 646 at 677) that it was conceded that the defendant must have acted with the intention of doing damage to the person damaged and that he must have succeeded in his efforts. So far as indirectly procuring a breach of contract was concerned, the same intention had to be proved, but the tort would only be committed if the acts indirectly inducing the breach of contract involved wrongful conduct.

[196] These principles were confirmed by the Court of Appeal in Torquay Hotel Co Ltd v Cousins [1969] 1 All ER 522, [1969] 2 Ch 106, although the tort was extended to procuring interference with the exercise of contractual rights that did not involve a breach of contract. Lord Denning MR observed ([1969] 1 All ER 522 at 530, [1969] 2 Ch 106 at 138) 'the interference must be deliberate. The person must know of the contract, or at any rate turn a blind eye to it, and intend to interfere with it'.

[197] Merkur Island Shipping Corp v Laughton [1983] 2 All ER 189, [1983] 2 AC 570 was another case of indirect interference. Union officials blacked a ship, with the result that the plaintiff shipowners were unable to perform a time charter. Lord Diplock confirmed that the tort required intention on the part of the defendants to procure the breach of contract. He held that the intention existed because the defendants must have known that the ship was about to sail pursuant to a contract of carriage and diminishing the earnings under the contract was the only way of putting pressure on the shipowners.

[198] The defendants' conduct in Merkur's case was aimed or directed at the shipowners. Lord Evershed MR's comments in the Thomson case suggest that this was a necessary element of the tort. If so, a claim by the charterers, or indeed by holders of bills of lading, would not have succeeded. In Dimbleby & Sons Ltd v National Union of Journalists [1984] 1 All ER 751, [1984] 1 WLR 427, the defendant union caused its members to withdraw their labour from the plaintiff, thereby preventing the plaintiff from performing a contract with a firm of printers. The conduct was aimed, primarily, not at the plaintiff but at the printers, with whom the union was in dispute. The plaintiff's claim for an injunction was upheld by the House of Lords.

[199] Thus far, judicial statements in relation to intention are wholly consistent with those in relation to the tort of unlawful interference.' There is no requirement of a predominant intention to harm the claimant, but such harm must none the less be an object of the defendant's conduct, albeit aimed at achieving an ulterior purpose. Dimbleby was such a case. The ultimate object was to harm the printers, but there was a deliberate intention to prevent Dimbleby from performing the contract in order to achieve this end.

[200] The decision that is somewhat out of step with the authorities is that of this court in Millar v Bassey [1994] EMLR 44. Shirley Bassey had contracted with Dreampace, a record producer, to record an album of songs. Dreampace contracted with the plaintiffs to provide the backing. Miss Bassey then declined to make the recording, with the result that Dreampace could not perform its contract with the plaintiffs. They sued Miss Bassey for inducing breach of contract. Miss Bassey sought to have the claim struck out on the ground that the plaintiffs had not alleged that Miss Bassey had acted with the intention of causing them damage or that her actions were directed at them. The judge struck out the claim and the plaintiffs appealed.

[201] Beldam LJ conducted a review of the authorities and was particularly impressed by the passage that we have already quoted in the judgment of Woolf LJ in Lonrho v Shell. He observed (at 51):

'In the passage cited, Woolf LJ was in my opinion emphasising the distinction between an intention to bring about a consequence and the desire to do so and was pointing out that a person can intend a consequence if he knows that it will follow from a course of conduct on which he embarks deliberately. Nor I my view can a consequence properly be regarded as unintended or incidental if the deliberate action is taken knowing that it must inevitably bring about the consequence, desired or not. In truth in such a case the actor intends to bring about both the undesired and the desired consequence and is willing to bring about the one to achieve the other.'

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

[202] Subsequently, Beldam LJ expressed this view (at 55):

'If there is no valid distinction between persuading a man to break his contract with another and making his performance of it impossible by depriving him in breach of their contracts of the services of his employees, I do not see a basis for distinguishing the deliberate refusal to perform irreplaceable services in breach of contract knowing that such refusal will inevitably make the performance of another's contract impossible. If it is actionable to cause loss to the plaintiff by enticing or persuading another to break his contract with the plaintiff, can it be said to be unarguable that it is actionable to cause such loss by voluntarily and deliberately refusing to perform a contract knowing that such refusal will make it impossible for the other party to fulfil his obligations to the plaintiff? I do not think so.'

His conclusion appears in the following passage (at 58):

'In the present case, on the facts taken to be proved, the appellants establish that the respondent voluntarily broke her agreement with Dreampace knowing of the appellants' contracts and that the performance of those contracts would be impossible if she refused to perform the obligations under her agreement with Dreampace. Since she must have realised that her talents were essential and irreplaceable, she must have intended that Dreampace would be unable to fulfil its obligations to the appellants. In such circumstances it seems to me unnecessary to assert a specific intention to interfere with the performance of the appellants' contracts which must necessarily follow from her own refusal to perform her obligations to Dreampace. In the absence of any explanation advanced by the respondent for her actions, the only reasonable inference is that in refusing to perform she must have had a purpose of her own to serve which she pursued at the expense of the plaintiffs' right to contractual performance by Dreampace of its obligations.'

[203] Peter Gibson LJ did not agree. The authorities led him to conclude that—

'it is a requirement of the tort that it should be established that the defendant by his conduct intended to break or otherwise interfere with and, with that intention, did break or otherwise interfere with a contract to which the plaintiff was a party.'

He also said that he would answer the following question in the former, rather than the latter, sense:

'Must the conduct of the defendant . . . be aimed directly at the plaintiff, the contracting party who suffers the damage, in the sense that the defendant intends that the plaintiff's contract should be broken, or is it sufficient that the conduct should have the natural and probable consequence that the plaintiff's contract should be broken?'

[204] Ralph Gibson LJ inclined to the view expressed by Peter Gibson LJ, but concluded that the authorities were insufficiently clear to justify striking out the claim so the appeal was allowed.

[205] Since the decision in Millar's case, it is the approach of Peter Gibson LJ, rather than that of Beldam LJ, that has found judicial favour. In ISSAC Oren v Red Box Toy Factory Ltd [1999] FSR 785, Jacob J considered the tort of interfering with contractual relations, which requires an intention to interfere, and expressly followed the approach of Peter Gibson LJ, saying (at 799) that the unlawful conduct must 'in some real sense be "aimed at" the contract'. In OBG Ltd v Allan [2005] EWCA Civ 106 at [82]-[83], [2005] 2 All ER 602 at [43] and [82]-[83] respectively, Peter Gibson LJ himself (with whom Carnwath LJ agreed) and Mance LJ (who dissented in the result) adopted the approach of Peter Gibson LJ, in preference to that of Beldam LJ, in Millar's case. Indeed, they expressed the view that Peter Gibson LJ's approach was that of the majority in Millar's case.

Intention: misfeasance in public office

[206] The tort of misfeasance in public office occurs when an official acts beyond his powers provided that the necessary mental element is present. What do the authorities say about that mental element and can what they say be applied to the tort of unlawful interference?

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

[207] We turn first to Bourgoin's case, which, as we have seen, was referred to in the Kuwait Oil Tanker case. The plaintiffs were French producers of turkeys. They alleged that the Minister revoked their licence to import turkeys into this country by a decision that was ultra vires and motivated by a desire to assist the British turkey producers. The minister sought to have the plea struck out on the ground that it lacked the essential averment that the minister acted with the purpose of inflicting harm on the plaintiffs, in other words that he had 'targeted malice'. Oliver LJ quoted the view of the judge on this point and then added his own comments ([1985] 3 All ER 585 at 624, [1986] QB 716 at 777):

"'I do not read any of the decisions to which I have been referred as precluding the commission of the tort of misfeasance in public office where the officer actually knew that he had no power to do that which he did, and that his act would injure the plaintiff as subsequently it does. I read the judgment in Dunlop v Woollahra Municipal Council [1981] 1 All ER 1202, [1982] AC 158 in the sense that malice and knowledge are alternatives. There is no sensible reason why the common law should not afford a remedy to the injured party in circumstances such as are before me. There is no sensible distinction between the case where an officer performs an act which has no power to perform with the object of injuring A (which the defendant accepts is actionable at the instance of A) and the case where an officer performs an act which he knows he has no power to perform with the object of conferring a benefit on B but which has the foreseeable and actual consequence of injury to A (which the defendant denies is actionable at the instance of A). In my judgment each case is actionable at the instance of A and, accordingly, I determine that paras 23 and 36 of the amended statement of claim do disclose a cause of action."

For my part, I too can see no sensible distinction between the two cases which the judge mentions.

If it be shown that the minister's motive was to further the interests of English turkey producers by keeping out the produce of French turkey producers-an act which must necessarily injure them-it seems to me entirely immaterial that the one purpose was dominant and the second merely a subsidiary purpose for giving effect to the dominant purpose. If an act is done deliberately and with knowledge of its consequences, I do not think that the actor can sensibly say that he did not "intend" the consequences or that the act was not "aimed" at the person who, it is known, will suffer them. In my judgment, the judge was right in his conclusion also on this point.'

[208] On the facts alleged in the Bourgoin case, this statement of the law could be reconciled with the requirement of intention in the tort of unlawful interference. It was the intention of the minister that harm should be caused to the French producers. This was because causing such harm would fulfil the ulterior object of benefiting the British producers. It was necessary to cause the harm in order to confer the benefit. Causing the harm was 'a subsidiary purpose for giving effect to the dominant purpose'. In other words, the Bourgoin case was a case where test (b) was satisfied.

[209] The Bourgoin case was a case where a positive action by the minister was aimed or directed at the claimants, the French Turkey producers. Three Rivers DC v Bank of England (No 3) [2000] 3 All ER 1, [2003] 2 AC 1 was a very different case. The claim was brought by creditors of BCCI. The allegation was that the Bank of England had wrongly granted a licence to, or failed to revoke the licence of, BCCI when it knew, believed or suspected that BCCI would collapse if not rescued. There was no allegation that the Bank's conduct was aimed or directed at the claimants. Preliminary issues were tried that raised the question of whether the claimants had pleaded a viable case. These raised questions as to the ingredients of the tort of misfeasance in public office. One such question related to the state of mind that had to be demonstrated in respect of the damage that the claimants alleged that they had suffered. The claimants alleged that it sufficed if the damage that they sustained was reasonably foreseeable by the Bank.

[210] All members of the House of Lords agreed that there were two forms of the tort. Common to each was that the defendant must have committed a deliberate and dishonest abuse of power. This, however, was not of itself enough to establish liability for consequent economic injury. A further mental element had to be established in relation to this. All were agreed on the first form. This was described as 'targeted malice', that is a deliberate intention to cause the injury to the defendant or to a class of which the defendant is one.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

[211] As to the other form, the majority (Lord Steyn, Lord Hope, Lord Hutton and Lord Hobhouse) agreed that this in its turn could be subdivided into two mental conditions. The first was knowledge that the abuse of power would probably cause injury to the claimant or to a class to which he was one. The second was subjective reckless indifference as to whether such injury was caused or not.

[212] Lord Millett's reasoning differed from that of the majority. He expressed the view ([2000] 3 All ER 1 at 49, [2003] 2 AC 1 at 235) that the element of knowledge was a means of establishing the relevant intention, but not a substitute for it. On the next page he stated that the fact that the defendant foresaw that his conduct would probably harm the claimant was not enough. The inference could not be drawn unless the defendant did foresee the consequences.

Intention: discussion and conclusion

[213] The law has always shown a reluctance to impose liability in tort for causing purely pecuniary loss. In the case of conspiracy to injure that does not involve the use of unlawful means, the law overcomes that reluctance where the tortfeasors conspire and where the predominant object of the conspiracy is to cause the claimant economic harm. The fact that the predominant object, or (which, as far as we can see, is the same thing in this context) the predominant purpose, of the exercise is to cause harm is of the essence of the tort. Where conspirators resort, or indeed an individual resorts, to unlawful conduct with the object of causing the claimant economic harm, the law holds the conduct tortious, even if causing the harm is not the predominant object or purpose of the exercise. The tort will be made out even though causing the harm may only be the means to some other end.

[214] However, in all cases of alleged unlawful interference and unlawful means conspiracy where liability has been established, the necessary object or purpose of causing the claimant economic harm has not been made out unless the conduct can be shown to have been aimed or directed at the claimant. That seems to us to be the consistent theme in the two Lonrho cases in the House of Lords.

[215] In Lonrho v Shell Lord Diplock referred to 'acts done . . . for the purpose . . . of injuring the plaintiffs'. In Lonrho v Fayed, Lord Bridge approved Lord Denning's formulation in Lonrho v Shell in the Court of Appeal, where it was said that '[i]t s sufficient if the conspiracy is aimed or directed at the plaintiff'. This approach is to be found elsewhere. We note in particular the statement in Clerk and Lindsell that the tort consists of using unlawful means with the object of injuring the claimant, the dicta of Dillon and Ralph Gibson LJJ in Lonrho v Fayed, Stuart-Smith LJ's reference to deliberate and intended damage in the Associated British Ports case, and the observations in the Van Camp Chocolates and Cheticamp cases.

[216] Cases on other economic torts appear to us to have approached the question of intention in the same way. For example, in the context of inducement, in the passage quoted above from Allen's case, Lord Watson referred to ' the use of illegal means directed against a third party'. In her book, at p 101, Hazel Carty traces the tort of unlawful interference back to the assertion of Lord Lindley in Quinn v Leathem [1901] AC 495, [1900-3] All ER Rep 1, by reference to Lumley v Gye (1853) 2 E & B 216, that the underlying principle was 'wrongful acts done intentionally to damage a particular individual and actually damaging him'.

[217] The relevant conduct was as much directed at the claimant in the Kuwait Oil Tanker case as in all the others. Only by diverting income that should have gone to the claimants could the defendants have enriched themselves. In other words test (b) was satisfied, because the very act of diverting the money to the defendants required and involved (as opposed to merely resulted in) diverting the money away from the claimant. Indeed, it may be said that the wrongful act of diverting the money from the claimant in a sense preceded the ulterior motive, namely the receipt of the money by the defendant. However, in some situations an unlawful act will have adverse financial consequences to third parties, which are foreseeable and foreseen, but which are not consequences that the defendant desires or has any interest in bringing about. The statement from the Bourgoin case cited in the Kuwait Oil Tanker case might suggest that foresight of consequences must always be equated with intention to cause them-ie that satisfying test (c) will suffice to

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

establish the necessary intention. However, as we have explained at [208] above, looked at the context in which the statement was made, it does not carry that inference.

[218] The authorities that we have considered indicate that it is of the essence of the torts of unlawful means conspiracy and unlawful interference that the conduct that causes the harm is aimed or directed at the claimant, and that in such cases the courts have inferred that the requisite intention, that is the purpose or object of causing the claimant economic loss, is present. The one discordant voice is that of Woolf LJ in Lonhro v Fayed. He postulated that foresight by a defendant of harm to a plaintiff was sufficient to satisfy the mental element in the tort of unlawful interference even though there was no desire to bring about that consequence in order to achieve what he regarded as his ultimate end. If by this Woolf LJ meant that foresight of an incidental consequence of unlawful action sufficed to constitute the mental element of the tort, even though achieving that consequence was no part of the defendant's design, we consider that his statement was contrary to the weight of the authority that we have summarised.

[219] As to the cases on interference with contractual rights, Tony Weir in his published lectures on Economic Torts (1997) reacted strongly against the decision in Millar's case. At p 19 he said:

'Admittedly it was a striking-out action, but what nonsense that it should go to trial, that Miss Bassey should have to defend herself against five people she had never contracted with and did not aim to harm just because she changed her mind about making a recording. Must I perform my contract with you just because a third party may, to my knowledge, suffer if I don't? Suppose that I agree to buy goods from you knowing that if the sale goes through, your agent will received a hefty commission: am I liable to him for refusing to accept delivery? In such a case there is only one third party: in Millar v Bassey the defendant looked to be liable to a whole orchestra plus the electronic bank. Dear me! Privity come back!-almost all is forgiven. It is easy to see how wrong this decision is, and we shall see later how it came to be possible.'

[220] Other commentators have expressed similar, although more moderate, views. We consider that the conclusions of Peter Gibson LJ are to be preferred to those of Beldam LJ. It is often the case that failure to perform one contract will lead to a series of consequent breaches of contracts to which the original contract breaker is not party. To render him liable for these breaches simply because they are consequences which he foresaw would be to undermine the doctrine of privity of contract.

[221] Professor Weir and most other writers, including Hazel Carty and Messrs Sales and Stilitz, are of the view that the gist of all the economic torts is the intentional infliction of economic harm. We consider that this is a fair and satisfactory conclusion to draw from the authorities, difficult as some of these are to reconcile. Intention to inflict harm on a claimant is not the same as a wish to harm him. It is, however, very different from knowledge that economic harm will follow as a result of incidental consequences of conduct, when those consequences are not necessary steps in achieving the object of the conduct and are unsought.

[222] The Three Rivers case establishes that foresight of probable injury or subjective recklessness as to whether such injury is caused is the mental element required in relation to the consequences of abuse of power, if the cause of action of misfeasance in public office is to be made out. This is a developing tort, as is the tort of unlawful interference. Is there a case for equating the mental element in the two torts? The House of Lords did not so suggest in the Three Rivers case, and Clarke J, who sat at first instance in the Three Rivers case, did not consider that there was-see at [1996] 3 All ER 558 at 583. We do not consider that there is. The gist of the tort of misfeasance in public office is the deliberate abuse of power. The mental element in the first form of the tort, namely targeted malice, bears strong echoes of the mental element required for unlawful interference, particularly in the early days of the development of that tort. The same is not true of the alternative requirements of foresight of consequences or subjective recklessness. These are not the gist of the tort; they are closer to control mechanisms limiting the liability that flows from the wrongful conduct.

[223] The gist of the tort of unlawful interference is the intentional infliction of economic harm. In other words, it must be shown that the object or purpose of the defendant is to inflict harm on the claimant, either as an end in itself, or

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

as a means to another end. If foresight of probable consequences or subjective recklessness sufficed as the mental element of the tort, this would transform the nature of the tort. This, in effect, is what Mr Browne sought to persuade us to do when he advanced tests (d) and (e) as sufficient to satisfy the mental element in the tort of unlawful interference. Indeed, we take the view that satisfaction of test (c) would not be sufficient to establish the requisite mental element. However, as mentioned at [159] above, establishing that the defendant knew that the claimant would suffer economic loss may well be evidence which can support a contention that test (b) or even test (a), is satisfied..

[224] It might be possible to envisage a case in which an intention satisfying test (a) or (b) could be established even though the unlawful act was not aimed, targeted or directed at the claimant. Equally it might be possible to envisage a case in which the relevant intention was not established, even though the unlawful conduct was in some way directed at the claimant. These are, however, unlikely scenarios and the decided cases do not provide an example of either. In principle we agree with Hazel Carty, and what she describes as 'most commentators', that it is necessary to prove targeted or directed harm. The essence of the tort is that the conduct is done with the object or purpose (but not necessarily the predominant object or purpose) of injuring the claimant or, which seems to us to be the same thing, that the conduct is in some sense aimed or directed at the claimant.

[225] For the reasons that we have given, we reject this part of OK!'s case and hold that the claims founded on the economic torts are not made out.

Unlawful means

[226] In the light of the above conclusions it is strictly unnecessary to consider what amount to unlawful means for the purposes of the tort with which we are concerned. We therefore refer to it relatively shortly.

[227] There is scope for argument as to what can and cannot amount to unlawful means for the purposes of the tort of interference with business by unlawful means or of the tort of conspiracy to injure by unlawful means. It is not suggested that any distinction is to be drawn between the two torts for this purpose. It appears possible that not every unlawful act amounts to unlawful means-see for instance RCA v Pollard. But, if that is so, it is not always easy to know which acts qualify and which do not. However, it appears to us that the exceptions should be few and identified on some clear and principled basis.

[228] The economic torts may be regarded as somewhat anomalous, in the sense that they give rise to a claim by a party who, ex hypothesi, is not within the class of persons who could claim for damage suffered simply as a result of the act embodied in the 'unlawful means'. However, once one accepts the existence of the economic torts, it seems to us that it would add to any anomalies if only certain types of unlawful acts could, as a matter of principle, qualify as 'unlawful means', at any rate unless the principles of exclusions were clearly identified and justified. It would be more consistent and more likely to lead to just results if any unlawful act could be 'unlawful means', while requiring a sufficient nexus between the act and its unlawfulness and the harm complained of. The need for a claimant to establish an intention on the part of the defendant to harm him, sufficient to satisfy test (a) or (b), would, at least normally, serve to incorporate this rather ill-defined reference to a sufficient nexus, although it is right to add that it also goes further than that.

[229] Fortunately, it is not necessary for us to try to identify or formulate any exclusionary principle of general application in order to determine this appeal. In the light of the decided cases, it would not be easy to do so. The question here is whether publication by Hello! of unauthorised photographs which amounts to an infringement of the Douglases' rights of privacy and a breach of a duty of confidence owed to them is sufficient unlawful means to entitle OK! to maintain a claim in tort for loss intentionally caused to it by the publication.

[230] In Clerk and Lindsell, at paras 24-97 to 24-98, the editors consider whether breach of confidence can amount to 'unlawful means', albeit for the purpose of the tort of interference with economic interests, and conclude that it can. As they suggest in the text and the footnotes, this view seems to be supported by the majority of this court (Otton LJ and

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

Owen J) in Indata Equipment Supplies Ltd (t/a Autofleet) v ACL Ltd [1998] 1 BCLC 412. The facts were these, essentially as summarised by Clerk and Lindsell. A broker arranged through a finance house the leasing of cars and computers for clients. In one transaction he gave confidential information about the client and his own trade terms, including his profit margin, to the defendant which used it without authorisation to offer more attractive terms, aiming to cut out the broker from deals with the client. It was held that there was no fiduciary duty or relationship between the broker and the finance house; they were at arm's length. However, it was held that the broker's profit margin and to a lesser degree the invoice price between the defendant and the broker were items of confidential information which had been misused by the defendant to enable it to put forward another deal to the client.

[231] In these circumstances the claim succeeded in breach of confidence so that the views of the majority of this court on the tort of unlawful interference with business or, as Otton LJ put it, economic or other interests, were obiter. Simon Brown LJ preferred to express no view on the point. Otton LJ said (at 424) that in the particular circumstances of the case, the breach of contract coupled with the ruthless conduct of the defendant would amount to unlawful means. Owen J agreed that the defendant had used unlawful means.

[232] That was a stronger case than this on the facts, and each case depends upon its own facts. However, the position here was that Hello! published photographs which it knew to be unauthorised by the Douglases in circumstances in which it also knew that OK! had acquired the rights to publish authorised photographs of the wedding and that it was OK!'s case that the publication would be in breach of duties of confidence owed both to OK! and to the Douglases. Indeed, two judges had granted an injunction to restrain Hello! from publishing the photographs and, although the Court of Appeal had allowed Hello!'s appeal against the interlocutory injunction (but had not yet given its reasons for doing so), Hello! must have appreciated that the court may well conclude that OK!'s case was well-founded, although damages would be an adequate remedy.

[233] To publish unauthorised photographs in those circumstances with the intention of injuring OK! (in the sense discussed above) and in fact injuring OK! was in our opinion to do so by unlawful means, namely the infringement of the rights of the Douglases. Moreover there would have been, in our view, a sufficient nexus between the publication, the fact that it was unlawful and the injury to OK! to justify the conclusion that there was here an interference with the business of OK! committed with the intention of injuring OK!.

[234] We recognise that, having regard to the conclusions reached earlier as to OK!'s claim for breach of confidence, there was no breach of a duty of confidence owed to OK!, but it cannot be necessary for the unlawful means to amount to an actionable infringement of the claimant's own rights. Otherwise the tort would be largely ineffective: see Associated British Ports v Transport and General Workers' Union [1989] 3 All ER 822 esp at 818-819, [1989] 1 WLR 939 esp at 965 per Stuart-Smith LJ.

[235] Accordingly, if we had held that OK! had satisfied the high test of intention, bearing in mind the principle suggested by Sales and Stilitz that it is not appropriate to determine whether the means used were in a relevant sense unlawful by the seriousness of the civil wrong, we would have held that the test of unlawful means was satisfied.

Conclusion on OK!'s cross-appeal

[236] For the reasons given above, OK! has failed to establish that Hello! had the requisite intention to establish the tort of unlawful interference with business or conspiracy to injury by unlawful means with the result that OK!'s cross-appeal fails.

THE TWO ISSUES ON DAMAGES

[237] As mentioned above, two issues were raised before us on the judge's assessment of damages. Because we have allowed Hello!'s appeal against the judgment in favour of OK!, the first of those issues, which only bears on the level of damages awarded to OK!, has become moot. We none the less propose to deal with it, and we will then turn to the Douglases' appeal in relation to damages. That appeal is in point because we have concluded that OK! have no

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

cause of action against Hello!; accordingly, the Douglases maintain their contention that the damages they were awarded were far too low, and, in particular, were assessed on a wrong basis.

Liability for losses from publication in the newspapers

[238] After the judgment on the issues of liability, there was, as we have mentioned, a subsequent hearing to determine the measure of damages. OK!'s damages were assessed on the basis of the profit they lost as a result of the reduction in sales of the two issues of OK! magazine containing the authorised photographs caused by the publication of the unauthorised photographs. The judge decided, when assessing the effect on the circulation of Issues 241 and 242 of OK! magazine, that he should take into account not only the effect of the publication of the unauthorised photographs in Hello! magazine, but also that of the publication of copies of some of those photographs in the Sun and in the Daily Mail on (or shortly after) 24 November 2000. For Hello! it is said that this was wrong in principle, in light of the facts found by the judge. The relevant facts relied on to support that contention are as follows.

[239] First, no consent was ever given by Hello! to the publication of any photographs in the two newspapers. Secondly, following the discharge of the interlocutory injunction, the two newspapers had been expressly forbidden by Hello! from publishing the photographs. Thirdly, at the time they were forbidden from publishing any of the photographs, it was not too late for the Sun to have withdrawn from publishing them, even though preparatory steps had been taken to do so. Fourthly, the judge said, at [40], that, albeit after 'a hesitant start', Hello! had 'acted with reasonable speed to stop publication by others'. In these circumstances, it is said that the judge's conclusion, whose basis was only briefly explained in the damages judgment, that the damages flowing from the publication of the unauthorised photographs were not 'so remote a consequence of Hello!'s publication as not to be laid at Hello!'s door', cannot stand.

[240] In our judgment, although it might have been better if the judge had given fuller reasons for his decision on this point, his determination on remoteness was one that he was entitled to reach. While the resolution of the question of remoteness will often involve issues of law, it is normally a fact-sensitive determination, which must carry with it a degree of inference and value judgment. As Laws LJ said in McManus v Beckham [2002] EWCA Civ 939 at [39], [2002] 4 All ER 497 at [39], in connection with a slander action, 'The reality is that the court has to decide whether, on the facts before it, it is just to hold [the defendant] responsible for the loss in question'. The judge held that the 'but for' test was satisfied, but that that was clearly not enough (although it was necessary) to justify his conclusion. However, there were a number of other findings, or items of uncontroversial evidence, which, when taken together, in our view, justify his conclusion.

[241] First, Hello! knew well before 24 November 2000 that some newspapers were wishing to publish copies of some of the unauthorised photographs. Secondly, it had been indicated on behalf of Hello! that the newspapers might be able to do so. Thirdly, there was evidence that it was not uncommon for newspapers to copy at least the front cover of Hello! (as well as OK!) magazine. Fourthly, it was foreseeable, especially to those in this business, that these photographs would provide particularly attractive copy for the newspapers, bearing in mind their subject matter and controversial history. Fifthly, there was Hello!'s 'hesitant start' referred to by the judge. Sixthly, there was the judge's finding in his quantum judgment that, after the newspapers learnt of the discharge of the interlocutory injunction, 'they not unnaturally thought that they were free to use the pictures'. Seventhly, given that Hello! were publishing photographs which they well knew had been taken in an underhand way, it could scarcely have come as any surprise that others in the same line of business were prepared to run risks by publishing copies of those photographs. Indeed, having agreed to the circumstances in which the photographs had been taken, it is questionable whether Hello! could successfully have brought proceedings for breach of copyright. Ex turpi causa non oritur actio.

[242] In all these circumstances, we have reached the conclusion that the judge was entitled to decide, as he did, that the losses suffered by OK! from the publication of the unauthorised photographs in the two newspapers were 'sufficiently consequential upon the breach and sufficiently foreseeable to make Hello! Ltd liable for them in the normal way'.

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

The Douglases' claim for a notional licence fee

[243] When it came to the assessment of damages, the Douglases were awarded £3,750 each as general damages for mental distress, plus a further £7,000 between them for additional expenses and disruption in respect of selecting photographs for publication. Given that they are entitled to damages and that OK! are not entitled to damages, it is contended on behalf of the Douglases that they should be entitled to more substantial damages, namely a sum equal to the notional licence they would have charged Hello! to permit them to publish the unauthorised photographs. The Douglases also contend that the judge's assessment of that fee at £125,000 was significantly too low. We observe at the outset that it is not easy to understand why the Douglases' appeal in this connection should be contingent upon Hello!'s appeal succeeding against OK!. This anomaly raises an immediate question mark over the validity of this claim.

[244] It is well established that damages in a case involving unauthorised use of, or unlawfully benefiting from, intellectual property and similar rights can be assessed in a number of different ways. In General Tire and Rubber Co v Firestone Tyre and Rubber Co Ltd [1975] 2 All ER 173 at 177-180, [1975] 1 WLR 819 at 824-827, Lord Wilberforce identified the normal categories at least in patent cases. They are the profit, or the royalty, which was or would have been achieved (eg where the defendant manufactures, or licences the manufacture of, goods covered by the patent), and the licence fee which would reasonably have been charged (eg where it is not possible to assess the level of profit). The present case is far from normal, and in our view none of these normal methods of assessment would be appropriate.

[245] This is not a case where a profit was made by the defendant: bearing in mind the payment they made, £125,000, for the unauthorised photographs, Hello! actually made a loss on the whole exercise. This is not a case where a royalty, or its equivalent, would be appropriate, partly for the same reason, and partly because Hello! effected no licensing, or its equivalent, in relation to the use of the unauthorised photographs.

[246] There are obvious problems with assessing the Douglases' damages on a notional licence fee basis. First, the whole basis of their (as opposed to OK!'s) complaint about Hello!'s publication of the unauthorised photographs is upset and affront at invasion of privacy, not loss of the opportunity to earn money. Indeed, they have already claimed and been paid, damages assessed on that former basis. That factor alone would not prevent an assessment on a notional licence fee basis, but it is not a good start. Secondly, the Douglases would never have agreed to any of the unauthorised photographs being published. The licence fee approach will normally involve a fictional negotiation, but the unreality of the fictional negotiation in this case is palpable.

[247] Thirdly, and most importantly, having sold the exclusive right to publish photographs of the reception to OK!, the Douglases would not have been in a position to grant a licence to Hello!. In this connection, we do not consider that, in light of the terms of the OK! contract, especially cl 10, the Douglases could claim to be required to account for the notional licence fee to OK!. Accordingly, an award of a notional licence fee would involve the Douglases being unjustly enriched: they have already been paid £1m for the exclusive right to publish photographs of the reception. As was said in argument, they have thereby exhausted their relevant commercial interest.

[248] Quite apart from these factors, while it is not a sufficient reason for rejecting the notional licence fee approach, there is the difficulty of assessing a fee. The Douglases would have been very unwilling to agree to publication of the unauthorised photographs in light of the terms of the OK! contract, the quality of the photographs, and the circumstances in which they were taken. Hello! would presumably have been prepared to pay at least £125,000, as that is what they actually paid for them, but Mr Browne made it clear that the Douglases would have wanted a lot more. The worse the quality of the photographs, the less they would have been worth to Hello! and the more the Douglases would have wanted for their publication.

[249] In all these circumstances, we are of the view that a notional licence fee would not be the right basis on which to assess the Douglases' damages, even given that they, but not OK!, are entitled to claim against Hello!. If, however, Hello! had made a profit on the publication, we would have had no hesitation in accepting that the Douglases would have been entitled to seek an account of that profit. Such an approach would not run into the difficulties of principle

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

which their notional licence fee argument faces. Such an approach may also serve to discourage any wrongful publication, at least where it is motivated by money.

[250] Finally, if it had been right to award damages to the Douglases on the basis of a notional licence fee, we would not, in any event, have thought it right to interfere with the judge's assessment of £125,000. Various factors to which we have made reference render it impossible to contend that the figure adopted by the judge was one which he could not properly have reached. We have in mind the fact that the assessment was a matter of valuation opinion, the difficulties inherent in this particular assessment, the fact that Hello! actually paid £150,000 for the unauthorised photographs, and the fact that Hello! made a loss on the whole exercise.

THE DISCHARGE OF THE INTERLOCUTORY INJUNCTION

[251] We turn to an issue upon which we were not addressed, but which we believe justifies revisiting. It is the decision of this court in November 2000, reported at [2001] 2 All ER 289, [2001] QB 967, to lift the interlocutory injunction granted by Hunt J, restraining Hello! from publishing the unauthorised photographs. In our view, in the light of the law as it can now be seen to be, that decision was wrong, and the interlocutory injunction should in fact have been upheld.

[252] The reasons given by the three members of this court for concluding that an interlocutory injunction was inappropriate were slightly different. Brooke LJ considered that it was no more than arguable that the Douglases 'had a right to privacy which Englishlaw would recognise', and that their claim based on privacy was 'not a particularly strong one' (paras 60 and 95). Although Sedley LJ thought that the Douglases had 'a powerful prima facie claim to redress for invasion of their privacy', he considered that 'by far the greater part of that privacy has already been traded and falls to be protected, if at all, as a commodity in the hands of [OK!]'-paras 137 and 144). At para 171, Keene LJ was primarily influenced by the point that the 'court in exercising its discretion at this interlocutory stage must still take account of the widespread publicity arranged by the [Douglases] for this occasion'.

[253] In our view, these analyses, and indeed the decision to discharge the injunction, did not give sufficient weight to two factors. The first was the strength of the Douglases' claim for an injunction restraining publication of the unauthorised photographs. Although Sedley LJ took the view that they had a strong case in this connection, it would appear that Brooke and Keene LJJ were more doubtful. The Court of Appeal did not have the benefit of the reasoning in the House of Lords in Campbell's case or, even more significantly for present purposes, the reasoning of the European Court of Human Rights in Von Hannover v Germany. Had the court had the opportunity to consider those two decisions, we believe that it would have reached the conclusion that the Douglases appeared to have a virtually unanswerable case for contending that publication of the unauthorised photographs would infringe their privacy.

[254] Of course, even where a claimant has a very strong case indeed for contending that publication of information would infringe his privacy, there may be good reasons for refusing an interlocutory injunction. In the present case, however, we find it difficult to see how it could be contended that the public interest (as opposed to public curiosity) could be involved over and above the general public interest in a free press. Particularly so, as it was clearly the intention of the Douglases and OK! to publish a large number of (much clearer) photographs of the same event. The fact that the Douglases can be fairly said to have 'traded' their privacy to a substantial extent as a result of their contract with OK! does not undermine the point that publication of the unauthorised photographs would infringe their privacy.

[255] The second factor to which this court appears to have given insufficient weight was the likely level of damages which the Douglases would recover if an interlocutory injunction was refused and, as now turns out, publication of the unauthorised photographs infringed their rights. We have been provided with transcripts recording remarks from the Bench during the argument, which suggested that the level of damages which would be awarded to the Douglases, if they established that the publication of the unauthorised photographs infringed their right to privacy, would be very substantial. In the event, the damages awarded to them was the relatively small sum of £14,600 (of which nearly half is attributable to the inconvenience they suffered as a result of having to select photographs for

[2005] EWCA Civ 595, [2006] QB 125, [2005] 2 FCR 487

publication by OK! owing to the imminent publication of the unauthorised photographs by Hello!).

[256] The characterisation of this sum as 'relatively small' is not intended to indicate that we think that the level of damages should have been greater. The description is appropriate because damages, particularly in that sum, cannot fairly be regarded as an adequate remedy. As we have already observed, the Douglases would never have agreed to the publication of the unauthorised photographs. In those circumstances, bearing in mind the nature of the injury they suffered, namely mental distress, a modest sum by way of damages does not represent an adequate remedy.

[257] The sum is also small in the sense that it could not represent any real deterrent to a newspaper or magazine, with a large circulation, contemplating the publication of photographs which infringed an individual's privacy. Accordingly, particularly in the light of the state of competition in the newspaper and magazine industry, the refusal of an interlocutory injunction in a case such as this represents a strong potential disincentive to respect for aspects of private life, which the Convention intends should be respected.

[258] Of course, as recently emphasised by the House of Lords in Cream Holdings Ltd v Banerjee [2004] UKHL 44, [2004] 4 All ER 617, [2004] 3 WLR 918, a claimant seeking an interlocutory injunction restraining publication has to satisfy a particularly high threshold test, in light of s 12(3) of the Human Rights Act 1998. However, with the benefit of the reasoning in Campbell's case and Von Hannover v Germany, we consider that this threshold test was in fact satisfied by the Douglases when they sought the interlocutory injunction in this case.

[259] The Douglases had a very strong claim; indeed, in the light of the two recent authorities to which we have referred, we would have thought that it was one which may well have been clear enough to justify summary judgment in their favour. The award of damages eventually made to the Douglases, although unassailable in principle, was not at a level which, when measured against the effect of refusing them an interlocutory injunction, can fairly be characterised as adequate or satisfactory. Only by the grant of an interlocutory injunction could the Douglases' rights have been satisfactorily protected. Further, the interests of Hello! at the interlocutory stage, which were essentially only financial, could have been protected by an appropriate undertaking in damages by the Douglases.

CONCLUSION

[260] In the event, the outcome of this appeal is as follows:

-- Hello!'s appeal against the judgment in favour of the Douglases based on privacy and commercial confidence is dismissed.

-- Hello!'s appeal against the judgment in favour of OK! based on commercial confidence is allowed.

-- OK!'s cross-appeal based on the economic torts is dismissed.

-- The claimants' cross-appeal on damages based on a notional licence fee is dismissed.

**DISPOSITION:**

Appeal allowed in part. Cross-appeal dismissed.

**SOLICITORS:**

M Law; Addleshaw Goddard.