Tab 5

Higher District Court Karlsruhe, decision from 24 January 2001 - 6 U 167/00 *(luring away of employees)*

**Official Head Note:**

**1. The generally permissible solicitation (luring away) of employees of another company is only against public policy if there are additional particular circumstances. Such circumstances are, for example, the inducement to a breach of contract, the solicitation by invasion into the business sphere of the competitor and in particular, sustained and repeated attempts of solicitation through a business phone.**

**2. Also, there is no disruption of the competition simply because the targeted person is being called on his private phone (at his home). The principles of the Federal Court (BGH rewgadring the protection of privacy of the called person (telephone advertisement) are not applicable in this case.**

Generally, with a view to competition, the luring away of employees of a competitor is a permissible measure in the field of competition (Federal Court, GRUR 1961, 482; Commentary Baumbach/Hefermehl, Act against unfair competition, 21st ed., § 1 UWG, margin numbers 583,585 et seq.). This freedom of action is part of the free economic system. Otherwise, not only competition would be restrained, but also the employees' freedom of professional movement would be unduly restrained.

Therefore, a violation of public policy in the field of competition will only be assumed once particular circumstances accompany the attempt of solicitation, for example when an unfair measure is being employed or if a condemnable purpose is being pursued. Such conduct violates public policy in the field of competition under the aspects of exploitation, or interference, of a competitor.

Higher District Court Frankfurt, decision from 21 January 1963 - 6 W 431/62

**Official Head Note:**

**The solicitation of employees without the inducement to breach a contract is not against public policy just because it is done in accordance with a premeditated plan. Systematic solicitation is against public policy if the solicitation is perceived as a competitive measure with the purpose to repel the competitor by depriving him of employees rather than through better performance.**

It is without any legal importance that the defendant made use of his specific knowledge about the business of the plaintiff. Based on the facts in the court's file, the [defendant's] specific knowledge related only to the fact that the defendant was still in touch and friendly with some of his former colleagues. Therefore, it was only natural that the defendant approached those persons in order to solicit employees [for his new employer].This cannot be regarded as being against public policy, not even the fact that he successfully solicited 4 employees. Furthermore, of no legal importance is the fact that the solicited employees were specialists and that the new employer possibly wanted to benefit from the special knowledge and skills of the employees. Such consequence almost always accompanies the solicitation of specialists and makes, with a view to the competition at the employee market, economically sense. However, the defendant [...] acted in accordance with a premeditated plan. [...] a premeditated systematic action with the goal to hit the competitor in his existence, specifically through the solicitation of the employees [is not present here]. The facts in the court's files show clearly that the competitor which in comparison to the plaintiff was a minor company, had received a big order and therefore was in urgent need for employees to fill the order, whereby it legitimately asked the defendant to be the intermediary [btw. the company and the employees of the plaintiff].

Federal Court decision from 19 November 1965 Ib ZR 122/63 "Bau-Chemie"
UWG § 1

**Official Head Note:**

**The fact that the solicitation of external employees is being done with intent does not already establish an act against public policy in the meaning of § 1 UWG, even it the solicitor pursues a specific plan. Not permissible is the systematic luring away of external employees if the solicitor aims at, or consciously accepts that the competitive activity of the other competitor is seriously impacted or his performance is being exploitet for the benefit of the solicitor.**

The systematic luring away of external employees may be impermissible with a view to the pursued purpose. This has been acknowledged in cases where the solicitor does not only use an opportunity that he came across in the normal course of business but purposefully aims for his own benefit to lure away employees from a competitor, even at the risk to seriously interfere with the competitors business activities. The purpose may be such to damage the competitor and to weaken the competitor's business performance efficiency. The purpose pursued with the systematic solicitation may also predominantly be the exploitation of the competitor by a systematic luring away of the competitor's employees in order to make use of its experience and performances or by even working his way into his customer base, in particular, if the solicited employees will be employed in their previous working sphere against their former employer. In individual cases this may happen by luring away important employees, or by luring away a greater number of external employees.

To the extent the judicature so far used the term "systematically" in connection with solicitation of employees, it has to be clarified, that not in every case the number of solicited employees is decisive but rather the purpose pursued with the solicitation. Already the – unsuccessful- attempt to solicit just one employee may be against public policy if it marks the beginn of a greater scheme of solicitation aimed at endangering the business of the competitor.

Tab 6

HIVAC LIMITED v PARK ROYAL SCIENTIFIC INSTRUMENTS LIMITED AND OTHERS

[COURT OF APPEAL]

*[1946] Ch 169*

**HEARING-DATES:** 4, 5 February 1946

5 February 1946

**CATCHWORDS:**

Master and Servant - Skilled worker - Employment in spare time by trade rival of employer on similar work - Duty to employer - Interlocutory injunction.

**HEADNOTE:**

The plaintiff company employed the defendants R. D. and G. D. on highly skilled work, in which R. D. at least had access to all the plaintiffs' manufacturing data. In their spare time R. D. and G. D. worked for the defendant company on similar work which was in direct competition with that of the plaintiff company, and they also persuaded others of the plaintiff company's employees to work for the defendant company in their spare time; but there was no evidence that these employees had access to, or divulged to the defendants, confidential information:-

Held, that the extent of the duty of fidelity owed to an employer by an employee may vary according to the nature of the employment, but while the court would be reluctant to impose on workers restrictions which would hamper them in increasing their earnings in their spare time, in the present case the employees had knowingly, deliberately and secretly set themselves to do in their spare time something which would inflict great harm on their employers' business; and that the plaintiff company were entitled to an interlocutory injunction to restrain the employment by the defendant company of the plaintiff company's employees.

**INTRODUCTION:**

APPEAL from Cohen J.

The plaintiff company Hivac, Ld., were manufacturers of midget valves for deaf aids; during the war their valves were also used for a number of war purposes, and their output was approximately 25,000 valves a month. The work of making and assembling the valves was highly skilled. The defendant Raymond Davis was employed by the plaintiff company from May, 1941, as a production engineer, and his wife, Mrs. Gladys Davis, was also employed by the plaintiff company with whom she had been a forewoman for the last six years in charge of the valve assembly department with a staff of eighty girls under her. As production engineer Raymond Davis had access to all the plaintiff company's manufacturing data relating to midget valves.

The defendant company Park Royal Scientific Instruments, Ld. was incorporated in April, 1944, with a capital of 1,000l., fully paid up, and the defendants Leslie Smith and Frank Bernhart were directors of the defendant company. Mrs. Gladys Davis, having secured her discharge under the Essential Work

Order from the plaintiffs' employment on the ground of ill-health, was employed part-time by the defendant company when she was well enough to work. Shortly before the writ in the action was issued, on December 4, 1945, it

came to the knowledge of the plaintiff company that the defendant company were manufacturing midget valves. Before that time the plaintiff company thought they had a monopoly. The manager of the plaintiff company, Mr. Diggle, made inquiries of the defendant company on the telephone, and spoke to the defendant Smith, who admitted that the defendant company were manufacturing valves for hearing aids. Asked where he had obtained his knowledge of the business he said that the defendant company had an Austrian working for them who had assisted them in the development of the valves. He did not mention that he had any present or past employee of the plaintiff company working for him. In fact, the defendant Raymond Davis had been for some time co-operating with the defendant Smith in designing, preparing, and obtaining the necessary equipment for the production of, a complete hearing aid including midget valves. He had designed for the defendant company two new types of midget valve, but he incorporated all the improvements also in the valves made by him for the plaintiff company. The two Davises, in addition to working themselves for the defendant company in their spare time, had also invited a number of other employees of the plaintiff company to work for the defendants, some of whom had done so for varying periods, receiving at least their expenses. These employees were not made parties to the action.

When further inquiries revealed these facts to the managing director of the plaintiff company, the defendant Raymond Davis was dismissed and the writ was issued, and the plaintiffs moved for an interlocutory injunction "that the defendants and each of them and their agents may be restrained until judgment in this action or until further order from employing or procuring to be employed in the service of the defendants or any of them any servant or employee of the plaintiff company of any of the categories specified in the schedule to this order whilst still in the service or employment of the plaintiff company or in any other manner so as to cause such servant or employee to commit a breach of his contract of employment or service with the plaintiff company or of the duty owed to the plaintiff company." Cohen J. held that

in the absence of express stipulation in their contracts of employment as to the use of their spare time he could not restrain the plaintiff company's employees from working in their spare time for a trade rival, unless it were shown that they were in possession of confidential information. He made no order on the motion, except that the costs should be costs in the action. The plaintiff company appealed.

**COUNSEL:**

Clark K.C. and Dunbar for the plaintiff company. Cohen J. was wrong in law, in that it would be a breach of the duty of fidelity owed to the plaintiffs for their employees to work for a direct competitor to the detriment of the plaintiffs' business, even in their spare time. The duty is stated in Addison on Contract, 10th ed., 861: "A servant in the service of a tradesman impliedly promises to do no act knowingly and wilfully which may injure his master's trade." Nichol v. Martyn n(1) has been disapproved as being too lenient to the servant. Wessex Dairies, Ld. v. Smith n(2) which extends Robb v. Green n(3) is a clear exposition of the law as it stands to-day, but it does not deal with the question of what a man may do in his spare time. If the servant commits a breach of the fiduciary duty, it is submitted that it is wholly immaterial whether it is done in his own time or his master's, so long as the contract of service still subsists. The question is always not whether the acts were done in time paid for by the master, but whether they were a breach of the trust reposed in the servant by the master.

Upjohn K.C. and Lindner for defendants. These are skilled manual workers carrying out processes which are perfectly well known. No one doubts that a servant must be faithful to his master, but the plaintiffs' claim is that the servants may not do anything which might tend to the damage of the master's business. In the absence of any clause expressly binding them to work exclusively for the master, that cannot be implied.

The action is not properly constituted in the absence of the workmen, into whose contracts of service a most material term is sought to be implied in their absence. To grant an injunction in this case would be virtually granting specific performance of a contract of service. An injunction, moreover, would serve no useful purpose at the present time, for if there is this implied term in the contracts of service, the breach of it would clearly

n(1) (1799) 2 Esp. 732.

n(2) [1935] 2 K. B. 80.

n(3) [1895] 2 Q. B. 315.

entitle the plaintiffs to dismiss the offenders on the ground of "serious misconduct" notwithstanding the Essential Work Order. In any case, it is not a case for an interlocutory order of any sort. Very difficult questions are raised by the plaintiffs' writ, which are not material on this motion; it would not be right to make an order which would hamper the defendant company's output, until the precise nature of the processes in which they are engaged is ascertained by evidence in the action. No harm will be done by refusing an injunction at this stage, for if the plaintiffs are entitled to any relief, damages will be a sufficient remedy.

Clark K.C. replied.

**PANEL:** Lord Greene M.R., Morton and Bucknill L.JJ

**JUDGMENTBY-1:** LORD GREENE M.R.

**JUDGMENT-1:**

LORD GREENE M.R.: , having stated the facts, said: The defendants secretly procured five employees of the plaintiffs to come and work for them, and to put at their disposal their skill and experience for the purpose of enabling the defendant company to get its business going and to become successful in their particular field. The defendants and the employees on the evidence appear quite clearly to have known exactly what they were doing, and they knew that, at any rate, it was morally reprehensible, if not legally wrong. If they had not known that it was wrong, it is not conceivable that they would not have told the plaintiffs. The actual time which these employees were bound by their contract to give to the plaintiffs appears to have been the normal five and half days a week. There are provisions in the Essential Work Order by which, in certain circumstances, and provided certain conditions are complied with, employees who fall under that order can be compelled to work overtime, but nothing of that sort comes into question here. The time in which these employees were working for the defendant company was unquestionably what may be described as their own spare time. The question we have to decide for the purpose of this interlocutory appeal is whether or not the five employees were committing a breach of their obligation to their employers in using their spare time for the purpose of assisting a company which they must have known was either in competition, or proposing to enter into competition, with their employers; and, if so, whether the defendants procured that breach.

A question of this kind in normal times would not have been likely to arise, for the very simple reason that these employees could have been got rid of on twenty-four hours' notice, and no

doubt there were skilled people who could have been obtained to take their place. It may very well be that this class of question has never arisen in the past because there was no practical reason why it should. But now, in present conditions, the question has arisen, and we have to consider on the facts before us whether or not a question of importance and difficulty is raised, and what prima facie view the court takes of it, and whether, in the circumstances, we ought to grant an interlocutory injunction.

There is one matter which I think I can dispose of at once. It is argued on behalf of the plaintiffs that on the evidence what may be called confidential information must have been disclosed or utilized by these five employees for the benefit of the defendant company. The learned judge took the view that no such case had been made out. I do not differ from that view. It seems to me that confidential information has not down to the present, at any rate, been made use of by these five employees, if, indeed, they were in possession of any such information. When one gets into the area of confidential information the law is fortunately much more certain, but once that particular element is excluded, we are in an area which has not, as I have said, been sufficiently explored.

The argument on behalf of the plaintiffs with regard to confidential information was also to the effect that, even assuming no confidential information has as yet been disclosed, and assuming there is no threat to disclose it or use it for the benefit of the defendants, it will, nevertheless, be inevitable, if those employees continue to work for the defendants, that they will put at the disposal of the defendants any confidential information which, in the course of their work for the plaintiffs, they may obtain. It is said with force that employees engaged in this particular work are bound to become acquainted with any improvements or any experiments which the plaintiffs may make in the course of their business in relation to these midget valves, because they would be given the task of constructing or assembling valves for the purpose of incorporating such improvements, and so forth. That is, I think, a matter which the court cannot ignore. After all, one has to be practical in these matters, and one has to consider what the practical result will be, and it may very well be said that to say that people in these circumstances can, so to speak, make a division in their minds between what is confidential and what is not, and be quite careful while they are working for the defendants to keep

the confidential information locked up in some secret compartment of their minds theoretically may be all very well, but from the practical point of view has a certain unreality.

It has been said on many occasions that an employee owes a duty of fidelity to his employer. As a general proposition that is indisputable. The practical difficulty in any given case is to find exactly how far that rather vague duty of fidelity extends. Prima facie it seems to me on considering the authorities and the arguments that it must be a question on the facts of each particular case. I can very well understand that the obligation of fidelity, which is an implied term of the contract, may extend very much further in the case of one class of employee than it does in others. For instance, when you are dealing, as we are dealing here, with mere manual workers whose job is to work five and a half days for their employer at a specific type of work and stop their work when the hour strikes, the obligation of fidelity may be one the operation of which will have a comparatively limited scope. The law would, I think, be jealous of attempting to impose on a manual worker restrictions, the real effect of which would be to prevent him utilizing his spare time. He is paid for five and a half days in the week. The rest of the week is his own, and to impose upon a man, in relation to the rest of the week, some kind of obligation which really would unreasonably tie his hands and prevent him adding to his weekly money during that time would, I think, be very undesirable. On the other hand, if one has employees of a different character, one may very well find that the obligation is of a different nature. A manual worker might say: "You pay me for five and a half days work. I do five and a half days work for you. What greater obligation have I taken upon myself? If you want in some way to limit my activities during the other day and a half of the week, you must pay me for it." In many cases that may be a very good answer. In other cases it may not be a good answer because the very nature of the work may be such as to make it quite clear that the duties of the employee to his employer cannot properly be performed if in his spare time the employee engages in certain classes of activity. One example was discussed in argument, that of a solicitor's clerk who on Sundays it was assumed went and worked for another firm in the same town. He might find himself embarrassed because the very client for whom he had done work while working for the other firm on the Sunday might be a client against whom

clients of his main employer were conducting litigation, or something of that kind. Obviously in a case of that kind, by working for another firm he is in effect, or may be, disabling himself from performing his duties to his real employer and placing himself in an embarrassing position. I can well understand it being said: "That is a breach of the duty of fidelity to your employer because as a result of what you have done you have disabled yourself from giving to your employer that undivided attention to his business which it is your duty to give." I merely put that forward, not for the purpose of laying down the law or expressing any concluded opinion, but merely as illustrating the danger of laying down any general proposition and the necessity of considering each case on its facts.

The authorities which have been cited are few, and the facts with which they were concerned differed from the facts of this particular case. For instance, the authority on which reliance was principally placed was Wessex Dairies, Ld. v. Smith n(1) in this court. There the defendant, who was a dairy roundsman in his master's time proceeded to solicit customers of his master for the purpose of obtaining their custom in a business which he was shortly about to set up for himself. That is, I should have thought, a clear case, because he was doing it first of all in his master's time; and in his master's time he was making use of the information which his master had placed at his disposal, namely, the identity of

the various customers and their particular requirements. Greer L.J., in the course of his judgment, placed some emphasis on the fact that the case was one in which the servant was using his master's time for the purpose of furthering his own interest. He said this: "The defendant would nevertheless be under the ordinary implied obligation existing between master and servant - namely, that during the continuance of his employment he will act in his employers' interests and not use the time for which he is paid by the employers in furthering his own interests." Then lower down he says this: "During the subsistence of the contract of service and during his master's time the servant has to look after, not his own interests, but those of his master." Then he quotes Hawkins J. in Robb v. Green n(2) where he comments on Nichol v. Martyn n(3). Hawkins J. had referred to utilization of the hours of service by being false to

n(1) [1935] 2 K. B. 80, 84, 85.

n(2) [1895] 2 Q. B. 1.

n(3) 2 Esp. 732.

the master's interests. Then at the conclusion of his judgment Greer L.J. says: "In this case the defendant acted contrary to his duty. During the last week of his service with the plaintiffs, while pursuing his duty by calling on customers and delivering milk to them, he tried to induce them to become his customers after his employment with the plaintiffs was terminated."

Maugham L.J. started his judgment with the following words n(1): "The claim in this case raises a question of some interest in relation to the duty of a servant to his master during the period of his employment." He goes on and examines the earlier case of Nichol v. Martyn n(2), which is not satisfactorily reported, and Robb v. Green n(3), and he then said this, after looking at Hawkins J.'s judgment in that case: "That appears to show that Hawkins J. did not take the view, which the other passage I read seems to indicate, that a servant can properly canvass his master's customers for himself as from a near approaching day. The question to be determined essentially depends upon the term to be implied in the ordinary case of a contract of employment in the absence of express agreement." Then he refers to the fact that there was a reference to the duty of fidelity in the contract, but he said that he wished to decide the case on a wider ground. He quotes a passage from A. L. Smith L.J. in Robb v. Green n(4), where he said: "'I think that it is a necessary implication which must be engrafted on such a contract that the servant undertakes to serve his master with good faith and fidelity'." Then he says n(5): "On the other hand, it has been held that while the servant is in the employment of the master he is not justified in making a list of the master's customers." That is what had been done in Robb v. Green n(6) and that immediately introduces a quite different set of ideas because if a servant took copies of his master's list of customers, he would be quite obviously committing a breach of duty in making use of something which is the master's property, namely, the list of customers, for an improper purpose, other than that for which he was employed. Then the learned Lord Justice says: "Another thing to be borne in mind is that, although the servant is not entitled to make use of information which he has

n(1) [1935] 2 K. B. 80, 85, 88.

n(2) 2 Esp. 732.

n(3) [1895] 2 Q. B. 1.

n(4) [1895] 2 Q. B. 315, 320.

n(5) [1935] 2 K. B. 80, 89.

n(6) [1895] 2 Q. B. 1; in C. A. ibid. 315.

obtained in confidence in his master's service, he is entitled to make use of the knowledge and skill which he

acquired while in that service." There he is dealing with the position of the employee after the service has terminated and is calling attention to the well known distinction between a man's skill, which is his own property, part of his own equipment, and confidential information which he has acquired during his service. Then again he points out that the facts complained of were done by the roundsman while going his round, and he said that was a deliberate canvassing at a time when the defendant was under an obligation to serve the plaintiffs with fidelity. Talbot J. appears to have agreed with both the judgments pronounced, and we have to consider to what extent the judgments assist us in deciding on an interlocutory application the proper course for this court to pursue.

Anything that I say on this matter stands, of course, to be varied and corrected when the full facts are known, but prima facie it appears to me the question we have to consider resolves itself into these elements. First of all, what was done here was done in the spare time of the employees. That leads to this: we have to consider what implication, if any, needs to be read into the contract of service with regard to the employee's use of his spare time. Does that implication in any way restrict him, or, rather (which is the practical question here) did that implication make it a breach of duty on his part to do what he did, with the consequential result that the defendants, in persuading the employees to do what they did, procured a breach of contract? I think the judgment of Maugham L.J. in Wessex Dairies, Ld. v. Smith n(1), which is quite deliberately placed by him on a broad ground, does lead to this. Although the case before him was concerned with an employee who had done certain things in his employer's time, I cannot find that in his reasoning that was regarded as an essential part of the offence. I cannot read the judgment as meaning that if the roundsman had on a Saturday afternoon, when his work was over, gone round to all these customers and canvassed them, he would have been doing something he was entitled to do. It would be a curious result if, quite apart from making use of the list of customers or his special knowledge or anything of that kind, he could set himself during his spare time deliberately to injure the goodwill of his master's business by trying to get his customers to leave him. Then again the question here is

n(1) [1935] 2 K. B. 80, 85.

not a question of getting the customers to leave the business but a question of building up a rival in business to the prejudice of the goodwill of the employer's business.

I am not ashamed to confess that in the course of the argument my mind has fluctuated considerably on this question. As I see it, the court stands in a sense between Scylla and Charybdis, because it would be most unfortunate if anything we said, or any other court said, should place an undue restriction on the right of the workman, particularly a manual workman, to make use of his leisure for his profit. On the other hand, it would be deplorable if it were laid down that a workman could, consistently with his duty to his employer, knowingly, deliberately and secretly set himself to do in his spare time something which would inflict great harm on his employer's business. I have endeavoured to raise the questions in the way that they appeal to me and, on the best consideration I can give to the matter, I think that the plaintiffs are prima facie right in this case. That being so, what is the right course for this court to pursue? Mr. Upjohn took several points, on the assumption that a prima facie case was established, to suggest that it was not a case for an injunction. He said, for instance that in the absence of the five workpeople in question the action was not properly constituted. There is no doubt that, in a way, it is unfortunate in an action complaining of procuring breach of contract not to have before the court the contracting party whose breach of the contract it is said the defendants have procured, but the circumstances of the present case are peculiar. There is a very good practical reason why these workpeople should not be joined, and I can see no reason why the court should not be able to decide the question satisfactorily in their absence. Then Mr. Upjohn said there is no case for an injunction because if the plaintiffs are right the workpeople could be dismissed for serious misconduct. That is a much more difficult thing under the Essential Work Order than would appear from that bald statement, because the plaintiffs have not the last word in the matter. It would be unreasonable to expect them, in the circumstance of the shortage of labour and the difficult procedure they would have to go through, to take any such course. The times are peculiar, and it seems to me that the plaintiffs are entitled to have the position considered in the light of the circumstances as they in fact exist and not in the light of some circumstances which might have existed in more normal times and would have given them a remedy ready

to their hand which would have made it unnecessary for them to invoke the assistance of the court. Then Mr. Upjohn said in any case there is no case for an interlocutory order. I do not think myself that any of those arguments ought to be allowed to prevail.

This is a case of deliberate and secret action by these employees, deliberate and secret action by the defendants in circumstances where both the employees and the defendants must have known the exact result of what they were doing and must have realized that what they were doing was wrong, even if they did not distinguish in their minds between the question of commercial morality and legal obligation. That being so, and there being in my opinion a prima facie case and the balance of convenience and fairness being in favour of an injunction, I think the learned judge who took the other view came to the wrong conclusion. I should perhaps have mentioned that he did not think that once the question of confidential information was excluded there was sufficient left in the action of the plaintiffs' workpeople to constitute a breach of any implied obligation. It is on that point that I take a different prima facie view. The way the matter struck me was that prima facie, in the absence of direct authority on the point, he did not feel that he ought to say that the obligation of the servants in this case went as far as it was said it did. I have come to the opposite conclusion without expressing any final judgment on the matter, because we have not all the facts before us. I think that prima facie on the facts of this case so far as they at present appear, the conclusion ought to be the opposite one. That is the extent of our difference. In my opinion, the injunction asked for should be granted.

**JUDGMENTBY-2:** MORTON L.J.

**JUDGMENT-2:**

MORTON L.J.: I am of the same opinion, but in this somewhat unusual case I shall express my reasons for arriving at that conclusion in my own words as briefly as I can. The question arising on this motion is whether it was a breach of contract on the part of five employees of the plaintiff company to devote their spare time, or part of their spare time, to the service of the defendant company in the circumstances set out in the affidavits. If their conduct was a breach of their contract of service I think there would be no doubt that an interlocutory injunction should be granted. I cannot doubt that the whole matter was done with the knowledge and approval of the defendant company and its directors and, although in one part

of his evidence Mr. Davis described these five employees as volunteers for the work, there was other evidence that invitations were issued to them by Mr. Davis or by his wife. On the other hand, if the court thinks that the breach of contract is not clear but that there is a substantial question to determine at the trial and that the plaintiffs have made out a prima facie case of breach of contract, then the court must consider the question of the balance of convenience.

It is clear that the five employees in question have not broken any express term of their contract of employment. It was not provided in their contract, for instance, that they should give their time exclusively to the work of the plaintiff company. What implied term, if any, has been broken? I am content, as Maugham L.J. was content in Wessex Dairies, Ld. v. Smith n(1), to quote from A. L. Smith L.J. in Robb v. Green n(2), when he said: "I think that it is a necessary implication which must be engrafted on such a contract" - that is a contract of service - "that the servant undertakes to serve his master with good faith and fidelity."

In all the circumstances of the case, have these five employees observed the obligations of good faith and fidelity? The work done for the defendants was done in what is usually described as the employees' spare time. No cases were cited to us in which work so done was held to be a breach of the obligation of fidelity to the employer. I do not propose to express any view of such a general nature as that all work done for a firm in the same line of business as the employers in the spare time of the employees is a breach of contract, but I do say that in my view the obligation of fidelity subsists so long as the contract of service subsists, and even in his spare time an employee does owe that obligation of fidelity. In my view, a prima facie case of a breach of that obligation is made out in the present case and I shall refer briefly to certain points which impressed me in the course of the evidence.

In the first place, it is plain from the affidavit of Mr. Diggle that the plaintiff company is at the moment the only source of supply in this country of midget valves for hearing aids other than the defendant company. When I say it is clear, that is the evidence before us, although, as my Lord has said, the evidence at the trial may throw more light on the matter. I couple with that piece of evidence from Mr. Diggle the evidence of Mr. Smith, who is a director of the defendant

n(1) [1935] 2 K. B. 80, 88.

n(2) [1895] 2 Q. B. 315. 320.

company and is a practical man. He says in his affidavit: "Since the year 1925 I have been engaged in various branches of the radio engineering and valve amplifier industry and I have for several years been concerned with the manufacture of hearing aids." Then he refers to the fact that there is a limited market for hearing aids and that they have been sold in his view at too high a price and that he intends to put on the market a hearing aid at a lower price. That is a direct form of competition which is contemplated by the defendant company. Mr. Davis makes it plain that while he, Mr. Davis, was occupying the important post of production engineer at the plaintiffs' factory at Harrow he was assisting in the promoting of the defendant company and co-operating with Mr. Smith. His conduct is not before us on this occasion and I make no comment on that. There is thus in this case assistance given to a competitor whose activities would I think inevitably result in damage to the plaintiff company if they were successful.

In the second place, I am impressed by the secrecy which was maintained throughout the time when these employees of the plaintiff company were working for the defendant company. I think that is a pretty plain indication that the employees knew perfectly well they were breaking an implied term of their contract of employment. I do not doubt that if the plaintiff company had been asked "Have you any objection to our doing this in our spare time?" the answer would have been "You have no right whatever, in view of your contract of service with us, to do any such thing." I suspect that the employees knew that perfectly well, and that is why nothing was said about it.

In the third place, although these workmen are doing manual labour, it is manual labour of a very skilled kind and it has been, as the evidence shows, of the very greatest assistance to the defendant company in bringing their activities up to the point when they can develop their business. The circumstances are that in this particular case these men have assisted the defendant company to develop its business from the early stages to that of a competitor.

The last fact, and a very important one, which I would mention is this. It is true that it is not established on the evidence as I see it that any confidential information has passed or could have passed in the past from the employees to the defendant company, but I think it is right to say, as

Mr. Andrew Clark pointed out, that any improvements in the assembly of the valves which may be introduced by the plaintiff company will almost inevitably be put into operation by the defendant company through these employees. It is very difficult to conceive that if the plaintiffs were showing the employees a new and improved way of making midget valves there would be no mention and no demonstration of that to the defendant Company.

With regard to Wessex Dairies, Ld. v. Smith n(1) it is true that the operations which were objected to were carried out by the milk roundsman actually in the time when he was employed about his master's business, but for my part I think if those same operations had been carried out while he had been employed by that master in the evening or on a Saturday afternoon, they would also have been held to be a breach of his duty of fidelity. It is true that Greer L.J. in the course of his judgment lays some emphasis on the fact that the hours of service were utilized for these purposes, but I do not think that any member of the court throws any doubt upon the proposition that those activities would have been improper even if they had been done in the employee's spare time. Having regard to all the facts, I think the plaintiffs have made out a prima facie case here, and one has to consider the balance of convenience.

Looking at it from the defendants' point of view, it does not seem to me that any irreparable harm will be done to

the defendants if an injunction is granted and if it should subsequently turn out at the trial that an injunction should not have been granted. Mr. Smith says in his affidavit: "The defendant company is now in a position to advise the Board of Trade that it will be able to obtain and execute export orders, and so apply for and obtain the necessary priorities to secure skilled labour. There will be no difficulty in securing the labour although it may involve some delay, and if in the interim the defendant company is prevented from using the services of the persons mentioned in para. 11 of the affidavit of Harry Diggle, the production of the company will to some extent be handicapped." Then he goes on to say that production can be continued without the services of those persons. So much for the position of the defendants.

On the other hand, taking the position of the plaintiffs, it seems to me a most unfortunate position if the plaintiffs are

n(1) [1935] 2 K. B. 80.

compelled to have in their employment persons who week by week are assisting their rivals in the way described in the evidence. The learned judge suggested that the plaintiffs might impose a condition that the employees should not accept employment for any part of their time with the defendants, but I see grave difficulties in the plaintiff company achieving that result having regard to the terms of the Essential Work Order, and for my part I do not see why they should be faced with the alternative of trying to impose such a condition and possibly losing by so doing the services of valuable workmen. I think it is an intolerable position that this should be allowed to continue.

Finally, if one looks at it from the standpoint of the five employees in question, although they are not before the court, each of them in his or her affidavit uses the same phrase, which is a curious one, "I receive payment by way of expenses for my work." I am not quite sure what that means, but I apprehend it is intended to convey the impression that they have only had their expenses paid. In those circumstances, it does not seem to me that it will involve any hardship on those five employees if they are prevented from making use of their leisure time in doing this no doubt rather hard work and getting nothing more for it than their expenses. I cannot think that the sorrow which they might feel at being deprived of that occupation should induce the court to refuse to grant an injunction. In my opinion the appeal should be allowed and an injunction granted in the terms of the notice of motion.

**JUDGMENTBY-3:** BUCKNILL L.J.

**JUDGMENT-3:**

BUCKNILL L.J.: I agree.

**DISPOSITION:**

Appeal allowed.

**SOLICITORS:**

Solicitors for plaintiffs: Lawrance, Messer & Co.

Solicitor for defendants: Harold Benjamin.

J. W. H.

(c)2001 The Incorporated Council of Law Reporting for England & Wales

Tab 7

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2006 WL 1720461 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C
KeyBank, Nat. Ass'n v. Quality Payroll Systems, Inc.
E.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,E.D. New York.
KEYBANK, NATIONAL ASSOCIATION, Plaintiff,
v.
QUALITY PAYROLL SYSTEMS, INC., et al., Defendants.
No. CV 06-3013(JS)(AKT).

June 22, 2006.

Andrew P. Karamouzis, Moran Karamouzis LLP, Rockville Centre, NY, for Plaintiff.

**ORDER**
A. KATHLEEN TOMLINSON, Magistrate Judge.
*1 This is a breach of contract action which has been referred to me for a Report and Recommendation on Plaintiffs' motion for a preliminary injunction. However, during the preliminary injunction hearing on June 21, 2006, it became clear that certain segments of the various requests for relief were based upon KeyBank, National Association's ("KeyBank" or "Plaintiff") asserted need for expedited discovery, separate and apart from the other segments seeking injunctive relief. Therefore, I am dealing with the requests for relief in two parts. This Order deals solely with the request for expedited, pre-answer discovery. The remainder of the motion for a preliminary injunction which seeks affirmative injunctive relief was also heard during the June 21, 2006 proceeding and those issues and findings will be set forth in a separate Report and Recommendation to Judge Seybert, the District Judge assigned to this case.

***Procedural Setting***

On June 16, 2006, KeyBank filed a Complaint and an Order to Show Cause, with supporting documentation, seeking a preliminary injunction, pursuant to Fed.R.Civ.P. 65, against Quality Payroll Systems, Inc. ("Quality Payroll") with respect to various records and correspondence between KeyBank and Quality Payroll and Quality Payroll's customers. On June 16, 2006, District Judge Feuerstein signed the Order to Show Cause as well as a Temporary Restraining Order directing that " [p]ending the hearing of this motion, defendant is enjoined from and restrained from altering, modifying or destroying any and all relevant documents, correspondence, e-mails and financial records of its customers." *See* Order Granting TRO, June 16, 2006. The Order to Show Cause also directed Quality Payroll to appear and show cause, at a hearing to be conducted before me on June 26, 2006, why Plaintiff's requested relief should not be granted.

KeyBank moves the Court for an Order directing and enjoining Quality Payroll from (i) altering, modifying or destroying any documents, correspondence, e-mails, financial records and the like related to KeyBank; (ii) altering, modifying or destroying any and all documents, correspondence, e-mails, financial records and the like related to any of its customers; (iii) directing Quality Payroll to immediately produce true, accurate and complete copies of all executed authorizations from its customers as required under paragraph 4 of the Electronic Fund Transfer Service Agreement between the parties dated June 11, 1998; and (iv) directing Quality Payroll to immediately produce true, accurate and complete copies of all Client Services Agreements with its customers as required by paragraph 4 of that same Electronic Fund Transfer Service Agreement. This Order is directed only to sections (iii) and (iv) above.

At the June 26, 2006 hearing, Plaintiff's counsel appeared, along with his client's Senior Vice-President who had provided an affidavit in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2006 WL 1720461 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

support of the original Order to Show Cause. In addition, counsel for two other entities, DZ Bank and Three Village Bennett Agency, were present in the courtroom. These attorneys asserted that their clients were being adversely impacted by the actions of the parties in this case. I advised both attorneys that although I permitted them to speak as a professional courtesy, they have no standing in this action currently. It appears that these entities plan to file motions to intervene, but such prospective activity has no bearing on the current hearing.

*2 As to Quality Payroll, Stephen D. Haber, Esq. was present in the courtroom but emphasized that he did not and was not representing Quality Payroll. According to Mr. Haber, he only came to court to ask for an adjournment of the proceedings because he understood that Quality Payroll's principals were looking for counsel to represent them in this matter. [FN1] When I asked Mr. Haber if he were representing the corporation solely for the purpose of appearing in the proceedings on June 26, 2006, Mr. Haber responded "no" and confirmed on several different occasions that he did not represent Quality Payroll in any capacity for any purpose at the proceedings. Mr. Haber also later confirmed that Quality Payroll essentially was not appearing and had no one appearing on its behalf, but nonetheless was seeking an adjournment. Based on those responses, Plaintiff's counsel requested that the court hold Quality Payroll in default.

> FN1. KeyBank's counsel, Andrew Karamouzis, Esq. stated on the record at the June 26 hearing that he personally served the Order to Show Cause with Temporary Restraining Order upon Quality Payroll at its offices in Bohemia, New York in and around 4 p.m. on June 20, 2006, approximately an hour or so after District Judge Feuerstein signed the documents. An affidavit of service to that effect has been filed on ECF and appears as docket entry no. 6.

***Background***

KeyBank Electronic Services, a division of KeyBank provides electronic banking services and acts as an "Originating Financial Institution"-as that term is defined under the Operating Guidelines of the National Automated Clearing House Association ("NACHA")-on behalf of various payroll processors and their customers. *See* Affidavit of Robert E. Harrison, ¶ 5.[FN2] On or about June 11, 1998, Quality Payroll entered into three agreements with KeyBank. Quality Payroll, one of the defendants in this action, provides payroll services, tax and banking services, time attendance systems, human resources and benefits administration, including 401k and Flexible Spending Accounts, to clients throughout the United States. *Id.*, ¶¶ 6, 7; *see also* Quality Payroll Systems web site at www.qualitypayroll.com. One of those clients is KeyBank. Pursuant to these three agreements, KeyBank provided electronic banking services on behalf of Quality Payroll and its customers and acted as an Originating Financial Institution. *See* Harrison Aff. ¶ 9.

> FN2. Hereafter, cited as "Harrison Aff., ¶ ----." These references are to the Affidavit of Robert E. Harrison, Senior Vice President of KeyBank Electronic Services, a division of KeyBank, National Association.

For purposes of this Order, two of these agreements are pertinent. KeyBank asserts that Quality Payroll should be required to produce immediately true and accurate copies of (1) the authorizations executed by its customers which permit debit entries to the customers' accounts and which are required to be maintained pursuant to paragraph 4 of the "Service Agreement for Electronic Fund Transfers" (hereafter referred to as the EFT Service Agreement), annexed as Exhibit C to the Harrison Affidavit, and (2) all the Client Services Agreements Quality Payroll has with its customers which are also required under paragraph 4 of that same Service Agreement.

The other agreement relevant to this Order is the July 1998 "Automated Clearing House Electronic

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2006 WL 1720461 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Data Interchange Service Agreement." *See* Harrison Aff. Ex. B. Paragraph 14 of this Agreement provides as follows:
14. Record Retention. Client agrees to keep all written authorizations required by the Rules on file for at least two years after such authorization has been terminated. ***Authorizations should be available upon request to Bank or RDFI*** (emphasis supplied).

*3 The "Bank" referenced here is Plaintiff.

Plaintiff asserts that it has an urgent need to access these records and will be irreparably harmed if it cannot do so. This entire action is precipitated by KeyBank's having come to learn in and around June 5, 2006 that one of Quality Payroll's accounts with Plaintiff had an overdraft in the amount of $1,241,522.30. KeyBank promptly notified Quality Payroll's President Geller and demanded that Quality Payroll make immediate payment to satisfy the overdraft. *See* Harrison Aff. ¶¶ 12, 13. Notwithstanding some initial brief response from Quality Payroll, the overdraft was not paid, and, by June 12, 2006, the overdraft had increased to $2,429,949.95. *Id.* at ¶ 16. On June 14, 2006, KeyBank notified Quality Payroll, in writing, that it was in default of its obligations under the EFT Service Agreement and that KeyBank was terminating the Agreement on two days' written notice, effective June 16, 2006, pursuant to paragraph 19(a) of the EFT Service Agreement. KeyBank asserts that Quality Payroll defaulted and as a result, KeyBank exercised its right of set-off under paragraph 9 of the Master Agreement, annexed as Exhibit A to the Harrison Affidavit. *Id.* at ¶¶ 18, 19.

At the hearing, KeyBank stated that as a result of the overdraft by Quality Payroll and the lack of available funds, KeyBank will not be able to issue the necessary credits on behalf of Quality Payroll to its various customers as they come due. Plaintiff therefore concludes that when Quality Payroll's various customers realize that payroll checks to their employees are not being funded, they will, in all likelihood, assert claims against KeyBank. *Id.* at ¶ 20. In its papers as well as at the hearing, KeyBank also stated that Quality Payroll's Geller had tole KeyBank representatives that Quality Payroll had sold its client list to ADP, a national payroll processor for consideration somewhere between $1 million and $2.5 million. Quality Payroll also acknowledged that it had already received a $1million payment from ADP in connection with the transaction. *Id.* at ¶ 15. During the hearing, it was also brought to the Court's attention that Quality Payroll had put its building up for sale. In addition, no accounting has been given for the whereabouts of the overdraft monies in the amount of $2.4 million.

### *Discussion*

As noted previously, and as acknowledged by KeyBank's counsel during the hearing, the relief sought by KeyBank in the third and fourth prongs of its order to show cause is essentially a request for expedited discovery. Fed.R.Civ.P. 26(d) states in pertinent part that "unless the court upon motion, for the convenience of the parties and witnesses and in the interests of justice, orders otherwise, methods of discovery may be used in any sequence ..." Fed.R.Civ.P. 26(d). Fed.R.Civ.P. 34(b), which concerns the procedure with respect to the production of documents states, that "without leave of the court or written stipulation, a request may not be served before the time specified in Rule 26(d)." Fed.R.Civ.P. 34(b). However, the Court may expedite discovery under certain circumstances.

*4 As stated in *Better Packages, Inc. v. Zheng*, No. 05-CV-4477, 2006 WL 1373055, at *2 (D.N.J.2006), courts generally employ two standards in determining whether expedited discovery is appropriate. *Id.* The first is the so-called "reasonableness standard," which "requires the party seeking the discovery to prove that the requests are reasonable under the circumstances." *Id.* The second standard is a multi-part test set forth in *Notaro v. Koch*, 95 F.R.D. 403 (S.D.N.Y.1982) and requires a plaintiff seeking expedited discovery to show:
(1) irreparable injury; (2) some probability of success on the merits; (3) some connection between the expedited discovery and the avoidance of irreparable injury, and (4) some evidence that the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                     Page 4
Not Reported in F.Supp.2d, 2006 WL 1720461 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

injury that will result without expedited discovery looms greater than the injury the defendant will suffer if the expedited relief is granted.

*Id.* at 405.

As noted by Judge Edelstein in *Notaro,* the four requirements set forth above "parallel those showings necessary to obtain a preliminary injunction." *Id.* at 405 n. 4. Under either test, I find that the Plaintiff has satisfied the standard for obtaining expedited discovery. The Plaintiff has made a sufficient showing of irreparable harm if expedited discovery is not granted based on the uncontroverted facts presented in its motion papers and on the record at today's hearing. As stated in the Affidavit of Robert E. Harrison, Senior Vice-President of KeyBank, Plaintiff is faced with the possibility of being inundated with claims from various third-parties seeking their payroll monies which KeyBank will not be able to properly address without the documents sought. *See* Harrison Aff. ¶ 23. In addition, KeyBank is subject to the rules and regulations of the National Automated Clearing House Association ("NACHA") which requires it to maintain and comply with certain disclosure requirements. By not having access to Quality Payroll's documentation, KeyBank faces the possibility of irreparable harm because of their inability to comply with NACHA's rules and regulations-not to mention the harm to KeyBank's commercial reputation in the marketplace. What the Court knows of Quality Payroll's circumstances as of the hearing is disturbing. First, this entity has sold its client list very recently to ADP. Second, the Court is advised that Quality Payroll's building has been placed on the market. Third, and most importantly, $ 2.4 million which represents the overdraft is still unaccounted for. Fourth, Quality Payroll, despite having been served with the order to show cause and temporary restraining order has not appeared in this action, despite Mr. Haber's presence in court. I further find that the relief which KeyBank seeks is nothing more than it is entitled to under paragraph 14 of the Automated Clearing House Electronic Data Interchange Service Agreement.

Further, Plaintiff satisfies the second prong of the *Notaro* test in that it has shown some probability of success on the merits. The Master Agreement, the Automated Clearing House Electronic Data Interchange Service Agreement, both dated July 13, 1998, the Service Agreement for Electronic Fund Transfers dated July 11, 1998, and the Key Exchange Services Amendment Agreement dated December 10, 2004 (collectively the "Agreements") clearly define the rights and duties of the parties. Specifically, paragraph 9 of the July 13, 1998 Master Agreement permits Plaintiff to "set off the unpaid balance of any amount owed" to it. *See* Harrison Aff., Ex. A. Therefore, I find that Plaintiff has shown some possibility of success at least with respect to its claim for a declaratory judgment. *See* Compl. ¶ 37.

*5 In addition, there is some connection between documents requested here and the avoidance of irreparable injury. As stated by Harrison in his affidavit, the documentation sought is critical in addressing third-party questions or claims that have already arisen from Quality Payroll's customers as a result of the overdraft. *See* Harrison Aff. ¶ 22. Therefore, I find that the injury which KeyBank faces in not having Quality Payroll provide its customer documentation to KeyBank is far greater than in directing them to provide it. This factor also satisfies the so-called "reasonableness test" for expedited discovery. *See Better Packages, Inc.,* 2006 WL 1373055, at *2. Paragraph 14 of the Automated Clearing House Electronic Data Interchange Service Agreement, both dated July 13, 1998, states that "client agrees to keep all written authorizations required by the Rules on file for at least two years after such authorization has been terminated. Authorizations should be available upon request to Bank or RDFI." *See* Compl. Ex. B. Therefore, Quality Payroll is already under an obligation to maintain the records sought.

Based on the foregoing, I find that expedited discovery is warranted therefore, pursuant to Fed.R.Civ.P. 34(b), it is hereby;

**ORDERED,** that Defendant Quality Payroll make available for discovery and inspection by Plaintiff's counsel no later than June 27, 2006 all executed authorizations from its customers as required under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 5
Not Reported in F.Supp.2d, 2006 WL 1720461 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

paragraph 4 of the Electronic Fund Transfer Service Agreement dated June 11, 1998; and it is further

**ORDERED,** that Defendant Quality Payroll make available for discovery and inspection by Plaintiff's counsel no later than June 27, 2006 all Client Services Agreements with its customers as required by paragraph 4 of the Electronic Fund Transfer Service Agreement dated June 11, 1998; and it is further

**ORDERED,** that Defendant Quality Payroll cooperate with Plaintiff's counsel in providing the necessary documentation for discovery and inspection by June 27, 2006; and it is further

**ORDERED,** that Plaintiff's counsel is directed to serve a copy of this Order upon Quality Payroll Services, Inc. by personal service no later than the close of business on June 23, 2006.

Defendant Quality Payroll is hereby put on notice that failure to comply with this Order may subject it to contempt proceedings before this Court.

**SO ORDERED.**

E.D.N.Y.,2006.
KeyBank, Nat. Ass'n v. Quality Payroll Systems, Inc.
Not Reported in F.Supp.2d, 2006 WL 1720461 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.