Tab 8

Mainstream Properties Limited v Young and others

COURT OF APPEAL, CIVIL DIVISION

JUDGMENT: APPROVED BY THE COURT FOR HANDING DOWN (SUBJECT
TO EDITORIAL CORRECTIONS)

*[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)*

**HEARING-DATES:** 13 JULY 2005

13 JULY 2005

**CATCHWORDS:**

Tort - Inducement to commit breach of contract - Inference of intention - Whether requirement for intention to cause economic harm to claimant - Whether objective test sufficient - Whether tortious interference with contractual relations - Whether recklessness sufficient to establish tort.

**HEADNOTE:**

This judgment has been summarised by LexisNexis UK editors.

Y and B, were employed by the claimant company. B's main responsibility was to find properties suitable for development by the company. Y and B formed a company of their own (Homes). Homes undertook two developments as joint ventures with the sixth defendant, W. The company sued W for damages for inducing the breach of contracts of employment Y and B, in respect of one of the transactions. The judge found W to be a credible witness when he gave evidence that he had specifically raised the question of conflict of interests with Y and B and had been assured that there was no such conflict. The judge held that actual knowledge and intention to interfere with the contracts could not be proved and that what a reasonable man ought to have known or done or intended was not relevant. He stated that the tort was one of deliberately inducing breach of contract: not carelessly or negligently inducing such a breach. He therefore held that the company had not established that W intended to procure a breach of or to interfere with the performance of the employment contracts and dismissed the claim. The company appealed.

The company submitted that the test of intent was objective and that W's mistaken belief was no defence. They also argued that recklessness might suffice to establish the tort.

The appeal would be dismissed.

Having regard to the authorities the tort of interference with contractual rights required a specific subjective intention to interfere in that the unlawful conduct had to be in some real sense aimed at the contract. It had to have the intention to cause economic harm to the claimant either as an end in itself or because it was a necessary means of achieving some ulterior motive. It was not satisfied by showing that the defendant was reckless as to whether his conduct interfered with the claimant's contractual rights or not.

The imposition of greater liability on third parties for interference with contractual rights would carry with it the undesired effect, or at least the risk, of inhibiting competition and entrepreneurialism. In the instant case, no specific intention to cause harm was shown. The judge had not misdirected himself as to the law.

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

Millar v Bassey [1994] EMLR 44 and Douglas v Hello [2005] All ER (D) 280 (May) applied. Emerald Construction Co Ltd v Lowthian [1966] 1 All ER 1013 and OBG (Plant and Transport Hire) Ltd v Allan [2005] 2 All ER 602 considered.

## INTRODUCTION:

THIS IS THE FIRST APPROVED VERSION HANDED DOWN BY THE COURT. AN EDITED OFFICAL TRANSCRIPT OR REPORT WILL FOLLOW.

## COUNSEL:

John Randall QC and John de Waal for the company.; Mark Lomas QC for the sixth defendant.

## PANEL: SEDLEY, ARDEN LJJ AND AIKENS J

## JUDGMENTBY-1: LADY JUSTICE ARDEN

## JUDGMENT-1:

LADY JUSTICE ARDEN:

1. This is an appeal with the permission of Sir William Aldous from the order dated 10 September 2004 of HHJ Norris QC sitting as a deputy judge at the High Court of Justice, Chancery Division, Birmingham District Registry insofar as it dismissed the appellant's action against the respondent, the sixth defendant, and ordered the appellant to pay the costs of his defence. I will call the appellant "Mainstream".

2. The respondent was sued for damages for inducing breach of contract. The contracts in question were contracts of employment of two directors of Mainstream, Mr. Young and Mr. Broad. It is common ground that the acts of the sixth defendant amounted to interference with their contracts. He provided finance to enable Mr. Young and Mr. Broad to appropriate for themselves an opportunity which belonged to their employer. The question in issue is whether the sixth defendant had the intention necessary to commit this tort.

3. As to the background, Mainstream Properties Ltd. is owned by Mr Moriarty. His business is property development. Mr Moriarty himself has another business and involves himself very little in the business of Mainstream. Mr Young was appointed an executive director in January 1999 and Mr Broad was appointed an employee in February 1999. Mr Broad's responsibility was to find properties for Mainstream.

4. Within a few months of joining Mainstream, Mr Young and Mr Broad formed companies of their own. First, they formed Excellence Property Management Ltd. ("Excellence"). Excellence was used to exploit opportunities available to Mainstream. Then in May 2000, Mr Broad and Mr Young incorporated Wilfred Young Homes Ltd ("Homes"). Homes undertook two developments as joint ventures with Mr De Winter. Both were on sites identified by Mr Young and Mr Broad as suitable for Mainstream's purposes. The first was at Rangemoor and the second was at Findern. Mr Moriarty was kept in the dark about these companies until the end of March 2001, when Mainstream dismissed both Mr Young and Mr Broad. It then sued them for loss of the Findern opportunity. No claim was brought in respect of Rangemoor. Mainstream also sought damages against Mr De Winter on the grounds that he had induced a breach of Mr Young's and Mr Broad's contracts with Mainstream. At trial the claims against Mr Young and Mr Broad succeeded, but that against Mr De Winter failed.

5. The judge's assessment of Mr De Winter was as follows:-

"(g) Mr De Winter was a very careful witness, though it was not easy to assess whether the care with which questions were answered arose from a desire to tell the exact and considered truth, or from a desire to assess where the

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

answer fitted in the overall evidence and its implications for his own position. In the end I assessed him as an honest (if calculating) witness who essentially told me the truth (if not the whole truth) as he recollected it. One feature of his evidence was the development of its detail (as the case against Mr Young and Mr Broad progressed); I have felt unable to rely on significant parts of this developed detail unless supported by documents or evidence from Mr Young that I considered was trustworthy."

6. As to the Rangemoor site, Mainstream declined this in December 1999 as it was a risky conversion project. Mr Young and Mr Broad then took it up. The judge found that Mainstream would not have given its approval if it had known that Mr Young and Mr Broad intended to take it up themselves. The judge made findings about the approach to Mr De Winter. He found that Mr De Winter knew that Mr Broad and Mr Young were directors of Mainstream but that Mr De Winter had been assured that the Rangemoor project would not involve any conflict of interest with Mainstream. He held:

" 51. My finding as to Mr De Winter's involvement in Rangemoor are these. On 23 March 2000 (during the working day) Mr Young and Mr Broad went down to Mr De Winter's business premises in London. They discussed the Rangemoor project. Mr De Winter was to buy the land, Homes would do the development - an evolution of the arrangement that Mr De Winter had with Mr Broad. Mr Young and Mr Broad had prepared documents headed "brief appraisal" setting out the costings and likely profit, showing a margin of 24%. They had also prepared a cash flow projection and the schedule setting out all legitimate charges and expenses. They took with them plans that had been prepared for the development. There were detailed discussions. Following that, on 4 April 2000, Mr De Winter had sent a fax to Mr Young and Mr Broad outlining the risks involved. I regard it as probable that there were then further detailed discussions. On 18 May 2000 Mr De Winter sent a detailed letter containing a detailed funding proposal. This gave Mr De Winter 11% interest on his investment, plus the first £ 225,000 of any profit, plus 50% of the profits over £ 450,000. Mr Young and Mr Broad agreed these terms (though at trial neither was very clear what they had let themselves in for). Mr Young, Mr Broad and Mr De Winter all said that there was not really anything else in the way of documents on the Rangemoor development, and that the matter proceeded on the basis of an exceptional level of trust. But I do not consider that I was told the whole truth, and I find that the probability is that there was some written record of the course of the dealings between Mr De Winter and Homes. There are two bases for that finding. First, the probability is that there was a detailed written record of how much was drawn, and when, and for what (since otherwise Mr De Winter's profit share could not be calculated). Second, an entry in Mr Broad's diary referring to a letter to Mr De Winter led to the production (in the course of the trial) of such a letter. It did not match up to the diary entry. But it demonstrated a degree of formality in the relationship, the exchange of financial documents, and the copying of solicitors' correspondence. I therefore find that the arrangement between Mr Young and Mr Broad on the one side and Mr De Winter on the other, whilst in some respects informal, was an arm's length business relationship, the terms of which were formally recorded and the course of which was charted in correspondence and financial documents. It was supplemented by meetings (three or four of which took place at Mainstream's offices) and site visits by Mr De Winter, and by regular telephone calls at the end of each month (when the "draw down" against the schedule expenditure would be considered). "

52. Mr De Winter told me in his evidence what he knew of the circumstances in which the Rangemoor arrangements were made. He told that he knew Mr Broad was Development Director of Mainstream, that he knew Mr Young was a Director of Mainstream, and that Mr Moriarty was the Senior (probably Managing) Director. He was aware that Mainstream bought development sites. He agreed that there was an obvious conflict between Mr Broad and Mr Young acting for Mainstream and in their acting for themselves in the Rangemoor development: and that he certainly realised this. However, he understood that the Rangemoor development had been turned down by Mainstream, and on that basis he proceeded with his relationship with Mr Young and Mr Broad. In his witness statement of May 2003 (though not in either his August or September 2002 witness statements) Mr De Winter said:

"I wish to make it clear that I specifically said to Mr Broad that I would only agree to fund the project provided that there was no conflict of interest with regard to his and Mr Young's employment at [Mainstream]. Mr Broad confirmed to me that there was no question of a conflict of interest and I trusted his reply and was therefore happy to

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

proceed."

In cross examination he confirmed this saying:

"I would use the expression "conflict of interest" from time to time. I would not take something from somebody whose right it was. I wanted them to be free to do something with me: and to be sure that they had the capability. If I had to share men it would inhibit their work and mine."

I have considered the stage at which this evidence about "conflict of interest" emerged: and I have weighed what was said in the witness statements with what was said from the witness box. I have concluded (because of the manner in which the last quoted answer was given) that I can accept Mr De Winter's evidence as to specifically raising the "conflict of interest" issue, and as to receiving the reply he did. I accept that it was on that basis that he proceeded with Rangemoor. That concludes the relevant findings of fact on Rangemoor: and I can at last turn to the central issue."

7. Thereafter, Mr Young identified the Findern site. Mr Young and Mr Broad again approached Mr De Winter for funding. The judge found that Mr De Winter agreed to fund the site in the course of a telephone conversation on 29 March 2001, shortly before Messrs Young and Broad were dismissed by Mainstream. He also found that Mr De Winter again received an assurance from Mr Broad and Mr Young that there was no conflict of interest with Mainstream. The judge made the following findings, which are critical to the issue of Mr De Winter's state of mind when he committed himself to funding the Findern development:

" 108. As I have recorded in relation to Rangemoor, at the time of entering this commitment Mr De Winter knew exactly what Mr Broad and Mr Young did as officers and employees of Mainstream, and knew of Mr Moriarty's interest. At the time when Mr De Winter committed himself to fund the Findern development, so enabling Mr Young and Mr Broad to resume the detailed contractual negotiations that would lead to settlement of the contract terms within days, the potential for conflict between duty to Mainstream and personal interest on the part of Mr Young and Mr Broad was obvious to Mr De Winter as it was in relation to the Rangemoor project. He says that he expressly addressed the issue and received the assurance from Mr Young and Mr Broad that there was no conflict because the site had been offered to and reject to Mainstream."

109. The way in which this evidence emerged was not entirely satisfactory. It did not feature at all in either of Mr De Winter's first two witness statements: it did feature in his third witness statement of 15 May 2003, and prominently at trial. In the former Mr De Winter firmly placed the discussion about conflict as occurring in a conversation that took place after the dismissal of Mr Young and Mr Broad. Mr Randall QC drew attention to these features of Mr De Winter's evidence and to inadequacies in the evidence of Mr Broad and Mr Young on this topic (with which it is unnecessary to burden this judgment). The stark issue for me is whether this alleged conversation about "conflict" is a fabrication or is an honest (if perhaps muddled) recollection. I regard it as the latter, and find that there was a conversation at some point at which Mr De Winter sought assurance from Mr Young and Mr Broad that the proposed venture did not conflict with their duties to Mainstream. The potential for conflict was obvious (and is admitted to be so by Mr De Winter). The question is therefore whether it is probable whether Mr De Winter ploughed ahead deliberately running the risk because only an initial investment of £ 25,000 was required, or whether he sought some assurance. It is plain from the way he gave his evidence that Mr De Winter is not an incautious man. He had nothing to lose by asking the question. Unlike Mr Young and Mr Broad, he had no pressing need to make an investment in this site. I believe him when he said to me:

"I would not take something from somebody whose right it was. I wanted them to be free to do something with me; and to be sure they had the capability. If it had to share men it would inhibit their work and mine".

110. I also find that when Mr De Winter raised the issue he received the assurance from Mr Young and Mr Broad that there was no conflict (even though this was untrue and both of them knew that if they had sought permission from Mr Moriarty it would have been refused). The reason they gave was that the site had been offered to and rejected by Mainstream (which was not the truth). They probably also gave as the reason for Mainstream's rejection the suggestion

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

that Mainstream could not afford to purchase the site (although this was not the position in March).

111. I further find that Mr De Winter accepted and relied on the answers given to his questions. Mr Randall QC commented that you do not ask the burglar carrying the television set down the garden path whether it really belongs to him, because you will only get one answer. He submitted that I should be wary of accepting Mr De Winter's evidence that he genuinely believed Mr Young and Mr Broad. But whether the belief was actually held and whether it was reasonably held are two different questions. Mr Lomas QC was able to point to a context that (coupled with my own estimate of Mr De Winter as a witness) is sufficient to persuade me to find that Mr De Winter genuinely accepted and relied on the answers he was given. He had been told the same about Rangemoor; and that development was now proceeding smoothly without objection. The story that Mainstream was desperately short of funds gained apparent support from the puzzling approach for a loan in December 2000. Mr De Winter had openly visited Mainstream's offices in connection with the Rangemoor development and was unaware of the level of concealment. Mr Lomas QC submits (and I accept) that these features prevent the inference being drawn that (notwithstanding what Mr De Winter may now say in his own interest) he must have known that Mr Young and Mr Broad were acting in breach of obligation."

8. In paragraph 109, the judge finds that "at some point", Mr De Winter was given an assurance that there was no conflict of interest. On this appeal, Mr John Randall QC submits that the judge made no finding that this assurance was given before the commitment to finance the Findern site was given. It is correct that the judge uses the words "at some point". However, that phrase has to be seen in the context of paragraph 109 and the succeeding paragraphs. It is quite clear that the judge had in mind a point in time prior to the commitment for finance. Otherwise he would not have referred to a "proposed venture" in the same sentence, or whether Mr De Winter was acting in good faith when he accepted this assurance. It would have been irrelevant whether there had been an assurance if the assurance was only given after the commitment to fund the project. Moreover the judge goes on to say that Mr De Winter accepted and relied on the assurance that he had been given. Reliance in this context must mean reliance when giving the funding commitment.

9. The judge therefore held that Mr De Winter accepted and relied on the assurance that there was no conflict of interest with Mainstream. The judge further found that Mr De Winter was entitled to rely on the assurance because he knew as a fact that Mainstream had been short of funds and because he had been given the assurance. He therefore accepted that those features prevented the inference being drawn that he must have known that Mr Young and Mr Broad were acting in breach of their obligations as employees.

10. The judge held that the provision of funds constituted interference with the contractual relationships between Mainstream, on the one hand, and Mr Young and Mr Broad, on the other hand. There is no cross appeal against that holding.

11. The question was then whether Mr De Winter knew that his actions would interfere, or intended to interfere, with the employment contracts of Mr Young and Mr Broad or, alternatively, whether a reasonable man, placed as Mr De Winter was placed, ought so to have known or intended. The judge held that actual knowledge and intention could not be proved and that what a reasonable man ought to have known or done or intended was not relevant:-

"121. Mr Lomas QC submits that actual knowledge of the contract is required (and constructive knowledge is insufficient) because an actual intention to break the contract is required (and a constructive intention is insufficient). I am therefore concerned with what Mr De Winter actually knew and intended with regard to the employment contracts, or alternatively what he must by compelling inference be taken to have known and intended; I am not concerned with what a reasonable man, placed as Mr De Winter was placed, ought to have known or may be though to have intended.

122. To these submissions Mainstream's answer was that people are presumed to intend the reasonable consequences of their actions (see Greig v Insole (supra) at 3388 A) and that a person can intend a consequence if he knows that it will follow from a course of conduct on which he embarks deliberately, so that a consequence cannot

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

properly be regarded as "unintended" if the deliberate action is taken knowing that it must inevitably bring about the consequence: see Millar v Bassey at p 4 of the Lexis transcript. But I do not consider that either of these passages (or the principle they embody) is inconsistent with the submissions of Mr Lomas QC. They are but an illustration of the alternative form of the submission (where inferences are to be drawn from the proven facts).

123. I accept the submissions of Mr Lomas QC. I have found that Mr De Winter knew sufficient of the contracts to spot the conflict problem. I have found that he raised the conflict issue. I have found that he genuinely believed that the participation of Mr Young and Mr Broad in the Findern venture would not occasion a conflict between their duty and their interest. What a reasonable man ought to have known or done or intended is not relevant. The tort is one of deliberately inducing breach of contract: not carelessly or negligently inducing such a breach. It follows that I must hold that Mainstream has not established that Mr De Winter intended to procure a breach of or to interfere with the performance of the employment contracts. It follows that I dismiss the claim against Mr De Winter."

The appellant's submissions

12. Mr Randall submits that for the tort of interfering with a subsisting contract, once the requisite knowledge is established, the element of intention merely requires that the acts of interference with a contractual relationship be voluntary or deliberate, rather than involuntary or accidental. Mr Randall submits that this is a case where it is alleged that the defendant directly interfered with contractual relationships and brought about a breach of contract. In the case of direct interference, the acts constituting the interference are likely to be directed at the claimant. In support of this submission, Mr Randall submits that there is an analogy between the tort of direct interference with contractual relations and the tort of conversion, for which no intention to question or deny the claimant's rights is required. Mr Randall submits that in appropriate circumstances, intent can be inferred. In support of this submission, Mr Randall relies on the statement in Clerk & Lindsell on Torts, 18th Ed. (2000), paragraph 24-16, that the test of intention is objective. The text continues:

"Good faith as such is no defence if knowledge and intention are proved [Pritchard v Briggs, Greig v Insole]. If the defendant is in "honest doubt", he may escape liability, but only where that doubt goes over to the existence of the contract, not to "the legal result of known facts". [Solihull v NUT, Pritcharrd v Briggs and other authorities]".

At paragraph 24-24, Clerk and Lindsell state:

"Inferred intention. Intention imports no desire to injure but it is sufficient that there is deliberate conduct by a defendant who appreciates, or is sufficiently reckless in regard to, the probable consequences on the plaintiff. Where knowledge of the existence of a contract is proved on the part of a defendant who induces one party to break it, his intention to do damage to the other party is readily inferred. Belief that the contracts are not enforceable or, a fortiori, indifference whether breach will be caused by the inducement does not excuse the defendant. It has therefore become very difficult to escape liability on the ground that knowledge or intention are absent, if the action of the defendant could be expected to induce a breach of a contract of which he is or must be or can easily be made aware, for example where he interferes with business relationships."

13. Mr Randall submits that it is a question of law whether knowledge can be inferred or not. Hobhouse J was in error in holding in Rickless v United Artists Corporation [1986] FSR 502, 524 that a subjective or specific intention is required.

14. In these submissions, Mr Randall distinguishes between five torts:

i) directly inducing, or procuring, a party to a contract to break it.

ii) indirectly inducing or procuring a breach of contract by the use of unlawful means.

iii) deliberate and direct interference with a contractual relationship or the prevention or hindrance of execution, or

the wrongful interference with the business.

    iv) unlawful means conspiracy.

    v) conspiracy to injure.

Mr Randall submits that the claimant does not have to show that the interference was aimed at him, except in the case of tort (ii) and possibly tort (iv).

15. Mr Randall relies on dicta of Viscount Simon LC in Crofter Handwoven Harris Tweed Co Ltd [1943] AC 435, especially at 445, and on Smithies v National Association of Operative Plasterers [1909] 1 KB 310, in which this court per Vaughan Williams LJ at 330 and Kennedy LJ at 341 held that it was no defence to a claim for inducing breach of contract brought by employers against a trade union for sanctioning a strike that the defendant trade union had acted in the honest belief that the employers against whom action was taken were not intending to comply with a collective agreement. Their good faith was no defence.

16. Mr Randall also relies on Greig v Insole [1978] 1 WLR 302. One of the issues in this case was whether the Test and County Cricket Board ("TCCB") had by passing resolutions induced cricketers with contracts with World Series Cricket Pty Ltd, the plaintiff, to break those contracts. The TCCB had acted in good faith and under a mistake as to the legal position. They believed that their resolutions would only induce cricketers who could lawfully terminate their contracts to do so. However Slade J applied an objective test to ascertain whether there was an intention to induce the cricketers to break their contracts and held that mistake and error as to the legal position were irrelevant. In Timeplan Educational Group Ltd v NUT [1997] 1RLR 457, this court cited with approval the conclusion of Slade J that ignorance of the terms of the contract did not suffice to show absence of intent.

17. Mr Randall also relies on 369413 Alberta Ltd. v Pocklington (2001) 194 DLR (4th) 109. In this case, the Court of Appeal of Alberta set out a number of propositions as to the intention required for inducing a breach of contract. These included inferred intention and recklessness. The Court of Appeal held as follows:

"[38] In order to find liability [for inference with contractual relations], a plaintiff must demonstrate that the defendant had an "intent" to induce the breach of contract. The intent component of the tort is the most difficult to understand. Malicious motive, unlawful conduct, hatred or intention to harm are not required elements of intent: Allen v Flood, [1898] A.C.1 9H.L.(E,));Parks West Mall Ltd v Jennett (1996), 36 Alta.L.R. (3d) 44 (C.A.) at 49; and Atcheson v College of Physicians and Surgeons (Alberta), [1994] 6 W.W.R. 239 (Alta.Q.B) at 246. However, what is required is less clear. The requisite intent has been described with "loose, vague and conflicting statements" that sometime appear to be irreconcilable: Ed Miller Sales, supra, at 230.

[39] Originally, the tort required the breach to be the result of wilful, deliberate and direct conduct which the defendant knew or hoped would result in a violation of the plaintiff's contractual rights. See for example, Lumley v Gye (1853), 118 E.R. 749, 2 El. & B1.216 (Q.B); and Quinn v Leathem, [1901] A.C.495 (H.L.(I.)).

[40] However, courts soon recognized that intent can also be inferred when the consequences of the conduct were a necessary or reasonable foreseeable result, because "people are presumed to intend the reasonable consequences of their acts": South Wales Miners' Federation v Glamorgan Coal Company, [1905]A.C.239 (H.L.(E.)) at 244. In Posluns v Toronto Stock Exchange and Gardiner (1965), 46 D.L.R. (2d) 210 (Ont. H.C) at 267; affirmed (1966), 53 D.L.R (2d) 193 (C.A.); affirmed [1968] S.C.R. 330, 67 D.L.R. (2d) 165, the court held that liability would attach if the defendant's conduct resulted in the breach of a contract "of which it was or ought to have been aware". The intention to bring about a breach of contract need not be the primary object; it is sufficient if the interference is necessarily incidental to attaining the defendant's primary objective: Fraser v Board of Trustees of Central United Church (1983), 38 O.R. (2d) 97 (H.C.J.) at 103' and Bank of Nova Scotia v Gaudreau (1985), 48 O.R. (2d) 478 (H.C.J.).

[41] Intention can also be established when the defendant was reckless or wilfully blind to a breach. The defendant

need not have actually known the precise terms of the contract or that his object only could be accomplished through breach of the contract. "If - turning a blind eye - he went about it regardless of whether it would involve a breach, he will be treated just as if he had knowingly procured it": J.G. Fleming, The Law of Torts, 8th Ed. (Sydney: law Book Co., 1992) at 694.

[42] Turning a blind eye may include situations in which the defendant failed to seek advice or employ the means available to obtain the necessary knowledge. For example, in Royal Bank of Canada v Wilton (1995), 165 A.R. 261, D.L.R. (4th) 266 (C.A.), the defendant was uncertain about the enforceability of a contract, had the "means of knowledge" to determine if a legitimate contract existed, but made no efforts to seek advice. This court found the defendant liable because he deliberately chose not to acquire the information, but proceeded on the basis that the contract was unenforceable. Similarly, when there are competing legal interpretations and the defendant adopts an interpretation which will interfere with the plaintiff's rights, the defendant "must at least show that he was advised and honestly believed that he was legally entitled to take that course": Swiss Bank v Lloyds Bank, [1979] Ch.548 at 580 (CH.D.); reversed on other grounds [1982] A.C. 584 (C.A.); affirmed [1982] A.C. 604 (H.L.(E)).

[43] If the defendant acted under a bona fide belief that contractual rights would not be infringed, liability will not be found even though the belief turned out to be mistaken. But for a mistaken belief to be bona fide, rather than the result of recklessness or wilful blindness, some basis for the belief must exist, and some reasonable effort must have been made by the defendant to learn the truth. In British Industrial Plastics Ltd. v Ferguson, [1940] 1 All E.R. 479 (H.L.(E.)), the defendants who had made the effort to seek advice were not found liable even though their belief was described as "illogical". In Z-Mark International Inc. v Leng Novak Inc. (1996), 12 O.T.C. 33 (Gen. Div.), appeal dismissed (1999), 122 O.A.C. 341, a defendant made inquiries and obtained assurances and a warranty. The court found that the defendant had no reason to doubt the assurance or the warranty and therefore the defendant was not knowingly or recklessly indifferent to a breach of contract.

[44] In some cases a distinction is drawn between direct interference, for which the breach must be foreseeable or reasonable consequence of the conduct, and indirect interference, for which the breach must be necessary or substantially certain consequence. See, for example, L.N. Klar, Tort Law, 2nd ed. (Scarborough: Carswell, 1996) at 498 and 507; Fleming, supra, at 694; D.C. Thomson & Co. Ltd. V Deakin ,[1952] Ch. 646 (C.A.); Bank of Nova Scotia, supra; Garry v Sherritt Gordon Mines Ltd., [1988] 1 W.W.R. 289, 45 D.L.R. (4d) 22 (Sask. C.A.); and Atcheson, supra.

[45] As this case involves direct interference, this distinction does not arise. Pocklington, as the director of Gainers, executed the documents to complete the transfer of the 350151 shares to his own company. The transfer caused Gainers to breach s. 12.03(1) of the Master Agreement, which prohibited dispositions of assets without Alberta's consent. Therefore, if the breach was a reasonable or foreseeable consequence of that transfer, or alternatively, if Pocklington completed the transfer recklessly, was wilfully blind to its consequences, or was indifferent as to whether or not it caused a breach, the necessary intent element for the tort will be met."

18. Mr Randall submits that the holding of Browne-Wilkinson J in Swiss Bank Corporation v Lloyds Bank [1979] Ch 548 at 580 (reversed on other grounds [1982] AC 584) that a subjective test applied to determine intention is not binding on this court. Moreover, the passage from the judgment at 572 relied on by the judge, on Mr Randall's submission, was a statement about knowledge and this was made in the context of the rule in De Mattos v Gibson (1838) 4 De G and J 276, (purchaser of an interest in property may not use it so as to breach contractual rights of which he was aware when he acquired the interest), not the tort of inducing breach of contract.

19. Mr Randall further relies on Lonrho plc v Al Fayed [1990] 2 QB 479. In that case, Dillon LJ held (at 489) that, in relation to unlawful interference with business, it was sufficient to show an intention directed at the claimant or alternatively intent to injure the claimant. Ralph Gibson and Woolf LJJ held that intention would be shown where the defendant had deliberately embarked on a course of conduct, "the probable consequences of which to the plaintiff he appreciated". In Woolf LJ's view, therefore, it was unnecessary to show that the interference was inevitable. It might be enough that the results were probable.

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

20. Mr Randall distinguishes a passage in Stocznia v Latco [2002] Lloyd's Law Reports 436 at 460 per Rix LJ, with whom Tuckey and Aldous LJJ agreed. In this case there were two claims, one for tort (i) and one for tort (ii). Although Rix LJ stated that a subjective test of intention applied, this was in the context of tort (ii), not tort (i).

21. On the basis of these authorities, Mr Randall submits that Mr De Winter's mistaken belief was no defence in this case. Mr De Winter's mistake was in part a mistake of fact as to whether Mainstream had rejected the Findern site or could not afford it. But it was also a mistake of law in that the assurance given by Mr Young and Mr Broad could not relieve them of a breach of duty: only the fully informed consent of Mainstream could have done that. In addition, the assurance did nothing to prevent a misappropriation of the employer's property by making telephone calls in his time and using Mainstream's office premises.

22. Mr Randall submits that the correct approach to a mistake of law is set out by Goff LJ in Pritchard v Briggs [1980] Ch 338 at 414G. A party does not avoid liability simply because through ignorance of the law he does not realise that his conduct is tortious. In Pritchard v Briggs, Goff LJ drew no distinction between the criminal and the civil law, and applied the criminal test in the civil context. Stephenson LJ expressly agreed with the judgment of Goff LJ.

23. In Solihull v National Union of Teachers [1985] IRLR 211, Warner J held that the employer had a good arguable case that the defendant union had interfered with his contract even if the defendant was mistaken as to the legal effect of the contract.

24. Mr Randall also relies on the decision of this court in Securities and Investments Board v Scandex Capital Management A/S [1998] 1 All ER 514. In that case the defendant was aware of the relevant facts. It was held that he could commit the criminal offence of being concerned in an investment business even if he mistakenly thought that he was entitled to do so as a matter of law.

25. In summary, Mr Randall submits that a mistaken belief does not generally excuse liability in tort. This applies a fortiori if the mistake is made unreasonably. Mr Randall submits that the judge accepted that the mistake in this case had been made unreasonably (see paragraphs 111, 112, 121 and 123 of his judgment). The mistaken belief was founded on the word of the very persons whom the judge found it was obvious to Mr De Winter were potentially acting in conflict of interest and whom Mr De Winter knew would only be able to proceed with the Findern project if he provided the finance.

26. Mr Randall further submits that, in any event, even if Mr De Winter had been correctly assured that there was no conflict of interest between Mr Young and Mr Broad and Mainstream, there would still have been breaches of their contracts with Mainstream. Mainstream had not given its consent: indeed, Mr De Winter never sought any assurance that Mainstream had given Mr Young and Mr Broad its consent. There were other breaches of obligation under the contracts of employment which pursuing the Findern venture would involve, particularly the obligation to apply the whole of their working time to the affairs of Mainstream. Mr Young and Mr Broad also used Mainstream's facilities to pursue their own business ventures with Mr De Winter. Homes had a separate office, but it had no separate employees. It was known to Mr De Winter that finding the Findern site involved many telephone calls from Mainstream's premises and one visit to Mr De Winter in London. These telephone calls and visits all took place in working time and therefore Mr De Winter ought to have known that the assurance was inadequate. Mr Young and Mr Broad subsequently compromised Mainstream's claim against them to compensate Mainstream for the loss resulting from their use of Mainstream's resources to develop the Rangemoor and Findern sites without the consent of Mainstream. Mr Randall points out that Mr De Winter never checked the position with Mr Moriarty or asked whether the position was satisfactory to Mr Moriarty: he relied solely on assurance from the wrongdoers.

27. Mr Randall submits that the practical effect of the judge's judgment was to allow an impermissible form of the defence of justification. As a matter of policy, the judge's conclusion relieving Mr De Winter from any liability to Mainstream is very harsh from Mainstream's point of view.

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

28. Mr Randall submits that recklessness may suffice to establish the tort. In this regard, he relies on Emerald Construction v Lowthian [1966] 1 WLR 691. Mr Randall submits that the judge made no express finding that Mr De Winter was not reckless in not asking further questions. He submits that there is no implied finding by the judge that Mr De Winter was not reckless in this way. However, if the court were contrary to his submission, he submits that if there is an implied finding that Mr De Winter was not reckless in asking further questions, this court should reverse that finding, because it consists of secondary fact.

The respondent's submissions

29. Mr Mark Lomas, for Mr De Winter, submits that the appellants must prove that Mr De Winter had the intention to bring about a breach of contract. Mr Lomas submits that this was an issue of fact.

30. Mr Lomas submits that there has to be a balance between knowledge and intention. The less detailed knowledge about the contract which the defendant has, the more evidence is needed on deliberate intention. In this case, on Mr Lomas's submission, the defendant did not have sufficient knowledge. This too was a question of fact for the trial court to decide.

31. Mr Lomas emphasises that the tort of inducing breach of contract is unique. It entails liability because of interference with a contract to which the defendant is not a party, and in respect of an act which is not unlawful. The only unlawfulness is the actual interference. This makes defendants to such claims the guardians of their competitors' interests. Therefore, the imposition of a requirement for intention is soundly based in policy.

32. Mr Lomas submits that there is no distinction as to the intent required for direct inducement and the intent required for indirect inducement of breach of contract. The rules are of general application. In this regard he relies on Thomson v Deakin, Greig v Insole and Stocznia v Latco.

33. In support of his submissions, Mr Lomas relies on Millar v Bassey [1994] EMLR 44. In that case, this court declined to strike out as disclosing no cause of action a statement of claim against Shirley Bassey, the well-known singer, and her agent. The plaintiffs were a record producer and musicians who had contracts with the second defendant to provide their services to Shirley Bassey for the purpose of recording an album. The claim against Shirley Bassey was for inducing breach of contract and that against her agent was for breach of contract. This court refused to strike out the claim against Shirley Bassey on the ground that the case was not suitable for summary disposal. This court therefore left to be tried the question whether it had to be shown that Miss Bassey intended to damage the plaintiffs or whether it was enough that she had acted deliberately and that she knew that the probable consequence of her acts was that the second defendant could not perform its contract with the plaintiffs. Beldam LJ held that it was unnecessary for the plaintiffs to assert that Miss Bassey had any specific intention to interfere with the plaintiffs' contracts with the second defendant. However, Peter Gibson LJ, in his dissenting judgment, held that the plaintiffs had to assert that Miss Bassey intended to interfere with the plaintiffs' contracts with the second defendant, not merely that such interference would result from her actions. The third member of this court, Ralph Gibson LJ, considered that the point about intention had not been clearly decided and for that reason the proceedings should not be struck out. Mr Lomas submits that the view expressed by Peter Gibson LJ correctly states the law.

34. As to Mr Randall's analogy with conversion, Mr Lomas rejects this and relies on OBG (Plant and Transport Hire) Ltd v Allan [2005] EWCA Civ 106. In that case, he submits, the majority firmly rejected an analogy with the tort of conversion. Accordingly, on Mr Lomas' submission, the requisite intention is actual intention.

35. As to mistake, Mr Lomas submits that the mistake was not a pure mistake of law but also involved facts. In any event, the distinction between mistake of law and mistake of fact is now otiose: see Kleinwort Benson v Lincoln City Council [1993] 2 AC 349, Brennan v Bolt Burdon [2004] 3 WLR 1321 and Pankhania v Hackney LBC [2002] EWHC 2441 (Ch D). Mr Lomas submits that the distinction between law and fact, even if it was at one time applicable, cannot now survive.

36. Mr Lomas submits that intention cannot be equated with what is reasonably foreseeable although matters which are reasonably foreseeable may be "evidential stepping stones". Mr Lomas submits that the test is not what a reasonable man ought to have known or intended.

37. As to the facts, Mr Lomas particularly relies on the facts found relating to the Rangemoor development. As to the Findern development, he submits that in layman's terms Mr De Winter had raised the right question. He relies on the meaning which Mr De Winter attributed to the defendants' assurance in relation to Rangemoor. It was enough that Mr De Winter was told that Mr Young and Mr Broad were free to undertake the Findern development. The background was that they had nothing to occupy them for Mainstream. In any event, Mr De Winter could assume that Mr Young and Mr Broad were part time employees of Mainstream. Mr De Winter recognised the potential for conflict. He received an answer, and the judge found that he relied on that answer. It is not open to the court to condemn Mr De Winter for not analysing the answer too precisely. Mr De Winter could have asked more searching questions. However, the judge believed him that he was satisfied with the assurance he got. Accordingly, that was enough. By inference, the judge found that Mr De Winter was not reckless in not making further enquiries.

Douglas v Hello Ltd ("Hello")

38. After the hearing of the appeal, this court (Lord Phillips MR, and Clarke and Neuberger LJJ) handed down its judgment in Douglas v Hello! Ltd [2005] EWCA Civ 595. In this case, the question arose whether on the facts as found by the trial judge the publisher of photographs (Hello) taken in breach of confidence was liable for the economic torts of conspiracy and interference with the economic or other interests between Mr Douglas and Miss Zeta-Jones ("the Douglases") and the magazine (OK! Magazine ("OK")) to whom the Douglases had sold the exclusive right to publish approved photographs of their wedding. I need not summarise any of this court's holdings on breach of confidence, save that this court concluded that Hello was not liable to OK for damages for breach of confidence ([122] to [137]). Paragraphs 152 to 236 of the judgment of the court, however, are concerned with OK's claim based on the economic torts of unlawful interference with business and conspiracy by unlawful means on the basis that the test of intention is the same in both torts. The argument of OK was that the publication by Hello of unauthorised photographs was an unlawful act.

39. This court conducted a panoramic overview of the case law on intention in all economic torts. At paragraph 159, this court noted that there were several contenders for intention to injure in the context of the tort of unlawful interference:

"a) an intention to cause economic harm to the claimant as an end in itself;

b) an intention to cause economic harm to the claimant because it is a necessary means of achieving some ulterior motive;

c) knowledge that the course of conduct undertaken will have the inevitable consequence of causing the claimant economic harm;

d) knowledge that the course of conduct will probably cause the claimant economic harm;

e) knowledge that the course of conduct undertaken may cause the claimant economic harm coupled with reckless indifference as to whether it does or not.

A course of conduct undertaken with an intention that satisfies test a) or b) can be said to be 'aimed', 'directed', or 'targeted' at the claimant. Causing the claimant economic harm will be a specific object of the conduct in question. A course of conduct which only satisfies test c) cannot of itself be said to be so aimed, directed or targeted, because the economic harm, although inevitable, will be no more than an incidental consequence, at least from the defendant's perspective. Nonetheless, the fact that the economic harm is inevitable (or even probable) may well be evidence to support a contention that test b), or even test a), is satisfied."

40. This court held that, on the judge's findings, intention within a) and b) above was not shown. The conduct of Hello was not targeted at OK and Hello had no specific intention to cause economic harm. Nor was intention within c) above shown on the judge's findings as the judge had found only that Hello knew that their conduct might cause economic harm to OK. However, the judge had found intention within e) above. OK's case was that knowledge within both d) and e) above was sufficient in law to satisfy the requirement of intention in the tort of economic interference with business.

41. In the course of its wide-ranging review of the case law, this court cited many of the authorities relied on in this case including Lonrho v Al Fayed. It also cited a number of cases not cited on the hearing of this appeal.

42. In Douglas v Hello, OK could not establish interference with their contractual rights. Nonetheless this court reviewed the authorities on the intention required for the purposes of that tort at [194] to [205]. This court considered South Wales Miners Federation v Glamorgan Coal Company [1905] AC 239, where the House of Lords held that malice was not required. It noted also the judgment of Evershed MR in Thomson v Deakin [1952] 1 Ch 646 recording that in that case it was conceded that the defendant to a claim for damages for inducing breach of contract must have acted with the intention of doing damage to the person damaged and that he must have succeeded in his efforts. Having considered these and other authorities the court concluded as follows, prior to the decision of this court in Millar v Bassey:-

"[199] Thus far, judicial statements in relation to intention are wholly consistent with those in relation to the tort of unlawful interference. There is no requirement of a predominant intention to harm the claimant, but such harm must none the less be an object of the defendant's conduct, albeit aimed at achieving an ulterior purpose. Dimbleby was such a case. The ultimate object was to harm the printers, but there was a deliberate intention to prevent Dimbleby from performing the contract in order to achieve this end."

43. This court then considered the decision of this court in Millar v Bassey and drew the following conclusion about that case:-

"[205] Since the decision in Millar v Bassey, it is the approach of Peter Gibson LJ, rather than that of Beldam LJ, that has found judicial favour. In Issac Oren v Red Box Toy Factory Ltd [1999] FSR 785, Jacob J considered the tort of interfering with contractual relations, which requires an intention to interfere, and expressly followed the approach of approach of Peter Gibson LG, saying at p 799 that the unlawful conduct must "in some real sense be 'aimed at' the contract." In OBG Ltd v Allen [2005] EWCA Civ 106, at paragraphs 43 and 82-3 respectively, Peter Gibson LJ himself (with whom Carnwath LJ agreed) and Mance LJ (who dissented in the result) adopted the approach of Peter Gibson LJ, in preference to that of Beldam LJ, in Millar v Bassey. Indeed, they expressed the view that Peter Gibson LJ's approach was that of the majority in Millar v Bassey."

44. Next this court considered the authorities on intention for the purposes of the tort of misfeasance in public office. This court considered the decision in Burgoin SA v Ministry of Agriculture [1986] 1 QB 716, which this court held was a case of intention within b) above. This court also considered the decision of the House of Lords in Three Rivers DC v Bank of England (No3) [2003] 2 AC 1. The House was unanimous that targeted malice would suffice, that is a deliberate intention to cause injury to the defendant or to a class of which the defendant was one. The majority also considered that other forms of intention would suffice, including knowledge that an abuse of power would probably cause injury to the claimant or to a class of which he was one and subjective reckless indifference as to whether such injury was caused or not.

45. This court drew together its conclusions on intention at [213] to [225]. It held:-

"[214] However, in all cases of alleged unlawful interference and unlawful means conspiracy where liability has been established, the necessary object or purpose of causing the claimant economic harm has not been made out unless the conduct can be shown to have been aimed or directed at the claimant. That seems to us to be the consistent theme in

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

the two Lonrho cases in the House of Lords.

[216] Cases on other economic torts appear to us to have approached the question of intention in the same way. For example, in the context of inducement, in the passage quoted above from Allen v Flood, Lord Watson referred to "the use of illegal means directed against a third party". In her book, at p 101, Hazel Carty traces the tort of unlawful interference back to the assertion of Lord Lindley in Quinn v Leathem at p 495, by reference to Lumley v Gye (1853) 2 E & B 216, that the underlying principle was "wrongful acts done intentionally to damage a particular individual and actually damaging him".

[217] The relevant conduct was as much directed at the claimant in the Kuwait Oil Tanker case as in all the others. Only by diverting income that should have gone to the claimants could the defendants have enriched themselves. In other words test b) was satisfied, because the very act of diverting the money to the defendants required and involved (as opposed to merely resulted in) diverting the money away from the claimant. Indeed, it may be said that the wrongful act of diverting the money from the claimant in a sense preceded the ulterior motive, namely the receipt of the money by the defendant. However, in some situations an unlawful act will have adverse financial consequences to third parties, which are foreseeable and foreseen, but which are not consequences that the defendant desires or has any interest in bringing about. The statement from Bourgoin cited in the Kuwait Oil Tanker case might suggest that foresight of consequences must always be equated with intention to cause them - i.e. that satisfying test c) will suffice to establish the necessary intention. However, as we have explained in a paragraph 208 above, looked at the context in which the statement was made, it does not carry that inference.

[218] The authorities that we have considered indicate that it is of the essence of the torts of unlawful means conspiracy and unlawful interference that the conduct that causes the harm is aimed or directed at the claimant, and that in such cases the courts have inferred that the requisite intention, that is the purpose or object of causing the claimant economic loss, is present. The one discordant voice is that of Woolf LJ in Lonrho v Fayed. He postulated that foresight by a defendant of harm to a plaintiff was sufficient to satisfy the mental element in the tort of unlawful interference even though there was no desire to bring about that consequence in order to achieve what he regarded as his ultimate end. If by this Woolf LJ meant that foresight of an incidental consequence of unlawful action sufficed to constitute the mental element of the tort, even though achieving that consequence was no part of the defendant's design, we consider that his statement was contrary to the weight of the authority that we have summarised.

[219] As to the cases on interference with contractual rights, Tony Weir in his published lectures on Economic Torts (1997) reacted strongly against the decision in Millar v Bassey. At p 19 he said this:

"Admittedly it was a striking-out action, but what nonsense that it should go to trial, that Miss Bassey should have to defend herself against five people she had never contracted with and did not aim to harm just because she changed her mind about making a recording. Must I perform my contract with you just because a third party may, to my knowledge, suffer if I don't? Suppose that I agree to buy goods from you knowing that if the sale goes through, your agent will received a hefty commission: am I liable to him for refusing to accept delivery? In such a case there is only one third party: in Millar v Bassey the defendant looked to be liable to a whole orchestra plus the electronic bank. Dear me! Privity come back! - almost all is forgiven. It is easy to see how wrong this decision is, and we shall see later how it came to be possible."

[220] Other commentators have expressed similar, although more moderate, views. We consider that the conclusions of Peter Gibson LJ are to be preferred to those of Beldam LJ. It is often the case that failure to perform one contract will lead to a series of consequent breaches of contracts to which the original contract breaker is not party. To render him liable for these breaches simply because they are consequences which he foresaw would be to undermine the doctrine of privity of contract.

[221] Professor Weir and most other writers, including Hazel Carty and Messrs Sales and Stilitz, are of the view that the gist of all the economic torts is the intentional infliction of economic harm. We consider that this is a fair and

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

satisfactory conclusion to draw from the authorities, difficult as some of these are to reconcile. Intention to inflict harm on a claimant is not the same as a wish to harm him. It is, however, very different from knowledge that economic harm will follow as a result of incidental consequences of conduct, when those consequences are not necessary steps in achieving the object of the conduct and are unsought.

[222] Three Rivers establishes that foresight of probable injury or subjective recklessness as to whether such injury is caused is the mental element required in relation to the consequences of abuse of power, if the cause of action of misfeasance in public office is to be made out. This is a developing tort, as is the tort of unlawful interference. Is there a case for equating the mental element in the two torts? The House of Lords did not so suggest in Three Rivers, and Clarke J, who sat at first instance in Three Rivers, did not consider that there was - see at [1996] 3 All ER 558 at p 583. We do not consider that there is. The gist of the tort of misfeasance in public office is the deliberate abuse of power. The mental element in the first form of the tort, namely targeted malice, bears strong echoes of the mental element required for unlawful interference, particularly in the early days of the development of that tort. The same is not true of the alternative requirements of foresight of consequences or subjective recklessness. These are not the gist of the tort; they are closer to control mechanisms limiting the liability that flows from the wrongful conduct.

[223] The gist of the tort of unlawful interference is the intentional infliction of economic harm. In other words, it must be shown that the object or purpose of the defendant is to inflict harm on the claimant, either as an end in itself, or as a means to another end. If foresight of probable consequences or subjective recklessness sufficed as the mental element of the tort, this would transform the nature of the tort. This, in effect, is what Mr Browne sought to persuade us to do when he advanced tests d) and e) as sufficient to satisfy the mental element in the tort of unlawful interference. Indeed, we take the view that satisfaction of test c) would not be sufficient to establish the requisite mental element. However, as mentioned in paragraph 159 above, establishing that the defendant knew that the claimant would suffer economic loss may well be evidence which can support a contention that test b) or even test a) is satisfied.

[224] It might be possible to envisage a case in which an intention satisfying test a) or b) could be established even though the unlawful act was not aimed, targeted or directed at the claimant. Equally it might be possible to envisage a case in which the relevant intention was not established, even though the unlawful conduct was in some way directed at the claimant. These are, however, unlikely scenarios and the decided cases do not provide an example of either. In principle we agree with Hazel Carty, and what she describes as 'most commentators', that it is necessary to prove targeted or directed harm. The essence of the tort is that the conduct is done with the object or purpose (but not necessarily the predominant object or purpose) of injuring the claimant or, which seems to us to be the same thing, that the conduct is in some sense aimed or directed at the claimant."

46. In the light of this court's decision in Douglas v Hello, we asked for further submissions, which the parties submitted in writing.

47. In his written submissions, Mr Randall submits that following Douglas v Hello, the mental element required in the various economic torts is as follows:-

| | |
|---|---|
| Conspiracy to injure by lawful means | predominant intention to injure |
| onspiracy to injure by unlawful means | predominant intention to injure not required the claimant must establish that the defendant's conduct was done with the object of injuring him |
| Intentional infliction of harm by unlawful means | the same intention as in conspiracy to injure by unlawful means |
| Interference with contractual relations | |
| Where the interference is direct, the | |

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

defendant must know of the relevant
contract and his conduct must be aimed or
directed to the claimant in the sense that it
has the necessary, or alternatively, the
natural and probable consequence that the
contract with the claimant will be broken.In
indirect unlawful interference, however, the
claimant must establish knowledge of the
relevant contract and that the defendant's
conduct was aimed or directed at the
claimant.

48. Mr Randall relies particularly on the distinction drawn by this court between intention to inflict harm and "knowledge that economic harm will follow as a result of incidental consequences of conduct, when those consequences are not necessary steps in achieving the object of the conduct and are unsought." (Douglas v Hello at [221]).

49. Mr Randall submits that where the relevant loss or detriment will necessarily or, alternatively, naturally and probably be suffered by a claimant as a result of the defendant's conduct there is a difference in the requirement as to intention. In these cases (of which he submits this case is one), it is inherently likely that the conduct in question will be sufficiently "aimed at" the claimant. Further, this court expressly recognised in Douglas v Hello that where the commission of the tort of conspiracy or the tort of intentional infliction of harm by unlawful means is aimed or directed at the claimant, "the courts have inferred that the requisite intention, that is the purpose of causing the claimant economic loss, is proven" (Douglas v Hello at [218]).

50. Mr Randall submits that the position is a fortiori in the case of interference with contractual relations by direct interference, where the directness of the interference is one of the elements of the tort. In addition, this recognition ties in closely with the principle that a man is to be treated as intended the reasonable consequences of his acts. This principle is applied in the context of unlawful interference with contractual relations by direct interference (see per Lord Simon LC in Crofter Handwoven Harris Tweed v Veitch [1942] AC 435, 444) and see also South Wales Miners Federation v Glamorgan Coal [1905] AC 239, 244 per Lord Halsbury LC, Greig v Insole and Millar v Bassey [1994] EMLR 44, 51 per Beldam LJ. In particular, Beldam LJ held :

"Nor [in] my view can a consequence be properly regarded as unintended or accidental if a deliberate action is taken knowing that it must inevitably bring about the consequence desired or not. In truth in such a case the actor intends to bring about both the undesired and the desired consequence, and is willing to bring about the one to achieve the other."

51. Mr Randall submits that this helps explain why it seemed to this court in Douglas v Hello that conduct in some sense aimed or directed at the claimant was the same thing as conduct done with the object or purpose of injuring the claimant. He here relies on passages in this court's judgment at [199] and [224].

52. Thus Mr Randall submits that it is clear from Douglas v Hello that the requisite intention will be inferred where the breach of contract necessarily results from achieving the object with which the defendant acted.

53. In the present case the injury to Mainstream deprived it of the opportunity of developing Findern and of the undivided loyalty of its directors, Mr Broad and Mr Young. This was a necessary consequence of Mr De Winter's conduct even on the basis of Mr De Winter's incorrect and mistaken belief that Findern had been offered to Mainstream but rejected. Mr De Winter knew of the employment contract in question and of the obligations of loyalty owed by Mr

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

Young and Mr Broad.

54. Mr Randall relies on this court's treatment in Douglas v Hello of Kuwait Oil Tanker v Al Bader, and also the decision of this court in Douglas v Hello, that an intention to cause economic harm to the claimant because it was a necessary means of achieving some ulterior motive was satisfied because the very act of diverting the money to the defendants required and involved as opposed to merely resulted in diverting money away from the claimant ([217]). (In addition he relies on the decision in Douglas v Hello that this type of intention would suffice ([223])). So too in this case the very act of acquiring the land at Findern deprived Mainstream of the chance of developing itself and the acquisition and funding of Mr Young and Mr Broad to work on the Findern development deprived Mainstream of the undivided loyalty of those fiduciaries. This can be contrasted with the facts of Douglas v Hello itself, where the trial judge (Lindsay J) found that the defendant's conduct would neither inevitably nor probably have caused economic harm to the claimant, OK! (see this court's judgment at [247]).

55. Mr Randall also relies on the following passage from Burgoin SA v Minister of Agriculture [1986] 1 QB 716 at 777 per Oliver LJ (with whom Parker and Nourse LJJ agreed), which was approved by this court at [193]:-

"if an act is done deliberately and with knowledge of the consequences I do not think that the actor can say that he did not "intend" the consequences or that that was not "aimed" at the person who, it is known, will suffer them."

56. So too here Mr Randall submits that Mr De Winter acted deliberately and with knowledge of the factual consequences, which involved a breach of the fiduciary duties of Mr Young and Mr Broad.

57. Mr Randall recognises that in Douglas v Hello this court disapproved obiter the decision of this court in Millar v Bassey. However, Mr Randall submits that under the doctrine of precedent this court has no power to decline to follow its own previous decisions save in circumstances which do not here apply. All that this court said was that that decision was "somewhat out of step" (Douglas v Hello at [200]). All the relevant authorities were considered in Millar v Bassey. The decision as to the intention required for indirect interference with contractual relations by unlawful means was not obiter. That Millar v Bassey was a decision on indirect interference with contractual relations by unlawful means is critically important in the consideration of the words of Peter Gibson LJ in the second passage set out at [203].

58. Thus Mr Randall submits on the facts of this case that the judge should have inferred from the primary facts found by him that Mr De Winter intended to cause the relevant injury to Mainstream and that the mere fact that he was mistaken in fact as to Mainstream's refusal of the development was as a matter of law insufficient to relieve him of liability because even if the mistaken belief of fact had been true, his actions were still facilitating or making a necessary contribution to breaches by the two fiduciaries of their contracts of employment. This conclusion is not undermined by any part of the judgment in Douglas v Hello.

59. Mr Randall submits that when this court in Douglas v Hello at [218] referred to conduct being aimed or directed at the claimant it was not there referring to the need for positive subjective intention but was referring to an intention which would be inferred where direct interference was a necessary result of the defendant's actions.

60. Mr Randall also submits that a sufficient degree of recklessness can suffice to justify a finding of the requisite intention. In this regard he relies particularly on the observations of this court in Douglas v Hello at [223]. Mr Randall notes that Emerald Construction v Lowthian was not cited in the decision of this court in Douglas v Hello.

61. Mr Lomas submits that the judgment of this court in Douglas v Hello actually confirms his line or argument. He relies on the conclusion of this court at [221] that "the gist of all the economic torts is the intentional infliction of economic harm." Mr Lomas submits that this conclusion is of general application to economic torts requiring proof of specific intent, including interference with contractual relations whether the interference is direct or indirect. He submits that the Douglas judgment rejects the argument relied on by the appellant that once knowledge is established it is only necessary to prove that there was a voluntary or deliberate act of interference or an act from which the interference would necessarily or naturally and probably flow. Mr Lomas submits that an objective test of intention is rejected as

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

insufficient. This court concluded that proof of actual intent on the part of the tortfeasor to damage the contractual rights of this claimant was required.

62. Mr Lomas submits that this court must necessarily have approved the judgment of Rix LJ in Stocznia v Latco, which was expressly followed by Peter Gibson LJ in OBG v Allan.

63. The essence of the judgment of Peter Gibson LJ in Millar v Bassey was that:-

"The conduct of the defendant [must] be aimed directly at the plaintiff, the contracting party who suffers the damage, in the sense that the defendant intends that the plaintiff's contract should be broken [and it is not] sufficient that the conduct should have the natural and probable consequence that the plaintiff's contract should be broken."

64. Mr Lomas submits that the Douglas case was much more extreme than the present case. The trial judge found that the defendant would or at least ought to have known of the contract and the sort of terms it included, in particular with regard to exclusivity (judgment, [13]). The trial judge also found that there was no intent to injure at all (judgment, [164] to [165]). That finding of fact was not disturbed on appeal.

65. Mr Lomas submits that the tests applied by the judge in this case at [117] to [123] are wholly vindicated and supported by the judgment of this court in Douglas v Hello. There is no basis for disturbing his finding.

66. As to recklessness, Mr Lomas submits that the effect of Douglas v Hello is that the possibility of breach coupled with reckless indifference is not a sufficient basis on which to find the economic torts proved. This is so even though the Emerald Construction case was not referred to in the judgment of the Court of Appeal. Emerald Construction was cited to the trial judge in this case.

67. As to Millar v Bassey, Mr Lomas submits that Peter Gibson LJ expressed the opposite view to that of Beldam LJ, and Ralph Gibson LJ expressed agreement in principle with Peter Gibson LJ, only differing from him to the extent of not accepting that the matter was clear enough for the claim to be struck out on the pleadings alone. This was the view taken also by Rix LJ in Stocznia v Latco where Rix LJ held that "In terms of principle, however, Ralph Gibson LJ and Peter Gibson LJ may be said to have been in or close to agreement." In addition, this court in Douglas v Hello at [204] held that "Ralph Gibson LJ inclined to the view expressed by Peter Gibson LJ, but concluded that the authorities were insufficiently clear to justify striking out the claim.

68. As to the facts, Mr Lomas points out that Mr De Winter did not escape being made liable simply because he mistakenly believed that the development had been offered to Mainstream and turned down. The judge made a finding that Mr De Winter had received an assurance that there was no conflict between the proposed venture and the duties of Mr Young and Mr Broad.

69. As to Mr Randall's submission that the mistaken belief of Mr De Winter was insufficient as a matter of law to avoid liability, Mr Lomas submits that the distinction between a mistake of fact and a mistake of law is no longer material. The fact that Mr De Winter made a mistake of law cannot be sufficient to fix him with liability for the tort of interference with contractual relations. On the basis of that case there has to be an actual, subjective intent in his mind aimed at interfering with the contractual relations.

Conclusions

70. The detailed survey of the case law placed before us by Mr Randall in his submissions as summarised above demonstrates that prior to the decision of this court in Douglas v Hello, the English courts had not analysed the conception of intention for the purposes of the tort of interference with contractual relations. The concept was analysed by the Court of Appeal of Alberta in the Pocklington case and no doubt there are other authorities in the common law world where such analysis took place. But it had not previously happened in an English case. Thus for example in Lonrho v Al Fayed, Dillon LJ (with whom the other members of the court agreed) held without further analysis that the

intention which had to be shown for the purposes of unlawful interference with business was that the unlawful act was either in some sense directed against the plaintiff or intended to harm the plaintiff. Similarly, in the leading case of Thomson v Deakin, Evershed MR went no further than to record without disapproval the concession made in that case that in the tort of wrongful interference with contractual relations the actor must have acted with the intention of doing damage to the person damaged (and must have succeeded in his efforts). In his classic statement of the tort of inducing breach of contract in the same case (which was approved by Lord Diplock in Merkur Island Corporation v Laughton [1983]2 AC 570), Jenkins LJ confirmed the need for an intention to procure a breach, but again did not analyse the concept of intention. Now, however, this court has in Douglas v Hello provided a list of the types of intention that might be sufficient (at [159]). It recognises that the list is not necessarily complete: indeed it does not for example include the situation where there is an intention to cause economic harm because that is a near-certain means of achieving some ulterior motive. The Law Commission referred to this type of intention in its draft Criminal Code (Report on Criminal Law: Legislating the Criminal Code:Offences aginst the Person and General Principles (Law Com No 218, pages 8 to 10), and the relevant provision was cited by Brooke LJ in Re A (Children)(Conjoined Twins : Surgical Separation) [2001] Fam 147, 215. Furthermore although this court in Douglas v Hello held that only intention within a) and b) of the types within [159] would suffice for the purposes of the economic torts, it recognised that there could be cases where intention was satisfied outside those categories ([224]). In other words, the categories of intention cannot be treated as absolutely finally closed.

71. Another great advance in the law made by Douglas v Hello was the holistic approach to intention in the various economic torts. There was a conscious attempt to rationalise so far as possible this area of law as a coherent jurisprudence. The court considered not just the intention in the specific tort with which they were concerned (interference with business), but also the tort of interference with contractual rights, conspiracy and misfeasance in public office. This court held that there were policy considerations which would justify a different approach to recklessness in the case of the last tort, (misfeasance in public office), which is still being developed ([222]). Of course it can be said that what this court held about intention in these torts was obiter in the light of its conclusion that the findings of fact justified only type e) intention. However, the matter was fully argued and the court set out its conclusions on the other types of intention in economic torts generally. I for my part would be loathe to differ from such a recent and comprehensive judgment of another constitution of this court. I must express my debt to the court in that case for its penetrating analysis.

72. In any event, the conclusion that this court reached on intention in Douglas v Hello is the conclusion which I would have preferred in any event. As this court pointed out, the need for a specific subjective intention is supported by the authorities, other than the judgment of Woolf LJ in Lonrho v Al Fayed, and the judgment of Beldam LJ in Millar v Bassey. With the qualification that there may be other types of intention similar to those formulated in a) and b) of [159] of this court's judgment in Douglas v Hello, the conclusion of this court in Douglas v Hello respecting the intention required for the purposes of the tort with which we are concerned represents also my preferred solution. Although this court in Douglas v Hello did not refer to the policy behind their conclusions, beyond referring to the reluctance of the law to award damages for purely economic loss ([213]) and to the undermining of the doctrine of privity ([219]to[220]), the court's conclusion is strongly supported by the analysis of the policy question in the judgment of Peter Gibson LJ in Miller v Bassey at 64:

"There are strong policy reasons why the law should restrict the ambit of the tort in this way. The tort gives the plaintiff a right of action in respect of a failure to comply with the terms of a contract against a person who is not a party to the contract. This is inconsistent with contractual principles, in particular in breaching the privity rule (see Cane: Tort Law and Economic Interests (1991) pages 122-5). As Hobhouse J said in Rickless v United Artists Corp. [1986] FSR 502 at page 524 of the tort of wrongful interference with contractual relations:

Unless the tort is to become virtually equivalent to the enforcement of contracts against third parties, it must remain an essential element of the tort that the interference occurs with the requisite actual intent [sc. To cause a breach of the plaintiff's contract]."

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

Further, without the limiting of the scope of the tort by the requirement of actual intention, freedom of action would be unduly restricted by liability for incidental consequences (see Fleming: The Law of Torts 7th edn (1987) 656). Interference with contracts may flow from competition and is the normal and expected consequence of industrial action. It would not be right for the law to discourage competition by encouraging actions by unsuccessful competitors or to allow tort actions by those who suffer only incidentally form another person's activities."

73. I respectfully agree with that reasoning. Likewise in Stocznia v Latco, Rix LJ dealt with the parties' submissions as to the policy reasons for the various requirements of the tort of inducing breach of contract and he concludes at [131]

"These considerations are designed to keep a wide ranging tort within bounds. It is therefore important that they are not applied mechanically and that regard is had to the balancing demands of moral constraint and economic freedom. For these purposes the concepts of knowledge and intention, direct participation, the causative relevance of unlawful means, and the possibilities of justification, are presumably sufficiently flexible to enable the principles of the tort to produce the right result. Where in specific areas policy makes its own specific demands, statute law is present to lend a hand"

74. I also agree with that conclusion.

75. Mr Randall submits that the imposition of a requirement of specific intention is unfair to the party harmed by the interference with contractual rights, namely Mainstream in this case. I accept that the law recognises a strong policy reason for imposing deterrent rules on fiduciaries, such as company directors (see for example Regal Hastings, Limited v Gulliver [1967] 2 AC 134). I would also accept that it can be argued that the wider the liability for interference with contractual relations the more likely it is that contracts would be performed, a value which the common law recognises. Incentives to perform contracts reduce transaction costs and promote economic efficiency. However, although the tort of interference with contractual relations is frequently invoked in relation to fiduciaries (and indeed in relation to employees), it applies to many other sorts of contracts as well. Moreover, as Lord Macnaghten said in Trego v Hunt [1896]AC 7:

"The common law has always been jealous of any interference with trade."

76. I consider that Peter Gibson LJ was right in saying that the imposition of greater liability on third parties for interference with contractual rights would carry with it the undesired effect, or at least the risk, of inhibiting competition and entrepreneurialism.

77. This case raises a question of law very similar to that which would have arisen if Millar v Bassey had gone to trial and the pleaded case had been proved. All that has been found is that Mr De Winter knew that Mr Young and Mr Broad were executive directors of Mainstream. He knew that his funding of the Findern site would prevent Mainstream from developing the site itself but he did not consider that there was any conflict of interest because of the assurance he had been given. Just as in Millar v Bassey no specific intention to harm the other contracting party was pleaded, so here no specific intention to cause harm was shown.

78. Mr Randall submits that, although this court in Douglas v Hello expressed the view that the conclusions of Peter Gibson LJ are to be preferred to those of Beldam LJ, it was not open to this court to do other than follow the decision of the majority in that case. For my part I would reject that submission. In my judgment Mr Lomas is correct in his analysis of the decision. Ralph Gibson LJ came to the same conclusion as Beldam LJ because he did not consider that the law was so clear that the case against Ms Bassey should be struck out as disclosing no cause of action. However he did not express his agreement with the law as set out in the judgment of Beldam LJ and accordingly the conclusions of Beldam LJ on the intention required for the tort of interference with contractual rights does not form part of the ratio in Millar v Bassey. It was therefore open to this court in Douglas v Hello to hold that the conclusions of Peter Gibson LJ are to be preferred. Although that holding was obiter, in my judgment, I should follow it for the reasons given above and for the reasons given by this court in Douglas v Hello.

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

79. Does that mean that recklessness will not suffice? This court in Douglas v Hello took the view that recklessness would not suffice save in relation to misfeasance in public office ([222] to [223]). Mr Randall submits that Emerald Construction v Lowthian (which was not referred to in the judgment in Douglas v Hello) decided in a manner binding on this court that recklessness would suffice. In that case, the question at issue was whether the court should grant an interlocutory injunction over until trial against an employer alleged to be interfering with the contractual rights of a subcontractor. Only two members of the court, Lord Denning MR and Diplock LJ, dealt expressly with the intention that had to be shown. The third member of the court, Russell LJ, held that the injunction should be granted for other reasons. As to intention, Lord Denning MR clearly thought that recklessness would suffice (701A). Lord Diplock, however, treated recklessness as a factor from which the court could infer that the intention of the defendant was to interfere with contractual rights (704A-D). In those circumstances I do not consider that there is any decision binding on this court that recklessness alone will suffice for this tort. For the reasons given above, and consistently with this court's judgment in Douglas v Hello, I hold that the tort of interference with contractual rights is not satisfied by showing that the defendant was reckless as to whether his conduct interfered with the claimant's contractual rights or not.

80. In any event in this case, I do not consider that the judge found even by implication that Mr De Winter was reckless as to whether the participation of Mr Young and Mr Broad in the Findern project would involve a breach of their duties to Mainstream. In my judgment there is no finding on recklessness, and it is not open to this court to make such a finding on its limited knowledge of the evidence in this case.

81. Mr Randall submits that there is a distinction to be drawn between direct and indirect interference with contractual rights, and that the requirement for an intention to cause economic harm or to achieve some other end necessarily involving economic harm to the claimant (types a) and b) intention as per [159] of this court's judgment in Douglas v Hello) does not apply to indirect interference with contractual rights. Direct interference occurs where the alleged wrongdoer persuades the other contracting party to break the contract. Indirect interference occurs where the alleged wrongdoer does some act which makes it impossible for a party to perform his contract. The argument is that direct interference is inevitably aimed at the defendant and therefore it is not necessary to show that the conduct is aimed or directed at the claimant. It simply has to be shown that the interference is the necessary or, alternatively, the natural and probable result of his act. I do not see that any distinction of this kind can be made. If it is necessary for specific intention to cause harm to the claimant to be shown in the case of indirect inducement, on what basis can it be said that it does not have to be shown in relation to direct inducement?

82. Mr Randall relies on the principle which obtains in some branches of the law that a person is presumed to intend the reasonable consequences of his acts. (see for example Crofter Handwoven Harris Tweed v Veitch [1942] AC 435 at 444 per Lord Simon LC and Greig v Insole [1978] 1 WLR 302 at 338A).With the exception of the judgment of Beldam LJ in Millar v Bassey, I do not consider that the authorities cited by Mr Randall bind us to hold that that principle applies where the question is whether the defendant had the intention necessary for the purposes of the tort of interference with contractual relations. I conclude therefore that this principle does not assist in the resolution of the present case. In the context of the tort of interference with contractual relations, it is not enough to show that the action of the alleged wrongdoer was deliberate in the sense that it was not accidental but was a voluntary action of his.

83. Mr Randall also argues that type b) intention is satisfied in this case because the funding of the Findern project would necessarily deprive Mainstream of the possibility of developing itself. In my judgment type b) intention entails that the alleged wrongdoer has knowledge of the harm that will inevitably be caused to the claimant as a result of his achieving his objective. The importance of knowledge of facts of this nature is illustrated by the decision of the House of Lords in British Industrial Plastics v Ferguson [1940] 1 All ER 479. The ex-employee of the plaintiffs in that case approached the defendants with some trade secrets. The defendants knew that they were trade secrets belonging to the plaintiffs but "illogically and muddle-headedly" considered that they would be entitled to use them if they were patentable. They were mistaken in this view, but, because of their lack of knowledge that what they proposed should be done would involve a breach of the obligations owed by the ex-employee to his employer, they were not liable for the tort of inducing breach of contract. It did not matter that their view was wholly unreasonable in this regard.

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

84. The opposite side of the coin to knowledge is ignorance. Mr Randall relies on the proposition that ignorance of the law is no defence. This is a point which did not arise in Douglas v Hello, and therefore falls to be decided by this court. It was undoubtedly held in Greig v Insole by Slade J and by Goff LJ in Pritchard v Briggs that if a person knows the facts which make the conduct tortious, a mistake as to the legal consequences flowing from those facts is no defence. Stephenson LJ would have agreed with Goff LJ but in his judgment and that of the third member of the court, Templeman LJ, the question of conspiracy did not arise. The holding of Goff LJ is therefore not binding on this court. In my judgment, it is difficult to reconcile these decisions with British Industrial Plastics v Ferguson: they can only be so reconciled on the basis that public policy demands an exception to be made as to the knowledge required for the tort to be committed in the case of mistake of law. Since Pritchard v Briggs and Greig v Insole were decided, the law on mistake has moved on. Originally at common law there was no relief where a party acted under a mistake of law. However, in Kleinwort Benson v Lincoln City Council [1999] 2 AC 349 the House of Lords decided, with respect to the rule precluding the recovery of money paid under a mistake of law, that the distinction between money paid under a mistake of fact and mistake of law could no longer be maintained. The House held that the law must be allowed to develop appropriate defences to provide protection to recipients of money paid under a mistake of law in those cases where justice or policy did not require them to refund the money. Following this decision, this court held in Brennan v Bolt Burdon (Sedley and Maurice Kay LJJ and Bodey J) that a common mistake was now capable of vitiating an agreement even if it was one of law, rather than fact. Maurice Kay LJ said that the effect of the decision in the Kleinwort Benson case "now permeates the law of contract" (at [10]). Likewise in Pankhania v Hackney LBC, Rex Tedd QC sitting as a deputy judge of the Chancery Division held that a claim lay for a misrepresentation of law, rather than fact, so that in this case too ignorance as to the law was no bar to the claimant's claim.

85. In the light of these developments in the law, this court must ask whether the policy behind the tort of interference with contractual relations would be furthered if a defendant to a claim based on this tort were to be prevented from relying on a mistake he made on the law to explain why he took the action he did. In my judgment there is nothing in the policy of this tort that requires this bar. It is clearly important that the law should provide proper incentives to parties to familiarise themselves with the law, but if the bar under consideration does not now apply to the recovery of money paid under a mistake, it is difficult to see why it should apply to the economic tort of interference with contractual relations.

86. Mr Randall also relied on the Solihull case, but in my judgment this takes the matter no further since the decision is at first instance and precedes that in the Kleinwort Benson case. Moreover it was only an interlocutory decision. The Scandex case is likewise of no assistance since it turns on the construction of the statutory offence in question.

Disposition

87. For the reasons given above, the judge in this case did not in my judgment misdirect himself as to the law. Accordingly, I would dismiss this appeal.

**JUDGMENTBY-2:** MR JUSTICE AIKENS

**JUDGMENT-2:**

MR JUSTICE AIKENS:

88. I agree that this appeal must be dismissed for the reasons given by Lady Justice Arden .

**JUDGMENTBY-3:** LORD JUSTICE SEDLEY

**JUDGMENT-3:**

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)

LORD JUSTICE SEDLEY:

89. I agree, for the reasons given by Lady Justice Arden, that this appeal should be dismissed.

90. I do so with misgivings. Mr De Winter's conduct was not exactly creditable. The enquiries he made ("inquiries" would be too strong a word) were eminently unlikely to reveal what he must have suspected was the case: that Messrs Young and Broad were moonlighting at Mr Moriarty's expense. He secured the reassurance he required from a source which was pretty much guaranteed to provide it.

91. Another judge might have found that Mr De Winter was putting a telescope to a blind eye. But Judge Norris's measured findings are entitled to respect in this court. Given the present law on knowing inducement of breach of contract, I accept that they exonerate Mr De Winter from liability. It would not take a major shift in the boundaries at present delineated by authority to alter this, but this court is no position to do more than has been so clearly and comprehensively done by Lady Justice Arden in assembling, explaining and applying the extant authorities.

92. I would, however, wish to add a note of caution about her remarks in paragraph 75 about the economic implications of a shift in the boundary of intent. Law has an ineluctable relationship to economics, and judges since Coke's day have been prepared to base their reasoning on economic policy considerations - for example in relation to monopolies and restraint of trade, or in a later period market crimes: see generally P.S.Atiyah The Rise and Fall of Freedom of Contract. But the trade union cases which form part of the modern line of authority on inducement of breach of contract may serve as a warning that economic theories are not neutral: they are not infrequently ideologically charged, and they are heavily divergent.

93. Legal theory - as the modern law and economics movement has not always acknowledged - needs to understand and declare what version of economics it is espousing before it reconfigures or adapts its doctrines to economic ends. Anything that makes it easier to interfere with other people's contracts might be thought to promote competition but to disrupt commerce, and I would not think it the common law's business to favour one of these over the other. The common law's business is the maintenance of fair dealing within whatever framework legislation has created, and that, as this case illustrates, is quite difficult enough.

**SOLICITORS:**

Smith Partnership; Leigh Davis & Co

[2005] EWCA Civ 861, [2005] All ER (D) 148 (Jul), (Approved judgment)