Tab 9

**Westlaw.**

Not Reported in F.Supp. Page 1

Not Reported in F.Supp., 1998 WL 269065 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

<span style="font-family:serif">H</span>
Prudential Ins. Co. of America v. Barone
W.D.N.Y.,1998.
Only the Westlaw citation is currently available.
  United States District Court, W.D. New York.
  The PRUDENTIAL INSURANCE COMPANY OF
         AMERICA, Plaintiff,
               v.
       Paul S. BARONE, Defendant.
         No. 98-CV-0272E(SC).

             May 19, 1998.

Paul I. Perlman, c/o Hodgson, Russ, Andrews, Woods & Goodyear, Buffalo, NY, Nathaniel H. Akerman, and Joyce J. Sun, c/o Seyfarth, Shaw, Fairweather & Geraldson, New York City, for the plaintiff.
James I. Myers, c/o Renaldo, Myers & Palumbo, Williamsville, NY, for the defendant.

         MEMORANDUM and ORDER
ELFVIN, J.
*1 Plaintiff The Prudential Insurance Company of America ("Prudential") commenced this action by filing on April 21, 1998 a Complaint wherein it asserts claims for breach of a fiduciary duty of loyalty, breach of contract, misappropriation of trade secrets, unfair competition, tortious interference with contract and conversion. According to the Amended Complaint served and filed May 14, 1998, defendant Barone was formerly employed by Prudential as an insurance salesperson. He resigned August 22, 1997 and he has since solicited certain Prudential customers and replaced certain insurance policies that had been issued by Prudential with policies from companies with which Barone is now affiliated. He is also alleged to have in his possession several client files that contain proprietary information belonging to Prudential. Contemporaneously with filing the Complaint, Prudential filed a Motion for a Temporary Restraining Order and a Preliminary Injunction. On May 1, 1998 this Court issued a Temporary Restraining Order ("TRO") directing Barone to refrain from soliciting any of Prudential's customers, from causing or inducing the termination of any Prudential policies and from disclosing any proprietary information belonging to Prudential to any third party. The TRO would have expired by its own terms May 11th but was extended by stipulation until May 13th, when a hearing on Prudential's application for a preliminary injunction-which is presently before this Court-was held. At such hearing, the undersigned extended the TRO to May 21, 1998 or until a decision was made with respect to the instant matter. For the reasons set forth below, that application will be granted in its entirety and Barone will be enjoined from engaging in those practices proscribed by the TRO and will be directed to return certain proprietary information to Prudential.

The following facts are undisputed. On December 20, 1993 Barone, then employed by Prudential as an insurance salesperson, executed an agreement ("the Agreement") with Prudential which contained the following pertinent clauses:
"That all books, records, documents and supplies, and all contractholder or product information of any kind whether furnished by [Prudential] or obtained or prepared by me while employed by [Prudential] shall be deemed exclusively [Prudential's] property; and upon termination of this Agreement by either party, I will promptly deliver all such property, including all copies thereof to a proper representative of [Prudential].


"That for a period of two years from the termination date of this Agreement, I shall not directly or indirectly:
(1) Solicit, cause or induce any contractholder of [Prudential] or its subsidiaries who became known to me during my employment with [Prudential] to purchase services or products which compete,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.          Page 2
Not Reported in F.Supp., 1998 WL 269065 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

directly or indirectly, with those sold by [Prudential] or its subsidiaries.

(2) Do anything to cause, persuade or encourage anyone to reduce, discontinue, or terminate any [Prudential] or subsidiary policy, contract, service, or product of any kind." Agreement, §§ 6(a), 14 (attached as Exhibit A to Affidavit of Patricia Finnegan sworn to April 15, 1998 ("Finnegan Affidavit")).

*2 Barone submitted a letter of resignation to Prudential on or about August 8, 1997, which resignation was effective August 22, 1997. Affidavit of Paul S. Barone sworn to May 8, 1998 (" Barone Affidavit"), ¶ 7. He thereafter sent a letter dated August 22, 1997 to certain Prudential customers on the letterhead of The Mutual of New York Life Insurance Company ("MONY") wherein he (1) announced the commencement of his employment as an "insurance specialist" with such company, (2) generally described the insurance products that MONY offers and (3) stated, in part: " I am pleased to announce that my address and telephone number you are already accustom [sic] to will remain the same. Should you require help now, please feel free to call me directly ***. Otherwise, I look forward to working with you in the future." Letter from Barone to Daniel J. Stahl (attached as Exhibit C to Finnegan Affidavit); Barone Affidavit, ¶ 11. Another, undated letter signed by Barone and thereafter sent to Prudential customers announced his affiliation with another company, EMS Group Insurance, Inc. ("EMS"). See Unaddressed Letter from Barone (attached as Exhibit D to Finnegan Affidavit); Barone Affidavit, ¶ 11.

On August 25, 1997 Prudential Regional Vice-President Martin H. Duff sent a letter to Barone wherein he demanded the return to Prudential of all client files and other proprietary information in his possession. Barone thereafter returned only 17 client files. Prudential's records indicate that Barone had sold 63 life insurance policies to new clients in 1996 and 1997 and that he has not returned any files for the vast majority of such new clients. Finnegan Affidavit, ¶¶ 18-19. Notably, Barone has not denied that he has such files and/or other proprietary information belonging to Prudential.

Since Barone left Prudential, he has replaced at least nine policies that had been issued by Prudential with policies from MONY and/or EMS. See Finnegan Affidavit, ¶ 28; Letters from MONY to Prudential (attached as Exhibits G, H, I and J to Finnegan Affidavit) (indicating the replacement of four Prudential life insurance policies with policies issued by MONY); Barone Affidavit, ¶¶ 15-24. Barone indicates that he intends to sell insurance policies to three other Prudential customers because, he asserts, such will be in their "best interest." Barone Affidavit, ¶¶ 25-28.

"In order to obtain a preliminary injunction, a party must demonstrate: 1) that it is subject to irreparable harm; and 2) either a) that it will likely succeed on the merits [of its claims] or b) that there are sufficiently serious questions going to the merits of the case to make them a fair ground for litigation, and that a balancing of the hardships tips 'decidedly ' in favor of the moving party." *Genesee Brewing Co., Inc. v. Stroh Brewing Co.,* 124 F.3d 137, 142 (2d Cir.1997); *see also Warner-Lambert Co. v. Northside Development Corp.,* 86 F.3d 3, 6 (2d Cir.1996). This Court finds that Prudential has alleged and has sufficiently demonstrated that Barone possesses confidential, proprietary information belonging to it and that he has solicited its customers, replaced its policies and intends to continue to do so in the future, absent a grant of injunctive relief, in violation of the Agreement. Such conduct threatens to diminish Prudential's goodwill and to devalue its trade secrets. Such harms are irreparable. *See, e.g., Ecolab Inc. v. Paolo,* 753 F.Supp. 1100, 1110 (E.D.N.Y.1991) (holding that the loss of goodwill and the loss of customers through the improper use of confidential customer information are not monetarily compensable); *Telerate Systems, Inc. v. Caro,* 689 F.Supp. 221, 233-234 (S.D.N.Y.1988) (enjoining the misuse of proprietary information); *Churchill Communications Corp. v. Demyanovich,* 668 F.Supp. 207, 214 (N.D.N.Y.1987) (enjoining the solicitation of the plaintiff's customers through the use of its proprietary information); *Ecolab, Inc. v. K.P. Laundry Machinery, Inc.,* 656 F.Supp. 894, 899-900 (S.D.N.Y.1987) (finding an injunction necessary to enforce a covenant not to compete). Furthermore, at this early stage of this case,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 3
Not Reported in F.Supp., 1998 WL 269065 (W.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Prudential has provided significant evidence that it is likely to succeed on the merits of its claims. Indeed, Barone's own affidavit tends to support such a finding.

*3 In opposition to the instant motion, Barone argues, *inter alia*, that this Court lacks subject-matter jurisdiction over this case and that the restrictive covenants contained in the Agreement are unenforceable under New York law. The former argument is based upon an asserted deficiency in the basis for the exercise of jurisdiction that was alleged in the Complaint. However, a consideration of the merits of that argument has been rendered unnecessary by the filing of the Amended Complaint, which newly and sufficiently alleges that the parties are of diverse citizenship and that jurisdiction is properly exercised pursuant to 28 U.S.C. § 1332. With respect to the latter argument, while "[i]t is well established that restrictive covenants that tend to prevent an employee from pursuing a similar vocation upon termination or retirement from employment are disfavored by the law," *Briskin v. All Seasons Services, Inc.*, 206 A.D.2d 906, 615 N.Y.S.2d 166, 167 (4th Dept.1994), this Court is unpersuaded that the non-competition clauses contained in the Agreement are unreasonable in any respect. That argument must be rejected. Barone's remaining arguments having been considered, this Court finds them to be without merit.

Based upon the foregoing, a preliminary injunction will issue restraining Barone from soliciting Prudential customers that became known to him during his employment at Prudential, from replacing Prudential policies and from disclosing any proprietary information belonging to Prudential to any third parties and directing Barone to return to Prudential all files and records in his possession that belong to Prudential, except those files and records that are encompassed in an Order dated April 30, 1997 and entered in the United States District Court for the District of New Jersey that concerns particular Prudential files and records.FN1

  FN1. Such Order arises out of a class action lawsuit that is ongoing in such Court and directs that all former employees of Prudential shall provide to a certain Special Master all files and records pertaining to permanent whole life insurance policies issued by Prudential or its subsidiaries between January 1, 1982 and December 31, 1995.

Barone not having demonstrated that he is likely to suffer any harm absent the posting of a bond by Prudential pursuant to Rule 65(c) of the Federal Rules of Civil Procedure, Prudential will not be required to post such. *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir.1996).

Accordingly, it is hereby **ORDERED** that the plaintiff's motion filed April 21, 1998, insofar as it seeks a preliminary injunction, is granted, that Paul S. Barone shall not, directly or indirectly, solicit, cause or induce any Prudential customers who became known to him during his employment by Prudential to purchase products which compete with Prudential's products, that Barone shall not, directly or indirectly, do anything to cause, persuade or encourage any Prudential customers to reduce, discontinue or terminate their Prudential policies or other products, that Barone shall not disclose or transfer to any third party any information, documents, records or other materials or property within his possession or under his control which belong to Prudential and/or relate to Prudential customers and that Barone shall return to Prudential on or before May 31, 1998 all Prudential documents, records or property of any kind or nature whatsoever which are within his possession or under his control (including copies thereof and computer records) and which are not encompassed in the Order of United States District Judge Alfred M. Wolin of the District of New Jersey dated April 30, 1997.

W.D.N.Y.,1998.
Prudential Ins. Co. of America v. Barone
Not Reported in F.Supp., 1998 WL 269065 (W.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab 10

Westlaw.

Not Reported in F.Supp.2d                                                                                                  Page 1
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

C
Sovereign Business Forms, Inc. v. Stenrite Industries, Inc.
S.D.N.Y.,2000.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
SOVEREIGN BUSINESS FORMS, INC., a corporation of the State of Delaware, and American Stenrite, Inc., a corporation of the State of New Jersey, Plaintiffs,
v.
STENRITE INDUSTRIES, INC., a corporation of the State of New York, Alfred R. Basso, and McKillip Industries, Inc., a corporation of the State of Illinois, d/b/a USA/Docufinish, d/b/a United Stencil and Affixing Co., Inc., Defendants.
No. 00 CIV. 3867 BDP.

Nov. 28, 2000.

William S. Gyves, Esq., Entwistle & Cappucci LLP, New York.
Ira Michael Shepard, Esq., Schmeltzer Aptaker & Shepard, The Watergate, Washington, D.C., for Plaintiff.
John W. Dean, Esq., Elizabeth T. Nicolato, Esq., Dean & Schnauer, White Plains, for Defendants Stenrite Industries and Alfred R. Basso.
Donald M. Bernstein, Esq., Victor & Bernstein, New York, for Defendants U.S.A Docufinish and Robert A. Stanley.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
PARKER, D.J.
*1 Plaintiffs commenced this diversity action on May 23, 2000 alleging violations of non-competition, non-solicitation and non-disclosure covenants by defendants Alfred R. Basso ("Basso") and Stenrite Industries, Inc. ("Stenrite Industries"). The alleged violations arise from certain agreements entered into as part of Sovereign Business Forms' ("Sovereign") purchase of American Stenrite, Inc.[FN1] Plaintiffs also contend that defendant McKillip Industries, Inc., d/b/a USA/Docufinish, ("Docufinish") tortiously interfered with Basso's contractual obligations and with plaintiffs' customer relationships. In addition, plaintiffs claim, *inter alia,* that defendants misappropriated trade secrets, engaged in unfair competition and conducted deceptive business practices under state common and statutory law.

FN1. As discussed in more detail below, Sovereign purchased the two predecessor companies which now make up American Stenrite-American Stenrite, Inc. and American Stencil East, Inc.-from Basso and two of his former partners.

The application for a preliminary injunction was combined with the trial on the merits. *See* Fed.R.Civ.P. 65(a)(2). This matter was tried to the Court from October 31, 2000 through November 2, 2000, and on November 15, 2000. Closing arguments were heard on November 22, 2000. The Court's Findings of Fact and Conclusions of Law follow.

FINDINGS OF FACT

*The Parties*

1. Sovereign is a Delaware corporation with its principle place of business in Houston, Texas and wholly-owns seven subsidiaries, including American Stenrite. Through its subsidiaries, Sovereign currently manufactures business forms and labels, and provides affixing services for sale and distribution on a nationwide, wholesale basis.

2. American Stenrite is in the business of selling labels and stencils and provides affixing services at wholesale.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 2
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

3. Stenrite Industries is a New York corporation with its principle place of business in Elmsford, New York. Basso, one of the three prior owners of American Stenrite, is its sole shareholder, officer and director.

4. Docufinish is an Illinois corporation with its principal place of business in Plainfield, Illinois and with facilities located in various other cities. Docufinish is in the business of manufacture and wholesale distribution of labels, stencils and cards, and provides affixing services. The president of Docufinish is Stephen McKillip ("McKillip").

*The Sale of American Stenrite*

5. In the spring of 1998, Sovereign entered into negotiations with Basso, Robert J. Stanley and Michael S. McClain ("McClain"; together, the "Sellers") to acquire American Stenrite and American Stencil East, Inc. (together, "American Stenrite"), which were then in the business of manufacturing and selling business forms, labels and affixing services to wholesale and retail (or end-user) customers.

6. The negotiations resulted in a Stock Purchase Agreement ("SPA"), dated October 6, 1998, whereby Sovereign agreed to purchase the outstanding stock of American Stenrite from the Sellers for $1,290,718 plus the assumption by Sovereign of approximately $958,000 in outstanding liabilities. The Sellers received $360,718 in cash, $480,000 in promissory notes providing for quarterly payments with interest to Sellers until 2003, and $300,000 in cash for the execution of the non-competition provisions of the SPA. The effective date of the acquisition was September 1, 1998.

*2 7. § 4.5 of the SPA, states, in relevant part:
Each of the [Sellers] hereby severally covenants and agrees that he will not, directly or indirectly, ... for a period of five (5) years ...
(a) Engage in the business of manufacturing or sale on a wholesale basis of business forms or labels (the "Restrictive Business");
(b) Canvas, solicit, accept or perform the Restrictive Business for any former or current customers of [American Stenrite];
(c) Request or advise any customer of [American Stenrite] or [Sovereign] to withdraw, curtail or cancel any of its business with [American Stenrite] or [Sovereign];
(d) Assist any person in soliciting any customer of [American Stenrite] or [Sovereign] for the Performance of the Restrictive Business;
...
(f) Disclose or communicate ... the names of any customers of [American Stenrite] or [Sovereign] or other knowledge of the operations and business of [American Stenrite] or [Sovereign];
...
(h) Knowingly or willfully do or perform any act that is designed or intended to materially and adversely affect the good will or operation and business of [American Stenrite] or [Sovereign] as it relates to the manufacture or sale of business forms or labels;

8. § 4.10 of the SPA states, in relevant part:
In the event any Seller violates any of the covenants set out in Section 4.5 ... [Sovereign and American Stenrite] shall suffer irreparable damage and shall be entitled to full injunctive relief or such other relief against such Seller as may be provided by law or in equity .... [Sovereign and American Stenrite] shall be entitled as a matter of right to specific performance of the requirements of Section 4.5 ... or to temporary or permanent injunctive relief against any breach of any provision of Section 4.5 ..."

9. Because Sovereign and its subsidiaries make sales solely on a wholesale basis to distributors in the business forms and labels industry, Sovereign assigned American Stenrite's retail sales business to Basso and only continued American Stenrite's business in the manufacture and sale of business forms and labels to distributors on a wholesale basis.

10. Under the October 18, 1998 Employment Agreement, McClain was hired as Vice President and General Manager of American Stenrite. He was to operate American Stenrite in a manner consistent

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                        Page 3
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

with its past operations.

*Stenrite Industries*

11. During the negotiations of the SPA, Basso informed Sovereign that he would continue to sell business forms and labels after the sale of American Stenrite. Consequently, Basso and Sovereign entered into an agreement on October 6, 1998, ancillary to and specifically referenced in the SPA (the "Basso Agreement").

12. Under the Basso Agreement, Basso was assigned a list of American Stenrite's retail customers in exchange for agreeing that for three years, he would purchase all of the required business forms and labels from Sovereign, so long as such forms and labels were sold to Basso at wholesale prices and could be delivered on the dates required. In addition, Basso assumed the lease for the office in Elmsford, New York, assumed all the obligations of American Stenrite relating to the employment of his assistant, Debra Nass, and was permitted to retain the phone number, toll-free number and fax number of American Stenrite. Nothing in the Basso Agreement modified § 4.5(a) of the SPA prohibiting the Sellers from selling business forms or labels on a wholesale basis.

*3 13. From its inception, Basso believed that the Basso Agreement permitted him to sell business forms and labels to any type of customer, wholesale or retail, provided he would purchase all of the required business forms and labels from Sovereign, if Sovereign could sell them to Basso at wholesale prices and could deliver them on the dates required.

14. Around the time of the sale of American Stenrite, Basso formed Stenrite Industries in order to conduct business under the Basso Agreement, as well as to sell packaging supplies, stencils, stencil accessories and affixing services. Stenrite Industries does not manufacture any products and uses the Elmsford office, the phone number, toll-free number and fax number assigned to Basso under the Basso Agreement. Stenrite Industries is not a party to the SPA nor the Basso Agreement.

15. Stenrite Industries's sales in fiscal year 1998-1999 totaled $601,966 and in fiscal year 1999-2000 (up to May 31, 2000) sales totaled $408,089. During that time, approximately 75% of its business consisted of the sale of packaging supplies, approximately 10% consisted of stencil sales and approximately 10% consisted of sales of business forms and labels. The remaining 5% consisted of affixing services. Sales were made on a retail and wholesale basis.

Course of Business Between American Stenrite *and Stenrite Industries*

16. Immediately after Stenrite Industries commenced operations in October 1998, it began accepting orders for the purchase of business forms, labels, stencils, packaging supplies and for performing affixing services from both distributors and end-users.

17. In connection with its orders for business forms and labels, Stenrite Industries' practice was to fill such orders by first ordering them from American Stenrite or another Sovereign subsidiary. American Stenrite or a Sovereign subsidiary often filled those orders for Stenrite Industries and accepted payment, knowing that a portion of the orders were for wholesale customers.

18. In early 1999, McClain began to suspect that Stenrite Industries and Basso may have contacted, solicited and possibly obtained business from distributors who were wholesale customers of American Stenrite.

19. Notwithstanding McClain's suspicions, Sovereign and its subsidiaries have continued to fill orders and accept payment for those orders from Stenrite Industries, knowing that certain of such orders were made for distributors on a wholesale basis.

20. Plaintiffs demonstrated by a preponderance of the evidence that Basso has breached §§ 4.5(a) and (b) of the SPA when Basso-through Stenrite Industries-engaged in the sale of business forms and labels on a wholesale basis with various

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                           Page 4
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

distributors, including customers of American Stenrite. Although Basso believed that the Basso Agreement modified these provisions by permitting him to sell to any customer-wholesale or retail-so long as he filled the orders with forms and labels from Sovereign, a thorough reading of the Basso Agreement reveals no such modification. Side by side, the two agreements work in tandem-first, the SPA forbids the Sellers from engaging in wholesale selling of business forms and labels, while the Basso Agreement, in return for the assignment of American Stenrite's retail customer list to Basso and other consideration, obligates Basso to look to Sovereign first in filling retail orders involving forms and labels, subject to certain conditions. There is no provision in the Basso Agreement which relieves Basso of his obligations under the SPA not to sell business forms and labels to wholesalers.

*4 21. As indicated by various witnesses at trial, however-which the Court credits-packaging supplies, stencils, stencil accessories and affixing services are not "business forms and labels." Accordingly, Basso was under no contractual obligation to refrain from selling those products or services on a wholesale basis.

22. Plaintiffs claim that Basso violated the Basso Agreement when Stenrite Industries had orders filled by manufacturers other than Sovereign or one of its subsidiaries. For the following reasons, however, the Court finds that plaintiffs have failed to demonstrate that Basso breached the Basso Agreement.

23. As an initial matter, Basso did not breach the Basso Agreement with regard to any sales concerning stencil products, whether they were made to wholesalers or retail customers.

24. In connection with orders relating to business forms and labels, plaintiffs have not adduced sufficient evidence to show that Basso did not first contact Sovereign to fill the orders at issue. In any event, to the extent Basso did, in fact, fail to contact Sovereign, plaintiffs have not demonstrated that Sovereign or its subsidiaries would have been able to produce the relevant products, that they would have been sold to Basso at wholesale prices, or that they would have been delivered to Basso at the required time.

*Use of the Name "Stenrite Industries"*

25. Sovereign was aware that Basso intended to use the name "Stenrite Industries" for his continuing business after the sale of American Stenrite. American Stenrite did business with Stenrite Industries after the sale to Sovereign without objection to the name.

26. After the sale of American Stenrite, Stenrite Industries sent a letter to its vendors informing them of the change in companies and advising them that American Stenrite and Stenrite Industries were different companies.

27. For several months after its sale to Sovereign, American Stenrite sent its customers invoices containing the name "Stenrite Industries" and the phone number and office assigned by Sovereign to Basso.

28. Plaintiff has failed to prove by a preponderance of the evidence that any confusion that may have resulted in the similarities between the names of "American Stenrite" and "Stenrite Industries" was the result of bad faith. Indeed, to the extent confusion existed among customers concerning the two names, the evidence at trial demonstrated that plaintiffs knew and approved of-either explicitly or implicitly-Basso using the name "Stenrite Industries" for his company. Moreover, the evidence has shown that any confusion that may have existed among customers was created-in part-by American Stenrite.

*Relationship between Docufinish and Stenrite Industries*

29. Docufinish is a direct competitor of Sovereign and American Stenrite. Docufinish was not a party to the SPA or the Basso Agreement, nor was it involved in any way with the negotiation, implementation or creation of those agreements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 5

Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

*5 30. Plaintiffs have failed to show by a preponderance of the evidence that Docufinish had actual knowledge of the SPA or the Basso Agreement. Moreover, plaintiffs have failed to show that Docufinish should have known of the existence of the SPA, the Basso Agreement, or any provisions therein, including the non-compete provisions in the SPA and the requirements arrangement in the Basso Agreement.

31. Docufinish and Basso have had a business relationship for a number of years, and McKillip and Kevin Springer, Vice President of Docufinish ("Springer"), have been friends with Basso for nearly twenty years. Basso was aware that Docufinish was contemplating opening a New York office for some time, and that it was seeking a New York salesperson.

32. From January 1, 2000 to May 31, 2000, Stenrite Industries agreed to lease a small room to Docufinish at its Elmsford offices for $1,500.00 per month. As part of the leasing of the room, Basso provided a telephone, computer, and chair to Docufinish and assisted in obtaining separate telephone lines and business cards for Docufinish salespersons. Basso was reimbursed for expenses incurred for his assistance.

33. In late 1999, Basso learned that Dan Foley ("Foley"), a former employee of Curtis Business Forms-a subsidiary of Sovereign-was looking for a job. Basso had discussions with Foley concerning the Docufinish sales position, and referred Foley to Springer for a job interview. Basso attended Foley's interview. In December 1999, Foley was hired as Docufinish's first salesperson for the New York office.

34. One of Foley's responsibilities was to submit Sales Call Reports to Docufinish's headquarters in Illinois. Despite repeated reminders, Foley failed to submit the reports on a regular basis. At one point during Foley's employment, Springer directed Foley to submit his sales call reports to Basso.

35. On February 14, 2000, only two months after having been hired, Foley's employment was terminated. Foley made no sales during the period he was employed by Docufinish.

36. In March 2000, Basso participated in Docufinish's interview of Chris Price, a potential salesperson for the Docufinish New York office. Mr. Price was not hired for the position.

37. In March 2000, Basso spoke with Robert A. Stanley ("Stanley"), who is the son of one of the Sellers and an employee of American Stenrite, and discussed the open salesperson position at the New York office of Docufinish. Stanley expressed interest in the position.

38. McKillip and Springer flew to New York in late March 2000 to interview Stanley. They were picked up at the airport by Basso, and all four attended a dinner interview after which McKillip hired Stanley. Stanley resigned from American Stenrite to work for Docufinish shortly thereafter.

39. Basso hired Jenny Moya ("Moya") in late December 1999 to work for Stenrite Industries. During her employment, she-along with Basso's long-time assistant, Debbie Nass ("Nass")-performed certain clerical assignments for Docufinish, which included answering phone calls.

*6 40. At Nass' instruction, Moya eventually started to send out Docufinish promotional materials to potential customers of Docufinish. Nass ordered business cards for Moya stating she was an employee of Docufinish. Moya would sometimes include her Docufinish business card along with promotional materials distributed to potential customers, and often assisted Stanley to send materials after he began his employment with Docufinish.

41. In January 2000, Basso attended a one-day sales meeting at Docufinish headquarters for the purpose of presenting Stenrite Industries' products to Docufinish salespersons. Docufinish paid his expenses, including airfare. Docufinish began purchasing packaging supplies from Stenrite Industries shortly thereafter, which Docufinish then marketed to its own customers. To date, the total amount of those sales is approximately $20,000 for which Docufinish was invoiced and which it paid to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                         Page 6
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Stenrite Industries.

42. Since the formation of Stenrite Industries, Docufinish has performed stencil affixing services for it worth a total of $27,922.44, and has filled label orders from Stenrite Industries for a total of $2,741.63. Each of these jobs were initiated by Stenrite Industries, and performed at its specific request, and only after Stenrite Industries had previously received an order from its own customer for those products or services.

43. When Docufinish performed the affixing services or sold labels to Stenrite Industries, Docufinish was not aware of who Stenrite Industries' customers were, and did not know whether they were wholesale or retail customers.

44. The first sale by Docufinish out of the New York office was on May 5, 2000 for $1,377. Stanley billed a total of $38,039.71 in sales on behalf of Docufinish.

45. Plaintiffs have proved that Basso violated his agreement under § 4.5(d) of the SPA when he assisted Docufinish to solicit customers of American Stenrite to sell business forms and labels on a wholesale basis. Basso authorized and directed his assistants at Stenrite Industries-Moya and Nass-to actively solicit customers of American Stenrite and Sovereign on behalf of Docufinish. In particular, he worked together with Docufinish's sales force and authorized Moya and Nass to aid Stanley with customer calls and the distribution of promotional materials to customers, and ordered business cards showing that Moya worked for Docufinish.

46. Plaintiffs did not prove by a preponderance of the evidence presented that Basso's violations of his obligations under the SPA involved fraud or dishonesty, nor did they prove that his conduct was otherwise improper, except to the extent it violated the contractual provisions in § 4.5 of the SPA. The proof at trial demonstrated that Basso's breaches were a result of a misunderstanding of the provisions of the Basso Agreement and a fundamental desire to help Docufinish set up a New York office based upon a long-time friendship with

Docufinish's owners.

*7 47. There is insufficient evidence to conclude that Docufinish made any misrepresentations to Sovereign customers, and plaintiffs did not prove at trial that Docufinish induced Basso to breach the SPA.

Use of Alleged Trade Secrets / Confidential Information *by Docufinish*

48. Prior to his employment at Docufinish, Stanley was the Product Manager at American Stenrite. Stanley had access to and retained a computer disc which contained (1) the names of numerous companies in the business forms and label industry, including their address, telephone numbers, fax numbers and contact person, and (2) a spread sheet pricing template.

49. In connection with the company list, less than 300 names out of more than two thousand companies were active customers of American Stenrite at that time. Stanley kept this information at home during the time he worked at American Stenrite-since he often worked at home on his computer-and did not delete it after commencing employment with Docufinish.

50. The information on the disc did not contain proprietary information relating to products, pricing or reorder dates. Moreover, the names, addresses and telephone numbers of companies on the list were accessible from a number of public sources, including (1) publications and data bases of the trade association, Document Management Industries Association ("DMIA"), (2) the American National Business Directory, (3) the Printing Industry Gold Book published in conjunction with the Association for Suppliers of Printing and Publishing Technologies and Printing Industries of America, Inc., (4) FORM Magazine, including its Top 100 manufacturers and list of Top 100 distributors, (5) the Who's Who in the Business Printing and Document Management Industry, (6) Business Forms, Labels & System Magazine Who's Who of Manufacturers and Suppliers, and (7) Form Magazine's web site (*www.formmag.com*) and links

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 7
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

from that site.

51. The DMIA trade shows also publish and distribute lists of attendees, which often contain hundreds of names of companies including and similar to the ones contained on the American Stenrite computer disc.

52. Docufinish has possession of, and access to, similar company directories which list the addresses and names of salespeople at the company offices. Docufinish uses these sources and directories to contact potential customers, and they are all readily obtainable.

53. American Stenrite provided general access to this list to its employees, and the list was readily available on various computers at American Stenrite without the use of a password. American Stenrite did not require Stanley to protect the information on the company list, nor did it instruct its employees to keep the company list confidential. Plaintiffs did not prove at trial that substantial time or effort was expended by American Stenrite or Sovereign in creating the list.

54. The spread sheet pricing template was originally created by Stanley when he was working at New Jersey Business Forms, prior to his employment at American Stenrite, and therefore did not belong to American Stenrite. It is a worksheet which, when specific figures and information are inputted, permitted Stanley to quote a price for a customer on a particular order.

*8 55. Each time the template was used, it deleted the information inputted from the prior order.

56. When Stanley left American Stenrite, the template was blank with no customer names, product or pricing information contained on it.

57. All pricing quotations made by Stanley during his employment with Docufinish originated from another Docufinish employee, usually from its Cleveland or Chicago offices.

58. The Court finds that defendants did not engage in bad faith misappropriation of the labors of another when Stanley possessed and used the company list and pricing template in his computer disc.

59. Plaintiff failed to prove that the possession of the company list and template was the result of bad faith or that Docufinish improperly used confidential information belonging to American Stenrite.

60. While testimony may have suggested that, during his interview, Stanley told Springer and McKillip that he had created a pricing template, plaintiffs did not prove that defendants used this knowledge to participate in the violation of a duty owed by Stanley to American Stenrite.

*Declining Sales of American Stenrite*

61. American Stenrite suffered annual declines in gross sales for each of the three fiscal years prior to its sale to Sovereign. In 1997, American Stenrite's ten largest customers accounted for $1,439,282.00 in sales. In 1999, those same ten companies generated only $515,952 in gross sales for American Stenrite. American Stenrite did not prove that these declines in sales were caused by the conduct of the defendants.

62. American Stenrite's largest customer was Reynolds & Reynolds ("R & R"). Since the sale of American Stenrite, its reported sales to R & R have dropped off from $408,810 in 1998 to $214,242 in 1999, and sales in 2000 (up to September) are reported to be $75,375. On May 8, 2000, R & R informed American Stenrite that it would no longer be a "preferred vendor." American Stenrite's removal from R & R's "preferred vendor" list was not caused by any acts or misconduct of Stenrite Industries, Basso or Docufinish.

63. Within eight months of the acquisition, American Stenrite demoted McClain for under performance from General Manager to Sales Manager, and later terminated him. While Matt Wilson-a Sovereign executive-replaced McClain as General Manager, he operated out of the North Carolina office, simultaneously managed another

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 8

Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Sovereign subsidiary, and visited American Stenrite approximately once a month, sometimes for a duration of a week.

64. American Stenrite lost sales to existing customers as a result of a variety of reasons, including management weaknesses, the failure to implement certain technological advancements and industry consolidation.

65. Plaintiffs have not properly demonstrated the existence of actual lost sales as a result of Basso's breach. In particular, plaintiffs' proof of lost sales failed to account for a number of factors. For example, plaintiffs presume that Basso was prohibited from selling stencil-related products to wholesale customers-a presumption that this Court has already rejected. Second, numerous invoices introduced at trial suggest that Sovereign knew, when it fulfilled orders from Basso, that Stenrite Industries was selling business forms and labels on a wholesale basis. Many of these invoices clearly indicated on their face that Basso's customer was a distributor and not an end-user, [FN2] suggesting that Sovereign waived the prohibition against selling business forms and labels to wholesalers for that particular transaction. Third, a number of invoices presented had been filled by Sovereign, and, according to evidence adduced at trial, Sovereign did not charge Basso a lower price than if it had sold directly to Basso's customer. Accordingly, Sovereign received full price from these sale to Basso's customer. Finally, plaintiffs' proof of lost sales is speculative in that it does not take into account the effect of intervening causes in the overall decline of American Stenrite's business, such as, the loss of its largest customer, Reynolds & Reynolds, industry-wide consolidation, management instability associated with the demotion and removal of McClain, the use of a part-time general manager (Matt Wilson), and technological advancements by competitors and customers.

>    FN2. This could be shown in two ways. First, many invoices showed that products were to be shipped "c/o" entities that were other than the named customer. According to the evidence presented, it was common knowledge in the industry that this delivery pattern indicated that the customer was a distributor, not an end-user. Second, Sovereign employees testified that they were commonly familiar with many of the names appearing on the invoices to be distributors.

*9 66. In addition, plaintiffs have not proved loss of future profits with any precision or certainty. Plaintiffs have not presented adequate proof of such loss, nor have they shown that such loss, if any, would be attributable to Basso's conduct, given intervening causes in the overall and continuing decline of American Stenrite's business discussed above.

CONCLUSIONS OF LAW

I. Breach of the SPA Against Basso

1. Plaintiffs allege that Basso breached various negative covenants entered into with Sovereign and American Stenrite under the SPA.

2. In order to prevail on a breach of contract claim under New York law, plaintiffs must prove, by a preponderance of the evidence: (1) the existence of a contract; (2) adequate performance of the contract by the plaintiffs; (3) breach of contract by the defendant; and (4) damages. *See Terwilliger v. Terwilliger,* 206 F.3d 240, 245-46 (2d Cir.2000).

3. As previously noted in its Findings of Fact, this Court finds that plaintiffs proved that Basso has breached §§ 4.5(a), (b) and (d) [FN3] of the SPA, by engaging in the sale on a wholesale basis of business forms and labels, soliciting former customers of American Stenrite for the sale of business forms and labels on a wholesale basis, and assisting Docufinish in operating in New York and in soliciting customers of American Stenrite for the sale of business forms and labels on a wholesale basis.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 9

Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

FN3. Because the parties specifically negotiated the terms of the non-solicitation covenant under § 4.5(d), the implied duty of non-solicitation alleged by plaintiffs and set forth in *Mohawk Maintenance Co., Inc. v. Kessler*, 52 N.Y.2d 276, 285-86, 419 N.E.2d 324, 437 N.Y.S.2d 646 (1981) is not applicable. *See Titus & Donnelly Inc. v. Poto*, 205 A.D.2d 475, 617 N.Y.2d 10, 11 (1st Dep't 1999) (where "the parties ... specifically negotiated and expressly agreed to a [non-solicitation provision] upon the seller," they "forgo the implied covenant recognized in *Mohawk*").

### II. Breach of the Basso Agreement by Basso

4. As previously noted in its Findings of Fact, the Court finds that plaintiff failed to prove beyond a preponderance of the evidence that Basso breached the provisions of the Basso Agreement.

### III. Tortious Interference of the SPA and the Basso Agreement Against Docufinish

5. To maintain a claim for tortious interference with contract under New York law, a plaintiff must " allege and prove the existence of a valid contract and damages caused by the defendant's knowing and intentional interference with that contract without reasonable justification." *International Minerals v. Pappas*, 96 F.3d 586, 595 (2d Cir.1996) (internal quotations omitted). The New York Court of Appeals has identified four elements under this claim: "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90,94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993).

6. Here, as the Court has previously found, plaintiffs have failed to establish that Docufinish had actual knowledge of the SPA or the Basso Agreement. "Although a defendant need not be aware of all the details of a contract to be liable for tortious interference, it must have actual knowledge of a specific contract." *International Minerals v. Pappas*, 1992 WL 354504, *3 (S.D.N.Y. Nov. 17, 1992); see also *Gold Medal Farms, Inc. v. Rutland County Co-Operative Creamery, Inc.*, 9 A.D.2d 473, 195 N.Y.S.2d 179 (3rd Dep't 1959). Plaintiffs' argument that Docufinish should have known of the existence of a non-competition agreement and requirements arrangement between Basso and Sovereign is tenuous and speculative, and was not established by the proof at trial. That proof established neither actual or constructive knowledge.

*10 7. Moreover, the Court has found that Docufinish did not intentionally induce Basso to breach the covenant not to engage in selling business forms and labels to wholesale customers. *See Sharma v. Skaarup Ship Management Corp.*, 916 F.2d 820, 828 (2d Cir.1990) (to prevail on a tortious interference claim, plaintiff must show that the defendant's actions were a "but for" cause of the breach).

### IV. Tortious Interference with Prospective Business Relationships Against Defendants

8. To maintain a claim of tortious interference with prospective business relationships under New York law, plaintiffs must show the following: "(1) business relations with a third party; (2) the defendant's interference with those business relations; (3) the defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means; and (4) the injury to the business relationship." *Nadel v. Play-By-Play Toys and Novelties, Inc.*, 208 F.3d 368, 382 (2d Cir.2000).

9. With regard to all defendants, plaintiffs failed to adduce evidence that they acted "with the sole purpose of harming" Sovereign. *Id.*

10. "To state a claim for interference with ... prospective business relations against a competitor, the alleged tortfeasor must employ 'wrongful means.'" *Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 206 (2d Cir.1998). The New York Court of Appeals has defined "wrongful means" as representing "physical

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03183-PKL   Document 6-9   Filed 05/01/2007   Page 15 of 18

Page 49 of 52

Not Reported in F.Supp.2d                                                          Page 10
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure." *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.,* 87 N.Y.2d 614, 664 N.E.2d 492, 641 N.Y.S.2d 581 (1996). That court noted, however that wrongful means do not "include persuasion alone although it is knowingly directed at interference with the contract." *Id.*

11. With regard to Docufinish, plaintiffs' did not prove by a preponderance of the evidence that Docufinish used "wrongful means" to interfere with Sovereign's business relationships.

12. With regard to Basso, plaintiffs did not prove by a preponderance of the evidence that his breaches of contract were sufficiently "dishonest, unfair or improper" to amount to tortious interference.

V. Misappropriation of Trade Secrets Against Defendants

13. To succeed on a claim for misappropriation of trade secrets under New York law, plaintiffs must show: (1) that it possessed a trade secret, and (2) that the defendants used that trade secret in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means." *North Atlantic Instruments, Inc. v. Haber,* 188 F.3d 38, 43-44 (2d Cir.1999).

14. "[A] trade secret is any formula, pattern, device or compilation of information which is used in one's business, and which gives [the owner] an opportunity to obtain an advantage over competitors who do not know or use it." *Id.* at 44 (internal quotations omitted). In determining whether information is a trade secret, New York courts have considered: "(1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others." *Ashland Management Inc. v. Janien,* 82 N.Y.2d 395, 407, 624 N.E.2d 1007, 604 N.Y.S.2d 912 (1993) (internal quotations omitted).

*11 15. With regard to the company list, the proof at trial did not establish that it properly constituted a trade secret. " 'A customer list developed by a business through a substantial effort and kept in confidence may be treated as a trade secret ... provided the information it contains is not otherwise readily attainable." ' *North Atlantic,* 188 F.3d at 44 (quoting *Defiance Button Mach. Co. v. C & C Metal Prod. Corp.,* 759 F.2d 1053, 1063 (2d Cir.), cert. denied, 474 U.S. 844, 106 S.Ct. 131, 88 L.Ed.2d 108 (1985); accord *Leo Silfen, Inc., v. Cream,* 29 N.Y.2d 387, 392, 278 N.E.2d 636, 328 N.Y.S.2d 423 (1972) ("Generally, where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection will not attach"). As this Court has found, the evidence has shown that the kind of information contained in the company list at issue, which did not contain confidential product information or pricing, is readily attainable through a variety of publically available sources.

16. As noted, plaintiffs have not proven by a preponderance of the evidence that the customer list in question amounted to a protectable trade secret. The information in question was obtainable from other sources and was not treated by American Stenrite with the requisite level of confidentiality. In addition, the proof at trial did not establish that the template ever belonged to American Stenrite. Moreover, the information contained in the template was deleted prior to Stanley beginning his employment at Docufinish, and therefore could not have been used to benefit Docufinish.

VI. Unfair Competition Against Defendants

17. Plaintiffs claim defendants engaged in unfair competition by misappropriating confidential proprietary information in the form of the company lists and the pricing template, and by misrepresenting their identities in order to mislead

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                     Page 11

Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

customers of American Stenrite.

18. The common law claim of unfair competition under New York law renders a party liable if it engages in the "bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 34 (2d Cir.1995). To prevail, a plaintiff must demonstrate "some showing of bad faith." *Id.* at 35.

19. As noted, the Court finds that defendants did not engage in bad faith misappropriation of the labors of another when Stanley possessed the company lists and pricing template in his computer disc.

20. Further, plaintiffs failed to prove at trial that the possession of the company list and template, as well as any confusion that may have resulted in the similarities between the names of "American Stenrite" and "Stenrite Industries" was the result of bad faith. Nor did plaintiffs prove confusion among, or deception by, purchasers as to the origins of any goods.

### VII. Tortious Participation in Breach of Fiduciary Duties by Defendants

*12 21. To show tortious inducement or participation in a breach of fiduciary duties under New York law, plaintiffs must show: "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that the plaintiffs suffered damages as a result of the breach." *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 847-48 (2d Cir.1987). As noted by the New York Court of Appeals, "the gravamen of the claim of participation in a breach of fiduciary duty is the 'knowing participation' of the third party in the fiduciary's breach of trust. *Id.* at 848 (citing *Wechsler v. Bowman,* 285 N.Y. 284, 291, 34 N.E.2d 322 (1941)).

22. Plaintiffs claim that defendants knowingly induced Stanley to breach his fiduciary duties to his former employer, American Stenrite, by encouraging him to use the company list and pricing template in direct competition against American Stenrite and Sovereign. As previously found, however, plaintiffs have not proved that Stanley possessed confidential information, or that he used the information improperly. Given this finding, the Court finds that Stanley did not violate his fiduciary duties, and, accordingly, defendants did not tortiously participate in any breach of fiduciary duties.

23. Even if Stanley did violate his duties to American Stenrite, plaintiffs did not prove that defendants "knowingly participated" in the breach.

### VIII. Violation of N.Y. Gen. Bus. Law § 133 Against Defendants

24. § 133 of the New York General Business Law " protects tradenames from unlawful infringement by prohibiting the use of someone else's name, style or symbol as part of one's own name with an intent to deceive the public." *Oliveira v. Frito-Lay,* 1997 WL 324042, *6 (S.D.N.Y. June 13, 1997).

25. Plaintiffs claim that defendants have assumed American Stenrite's identity in order to mislead customers and the general public of American Stenrite and Sovereign.

26. Plaintiffs failed to prove that defendants' conduct was intended to deceive, or in fact deceived, the customers of American Stenrite or the general public.

### IX. Violation of N.Y. Gen. Bus. Law § 349 Against Defendants

27. To prevail under § 349 of the New York General Business Law, plaintiffs must show that " (1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v. Goldsmith,* 230 F.3d 518, 2000 WL 1637847 (2d Cir. Nov. 1, 2000) (citations omitted). As noted by the New York Court of Appeals, "[p]rivate contract disputes, unique to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:07-cv-03183-PKL    Document 6-9    Filed 05/01/2007    Page 17 of 18    Page 51 of 52

Not Reported in F.Supp.2d                                                                                         Page 12
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

parties ... would not fall within the ambit of the statute." *Id.*, quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,* 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995). Furthermore, "the gravamen of the complaint must be consumer injury or harm to the public interest." *Securitron Magnalock Corp. v. Schnabolk,* 65 F.3d 256, 264 (2d Cir.1995).

*13 28. Plaintiffs contend that defendants' deceptive actions and conduct resulted in consumer injury and harm to the public interest.

29. The evidence presented at trial was insufficient to prove that defendants' acted deceptively or that their conduct was directed at consumers.

30. Further, plaintiffs did not prove by a preponderance of the evidence that any consumers were injured by defendants' actions. For example, plaintiffs failed to prove that prices of products were materially raised, or that consumers, including Sovereign or American Stenrite, were, or could have been, detrimentally deceived or harmed. *See Oswego,* 85 N.Y.2d at 26 ("a plaintiff ... must show that the defendant engaged in a material deceptive act or practice that caused actual, although not necessarily pecuniary, harm.").

X. Damages

31. As noted previously, plaintiffs have failed to present an adequate showing of actual lost sales caused by of Basso's breach.

32. As this Court has found, plaintiffs have failed to demonstrate the existence of lost future profits (or loss of goodwill) with the level of certainty required under New York law. "[T]o recover for loss of goodwill, which is sometimes referred to as loss of future profits .... [the claimant must meet] certain stringent requirements of proof" under New York law. *Toltec Fabrics, Inc., v. August Inc.,* 29 F.3d 778, 780 (2d Cir.1994). "In an action for breach of contract, a plaintiff is entitled to recover lost profits only if he can establish both the existence and amount of such damages with reasonable certainty." *Schonfeld v. Hilliard,* 218 F.3d 164, 172 (2d Cir.2000) (citing *Kenford Co. v.. County of Erie,* 67 N.Y.2d 257, 261, 493 N.E.2d 234, 502 N.Y.S.2d 131 (1986)). While lost profits need not be proven with absolute precision, they must be "capable of measurement based upon known reliable factors without undue speculation." *Ashland Mgt. Inc. v. Janien,* 82 N.Y.2d 395, 403, 624 N.E.2d 1007, 604 N.Y.S.2d 912 (1993); *see also Terwilliger,* 206 F.3d at 248 (damages which are "the result of other intervening causes ... cannot be allowed") (internal quotations omitted).

33. Plaintiffs are entitled to recover, however, damages for a portion of the value attributed by the parties of the SPA to the non-competition clause. Accordingly, this Court awards $30,500 in compensatory damages to plaintiffs against Basso.

34. "Generally, to obtain a permanent injunction a party must show the absence of an adequate remedy at law and irreparable harm if the relief is not granted." *New York State National Organization for Women v. Terry,* 886 F.2d 1339, 1362 (2d Cir.1989) . The standard is "essentially the same as for a preliminary injunction, except that plaintiffs must actually succeed on the merits." *Henrietta v. Giuliani,* 2000 WL 1617379, at *22 (E.D.N.Y. Sept. 18, 2000) (citing *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)). As noted, Basso has acknowledged pursuant to § 4.10 of the SPA that a violation of the non-compete and non-solicitation covenants in the SPA would cause irreparable damage to Sovereign and American Stenrite. Moreover, plaintiffs have shown at trial that there is no adequate remedy at law for Basso's breaches. This Court concludes that injunctive relief is appropriate because future violations are likely, cannot adequately be addressed by monetary damages and are likely to result in irreparable harm. Accordingly, this Court grants an injunction enjoining Basso from any further violations of § 4.5 of the SPA from the date of the judgment in this action until the effective expiration date of the relevant provisions of the SPA.

*14 35. The Court finds that the facts of this case do not warrant punitive damages as a result of Basso's breach of the provisions of the SPA. *See*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

*U.S. v. Merritt Meridian,* 95 F.3d 153, 160 (2d Cir.1996) ("Generally, punitive damages are not available for breach of contract"); *United States Naval Inst. v. Charter Communications, Inc.,* 936 F.2d 692, 698 (2d Cir.1991) ( "punitive awards are not part of the law of contract damages").

36. Plaintiffs are entitled to apply within 14 days of these Findings of Fact and Conclusions of Law for attorneys' fees attributable to the claim as to which they succeeded. *See* SPA § 4.10.

## CONCLUSION

For the foregoing reasons, this Court finds that defendant Basso breached non-competition and non-solicitation clauses of the SPA, and is liable to plaintiffs for compensatory damages in the amount of $30,500. In addition, Basso is enjoined from violating § 4.5 of the SPA from the date of the judgment in this action until the effective expiration date of the relevant provisions of the SPA. This Court finds in favor of defendants Basso, Stenrite Industries and Docufinish on all remaining claims, and accordingly Claims Two through Ten of the Amended Complaint are dismissed.

SO ORDERED:

S.D.N.Y.,2000.
Sovereign Business Forms, Inc. v. Stenrite Industries, Inc.
Not Reported in F.Supp.2d, 2000 WL 1772599 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.