Jay S. Berke  (JB 6500)
A Member of the Firm
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

BLACKROCK, INC.,                          :

                                     :   07 Civ. 3183 (PKL)

                    Plaintiff,           :

                                       :

            - against -             :

                                       :

SCHRODERS PLC.                   :

                                       :

                  Defendant.        :

                                       :

                                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**COMPENDIUM OF UNREPORTED DECISIONS CITED IN PLAINTIFF
BLACKROCK, INC.'S REPLY MEMORANDUM OF LAW IN
SUPPORT OF PLAINTIFF'S ORDERS TO SHOW
CAUSE FOR EXPEDITED DISCOVERY AND PRELIMINARY INJUNCTION**

## INDEX

**CASES**                                                                **TAB**

Dubied Machinery Co. v. Vermont Knitting Co., Inc., 1992 WL 142044
    (S.D.N.Y. June 3, 1992)...................................................................................1

Four Seasons Solar Products Corp. v. Solarium Systems, Inc., No. 86 CV 3468,
    1987 WL 4818 (E.D.N.Y. May 6, 1987) .....................................................2

Georgiadis v. First Boston Corp., No. 90 Civ. 7672 (PLK), 1994 WL 39229
    (S.D.N.Y. July 27, 1994) ............................................................................3

Haugh v. Schroders plc, No. Civ. 600651/03 (N.Y. Sup. Ct. Nov. 24, 2003) ...................4

In Re Chase Manhattan Corp. Secur. Litigation, 1991 WL 79432 (S.D.N.Y. May
    7, 1991) .......................................................................................................5

Manufacturing Technology, Inc. v. Kroger Co., No. 06 Civ. 3010(JSR), 2006 WL
    3714445 (S.D.N.Y. Dec. 13, 2006)............................................................6

Moran v. Flaherty, No. 92 Civ. 3200 (PKL), 1992 WL 276913 (S.D.N.Y. Sept. 25,
    1992) ..........................................................................................................7

Treppel v. Biovail Corp., No. 03 Civ. 3002 (PLK), 2004 WL 2339759 (S.D.N.Y.
    2004) ..........................................................................................................8

World Film Services, Inc. v. RAI Radiotelevisione Italiana S.p.A., No. 97 Civ.
    8627 (LMM), 1999 WL 47206 (S.D.N.Y. Feb. 3, 1999)...............................9

# TAB 1

Westlaw.

Not Reported in F.Supp.                                                                                    Page 1

Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Dubied Machinery Co. v. Vermont Knitting Co.,
Inc.
S.D.N.Y.,1992.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
DUBIED MACHINERY COMPANY, Plaintiff,
v.
VERMONT KNITTING CO., INC., Defendants.
VERMONT KNITTING CO., INC.,
Counterclaimant,
v.
DUBIED MACHINERY COMPANY and Edouard
DUbied & CIE. S.A., Counterclaim Defendants.
**No. 85 Civ. 8610 (PKL).**

June 11, 1992.

Warshaw, Burnstein, Cohen, Schlesinger & Kuh,
New York City (Martin R. Lee, of counsel), for
plaintiff and counterclaim defendants.
Cohen, Shapiro, Polisher, Shiekman and Cohen,
Philadelphia, (Alan M. Lerner, David L. Hyman,
Stephen V. Yarnell, Alise Panitch, of counsel),
Hall, Dickler, Lawler, Kent & Friedman, New York
City (Leonard Wagman, of counsel), for defendant
and counterclaimant.

### OPINION AND ORDER
LEISURE, District Judge,
*1 In this breach of contract action, with
jurisdiction founded on diversity of citizenship,
counterclaim defendant Edouard Dubied & Cie.
S.A. ("Edouard Dubied"), now moves the Court,
pursuant to Fed.R.Civ.P. 12(b)(2), to dismiss the
counterclaims asserted against it by Vermont
Knitting Co., Inc. ("Vermont Knitting"), for lack of
personal jurisdiction. For the following reasons,
the motion to dismiss is denied.

### BACKGROUND

This action, which focuses on
defendant/counterclaim plaintiff Vermont Knitting's
alleged breach of a contract to purchase knitting
machines, was commenced on October 31, 1985 by
Dubied Machinery Company ("Dubied"), a New
York Corporation that sells and services
commercial knitting equipment. In response to
Dubied's claims, Vermont Knitting counterclaimed
for breach of warranty and moved to join Edouard
Dubied, a Swiss Corporation, as an additional
counterclaim defendant, based on the allegation that
Dubied was a wholly-owned subsidiary of Edouard
Dubied that acted as the latter's agent in the United
States with respect to the transaction that underlies
this suit. The motion to join Edouard Dubied as a
counterclaim defendant was granted by Magistrate
Judge Naomi Reice Buchwald by Order dated
October 13, 1987.

Soon after the joinder motion was granted, progress
towards resolution of the merits of this action
became bogged down in a procedural quagmire.
As a result of Vermont Knitting's application for
bankruptcy protection in November 1987, the
action was entered on this Court's suspense docket
on December 21, 1987. Thereafter, by Order dated
January 12, 1988, the bankruptcy court granted
relief from the automatic stay, *see* 11 U.S.C. § 362,
so that the parties could pursue their claims and
counterclaims before this Court, and the instant
action was removed from the suspense docket by
Order of this Court dated February 2, 1988. Upon
removal of the case from the suspense docket, the
parties began engaging in procedural skirmishing.
For example, by Opinion and Order dated February
21, 1989, this Court denied Vermont Knitting's
motion under 28 U.S.C. § 1404(a) to transfer this
action to the District of Vermont, where the
bankruptcy action is pending. Subsequently, by
Opinion and Order dated June 12, 1990, Dubied's
motion for summary judgment on the main claims
in the action was denied. However, summary
judgment on Dubied's replevin action, which
concerned a knitting machine that was loaned to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Vermont Knitting but was not directly covered by the contract of sale at issue in this case, was granted.

In addition to the aforementioned procedural disputes, there is a lingering controversy concerning the propriety of haling Edouard Dubied into court in New York to defend against the counterclaims asserted by Vermont Knitting. By Notice of Motion dated October 22, 1990, Edouard Dubied moved to dismiss the counterclaims asserted against it under Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction. Thereafter, by Opinion and Order dated May 13, 1991, the Court rejected certain procedural arguments raised by Vermont Knitting in opposition to the motion to dismiss, stayed the motion pending discovery on the jurisdictional issue and referred the case to Judge Buchwald for supervision of the remaining discovery. At the close of discovery the parties filed supplemental briefs in support of and in opposition to the motion to dismiss, to which the Court now turns.[FN1]

DISCUSSION

*2 In this action, Vermont Knitting bears the burden of establishing personal jurisdiction over Edouard Dubied. *See Ball, supra,* 902 F.2d at 197; *Milgrim Thomajan & Lee P.C. v. Nycal Corp.,* 775 F.Supp. 117, 119 (S.D.N.Y.1991). However, to overcome the instant motion to dismiss for lack of personal jurisdiction, Vermont Knitting need only make a *prima facie* showing of jurisdiction. *See Ball, supra,* 902 F.2d at 197 ("If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation [s], in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction."); *accord Cutco Industries, Inc. v. Naughton,* 806 F.2d 361, 365 (2d Cir.1986); *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985). Since the Court has allowed discovery on the jurisdictional issue, "the *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball, supra,* 902 F.2d at 197. The Court must assume the truth of these factual

averments and construe the allegations, together with Vermont Knitting's pleadings and affidavits, in the light most favorable to the non-moving party. *See Landoil Resources Corp. v. Alexander & Alexander Services, Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990). In a diversity action, " 'the amenability of a foreign corporation to suit in a federal court ... is determined in accordance with the law of the state where the court sits.' " *Ball, supra,* 902 F.2d at 198 (quoting *Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir.1963) (en banc)). The Court thus turns to consider New York rules of personal jurisdiction.

N.Y.C.P.L.R. § 301 "provides for general jurisdiction over defendant corporations that are ' doing business' in New York." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria,* 937 F.2d 44, 50 (2d Cir.1991); *accord Laufer v. Ostrow,* 55 N.Y.2d 305, 310-11, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982).
Since a corporation amenable to jurisdiction under section 301 may be sued in New York on causes of action wholly unrelated to acts done in New York, its exposure to suit ... requires a showing that it is doing business in New York "with a fair measure of permanence and continuity."

*Ball, supra,* 902 F.2d at 198 (quoting *Laufer, supra,* 449 N.Y.S.2d at 458); *accord McGowan v. Smith,* 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981) (defendant must be "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its ' presence' in the jurisdiction." (quoting *Simonson v. International Bank,* 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427 (1964))). Section 301 thus imposes a requirement of " 'doing business here' in the *traditional sense." Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851 (emphasis in original), *cert. denied,* 389 U.S. 923 (1967).

*3 It is well-established that a principal can become subject to general jurisdiction in New York by the actions of its agents in New York. *See Ball, supra,* 902 F.2d at 199 (citing cases and listing factors giving rise to inference of agency sufficient to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

establish jurisdiction); *Frummer, supra,* 281 N.Y.S.2d at 45 (presence of principal "for the purposes of jurisdiction, is established by the activities conducted here on its behalf by its agent" ). In addition, once continuous and systematic solicitation of business in New York has been found, very little else is required to establish jurisdiction pursuant to N.Y.C.P.L.R. § 301. *See Landoil Resources, supra,* 918 F.2d at 1043; *Aquascutum of London, Inc. v. S.S. American Champion,* 426 F.2d 205, 211 (2d Cir.1970) ("once solicitation is found in any substantial degree very little more is necessary to a conclusion of 'doing business.' ").

A foreign corporation also can be subject to suit in New York based on the activities of its subsidiary within the state based on the factual question whether the subsidiary is "a really independent entity or a mere department of the parent." *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.,* 15 N.Y.2d 97, 256 N.Y.S.2d 129, 132, 204 N.E.2d 329 (1965). The determination whether a subsidiary is a "mere department" of the parent for the purposes of section 301 requires examination of four factors. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120-122 (2d Cir.1984).
The essential factor is common ownership.... The second factor is financial dependency of the subsidiary on the parent corporation.... The third factor is the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities.... The fourth factor is the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.

*Id.* Thus, if "a subsidiary establishes and expands a parent's market position then, so long as that activity is being conducted, and with respect to those activities furthering the parent's ends, the parent is doing business in New York." *Bulova Watch Co. v. K. Hattori & Co.,* 508 F.Supp. 1322, 1344-45 (E.D.N.Y.1981); *accord Frummer, supra,* 281 N.Y.S.2d at 44 (finding jurisdiction over parent where subsidiary "does all the business which [the parent] could do were it here by its own officials");

*Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni Viscosa,* 428 F.Supp. 1237, 1245 (S.D.N.Y.1977) (finding jurisdiction over Italian fabric manufacturer based on performance of essential services by commonly owned subsidiary in New York).

In support of its claim that Edouard Dubied did business in New York for the purposes of section 301, Vermont Knitting has presented the following factual averments. According to Robert Schneider, who was the president of Dubied when this dispute arose, Dubied was a wholly owned subsidiary of Edouard Dubied at all times relevant to this action. *See* Exhibits in Support of Vermont Knitting Company's Memorandum of Law in Opposition to Motion of Edouard Dubied & Cie. S.A. to Dismiss Counterclaims for Lack of Personal Jurisdiction (" Vermont Knitting Exhibits"), Exh. A, at 11 (deposition of Robert J. Schneider, taken on July 10, 1986 ("1986 Schneider Deposition")). Between 1984 and 1987, over 90% of Dubied's revenue came from the sale of Edouard Dubied machinery and parts. *See* Vermont Knitting Exhibits, Exh. B, at 70-71 (deposition of Robert Schneider, taken on September 23, 1991 ("1991 Schneider Deposition")). In fact, Dubied only sold products that could be used in connection with Edouard Dubied knitting machines. 1986 Schneider Deposition, at 18. According to Vermont Knitting, Dubied did not maintain an inventory of Edouard Dubied knitting machines, which were its major product, during the time period relevant to this action. Rather, because of financial difficulties being experienced by the parent, the subsidiary only received machines that had been sold pursuant to purchase orders that could be verified by Edouard Dubied. 1991 Schneider Deposition, at 54-55, 57-58.

**\*4** Vermont Knitting alleges that all of Dubied's directors were selected by Edouard Dubied, that employees of the parent dominated the subsidiary's board of directors and that Edouard Dubied's head of manufacturing served as the president of Dubied immediately prior to the events leading up to this litigation. *See* Vermont Knitting Motion, at 3-4. Moreover, Vermont Knitting claims that Edouard Dubied reviewed and controlled Dubied's budget,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

*see id.,* and that payments from the subsidiary to the parent were timed to maximize the economic benefit to Edouard Dubied without regard to the potential economic benefit to its subsidiary. *See id.* at 10. However, there allegedly was no formal agreement governing the timing of payments. *See* 1991 Schneider Deposition, at 68.

The interrelationship between Dubied and Edouard Dubied allegedly extended to modification of machinery, training of personnel and establishment of marketing and sales strategies. For example, Vermont Knitting claims that Edouard Dubied conducted all modifications to machinery sold by the subsidiary on its parent's behalf, and that Edouard Dubied provided the warranty for these machines. *See* 1991 Schneider Deposition, at 83. Edouard Dubied also purportedly maintained control of the training curricula used by Dubied, *see id.* at 33, and produced most of the sales and technical literature used by its subsidiary. *See id.* at 109-10. In fact, Edouard Dubied and Dubied shared identical logos and used substantially similar corporate names. *See id.*

In light of these factual averments, it cannot be disputed that Vermont Knitting has made a *prima facie* showing sufficient to overcome the instant motion to dismiss. In relevant part, Vermont Knitting has alleged that Dubied and Edouard Dubied were commonly owned, that the subsidiary was financially dependent on the parent, that there was a disregard of corporate formalities and that Edouard Dubied controlled Dubied's marketing and operational policies. Thus, Vermont Knitting has made the requisite showing that Dubied was a mere department of Edouard Dubied. *Compare Palmieri v. Estefan,* 1992 WL 108569, at * 4-5, 1992 U.S. Dist. LEXIS 7309, at * 16-17 (S.D.N.Y. May 18, 1992) (rejecting conclusion that subsidiary is mere department of parent based on lack of financial dependency) *with Volkswagenwerk, supra,* 751 F.2d at 122 (finding mere department status based on four factor analysis).

In response to this factual showing, Edouard Dubied attempts to rebut and discount the probative value of Vermont Knitting's factual averments. *See* Supplemental Reply Memorandum of Law of

Counterclaim Defendant Edouard Dubied & Cie. S.A., at 9-16. However, the current procedural posture of this case requires the Court both to assume the truth of the non-movant's factual allegations and to draw all inferences in the non-movant's favor. Edouard Dubied's factual arguments with respect to the proper weight to be assigned to Vermont Knitting's allegations therefore must be rejected, and the motion to dismiss must be denied.[FN2] In fact, careful examination of the litigants' various factual contentions reveals the existence of disputed issues of material fact on the jurisdictional issue. Thus, to resolve finally the jurisdictional question, the Court will ultimately have to conduct an evidentiary hearing, "at which the plaintiff must prove the existence of jurisdiction by a preponderance of the evidence." *Ball, supra,* 902 F.2d at 197.

**\*5** Before concluding, the Court pauses to address Vermont Knitting's request for additional discovery. As described, *supra,* the instant motion to dismiss was held in abeyance pending discovery on the jurisdictional issue, which was supervised by Judge Buchwald. Following the close of discovery, Vermont Knitting argued under Fed.R.Civ.P. 56(f) that additional discovery is necessary, because documents requested by the counterclaim plaintiff have been transferred between Dubied, William Cotton Ltd., Monk Dubied America's and Edouard Dubied by Edouard Dubied's liquidators, and have not been produced. *See* Vermont Knitting Motion, at 31-33.

Given that the Court has declined to treat the instant motion to dismiss as a summary judgment motion, Rule 56(f) is not directly applicable to the case at bar. However, in reviewing Vermont Knitting's request for additional discovery, it is useful to turn to Rule 56(f) by analogy. If inadequate discovery prevents presentation of facts necessary to oppose a summary judgment motion, Rule 56(f) allows a court to deny summary judgment or order a continuance until discovery is complete. To obtain this relief, the party seeking additional discovery must file an affidavit explaining what facts are sought, how they will create a factual issue precluding summary judgment, what efforts have been made to obtain these facts and why these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

efforts have failed. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy,* 891 F.2d 414, 422 (2d Cir.1989). Other mechanisms for enforcing the right to discovery include motions to compel discovery and for sanctions under Fed.R.Civ.P. 37. *See, e.g., Daval Steel Products, Division of FrancoSteel Corp. v. M/V Fakredine,* 951 F.2d 1357, 1365-67 (2d Cir.1991). This Court has stressed that these mechanisms must be used: a party cannot defeat a summary judgment motion by belatedly asserting that discovery efforts have been frustrated and by vaguely asserting that further discovery may yield unspecified facts that could plausibly defeat summary judgment. *See Bank of America National Trust and Savings Association v. Envases Venezolanos, S.A.,* 740 F.Supp. 260, 269 (S.D.N.Y.), *aff'd,* 923 F.2d 843 (2d Cir.1990); *Lawford v. New York Life Ins. Co.,* 739 F.Supp. 906, 917 n. 12 (S.D.N.Y.1990).

Because of the protracted nature of this litigation, the Court views Vermont Knitting's request for additional discovery with skepticism. However, in light of the alleged transfers of the records being sought by Vermont Knitting, and because of Edouard Dubied's apparent seizure by British liquidators, the Court must hesitate before rejecting the request for additional discovery on the instant record. Moreover, given the referral of this action to Judge Buchwald for supervision of discovery, it is apparent that this discovery dispute should be addressed by Judge Buchwald in the first instance. The Court therefore refers this action to Judge Buchwald, pursuant to 28 U.S.C. § 636 and Fed.R.Civ.P. 72, for supervision of discovery and for resolution of lingering discovery disputes.

## CONCLUSION

**\*6** For the foregoing reasons, Edouard Dubied's motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) hereby is denied. This action hereby is referred to Magistrate Judge Naomi Reice Buchwald for supervision of discovery and resolution of remaining discovery disputes.

SO ORDERED.

FN1. Vermont Knitting Company's Memorandum of Law in Opposition to Motion of Edouard Dubied & Cie. S.A. to Dismiss Counterclaims for Lack of Personal Jurisdiction ("Vermont Knitting Motion") argues that the Court should treat the instant motion as a motion for summary judgment pursuant to Fed.R.Civ.P. 56. *See* Vermont Knitting Motion, at 13-14. However, because it is clear that Edouard Dubied is entitled to challenge the sufficiency of the counterclaim plaintiff's allegations under Fed.R.Civ.P. 12(b)(2), and because disposition of the jurisdictional question ultimately will require a hearing on the merits of parties' positions, the Court declines to treat the instant motion as one for summary judgment as provided by Fed.R.Civ.P. 12(b). *See Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 111 S.Ct. 150 (1990).

FN2. This result also comports with the constitutional criteria of the Due Process Clause, which requires " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and the protection of its laws.' " *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)); *accord Chase Manhattan Service Corp. v. National Business Systems, Inc.,* 766 F.Supp. 203, 205 (S.D.N.Y.1991) (Leisure, J.). If Vermont Knitting's factual allegations are proved to be true, then it will be clear that Edouard Dubied's "conduct and connection with the forum state [were] such that [it] should reasonably [have] anticipate[d] being haled into court" in New York, *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980), and the assertion of jurisdiction will not offend "our traditional conception of fair play and substantial justice." *International*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**


       *Shoe Co. v. Washington,* 326 U.S. 310,
       320 (1945).
S.D.N.Y.,1992.
Dubied Machinery Co. v. Vermont Knitting Co.,
Inc.
Not Reported in F.Supp., 1992 WL 142044
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 2

Westlaw.

Not Reported in F.Supp.

Page 1

Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Four Seasons Solar Products Corp. v. Solarium
Systems, Inc.
E.D.N.Y., 1987.
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.
FOUR SEASONS SOLAR PRODUCTS
CORPORATION and FOUR SEASONS
MARKETING CORP., Plaintiffs,
v.
SOLARIUM SYSTEMS, INC. and JAMES
PETANO, Defendants.
**No. 86 C 3468.**

May 6, 1987.

ROBERTS, SPIECENS & COHEN (Alan K.
Roberts, of counsel) New York City for plaintiffs.
FREDRIKSON & BYRON, P.A. (Kent G.
Harbison, of counsel), Minneapolis, Minnesota,
BUTLER, FITZGERALD & POTTER (Claudia C.
Conway, of counsel), New York City for defendants.

### MEMORANDUM AND ORDER
NICKERSON, District Judge.
**\*1** Plaintiffs (collectively 'Four Seasons'), which
manufacture and sell prefabricated greenhouses and
solaria, brought this diversity action against
defendants Solarium Systems, Inc. ('Solarium'), a
Minnesota corporation, which manufactures and
sells the same type of products, and against James
Petano, an Illinois resident and a former employee
of Four Seasons now employed by Solarium. The
complaint, seeking an injunction and damages,
asserts against Solarium claims of unfair
competition, interference with contracts and
business relations, and wrongful appropriation of
trade secrets.

Defendant Solarium now moves to dismiss the
complaint for lack of personal jurisdiction. The
critical issue is whether the court has personal
jurisdiction over Solarium under New York

C.P.L.R. § 302(a)(3), which, in relevant part, reads
as follows.
(a) Acts which are the basis of jurisdiction. As to a
cause of action arising from any of the acts
enumerated in this section, a court may exercise
personal jurisdiction over any non-domiciliary, . . .
who . . . through an agent:
. . .
3. commits a tortious act without the state causing
injury to person or property within the state, . . . if he
(i) regularly does or solicits business, or engages in
any other persistent course of conduct, or derives
substantial revenue from goods used or consumed
or services rendered, in the state, or
(ii) expects or should reasonably expect the act to
have consequences in the state and derives
substantial revenue from interstate or international
commerce . . ..

Solarium contends that Four Seasons has not shown
that any of the alleged tortious acts Solarium
committed without the state 'caus[ed] injury to
person or property within the state.'

The complaint, so far as pertinent, alleges, in
substance, the following. Four Seasons employed
Petano from June 13, 1983 to April 27, 1986 as its
Midwest Regional Sales Manager, and from the
latter date to May 23, 1986 as its National Accounts
Manager. In these posts Petano was responsible for
servicing the national accounts and for soliciting
prospective dealers and franchisees and negotiating
contracts with them. He was privy to and used
confidential information of Four Seasons, under the
direction that he keep it confidential.

In the course of his employment Petano signed an
agreement stating that he would (a) for two years
after leaving Four Seasons not take employment
requiring him to disclose confidential information,
and (b) for one year after leaving would not try to
divert customers from Four Seasons or try to induce
its employees to leave.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

While still employed at Four Seasons, Petano conspired with Solarium to approach franchisees, dealers and employees of Four Seasons to convince them to terminate their relations with Four Seasons. After May 23, 1986, Solarium employed Petano, and they approached some of Four Season's employees, dealers and franchisees, using confidential information, to try to induce them to break their ties to Four Seasons and work for Solarium.

**\*2** The affidavits for Solarium state that (a) it has and has had no offices, employees or agents based in New York, (b) a mere 3-1/2 percent of its products have been sold in New York, (c) it has received orders from only six of approximately two hundred independent dealers in New York, and (d) Petano is based in Chicago, Illinois, and has performed no services for Solarium in New York.

Four Seasons submits affidavits from its President Christopher Esposito, its Eastern Regional Sales Manager Anthony Russo, and its Midwest Regional Manager John Gapa. Esposito says that in July 1985 Petano was in New York for Four Seasons' regional manager training meetings and there received confidential information about new products, company strategy, distribution, marketing and the like. Again in January 1986 Petano attended additional meetings in New York and acquired similar information.

Shortly after Petano's departure from Four Seasons Esposito began receiving reports that Petano was soliciting its suppliers, dealers and employees. In particular Esposito heard that Petano had approached Russo, who was based in New York. According to Esposito he was thus 'forced' to offer more bonuses and better incentive plans to keep Russo as an employee.

Esposito also says that Solarium contacted Southwall Technologies in California to induce it to sell to Solarium an insulating glass which Southwall manufactures in New York and is under exclusive license to sell to Four Seasons. Esposito in addition claims that in August 1986 Petano and other Solarium officials visited Four Seasons' Chicago franchisee, Bob Mulder, to induce him to switch to Solarium. Mulder, whose francise agreement is governed by New York law, declined to terminate his agreement with Four Seasons at that time. Gapa confirms that Mulder informed him of this incident.

Russo's affidavit recites Petano's call to him advising him that Solarium 'needed someone in the Northeast and that there might to a position available for someone like me.' Russo told Petano he intended to honor his contract with Four Seasons.

The New York case most closely in point is <u>Sybron Corp.</u> v. <u>Wetzel</u>, 46 N.Y.2d 197, 385 N.E.2d 1055, 413 N.Y.S.2d 127 (1978). There Sybron, a manufacturer of glass-lined vessels, sued its former employee, Wetzel, and a competitor corporation, De Dietrich, to enjoin it from employing Wetzel and to prevent him from divulging trade secrets which he acquired while working in New York.

The court considered the application of C.P.L.R. § 302(a)(3), quoted above, and held that (despite the literal language of the section) a tort need not ' already have been committed for jurisdiction to be available under the statute.' Id. at 204, 385 N.E.2d at 1058, 413 N.Y.S.2d at 131. To hold that the plaintiff had to show a completed tort would mean that the section 'would never be usable by a plaintiff seeking anticipatory injunctive relief.' Id. It was thus enough that the facts gave 'rise to the probable inference that there is a conscious plan to engage in unfair competition and misappropriation of trade secrets.' Id.

**\*3** Solarium tries to distinguish this holding on the ground that Four Seasons has made no motion for a preliminary injunction and therefore is not serious about seeking such relief. That argument presupposes that Solarium will have accomplished all of its allegedly tortious objectives prior to entry of any final injunction. Jurisdiction does not depend on such a presupposition.

The court in the <u>Sybron</u> case found the more difficult question to be whether the out of state acts of De Dietrich 'will result in injury in New York.' Id. at 205, 385 N.E.2d at 1058, 413 N.Y.S.2d at 131. De Dietrich approached Wetzel in Florida, where he had retired after working for many years

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

in New York, and asked him to supervise De Dietrich's facility in New Jersey. As to this issue of injury in New York the court said that the 'critical' facts were that 'it is New York where plaintiff manufactures and relines glasslined equipment and the alleged trade secrets were acquired, and the economic injury plaintiff seeks to avert stems from from the threatened loss of important New York customers.' Id. at 205, 385 N.E.2d at 1059, 413 N.Y.S.2d at 131.

The Four Seasons' affidavits in the present case certainly permit the inference that should its alleged trade secrets be disclosed some business from its New York sales could suffer. In contrast with what occurred in the Sybron case, Four Seasons has not pointed to the solicitation by Solarium of a large Four Seasons customer in New York. But Solarium admits to having made sales in New York through dealers, and the Four Seasons' affidavits assert, and Solarium does not deny, that it sells its products through dealers in at least Queens, Albany, and Port Jervis.

Four Seasons and Solarium are competitors for customers in New York. The confidential information is alleged to be useful in that competition. This case is thus not distinguishable from the Sybron decision. Here the expectation of consequences within the state is not merely limited to 'the indirect financial loss resulting from the fact' that Four Seasons 'is domiciled there.' Fantis Foods, Inc. v. Standard Importing Co., Inc., 49 N.Y.2d 317, 326-27, 402 N.E.2d 122, 126, 425 N.Y.S.2d 783, 787 (1980), and cases cited.

Solarium's motion to dismiss is denied. So ordered.

E.D.N.Y., 1987.
Four Seasons Solar Products Corp. v. Solarium Systems, Inc.
Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**

Georgiadis v. First Boston Corp.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Hourmouzis G. **GEORGIADIS**, Plaintiff,
v.
The **FIRST BOSTON** CORP. and Credit Suisse
**First Boston**, Ltd., Defendants.
**No. 90 CIV. 7672 (PKL).**

July 27, 1994.

Walker & Hill, New York City, Stephen R. Hill, of
counsel, for plaintiff.
Shaw, Pittman, Potts & Trowbridge, New York City
(Kenneth A. Caruso, of counsel), for defendants.

*OPINION AND ORDER*
LEISURE, District Judge:
**\*1** This is an action for breach of contract, unjust
enrichment and quantum meruit. Defendant Credit
Suisse First Boston, Ltd. ("CSFB") now moves to
dismiss the claims against it on the grounds of
*forum non conveniens.* CSFB originally moved to
dismiss plaintiff's Second Amended Complaint for
*forum non conveniens* in December of 1992. Since
then, the Court granted plaintiff leave to replead
claims against defendant First Boston. *Georgiadis
v. First Boston Corp. and CS First Boston, Inc.,* 90
Civ. 7672, 1992 WL 18270, at \*3, 1992 U.S.Dist.
LEXIS 787, at \*9 (S.D.N.Y. Jan. 29, 1992)
(Leisure, J.). Plaintiff reasserted his claims by way
of the Third Amended Complaint. While CSFB
has not amended its December, 1992 motion to
dismiss plaintiff's Third Amended Complaint for
*forum non conveniens,* the Court grants CSFB's
request to construe the instant motion as a motion to
dismiss plaintiff's Third Amended Complaint
(hereinafter "Complaint"). *See* CSFB's Reply
Memorandum in Support of Motion to Dismiss ("
CSFB Reply"), at 3. For the reasons set forth
below, CSFB's motion is denied.[FN1]

BACKGROUND

As a general matter, for the purposes of a motion to
dismiss, the allegations in the plaintiff's complaint
are assumed to be true. *See Easton v. Sundram,*
947 F.2d 1011, 1014-15 (2d Cir.1991), *cert. denied,*
112 S.Ct. 1943 (1992); *Allen v.
Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d
Cir.1991). However, it does not necessarily follow
that the Court must slavishly accept plaintiff's
allegations in his complaint as true in a motion to
dismiss. The Second Circuit has held that it is
entirely appropriate for a court to look beyond the
complaint and examine any evidence before it, such
as affidavits, in resolving a jurisdictional dispute.
*See Cargill Intern. S.A. v. M/T Pavel Dybenko,* 991
F.2d 1012, 1019 (2d Cir.1993) (citations omitted);
*Antares Aircraft, L.P. v. Federal Republic of
Nigeria,* 948 F.2d 90, 96 (2d Cir.1991) ( "On a
motion under Fed.R.Civ.P. 12(b)(1) challenging the
district courts's subject matter jurisdiction, the court
may resolve disputed jurisdictional fact issues by
reference to evidence outside the pleading, such as
affidavits"). Presently before this Court is
defendant's motion to dismiss for *forum non
conveniens,* which raises a disputed factual issue
relating to the appropriateness of this Court serving
as the forum. Accordingly, this Court has invoked
the aforementioned principles in resolving the
factual disputes surrounding the instant motion.

Applying these principles, the facts of the case are
as follows. Plaintiff alleges that CSFB is a British
corporation which maintains an office and does
business in New York. Complaint at 2. Plaintiff's
counsel affirms under penalty of perjury facts which
tend to substantiate this allegation. Affidavit at ¶
5. The Court notes that CSFB's counsel denies that
CSFB maintains an office in New York. Reply at
4. However, while CSFB does provide the Court
with affidavits of various CSFB employees, it does
not present any sworn deposition testimony or
affidavits that directly impugn plaintiff's contention.
*See, e.g.,* CSFB Motion at Exhibit A, B. Finding

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

that plaintiff's contention that CSFB maintains an office in New York has some evidentiary support, and that plaintiff's counsel has submitted a sworn affidavit supporting this contention, the Court also finds that CSFB has not presented sufficient evidence to controvert the factual contention advanced by plaintiff.

*2 In January of 1989, CSFB sought plaintiff's assistance to obtain a contract with the Halkis Cement Company ("Halkis") for advice regarding the sale of equity interest in Halkis and the financial restructuring of the company's indebtedness.[FN2] Plaintiff agreed to assist CSFB, and the parties entered into an oral agreement by which plaintiff was to be compensated for his services to CSFB in the amount of six percent (6%) of the amount Halkis paid CSFB, starting in February, 1989. Plaintiff was also to be reimbursed for expenses incurred in working to obtain a contract between CSFB and Halkis. On November 6, 1989, this oral agreement between plaintiff and CSFB was reduced to a writing. *See* Defendant CSFB's Motion to Dismiss, filed December 9, 1992, ("CSFB Motion" ), at Exhibit E.

In carrying out his obligations to CSFB, plaintiff incurred $57,677.28 in out-of-pocket expenses. In February of 1989, CSFB and Halkis entered into an oral contract, confirmed in writing on February 24, 1989, whereby Halkis retained the financial services of CSFB. *See* CSFB Motion at Exhibit D. To date, Halkis has paid CSFB in excess of 950,000 pounds sterling for their financial services, and continues to pay CSFB 42,500 pounds sterling per month. However, plaintiff has only received a sum of 4,080 pounds sterling ($6,400.40) from CSFB. *See* Complaint at ¶¶ 28-37.

## DISCUSSION

Under the doctrine of *forum non conveniens,* "when an alternative forum has jurisdiction to hear [a] case, and when trial in the chosen forum would ' establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting

the court's own administrative and legal problems,' the court may, in the exercise of its sound discretion, dismiss the case." *American Dredging Co. v. Miller,* 114 S.Ct. 981, 985 (1994) (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241 (1981)). *Accord Blanco v. Banco Indus. De Venezuela, S.A.,* 997 F.2d 974, 994 (2d Cir.1993). Therefore, there is a strong presumption in favor of a plaintiff's choice of forum, although dismissal nevertheless may be appropriate where certain private and public factors point towards trial in an alternative forum. *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.1993) (citing *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-509 (1947) and *Reyno,* 454 U.S. 235, 255 (1981)).

The private and public interest factors that constitute the "uniform standard" for *forum non conveniens* determinations in the Second Circuit include: (1) the ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) practical problems affecting the efficiency and expense of a trial; (5) enforceability of judgments; (6) administrative difficulties flowing from court congestion; (7) imposing jury duty on citizens of the forum; (8) the local interest in having controversies decided at home; and (9) the avoidance of unnecessary problems in the application of foreign law. *Alcoa S.S. Co. v. M/V Nordic Regent,* 654 F.2d 147, 156 (2d Cir.1980) ( *en banc* ), *cert. denied,* 449 U.S. 890. *Accord Allstate,* 994 F.2d at 1001 (citing *Gilbert,* 330 U.S. at 508-509). The Second Circuit relies heavily on the discretion of the district courts in weighing these factors, and has held that they will reverse a *forum non conveniens* determination only where a court fails to carefully consider the *Gilbert* factors. *Allstate,* 994 F.2d at 1001 (quoting *Borden, Inc. v. Meiji Milk Prods. Co.,* 919 F.2d 822, 828 (2d Cir.1990)). *See Blanco,* 997 F.2d at 978. Accordingly, this Court now turns to an evaluation of the *Gilbert* factors in the instant case.

I. Existence of an Alternative Forum and
Enforceability of Judgments

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**\*3** As a threshold matter, a defendant seeking to dismiss a complaint for *forum non conveniens* " must demonstrate that an adequate alternative forum exists." *Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167 (2d Cir.1991). By way of affidavits of an expert in English law, CSFB claims that the instant action may be brought in the High Court of Justice in London, England under British jurisdictional law. *See* CSFB's Memorandum in Support of Motion to Dismiss, filed December 9, 1992, at 5. Plaintiff does not contest this opinion. *See* Affidavit at ¶¶ 10-12. Although CSFB has not explicitly consented to suit in England, the Court finds that an alternative forum for plaintiff's claims against CSFB does exist. Since CSFB is a corporation organized and existing under the laws of the United Kingdom, this Court need not question whether the alternative forum in the instant case could grant and enforce an adequate remedy against it. *See Evans v. Cunard Line Limited,* 93 Civ. 5745, 1994 WL 150826, at \*1, 1994 U.S.Dist. LEXIS 5029, at \*2 (S.D.N.Y. Apr. 19, 1994) (Leisure, J.) (holding that England constitutes an alternative forum with adequate remedies for a maritime action).

### II. Availability of Witnesses and Ease of Access to Sources of Proof

CSFB contends that Harry Adamopoulos (" Adamopoulos"), the principle witness for CSFB in the instant case, resides and works in London. Plaintiff claims, however, that Adamopoulos travels frequently to New York. Affidavit, at ¶ 5. Additionally, it is undisputed that, Adamopoulos has travelled to Greece to represent CSFB in its affairs with Halkis. The Court sees no reason why Adamopoulos, as a CSFB employee, would be unable to travel to this forum to represent CSFB in the instant case. CSFB has not demonstrated that its difficulty in obtaining Adamopoulos as a witness in New York is sufficient to tip the balance of the instant *forum non conveniens* determination in their favor. *See also Calavo Growers v. Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J. concurring) ("It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit"), *cert. denied,* 449 U.S. 1084

(1981).

Furthermore, CSFB alleges that all documents relating to Halkis are stored in London. CSFB Motion at Exhibit B. However, the Court notes that, in contrast to the airplane wreckage that constituted the central evidence required to adjudicate *Reyno,* 454 U.S. 235, contractual documents can more easily be transferred from one forum to another. Nor would a jury in this case be required to view a specific location, or to have knowledge of a specific locality. *Cf.* Blanco, 997 F.2d at 982. CSFB's reliance on British treaties relating to the taking of Greek evidence abroad is inapposite since the record does not reveal substantial reasons why plaintiff would need to rely on Greek evidence to prove his claims. *Cf. Abiaad v. General Motors Corp.,* 538 F.Supp. 537, 542-43 (E.D.Pa.1982). Accordingly, this factor does not weigh in favor of CSFB's motion to dismiss for *forum non conveniens.*

### III. Cost and Practical Problems affecting the Efficiency of Trial

**\*4** CSFB does not claim that the cost or practical difficulties of transferring documents and witnesses to New York for trial would be "oppressive," " vexatious" or "harassing." As the documentary evidence is in the English language, no translation costs will be imposed on the parties or the Court in the instant case. *See Blanco,* 997 F.2d at 983 (necessity of translating documentary evidence, depositions and trial testimony weighs in favor of dismissal for *forum non conveniens* ). Additionally, it is undisputed that CSFB's parent company, CS First Boston, Inc., maintains an office in New York. Affidavit at ¶ 5; Reply at 4. Therefore, the practical difficulties of conducting litigation in a foreign nation are diminished by CSFB's pre-existing connections with this forum, and it cannot be inferred from the record that litigating the instant case would constitute an oppressive financial burden to the defendant. *See Calavo Growers,* 632 F.2d at 969 ("the realities of modern transportation and communications ... have significantly altered the meaning of non conveniens. ")

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

Furthermore, the Court must take into consideration that plaintiff has related claims pending against defendant First Boston in this forum. The Second Circuit has noted that "[t]here is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be avoided." *Wyndham Associates v. Bintliff,* 398 F.2d 614, 619 (2d Cir.1968), *cert. denied* 393 U.S. 977. Therefore, while CSFB's private interest in avoiding the cost of litigation in a foreign country supports its motion, the public interest in the efficient administration of justice constitutes a counter-balancing consideration. Evaluated together, these factors do not weigh in favor of the instant motion to dismiss for *forum non conveniens.*

### V. Avoidance of the Application of Foreign Law

A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 497 (1941); *Machleder v. Diaz,* 801 F.2d 46, 51 (2d Cir.1986), *cert. denied* 479 U.S. 1088 (1987). Following the constitutional standards for choice-of-law determinations established by the Supreme Court in *Allstate Ins. Co. v. Hague,* 449 U.S. 302 (1981), New York may assert its law only if a sufficient nexus with the case exists so that such an assertion would not be arbitrary or fundamentally unfair. *See Bader v. Purdom,* 841 F.2d 38, 39 (2d Cir.1988); *Cooney v. Osgood Mach., Inc.,* 81 N.Y.2d 66, 71, 612 N.E.2d 277, 279, 595 N.Y.S.2d 919 (1993) (Kaye, C.J.) (citing *Allstate Ins. Co. v. Hague,* 449 U.S. at 312-313).

Having rejected the traditional choice-of-law doctrine of *lex loci delicti* long ago in *Babcock v. Jackson,* 12 N.Y.2d 473, 484, 191 N.E.2d 279, 285, 240 N.Y.S.2d 743, 751 (1963), New York has developed a "center of gravity" or "grouping of contacts" approach to choice-of-law issues in contract cases to determine whether New York has a sufficient interest in a dispute to justify the assertion of its own law. *Matter of Allstate Ins. Co.,* 81 N.Y.2d 219, 226, 613 N.E.2d 936, 939, 597 N.Y.S.2d 904 (1993) (Kaye, C.J.) (citations omitted). In applying New York law to cases involving transnational financial transactions, the New York Court of Appeals has noted that New York is a "financial capital of the world" and "in order to maintain its pre-eminent financial position, it is important that the justified expectations of the parties to [a New York contract] be protected." *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.,* 37 N.Y.2d 220, 227, 333 N.E.2d 168, 172-73, 371 N.Y.S.2d 892, 898 (1975), *cert. denied* 423 U.S. 866.

**\*5** As previously noted, the instant defendant allegedly breached a contract that was negotiated in its own office in New York. This consideration supports the application of New York law. *See Passalacqua Builders, Inc. v. Resnick Developers South, Inc.,* 933 F.2d 131, 137 (2d Cir.1991) (negotiation of contract within New York establishes New York's interest in breach of contract case, as does place of business of the parties) (citing *Intercontinental Planning Ltd. v. Daystrom, Inc.,* 24 N.Y.2d 372, 382, 248 N.E.2d 576, 581, 300 N.Y.S.2d 817, 825 (1969)). While CSFB is an English corporation, neither plaintiff nor CSFB conducted business in England. Affidavit at ¶ 8. The Court finds that England's competing interest in asserting its own laws over the instant case is outweighed by New York's interest in regulating the contractual obligations of corporate agents within its territory. *See Totalplan Corp. of America v. Colbourne,* 14 F.3d 824, 832 (2d Cir.1994) (holding that New York law applies to a contractual dispute where the interests of California and New York are equally divided). Accordingly, New York law applies in the instant case and thus this factor weighs against the instant motion to dismiss for *forum non conveniens. See Gilbert,* 330 U.S. at 508.

### VI. Administrative Difficulties and Imposition of Jury Duty

The Southern District of New York regularly adjudicates cases involving issues similar to the one at bar. The Court therefore anticipates no special administrative difficulties that would weigh

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

significantly in favor of CSFB's motion to dismiss. *See Hatzlachh Supply Inc. v. Savannah Bank of Nigeria,* 649 F.Supp. 688, 693 (S.D.N.Y.1986) ("In terms of court congestion, it is true that the Southern District of New York is a very busy jurisdiction but this is only one factor and when balanced against the other public and private interests is not persuasive.") Plaintiff's allegations establish a meaningful nexus with the instant forum, and touch upon New York's interest in remaining a financial capital of the world by providing a forum for the instant dispute. *See J. Zeevi and Sons, Ltd.,* 37 N.Y.2d at 227. Accordingly, the Court concludes that the resolution of this case in a New York forum does not constitute an unreasonable imposition on a New York jury. *See Gilbert,* 330 U.S. at 508-509.

Conclusion

After a careful consideration of the *Gilbert* factors, the Court concludes that not only does the balance fail to tip strongly in favor of CSFB, but also that the calculus of convenience favors trial in this forum. Accordingly, the instant motion to dismiss for *forum non conveniens* is hereby denied.

SO ORDERED

> FN1. As an initial matter, it should be noted that plaintiff did not file the Third Amended complaint until July 18, 1994, although plaintiff served a copy of the Third Amended Complaint, along with an Affidavit in Opposition to CSFB's Motion to Dismiss (the "Affidavit"), on CSFB's counsel on September 17, 1993. *See* CSFB Reply at 2. Plaintiff's failure to file its opposition papers until after this Court specifically requested that it do so clearly violates Local Civil Rule 3(b), and thereby constitutes grounds for this Court entering default judgment in favor of the defendant. *See Washington Square Post No. 1212 v. City of New York,* 808 F.Supp. 264, 269 (S.D.N.Y.1992) (Leisure, J.). However, since CSFB received plaintiff's papers, and

had an opportunity to respond to the Third Amended Complaint and Affidavit in their Reply, it suffered no prejudice as a result of plaintiff's failure to file its papers. Accordingly, the Court shall consider plaintiff's arguments made in opposition to this motion despite plaintiff's initial failure to file them with the Court. As the instant motion was filed just months after CSFB was named a party to the action, plaintiff's contention that the motion is untimely is without merit.

> FN2. Halkis is a Greek cement company for which plaintiff had previously provided consulting services. Complaint at ¶ 28.

S.D.N.Y.,1994.
Georgiadis v. First Boston Corp.
Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 4

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 56
--------------------------------------------------------------------X

SHARON HAUGH,

                          Plaintiff,

                                                    Index No. 600651/03

          -against-

SCHRODERS PLC, SCHRODERS INCORPORATED,
and SCHRODER INVESTMENTS (BERMUDA)
LIMITED,

                          Defendants.

                                            FILED

                                            DEC - 4 2003

                                            COUNTY CLERK'S OFFICE
                                            NEW YORK
--------------------------------------------------------------------X

**RICHARD B. LOWE III, J.:**

  Motion sequence numbers 001 and 002 are consolidated for disposition.

  This action alleges breach of contract and breach of fiduciary duty, and seeks a

declaratory judgment that certain partnership units be reallocated.  In motion sequence number

001, defendant Schroders plc moves to dismiss the complaint as against it for lack of personal

jurisdiction.  In motion sequence number 002, all defendants move for an order admitting

Christine N. Kearns and Matthew A. Anzaldi, pro hac vice, for all purposes in conjunction with

this action.  Plaintiff opposes and cross-moves to disqualify Robert Robbins, Esq. and Shaw

Pittman LLP from serving as counsel in this action.

<u>FACTS (Motion Sequence 001)</u>

  Plaintiff Sharon Haugh (Haugh) is a limited partner in an Internet venture called Internet

Finance Partners LP (IFP), which was formed in late 1999. Defendants Schroders Incorporated

(Schroders GP) and Schroders Investments (Bermuda) Limited (Schroders Bermuda LP) are the

1

general partner and a limited partner, respectively, of IFP. Schroders GP is a corporation organized under the laws of Delaware, and is administered in Bermuda. Schroders Bermuda LP is a corporation organized under the laws of Bermuda, with its principal place of business in Bermuda. Both of these companies expressly consented to the personal jurisdiction of New York state and federal courts.

Schroders plc is a United Kingdom public limited company, with its principal office in London. According to defendants, Schroders plc is the ultimate parent of the Schroders group of companies worldwide, and is a holding company that owns the other defendants through several intermediate subsidiaries. Defendants maintain that Schroders plc's subsidiary, Schroders Holdings plc (also a UK corporation) owns Schroders International Holding Limited (also a UK corporation), which owns Schroders Bermuda LP. According to defendants, each of them maintains separate corporate formalities. When IFP was formed, and to date, Schroders Bermuda LP had no directors in common with Schroders plc. Schroders GP had only one director in common with Schroders plc. Defendants further maintain that Schroders plc was not a signatory to the agreements involving IFP, and is not even mentioned in them.

Plaintiff contends that Schroders plc was very much involved with the actions that are the subject of her complaint, and that it directly conducts substantial and profitable business in New York through three separate entities. Among the allegations, plaintiff states that Schroders plc caused Schroders LP (another related entity) to refuse to fund $8 million of its obligations, and forced Schroders GP to shut down IFP's business. It then failed to reallocate IFP's partnership interest among IFP's other limited partners, despite the fact that the allocation was based upon funding the partnership in accordance with the agreements. Haugh also contends that Schroders

2

plc was a party to the binding Memorandum of Understanding with respect to IFP, and attaches a copy of the Memorandum to her papers.

In response, Schroders plc contends that it is not the signatory to the Memorandum of Understanding, and submits several documents indicating that the corporation changed its name several times between January and April 2000. First incorporated as Granard Public Limited Company on January 14, 2000, the company changed its name to Schroder Holdings PLC on January 19, 2000, then to New Schroders plc on February 18, 2000, and finally to Schroders plc on April 18, 2000. The Memorandum of Understanding was signed by one David M. Salisbury on February 4, 2000, on behalf of Schroders plc. Schroders plc avers that at that time, it was not Schroders plc. Defendants do not offer any explanation regarding what entity did, in fact, sign the Memorandum of Understanding, or what the relationship is between the various entities. Another confusing aspect is that Schroders plc claims that Schroders Holding plc is its subsidiary, whereas, according to the documents submitted, it is a previous name of Schroders plc. Another area of confusion is that defendants contend that Schroders plc is the ultimate parent of the Schroders group of companies worldwide, yet its predecessor did not incorporate until January 2000, while at least some of its subsidiaries are alleged to have existed before that time, e.g., Schroders plc is alleged to have formed IFP in 1999.

<u>DISCUSSION (Motion sequence no. 001)</u>

The parties discuss the various requirements for finding that a party is subject to jurisdiction pursuant to CPLR 301 and 302. However, in view of the confusing and contradictory allegations regarding the identity of Schroders plc itself, much less its activities in New York and through New York entities, it is impossible, at this juncture, for the court to

3

determine whether jurisdiction can be asserted over Schroders plc. The parties must complete discovery on that issue. Following discovery, the matter can be considered based upon evidence, and, if needed, the court will conduct a hearing on the issue of jurisdiction. However, any determination would be premature at this time.

FACTS (Motion Sequence 002)

Defendants move to admit two attorneys, pro hac vice, so that they can participate in argument and trial in this action. Both are members in good standing of the bars of their respective states, and both are employed by the Washington, D.C. law firm of Shaw Pittman LLP (Shaw Pittman).

Haugh opposes the motion, and cross-moves to disqualify Robert Robbins, a partner with Shaw Pittman, as well as the Shaw Pittman firm, from representing defendants. Haugh maintains that disqualification is warranted because Robbins and other attorneys at Shaw Pittman will be material witnesses in this action, based upon their direct participation in the matters at issue. Haugh further maintains that Robbins and Shaw Pittman were counsel to defendants with respect to the formation of IFP, and rendered legal advice to the limited partners, including Haugh, in connection with the formation of IFP and the execution of the partnership agreements. They also continued to provide certain legal advice to IFP. After Schroders plc decided to shut down IFP's business, and to cease funding through Schroders LP, Haugh had numerous conversations and correspondence with Robbins concerning the funding obligation.

Robert Robbins submits an affidavit in opposition to the cross motion, in which he states that he and other attorneys in Shaw Pittman represented IFP, and its general partner, Schroders GP. Schroders GP had the complete right to operate, manage, and control the affairs of IFP.

4

Haugh was a limited partner, and a member of the Governing Board for IFP. Shaw Pittman did

not represent any of the individual limited partners, and communicated that fact to Haugh. Shaw

Pittman also did not represent Haugh in connection with any other matter. Haugh was

represented by separate legal counsel with respect to her employment agreement with IFP, and

with respect to the terms of the letter dated June 23, 2000, which constitutes part of the

agreement on which Haugh brings this action. Robbins maintains that Haugh was occasionally a

party to communications, due to her position as a member of the Governing Board and

Chairperson of the Management Committee of IFP, but was never given legal advice in any other

capacity. Robbins also states that he is not going to appear on behalf of defendants in this

litigation, and those attorneys who have appeared are part of Shaw Pittman's litigation group, and

have not represented IFP or Schroders GP in connection with the formation and business of IFP.

Christine Kearns also submits an affidavit in opposition, in which she asserts that, in a

related federal action, Haugh did not object to defendants' motion that she and another Shaw

Pittman attorney be admitted pro hac vice, nor did Haugh, at any time, object to Shaw Pittman

representing defendants in that action.

<u>DISCUSSION (Motion sequence 002)</u>

Haugh does not base her motion to disqualify on a violation of the Code of Professional

Responsibility, but rather on general equity notions based upon the particular circumstances.

Haugh points out that Robbins and other attorneys from Shaw Pittman will, in all likelihood, be

called to testify. She argues that there is danger that the jury may accord the testifying attorneys'

arguments and testimony undue weight.

Defendants point out that Haugh did not object to Shaw Pittman's representation of

5

defendants for more than eight months, even when Shaw Pittman moved, in the federal action, to disqualify Haugh's former counsel on the basis of conflict of interest. They also note that Haugh requested that Shaw Pittman accept service of the summons and complaint in this action on behalf of defendants.

Disqualification of a law firm implicates the substantive rights of the litigants to counsel of their choice. *S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp.*, 69 NY2d 437, 443 (1987). Motions to disqualify can become tactical decisions for strategic advantage. *Jamaica Publ. Serv. Co. v AIU Ins. Co.*, 92 NY2d 631, 638 (1998). Therefore, the court must carefully scrutinize such requests, and the party seeking such relief bears the burden of demonstrating why disqualification is necessary. *Id.*

Haugh had not demonstrated any compelling reason for disqualification. Shaw Pittman is not acting in violation of any disciplinary rules, and Haugh has not demonstrated that it represented her at any time, other than as a beneficiary of its representation of IFP. Nor is the attorney who may testify in this action the same attorney as the one who will be conducting the litigation. Thus, there is no danger that his testimony will be accorded greater weight than that of any other witness. The delay in seeking such disqualification also raises the question of whether it is being sought for tactical reasons. Haugh contends that she did not make this motion earlier because there had been no activity directed to the substance of Haugh's claims until defendants' recent service of discovery requests. However, this explanation ignores the fact that there were prior motions made in the federal action, and discovery was conducted in that action, including a deposition of Haugh. Nonetheless, no formal or informal objection was ever made to Shaw Pittman representing defendants.

6

The combination of plaintiff's delay in seeking disqualification, and the failure of Haugh to demonstrate any compelling need to disqualify Shaw Pittman, militates in favor of denying the cross motion.

Haugh does not raise any objection to admitting Kearns or Anzaldi, pro hac vice, other than the alleged conflict of interest. Since that argument is rejected, the motion to admit them is granted.

## CONCLUSION

Accordingly, it is hereby

ORDERED that defendant Schroders plc's motion (motion sequence 001) to dismiss for lack of personal jurisdiction is denied, without prejudice to renew following the completion of discovery on this issue; and it is further

ORDERED that defendants' motion (motion sequence no. 002) to admit Christine N. Kearns and Matthew A. Anzaldi pro hac vice is granted; and it is further

ORDERED that plaintiff's cross motion (motion sequence no. 002) to disqualify Robert Robbins and Shaw Pittman LLP from serving as counsel to defendants is denied.

Dated: November 24, 2003

FILED

DEC - 4 2003

COUNTY CLERK'S OFFICE
NEW YORK

ENTER:

J.S.C.

RICHARD B. LOWE III

7

# TAB 5

Westlaw.

Not Reported in F.Supp.                                                    Page 1

Not Reported in F.Supp., 1991 WL 79432 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

H

In re Chase Manhattan Corp. Securities Litigation
S.D.N.Y.,1991.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
In re CHASE MANHATTAN CORPORATION
SECURITIES LITIGATION.
This Document Relates To All Actions
**No. 90 Civ. 6092 (LMM).**

May 7, 1991.

*MEMORANDUM AND ORDER*
McKENNA, District Judge.
*1 Defendants' motion for a protective order vacating interrogatories and a document request and staying all discovery until after a ruling on their pending motion to dismiss pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) is denied.

While such relief is undoubtedly within the discretion of a District Court, *see* Fed.R.Civ.P. 26(c) , it should not be granted routinely simply on the basis that a motion to dismiss has been filed. "Had the Federal Rules contemplated that a motion to dismiss under Fed.R.Civ.P. 12(b)(6) would stay discovery, they would contain such a provision." *Moss v. Hollis,* 1990 Fed.Sec.L.Rep. (CCH) ¶ 95,443 at 97,260 (D.Conn. June 29, 1990). Defendants' argument is similar to that rejected in *Howard v. Galesi,* 107 F.R.D. 348, 350 (S.D.N.Y.1985), where the Court pointed out that " the defendant has assumed that the underlying motion to dismiss will be successful." But, as in that case, the Court is not prepared to find-especially since plaintiffs' response to the motion to dismiss is not yet due on an agreed briefing schedule-that dismissal is "inevitable." *Id.* (If there is a dismissal, moreover, plaintiffs may be granted the right to, and successfully, amend. *Id.* at 350 n. 4.) This is not a case such as *Kas v. Chase Manhattan Bank,* 1990 Fed.Sec.L.Rep. (CCH) ¶ 95,381 (S.D.N.Y. July 30, 1990) where the Court

denied discovery after dismissal of a complaint pending the filing of a well-pleaded amended complaint. Nor is it a case where plaintiffs' counsel are looking to discovery for a basis on which to sustain the challenged pleading: they have disavowed such a purpose.

Should the complaint (or an amended complaint) be sustained (but nothing contained herein is intended to reflect in any way on this question), commencement of the discovery process, while no doubt imposing some burden on defendants, will advance the ultimate disposition of this action. *Cf. Moss, supra,* at 97,260 n. 2. Such is particularly the case here where, although no motion to this effect is before the Court, defendants' counsel apparently have strong objections to the breadth of the outstanding discovery requests, and plaintiffs' counsel have suggested discussions with a view towards resolution of such objections, which, plainly, will take some time.

SO ORDERED.

S.D.N.Y.,1991.
In re Chase Manhattan Corp. Securities Litigation
Not Reported in F.Supp., 1991 WL 79432 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 6

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2006 WL 3714445 (S.D.N.Y.)
(Cite as: Slip Copy)

Manufacturing Technology, Inc. v. Kroger Co.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
MANUFACTURING TECHNOLOGY, INC.,
Plaintiff,
v.
THE KROGER CO., ATR Distributing Company,
Inc. and Fosdick & Hilmer, Inc., Defendants.
No. 06 Civ. 3010(JSR).

Dec. 13, 2006.

*MEMORANDUM*

RAKOFF, J.
*1 By respective motions dated September 6, 2006
and September 8, 2006, defendants Fosdick &
Hilmer, Inc. ("F & H") and ATR Distributing
Company, Inc. ("ATR") moved pursuant to
Fed.R.Civ.P. 12(b)(2) to dismiss plaintiff's
Amended Complaint for lack of personal
jurisdiction. By Order dated September 22, 2006,
the Court denied these motions. This Memorandum
serves to reconfirm that ruling and briefly states the
reasons therefor.

The pertinent allegations are as follows. Plaintiff
Manufacturing Technology, Inc. is a New York
corporation that develops computer programs to
collect, record, and analyze production information
at manufacturing facilities. Am. Compl. ¶¶ 1, 10.
Defendant The Kroger Co. ("Kroger") is an Ohio
corporation that operates supermarkets,
convenience stores, and jewelry stores throughout
the United States. *Id.* ¶ 2. Between 1998 and 2004,
Kroger purchased plaintiff's main offering, the "
FACTory Information System" ("FACTory"), for
use at 36 different facilities and agreed to abide by
licenses that prohibited Kroger from disclosing
FACTory to third parties. *Id.* ¶¶ 18-31. The
licenses are governed by Connecticut law. *Id.* ¶ 31.
Plaintiff alleges that Kroger, *inter alia,* breached

these license agreements and violated Connecticut's
trade secrets law when it disclosed FACTory to
competing software developers with the purpose of
developing a competing non-proprietary version of
FACTory. *Id.* ¶¶ 43-59.

After filing its original Complaint against Kroger on
or about April 19, 2006, plaintiff learned from
Kroger's initial production of documents that F & H
and ATR were involved in Kroger's attempts to
develop its own version of FACTory. Pl. Opp'n
Mem. at 3. In an Amended Complaint, dated
August 21, 2006, plaintiff named F & H and ATR
as additional defendants. The Amended Complaint
acknowledged that both companies are organized
under the laws of Ohio and have their principal
places of business in Ohio. Am. Compl. ¶¶ 3-4,
but asserted that ATR and F & H "are subject to the
jurisdiction of this Court since each: (i) has
committed tortious acts without the state causing
injury to Plaintiff within the State of New York (and
within this judicial district); (ii) should have
reasonably expected its tortious acts to have
consequences within the State of New York (and
within this judicial district); and (iii) derives
substantial revenue from interstate or international
commerce." *Id.* ¶ 8.

In a diversity case, a federal court applies the
personal jurisdiction rules of the forum state, here,
New York. *Arrowsmith v. United Press Int'l,* 320
F.2d 219, 223 (2d Cir.1963). Although the plaintiff
must ultimately "establish jurisdiction by a
preponderance of the evidence, either at a pretrial
evidentiary hearing or at trial," where an evidentiary
hearing has not taken place "the plaintiff need make
only a prima facie showing of jurisdiction through
its own affidavits and supporting materials." *Marine
Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904
(2d Cir.1981). At this stage, the Court must
construe such documents in the light most favorable
to the plaintiff, resolving all doubts in the plaintiff's
favor. *Cutco Indus., Inc. v. Naughton,* 806 F.2d
361, 365 (2d Cir.1986). Under New York law,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3714445 (S.D.N.Y.)
**(Cite as: Slip Copy)**

personal jurisdiction does not require that a tort be committed within the state; it is sufficient that the defendant's tortious act causes "injury to person or property within the state," the defendant "expects or should reasonably expect the act to have consequences in the state," and the defendant " derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3)(ii).

**\*2** Here, plaintiff has made a prima facie showing of each of these requirements. First, because plaintiff (and its intellectual property) is based in New York, the injury from the alleged trade secret theft is felt within New York State no matter where the theft took place. *See, e.g., Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 204-06 (1978) (finding financial injury to be felt in New York where defendant's out-of-state act of misappropriation of trade secrets threatened loss of New York sales).

Second, a string of emails makes out a prima facie showing that F & H and ATR should reasonably have expected their actions to have consequences in New York. In the first email in the string, dated October 24, 2003, Paul Kissner of plaintiff Manufacturing Technologies wrote to Greg Terhune of defendant Kroger, responding to various questions about plaintiff's programs. Declaration of James M. Andriola, Esq., dated September 14, 2006 ("Andriola Declaration"), Ex. D at FH005270-72. Mr. Kissner's email includes, at the bottom, a five-line warning that "[t]his document may include proprietary and confidential information of Manufacturing Technology Inc. and may only be read by those person or persons to whom it is addressed," and "may not be ... furnished to third parties" *Id.* at FH005272. Immediately above this short, clear warning is Mr. Kissner's name, email address, and the address of Manufacturing Technology at "3663 Lee Blvd. # 501 / Jefferson Valley, N.Y. 10535." *Id.* In spite of the warning, in the second email in the string, also dated October 24, 2003, Mr. Terhune forwarded the original email to David Bell at ATR, and wrote "[p]lease see Paul's response below to my earlier note." *Id.* at FH005269. In the third email in the string, dated October 28, 2003, Mr. Bell forwarded both of the prior emails to Joel Grubbs at F & H, with the

message "[h]ere is the write up from Kroger on how the system actually works for the time stamping." *Id.*

In the light most favorable to plaintiff, the email string shows that agents at F & H and ATR received a forwarded email from Kroger containing plaintiff's information that F & H and ATR intended to steal. In these circumstances, it is reasonably to be inferred that the agents at F & H and ATR would have read the clear warning at the bottom of the original email explaining that the email contained plaintiff's proprietary information, and would also have seen, immediately above the warning, plaintiff's New York address. This email string, therefore, constitutes a prima facie showing that both F & H and ATR should have expected their actions to have consequences in New York.

Third, plaintiff has made an adequate prima facie showing with respect to whether F & H and ATR derive substantial revenue from interstate commerce. With respect to F & H, plaintiff points to F & H's proposal to Kroger in which F & H wrote that

[f]rom our headquarters in Cincinnati, we conduct business across the nation.... [W]e have successfully conducted projects in the states of Alaska, California, Colorado, Georgia, Indiana, Maine, New Hampshire, New York, North Carolina, Ohio, Pennsylvania, and South Carolina. Additionally, we perform work for institutional and industrial clients in Indiana, Kentucky, Michigan, New Mexico, Ohio, Virginia, and West Virginia. We have experienced no difficulty in managing projects in any area of the country.

**\*3** Andriola Declaration Ex. A at FH000190. Plaintiff also points to a document showing that F & H received or would receive $7.4 million in revenue from Kroger in connection with the assignment at issue in this case, and plaintiff argues that because this revenue would come from Kroger's 41 facilities, only 4 of which are in Ohio, F & H necessarily was set to receive substantial revenue from interstate commerce. Pl. Opp'n Mem. at 12; Andriola Decl. Ex. E at K006750; Transcript, September 20, 2006 ("Tr."), at 17.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3714445 (S.D.N.Y.)
**(Cite as: Slip Copy)**

F & H admitted at oral argument that its total gross revenue over the last five years was $40 million and that F & H derived $3.2 million (8 percent) of this total revenue from interstate commerce. Tr. at 9, 28. But F & H asserts that all but $480,000 (1.2 percent of total revenue) of this $3.2 million was derived from the neighboring states of Kentucky and Indiana and must therefore be considered "local in character." Tr. at 6-7. F & H relies principally on *United Bank of Kuwait, PLC v. James M. Bridges, Ltd.,* 766 F.Supp. 113 (S.D.N.Y.1991), where the court did not consider revenues a Virginia company derived from the neighboring state of Maryland and from the District of Columbia in its determination of whether the Virginia company derived substantial revenue from interstate commerce. *Id.* at 117. But in that case, after excluding revenue derived from Maryland and the District of Columbia, the court found that the Virginia company derived only $2,000 (1 percent of revenues) in one year, and $22,600 (8 percent of revenues) in another year from interstate commerce. *Id.*

In the present case, even excluding revenue from neighboring states, F & H admits that it derived $480,000, or 1.2 percent of its gross revenue over five years, from interstate commerce, and in the present circumstances, at this early stage, this amount is "is too large to be considered insubstantial." *Allen v. Canadian General Elec. Co.,* 410 N.Y.S.2d 707, 708-09 (N.Y.App. Div.3d Dep't 1978) (holding that even "a mere 1% of total gross revenue" of $879 million can be considered substantial). Accordingly, plaintiff has made an adequate prima facie showing that F & H derives substantial revenue from interstate commerce.

As for ATR, it has provided no evidence that it does not derive substantial revenue from interstate commerce. ATR admitted at oral argument that the company derives revenue from interstate commerce, and that it serves at least Ohio, Kentucky, and Indiana. ATR claimed that the amount of revenue it derives from interstate commerce is not substantial, but ATR could not say specifically what percentage or amount of its revenue came from interstate commerce. Tr. at 20-22. The only number ATR offered was that its gross profits were $1.4 million

last year. Tr. at 21. Dismissal is inappropriate even where "there is no proof" that a defendant "derives substantial revenue from interstate or international commerce," where "that knowledge is peculiarly under the control of [the defendant]," and may come to light in the course of "[s]ubsequent discovery." *Tonelli v. Chase Manhattan Bank, N. A.,* 372 N.Y.S.2d 662, 663 (N.Y.App. Div. 1st Dep't 1975). Accordingly, dismissal of ATR is inappropriate at this stage.

*\*4* Finally, there is no due process concern in this case because, based on plaintiff's allegations, both ATR and F & H have had sufficient contacts with New York and the exercise of jurisdiction is reasonable. *See generally Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 113-15 (1987) (defining standards for assessing the twin due process requirements of minimum contacts and reasonableness).

Accordingly, the Court, by Order dated September 22, 2006, denied the motions to dismiss filed by ATR and F & H.

S.D.N.Y.,2006.
Manufacturing Technology, Inc. v. Kroger Co.
Slip Copy, 2006 WL 3714445 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.