TAB 7

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1992 WL 276913 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Moran v. Flaherty
S.D.N.Y.,1992.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Thomas MORAN and Ron Cirignano, Plaintiffs,
v.
Joseph FLAHERTY, individually and as President
of Local 1-2, Utility Workers Union of America,
JOHN WALSH, and LOCAL 1-2, UTILITY
WORKERS UNION OF AMERICA, Defendants.
**No. 92 Civ. 3200 (PKL).**

Sept. 25, 1992.

MEMORANDUM ORDER
LEISURE, District Judge,
*1 This Court referred this action to United States
Magistrate Judge Kathleen A. Roberts for general
pretrial supervision, including supervision of
discovery and resolution of nondispositive motions
on August 7, 1992. On September 9, 1992, Judge
Roberts issued an Order denying defendants'
request to stay discovery pending the resolution of
defendants' motion to dismiss plaintiffs' claims
pursuant to Fed.R.Civ.P. 12(b)(6), which is now
pending before this Court. Judge Roberts' Order
was subsequently amended by Order dated
September 14, 1992. On September 23, 1992, this
Court temporarily stayed discovery to permit
defendants to file objections to Judge Roberts'
Order. Defendants' objections and plaintiffs'
opposition to those objections were received on
September 24, 1992. For the reasons stated below,
defendants' objections are overruled and Judge
Roberts' Order is affirmed in whole.

When considering objections to an order issued by
a magistrate judge concerning a nondispositive
matter, the Court "shall modify or set aside any
portion of the magistrate judge's order found to be
clearly erroneous or contrary to law." Fed.R.Civ.P.
72(a). "Matters concerning discovery generally are

considered 'nondispositive' of the litigation."
*Thomas E. Hoar, Inc. v. Sara Lee Corp.,* 900 F.2d
522, 525 (2d Cir.), *cert. denied,* 111 S.Ct. 132
(1990); 12 Wright, Miller & Elliot, Federal
Practice & Procedure § 3076.5 (Supp.1992).

An order is clearly erroneous when " 'the reviewing
court on the entire record is left with the definite
and firm conviction that a mistake has been
committed.' " *Nikkal Indus., Ltd. v. Salton, Inc.,*
689 F.Supp. 187, 189 (S.D.N.Y.1988) (quoting
*Agricultural Servs. Ass'n v. Ferry-Morse Seed Co.,*
551 F.2d 1057, 1071 (6th Cir.1977)). Further, a
magistrate judge's resolution of a discovery dispute
deserves substantial deference. *See Thomas v.
Hoffman-La Roche, Inc.,* 126 F.R.D. 522, 524
(N.D.Miss.1989) (citing *Merritt v. International
Bro. of Boilermakers,* 649 F.2d 1013, 1017 (5th
Cir.1981); *Nikkal Indus., supra,* 689 F.Supp. at
189 ("a magistrate's report resolving a discovery
discourse between litigants should be afforded
substantial deference and be overturned only if
found to be an abuse of discretion.").

Addressing the appropriateness of a denial of a stay
of discovery pending the resolution of a motion to
dismiss, this Court does not find Judge Roberts'
decision to be clearly erroneous. While it is clear
that Fed.R.Civ.P. 26(c) provides authority for the
Court to issue a stay of discovery pending the
resolution of dispositive motions, *see, e.g.,
Transunion Corp. v. PepsiCo, Inc.,* 811 F.2d 127,
130 (2d Cir.1987), the issuance of a stay is not
mandated by rule or decision. Rather, as noted by
the Honorable Lawrence M. McKenna, United
States District Judge, Southern District of New
York, discovery should not be routinely stayed
simply on the basis that a motion to dismiss has
been filed. *In re Chase Manhattan Corp. Secur.
Litigation,* 1991 WL 79432, *1, 1991 U.S. Dist.
LEXIS 6136, *1 (S.D.N.Y. May 7, 1991). Judge
McKenna noted that the drafters of the Federal
Rules of Civil Procedure, had they contemplated an
automatic stay upon the filing of a motion to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1992 WL 276913 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

dismiss, would have so provided. In deciding whether a stay should issue, a court must consider the stage of the litigation, the type of motion currently pending, and other case-specific factors in determining whether to grant a stay. *See Hachette Distribution, Inc. v. Hudson County News Co.,* 136 F.R.D. 356, 358 (E.D.N.Y.1991).

**\*2** In *In re Chase Manhattan Corp. Securities Litigation,* Judge McKenna denied defendants' motion to stay discovery pending the resolution of a motion to dismiss. Judge McKenna noted that even if a dismissal was granted, plaintiffs might thereafter successfully amend their complaint. Allowing discovery to go forward could move the action along toward a speedier resolution:
Should the complaint (or an amended complaint) be sustained ..., commencement of the discovery process, while no doubt imposing some burden on defendants, will advance the ultimate disposition of this action.

1991 WL 79432, \*1, 1991 U.S. Dist. LEXIS 6136, \*2.

In the case presented to this Court, plaintiffs' have in fact already indicated an intention to file a motion to amend the Complaint. *See* Letter of Arthur Z. Schwartz, Esq., dated September 22, 1992. It is therefore possible, if not likely, that plaintiffs will succeed in correcting any procedural defects that might otherwise support defendants' motion to dismiss. Mindful of the procedural posture of this motion, this Court cannot find that the Order of Judge Roberts was clearly erroneous. Judge Roberts' Order denying a stay of discovery is supported by law and is appropriate under the particular facts of this case.

## CONCLUSION

For all the foregoing reasons, defendants' objections are overruled and the Order of United States Magistrate Judge Kathleen Roberts, dated September 9, 1992, as amended by Order dated September 14, 1992, is affirmed in whole. This Court further directs that defendants shall comply with the document production requirements of

Judge Roberts' Order by October 5, 1992, and that depositions shall be scheduled, at the mutual convenience of the parties, in an expeditious manner.

SO ORDERED.

S.D.N.Y.,1992.
Moran v. Flaherty
Not Reported in F.Supp., 1992 WL 276913 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB 8

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

▷
Treppel v. Biovail Corp.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Jerry I. TREPPEL, Plaintiff,
v.
BIOVAIL CORPORATION, Eugene N. Melnyk,
Kenneth C. Cancellara, Michael S. Sitrick, and
Sitrick and Company, Inc., Defendants.
**No. 03 Civ. 3002(PKL).**

Oct. 15, 2004.

Gibbons, Del Deo, Dolan, Griffinger & Vecchione,
P.C., New York, NY, R. Scott Garley, for Plaintiff.
Swidler Berlin Shereff Friedman, LLP, New York,
NY, Andrew J. Levander, Proskauer Rose LLP,
New York, NY, Ronald Rauchberg, for Defendants.

*OPINION AND ORDER*
LEISURE, J.
**\*1** In this diversity action claiming defamation,
defamation *per se*, tortious interference with
prospective economic advantage, prima facie tort,
and civil conspiracy, plaintiff alleges that
defendants' words and conduct ruined his reputation
and career as a successful securities research analyst
covering the healthcare and pharmaceutical
industry. Defendants now move to dismiss the
complaint under Rule 12(b)(6) of the Federal Rules
of Civil Procedure for failure to state a claim upon
which relief can be granted, contending that the
statements at issue are not defamatory and the
conduct at issue is not tortious. In addition,
defendants move to dismiss the complaint as to
defendants Biovail Corporation and Kenneth
Cancellara for lack of personal jurisdiction under
Rule 12(b)(2) of the Federal Rules of Civil
Procedure. For the reasons set forth below, the
Court denies in part and grants in part defendants'
motion to dismiss the complaint.

BACKGROUND

I. *Factual History*

Since the Court must accept plaintiff's allegations as
true for purposes of a motion to dismiss, *see
Eternity Global Master Fund Ltd. v. Morgan Guar.
Trust Co. of N.Y.,* 375 F.3d 168, 175 (2d Cir.2004),
the relevant facts, taken from plaintiff's Amended
Complaint, are set forth below.

A. *Parties*

Plaintiff Jerry Treppel was a prominent securities
research analyst for Banc of America Securities ("
BAS") at all times relevant to this action.
(Plaintiff's Amended Complaint ("Compl.") ¶ 13.)
As an analyst, he covered the healthcare and
pharmaceutical industry, focusing primarily on
small and medium size companies that
manufactured brand and generic drugs. *Id.* ¶¶
13-14. Among his duties as an analyst, plaintiff was
responsible for issuing research reports concerning
the financial health of the companies he followed
and for making recommendations regarding the
investment value of the securities of those
companies. *Id.* ¶ 15.

Defendant Biovail Corporation ("Biovail") is a
Canadian corporation that manufactures
pharmaceutical drugs and sells those drugs
throughout the United States. *Id.* ¶ 4. At all
relevant times, defendant Eugene Melnyk was the
Chairman and Chief Executive Officer of Biovail
and defendant Kenneth Cancellara was the General
Counsel of Biovail. *Id.* ¶¶ 5, 6. In addition,
defendant Michael Sitrick was the Chief Executive
Officer of defendant Sitrick and Company, and was
hired by Melnyk and Cancellara to serve as a media
contact and spokesperson for Biovail. *Id.* ¶ 7.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

### B. *Plaintiff's Coverage of Biovail and Andrx*

As an analyst covering the healthcare and pharmaceutical industry, plaintiff researched and analyzed Biovail and its business strategy over the course of many years. *Id.* ¶ 14. In addition to Biovail, plaintiff covered other companies in the industry, including Andrx Corporation ("Andrx"), Biovail's competitor. *Id.* In 1993, plaintiff acquired 24,000 shares of Andrx stock. *Id.* ¶ 18. Plaintiff avers that at all relevant times and in accordance with applicable securities laws and BAS policies, he held the stock in a managed account at UBS Paine Webber, which precluded him from controlling the trading of the stock. *Id.* Further, he consistently disclosed his holdings when required so as to avoid an apparent or actual conflict of interest. *Id.*

**\*2** On three occasions, plaintiff downgraded his recommendation concerning the value of Biovail's stock, resulting each time in a significant decline in Biovail's stock price and market capitalization. *Id.* ¶¶ 20, 24. On one of those occasions, April 29, 2002, plaintiff also publicly criticized Biovail and its management. *Id.* ¶ 24. In the days that followed, Biovail's stock price dropped by more than 21% and the company lost approximately $2.4 billion in market capitalization. *Id.*

### C. *Defendants' Response to Plaintiff's Coverage*

In an effort to counteract the negative media coverage of Biovail, defendants Melnyk and Cancellara hired defendants Sitrick and Sitrick and Company. *Id.* ¶ 21. After plaintiff's negative appraisal of Biovail on April 29, 2002, defendants made a series of public statements over the course of the following two months regarding plaintiff's coverage of Biovail and his investment in Andrx. The statements were incorporated into articles that were published by print and wire media in the United States and Canada.[FN1] *Id.* ¶¶ 29-31.

> FN1. The Court attaches a copy of each of the articles in question as an appendix to this Opinion and Order. Plaintiff relies upon twenty-two different articles, each of

which incorporated at least one of defendants' statements. The articles appeared in the following publications: *The Globe and Daily Mail, Canada Stockwatch, The Canadian Press, The National Post, Marketletter, CCN Newswire, The Ottawa Citizen, Dow Jones News Service, Dow Jones Newswires, Business Wire, Bloomberg News, The Business Journal, The San Francisco Chronicle,* and *Associated Press Newswires.*

### 1. *April 30, 2002 Statements*

The day after plaintiff downgraded Biovail's stock to a "sell" and criticized Biovail and its management, defendant Melnyk remarked that plaintiff turned sour on Biovail because the patent extension Biovail filed on Tiazac [a new hypertension drug] "hit one of his other recommendations hard," referring to Andrx (" Statement 29(a)").[FN2] *Id.* ¶ 29(a). He also stated that plaintiff's sell recommendation was "more about his support for Andrx than his negative view of Biovail" ("Statement 29(b)"). *Id.* ¶ 29(b).

> FN2. Consistent with the practice of the parties, the Court will refer to the statements at issue by the paragraph of the Amended Complaint in which each appears.

On the same day, defendant Cancellara, in discussing Biovail's patent infringement claim against Andrx, stated that "either Jerry doesn't understand the complexity of the issue, or worse, he understands it and chooses not to set the record straight" ("Statement 29(c)"). *Id.* ¶ 29(c).

### 2. *May 15, 2002 Statement*

BAS placed plaintiff on leave on May 13, 2002 because of his public criticism of Biovail and its management at the time he issued his April 29, 2002 sell recommendation. *Id.* ¶ 29(d). On May 15, 2002, defendant Sitrick, as spokesperson for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Biovail, stated: "We believe that given the serious action taken by Bank of America Securities that all of Mr. Treppel's comments about Biovail, both written and oral, should be called into question" (" Statement 29(d)"). *Id.* ¶ 29(d).

### 3. *May 16, 2002 Statements*

On May 16, 2002, *The Wall Street Journal* published an article based upon its review of plaintiff's account records, which revealed plaintiff's ownership of Andrx securities and the trading of options to buy and sell Andrx securities in plaintiff's account. *Id.* ¶ 26. That day, Biovail issued a press release that contained the company's reaction to the article. Four statements within the release are at issue and they read as follows:
*3 a. "After reviewing the trading records reported on by *The Wall Street Journal,* it was clear that Treppel held a substantial, previously undisclosed equity interest in a direct competitor-Andrx Group" ("Statement 30(a)"). *Id.* ¶ 30(a).
b. Plaintiff's account records "also showed unsolicited buy and sell orders for options in Andrx both prior and concurrently with Mr. Treppel issuing his analyst reports on Andrx and Biovail" (" Statement 31(a)"). *Id.* ¶ 31(a).
c. "After reviewing the trading records reported on by *The Wall Street Journal,* it was clear Mr. Treppel had directed his broker to make buy and sell orders on Andrx options prior to and concurrent with issuing reports on Andrx and Biovail" ("Statement 31(b)"). *Id.* ¶ 31(b).
d. Plaintiff's investment in Andrx "calls into question the objectivity of all reporting by Treppel" ("Statement 31(c)"). *Id.* ¶ 31(c).

In addition, within the news release, defendant Sitrick provided the following quote: "The information made public today is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel" ("Statement 30(b)"). *Id.* ¶ 30(b). Furthermore, he stated: "We have been concerned by the contradictory coverage of both Andrx and Biovail" ("Statement 30(c)"). *Id.* ¶ 30(c).

### 4. *June 22, 2002 Statement*

According to the complaint, the final statement at issue was uttered on June 22, 2002, more than one month after the other ten statements. On that date, defendant Melnyk remarked: "What Jerry Treppel did to us was illegal from a regulatory prospective [sic]" ("Statement 31(d)"), in reference to plaintiff's alleged trading of Andrx options coinciding with his sell recommendation on Biovail. *Id.* ¶ 31(d).

### 5. *Defendants' Conduct*

In addition to the allegedly defamatory statements, plaintiff asserts that defendants committed additional acts intended to harm plaintiff. These acts serve as the basis for plaintiff's claims of tortious interference with prospective economic advantage and prima facie tort, and include: (1) obtaining plaintiff's account records listing his Andrx holdings through "improper" non-party discovery of BAS in a patent infringement lawsuit against Andrx in February 2002 (*id.* ¶ 19); (2) providing *The Wall Street Journal* with those account records and advising the newspaper that plaintiff was improperly profiting from his research reports (*id.* ¶ 26); and (3) pressuring BAS to investigate plaintiff and terminate its relationship with him. *Id.* ¶ 34. Plaintiff contends that defendants' conduct, in its entirety, amounts to a " smear campaign ... calculated to cast him in the same light as those analysts who had allegedly engaged in securities fraud, market manipulation, and other unlawful activity" at that time. *Id.* ¶ 27.

### D. *Events Following Defendants' Statements and Conduct*

In the period that followed plaintiff's report on Biovail and defendants' response, plaintiff avers that his conduct was investigated by the New York State Attorney General's Office, the Securities and Exchange Commission, the National Association of Securities Dealers and other agencies. *Id.* ¶ 33. Moreover, on June 15, 2002, plaintiff resigned from his position at BAS and left the profession of securities research analyst. *Id.* ¶ 35.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

## II. *Procedural History*

**\*4** Plaintiff filed an amended complaint in August 2003 for defamation, defamation *per se,* tortious interference with prospective economic advantage, prima facie tort and civil conspiracy, seeking compensatory and punitive damages in excess of $100 million for injury to his reputation caused by defendants' defamatory statements and tortious conduct. *Id.* ¶¶ 36-55. He brings the action in this Court based upon diversity jurisdiction under 28 U.S.C. § 1332, claiming that the "smear campaign" launched by defendants has "subjected [him] to public shame, criticism, contempt, ridicule and disgrace...." *Id.* ¶¶ 26, 37. Defendants respond with the current motion to dismiss.

## DISCUSSION

Defendants' motion raises a number of issues for the Court to decide. Specifically, the Court must decide whether it has personal jurisdiction over defendants Biovail and Cancellara, whether the law of New York or New Jersey applies to each of plaintiff's claims, and whether defendants' statements and conduct support claims for defamation, defamation *per se,* tortious interference with prospective economic advantage, prima facie tort and civil conspiracy.

### I. *Personal Jurisdiction over Defendants Biovail and Cancellara*

As a threshold matter, the Court must determine whether it has personal jurisdiction over defendants Biovail and Cancellara. On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, it is well established that "the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999); *Metro. Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 566 (2d Cir.1996). "Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction. " *Metro. Life,* 84 F.3d at 566. "Eventually, personal jurisdiction must be established by a preponderance

of the evidence, either at an evidentiary hearing or at trial. But where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor, notwithstanding a controverting presentation by the moving party." *A.I. Trade Fin., Inc. v. Petra Bank,* 989 F.2d 76, 79-80 (2d Cir.1993); *see also United States Theatre Corp. v. Gunwyn/Lansburgh Ltd. P'ship.,* 825 F.Supp. 594, 595 (S.D.N.Y.1993).

The parties have submitted affidavits and supporting documents supporting their jurisdictional arguments. The affidavits and documents of the parties differ regarding a number of significant facts, leading to divergent views on jurisdiction. Accordingly, the Court will determine whether the facts, as alleged by plaintiff, are legally sufficient to support personal jurisdiction over defendants Biovail and Cancellara.

### A. *Biovail*

"Absent a specific grant of jurisdiction, the reach of a federal district court's personal jurisdiction is coterminous with that of the personal jurisdiction of a court of general jurisdiction in the state in which the court sits." *Geller Media Mgmt., Inc. v. Beaudreault,* 910 F.Supp. 135, 137 (S.D.N.Y.1996) (Leisure, J.) (citing Fed.R.Civ.P. 4(k)(1)(A)). Thus, "the amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee." *Metro. Life,* 84 F.3d at 567 (quoting *Arrowsmith v. United Press Int'l,* 320 F.2d 219, 223 (2d Cir.1963) (en banc)). To determine whether it has personal jurisdiction over Biovail, the Court engages in a two-part inquiry. First, it must determine whether there is personal jurisdiction over Biovail under New York state law; second, if New York law provides for personal jurisdiction, the Court must determine whether the assertion of jurisdiction comports with the constitutional requirements of due process. *Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

**\*5** Plaintiff contends that this Court has personal jurisdiction over defendant Biovail pursuant to Sections 301 and 302 of the New York Civil Practice Law and Rules ("CPLR"). Defendants challenge this Court's jurisdiction over Biovail under Sections 301 and 302 but have not argued that Biovail's contacts with New York State are so attenuated as to offend the "minimum contacts" test of due process established in *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Thus, because defendants have not raised any due process issue, the Court will only address whether the statutory requirements for jurisdiction under New York law have been met. *See EEOC v. Plaza Operating Partners, Ltd.,* 2004 U.S. Dist. LEXIS 15863, at \*8 (S.D.N.Y. Aug. 13, 2004) (citation omitted).

Section 301 of the CPLR provides for the exercise of "jurisdiction over such persons, property, or status as might have been exercised heretofore." N.Y. CPLR § 301 (McKinney 2001). The Section permits courts to exercise personal jurisdiction over a foreign corporation that is "engaged in such a continuous and systematic course of 'doing business' in New York as to warrant a finding of ' presence' " in the state. *Carell v. The Shubert Org., Inc.,* 104 F.Supp.2d 236, 268 (S.D.N.Y.2000) (citation omitted). To be found "doing business" in the state for Section 301 purposes, a corporation must be present in the state "not occasionally or casually, but with a fair measure of permanence and continuity." *Landoil Res. v. Alexander & Alexander Servs. Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990) (quoting *McGowan v. Smith,* 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 419 N.E.2d 321 (1981)). New York courts have traditionally considered the following factors when making this determination: (1) the existence of an office in New York; (2) the solicitation of business in New York; (3) the presence of bank accounts or other property in New York; and (4) the presence of employees or agents in New York. *Id.*

The complaint in this action alleges that, "Biovail is in the business of manufacturing pharmaceutical drugs and selling and distributing those drugs throughout the United States, including in the State of New York." (Compl.¶ 4.) Plaintiff asserts that

Biovail maintains a website, which solicits business nationally and internationally, including in New York and represents that the company employs a significant number of sales representatives in New York. (Plaintiff's Memorandum of Law In Opposition to Defendants' Motion to Dismiss the Amended Complaint ("Pl.s Opp.") at 34; Affidavit of Patrick V. DiDomenico ("DiDomenico Aff.") ¶ ¶ 28, 30.) Further, plaintiff avers that Biovail is listed on the New York Stock Exchange and obtained financing in New York with the assistance of three New York based investment banking firms. (DiDomenico Aff. ¶ ¶ 31, 35.) Defendants dispute plaintiff's factual allegations, contending that it is only wholly owned subsidiaries of Biovail that may be doing continuous and systematic business in New York. (Reply Memorandum In Support of Defendants' Motion to Dismiss Complaint ("Defs.' Rep.") at 16-17.) However, given the posture of the case, a defendant must " assume[ ] the truth of the plaintiff's factual allegations for the purposes of the motion" and be " content to challenge only [their] sufficiency...." *Ball v. Metallurgie Hoboken Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990). While defendants may request an adjudication of jurisdictional facts following discovery or during a trial on the merits, *see id.,* prior to discovery, plaintiff need only make a prima facie showing of jurisdiction to withstand a Rule 12(b)(2) motion, notwithstanding a controverting presentation by defendants. *See A.I. Trade Fin., Inc.,* 989 F.2d at 79-80.

**\*6** The Court finds that plaintiff's factual allegations, liberally construed, are sufficient to constitute a prima facie showing of personal jurisdiction over Biovail pursuant to CPLR § 301. The regular sale and distribution of products within the state coupled with solicitation of business within the state clearly constitute a continuous and systematic course of "doing business" within the scope of CPLR § 301. Accordingly, to the extent that defendants' motion seeks dismissal of Biovail pursuant to Rule 12(b)(2), it is denied.[FN3]

> FN3. Plaintiff has also argued that the Court may exercise jurisdiction over Biovail pursuant to CPLR § 302(a), which

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

provides for jurisdiction over non-domiciliaries who commit tortious acts within the state and non-domiciliaries who commit tortious acts without the state causing injuries to persons or property within the state. However, because plaintiff has made a prima facie showing of jurisdiction under Section 301, the Court finds it unnecessary to reach the issue of whether jurisdiction over Biovail may properly be exercised pursuant to 302(a).

### B. Cancellara

Defendants maintain that the Court does not have personal jurisdiction over defendant Cancellara because he lives and works in Canada and he is not alleged to have committed any tortious act in New York. (Memorandum In Support of Defendants' Motion to Dismiss the Amended Complaint ("Defs.' Mem.") at 39; Defs.' Rep. at 19.) Plaintiff contends that jurisdiction over Cancellara is proper pursuant to CPLR §§ 302(a)(2) and 302(a)(3) based upon the claims for tortious interference with prospective economic advantage, prima facie tort, and civil conspiracy.[FN4] Because the Court finds that plaintiff has not established a claim for prima facie tort, see infra Part VI, and that civil conspiracy is a derivative, rather than independent, cause of action, see infra Part VII, jurisdiction over Cancellara hinges on the allegations relating to tortious interference with prospective economic advantage. As with Biovail, defendants have not raised a due process challenge with respect to Cancellara under Int'l Shoe Co. and thus the Court will focus only on whether the New York statutory requirements have been satisfied.

> FN4. Plaintiff recognizes that Sections 302(a)(2) and 302(a)(3) expressly exclude defamation as a basis for jurisdiction over a foreign defendant and relies only upon the remaining independent causes of action. See Pl.'s Opp. at 35-36.

Section 302(a)(2) provides for jurisdiction over a person who "commits a tortious act within the state" unless that act is one of defamation. CPLR § 302(a)(2). "To satisfy New York's long-arm statute, the complaint must 'adequately frame[ ] a cause of action in tort arising from those acts." ' Pi, Inc., v. Quality Prods., Inc., 907 F.Supp. 752, 760 (S.D.N.Y.1995) (citation omitted) (alteration in original); accord Bank Brussels Lambert, 171 F.3d at 785. Moreover, the defendant must have been physically present in New York while committing the tort to establish jurisdiction under this section. See Feathers v. McLucas, 15 N.Y.2d 443, 459, 261 N.Y.S.2d 8, 209 N.E.2d 68 (1965); see also Bensusan Rest. Corp. v. King, 126 F.3d 25, 29 (2d Cir.1997) (denying jurisdiction under § 302(a)(2) where acts were performed by persons physically present in Missouri even though injury may have been suffered in New York); Carlson v. Cuevas, 932 F.Supp. 76, 80 (S.D.N.Y.1996) ("To subject non-residents to New York jurisdiction under § 302(a)(2), the defendant must commit the tort while he or she is physically in New York state.").

Assuming plaintiff's allegations to be true, the Court finds that jurisdiction over Cancellara may obtain pursuant to Section 302(a)(2). The Court finds that plaintiff properly pled a cause of action for tortious interference with prospective economic advantage as to all defendants. See infra Part V. The claim is based, in part, on defendants' tortious conduct, which includes obtaining plaintiff's account records from BAS, providing the records to The Wall Street Journal, and pressuring BAS to suspend plaintiff.[FN5] In his opposition papers, plaintiff asserts that Cancellara played a role in the alleged tortious interference while present in New York. (Pl.'s Opp. at 35-36) ("On information and belief, Cancellara also committed or participated in the following alleged acts in New York in furtherance of defendants' smear campaign and other unlawful conduct against Treppel: (1) wrongfully obtained Treppel's personal account records and records from BAS in New York; (2) improperly provided those records and the false trading information concerning Treppel to The Wall Street Journal in New York; and (3) attended one or more meetings with BAS in New York to call for an investigation of Treppel's alleged activities and to pressure BAS into placing Treppel on leave and ultimately forcing his resignation from the firm.") (internal citations omitted).) Accordingly, plaintiff has satisfied his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

burden and established a prima facie showing of jurisdiction over Cancellara under Section 302(a)(2) .[FN6] The Court notes, however, that, because of Section 302(a)(2)'s express exclusion of defamation claims, the Court has jurisdiction over defendant Cancellara with respect to the tortious interference with prospective economic advantage claim only. Thus, with that caveat, defendants' motion to dismiss with respect to defendant Cancellara is also denied.

> FN5. Plaintiff's tortious interference with prospective economic advantage claim is also premised on defendants' defamatory statements. However, because a defamation claim may not form a jurisdictional basis under Section 302(a)(2), the Court will only consider the factual allegations that support the alleged non-defamatory conduct upon which plaintiff's claim is based. *See, e.g., Lacey v. Zartman,* No. 97 Civ. 198, 1998 WL 312354, at *7 (N.D.N.Y. June 8, 1998) (holding a prima facie tort claim cannot serve as basis for jurisdiction under Section 302(a)(3) because it sounds in defamation).

> FN6. Plaintiff has also argued that the Court may exercise jurisdiction over Cancellara pursuant to CPLR § 302(a)(3), which provides for jurisdiction over non-domiciliaries who commit tortious acts without the state causing injuries to persons or property within the state. However, because plaintiff has made a prima facie showing of jurisdiction under Section 302(a)(2), the Court finds it unnecessary to reach the issue of whether jurisdiction over Cancellara may properly be exercised pursuant to 302(a)(3).

## II. *Choice of Law*

*7 "A federal court sitting in diversity applies the choice of law rules of the forum state," which in this case is New York. *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999). Under a New York

choice of law analysis, a court must first consider " whether there is an actual conflict of laws." *Curley v. AMR Corp.,* 153 F.3d 5, 12 (2d Cir.1998) (citing *In re Alstate Ins. Co. and Stolarz,* 81 N.Y.2d 219, 597 N.Y.S.2d 904, 613 N.E.2d 936 (1993)). An actual conflict is one that could "have a significant possible effect on the outcome of the trial." *Id.* In the absence of such a substantive conflict, a New York court need not conduct a choice of law analysis and may apply New York law. *Id.*

Here, without thoroughly addressing whether New York's laws of defamation, defamation *per se,* tortious interference with prospective economic advantage, prima facie tort, and civil conspiracy actually conflict with those of New Jersey, the parties analyzed plaintiff's claims under the laws of both states. Defendants argue that New Jersey law applies because plaintiff lives in New Jersey and New York courts typically apply the law of plaintiff's residence in defamation cases. (Defs.' Mem. at 15.) Nevertheless, defendants maintain that each of plaintiff's claims fail even if New York law applies. (Defs.' Mem. at 16.)

Conversely, plaintiff asserts that New York law should apply because plaintiff cultivated his professional reputation and career in the financial and securities markets in New York City and his state of employment, not his state of domicile, has a more significant interest in the litigation. However, even if New Jersey law applies, plaintiff contends that defendants' motion to dismiss should be denied. (Pl.'s Opp. at 12.)

New York's law of defamation is sufficiently similar to its New Jersey counterpart such that an actual conflict does not result when each is applied to the instant claim. *Compare Celle v. Filipino Reporter Enters. Inc.,* 209 F.3d 163, 177 (2d Cir.2000) (applying New York law) ("The gravamen of an action alleging defamation is an injury to reputation. ") *with Ruoccchio v. United Transp. Union, Local 60,* 181 F.3d 376, 391 (3d Cir.1999) (applying New Jersey law) ("The law of defamation ... imposes liability for any statement ... 'which is damaging to reputation.' ") (citation omitted) *and Feggans v. Billington,* 291 N.J.Super. 382, 390-91, 677 A.2d 771 (App.Div.1996). Further, the doctrine of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

defamation *per se* is consistent between the states. *Compare Nichols v. Item Publishers,* 309 N.Y. 596, 602, 132 N.E.2d 860 (1956) (adjudging a statement defamation *per se* where it "disparage[s] a person in the way of his office, profession or trade") *with Devries v. McNeil Consumer Prods. Co.,* 250 N.J.Super. 159, 166-67, 593 A.2d 819 (App.Div.1991) (finding a statement "which ascribes to another conduct, characteristics or a condition incompatible with proper conduct of his lawful business, trade, or profession is ... slander *per se"* ).

*8 With respect to tortious interference with prospective economic advantage, the laws of New York and New Jersey are nearly indistinguishable. *Compare Gianni Versace, S.p.A v. Versace,* No. 01 Civ. 9645, 2003 WL 470340, at *2 (S.D.N.Y. Feb.25, 2003) (Leisure, J.) (stating that New York law requires four elements to establish a claim for tortious interference with prospective economic advantage: (1) a reasonable expectation of economic advantage; (2) intentional and malicious interference with that advantage by defendant; (3) loss of the anticipated advantage; and (4) damages caused by defendant's conduct) *with Printing Mart-Morristown v. Sharp Elecs. Corp.,* 116 N.J. 739, 751, 563 A.2d 31 (N.J.1989) (citing substantially the same elements under New Jersey law); *see also G-I Holdings, Inc. v. Baron & Budd,* 179 F.Supp.2d 233, 250 (S.D.N.Y.2001) (finding no "material difference" between the laws of New York and New Jersey in this area).

While New Jersey law recognizes an action for prima facie tort, there is a dearth of case law on the subject. Defendants claim that New Jersey has never recognized a claim for prima facie tort. (Defs.' Mem. at 33.) However, the case defendants cite for that proposition, *Taylor v. Metzger,* only declined to recognize such a claim in that instance. 152 N.J. 490, 522, 706 A.2d 685 (N.J.1998). Indeed, the *Taylor* court's discussion of the prima facie tort doctrine demonstrates its viability under New Jersey law. *Id.* (citing to the Restatement (Second) of Torts and *Freihofer v. Hearst Corp.,* 65 N.Y.2d 135, 490 N.Y.S.2d 735, 480 N.E.2d 349 (1985) in a general overview of prima facie tort). Moreover, there are other instances where New

Jersey courts have considered prima facie tort claims, though without extensive discussion. *See Bishop v. Inacom, Inc.,* No. 99 Civ. 664, 1999 WL 1416919 (D.N.J. Dec.1, 1999); *Riggs v. Schappell,* 939 F.Supp. 321, 329 (D.N.J.1996); *Brody v. Albert Lifson & Sons,* 17 N.J. 383, 111 A.2d 504 (1955). As a result, the pleading requirements for prima facie tort have not been clearly defined under New Jersey law.[FN7] Consequently, New Jersey's jurisprudence in this area is not sufficiently developed to create a conflict with the law of another jurisdiction.

> FN7. However, a court in this district has opined that New Jersey courts will likely rely upon New York law in this area. *See G-I Holdings,* 179 F.Supp.2d at 250.

Finally, defendants are correct that New York law does not recognize an independent cause of action for civil conspiracy. (Defs .' Mem. at 35-36) (citing *Burdick v. Verizon Communications, Inc.,* 305 A.D.2d 1030, 758 N.Y.S.2d 877, 878 (App.Div.2003). However, "[i]f an underlying, actionable tort is established, ... plaintiff may plead the existence of a conspiracy in order to demonstrate that each defendant's conduct was part of a common scheme." *Sepenuk v. Marshall,* No. 98 Civ. 1569, 2000 WL 1808977, at *6 (S.D.N.Y. Dec.8, 2000); *see Arlinghaus v. Ritenour,* 622 F.2d 629 (2d Cir.1980), *cert. denied,* 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980). This allows defendants to be held jointly and severally liable for any compensatory or punitive damages awarded for the underlying torts. *Id.* In this regard, New York and New Jersey do not conflict in that each requires plaintiff to establish four elements in addition to the underlying tort. *Compare World Wrestling Fed'n Entm't., Inc. v. Bozell,* 142 F.Supp.2d 514, 532 (S.D.N.Y.2001) (holding that plaintiff must demonstrate (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury) *with Morgan v. Union County Bd. of Chosen Freeholders,* 268 N.J.Super. 337, 364, 633 A.2d 985 (App.Div.1993) (identifying substantially the same elements under

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

New Jersey law).

**\*9** Thus, in the absence of an actual conflict between the laws of New York and New Jersey, New York's choice of law rules dictate that New York law should apply to each of plaintiff's claims. *See Curley,* 153 F.3d at 12; *see also G-I Holdings,* 179 F.Supp.2d at 250; *Tronelone v. Lac d'Aminate du Quesbec, Ltee,* 297 A.D.2d 528, 747 N.Y.S.2d 79 (App.Div.2002), *aff'd* 99 N.Y.2d 647, 760 N.Y.S.2d 96, 790 N.E.2d 269 (2003) (affirming the application of New York law where no "relevant conflict" existed between substantive law of New York and Newfoundland).

### III. *Standard under Rule 12(b)(6)*

In deciding a motion to dismiss under Rule 12(b)(6), a court must construe all well-pleaded factual allegations in the complaint in plaintiff's favor. *See Allen v. Westpoint-Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991). The issue before the Court is not " whether a plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheur v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Thus, a party is entitled to dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The Court will now address in turn each of defendants' claimed grounds for dismissal.

### IV. *Defamation and Defamation Per Se*

To establish a cause of action based on defamation under New York law, the plaintiff must establish four elements in order to prevail: (1) a false and defamatory statement of fact; (2) regarding the plaintiff; (3) published to a third party by the defendant; and (4) resulting in injury to the plaintiff. *See Dellefave v. Access Temps., Inc.,* No. 99 Civ. 6098, 2001 WL 25745, at \*4 (S.D.N.Y. Jan.10, 2001) (citing *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 61 (2d Cir.1993)). A defamatory statement

is one that leaves an individual vulnerable to " public hatred, shame, obloquy, contumely, odium, contempt, ridicule, aversion, ostracism, degradation, or disgrace, or ... [which] induce [s] an evil opinion of one in the minds of right-thinking persons, and ... deprives one of ... confidence and friendly intercourse in society." *Celle,* 209 F.3d at 177.

In addition to the aforementioned elements, the plaintiff in a defamation action must also plead special damages,[FN8] unless the language at issue qualifies as defamation *per se.* Defamation *per se* may be defined as a statement that casts aspersions upon the basic character and integrity of an individual or business. Thus, a statement "which *tends* to disparage a person in the way of his office, profession or trade" is defamatory *per se* and does not require proof of special damages because injury is assumed. *Davis v. Ross,* 754 F.2d 80, 82 (2d Cir.1985) (quoting *Nichols,* 309 N.Y. at 602, 132 N.E.2d 860). Although a clear distinction between statements that are defamatory *per se* and those that require proof of special damages remains elusive, the following synopsis is useful:

> FN8. Special damages constitute "the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation...." *Matherson v. Marchello,* 100 A.D.2d 233, 235, 473 N.Y.S.2d 998 (App.Div.1984) (citations and quotations omitted); Robert D. Sack, 1 *Sack on Defamation: Libel, Slander and Related Problems* § 2.8.7.1, at 2-113 (3d ed. 2004) ("Special damages refers only to pecuniary damages such as out-of-pocket loss.").

**\*10** [I]t is actionable without proof of damage to say of a physician that he is a butcher ..., of an attorney that he is a shyster, of a school teacher that he has been guilty of improper conduct as to his pupils, of a clergyman that he is the subject of scandalous rumors, of a chauffeur that he is habitually drinking, of a merchant that his credit is bad or that he sells adulterated goods, of a public officer that he has accepted a bribe or has used his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

office for corrupt purposes ... since these things discredit [one] in his chosen calling.
W. Page Keeton et al., *Prosser and Keeton on the Law of Torts*, § 112, at 791 (5th ed.1984); *see also Four Star Stage Lighting, Inc. v. Merrick*, 56 A.D.2d 767, 768, 392 N.Y.S.2d 297 (App.Div.1977) (holding that "words are libelous if they affect a person in his profession, trade, or business by imputing to him any kind of fraud, dishonesty, misconduct, incapacity, unfitness or want of any necessary qualification in the exercise thereof").

At this stage of the proceeding, where the plaintiff's allegations must be accepted as true and all reasonable inferences must be drawn in his favor, *see Conley*, 355 U.S. at 46, the Court's task is clear: to determine whether the statements at issue are "reasonably susceptible of a defamatory meaning." *Armstrong v. Simon & Schuster, Inc.*, 85 N.Y.2d 373, 380, 625 N.Y.S.2d 477, 649 N.E.2d 825 (1985) ; *see also Celle*, 209 F.3d at 177 (observing that whether particular words are defamatory is a legal question to be decided by the court as a threshold matter); *Kelly v. Schmidberger*, 806 F.2d 44, 46 (2d Cir.1986) ("[O]n a motion to dismiss or for summary judgment, the issue is not whether the court regards the language as libelous, but whether it is reasonably susceptible of such a construction." ). If the Court deems the statements to be reasonably susceptible to a defamatory interpretation, then "it becomes the jury's function to say whether that was the sense in which the words were likely to be understood by the ordinary and average reader." *James v. Gannett Co., Inc.*, 40 N.Y.2d 415, 419, 386 N.Y.S.2d 871, 353 N.E.2d 834 (1976) (citation omitted).

Furthermore, since the Court accepts plaintiff's allegations as true, it assumes that defendants' statements are false and that defendants were culpable in making the statements. *See Lucking v. Maier*, No. 03 Civ. 1401, 2003 U.S. Dist. LEXIS 23060, at *8 n. 4 (S.D.N.Y. Dec. 23, 2003) ("The falsity of the accused passage and defendants' fault are both presumed at this [motion to dismiss] juncture."); *Daniels v. Provident Life & Cas. Ins. Co.*, No. 02 Civ. 0668, 2002 U.S. Dist. LEXIS 24704, at *15-16 (W.D.N.Y. Dec. 22, 2002)

(denying defendant's motion to dismiss due to a dispute as to the truth of alleged facts).

To assist the trial court in interpreting allegedly defamatory utterances, the Second Circuit relies upon certain principles elucidated by the New York State Court of Appeals. First, the Court "must give the disputed language a fair reading in the context of the *publication as a whole." Celle*, 209 F.3d at 177 (alteration in original) (citation omitted). The material in question should not be read in isolation, but "must be perused as the average reader would against the 'whole apparent scope and intent' of the writing." *Id.* (quoting *November v. Time Inc.*, 13 N.Y.2d 175, 178, 244 N.Y.S.2d 309, 194 N.E.2d 126 (1963)). "[T]he words are to be construed not with the close precision expected from lawyers and judges but as they would be read and understood *by the public to which they are addressed." Id.* (alteration in original) (citation omitted). Moreover, a fair reading of the text is necessary, not one which " 'strain[s]' to interpret [the material] 'in [its] mildest and most inoffensive sense to hold [it] nonlibelous.' " *Id.* (citation omitted). Finally, if the statement in question is reasonably susceptible to more than one interpretation, one of which is not defamatory, "it is then for the trier of fact, not for the court acting on the issue solely as a matter of law, to determine in what sense the words were used and understood." *Davis v. Ross*, 754 F.2d 80, 82 (2d Cir.1985).

### A. *Protected Speech: Truth and Opinion*

**\*11** In assessing whether the statements at issue are reasonably susceptible of a defamatory meaning, the Court is cognizant of the fact that the law affords absolute protection to certain types of speech. Defendants rely upon two types of protected speech in challenging plaintiff's claims: truth and opinion.

Under New York law, "it is fundamental that truth is an absolute, unqualified defense to a civil defamation action." *Guccione v. Hustler Magazine, Inc.*, 800 F.2d 298, 301 (2d Cir.1986). Indeed, falsity is the *sine qua non* of an action for defamation. *See Rail Europe, Inc. v. Rail Pass Express, Inc.*, No. 94 Civ. 1506, 1996 WL 157503,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

at *9 (S.D.N.Y. Apr. 3, 1996) (Leisure, J.) (citation omitted); *see also Southridge Capital Mgmt., LLC v. Lowry,* No. 01 Civ. 4880, 2003 WL 68041, at *2 (S.D.N.Y. Jan.7, 2003) (dismissing a defamation claim because statement was "literally true"); *Contes v. City of New York,* No. 99 Civ. 1597, 1999 WL 500140, at *9 (S.D.N.Y. July 14, 1999).

In addition, the New York Constitution, unlike the Federal Constitution, provides for absolute protection of pure opinions. *See Flamm v. Am. Assoc. of Univ. Women,* 201 F.3d 144, 147-48 (2d Cir.2000); *compare Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (rejecting the argument that "an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment") *with Immuno AG. v. Moor-Jankowski,* 77 N.Y.2d 235, 566 N.Y.S.2d 906, 567 N.E.2d 1270 (1991) (Kaye, C.J.) (holding that expressions of "pure" opinion are afforded absolute protection under the New York Constitution). In the realm of defamation, this constitutional shield requires that assertions of fact, not opinion, form the basis of a claim. *See Brian v. Richardson,* 87 N.Y.2d 46, 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126 (1995) (citations omitted). Thus, the Court must decide as a matter of law whether any of the statements at issue are protected opinion and therefore not actionable. *See Rinaldi v. Holt, Rinehart & Winston,* 42 N.Y.2d 369, 397, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) ("Whether a particular statement constitutes fact or opinion is a question of law.").

The Court's "essential task" in this inquiry is to determine whether the allegedly defamatory statements "may be reasonably understood as implying the assertion of undisclosed facts justifying the opinion," when considering the statements in the immediate context of the communication as a whole and the broader context in which the statements were published. *Steinhilber v. Alphonse,* 68 N.Y.2d 283, 292, 508 N.Y.S.2d 901, 501 N.E.2d 550 (1986); *see also Brian,* 87 N.Y.2d at 51, 637 N.Y.S.2d 347, 660 N.E.2d 1126; *Immuno,* 77 N.Y.2d at 254, 566 N.Y.S.2d 906, 567 N.E.2d 1270. If one of the statements may be viewed as implying undisclosed facts, then it is not

protected as opinion under the New York Constitution. *See Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. Notably, the Court should examine the material in question from the perspective of an "ordinary reader." *Mr. Chow of New York v. Ste Jour S.A.,* 759 F.2d 219, 224 (2d Cir.1985).

**\*12** The New York Court of Appeals has considered the following factors when distinguishing between assertions of fact and non-actionable expressions of opinion:
(1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to "signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact."

*Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163 (1993) (quoting *Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550).

Finally, an opinion may be offered with such excessive language that a reasonable audience may not fairly conclude that the opinion has any basis in fact. In *Milkovich v. Lorain Journal Co.,* the Supreme Court afforded constitutional protection to the type of speech often characterized as "rhetorical hyperbole," "parody," "loose," or "figurative." 497 U.S. at 16-17 (citing *Greenbelt Coop. Publ'g. Assn. v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970)) (finding defendant's description of plaintiff's position as "a slight case of blackmail" to be "rhetorical hyperbole" and "a vigorous epithet"); *Hustler Magazine v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (defining constitutional protection of parody); *Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (referring to statements in question as being used "in a loose figurative sense"); *Sack, supra,* § 2.4.7, at 2-41 (explaining that hyperbole is protected, in part, because "[m]uch name-calling is an invective form of opinion that is incapable of being proved false and is therefore not ordinarily

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

actionable"). This type of opinion can be so "imprecise" and uttered in such an "unusual setting [that it] would signal the reasonable observer that no actual facts were being conveyed about an individual." *Immuno,* 77 N.Y.2d at 244, 566 N.Y.S.2d 906, 567 N.E.2d 1270.

### B. *Defendants' Statements*

Defendants contend that three of the eleven statements at issue are not defamatory because they are true and that the remaining eight statements are non-actionable because they constitute opinion or rhetorical hyperbole based on publicly disclosed facts. Plaintiff's response is premised on the argument that each of the statements contains express or implied false assertions of fact and therefore, the claims for defamation and defamation *per se* should be sustained.

The Court will first address the statements defendants claim are true and then will turn to those claimed to be protected opinion.

### 1. *Truth*

Defendants assert that Statements 30(a), 31(a), and 31(b) are non-actionable because they are true.
a. *Statement 30(a)*-"After reviewing the trading records reported on by *The Wall Street Journal,* it was clear that Treppel held a substantial, previously undisclosed equity interest in a direct competitor-Andrx Group."

**\*13** At this stage of the proceeding, it is not clear that this statement is true. The parties dispute whether plaintiff properly disclosed his interest in Andrx to defendants. Defendants allege that neither plaintiff's equity interest in Andrx nor his trading in Andrx options was ever disclosed in any of his research reports on Biovail or Andrx. (Defs.' Mem. at 25.) Plaintiff maintains that he was not legally required to disclose his specific interest in Andrx and each of his research reports contained a general disclosure statement that satisfied applicable securities laws and company rules.[FN9] (Pl.'s Opp.

at 22). This is an issue of fact that cannot and should not properly be decided at this juncture. When a "plaintiff alleges that both the opinions and the facts are false, a motion to dismiss should not be granted, and the plaintiff may proceed against both the statements of fact and opinion." *Jewell v. NYP Holdings,* 23 F.Supp.2d 348, 377 (S.D.N.Y.1998) (citing *Silsdorf v. Levine,* 59 N.Y.2d 8, 462 N.Y.S.2d 822, 449 N.E.2d 716 (1983)).

> FN9. In relevant part, the general disclosure statement reads: "Banc of America Securities, its affiliates and their respective officers, directors, partners and employees, including persons involved in the preparation or issuance of this report, may from time to time maintain a long or short position in, or purchase or sell a position in ... the securities (or related securities, financial products, options, warrants, rights or derivatives) of persons mentioned in this report or be represented on the board of such persons." (Pl.'s Opp. at 22.)

Furthermore, defendants' argument that the statement was not made recklessly and thus, lacked actual malice is inapposite because fault is presumed at this preliminary stage. *See Lucking,* 2003 U.S. Dist. LEXIS 23060, at \*8 n. 4. Consequently, defendants' argument that this statement is non-actionable because it is true is rejected. Statement 30(a) is reasonably susceptible to a defamatory meaning because it asserts that plaintiff did not previously disclose his interest in Andrx, a fact alleged to be false. Moreover, because Statement 30(a) tends to disparage plaintiff in his position as a securities analyst, it may sustain a claim for defamation *per se* as well as for defamation.
b. *Statement 31(a)*-Plaintiff's account records "also showed unsolicited buy and sell orders for options in Andrx both prior and concurrently with Mr. Treppel issuing his analyst reports on Andrx and Biovail."

As with Statement 30(a), the parties disagree as to

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

the factual accuracy of this statement. Relying on plaintiff's account records, which are referenced in the complaint (Compl.¶¶ 19, 26, 30-32) and which the Court may properly consider for purposes of this motion,[FN10] defendants maintain that the statement is true because the records in fact show that unsolicited trades were made on Andrx options from plaintiff's account around the time he issued reports on Andrx and Biovail. (Defs.' Mem. at 26.) The Court finds it telling that plaintiff does not directly challenge the accuracy of the statement. Rather, plaintiff asserts that the statement falsely implies that he "illegally" traded Andrx options during the relevant period. (Pl.'s Opp. at 21.) Nevertheless, plaintiff's own account records demonstrate that Statement 31(a) is true. The records indicate that there were unsolicited sales and purchases of Andrx options within days, and even on the same day, of plaintiff's release of his reports on Biovail and Andrx. Notwithstanding plaintiff's argument that the statement implies that he acted illegally, Statement 31(a), on its face, accurately points out that the records show unsolicited trades were made from plaintiff's account around the time he issued some of his reports. The statement is silent as to who was responsible for making the trades; it only makes the more limited observation that the account records show unsolicited trades did occur in temporal proximity to the issuance of plaintiff's reports. Accordingly, given its literal truth, Statement 31(a) is nonactionable under the theories of defamation and defamation *per se.*

FN10. A district court may take notice of documents attached to motion papers where plaintiff either had notice of or possessed the documents in question and relied upon those documents in drafting the complaint. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002).

*14 c. *Statement 31(b)-*"After reviewing the trading records reported on by *The Wall Street Journal,* it was clear Mr. Treppel had directed his broker to make buy and sell orders on Andrx options prior to and concurrent with issuing reports on Andrx and

Biovail."

Like Statement 30(a), the truth of this statement cannot be verified based on the present record. Defendants believe that it is a "fair inference" to conclude that plaintiff directed his brokers to trade in the Andrx options because the account records indicate that unsolicited orders were made. (Defs.' Mem. at 27.) Needless to say, a fair inference need not always lead to the truth. Defendants' conclusion is one possible explanation, but there may be others. For present purposes, however, it is only significant that plaintiff alleges that defendants' facts are false by denying that he was able to make any investment decisions related to his managed account. (Pl.'s Opp. at 24.) Thus, the statement is reasonably susceptible to a defamatory meaning to the extent that it concludes that plaintiff directed his broker to trade in Andrx options. Further, like Statement 30(a), it may also substantiate a claim for defamation *per se* because it may tarnish plaintiff in his profession.

### 2. *Opinion and Rhetorical Hyperbole*

The Court now turns to the eight statements that defendants claim are constitutionally protected on the grounds that they are opinion or rhetorical hyperbole.

The Court will consider Statements 29(a), 29(b), and 29(c) collectively because they appeared in the same article in Canada's *The Daily Globe and Mail* and plaintiff alleges that each falsely states or implies that he was biased against Biovail because of his investment in Andrx. (Pl.'s Opp. at 18.)
a. *Statement 29(a)-*Plaintiff turned sour on Biovail because the patent extension Biovail filed on Tiazac "hit one of his other recommendations [Andrx] hard."

b. *Statement 29(b)-*Plaintiff's sell recommendation is "more about his support for Andrx than his negative view of Biovail ."
c. *Statement 29(c)-*With respect to Biovail's patent infringement claim against Andrx, "[e]ither Jerry doesn't understand the complexity of the issue, or worse, he understands it and chooses not to set the record straight."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

In light of the factors set forth in *Steinhilber,* an examination of the full context of these statements reveals that they are pure opinion. *See Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. Neither Statement 29(a) nor 29(b) have a " precise meaning" and neither are "capable of being objectively characterized as true or false." *Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. Each is a vague comment on plaintiff's negative coverage of Biovail from the day before. While Statement 29(c) may be a bit more focused, it too is incapable of being proven true or false because it concerns plaintiff's frame of mind and motivation. *See Immuno AG.,* 74 N.Y.2d at 560, 549 N.Y.S.2d 938, 549 N.E.2d 129 (" Speculations as to the motivations and potential future consequences of proposed conduct generally are not readily verifiable, and are therefore intrinsically unsuited as a foundation for libel.").

**\*15** Moreover, the Court finds that the reasonable reader of the article could not interpret these statements as implying the existence of undisclosed facts supporting the statement. The article is entitled "Biovail Plunges on Downgrade Drug Developer Blasts Analyst's Reasoning." Read in proper context, the statements express the predictable frustration of company executives the day after negative coverage cost their business over $1 billion in market value. Further, the article references plaintiff's prior downgrades of Biovail, which suggests that defendants may possess previously held views of plaintiff. Thus, defendants statements may be based on their past dealings with plaintiff and not certain undisclosed facts, thereby " signal[ing] to readers that what was being read ... was likely to be opinion, not fact." *Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. Rather than implying undisclosed facts, the statements appear to be squarely based on the fact that plaintiff held a favorable view of Andrx in the past, a fact publicly disclosed in plaintiff's research reports and recommendations on Andrx. Accordingly, the Court finds that Statements 29(a), 29(b), and 29(c) are protected opinion and cannot support claims for defamation and defamation *per se.*[FN11]

FN11. Since the Court finds that Statement 29(c) is protected opinion, it need not address defendants' additional contention that the statement also constitutes rhetorical hyperbole. *See* Defs.' Mem. at 24; Defs.' Rep. at 7-8.

d. *Statement 29(d)*-"We believe that given the serious action taken by Bank of America Securities that all of Mr. Treppel's comments about Biovail, both written and oral, should be called into question. "

The "serious action" referenced in Statement 29(d) was Biovail's suspension of plaintiff on May 13, 2002 for his public criticism of Biovail and its management on April 29, 2002. The Court rejects plaintiff's contention that Statement 29(d), made on May 16, 2002, falsely implies that BAS placed plaintiff on leave three days earlier because it did not support his report and recommendation on Biovail. (Pl.'s Opp. at 20.) Plaintiff's argument overreaches and seeks to inject a false implication into a statement clearly based on disclosed facts. It fails to acknowledge that the statement is expressly based upon the previously disclosed fact that BAS placed plaintiff on leave for his unauthorized public criticism of Biovail. In light of the fact that plaintiff's suspension flowed from conduct related to defendants, the ordinary reader would not be surprised that defendants would choose to comment on such a development. Furthermore, the statement cannot be objectively characterized as true or false and the use of the indicator-"we believe"-suggests to the audience that it is faced with an opinion, not fact. *See Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. Thus, Statement 29(d), reflecting defendants' view of plaintiff's suspension, is non-actionable opinion.

e. *Statement 30(b)*-"The information made public today is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel."

Just as Statement 29(d) expressly relied on the publicly disclosed facts surrounding plaintiff's suspension, Statement 30(b) was based upon the public disclosure of plaintiff's account records. Simply put, an average reader could not have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

reasonably understood this statement to imply the assertion of undisclosed facts as it appeared in the context of *The Wall Street Journal'* s review of plaintiff's account records. Plaintiff's argument that the statement imputes to plaintiff "dishonesty and bias" is of no avail. (Pl.'s Opp. at 23.) The question is whether the statement may imply the assertion of undisclosed facts; determining plaintiff's level of honesty or bias is a subjective inquiry, incapable of being proven true or false. In full context, Statement 30(b) may be reasonably read only as opinion. Thus, for the same reasons outlined for Statement 29(d), the Court finds Statement 30(b) to be non-actionable.

*16 f. *Statement 30(c)*-"We have been concerned by the contradictory coverage of both Andrx and Biovail."

In the context of the verbal jousting in which the plaintiff and defendants have engaged, this statement may be the most benign of them all. Following plaintiff's suspension for unauthorized criticism of Biovail and public disclosure of plaintiff's financial stake in one of Biovail's competitors, an ordinary reader would not reasonably understand this statement as implying any undisclosed facts. Rather, the statement may be reasonably interpreted to mean that Biovail's concern may stem from the two primary previously disclosed facts, plaintiff's public criticism of Biovail and plaintiff's financial interest in Andrx. Further, the statement is ambiguous and incapable of being proven true or false. It is also phrased in a manner that makes clear this is merely the view of the company on this topic, not the assertion of a specific fact. *See Steinhilber,* 68 N.Y.2d at 292, 508 N.Y.S.2d 901, 501 N.E.2d 550. As such, the Court credits defendants' arguments regarding this statement and finds it to be protected opinion.

g. *Statement 31(c)*-Plaintiff's investment in Andrx " calls into question the objectivity of all reporting by Treppel."

Statement 31(c) contains language identical to the latter clause of Statement 30(b). Again, defendants are only offering their view on the effect of plaintiff's publicly disclosed Andrx holdings and are

not implying any undisclosed facts. For the same reasons as Statement 30(b), Statement 31(c) is protected opinion

h. *Statement 31(d)*-"What Jerry Treppel did to us was illegal from a regulatory prospective [sic]."

Defendants maintain that Statement 31(d), which refers to the trading of Andrx options in plaintiff's account around the time plaintiff issued reports on Andrx and Biovail, is a protected rhetorical opinion because it is based on previously disclosed facts. (Defs.' Mem. at 28-29.) Plaintiff counters that this utterance amounts to an accusation of criminal conduct based on the false factual assertion that plaintiff traded Andrx options to profit from his research reports. (Pl.'s Opp. at 25.) Though the parties debate whether the statement accuses plaintiff of criminality or merely a regulatory violation, the key inquiry is once again whether the statement may be reasonably understood by the ordinary reader as implying the assertion of an undisclosed fact. The Court finds that it may be.

On its face, Statement 31(d) is a specific statement of fact capable of being proven true or false-either plaintiff's conduct was illegal from a regulatory perspective or it was not. It does not contain "loose" or "figurative" phrases but uses precise language. *See Mr. Chow of New York,* 759 F.2d at 226. Moreover, appearing five weeks after the numerous other statements concerning plaintiff's alleged trading, it may be interpreted as "the product of some deliberation," rather than a "heat of [the] moment" exclamation in a war of words. *Gross,* 82 N.Y.2d at 153, 603 N.Y.S.2d 813, 623 N.E.2d 1163.

*17 The statement contains the discernible implication that, at the very least, plaintiff acted inconsistent with proper industry practice and, more likely, that he committed a crime. Neither plaintiff's suspension from BAS nor plaintiff's account records nor any other publicly disclosed fact of which the Court is aware supports such a conclusion. Plaintiff's account records show that unsolicited trades were made in plaintiff's account but that does not establish to the Court's satisfaction that plaintiff acted improperly or illegally. Even if the Court were to accept defendants' proposed interpretation

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

and allow for two competing interpretations, the statement may not be disposed of at this juncture because it is for the trier of fact, not the Court acting on the issue solely as a matter of law, to determine which interpretation is more credible. *See Davis,* 754 F.2d at 82. Finally, the statement clearly casts doubt upon plaintiff's character and integrity as it accuses him of illegal conduct. Thus, Statement 31(d) does not qualify as rhetorical hyperbole and may substantiate claims for defamation and defamation *per se.*

In sum, the Court finds that Statements 30(a), 31(b), and 31(d) are reasonably susceptible to a defamatory meaning and may support plaintiff's claims for defamation and defamation *per se.* The remaining eight statements are protected as truth or pure opinion and will be dismissed from plaintiff's claims.

### V. *Tortious Interference with Prospective Economic Advantage*

Plaintiff contends that defendants' defamatory statements and conduct constitute tortious interference with prospective economic advantage. Defendants move to dismiss the claim on the ground that the complaint does not sufficiently allege that defendants' conduct constituted " wrongful means" or caused the claimed damages. The Court finds that defendants' arguments are not persuasive and the claim may stand.

To establish a claim for tortious interference with prospective business advantage, plaintiff must prove that: (1) there was a business relationship with a third party; (2) defendants knew of that relationship and intentionally interfered with it; (3) defendants either acted "solely out of malice" or used " wrongful means;" and (4) defendants' interference caused injury to the relationship with the third-party. *See Carvel Corp. v. Noonan,* 350 F.3d 6, 17 (2d Cir.2003); *see also Lombard v. Booz-Allen & Hamilton, Inc.,* 280 F.3d 209, 214 (2d Cir.2002); *Purgess v. Sharrock,* 33 F.3d 134, 141 (2d Cir.1994); *PPX Enters., Inc. v. Autofidelity Enters., Inc.,* 818 F.2d 266, 269 (2d Cir.1987); *Riddell Sports Inc. v. Brooks,* 872 F.Supp. 73, 78 n

.2 (S.D.N.Y.1995) (Leisure, J.). This cause of action has a "limited scope." *Piccoli A/S v. Calvin Klein Jeanswear Co.,* 19 F.Supp.2d 157, 169 (S.D.N.Y.1998).

A properly pleaded complaint for this tort must allege relationships with specific third parties with which the respondent interfered. *See Four Finger Art Factory, Inc. v. Dinicola,* No. 99 Civ. 1259, 2000 U.S. Dist. LEXIS 1221, at *23-24 (S.D.N.Y. Feb. 9, 2000); *Minnesota Mining & Mfg. Co. v. Graham-Field, Inc.,* No. 96 Civ. 3839, 1997 WL 166497, at *7 (S.D.N.Y. Apr. 9, 1997) (Mukasey, J.); *Winner Int'l v. Kryptonite Corp.,* No. 95 Civ. 247, 1996 U.S. Dist. LEXIS 2182, at *4 (S.D.N.Y. Feb. 27, 1996) ("As Winner does not allege that Kryptonite's conduct interfered with its business relationship with any specific party, it cannot establish the elements necessary for this tort...."). Furthermore, the relationship must be in existence at the time of the interference. *See Huntington Dental & Med. Co., Inc. v. Minnesota Mining & Mfg. Co.,* No. 95 Civ. 10959, 1998 U.S. Dist. LEXIS 1526, at *4 (S.D.N.Y. Feb. 13, 1998); *Minnesota Mining,* 1997 WL 166497, at *7.

**\*18** The complaint must also state how the defendant interfered in those relationships. *See Four Finger,* 2000 WL 145466, at *7; *Envirosource, Inc. v. Horsehead Res. Dev. Co.,* No. 95 Civ. 5106, 1996 WL 363091, at *14 (S.D.N.Y. July 1, 1996). That interference must be "direct interference with a third party, that is, 'the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." ' *Black Radio Network, Inc. v. NYNEX Corp.,* No. 96 Civ. 4138, 2000 WL 64874, at *4 (S.D.N.Y. Jan.25, 2000) (quoting *Fonar Corp. v. Magnetic Resonance Plus, Inc.,* 957 F.Supp. 477, 482 (S.D.N.Y.1997)); *see also Piccoli,* 19 F.Supp.2d at 167-68.

Here, defendants first contend that plaintiff has failed to establish the third element of the tort-" wrongful means." The New York Court of Appeals has defined "wrongful means" to include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

economic pressure...." *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 624, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996) (citation omitted). Defendants argue that "wrongful means" have not been plead because their statements are not defamatory and their conduct does not fall within the purview of the above definition. (Defs.' Mem. at 32-33; Defs.' Rep.at 10-13.) However, the Court has found that three of defendants' statements may substantiate a claim for defamation. *See supra* Part IV. Thus, if plaintiff can prove these statements are defamatory, he may also be able to establish that defendants used wrongful means to tortiously interfere with his business relations with BAS. *See McNally v. Yarnall,* 764 F.Supp. 838, 853 (S.D.N.Y.1991) (finding that the defamation claims determine the tortious interference claims).

Moreover, apart from the statements, the Court finds that plaintiff has sufficiently pled wrongful means. *See* Compl. ¶ 19 ("Biovail ... obtained a copy of Treppel's personal account records and documents through improper discovery of nonparty BAS...."); ¶ 26 ("[D]efendants secretly provided Treppel's personal account records to *The Wall Street Journal* and falsely advised the newspaper that he was trading Andrx options to coincide with the issuance of his research reports and recommendations concerning Biovail and Andrx...." ; ¶ 34 ("[D]efendants also pressured BAS into placing Treppel on leave and ultimately forced his resignation from the firm...."). For purposes of this motion where all inferences are construed in plaintiff's favor, these allegations establish a level of conduct that satisfies the definition of wrongful means. *See, e.g., MDC Corp., Inc. v. John H. Harland Co.,* 228 F.Supp.2d 387, 397-98 (S.D.N.Y.2002) (finding allegation that defendant " acted maliciously and used fraudulent or illegal means" was sufficient pleading of wrongful means); *Preferred Health Care, Ltd. v. Empire Blue Cross & Blue Shield,* No. 94 Civ. 9326, 1997 WL 160489, at *3 (S.D.N.Y. Apr.7, 1997) (stating that the words "with malice" were sufficient).

*19 Defendants next argue that plaintiff's alleged damages resulted from his own misconduct, namely his public criticism of Biovail, and not from any act

of defendants. (Defs.' Mem. at 33.) This claim is specious, as plaintiff has alleged that damages resulted from the tortious conduct referenced above, which is sufficient to sustain the claim at the pleadings stage.

Finally, the Court notes that plaintiff's claim is limited to defendants' alleged interference with his business relationship with BAS. In his opposition papers, plaintiff states that defendants' statements and conduct tortiously interfered with plaintiff's prospective economic advantage with "BAS and other employers." (Pl .'s Opp. at 27.) Since the complaint does not specifically identify a relationship with any employer other than BAS, the claim may stand only as an allegation of interference with plaintiff's relationship with BAS. *See Four Finger,* 2000 U.S. Dist. LEXIS 1221, at *23-24.

## VI. *Prima Facie Tort*

Plaintiff alleges that defendants' conduct also renders them liable for prima facie tort under New York law. The elements of prima facie tort are: "(1) intentional infliction of harm; (2) resulting in special damages; (3) without excuse or justification; (4) by an act that would otherwise be lawful." *Twin Labs., Inc. v.. Weider Health & Fitness,* 900 F.2d 566, 571 (2d Cir.1990) (citing *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332, 464 N.Y.S.2d 712, 451 N.E.2d 459 (1983)). The Second Circuit has held that the "touchstone" of such a claim is "disinterested malevolence," meaning that "the defendant's conduct was not only harmful, but done with the sole intent to harm." *Id.* As a result, evidence of motives other than disinterested malevolence, "such as profit, self-interest, or business advantage" will defeat a claim of prima facie tort. *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985).

Defendants claim that the complaint belies plaintiff's claim for prima facie tort, and the Court agrees. Plaintiff avers that "defendants' smear campaign and course of unlawful conduct against Treppel were also calculated to divert attention from, and chill any further scrutiny and criticism of,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Biovail's business and accounting problems and practices, and thereby bolster or sustain Biovail's stock price." (Compl.¶ 28.) Thus, in his own words, plaintiff concedes that defendants' actions were motivated, at least in part, by a self-serving desire to protect their business, and not solely by disinterested malevolence toward plaintiff. As a consequence, plaintiff's claim for prima facie tort must be dismissed because plaintiff can prove no set of facts consistent with the complaint that would entitle him to relief.

## VII. *Civil Conspiracy*

The final cause of action in the complaint alleges that, through their defamatory statements and tortious conduct, defendants engaged in a civil conspiracy to "harm [plaintiff] and destroy his reputation and career." (*Id.* ¶¶ 53, 54.) New York law only recognizes an action for civil conspiracy if it is connected to a separate underlying tort. The New York Court of Appeals has made it clear that " [a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort...." *Alexander & Alexander Inc. v. Fritzen,* 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 503 N.E.2d 102 (1986) (internal quotations and citations omitted). Thus, "plaintiff may plead the existence of a conspiracy ... to demonstrate that each defendant's conduct was part of a common scheme." *World Wrestling Fed'n. Entm't., Inc. v. Bozell,* 142 F.Supp.2d 514, 532-533 (S.D.N.Y.2001) (citation omitted). To establish a claim of civil conspiracy, plaintiff must demonstrate the underlying tort, plus the following four elements: (1) an agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties' intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury. *Id.*

**\*20** The Court finds that the complaint alleges facts that are legally sufficient to support a claim for civil conspiracy. As discussed above, plaintiff has sufficiently pled the underlying torts of defamation (premised on three of the eleven statements at issue) and tortious interference with prospective economic advantage. *See supra* Parts IV and V. In addition,

plaintiff has satisfied the additional four elements necessary for a civil conspiracy claim. The complaint alleges that each of the defendants-Biovail, Melnyk, Cancellara, Sitrick, and Sitrick and Company-committed specific overt acts in furtherance of their effort to defame plaintiff and tortiously interfere with his relationship with his employer, BAS. Further, as a direct and proximate result, plaintiff was harmed in that he "was forced to resign from BAS and leave the profession of securities research analyst...." (Compl.¶ 55.)

Accordingly, defendants' motion to dismiss the civil conspiracy claim is denied.

## Conclusion

For the reasons set forth above, the Court denies defendants' motion to dismiss defendants Biovail and Cancellara pursuant to Rule 12(b)(2) for lack of personal jurisdiction. The Court also denies in part and grants in part defendants' motion to dismiss the complaint pursuant to Rule 12(b)(6). The Court denies defendants' motion with respect to the claims of defamation and defamation *per se* based on Statements 30(a), 31(b), and 31(d). The Court grants defendants' motion with respect to plaintiff's claims of defamation and defamation *per se* based on Statements 29(a), 29(b), 29(c), 29(d), 30(b), 30(c), 31(a), and 31(c). The Court denies defendants' motion with respect to the claim of tortious interference with prospective economic advantage. The Court grants defendants' motion with respect to the claim of prima facie tort. Finally, the Court denies defendants' motion with respect to the claim of civil conspiracy. The parties are ordered to appear for a status conference on November 10, 2004 at 11:30 a.m.

SO ORDERED.

## APPENDIX

LEISURE.

The Globe and Mail

Copyright (c) 2002 by The Globe and Mail

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Report on Business: Money & Markets

Tuesday, April 30, 2002

By Leonard Zehr

BIOTECHNOLOGY REPORTER Biovail Corp.
stoc

Biovail plunges on downgrade

Drug developer blasts analyst's reasoning

The downgrade by Banc of America Securities LLC analyst Jerry Treppel slashed more than $1.6-billion (U.S.) or 21 per cent off Biovail's market value.

In a hastily arranged conference call, Biovail senior vice-president Kenneth Cancellera said statements about the company's consent agreement with the U.S. Federal Trade Commission in a report by Mr. Treppel are 'absolutely and categorically wrong.'

Last week, Biovail agreed to settle FTC claims that it improperly listed a new patent with the U.S. Food and Drug Administration to prevent generic competition for its Tiazac heart drug, which is expected to generate sales of $200-million this year.

In his report, Mr. Treppel questioned Biovail's assertion that it acted properly in listing the patent.

'Either Jerry doesn't understand the complexity of the issue or worse, he understands it and chooses not to set the record straight,' Mr. Cancellera said.

A spokesman for Banc of America said the report speaks for itself.

Biovail chairman and chief executive officer Eugene Melnyk said the company settled with the FTC to avoid spending 'legal time and legal effort ..

. battling an issue that was almost moot in our minds.'

Mississauga-based Biovail has already developed its own generic version of Tiazac. It plans to start selling it later this year if competitor Andrx Corp. receives regulatory approval for its generic version of the drug.

Mr. Treppel turned sour on Biovail a year ago after the patent extension was filed because it 'hit one of his other [stock] recommendations hard,' Mr. Melnyk said, referring to Andrx.

'It's more about his support for Andrx than his negative view of Biovail.'

In a telephone interview yesterday, Mr. Melnyk alleged that Mr. Treppel was a founding shareholder of Andrx before it went public, and that he is still a shareholder.

'Up until now, we've kept that quiet because what you don't want to do is criticize analysts,' he said.

'But when a guy goes way beyond the norm, people start asking, what's his grind.'

Mr. Treppel could not be reached for comment.

Mr. Treppel has a 'buy' rating on Andrx. His latest research notes that Banc of America currently maintains a market in Andrx and has acted as a manager of a public offering for the company in the past three years.

Biovail shares plunged $9.65 or 21 per cent to $36.80 yesterday on New York Stock Exchange volume of 12.3 million shares after Mr. Treppel downgraded Biovail to 'sell' from 'market perform.'

In Toronto Stock Exchange trading of 2.3 million shares, Biovail dropped $14.91 (Canadian) to $57.60.

This isn't the first time Mr. Treppel has beat up Biovail.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Last January, investors slashed more than $700-million from Biovail's value after Mr. Treppel downgraded the stock, citing concerns about prospects for the company's Cardizem XL heart drug, which is due to be launched in the fourth quarter of this year.

In October, 2000, Biovail shares plummeted 22 per cent after the analyst downgraded the stock in the wake of a tentative FDA approval of a generic version of Tiazac.

In addition to Biovail's handling of the FTC issue, Mr. Treppel said in his latest report that the company's revenue and earnings performance over the past 18 months 'has not been of high quality.'

He also cited several financial ratios that suggest Biovail's stock price is overvalued compared with other specialty pharmaceutical companies.

'I've been on the phone all day with clients, telling them that the FTC consent is a benign non-event for Biovail and there are no financial penalties,' said one industry analyst, who declined to be identified because his brokerage does not permit research analysts to be named.

'I'm still upbeat on the company, but I can understand why retail investors want out.'

Cory Davis, an analyst with J.P. Morgan Securities Inc., who arranged the conference call for Biovail, said the latest downturn for the stock represents a ' tremendous buying opportunity.'

He figures Biovail will earn $2.32 (U.S.) a share next year, which is near the high end of the company's own guidance of $2.25 to $2.35.

Biovail is forecasting a profit of $1.70 to $1.80 a share this year.

---- INDEX REFERENCES ----

KEYWORDS: stocks

ORGANIZATION:  ROB  1000;  $BVF;  Biovail

Corp.

EDITION: Metro

Word Count: 776

04/30/2002 GLOBEMAIL B1

Canada Stockwatch

(c) Copyright 2002 Canjex Publishing Ltd.

Tuesday, April 30, 2002

Biovail Corp (2)-Globe says Biovail drops like a rock on downgrade

The Globe and Mail reports in its Tuesday edition that Biovail tumbled $14.91 to $57.60 on the Toronto Stock Exchange Monday after a downgrade by by Banc of America Securities analyst Jerry Treppel. The Globe's Leonard Zehr writes that Biovail senior vice-president Kenneth Cancellera said statements about the company's consent agreement with the United States Federal Trade Commission in a report by Mr. Treppel are " absolutely and categorically wrong." Last week, Biovail agreed to settle FTC claims that it improperly listed a new patent with the U.S. Food and Drug Administration to prevent generic competition from rival Andrx for its Tiazac heart drug. In his report, Mr. Treppel questioned Biovail's assertion that it acted properly in listing the patent. " Either Jerry doesn't understand the complexity of the issue or worse, he understands it and chooses not to set the record straight," Mr. Cancellera said. A spokesman for Banc of America said the report speaks for itself. Biovail chairman and chief executive officer Eugene Melnyk alleges Mr. Treppel has an interest in Andrx and so has an axe to grind with Biovail for keeping Andrx stock depressed.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

| Biovail | BVF |
|---------|-----|
| Corp (2) | |
| Shares | Apr 29 |
| issued | close |
| 157.4 | $57.60 |
| 96.407 | |
| Tue 30 | In the News |
| Apr 2002 | |

---- INDEX REFERENCES ----

COMPANY (TICKER): Biovail Corp.; Biovail Corp. (BVF T.BVF)

NEWS SUBJECT: English language content; High-Yield Issuers; Dow Jones Total Market Index; Patents; Corporate/Industrial News; Patents; Equity Markets; Canadian Stock Market News; Regulation/Government Policy; Market News (ENGL HIY WEI C133 CCAT PAT M11 TOR C13 MCAT)

MARKET SECTOR: Clip Routing Code (TPX)

INDUSTRY: Drug Manufacturers; Islamic Index (DRG XISL)

PRODUCT: Canadian News (DCA)

GOVERNMENT: Federal Trade Commission (FTC)(FTC)

REGION: Canada; North America; Ontario; Canada; Canada-Ontario; North American Countries; United States; United States (CN NME ONT CANA CAON NAMZ U.S. USA)

Word Count: 206

4/30/02 CANSTCKWTH (No Page)

Copyright 2002 Bloomberg L.P.

Bloomberg News

May 14, 2002, Tuesday 9:49 PM Eastern Time

LENGTH: 153 words

HEADLINE: BANC OF AMERICA RETRACTS ANALYST'S COMMENTS ABOUT BIOVAIL

BYLINE: Edvard Pettersson in Los Angeles, (323) 801-1280 or at epettersson @Bloomberg.net, through the San Francisco newsroom. Editor: Marley.

DATELINE: Toronto

BODY:

Banc of America Securities, a unit of Bank of America Corp., said it retracted comments and inferences made last month by analyst Jerry Treppel about Biovail Corp.. the largest Canadian maker of brand-name drugs.

Treppel's oral comments and inferences, questioning Biovail and its management, were neither authorized nor approved by anyone at Banc of America, the securities firm said in a release distributed by PR Newswire.

Shares of Biovail fell 21 percent April 29 after Treppel cut the stock to "sell" from "market perform" because of concern over how the company has accounted for sales of its blood-pressure drug Cardizem. Banc of America didn't retract the rating downgrade, it said.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Officials at Banc of America Securities couldn't be reached immediately to comment. Biovail rose $1.14 to $36.80 in New York trading. The retraction was released after the close of regular U.S. trading.

LOAD-DATE: May 15, 2002

Copyright 2002 Bloomberg L.P.

Bloomberg News

April 29, 2002, Monday 4:26 PM Eastern Time

LENGTH: 692 words

HEADLINE: CANADA'S TSE 300 FALLS, LED BY BIOVAIL ON ANALYST 'SELL' RATING

BYLINE: Matt Mossman in the Toronto newsroom (416) 203-5750, or at mmossman @bloomberg.net. Editor: Erman, MacKay, Erman.

DATELINE: Toronto

BODY:

Canadian stocks fell for a sixth day, led by Biovail Corp., which slid to its lowest in a year after an analyst questioned the quality of the company's earnings.

The drug maker and marketer was cut to "sell" from "market perform" by analyst Jerry Treppel at Banc of America. Biovail fell C$14.91 ($9.51), or 21 percent, to C$57.60, accounting for more than half of the Toronto Stock Exchange 300 Composite Index's drop of 47.12 points, or 0.62 percent, to 7582.50.

"Banc of America has been a lead underwriter for Biovail, so they've been pretty close to the company, " said Bruce Cooper, who manages C$400 million in mutual funds for TD Asset Management Inc. " For them to go to a 'sell' probably makes people

pretty nervous." Cooper said he sold his Biovail holdings over the past two months.

The TSE 300 finished at its lowest since Feb. 26, leaving the benchmark 1.4 percent lower this year. Investors have been disappointed by companies' first-quarter earnings and outlooks for sales this year, said Katherine Beattie, a technical analyst for Standard & Poor's MMS in Toronto.

"There's concern that things are not picking up as much we thought they would," Beattie said. "People are very wary, even when they are seeing good numbers, so they aren't rallying the market as much. "

Several companies fell to their lowest in recent months, including aluminum producer Alcan Inc., which dropped 90 cents to C$56.60, lowest since January. Celestica Inc., which makes electronics for sale by brand-name companies, fell 98 cents to C$43.07, lowest since October. Toronto-Dominion Bank fell 33 cents to C$41.67, after trading above C$42 since Feb. 26.

The Standard & Poor's-TSE 60 Index fell 2.20 points, or 0.51 percent, to 428.59. About 168 million shares worth C$2.14 billion traded on the TSE, 7.8 percent less than the three-month daily average. There were 461 advancers and 628 decliners.

The Standard & Poor's-Canadian Venture Exchange Composite Index rose 4.15 points to 1162.99. The exchange is home to stocks too small for the TSE.

The following stocks made significant gains or losses today. The stock symbol is after the company name:

Burntsand Inc. (BRT CN) fell 14 cents, or 8.5 percent, to C$1.51. The business-software maker was maintained "buy" by analyst Steven Li at Raymond James. The target price was reduced to C$2.25 from C$3 per share.

Glyko Biomedical Ltd. (GBL CN) fell 25 cents, or 7.7 percent, to C$3. The Novato, California-based company, whose main asset is a 21 percent stake in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

BioMarin Pharmaceutical Inc., postponed a special meeting of shareholders after the U.S. Securities and Exchange Commission said it would review the joint circular prepared by the two companies. BioMarin agreed to buy Glyko in February for $140 million.

GTC Transcontinental (GRT/A CN) fell C$2.05, or 5.7 percent, to C$34.05. The Montreal-based commercial printer was cut to "hold" from "buy" by analyst Stephannie Larocque at UBS Bunting Warburg Inc.

Norwall Group Inc. (NGI CN) rose C$1.70, or 25 percent, to C$8.50. The maker of residential wall coverings said first-quarter net income more than tripled to C$4.3 million, or 67 cents a share, from C$1.3 million, or 21 cents in the year-earlier quarter.

PanGeo Pharma Inc. (PIL CN) rose 24 cents, or 7 percent, to C$3.70. The Mississauga, Ontario-based drugmaker will be added to the TSE 300 Index after trading today. PanGeo will also join the Standard & Poor's/TSE Canadian Small Cap Index and the TSE 200 index, replacing Enserco Energy Service Co., which is being bought.

Parkland Industries Ltd. (PKI CN) rose C$3.94, or 24 percent, to C$20.14. The Red Deer, Alberta-based oil refiner and fuel seller said it would reorganize into an income fund and pay a special dividend of C$1.

Thistle Mining Inc. (THT CN) rose 7 cents, or 10 percent, to 75 cents. The Toronto-based company said its five South African gold mines contain 47 percent more gold than previously estimated because metal in the ground between mine shafts hadn't been included in estimates.

LOAD-DATE: April 30, 2002

Copyright 2002 Bloomberg L.P.

Bloomberg News

May 15, 2002, Wednesday 4:38 PM Eastern Time

LENGTH: 363 words

HEADLINE: BANC OF AMERICA'S TREPPEL PUT ON LEAVE OVER BIOVAIL

BYLINE: Kim Dixon in Washington and Cathy Dodge in Princeton with reporting by Joe Richter and David Russell in the Princeton newsroom (609) 750-4654, or at drussell4@bloomberg.net. Editor: J. Norton

DATELINE: Charlotte

BODY:

Bank of America Corp. said it put analyst Jerry Treppel on indefinite leave for his criticism of Biovail Corp., the biggest Canadian drugmaker, and its effort to maintain a patent for the hypertension drug Tiazac.

Treppel, an analyst for the banking company's Banc of America securities arm, cut his rating on Biovail to a "sell" from "market perform" on April 29 and in a report questioning Biovail's reporting of sales of blood-pressure medicine Cardizem and a Tiazac patent listing. The shares fell 21 percent that day.

Biovail last month agreed to settle U.S. government claims that it improperly listed a patent with the Food and Drug Administration to prevent generic competition for Tiazac. In his report, Treppel questioned Biovail's assertion that it acted properly in listing the patent.

"He's still employed with the firm but he's not working," said Bank of America spokesman John Roehm.

The Charlotte-based bank, the third-largest in the U.S., yesterday said comments made by Treppel on Biovail were "neither authorized nor approved by anyone at Bank of America."

A Biovail spokesman, Michael Sitrick, said that given Bank of America's actions, "all of Mr. Treppel's comments, both written and oral, should be called into question."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Roehm said while Biovail's complaints didn't specifically prompt the move, "we've definitely talked to them about it."

Biovail severed its investment-banking business with Banc of America Securities in November 2000 after learning that a Banc of America managing director was also a director of Andrx Group, a rival of Biovail, Sitrick said.

Andrew Forman, an analyst at Friedman, Billings, Ramsey, who has an " underperform" rating on Biovail's stock, also said he has "a negative opinion" of Biovail.

Forman cited Biovail's growth strategy driven by acquisitions of old products and its lack of a track record of getting drugs approved at the U.S. Food and Drug Administration.

For example, he called Biovail's purchase of Merck & Co.'s blood pressure drug Vasotec "a bridge to nowhere" because it has competition from cheaper generics.

UPDATED-INFO: Adds analyst comment in ninth through 12th paragraphs.

LOAD-DATE: May 16, 2002

The Globe and Mail

Copyright (c) 2002 by The Globe and Mail

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Report on Business: Canadian

Friday, May 17, 2002

By Leonard Zehr And Dave Ebner

Biovail demands probe of bank analyst

Drug maker Biovail Corp. unleashed a scathing attack against Banc of America Securities LLC yesterday and demanded a full-scale investigation of the stock and options trading of the brokerage's pharmaceutical analyst, his former colleagues and associates.

The unusual request came in the wake of Banc of America placing analyst Jerry Treppel on ' administrative leave' on Tuesday for making ' unauthorized comments' about Biovail.

Last month, when Mr. Treppel downgraded Biovail's stock to 'sell,' he publicly questioned the legality of actions taken by the company to maintain its patent rights for the popular hypertension drug Tiazac.

Biovail's new patent prevented competitor Andrx Corp. from developing a generic version of Tiazac.

Mr. Treppel, who couldn't be reached for comment yesterday, is a long-time shareholder of Andrx and has a 'buy' rating on the stock.

According to a report in The Wall Street Journal, an account in Mr. Treppel's name at UBS PaineWebber, an arm of his former employer, made more than $100,000 (U.S.) last year in 35 trades in options on Andrx stock.

Some of the trades were done immediately before, during and after the days Mr. Treppel issued reports urging investors to buy Andrx stock.

'We have been concerned by the contradictory coverage of both Andrx and Biovail,' Michael Sitrick, a spokesman for Biovail, said in a statement yesterday.

'The information made public ... is alarming and, we believe, calls into question the objectivity of all reporting by Mr. Treppel,' he added.

Last month, Biovail chairman Eugene Melnyk accused Mr. Treppel of having a conflict of interest in his opinions on both companies.

'It's more about his support for Andrx than his

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

negative view of Biovail,' he said.

Banc of America spokesman John Roehm said the firm has been in discussions with Mississauga-based Biovail about Mr. Treppel's research on the two companies, and it stands by his work.

But he declined to indicate when an investigation of Mr. Treppel's trading history will be finished or whether the findings will be made public.

'This is shocking.' said an investment source, who asked to remain anonymous. 'For two years. [Wall] Street has wondered why the glass was half full for Andrx and half empty for Biovail and now we know.'

He said Mr. Treppel's actions, if confirmed, could make Banc of America the target of class-action lawsuits from shareholders who sold Biovail stock based on the firm's recommendations.

Mr. Treppel's 'sell' recommendation on April 29, which followed an earlier downgrade in January, prompted a torrent of selling in Biovail shares. For example, the April downgrade wiped nearly $1.6-billion off the company's value.

The stock closed at $37.80, down 40 cents, on the New York Stock Exchange yesterday, compared with a 52-week high of $57.18 in January.

Mr. Treppel bought shares of Andrx before it went public in 1996, taking a position then worth about $25,000, said Elliot Hahn, president of Fort Lauderdale, Fla.-based Andrx.

Working for Dillon Read & Co. Inc., which is now part of UBS Warburg LLC, Mr. Treppel disclosed a personal holding of Andrx shares when he issued his first report on the company in 1997.

Mr. Treppel moved to Banc of America Securities in 1999 and was not required to disclose his Andrx holdings because he held less than 1 per cent of the company's shares outstanding.

Biovail severed its investment banking relationship with Banc of America in March, 2000, when it

discovered that a managing director at the investment bank was a former director of Andrx. Mr. Treppel initially downgraded Biovail shares in October, 2000.

Last September, Banc of America barred analysts from holding shares in companies they cover but grandfathered Mr. Treppel's Andrx holding because it was a long-term position, Mr. Roehm said.

However, account records reviewed by The Wall Street Journal list many of the trades in the ' managed account' as unsolicited, indicating the broker did not initiate the trades.

Mr. Roehm disagreed. 'We've spoken to PaineWebber and they have confirmed that the trading decisions in the account were made solely by the broker managing the account,' he said.

But another investment source said it is highly unusual for managed accounts to engage in volatile options trading. 'Managed accounts are the stuff of widows and orphans.' he said.

Mr. Treppel's undisclosed holdings and trading would have contravened new rules recently approved by the U.S. Securities and Exchange Commission, most of which will be in effect by summer's end.

One change forbids analysts from investing in companies in their sector before an initial public offering, as in Mr. Treppel's relationship with Andrx.

Moreover, analysts will be banned from trading securities of a company they follow for 30 days before and five days after they issue a report on the company.

'Removing analysts' incentives to trade around the time they issue research reports should reduce conflicts arising from personal financial interests,' the SEC said this month when it approved the new rules. Another change demands that analysts make public any holding of companies they cover, in print and in the media.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

'Requiring analysts and securities firms to disclose financial interests can alert investors to potential biases in their recommendations,' the SEC said. War of words

Biovail chairman Eugene Melnyk has called for an investigation of Banc of America Securities analyst Jerry Treppel after the disclosure that Mr. Treppel held stock in Biovail rival Andrx Corp. while issuing negative reports on Biovail. Oct.3, 2000

Downgrades to 'Market Performer' from 'Buy'. Cites rising stock price, valuation and threat of generic competition for Tiazac. Market value falls $1.76-billion Jan. 22, 2002

Downgrades to 'Market performer' from 'Buy' ... 'we are less enthusiastic about the prospects for Cardizem XL ... and are concerned about the potential future ramifications of its legal strategy in delaying the entry of generic Tiazac.' Market value falls $700-million April 29, 2002

Downgrades to 'Sell' from 'Market Performer'. ' Despite the proposed FTC settlement on the second Tiazac patent, we question management's handling of the issue and we believe tracking revenue and earnings quality remains a questions. We believe the current P/E multiple is unwarranted and not sustainable.' Market value falls $2.4-billion

---- INDEX REFERENCES ----

KEYWORDS: securities industry; conflict of interest; regulation; stocks; chronology

NAMED PERSON: Jerry Treppel

GEOGRAPHY: United States

ORGANIZATION: ROB 1000; $BVF; Biovail Corp.; Banc of America Securities LLC; Andrx Corp.

EDITION: Metro

Word Count: 1096

05/17/2002 GLOBEMAIL B1

The Canadian Press

Copyright (c) 2002 The Canadian Press. All rights reserved.

Thursday, May 16, 2002

Bitter pill: Biovail enraged over negative analyst report by Andrx investor BY GARY NORRIS CP

TORONTO (CP) _ Blood is boiling in the executive suite of Canadian drug maker Biovail Corp. over reports that an American stock analyst who battered Biovail's share price owned stock in one of the company's U.S. competitors.

Jerry Treppel, an analyst at Banc of America Securities, has been placed on indefinite leave after the Wall Street Journal investigation.

Biovail lost almost $2.4 billion in market value after Treppel advised investors on April 29 to sell the company's stock. He cast doubt on Biovail's " earnings quality" and on its relations with U.S. regulatory authorities.

At the same time, Treppel held a "buy" rating on Andrx Corp., a Florida-based drug company in which he held shares.

"After reviewing the trading records reported on by the Wall Street Journal, it was clear that Mr. Treppel held a substantial, previously undisclosed equity interest in a direct competitor _ Andrx Group, " Biovail said in a statement Thursday.

"The records also showed unsolicited buy and sell orders for options in Andrx both prior and concurrently with Mr. Treppel issuing his analyst reports on Andrx and Biovail."

Biovail urged Banc of America Securities to " launch a full-scale investigation into the stock and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

options trading and equity holdings of pharmaceutical analyst Jerry Treppel, his former colleagues and associates, and to make the results of that investigation public."

Most analysts who follow Biovail rate the company a buy, although a few echo some of the concerns raised by Treppel as he cut the company from " market performer" to "sell."

Chicago-based Zacks Investment Research gave Biovail a solid buy recommendation on Tuesday. " Given the breadth of their branded drug pipeline, the consensus is that Biovail is on the cusp of a dramatic acceleration in earnings-per-share growth through 2005," Zacks.com enthused.

"Although pharmaceuticals have been less than stellar, it might be wise to be on the launch pad when this stock takes off."

Biovail shares (TSX:BVF) dropped by 20 per cent on April 29, falling to $57.60 from the previous session's close of $72.51 in frantic trading on the Toronto market.

The stock, which has a 52-week high and low of $91 and $50.74, traded Thursday at $58.34. down $1.54.

"We have been concerned by the contradictory coverage of both Andrx and Biovail," stated Michael Sitrick, a Biovail spokesman.

"The information ... is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel."

Biovail said it has had no business relationship with Banc of America since March 2000.

Four days before Treppel's recommendation, Biovail reported record first-quarter results, with revenue up 30 per cent from a year earlier to $155.3 million U.S. while net income increased 82 per cent to $53.1 million US.

The company also affirmed its "comfort" with expectations of 30 per cent growthin per-share

earnings this year and next.

---- INDEX REFERENCES ----

KEY WORDS: BUSINESS; HEALTH; FINANCE; TSX; BVF

NEWS SUBJECT: Corporate/Industrial News; Health; Health; English language content; Stock News; Political/General News (CCAT HLT GHEA ENGL STK GCAT)

NEWS CATEGORY: BUSINESS

MARKET SECTOR: Consumer Non-Cyclical (NCY)

INDUSTRY: Drug Manufacturers (DRG)

PRODUCT: Pharmaceuticals; Canadian News (DPH DCA)

REGION: Canada; North American Countries; Canada; North America; United States; United States (CANA NAMZ CN NME USA US)

Word Count: 467

5/16/02 CANADAPRESS (No Page)

Copyright 2002 Business Wire, Inc.

Business Wire

May 16, 2002, Thursday

SECTION: HEALTHWIRE

DISTRIBUTION: Business & Health/Medical Editors

LENGTH: 379 words

HEADLINE: Biovail Comments On Media Reports

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.