Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

DATELINE: TORONTO, May 16, 2002

BODY:

Citing reports today in the Wall Street Journal, The Globe and Mail and the National Post, Biovail Corporation (N.Y.SE:BVF) (TSX:BVF) called upon Bank of America Securities (N.Y.SE:BAC) to launch a full-scale investigation into the stock and options trading and equity holdings of pharmaceutical analyst Jerry Treppel, his former colleagues and associates, and to make the results of that investigation public.

Biovail stated that after reviewing the trading records reported on by the Wall Street Journal, it was clear that Mr. Treppel held a substantial, previously undisclosed, equity interest in a direct competitor-Andrx Group (Nasdaq:ADRX). The records also showed unsolicited buy and sell orders for options in Andrx both prior and concurrently with Mr. Treppel issuing his analyst reports on Andrx and Biovail.

"We have been concerned by the contradictory coverage of both Andrx and Biovail." Michael Sitrick, a Biovail spokesman, said. "The information made public today is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel." Biovail also confirmed that it does not currently have any banking relationship with Bank of America Corporation nor has it since March 2000.

Biovail Corporation is a full-service pharmaceutical company, engaged in the formulation, clinical testing, registration, manufacture, sale and promotion of pharmaceutical products utilizing advanced drug delivery technologies.

"Safe Harbor" statement under the Private Securities Litigation Reform Act of 1995.

To the extent any statements made in this release contain information that is not historical, these statements are essentially forward looking and are subject to risks and uncertainties, including the difficulty of predicting FDA approvals, acceptance and demand for new pharmaceutical products, the impact of competitive products and pricing, new product development and launch, reliance on key strategic alliances, availability of raw materials, the regulatory environment, fluctuations in operating results and other risks detailed from time to time in the company's filings with the Securities and Exchange Commission.

CONTACT: Biovail Corporation

Ken Howling, 416/285-6000

URL: http://www.businesswire.com

Copyright 2002 National Post, All Rights Reserved

National Post (Canada)

May 16, 2002 Thursday National Edition

SECTION: Financial Post; Pg. FP1

LENGTH: 537 words

HEADLINE: Biovail takes aim at U.S. brokerage: Claims executive sat on rival's board (Toronto / Late edition headline.);

Biovail takes aim at Bank of America: Claims executive sat on rival's board (All but Toronto / Late edition headline.)

SOURCE: Financial Post

BYLINE: John Greenwood and Steve Maich

BODY:

Biovail Corp. has fired a shot at its critics, advising that all comments made by a Bank of America Securities analyst about Biovail "should be called into question."

Late Tuesday, in a highly unusual move, Bank of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

America Securities said it put analyst Jerry Treppel on indefinite leave for his criticism of Canadian drugmaker Biovail and its effort to maintain a patent for the hypertension drug Tiazac.

"We believe that given the serious action taken by Bank of America Securities that all of Mr. Treppel's comments about Biovail, both written and oral, should be called into question," said Michael Sitrik, a Biovail spokesman.

Biovail also disclosed yesterday that in November, 2000, it severed a relationship with Bank of America Securities after discovering that a senior officer at the investment bank had served on the board of directors of one of Biovail's fiercest rivals, Florida-based Andrx Group.

Andrx and Biovail, Canada's biggest drugmaker led by chairman Eugene Melnyk, have come to blows of late over Andrx's attempt to create a generic version of Tiazac.

After slapping out a "sell" recommendation on Biovail on April 29, Mr. Treppel commented in a media interview that Biovail's acquisition of an exclusive patent licence on Tiazac "looked like fraud."

While the Bank of America Securities distanced itself this week from those comments, it says it still stands behind the "sell" recommendation.

Mr. Treppel, contacted at his New Jersey home yesterday, declined to comment.

John Roehm, a spokesman for the investment bank, confirmed that one of its managing directors had served as a director of Andrx. However, Mr. Roehm noted that the employee resigned his Andrx directorship in 1997, some years before joining Bank of America.

The mud-slinging match grew even bigger late yesterday when the chief executive of Andrx weighed in.

"I have known Mr. Treppel for more than a decade," said Elliot Hahn, in an interview. "He is a person

of complete integrity and I have zero belief that he did anything to compromise that integrity ... To say the least, it is disappointing that Bank of America did not stand up to pressure."

Mr. Hahn confirmed that Mr. Treppel was an early investor in Andrx, having bought up to US$35,000 of securities in the company.

Mr. Roehm said any stock Mr. Treppel holds today is held in a managed account with another firm.

"Jerry does not exercise day-to-day control over that account," he said. "If a broker added to that position or is active in the shares, it was at the discretion of that broker, not Jerry."

According to Bloomberg News, Mr. Treppel is one of only two analysts who rate Biovail as a "sell." By contrast 19 analysts call the stock a "buy."

In April, Mr. Treppel cutting his rating to "sell" from "market perform." The next day after Mr. Treppel's report, shares in Biovail plunged 21%. On Jan. 22, he dropped his rating from "buy" to " market perform." The next day the shares slumped 24%.

Since the start of the year, Biovail has lost $5.26-billion of market capitalization.

Mr. Treppel is not the only player on the Street to raise questions about Biovail, but he may well be one of the most senior to date.

GRAPHIC: Color Photo: Glenn Lowson, National Post; Eugene Melnyk, chairman of Biovail Corp.

LOAD-DATE: May 16, 2002

Copyright 2002 Financial Times Information

All rights reserved

Global News Wire

Copyright 2002 CCN Newswire

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

CCN Newswire

May 16, 2002

LENGTH: 372 words

HEADLINE: MAY 16, 2002-12:34 EDT

BODY:

Biovail Comments On Media Reports

TORONTO, ONTARIO-Citing reports today in the Wall Street Journal, The Globe and Mail and the National Post, Biovail Corporation (N.Y.SE:BVF) (TSX:BVF) called upon Bank of America Securities (N.Y.SE:BAC) to launch a full-scale investigation into the stock and options trading and equity holdings of pharmaceutical analyst Jerry Treppel, his former colleagues and associates, and to make the results of that investigation public.

Biovail stated that after reviewing the trading records reported on by the Wall Street Journal, it was clear that Mr. Treppel held a substantial, previously undisclosed, equity interest in a direct competitor-Andrx Group (Nasdaq:ADRX). The records also showed unsolicited buy and sell orders for options in Andrx both prior and concurrently with Mr. Treppel issuing his analyst reports on Andrx and Biovail.

"We have been concerned by the contradictory coverage of both Andrx and Biovail," Michael Sitrick, a Biovail spokesman, said. "The information made public today is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel." Biovail also confirmed that it does not currently have any banking relationship with Bank of America Corporation nor has it since March 2000.

Biovail Corporation is a full-service pharmaceutical company, engaged in the formulation, clinical testing, registration, manufacture, sale and promotion of pharmaceutical products utilizing advanced drug delivery technologies.

"Safe Harbor" statement under the Private Securities Litigation Reform Act of 1995.

To the extent any statements made in this release contain information that is not historical, these statements are essentially forward looking and are subject to risks and uncertainties, including the difficulty of predicting FDA approvals, acceptance and demand for new pharmaceutical products, the impact of competitive products and pricing, new product development and launch, reliance on key strategic alliances, availability of raw materials, the regulatory environment, fluctuations in operating results and other risks detailed from time to time in the company's filings with the Securities and Exchange Commission.

JOURNAL-CODE: WCCN

LOAD-DATE: May 16, 2002

Thursday May 16, 5:12 pm Eastern Time

Bank of America Says It Backs Analyst's Research on Biovail, Andrx

(Editor's note: This story, which originally ran May 16, was retransmitted May 17 for a correction. The headline of the previous version incorrectly said Bank of America had a "sell" rating on Andrx Corp.)

By Lynn Cowan

Dow Jones Newswires

WASHINGTON-Bank of America (N.Y.SE: *BAC-News* ) Corp. (BAC) said it continues to stand by the accuracy of pharmaceutical analyst Jerry Treppel's research on Biovail Corp. (N.Y.SE: *BVF-News* ) (BVF) and Andrx Corp. (ADRX), despite news reports that Mr. Treppel made trading profits on Andrx stock options at the same time he was recommending it.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Toronto-based Biovail demanded Thursday that Bank of America conduct a fullscale investigation into Mr. Treppel's stock and options activities, as well as that of his former coworkers, following reports in several newspapers about the profits be made.

Bank of America spokesman John Roehm said Biovail's request is under review, but the bank maintains that Mr. Treppel's written analyses on both Biovail and Andrx are accurate.

Biovail and Fort Lauderdale, Fla. -based Andrx are fierce competitors. In April, Biovail reached a consent decree with the U.S. Federal Trade Commission, which charged that the company had illegally acquired an exclusive patent license for the hypertension drug Tiazac. Andrx plans to market a generic version of Tiazac later this year.

Earlier this week, Mr. Treppel was placed on administrative leave and Bank of America issued a formal statement retracting oral comments the analyst made to a reporter on April 29, when he said that Biovail's actions on the Tiazac patent looked like fraud. Biovail, which didn't admit wrongdoing in its settlement with the FTC, demanded a retraction by Bank of America.

On the same day he made the fraud comment, Mr. Treppel downgraded Biovail's stock to a "sell" rating and issued a negative report on the company. Bank of America said it isn't retracting his "sell" rating or the contents of the report, just his oral statements.

"I understand why Biovail would be upset at receiving a 'sell' rating on their stock, but all our research is carefully reviewed by research management before it is published," Mr. Rochm said. "In this case, we conducted a further review on Andrx and Biovail, and we stand by both the research and the ratings on the stocks."

Mr. Treppel didn't immediately return a phone call to his home seeking comment. He is still employed by Bank of America, but his leave is indefinite, said Mr. Rochm.

Biovail said that after reviewing the trading records reported on by The Wall Street Journal, it was clear Mr. Treppel had directed his broker to make buy and sell orders on Andrx options prior to and concurrent with issuing reports on Andrx and Biovail. A Biovail spokesman refused to comment on how it obtained Mr. Treppel's trading records.

Biovail said the trading data "calls into question the objectivity of all reporting by Treppel." The company confirmed it hasn't had an investment-banking relationship with Bank of America since March 2000, when it discovered that a managing director at Bank of America sat on the board of Andrx.

But Bank of America disputed Biovail's description of Mr. Treppel's account activity and its claim about the managing director.

Mr. Roehm said it is the bank's policy that analysts hold their brokerage accounts either in-house or in a managed accounts an outside brokerage firm, and Mr. Treppel's account was of the latter type. In a managed account, the stockbroker makes trading decisions without input from the client, and "any options trades made in an account would have been at the discretion of the broker and not Treppel," said Mr. Roehm.

As for Biovail's claim that a Bank of America managing director sat on Andrx's board, Mr. Roehm said that isn't quite accurate. That individual left Andrx's board in 1997, but didn't begin working at Bank of America until 1999. Mr. Roehm refused to say why the investment-banking relationship with Biovail ended, nor would he comment on whether it was Biovail's decision alone to end it.

-By Lynn Cowan, Dow Jones Newswires; 202-628-9783; Lynn.Cowan@dowjones.com

*Email this story-Most-emailed articles-Most-viewed articles*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

—————
—————
—————
—————
—————
—————
—————

| More Quotes | • Andrx Corp (Nasd aqNM: *ADRXi-iNews* ) |
| and News: | • Bank of America Corp (N.Y.SE: *BACi-iNews* ) • Biovail Corp (N.Y.SE-*BVF-News* ) |

Related News Categories: *banking, biotech, medica l/pha rmaceutical*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

ADVERTISEMENT

Special Offers

• *Refinance Now! Before Rates Increase!*
• *FREE credit report & trial membership!*
• *Access Your PC from*
*Anywhere-Free Download*

Bank Of America Not Backing Down On Biovail Sell Rating

By Lynn Cowan

724 words

16 May 2002

08:57 pm GMT

Dow Jones News Service

English

(Copyright (c) 2002, Dow Jones & Company, Inc.)

Of DOW JONES NEWSWIRES

WASHINGTON -(Dow Jones)Bank of America Corp. (BAC) said it continues to stand by the accuracy of pharmaceutical analyst Jerry Treppel's research on Biovail Corp. (BVF) and Andrx Group (ADRX), despite news reports that Treppel made trading profits on Andrx stock options at the same time he was recommending it.

Toronto-based Biovail demanded Thursday that Bank of America conduct a full-scale investigation into Treppel's stock and options activities, as well as that of his former co-workers, following reports in several newspapers about the profits he made.

Bank of America spokesman John Roehm said Biovail's request is under review, but the bank maintains that Treppel's written analyses on both Biovail and Andrx are accurate. Biovail and Fort Lauderdale, Fla.-based Andrx are fierce competitors. In April, Biovail reached a consent decree with the U.S. Federal Trade Commission, which charged that the company had illegally acquired an exclusive patent license for hypertension drug Tiazac; Andrx plans to market a generic version of Tiazac later this year.

Earlier this week, Treppel was placed on administrative leave and Bank of America issued a formal statement retracting oral comments the analyst made to a reporter on April 29, when he said that Biovail's actions on the Tiazac patent looked like fraud. Biovail, which didn't admit wrongdoing in its settlement with the FTC, demanded a retraction by Bank of America.

On the same day he made the fraud comment, Treppel downgraded Biovail's stock to a sell rating and issued a negative report on the company. Bank of America said it is not retracting his sell rating or the contents of the report, just his oral statements.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

"I understand why Biovail would be upset at receiving a sell rating on their stock, but all our research is carefully reviewed by research management before it is published," said Roehm. " in this case, we conducted a further review on Andrx and Biovail, and we stand by both the research and the ratings on the stocks."

Treppel did not immediately return a phone call to his home seeking comment. He is still employed by Bank of America, but his leave is indefinite, said Roehm.

Biovail said Thursday that after reviewing the trading records reported on by The Wall Street Journal, it was clear that Treppel had directed his broker to make buy and sell orders on Andrx options prior to and concurrent with issuing reports on Andrx and Biovail. A Biovail spokesman refused to comment on how it obtained Treppel's trading records.

Biovail said the trading data "calls into question the objectivity of all reporting by Treppel." The company confirmed it hasn't had an investment banking relationship with Bank of America since March 2000, when it discovered that a managing director at Bank of America sat on the board of Andrx.

But Bank of America disputed Biovail's description of Treppel's account activity and its claim about the managing director. Roehm said it's the bank's policy that analysts hold their brokerage accounts either in-house or in a managed account at an outside brokerage firm, and Treppel's account was of the latter type. In a managed account, the stockbroker makes trading decisions without input from the client, and "any options trades made in an account would have been at the discretion of the broker and not Treppel," said Roehm.

As for Biovail's claim that a Bank of America managing director sat on Andrx's board, Roehm said that's not quite accurate. That individual left Andrx's board in 1997, but didn't begin working at Bank of America until 1999. Roehm refused to say why the investment banking relationship with Biovail ended, nor would he comment on whether it

was Biovail's decision alone to end it.

-By Lynn Cowan, Dow Jones Newswires; 202-628-9783; Lynn.Cowan@dowjones.com

Bank of America spokesman Roehm added that the bank has talked to PaineWebber about Treppel's account, and PaineWebber confirmed that trading decisions in the account were made solely by the broker.

A PaineWebber spokesman didn't immediately return phone calls seeking comment.

-By Lynn Cowan, Dow Jones Newswires; 202-628-9783; Lynn.Cowan@dowjones.com

Biovail Seeks Investigation Into Treppel's Stk Holdings

425 words

16 May 2002

04:31 pm GMT

Dow Jones News Service

English

(Copyright (c) 2002, Dow Jones & Company, Inc.)

TORONTO -(Dow Jones)Citing reports in a number of newspapers Thursday, Biovail Corp. (BVF) has called for an investigation into the stock and options trading and equity holdings of pharmaceutical analyst Jerry Treppel, his former colleagues and associates.

In a news release. Biovail said it has asked Bank of America Securities to taunch a full-scale investigation.

Biovail said that, after reviewing trading records cited in the reports, "it was clear that Mr. Treppel held a substantial, previously undisclosed, equity interest in a direct competitor-Andrx Group (ADRX)."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Biovail said the records also showed unsolicited buy and sell orders for options in Andrx both prior and concurrently with Treppel issuing his analyst reports on Andrx and Biovail.

Company Web Site: http://www.biovail.com

As reported, Bank of America has placed Jerry Treppel on indefinite administrative leave after determining that remarks he made to a reporter about Biovail Corp. (BVF) were "inappropriate."

Treppel told a reporter on April 29 that Biovail's acquisition of an exclusive patent license for hypertension drug Tiazac looked like fraud. On Tuesday, Bank of America Securities issued a press release stating that it "formally retracts" itself from oral comments and inferences made by Treppel about the company.

Treppel downgraded Biovail to "sell" from "market performer" on April 29, citing concerns in a research note about management's handling of the Tiazac patent issue, future product sales and valuation.

Biovail didn't admit any wrongdoing in its settlement with the Federal Trade Commission over the acquisition of an exclusive patent on Tiazac, and maintains that it has a proper patent for the drug.

A Wall Street Journal report Thursday said an account in the name of Treppel executed 35 trades last year in options of Andrx Corp. (ADRX), making money on all but four of the trades.

The Journal said the trading records show "some of the trades were done immediately before, during and after the days Mr. Treppel issued reports urging investors to buy Andrx stock."

In its news release Thursday, Biovail said "we have been concerned by the contradictory coverage of both Andrx and Biovail."

"The information made public today is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel."

Biovail also confirmed that it doesn't currently have any banking relationship with Bank of America, and hasn't had since March 2000.

Andrx is a Fort Lauderdale maker of generic drugs.

Biovail is specialty pharmaceutical company.

-Judy McKinnon, Dow Jones Newswires: 416-306-2100

Copyright 2002 Bloomberg L.P.

Bloomberg News

May 16, 2002, Thursday 3:32 PM Eastern Time

LENGTH: 406 words

HEADLINE: BIOVAIL DEMANDS BANK OF AMERICA INVESTIGATE ANALYST

BYLINE: Ambre Brown Morley in Princeton newsroom (609) 750-4501, or amorley1 @bloomberg.net through the Washington newsroom. Editor: Rohner

DATELINE: Toronto

BODY:

Biovail Corp. called on Bank of America Corp. to investigate the holdings of analyst Jerry Treppel, whom the bank put on indefinite leave yesterday following his criticism of the biggest Canadian drugmaker.

Trading records disclosed by the Wall Street Journal show that Treppel "held a substantial, previously undisclosed equity interest in a direct competitor-Andrx Group," Biovail said in a statement. An account in Treppel's name made more than $100,000 in profits last year buying and selling options, the Journal said. The account lost $968.32 in only four of the 35 Andrx options trades, the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

newspaper said.

"The account is a managed account, under which Mr. Treppel does not exercise control," said Bank of America spokesman John Roehm. "We've spoken to Paine Webber, and they have confirmed that the trading decisions made in the account were made solely by the broker managing the account" and not Treppel.

Treppel covered Andrx and Biovail as an analyst for the banking company's securities arm. He cut his Biovail rating to "sell" from "market perform" on April 29 and questioned the way Biovail reported sales of its blood-pressure medicine Cardizem and a Tiazac patent listing. Biovail's shares fell 21 percent that day. He has a "buy" rating on Andrx.

Last month Biovail agreed to settle U.S. government claims that it improperly listed a patent with the Food and Drug Administration to prevent generic competition for Tiazac. In his report, Treppel questioned Biovail's assertion that it acted properly in listing the patent.

Two days ago, Charlotte-based Bank of America said it "disassociates itself from oral comments and inferences made by"

Treppel. Treppel's comments on Biovail were " neither authorized nor approved by anyone at Bank of America," the bank said in a statement.

An assistant at Treppel's Bank of America office in New York said he wasn't available for comment.

Bank of America's Roehm said the company has seen Biovail's statement today and "the situation is under review." Still, he said the bank has reviewed Treppel's research on Biovail and Andrx and it stands by the information in his written reports.

Biovail shares fell 54 cents to $37.66 in late trading on the New York Stock Exchange. Bank of America shares rose 58 cents to $76.50.

UPDATED-INFO: Adds article details in second, seventh paragraphs, Bank of America comment in third, eighth paragraph.

LOAD-DATE: May 17, 2002

25 of 89 DOCUMENTS

Copyright 2002 National Post, All Rights Reserved

National Post (f/k/a The Financial Post)

May 17, 2002 Friday National Edition

SECTION: Financial Post; Pg. FP1

LENGTH: 1227 words

HEADLINE: Biovail calls for probe into 'sell' rating: Demands trading records: Embattled analyst not the only one to raise questions

SOURCE: Financial Post, with a file from Dow Jones

BYLINE: Steve Maich

BODY:

Biovail Corp. turned up the heat on Banc of America Securities and its suspended biotech analyst Jerry Treppel yesterday, demanding a full investigation into the analyst who recently advised clients to sell Biovail stock.

The Toronto-based drugmaker is calling on Banc of America to make public Mr. Treppel's trading records after the Financial Post and other news organizations yesterday revealed that the analyst holds shares in a key Biovail competitor, Andrx Group.

"We have been concerned by the contradictory coverage of both Andrx and Biovail." Michael Sitrick, a Biovail spokesman said. "The information made public [yesterday] is alarming and, we believe, calls into question the objectivity of all reporting by Mr. Treppel."

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

Allegations that Mr. Treppel's research might have been compromised by his stake in a rival has cast a shadow on the reputation of the Wall Street veteran. So far, there is little to suggest Mr. Treppel tried to cash in on his recommendations.

His confrontation with Biovail has been brewing for three weeks since he harshly indicted management's attempts to preserve a patent on one of its most important products, which was facing potential competition from a rival Andrx drug. But Mr. Treppel is not the only analyst to raise serious questions about the company's handling of the case.

Biovail's call for an investigation comes four days after Banc of America put Mr. Treppel on indefinite "administrative" leave, over comments he made to reporters on April 29-the day he advised clients to sell the stock in a written research report.

In the note, Mr. Treppel said Biovail's actions in the case were "illegal" and that it faced the threat of civil lawsuits. Banc of America is standing by the report but has distanced itself from Mr. Treppel's comments to the media, in which he said the patent case "looked like fraud."

Mr. Treppel's comment sparked a 21% plunge in Biovail shares. Andrx shares also fell that day.

"The research report was within the realm of standard financial analysis, and we felt his comments [to reporters] might have been outside the realm of standard financial analysis," Banc of America spokesman John Roehm said.

Biovail maintains that Mr. Treppel's research is tainted by his stake of about 20,000 shares in Andrx.

The Wall Street Journal reported yesterday that an account in Mr. Treppel's name at UBS PaineWebber made substantial profits in the past year writing options contracts on the Andrx shares, and critics say that might represent a serious conflict of interest for Mr. Treppel.

But there is little evidence that the analyst profited or tried to cash in on his research calls.

Banc of America and Mr. Treppel insist that control over the account was in the hands of his broker at UBS, and the analyst was not responsible for the trades.

Furthermore, options contracts are generally used to protect against the risk of sharp declines in a stock, giving up profits from any sudden gains. The Journal said there is nothing to suggest Mr. Treppel bought or sold the stock.

The question of whether analysts should own shares of the companies they cover has become a hot debate over the past year, as investors have become increasingly concerned about potential conflicts of interest in research reports. But there are no laws or industry regulations prohibiting analysts from owning stocks they cover and Banc of America said Mr. Treppel complied with the firm's internal restrictions on trading.

Mr. Treppel has maintained a "buy" rating on Andrx since 1999. He also rated Biovail a "buy" for all of last year, until cutting his rating to "market perform" on Jan. 23 and then to "sell" last month.

Banc of America continued to stand behind Mr. Treppel's stock ratings yesterday.

"I understand why Biovail would be upset at receiving a 'sell' rating on their stock, but all our research is carefully reviewed by research management before it is published," Mr. Roehm said. "In this case, we conducted a further review on Andrx and Biovail, and we stand by both the research and the ratings on the stocks."

Mr. Treppel did not return calls seeking comment.

But the entire affair of Mr. Treppel's "sell" rating and his later suspension is focusing attention once again on Biovail's handling of the Tiazac patent dispute.

The U.S. government alleged the company misled the U.S. Food and Drug Administration and illegally tried to protect its monopoly on a drug that represented US$200-million in sales in 2000, or 38% of the Biovail's total revenue.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Biovail settled the charges last month, agreeing to drop its patent claims against Andrx, and to refrain from illegally listing patents in the future.

Biovail did not admit any wrongdoing, but that did not stop Mr. Treppel and other analysts from calling their conduct "illegal."

Mr. Treppel is far from alone in raising serious concerns about Biovail's stock. Research Capital Corp. analyst Andre Uddin and others noted that the company would have fallen short of earning forecasts in the first quarter if not for a $2-million reduction in research and development costs and a $5.1-million boost from deferred revenue.

But so far Mr. Treppel is the only prominent analyst to tell investors to "sell" Biovail. He is the only one known to hold a stake in Andrx. And he is the only analyst whose credibility is now under public attack.

TIMELINE:

JUNE, 1998

- Andrx Group files plans to market a generic version of Tiazac, Biovail's marquee hypertension drug. Andrx claims their product will not infringe on Biovail's patent.

- Biovail files a patent infringement lawsuit, triggering a 30-month delay in the approval process for Andrx's generic Tiazac.

MARCH 6, 2000

- Andrx wins the patent infringement case. Biovail appeals.

SEPT. 29, 2000

- FDA tentatively approves Andrx's application for generic Tiazac, provided Andrx wins the appeal of the patent case, paving the way for final approval of generic Tiazac in February, 2001.

JAN. 8, 2001

- Less than 30 days before Biovail's 30-month

roadblock against Andrx was to expire, the company announced an exclusive licensing deal with Dow Pharmaceuticals on another patent, which Biovail says also applies to Tiazac.

- Andrx is forced to file another application for generic Tiazac, Biovail files a second patent infringement suit, triggering another 30-month delay in Andrx's plans to market a generic competitor.

MARCH, 2001

- The FDA and FTC launch investigations into Biovail's second patent, eventually concluding the company illegally acquired the patent to protect its monopoly and misrepresented the facts in submissions to the FDA.

SEPT., 2001

- A Florida Judge rules against Biovail's patent infringement case, lifting the stay on Andrx's development of the drug. Analysts predict a generic version will be on the market in months.

FEB. 22, 2002

- Biovail and Andrx settle their legal struggle over Tiazac. Andrx agrees to pay undisclosed royalties to Biovail for sales of the generic version.

APRIL 23, 2002

- Biovail settles a complaint with the FTC, without admitting wrongdoing. Biovail agrees to drop its patent agreement with DOV Pharmaceuticals, and relinquish its patent claims against Andrx, and is "is prohibited from wrongfully listing any patents" in the future.

28 of 89 DOCUMENTS

Copyright 2002 The Chronicle Publishing Co.

The San Francisco Chronicle

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

MAY 17, 2002, FRIDAY, FINAL EDITION

SECTION: BUSINESS; Pg. B1

LENGTH: 814 words

HEADLINE: Stock analyst placed on leave;

Company questions his objectivity

SOURCE: Chronicle Staff Writer

BYLINE: Christian Berthelsen

BODY:

A Canadian pharmaceutical company called for a full investigation Thursday of stock option trades executed in a brokerage account held by a Banc of America Securities analyst who has been placed on administrative leave.

The analyst Jerry I. Treppel, was placed on leave Monday. The company calling for the investigation, Biovail, was downgraded by Treppel to a sell rating on April 29, but has raised questions about his objectivity because he owned undisclosed shares in a major competitor.

The case represents yet another example in the roiling controversy over conflicts of interest among Wall Street analysts. Specifically, it raises questions about how effectively Banc of America Securities is monitoring the personal trading of analysts it employs to provide investment recommendations to investors.

Treppel owned 21,000 shares of the competing company, AndrxCQ Group, but those holdings were not disclosed in his research reports.

Treppel reiterated a "buy" rating on Andrx five times during 2001. According to two sources who have reviewed the records of his brokerage account, about 35 complicated options trades were executed on a number of occasions in the days immediately

before, and sometimes on, the day he issued bullish research reports about Andrx. The trades netted proceeds of about $100,000, according to the sources.

"We have been concerned by the contradictory coverage of both Andrx and Biovail," a Biovail spokesman, Michael Sitrick, said in a prepared statement. "The information made public today is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel."

A key question is who directed the trades in Treppel's brokerage account, maintained at UBS PaineWebber. Banc of America securities said the account was a managed account in which Treppel had absolutely no control or input into trading investment decisions or timing.

The sources who have reviewed the trading records question that assertion, saying the records indicate the trades were unsolicited. That notation means that the broker in charge of the account did not do the trades at his own discretion and that they were done at the direction of the client-in this case, Treppel.

John Roehm, a Banc of America spokesman, said UBS PaineWebber had confirmed that the account was managed and that Treppel had no discretion over trades. UBS declined comment on the incident, citing client confidentiality. A woman who answered Treppel's telephone at his Banc of America Securities office in New York said he was not available for comment.

Banc of America Securities does not require analysts to disclose specific holdings in a company they research. Instead it uses a boilerplate statement that says anyone associated with the firm "may maintain a long or short position" in the stock.

When Treppel downgraded Biovail stock on April 29, he told media outlets that he questioned the legality of the firm's strategy to secure a drug patent.

Banc of America Securities said it stands by Treppel's research and downgrade but suspended him for his media comments about Biovail's legal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

strategy, saying they "went outside the realm of standard financial analysis."

Treppel's downgrade of Biovail hit the stock hard, causing a one-day, 21 percent drop of $9.65 to $36.80. The stock closed at $37.80 Thursday.

Circumstances surrounding the downgrade were unusual. The report was issued after Biovail issued an earnings report that beat both Treppel's estimate and the Wall Street analyst consensus. Andrx has underperformed the Standard & Poor's index since January and has provided a negative 23.36 percent total return in the past 12 months.

Biovail, meanwhile, has outperformed the S & P and provided a negative 12-month return of 3.84 percent.

Before Treppel was hired by Banc of America Securities in 1999, he worked for Dillon, Read, which ultimately merged into what is now UBS. In his research reports there, his stake in Andrx was disclosed.

Treppel received the shares prior to Andrx's 1996 IPO. The shares, priced initially at $12, closed at $45.46 Thursday, nearly four times their original value. His total Andrx holdings are worth about $955,000.

Another question is why Treppel was allowed to maintain a brokerage account outside his firm. Many Wall Street banks prohibit analysts and other capital markets employees from having outside accounts, to ensure the banks' compliance officers can constantly monitor their trading.

Banc of America Securities said analysts are allowed to maintain outside accounts as long as they are not allowed to make investment decisions in them. Further, a firm spokesman. John Roehm, said that its compliance department was aware of the trades and that the timing did not raise any red flags.E-mail Christian Berthelsen at cberthelsen@sfchronicle.com.

LOAD-DATE: May 17, 2002

Copyright 2002 CanWest Interactive, a division of CanWest Global Communications Corp. All Rights Reserved

Ottawa Citizen

May 17, 2002 Friday EARLY Edition

SECTION: Business; Pg. E1

LENGTH: 257 words

HEADLINE: Biovail boils over analyst report by Andrx investor

SOURCE: The Canadian Press

BYLINE: Gary Norris

DATELINE: TORONTO

BODY:

TORONTO-Blood is boiling in the executive suite of Canadian drug maker Biovail Corp. over reports that a U.S. stock analyst who battered Biovail's share price owned stock in one of Biovail's U.S. competitors.

Jerry Treppel, an analyst at Banc of America Securities, has been placed on indefinite leave after an investigation by The Wall Street Journal.

Biovail lost almost $2.4 billion in market value after Mr. Treppel advised investors on April 29 to sell its stock. He cast doubt on Biovail's "earnings quality" and on its relations with U.S. regulatory authorities. At the same time, he held a "buy" rating on Andrx Corp., a Florida drug company in which he held shares.

"After reviewing the trading records reported on by The Wall Street Journal, it was clear that Mr. Treppel held a substantial, previously undisclosed equity interest in a direct competitor-Andrx Group," Biovail said yesterday.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

"The records also showed unsolicited buy and sell orders for options in Andrx both prior and concurrently with Mr. Treppel issuing his analyst reports on Andrx and Biovail."

Biovail urged Banc of America Securities to " launch a full-scale investigation into the stock and options trading and equity holdings of pharmaceutical analyst Jerry Treppel, his former colleagues and associates and to make the results of that investigation public."

Most analysts who follow Biovail rate the company a buy, although a few echo some concerns raised by Mr. Treppel as he cut the company from "market performer" to "sell."

LOAD-DATE: May 17, 2002

Copyright 2002 CanWest Interactive, a division of CanWest Global Communications Corp. All Rights Reserved

Montreal Gazette

May 17, 2002 Friday Final Edition

SECTION: Business; Pg. C12

LENGTH: 327 words

HEADLINE: Biovail's bitter pill: Drugmaker urges brokerage to probe analyst's trading pill; Biovail enraged over negative analyst report by Andrx investor

SOURCE: CP

BYLINE: GARY NORRIS

DATELINE: TORONTO

BODY:

Blood is boiling in the executive suite of Canadian drugmaker Biovail Corp. over reports that an American stock analyst who battered Biovail's share price owned stock in one of the company's U.S. competitors.

Jerry Treppel, an analyst at Banc of America Securities, has been placed on indefinite leave after the Wall Street Journal investigation.

Biovail lost almost $2.4 billion in market value after Treppel advised investors on April 29 to sell the company's stock. He cast doubt on Biovail's "earnings quality" and on its relations with U.S. regulatory authorities.

At the same time, Treppel held a "buy" rating on Andrx Corp., a Florida-based drug company in which he held shares.

"After reviewing the trading records reported on by the Wall Street Journal, it was clear that Mr. Treppel held a substantial, previously undisclosed equity interest in a direct competitor-Andrx," Biovail said yesterday.

"The records also showed unsolicited buy and sell orders for options in Andrx, both prior to and concurrently with Mr. Treppel issuing his analyst reports on Andrx and Biovail."

Biovail urged Banc of America Securities to " launch a full-scale investigation into the stock and options trading, and equity holdings of pharmaceutical analyst Jerry Treppel, his former colleagues and associates, and to make the results of that investigation public."

Most analysts who follow Biovail rate the company "buy," although a few echo some of the concerns raised by Treppel as he cut the company from "market performer" to "sell."

Chicago-based Zacks Investment Research gave Biovail a solid "buy" recommendation on Tuesday.

"Given the breadth of their branded-drug pipeline, the consensus is that Biovail is on the cusp of a dramatic acceleration in earnings-per-share growth through 2005," Zacks.com enthused.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Biovail shares dropped 20 per cent on April 29.

The stock fell $1.18 to $58.70 yesterday in Toronto trading.

LOAD-DATE: May 17, 2002

The Associated Press State & Local Wire

The materials in the AP file were compiled by The Associated Press. These materials may not be republished without the express written consent of The Associated Press.

May 18, 2002, Saturday, BC cycle

SECTION: Business News

LENGTH: 296 words

HEADLINE: Canadian company calls for investigation of stock option trades

DATELINE: SAN FRANCISCO

BODY:

A Canadian company has called for an investigation into stock option trades in a brokerage account held by a Banc of America Securities analyst.

The company, Biovail, has questioned analyst Jerry I. Treppel's objectivity because he owned undisclosed shares in one of Biovail's competitors, AndrxCQ Group. Banc of America Securities does not require analysts to disclose their holdings in companies that they research.

The San Francisco Chronicle reported Saturday that Treppel was placed on administrative leave Monday.

Banc of America spokesman John Roehm, said UBS PaineWebber confirmed that Treppel's account was managed there and that Treppel had no control or input into trading investment decisions or timing.

Treppel owned 21,000 shares in Andrx and gave the company a "buy" rating five times last year. He downgraded Biovail to a "sell" rating on April 29. Just before Treppel's downgrade of Biovail, the company's earnings report beat Treppel's estimate and the Wall Street analyst consensus.

The Chronicle, citing unidentified sources who reviewed records of the account, reported that 35 complicated options trades occurred just before, and sometimes on, the days Treppel gave Andrx positive reports, netting about $100,000.

"We have been concerned by the contradictory coverage of both Andrx and Biovail," said Biovail spokesman Michael Sitrick in a prepared statement. "The information made public today is alarming and we believe calls into question the objectivity of all reporting by Mr. Treppel."

Biovail called for the investigation Thursday.

But Banc of America Securities maintains Treppel's research and downgrade were sound, but placed him on leave because of comments he made to the media about Biovail's legal strategy.

LOAD-DATE: May 19, 2002

Canada Stockwatch (c) Copyright 2002 Canjex Publishing Ltd.

Monday, May 20, 2002

Biovail (2)-Globe says Biovail on the hunt for analyst's blood

The Globe and Mail reports in its Friday, May 17, edition that Biovail unleashed a scathing attack against Banc of America Securities Thursday and demanded an investigation of the stock and options trading of the brokerage's pharmaceutical analyst, his former colleagues and associates. The Globe's Leonard Zehr and Dave Ebner write that the unusual request came in the wake of Banc of America placing analyst Jerry Treppel on "

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

administrative leave" on Tuesday for making " unauthorized comments" about Biovail. Mr. Treppel is a long-time shareholder of Andrx and has a "buy" rating on the stock. An account in Mr. Treppel's name at UBS PaineWebber, an arm of his former employer, made more than $100,000 (U.S.) last year in 35 trades in options on Andrx stock. Some of the trades were done immediately before, during and after the days Mr. Treppel issued reports urging investors to buy Andrx stock. "We have been concerned by the contradictory coverage of both Andrx and Biovail," says Biovail spokesperson Michael Sitrick. Last month, Biovail chairman Eugene Melnyk accused Mr. Treppel of having a conflict of interest in his opinions on both companies.

| Biovail (2) | BVF |
| Shares | May 16 |
| issued | close |
| 157,4 | $58.70 |
| 96,407 | |
| Mon 20 | In the News |
| May 2002 | |

May 24, 2002

---- INDEX REFERENCES ----

NEWS SUBJECT: English language content; Stock News; Analyst Comment/Recommendation; Performance; Corporate/Industrial News; Analysts' Comments & Ratings of Stocks; Earnings Projections (ENGL STK C1521 C15 CCAT ANL C152)

PRODUCT: Analysts' Ratings/Comments (DAR)

Word Count: 206

5/20/02 CANSTCKWTH (No Page)

Business Dateline Copyright 2002 American City Business Journals

The Business Journal

SECTION: Vol. 17, No. 8; Pg. 7; ISSN: 08875588

B & H-ACC-NO: 121854477

DOC-REF-NO: CHAR-2388-12

LENGTH: 287 words

HEADLINE: Drug maker asks BofA to investigate suspended analyst

BODY:

Biovail Corp. is calling on Banc of America Securities to launch an investigation of a suspended analyst's trades and equity holdings and make the results public.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

A BofA spokesman says the situation is under review, but he will not say whether there will be an investigation.

BofA put analyst Jerry Treppel, who covered Biovail and other pharmaceutical companies, on indefinite administrative leave after determining that remarks he made to a reporter about Biovail were inappropriate.

In late April, Treppel told a reporter that Biovail's acquisition of an exclusive patent license looked like fraud. Last week, BofA Securities said Treppel's comments were neither authorized nor approved by the company.

After that, published reports questioned the propriety of some trades in an account owned by Treppel.

They contended that trading records of an account in Treppel's name showed 35 trades last year in options of Andrx Corp., a Florida drug manufacturer.

Those trades were made as Treppel recommended the company. The reports said he made money on all but four of these trades.

Michael Sitrick, a Biovail spokesman, called the reports alarming and said that the information "calls into question the objectivity of all reporting by Mr. Treppel."

Biovail also called on BofA securities to investigate Treppel's former colleagues and associates.

BofA spokesman John Roehm says the options were traded under a managed account, meaning all trading was controlled solely by the account's broker. Whether any further investigation is made, Roehm says, BofA Securities is already satisfied that all of Treppel's research published by BofA Securities meets the company's standards for fairness and accuracy.

LOAD-DATE: June 13, 2002

Marketletter Copyright 2002 Gale Group Inc. All rights reserved. COPYRIGHT 2002 Marketletter Publications Ltd.

Monday, May 27, 2002

ISSN: 0951-3175

Biovail questions analyst's motives. (Jerry Treppel of Bank of America Securities) (Brief Article)

FULL TEXT

Canada's Biovail Corp has asked Bank of America Securities to launch a full-scale investigation into the stock and options trading and equity holdings of BAS' pharmaceutical analyst Jerry Treppel, whose negative "sell" comments on the company after its recent revenue forecasts were reported in the press. Biovail had increased its second-quarter revenues forecast by 3%-8%.

Biovail said that, after reviewing the trading records reported on by the Wall Street Journal, it was clear that Mr Treppel held a substantial, previously-undisclosed, equity interest in a direct competitor, Andrx Corp. The records are said to have also shown unsolicited buy and sell orders for options in Andrx both prior to and concurrently with Mr Treppel issuing his reports on Andrx and Biovail. BAS has subsequently put Mr Treppel on "administrative leave" for having made "unauthorized comments" about Biovail.

---- INDEX REFERENCES ----

KEY WORDS: DRUGS & PHARMACEUTICALS; SECURITIES DEALERS; UNITED STATES; CANADA; FINANCIAL ANALYSIS; PUBLIC AFFAIRS; PHARMACEUTICAL AND MEDICINE MANUFACTURING; INVESTMENT BANKING AND SECURITIES DEALING

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

NEWS SUBJECT: Corporate/Industrial News; Regulatory Bodies; English language content; Stock News; Corporate Actions; Regulation/Government Policy (CCAT C131 ENGL STK CAC C13)

NEWS CATEGORY: BRIEF ARTICLE

INDUSTRY: Drug Manufacturers; Securities (DRG SCR)

SIC: 2830; 6211

REGION: United States; North America; United States; Canada; Canada; North American Countries (U.S. NME USA CN CANA NAMZ)

Word Count: 137

5/27/02 MKTLTR (No Page)

Biovail and the analyst's secret account Trading in a competitor's options was discovered, and the Canadian drug firm went on the offensive, LEONARD ZEHR writes

LEONARD ZEHR

SOURCE:          THOMSON          FINANCIAL DATASTREAM

1,732 words

22 June 2002

The Globe and Mail

Metro

B1

English

"All material Copyright (c) Bell Globemedia Publishing Inc. and its licensors. All rights reserved."

TORONTO-It arrived innocently enough at Biovail Corp.'s law offices along with dozens of other legal briefs from Andrx Corp.

And as Biovail lawyers pored over the papers-a normal swap of documents in the drug makers' endless lawsuits against each other-they came across a dynamite piece of information.

Banc of America Securities LLC pharmaceutical analyst Jerry Treppel, a vocal sell-side critic of Biovail, had a secret account that traded in Andrx stock options, a disclosure that would discredit the influential stock picker and mute growing investor concerns about Biovail's outlook that Mr. Treppel unleashed.

It would also give Biovail chief executive officer Eugene Melnyk another opportunity to flex his muscles and quash an attack against the company he founded in 1994. "What Jerry Treppel did to us was illegal from a regulatory prospective." Mr. Melnyk said.

One individual who has seen Mr. Treppel's trading records, which went through an account at the PaineWebber unit of UBS Warburg LLC, said trading in the account coincided with reports the analyst issued last year urging investors to buy Andrx stock.

Scott Garley, Mr. Treppel's lawyer, said the matter is "under review by state and federal regulators, so it would be inappropriate to comment."

Armed with with Mr. Treppel's equity position and options trading in Andrx, and his attacks against the Mississauga-based company, Mr. Melnyk and several Biovail executives brought the evidence to Banc of America several days after the analyst downgraded Biovail to "sell" on April 29.

The downgrade wiped $1.6-billion (U.S.) from the company's market value in a single trading session and also cost Mr. Melnyk, who owns 18 per cent of the company, $250-million.

"It was not a cordial meeting but very professional," said one individual who attended the meeting. " Banc of America realized it had a problem right from the get-go."

On May 14, the brokerage suspended Mr. Treppel

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

and retracted "oral" comments he made to reporters about Biovail that were "outside the realm of standard financial analysis," the brokerage said.

Biovail plans to launch one new drug each year through 2005, has 20 drugs in development and is tripling its sales force to 900 medical representatives this year.

It also predicts profit will grow 30 per cent this year and next.

"What we're seeing now is wholesale selling of all pharma stocks," Mr. Melnyk said. "In 12 months, this will be a distant memory." Biovail's troubled times

Oct. 3, 2000

Banc of America Securities analyst Jerry Treppel downgrades to "Market Performer" from "Buy" Cites rising stock price, valuation and threat of generic competition for Tiazac.

Market value falls $1.76-billion

Jan. 22, 2002

Mr. Treppel downgrades to "Market Performer" from "Buy" "...we are less enthusiastic about the prospects for Cardizem XL...and are concerned about the potential future ramifications of its legal strategy in delaying the entry of generic Tiazac."

Market value falls $700-million

April 29, 2002

Mr. Treppel downgrades to "Sell" from "Market Performer". "Despite the proposed FTC settlement on the second Tiazac patent, we question management's handling of the issue and we believe tracking revenue and earnings progression has become particularly challenging. In addition, earnings quality remains a question. We believe the current P/E multiple is unwarranted and not sustainable."

Market value falls $2.4-billion

Illustration

S.D.N.Y.,2004.
Treppel v. Biovail Corp.
Not Reported in F.Supp.2d, 2004 WL 2339759 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

TAB 9

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 1

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

C
World Film Services, Inc. v. RAI Radiotelevisione
Italiana S.p.A.
S.D.N.Y.,1999.

United States District Court, S.D. New York.
WORLD FILM SERVICES, INC., Plaintiff,
v.
RAI RADIOTELEVISIONE ITALIANA S.p.A.,
Defendant.
**No. 97 Civ. 8627(LMM).**

Feb. 3, 1999.

*MEMORANDUM AND ORDER*
MCKENNA, J.
*1 Plaintiff World Film Services, Inc. ("World Film
") brought this action alleging that defendant RAI
Radiotelevisione Italiana, S.p.A. ("RAI") has
infringed its rights in a television game show
entitled "Snakes & Ladders" by the production and
distribution of a similar game show entitled "
Colorado." World Film's complaint asserts four
claims for relief: copyright infringement under 17
U.S.C. § 101, *et. seq.,* violation of Italian copyright
law, trade dress infringement in violation of 15
U.S.C. § 1125(a), and unfair competition under
New York law.

Defendant moves for an order dismissing the
complaint for lack of personal jurisdiction pursuant
to Rule 12(b)(2), or for improper venue and forum
non conveniens pursuant to Rule 12(b)(3). For the
following reasons, defendant's motion to dismiss is
denied on all grounds.

I. BACKGROUND

World Film is a New York corporation with its
principal place of business in New York City.
(Compl.¶ 7). It claims to be the exclusive owner of
a copyright in a television game show pilot entitled "

Snakes & Ladders" and has filed a copyright
registration certificate with the U.S. Copyright
Office. (Id. ¶ 7 & Ex. 1). "Snakes & Ladders" is
alleged to be based on an old Indian board game
entitled "Moksha Patamu," which is alleged to be in
the public domain. (Id.¶ 10).

RAI is a public corporation established and
controlled by the government of Italy; it maintains
its registered office in Rome, Italy. (Lax Decl. ¶¶
3-4). RAI holds the exclusive concession from the
Italian government for the public service of radio
and television broadcasting both within Italy and
abroad. (Celsi Decl. ¶ 3). Its purpose, with regard
to broadcasts outside of Italy, is a "cultural (as
opposed to profit-driven) mission to disseminate
Italian language programming." (Def.'s Br. at 3
(citing Lax Decl. ¶ 4; Celsi Decl. ¶ 3 & Ex. 1)).

World Film alleges that, sometime in or around
October 1995, it provided RAI with a model of the
set for "Snakes & Ladders" and commenced
discussions with it regarding the possibility of
licensing "Snakes & Ladders" to RAI for
production and distribution in Italy. (Compl.¶ 11).
It also alleges that, in or about September 1996, it
presented RAI with a videotape copy of the "Snakes
& Ladders" pilot it had developed. (Id.¶ 12).
Thereafter, the parties began to negotiate regarding
a possible license agreement. (Id.). All of these
negotiations took place in Italy and were initiated
by representatives of World Film. (*See* Rastrello
Decl. ¶¶ 3, 6).

Ultimately, by letter dated July 8, 1997, RAI
notified World Film's lawyer that it had decided not
to enter into a license agreement. (*See* Rastrello
Decl. ¶ 4 & Ex. 1). The letter indicated that RAI
had decided to terminate negotiations for two main
reasons: first, because it believed that "Snakes &
Ladders" was not original, in that it was merely a
television translation of an Indian game, the concept
of which was referable to the Italian game "Gioco
dell'Oca" ("Game of Goose"), which had been the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

subject of a previous, successful RAI broadcast, and second, because there was no reliable data on the popularity of "Snakes & Ladders" because it had never been broadcast as of that date. (Rastrello Decl. ¶ 4 & Ex. 1). RAI further advised World Film of its intention to develop a game show of its own based on "Gioco dell'Oca." (Compl. ¶ 15; Rastrello Decl. Ex. 1). World Film alleges that RAI copied "Snakes & Ladders" in developing its own show, "Colorado." (Compl.¶ 17).

*2 In the meantime, World Film had been successful in licensing its program to a French entity. (Compl.¶ 13). There is no claim, however, that "Snakes & Ladders" has ever been broadcast anywhere; plaintiff only alleges that it licensed the show to an entity in France, that it has invested a substantial amount of money in marketing and promoting the show, and that it is negotiating with other entities in Germany and Australia regarding licensing the show for production in those countries. (*See* Compl. ¶¶ 13, 34, 35).

RAI has broadcast "Colorado" in Italy beginning in or around October 1997. (Id.¶ 18). In addition, plaintiff alleges that RAI "has broadcast a signal via satellite, containing the infringing work, into the United States, including into the State of New York. " (Id.¶ 19). RAI maintains, however, that it does not directly broadcast its programs in the U.S. or in New York, nor does it solicit any subscriptions for programming in the U.S. (*See* Def.'s Br. at 4). Rather, any broadcast of "Colorado" in the United States is made by a Colorado company called Echostar pursuant to a series of agreements among various entities.

Specifically, in or about 1995, RAI entered into an agreement with a Saudi company called Dallah Albaraka Holding E.C. ("Albaraka") pursuant to which Albaraka agreed to arrange the distribution and marketing of RAI's programming in the Americas and Australia. (*See* Celsi Decl. ¶ 5 & Ex. 2). The agreement required Albaraka to devise a marketing plan ("the Plan") and to make arrangements for the broadcast of RAI's programming in these areas. (Celsi Decl. ¶ 6). The Plan that was subsequently devised by Albaraka identified the United States market as "the primary

objective of initial Albaraka distribution efforts," and stated as one of its objectives the marketing and promotion of RAI's programming in Italian-American communities, including New York. (*See* Plan, Dreeman Decl. Ex. G at 1, 2, 16). [FN1] Albaraka was also required to establish a wholly-owned subsidiary to satisfy its duties under the agreement; it subsequently formed a subsidiary called Nasacom, which is incorporated under the laws of Ireland and does not have offices in the U.S. (Celsi Decl. ¶ 8). On or about January 31, 1996, Nasacom entered into an agreement with a Colorado company called Echostar Satellite Corporation ("Echostar") to distribute RAI programming (and Arab programming) in the U.S. ( "the Echostar Agreement"). (Celsi Decl. ¶ 8; Def.'s Br. at 5). Pursuant to the Echostar Agreement, Nasacom delivers RAI's programming via satellite to Echostar's broadcast center in Cheyenne, Wyoming, and Echostar then distributes the programming (including "Colorado") to its subscribers throughout the U.S. via satellites that are owned and/or controlled exclusively by Echostar. (Celsi Decl. ¶ 9). At present, there are approximately 26,000 Echostar subscribers in the U.S. (Celsi Decl. ¶ 11). Although RAI admits that there are New York subscribers to Echostar, it does not know how many. (Def.'s Response to Pl.'s Request for Admissions No. 7, Dreeman Decl. Ex. A at 4). RAI is not a party to and receives no revenue under the Echostar Agreement. (Celsi Decl. ¶ 10). Nor does RAI engage in any efforts to sell subscriptions to Echostar's service. (Id.).

> FN1. Under the Albaraka Agreement, RAI was to receive a percentage royalty on a sliding scale based on the number of subscriptions sold, as well as a fixed sum (3 million in the first fiscal year and 5 million each year thereafter) from Albaraka. (Celsi Decl. ¶ 7 & Ex. 2 at ¶ 10.3). However, RAI claims that, so far, it has not received any revenue pursuant to the agreement, nor has it received any revenue as a result of Albaraka's arrangements to broadcast RAI programming in the Americas. (Celsi Decl. ¶ 7).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                Page 3

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

**\*3** After discovering the alleged infringement, World Film filed the present suit. RAI now moves to dismiss the complaint, arguing that it has insufficient contacts with New York to subject it to personal jurisdiction in this forum, and that venue in this district is improper and/or inconvenient.

## II. DISCUSSION

### A. Personal Jurisdiction

#### 1. Legal Standard

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the plaintiff has the burden of showing that the court has jurisdiction. *Chaiken v. VV Publishing Corp.,* 119 F.3d 1018, 1025 (2d Cir.1997); *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.), *cert. denied,* 117 S.Ct. 508 (1996). Where, as here, the parties have conducted jurisdictional discovery but have not held an evidentiary hearing, "the plaintiff must allege facts that, 'if credited ..., would suffice to establish jurisdiction over the defendant." ' *Chaiken,* 119 F.3d at 1025 (quoting *Metropolitan Life,* 84 F.3d at 567). At this stage, the Court must construe all pleadings and affidavits in the light most favorable to the plaintiff. *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d at 1043; *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985).

In copyright and trademark infringement actions, the court must apply the forum state's personal jurisdiction rules. *See PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997). In this case, plaintiff argues that jurisdiction exists over RAI under both New York C.P.L.R. 301 and 302.

#### 2. Section 301-General Jurisdiction

"Section 301, as construed by the New York courts, permits a court to exercise jurisdiction over a foreign corporation on any cause of action if the defendant is 'engaged in such a continuous and systematic course of "doing business" here as to warrant a finding of "presence" in this jurisdiction." ' *Landoil,* 918 F.2d at 1043 (quoting *McGowan v. Smith,* 52 N.Y.2d 268, 272 (1981)); *see also Stratagem Dev. Corp. v. Heron Int'l,* 153 F .R.D. 535, 545 (S.D.N.Y.1994); *Frummer v. Hilton Hotels Int'l, Inc .,* 19 N.Y.2d 533, 536 (1967). The " doing business" standard requires that the defendant be operating within the state " 'not occasionally or casually, but with a fair measure of permanence and continuity." ' *Landoil,* 918 F.2d at 1043 (quoting *Tauza v. Susquehanna Coal Corp.,* 220 N.Y. 259, 267 (1917)); *see also Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 198 (2d Cir.) , *cert. denied,* 498 U.S. 854 (1990); *Hoffritz,* 763 F.2d 55, 58 (2d Cir.1985). In assessing jurisdiction under this standard, New York courts have generally focused on the following indicia of jurisdiction: the solicitation of business in New York; the presence of bank accounts and other property in New York; the existence of an office in New York; and the presence of employees or agents in New York. *Landoil,* 918 F.2d at 1043; *Hoffritz,* 763 F.2d at 58. World Film argues that jurisdiction exists under C.P.L.R. 301 based both on RAI's own contacts with the forum and because RAI is doing business in New York through its agent, RAI Corp.

**\*4** As for RAI's own contacts with the forum, there is no evidence that RAI solicits business in New York. Although it admits entering into licensing and/or purchase agreements with fourteen U.S. companies, some of which may have an office in New York, that does not amount to "soliciting" business in New York. *See, e.g., Mantello v. Hall,* 947 F.Supp. 92, 98 (S.D.N.Y.1996) (allegation that defendant regularly entered into licensing agreements with New York entities for rights to produce plays elsewhere, and regularly hired New York actors did not amount to "doing business" in New York; through these acts, defendant merely procured goods needed to do business elsewhere). On the contrary, RAI has stated that it has no customers in the U.S., has received no revenue as a result of any broadcasts of its programming in the U.S., and has taken no action to gather advertisers or sponsorships in the U.S. generally or in New

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                         Page 4

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

York in particular. (*See* Def.'s Response to Interrog. Nos. 6, 11, Dreeman Decl. Ex. A at 3-5).

While RAI does maintain a bank account in New York, it claims that the sole purpose of this account is to provide a way for it to pay those of its creditors who contract to receive payment in U.S. dollars. (Lax Decl. ¶ 6). Moreover, RAI has identified only one such creditor, Warner Bros. International, which is located in California. (*See* Def.'s Response to Interrog. No. 20, Dreeman Decl. Ex. A, at 8). The maintenance of a New York bank account, without more, is insufficient to confer jurisdiction over a foreign defendant. *See Fremay, Inc. v. Modern Plastic Mach. Corp.,* 222 N.Y.S.2d 694, 700-01 (1 st Dep't 1961) (mere existence of bank account in New York insufficient to confer jurisdiction); *Hastings v. Piper Aircraft Corp.,* 84 N.Y.S.2d 580, 583-84 (1 st Dep't 1948) (maintenance of "substantial and active" New York bank account by foreign defendant insufficient to confer personal jurisdiction). This is especially true where the account is used for the limited purpose of paying U.S. creditors outside New York. *See Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 36 (1990) (defendant's interest in New York trust account did not confer jurisdiction where account was not maintained for purpose of allowing defendant to take advantage of New York insurance market); *cf. United Rope Distribs., Inc. v. Line,* 785 F.Supp. 446, 450 (S.D.N.Y.1992) (New York bank account used for almost all of defendant's business was sufficient to confer jurisdiction).

Furthermore, RAI does not have its own office in New York. However, its wholly-owned subsidiary, RAI Corp., is incorporated in New York and its main office is in New York City. (Lax Decl. ¶ 5). RAI Corp. provides office space for six journalists who are employed by RAI as foreign news correspondents. (Lax Decl. ¶ 6). Plaintiff argues that this "for all practical intents and purposes" constitutes a New York office for RAI. (Pl.'s Br. at 11). The mere presence of a local subsidiary, however, does not confer jurisdiction over a foreign parent, absent evidence that the subsidiary is acting as the parent's agent or that the parent exerts such control over the subsidiary as to render it a mere

department or division of the parent. *See Landoil,* 918 F.2d at 1046; *Mantello,* 947 F.Supp. at 98; *Bear, Stearns & Co. Inc. v. Ralph C. Wilson Indus., Inc.,* 1991 WL 211203, at *4 (S.D.N.Y. Oct. 9, 1991). The relationship between RAI Corp. and RAI is discussed below.

*5 Finally, RAI has admitted that it has six employees in New York-the journalists it employs as foreign news correspondents. (*See* Def.'s Response to Interrog. No. 4, Dreeman Decl. Ex. A at 3). The fact that these reporters are "not engaged in soliciting business or exchanging of goods or services with any person or entity in New York State " (Def.'s Reply Br. at 3) does not necessarily mean that they are not doing business on behalf of RAI. RAI is engaged, among other things, in the business of reporting news; these employees are present in New York conducting such business for RAI. *Fremay,* relied upon by Defendant, is therefore distinguishable because the New York officers in that case were found to be "devoted ... [in large part] to businesses which have no relationship to defendant corporation." *Fremay,* 222 N.Y.S.2d at 696. However, the presence of these employees would not alone amount to a showing that RAI is present in New York for jurisdictional purposes, because their limited function in reporting U.S. news to RAI in Italy does not constitute the type of continuous and systematic activities required under 301. RAI is therefore not subject to jurisdiction based on the traditional indicia of jurisdiction.

However, regardless of RAI's own contacts with New York, the presence and activities of RAI Corp. in New York suffice to subject RAI to personal jurisdiction in this forum. Jurisdiction over a foreign parent will be appropriate where its subsidiary is doing business in New York and either (1) the subsidiary does all the business that its parent could do were it in New York by its own officials, *see Frummer,* 19 N.Y.2d at 537-38; *Anglo American Ins. Group v. Calfed, Inc.,* 899 F.Supp. 1070, 1072 (S.D.N.Y.1995), or (2) the parent controls the operations of the subsidiary to such an extent that the subsidiary is a mere department or division of the parent. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984); *Stratagem,* 153

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 5

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

F.R.D. at 546; *Advance Coating Tech ., Inc. v. LEP Chem. Ltd.,* 142 F.R.D. 91, 95 (S.D.N.Y.1992).

It is undisputed that RAI Corp. is wholly owned by RAI. The relevant inquiry is therefore whether RAI Corp. does all the business that RAI could do if it were here by its own officials, and whether these activities are important enough to RAI that, if its agent were not performing them, RAI would undertake to perform such activities itself. *Gelfand v. Tanner Motor Tours, Ltd.,* 385 F.2d 116, 120-21 (2d Cir.1967) (citing *Frummer,* 19 N.Y.2d at 537), *cert. denied,* 390 U.S. 996 (1968); *Independent Nat'l Distribs., Inc. v. Black Rain Communications, Inc.,* 1995 WL 571449, at *2 (S.D.N.Y. Sept. 28, 1995). [FN2]

> FN2. *See also* Joseph M. McLaughlin, Practice Commentaries to C.P.L.R. 301, cmt. C301:3 at 18 (McKinney's 1990) ("It now appears to be the rule that where a foreign corporation has a subsidiary or other 'agent' perform substantial activities in this state for its benefit-acts which are so essential to the foreign corporation that if the subsidiary or 'agent' did not perform them, the foreign corporation would have to-it is doing business in this state.... And ... where the foreign corporation is doing business in this fashion, it is 'here,' so that it may be sued on any cause of action, whether related to the New York activities or not.").

RAI Corp.'s "principal operations include broadcasting and producing Italian radio and television programs in the United States, Canada, and Latin America on behalf of [RAI] and affiliates, and performing research and technical services for [RAI] and affiliates." (Indep. Auditor's Report, Dreeman Decl. Ex. B at 5). As described in an independent auditors' report, RAI Corp.'s activities on behalf of RAI are extensive:
*6 In accordance with an agreement (the " Convention") with its Parent [RAI], the Company [RAI Corp.] performs various services for its Parent, including maintenance of technical equipment used for television broadcasts,

distribution of the Parent's television programs, research activity concerning television programs, acquisition of television rights, procurement of leasehold improvements, and various technical and other services. In addition, the Company represents the Parent in the United States on various other matters and provides office space for representatives of the Parent.

(Dreeman Decl. Ex. B at 6).

In *Frummer,* the New York Court of Appeals held that a British hotel corporation (Hilton U.K.) was " doing business" in New York based on the activities of a commonly-owned New York corporation (Hilton Reservation Service). The New York corporation performed public relations work and helped generate business for Hilton U.K., and it also accepted and confirmed reservations for Hilton U.K. This led to a finding that the New York corporation was "do[ing] all the business which Hilton (U.K.) could do were it here by its own officials." *Frummer,* 19 N.Y.2d at 537. *See also Gelfand,* 385 F.2d at 119-21 (out of state tour company was sufficiently dependent on activities of New York representative, which confirmed reservations for its tours, to satisfy "doing business" standard); *Anglo American,* 899 F.Supp. at 1072-74 (foreign insurance company was subject to jurisdiction based on its relationship with New York excess line brokers, whose services on behalf of defendant were so important that if they were not available, defendant would have to perform that role itself).

In this case, RAI Corp. performs substantial activities on behalf of RAI. It distributes RAI's programs, acquires television rights, rents time on cable, broadcast radio and television stations, and procures leasehold improvements for RAI. (*See* Dreeman Decl. Ex. B at 6). It also provides office space for RAI's employees and incurs costs on RAI's behalf. (Id.). RAI's Annual Report itself states that RAI Corp. is responsible for "representing [RAI's] interests on the American continent...." (Dreeman Decl. Ex. E at p. 86). The Court finds that this amounts to a showing that RAI Corp. essentially does all the business which RAI could do were it here by its own officials and that these

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

activities are sufficiently important to RAI that, if RAI Corp. were not performing them for RAI, RAI would have to perform them itself. RAI is therefore "doing business" in New York through its agent and is subject to the jurisdiction of this Court pursuant to C.P.L.R. 301.[FN3] It is therefore unnecessary for the Court to determine whether jurisdiction also exists under C.P.L.R. 302 or, alternatively, under Federal Rule 4(k)(2).

> FN3. It should be noted that, because section 301 is New York's general jurisdiction provision, the cause of action need not arise out of RAI Corp.'s activities in the forum; if RAI is "doing business" in New York, it is subject to personal jurisdiction on causes of action "wholly unrelated to acts done in New York." *Ball,* 902 F.2d at 198; *see also Mantello,* 947 F.Supp. at 96-97.

### 3. Due Process

In addition to satisfying New York's jurisdictional rules, the court's assertion of jurisdiction must also comport with the constitutional requirement of due process. *See Metropolitan Life,* 84 F.3d at 567. The due process analysis has two components, the " minimum contacts" inquiry and the "reasonableness " inquiry. *Id.* The minimum contacts test is satisfied by the Court's determination that RAI is subject to jurisdiction under C.P.L.R. 301 because it is "doing business" in New York on a continuous and systematic basis. *See Rocket Jewelry,* 869 F.Supp. at 155-56; *New York Marine Managers, Inc. v. M.V. Topor-1,* 716 F.Supp. 783, 786 (S.D.N.Y.1989) (because defendant was found to be doing business in New York under C.P.L.R. 301, court could exercise jurisdiction over it without offending due process). The reasonableness inquiry-which must be conducted even in cases in which general jurisdiction is determined to exist, *see Metropolitan Life,* 84 F.3d at 573-involves the application of a five-factor test established by the Supreme Court in *Asahi Metal Indus. Co. v. Superior Court of Calif.,* 480 U.S. 102, 113 (1987). These factors include: (1) the burden that the exercise of jurisdiction will impose on the

defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *Id.* at 113-14; *Met. Life,* 84 F.3d at 568. Rarely will a case be dismissed on reasonableness grounds where it has been determined that the defendant possesses minimum contacts with the forum state. *See Burger King Corp. v. Rudzewick,* 471 U.S. 462, 477 (1985); *Met. Life,* 84 F.3d at 575.

**\*7** Analysis of the foregoing factors demonstrates that the exercise of jurisdiction over RAI is reasonable. Plaintiff has an interest in litigating in this forum, where it is incorporated and maintains its principal place of business. Furthermore, the claimed infringement is alleged to have taken place, in part, in this state, and the forum therefore has an interest in adjudicating the case. Plaintiff's witnesses and documents-even if they are not voluminous-are in New York, and litigation in this district will therefore be as efficient as it would be elsewhere. While it will undoubtedly be burdensome for RAI to litigate in this forum, "the conveniences of modern communication and transportation ease what would have been a serious burden [years] ago," *Met. Life,* 84 F.3d at 574, and, in any event, this burden is insufficient to overcome the plaintiff's showing of minimum contacts. *See id.*

Accordingly, the Court finds that its exercise of jurisdiction over RAI comports with due process.

### B. Venue

The Complaint alleges that venue in this district is appropriate under both 28 U.S.C. §§ 1400 and 1391.

Venue in a copyright action is governed by 28 U.S.C. § 1400(a), which provides that venue is proper in any district in which the defendant or its agent resides or may be found. The phrase "may be found" has been determined to require no more contact with the forum than is required by New York's long-arm statute. *Psihoyos v. Liberation,*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 7

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

*Inc.,* 1997 U.S. Dist. LEXIS 5777, at *12 (S.D.N.Y. April 29, 1997) (citing *Business Trends Analysts v. Freedonia Group, Inc.,* 650 F.Supp. 1452, 1457 (S.D.N.Y.1987)). Because the Court has determined that it has jurisdiction over RAI pursuant to C .P.L.R. 301, RAI "may be found" in this district and venue is therefore proper.

As to the remaining claims, venue is governed by 28 U.S.C. § 1391(b), which provides, *inter alia,* that venue lies in a judicial district where any defendant resides, if all defendants reside in the same state. 28 U.S.C. § 1391(b)(1). A corporate defendant is deemed to "reside" in any district in which it is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. § 1391(c). Venue in this district is therefore proper because RAI is subject to personal jurisdiction here.

### C. Forum Non Conveniens

Defendant's final argument is that venue in this district, if not improper, is at least inconvenient, and the action should therefore be dismissed under the doctrine of forum non conveniens.

A forum non conveniens analysis involves a two-step inquiry. First, the court must determine whether there is an adequate alternative forum. *Alfadda v. Fenn,* 159 F.3d 41, 45 (2d Cir.1998); *Peregrine Myanmar Ltd. v. Segal,* 89 F.3d 41, 46 (2d Cir.1996). "An alternative forum is adequate if: (1) the defendants are subject to service of process there and (2) the forum permits 'litigation of the subject matter of the dispute." ' *Id.* (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 254 n. 22 (1981)). Once it is determined that an alternative forum exists, the Court must weigh the public and private interests enumerated by the Supreme Court in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508-09 (1947), in order to determine which forum is most convenient and will best serve the interests of justice. *Alfadda,* 159 F.3d at 46 (citing *Peregrine,* 89 F.3d at 46). The public interests include: (1) having local disputes settled locally; (2) avoiding the problems presented by applying foreign law; and (3) avoiding the burdening of jurors with cases that have no impact on their community. *Id.* The

private interests include: (1) ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might make the trial shorter or less costly. *Id.* (citing *Piper,* 454 U.S. at 241 and *Gilbert,* 330 U.S. at 508).

**\*8** RAI argues that Italy is an appropriate alternate forum in this case because RAI is "obviously" subject to service of process there. (Def.'s Br. at 26). World Film counters that, because there is no guarantee that an Italian Court would accept jurisdiction over the U.S. copyright and trade dress infringement claims, the adequacy of Italy as an alternative forum has not been established. (Pl.'s Br. at 26). It is unnecessary for the Court to determine whether Italy is an adequate forum because, even assuming that it is, the Court finds that the balance of public and private interests does not favor dismissal.

First, "[i]n assessing convenience, '[t]here is ordinarily a strong presumption in favor of the plaintiff's choice of forum." ' *Alfadda,* 159 F.3d at 46 (quoting *Murray v. British Broad. Corp .,* 81 F.3d 287, 290 (2d Cir.1996)); *see Peregrine,* 89 F.3d at 46 (court starts with a presumption in favor of plaintiff's chosen forum). Moreover, "[c]ourts are particularly reluctant to disturb a plaintiff's choice of forum when the action involves, as here, an American plaintiff against a foreign defendant." *Firma Melodiya v. ZYX Music,* 882 F.Supp. 1306, 1317 (S.D.N.Y.1995) (citing *Nationsbank of Florida v. Banco Exterior de Espana,* 867 F.Supp. 167, 171 (S.D.N.Y.1994)); *see also In re Houbigant,* 914 F.Supp. 964, 980 (S.D.N.Y.1995). Dismissal will generally be inappropriate "unless ' the balance of convenience tilts strongly in favor of trial in the foreign forum." ' *Alfadda,* 159 F.3d at 46 (quoting *R. Maganlal & Co. v. M.G. Chem. Co.,* 942 F.2d 164, 167 (2d Cir.1991)). Considering the public and private factors in this case, RAI has failed to meet its burden of overcoming the presumption in favor of plaintiff's forum choice.

### 1. Public Interest Factors

RAI argues that the public interest factors favor

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 8

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

dismissal because the dispute is governed by Italian law, with which an Italian court will be more familiar; Italy has a greater interest in the litigation than does New York, which lacks significant connection to the dispute; and the congestion of this Court's docket makes Italy a more desirable forum. The Court disagrees.

First, despite defendant's repeated assertions that Italian law governs this case (Def.'s Br. at 28; Def.'s Reply Br. at 14), it is clear that plaintiff's claims arise under both U.S. and Italian intellectual property law. There is no reason to believe that this Court will be unable to apply Italian copyright law as necessary. Moreover, "the need to analyze foreign law ... is not dispositive of a motion to dismiss." *Firma Melodiya,* 882 F.Supp. at 1318 (citing *R. Maganlal,* 942 F.2d at 169); *see Manu Int'l, S.A. v. Avon Prods., Inc.,* 641 F.2d 62, 67 (2d Cir.1981) (" '[T]he need to apply foreign law is not in itself a reason to apply the doctrine of forum non conveniens,' and we must guard against an excessive reluctance to undertake the task of deciding foreign law, a chore federal courts must often perform.") (quoting *Olympic Corp. v. Societe Generale,* 462 F.2d 376, 379 (2d Cir.1972)).

*\*9* Nor does the interest in having local disputes settled locally weigh in favor of litigating in Italy. This dispute does have a connection to this forum because the allegedly infringing work is claimed to have been distributed in the United States generally, and specifically in New York. It is well-settled that the United States has an interest in protecting the intellectual property rights of its citizens. *See Update Art Inc. v. Maariv Israel News., Inc.,* 635 F.Supp. 228, 233 (S.D.N.Y.1986); *Firma Melodyia,* 882 F.Supp. at 1318 (this factor weighed in plaintiff's favor where central issues concerned violations of U.S. trademark and copyright laws and allegedly infringing articles were being sold in New York).[FN4]

> FN4. The cases cited by RAI on this point are distinguishable. In *Ente Nazionale Idrocarburi v. Prudential Secs. Group, Inc.,* 744 F.Supp. 450 (S.D.N.Y.1990), the court determined that Italy had a stronger

interest in the litigation because, *inter alia,* there were already two related actions pending there (presenting the possibility of inconsistent judgments), and the plaintiff was the energy and pharmaceutical agency of the Italian government, which was suing a U.S. company for tortious interference with its contract with another Italian entity. Furthermore, the contract itself was governed by Italian law and was very important to the Italian economy. *See id.* at 451-52, 462. Likewise, in *Broadcasting Rights Int'l Corp. v. Societe du Tour de France,S.A.R.L.,* 675 F.Supp. 1439 (S.D.N.Y.1987), France was found to have a stronger interest in the litigation because the suit involved a contract concerning the Tour de France, a "source of national pride " in France; the subject contract was negotiated and executed in France by two French citizens, called for the application of French law, and was written in French; and the plaintiff, although nominally a U .S. entity, was essentially a French interest. *See id.* at 1446-48. This case simply does not present the same sort of foreign interests that were at stake in the above cases.

Finally, although courts have found calendar congestion to be a factor weighing in favor of dismissal, *see, e.g., Ocean Shelf Trading Inc. v. Flota Mercante Grancolombiana S.A.,* 638 F.Supp. 249, 253 (S.D.N.Y.1986), this factor cannot alone satisfy RAI's burden of showing that a dismissal is warranted. *See Firma Melodiya,* 882 F.Supp. at 1318 n. 18. Furthermore, RAI has submitted no evidence that the Italian docket is any less crowded than this Court's. The Second Circuit has also noted that courts in a busy district such as this should resist the temptation to transfer or dismiss cases that may be as appropriately, or even slightly more appropriately, tried elsewhere. *See Manu,* 641 F.2d at 65 (quoting *Calavo Growers of Cal. v. Generali Belgium,* 632 F.2d 963, 969 (2d Cir.1980), *cert. denied,* 449 U.S. 1084 (1981)).

The public interest factors therefore do not weigh in favor of dismissal.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 9

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**

### 2. Private Interest Factors

Nor do the private interests involved in this case weigh strongly in favor of litigating in Italy.

The first factor is the cost for witnesses to attend trial. *See Alfadda,* 159 F.3d at 46. RAI does not name any of its potential witnesses specifically; it states only that most of the witnesses are in Italy, including World Film's agents who negotiated with RAI regarding the license agreement, RAI's representatives who dealt with World Film and considered its license proposal, and all of the creative and corporate officers who participated in the development of "Colorado." (*See* Def.'s Br. at 28). However, RAI cannot rely on the location of witnesses with knowledge of the parties' unsuccessful licensing negotiations, since this matter is largely irrelevant to the claims asserted in the complaint. While RAI will incur costs in transporting its other prospective witnesses to New York, *i.e.,* the people who developed and distributed "Colorado," World Film would incur similar expenses should the action be tried in Italy, since all of its expected witnesses are located in New York.[FN5] Where witnesses are located both abroad and in the plaintiff's home forum, this factor does not favor dismissal. *See Manu Int'l,* 641 F.2d at 66; *Firma Melodiya,* 882 F.Supp. at 1318.

> FN5. World Film specifically names John Heyman, its president, as its primary witness. (Dreeman Decl. ¶ 11). He resides in New York. (Id.). It also expects to call its Vice President, Pamela Osowski, and Fenita Bilgoraj Heyman, both of whom are also located in New York. (*See* Pl.'s Br. at 23).

*10 Moreover, both parties' witnesses are likely to be its employees or agents-individuals who would be subject to the compulsory process of this Court. *See Update Art,* 635 F.Supp. at 233; *Ocean Shelf Trading,* 638 F.Supp. at 252 (noting that many eyewitnesses were employees of parties and thus subject to court's compulsory process). Because neither RAI nor World Film has named any non-party witnesses who would be beyond the

subpoena power of the Court, this factor is neutral.

As for the ease of access to evidence, RAI argues that most of the relevant documents are located in Italy, specifically documents concerning the revenues received from advertising in or distribution of "Colorado," which are necessary to determine damages. It argues that it would be much simpler to transport plaintiff's copyright registration and a videotape of "Snakes & Ladders" to Italy than to transport the "whole body of evidence" from Italy to New York. (*See* Def.'s Reply Br. at 14). The Court does not find, however, that transporting RAI's documents-which are unlikely to be that voluminous-to New York would be unduly burdensome.

RAI further argues that extensive translation of its documents and testimony will be required if its action is tried here. While the Court recognizes that the translation of extensive amounts of documents may prove burdensome in certain cases, in this case, this factor does not weigh strongly in favor of litigating in Italy because (1) World Film's testimony and documents would have to be translated into Italian were the action tried in Italy, and (2) it appears that at least some of RAI's documents, such as the Plan for distribution of its programming in the U.S., are written in both English and Italian. (*See* Dreeman Decl. Ex. G). Accordingly, while the need to translate documents and testimony may complicate the trial of this action, it would not necessarily be avoided by litigating in Italy instead.

In sum, the Court concludes that, considering the weight that must be accorded to plaintiff's forum choice, the balance of public and private interests does not favor the dismissal of this action on forum non conveniens grounds.

### III. CONCLUSION

Defendant's motion to dismiss the complaint for lack of personal jurisdiction is denied, as is its motion to dismiss for improper and inconvenient venue.
SO ORDERED.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 10

Not Reported in F.Supp.2d, 1999 WL 47206 (S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50 U.S.P.Q.2d 1187
**(Cite as: Not Reported in F.Supp.2d)**


S.D.N.Y.,1999.
World Film Services, Inc. v. RAI Radiotelevisione
Italiana S.p.A.
Not Reported in F.Supp.2d, 1999 WL 47206
(S.D.N.Y.), 1999 Copr.L.Dec. P 27,862, 50
U.S.P.Q.2d 1187

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.