The non-executive Directors, led by Sir Peter Job in his role as Senior Independent Director, also assessed the performance of the Chairman with input from the whole Board. Sir Peter discussed with the Chairman the outcome of this review.

### Induction and updating of knowledge

All new Directors undertake an induction programme on joining the Board. The aim of this programme is to introduce new Directors to the Group's business, its operations and its governance arrangements. The induction programme includes meetings with senior management, visits to offices, presentations on key business areas and relevant documentation. The Board receives presentations on business and functional areas and new business and strategic developments.

In addition, briefing sessions are held which are open to all Directors. Topics covered in 2006 included the management of investment risk, the Group's property business and the implications for Directors of the new Companies Act.

### Shareholder relations

Ongoing communication across the Company's shareholder base, including institutional investors and private and employee shareholders, is achieved mainly through the publication of the annual and interim reports and quarterly trading updates, the announcement of significant developments affecting the Group and the Annual General Meeting. Corporate and investor information, including webcasts of the presentations of the interim and final results made by the Chief Executive, Chief Financial Officer and other senior management are published on our website.

The Board as a whole is responsible for ensuring that dialogue with shareholders takes place. During the year the Chief Executive, the Chief Financial Officer and other senior executives conducted a series of meetings with, and presentations to, institutional investors, analysts and prospective shareholders to review the Group's strategy and prospects and to discuss corporate governance matters. Over 30 such meetings were held in 2006. The Chairman is also available to meet institutional shareholders, as is the Senior Independent Director. Feedback from shareholders is available to the Board from the Chairman, the Chief Executive and the Chief Financial Officer.

The Annual General Meeting provides shareholders with an opportunity to question the Chairman and other Directors, including the Chairmen of the Remuneration and Audit Committees. The Chief Executive provided shareholders at the 2006 meeting with a review of the Group's business in 2005. The Annual Report and Accounts and the notice of meeting are sent to shareholders at least 20 working days prior to the date of the Annual General Meeting.

### Compliance with Code Provisions

The Company complied with all of the provisions of section 1 of the Combined Code 2003 throughout the year. There were only two provisions of the entire Code with which we did not comply fully. These were:

• Neither Bruno Schroder nor George Mallinckrodt are considered independent under the provisions of the Code. Consequently, fewer than half (five) of the members of the Board (excluding the Chairman) comprised independent non-executive Directors. Bruno Schroder is a representative of the principal shareholder group and the Board considers that it is appropriate for this group to be represented on the Board. George Mallinckrodt is not considered independent as he is a former executive Director of the Company. The Board considers that his business and international experience are of great value to the Board. The Board is looking to appoint an additional independent non-executive Director in 2007.

• Until he stood down at the end of March 2006, Michael Miles was also chairman of Johnson Matthey plc. During that time both Schroders and Johnson Matthey were constituents of the FTSE 100 Index. Michael Miles was appointed Chairman of both companies before the provisions of the Combined Code were introduced.

**Michael Miles**
Chairman

8 March 2007



# Remuneration report

This report describes the Group's overall remuneration policy and gives details of the compensation arrangements for Directors for the year ended 31 December 2006. It also sets out the membership of the Remuneration Committee and its role and remit. The report has been prepared on behalf of the Board in accordance with the Companies Act 1985 (as amended) and the Combined Code 2003.

## Role of the Committee

The Committee's role is to review and approve the remuneration strategy and policies of the Group including the policy for the Group's annual compensation review. It is also responsible for determining the remuneration of the executive Directors, and monitoring the level and structure of remuneration for senior management generally.

The full terms of reference of the Committee are available on www.schroders.com or from the Company Secretary.

## Composition of the Committee

The current members of the Committee, unchanged throughout 2006, are:

Sir Peter Job (Chairman)
Andrew Beeson
Kevin Parry

The Committee, which meets as often as necessary to discharge its duties, met on three occasions during 2006 and there was full attendance at all meetings.

Other non-executive Directors as well as the Chief Executive, Chief Financial Officer and senior Human Resources executives attend by invitation but they play no part in the determination of their own remuneration arrangements.

The Committee has appointed Hewitt Bacon & Woodrow Limited, McLagan Partners Inc. and New Bridge Street Consultants LLP as its external advisers. New Bridge Street Consultants LLP provided advice to the Committee on equity incentive plans and also provided advice to the Group on the implementation of these plans. McLagan Partners Inc. provided the Committee with an interpretation of external market compensation levels and practices and also provided information and advice to management on the external market. Hewitt Bacon & Woodrow Limited provided advice to the Committee and the Group on domestic and international pensions issues, as well as acting as the actuarial advisers to, and administrators of, the UK pension scheme. McLagan Partners Inc. attended one meeting of the Committee during 2006.

## Remuneration policy

The Group's remuneration policy is to attract, motivate and retain the talent the Group needs in order to achieve its strategic objectives. We structure the remuneration of executive Directors in a manner which reflects performance and leads to them accumulating rights to shares in the Company and exposure to the performance of Schroders investment funds.

The Committee believes that the total compensation package offered must reflect the global competition for talent in an industry in which successful people are particularly mobile. The Group compensates its executive Directors and other employees by balancing fixed and variable compensation. Fixed compensation, in the form of base salary, pensions and other benefits, continues to be low for our executive Directors relative to companies in the FTSE 100 Index and to our broader base of asset management competitors. In years of strong performance, however, variable compensation, in the form of cash bonuses and deferred bonuses, can be high.

Our policy is not to guarantee compensation levels but to recognise that there will be times when this forms part of the initial package necessary to recruit senior employees. No current executive Director has such a guarantee.

The total remuneration expense for the Group is based upon a ratio of the cost of total compensation to a measure of core net operating revenues. The Committee determines the target aggregate ratio ahead of the performance year. One factor considered in setting the ratio was an analysis of competitor ratios. At the end of each financial year the Committee is advised of the level of fixed compensation expense and then approves the amount distributable as variable compensation across the Group. The ratio of total compensation costs to operating revenues achieved in 2006 was 47 per cent. Further details of this ratio are covered in the business review on page 10.

It remains the Committee's practice and intention to grant share options sparingly, mainly to assist in recruitment where necessary.

## Key developments

The Committee reviewed the remuneration policy in 2006 and has made only minor changes. In conducting this review the Committee considered the guidelines of investor bodies on policies and practices in executive remuneration.

Developments since the last report include:

- the launch of our Share Incentive Plan to all UK employees at the beginning of the year. 43 per cent. of UK employees have taken the opportunity to participate; and

- the launch of a flexible benefits plan for our UK employees to enable them to choose benefits that suit their personal circumstances and to increase understanding among employees of the value of the whole of their compensation package.

## Elements of the compensation package

### Base salary

The base salary of executive Directors is reviewed annually by the Committee. The maximum limit of £200,000 has remained unchanged for over six years. Base salary is the only element of remuneration that is pensionable, with the level of contribution into the UK pension scheme being subject to the statutory or notional earnings cap (see note 4 on page 57).

### Benefits

Executive Directors can participate in the flexible benefits plan on the same basis as other UK employees. Benefits entitlements, including pension, for the executive Directors are shown in the tables on pages 29 and 30.

In response to the pensions legislation that came into effect in April 2006 in the UK, employees who choose not to accrue benefits in our pension scheme apart from life assurance cover, due to the impact of the new lifetime allowance, receive a taxable cash allowance. In accordance with the ABI best practice guidance this allowance is set at a level to ensure that the cost impact to the Company (including employer National Insurance) is neutral.

### Variable compensation

Discretionary bonus awards are delivered in two forms: a cash bonus and a deferred bonus. The deferral is mandatory and delivered via the Equity Compensation Plan. There are two types of Equity Compensation Plan award: a share award and a fund award, which are described more fully on page 27.

The bonus awards are determined with regard to the performance of the individual and the area or function of the business in which the individual works or for which the individual is responsible, the profitability of the Group and the external market. Given our relatively low levels of fixed compensation and the intent to provide an effective financial incentive within our highly competitive market place, the Committee does not consider it appropriate to set a cap on discretionary bonus awards at the individual level. The Committee intends to deliver exceptional rewards for outstanding corporate and individual performance, but within the constraint of a total compensation costs to operating revenues ratio. In practice, when determining the individual bonus awards for the executive Directors, the Committee take into account the following important factors – Group profitability, investment performance, growth in funds under management and individual performance.

The balance between the fixed and variable elements of the total compensation package for the executive Directors as a whole is summarised in the diagram below. Less than 12 per cent. of their individual total compensation was fixed, and slightly more than half of the 2006 variable compensation for each of the executive Directors in 2006 has been deferred for three years on a mandatory basis via the Equity Compensation Plan.

## Executive Directors – total compensation



- Fixed 8.7%
- Variable – cash 44.5%
- Variable – deferred 46.8%

## Equity Compensation Plan 2000

Key employees receive deferred bonus awards under the Equity Compensation Plan on terms designed to identify their interests with our shareholders and to retain their services in the Group. The level of mandatory deferral is determined by the Committee in accordance with a matrix that is agreed in advance of the annual compensation review.

These awards do not give rise to any immediate entitlement but will vest in full on the third anniversary of the grant date provided that the participant continues to be employed within the Group. This Plan allows deferred awards to be granted in either share awards, fund awards or a combination of both.

## Share awards

Share awards can be granted over either ordinary or non-voting ordinary shares in the Company and are normally structured as rights to acquire shares at nil cost. Historically awards under this Plan were made over non-voting ordinary shares. As a result of a resolution approved at the 2006 Annual General Meeting share awards for 2005 and 2006 are in respect of ordinary shares.

If a participant resigns before the three years have elapsed then the following forfeiture provisions apply:

| Completed years of service from date of award | Less than 1 | ≥1 and <2 | ≥2 and <3 | 3 |
|---|---|---|---|---|
| Percentage of share award forfeited | 100% | 72% | 44% | 0% |

During the deferral period these awards do not attract dividends. To the extent that the employee chooses to leave share awards within the Equity Compensation Plan for a further two years after vesting, the employee is rewarded with additional shares of 11.1 per cent. of the number of shares which vest at the third anniversary. This compensates for dividends foregone during this period.

## Fund awards

Fund awards are notional investments in a range of Schroder investment funds and can be granted by the Committee as an alternative to share awards. They give holders a personal interest in the performance of our funds. Fund awards have a three-year vesting period, with no option to extend, and have the following forfeiture provisions in the event of resignation:

| Completed years of service from date of award | Less than 1 | ≥1 and <2 | ≥2 and <3 | 3 |
|---|---|---|---|---|
| Percentage of fund award forfeited | 100% | 66.6% | 33.3% | 0% |

These deferred awards will be re-valued in line with the performance of the selected products and will be paid out in cash at the end of the deferral period.

In 2006 the first £60,000 of the deferred bonus award was delivered in share awards and any balance, above a minimum level, was delivered equally in share awards and fund awards. In overseas locations where it was not possible to deliver fund awards the deferred bonus award was delivered solely in the form of share awards.

Equity Compensation Plan awards are not subject to further performance conditions as they are considered as already having been earned by reference to performance.

## Share Option Plan 2000

Under the Share Option Plan 2000, the Company has granted market value share options over non-voting ordinary shares. Options usually become exercisable if the option holder remains with the Group for at least three years and, for executive Directors, if the performance target has been met at the third anniversary. Share options granted to other employees have no performance conditions.

In line with market practice, the performance target is that the Company's earnings per share growth (defined as the earnings per ordinary share before any items considered exceptional, as derived from the Company's Annual Report and Accounts) must be at least four per cent. per annum above the increase in the Retail Price Index over a three-year period. There is no re-test if the target is not met after three years. This performance target is a general condition and standard for each executive Director. New Bridge Street Consultants LLP confirms the performance criteria calculations annually for the Committee based on audited results.

Outstanding awards held by executive Directors under these Plans are disclosed in the Directors' rights to shares table on page 32.

Of the total variable compensation awarded to all employees in the Group in 2006, the proportion that was deferred amounted to 31.2 per cent.

The Company implemented in 2006, for the first time, a Share Incentive Plan. Each of the executive Directors and 538 other employees joined the Plan, which is helping to broaden the number of employee shareholders.

Total employees' rights to ordinary and non-voting ordinary shares in all of Schroders' employee share plans, as a percentage of the total ordinary and non-voting ordinary shares in issue, were 7.2 per cent. as at 31 December 2006.

### Personal shareholding policy
In order to further align the interests of our most senior employees with those of shareholders, each of the executive Directors and the other members of the Group Management Committee is required, over time, to acquire and retain a target holding of Schroders' shares, equivalent to 300 per cent. of annual base salary.

### Performance graph
The following performance graph shows the Company's total shareholder return performance, comprising share price movements plus the value of dividends reinvested, compared with that of the FTSE 100 Index. This index was chosen by the Committee because it represents the principal index in which the Company's shares were quoted throughout the majority of the performance period and is still perceived as the most relevant index.

This graph shows the annual percentage change in the value over each financial year of £100 invested in Schroders plc on 31 December 2001 to 31 December 2006 compared to the value of £100 invested in the FTSE 100 Index.



**Total shareholder return**
since 31 December 2001

Source: Datastream

### Service contracts
The Committee's general policy is that each executive Director should have a rolling contract of employment with notice periods of six months on either side. When recruiting executive Directors, the Committee's policy is that contracts should not contain any provision for compensation upon early termination and that the parties should rely on employment rights conferred by law. In the event that compensation for early termination is payable, the Committee's policy is to seek to keep such compensation at an appropriate level.

The following table provides details of the current executive Directors' service contracts:

| | Date of contract(s) | Nature of contract | Notice period from Company | Notice period from Director | Compensation provisions for early termination |
|---|---|---|---|---|---|
| **Executive Directors** | | | | | |
| **Michael Dobson**[1] | 19 October 2001 | Rolling | 12 months | 6 months | Note 1 |
| **Jonathan Asquith** | 12 November 2001 | Rolling | 6 months | 6 months | None |
| **Alan Brown**[2] | 17 May 2005 | Rolling | 6 months | 6 months | None |
| **Massimo Tosato**[3] | 27 July 2001 and 1 August 2001 | Rolling | 6 months | 6 months | Note 3 |

**Notes**
[1] If Michael Dobson's employment is terminated by the Company without cause he would be entitled to receive the equivalent of one year's compensation, calculated as the annual average of the aggregate of base salary, discretionary cash bonus and awards under the Equity Compensation Plan received in the preceding three years.

[2] Alan Brown had a potential entitlement to be compensated up to US$3 million if he suffered loss as a result of any claim by his previous employer that he was in violation of certain restrictions expiring before the end of 2006. No such claim was made in 2006.

[3] Massimo Tosato's contract dated 27 July 2001 relates to his UK duties and his contract dated 1 August 2001 relates to his international duties. Upon early termination of these contracts he would be entitled to 12 months' compensation (calculated as base salary, discretionary cash bonus and any award under the Equity Compensation Plan for the previous year).

### Executive Directors' non-executive directorships
It is the Company's policy to allow executive Directors to retain any fees earned from any non-executive directorships they hold in other external organisations. No such fees were earned during the year.

### Non-executive Directors
Each non-executive Director has a letter of appointment in which both the non-executive Director and the Company are required to give reasonable notice to terminate the appointment. Non-executive Directors' appointments are subject to the re-election requirements of the Company's Articles of Association and are without a fixed term. There are no specific contractual provisions for non-executive Directors to receive compensation upon early termination.

The dates of the non-executive Directors' letters of appointment are as follows:

| | |
|---|---|
| **Michael Miles** | 17 December 2002 |
| **Andrew Beeson** | 1 October 2004 |
| **Luc Bertrand** | 20 February 2006 |
| **Sir Peter Job** | 23 December 2002 |
| **Merlyn Lowther** | 4 March 2004 |
| **George Mallinckrodt** | 24 December 2002 |
| **Kevin Parry** | 16 December 2002 |
| **Bruno Schroder** | 24 December 2002 |

Fees for the Chairman and other non-executive Directors are determined by the Board based on market information supplied by New Bridge Street Consultants LLP, and in accordance with the restrictions contained in the Company's Articles of Association. Non-executive Directors do not participate in decisions concerning their fees. Fees are reviewed annually, although it is anticipated that, in the absence of any significant market movement, fees would remain unchanged for two years.

The fees were reviewed during 2006 and as a result of general movement in the market certain changes have been made. With the exception of the fee for the Audit Committee chairman which was increased during 2005 fees had last been increased in 2004. The current and former annual fees payable are as follows:

| Non-executive Directors' fees | Current £ | Former £ |
|---|---|---|
| Board chairman | 200,000 | 165,000 |
| Board member | 45,000 | 40,000 |
| Audit Committee member | 12,500 | 12,500 |
| Audit Committee chairman* | 15,000 | 15,000 |
| Nominations Committee member | Nil | Nil |
| Nominations Committee chairman | Nil | Nil |
| Remuneration Committee member | 10,000 | 10,000 |
| Remuneration Committee chairman* | 12,000 | 8,000 |

* In addition to the Committee membership fee.

The Senior Independent Director receives no additional fee.

Awards from the Group's incentive plans are not made to non-executive Directors.

### Directors' remuneration in 2006
The following tables on pages 29 to 33 provide details of each of the Directors' and former Directors' emoluments, pension entitlements, rights to fund awards, rights to shares and share interests. In accordance with the Companies Act 1985, the tables on pages 29 to 33, excluding the summary of deferred compensation table on page 31, have been audited by the independent auditors.

### Directors' emoluments
The emoluments (not including any pension contributions, deferred fund awards and deferred share awards on pages 30 to 32) of the Directors of the Company in respect of the period for which they were in office in the relevant year, including their remuneration in respect of subsidiary undertakings, comprised:

| | Salary and fees £'000 | Other cash payments[1] £'000 | Benefits-in-kind[2] £'000 | Annual cash bonus £'000 | 2006 Total £'000 | 2005 Total £'000 |
|---|---|---|---|---|---|---|
| **Executive Directors** | | | | | | |
| **Michael Dobson** | | | | | | |
| **(Chief Executive)** | 200 | 46 | 7 | 2,217 | 2,470 | 1,764 |
| Jonathan Asquith | 200 | 24 | 2 | 1,042 | 1,268 | 762 |
| Alan Brown | 200 | 34 | – | 1,142 | 1,376 | 614 |
| Massimo Tosato | 200 | 11 | 34 | 1,382 | 1,627 | 1,278 |
| | | | | | | |
| **Non-executive Directors** | | | | | | |
| **Michael Miles (Chairman)** | 183 | – | 1 | – | 184 | 166 |
| **George Mallinckrodt** | | | | | | |
| **(President)[3]** | 100 | 7 | 6 | – | 113 | 111 |
| Andrew Beeson | 65 | – | – | – | 65 | 63 |
| Luc Bertrand[4] | 46 | – | – | – | 46 | – |
| Sir Peter Job | 63 | – | – | – | 63 | 58 |
| Merlyn Lowther | 55 | – | – | – | 55 | 53 |
| Kevin Parry | 80 | – | – | – | 80 | 75 |
| Bruno Schroder[5] | 70 | 4 | 1 | – | 75 | 73 |
| | | | | | | |
| **Former executive Director** | – | – | – | – | – | 1,111 |
| | | | | | | |
| **Former non-executive Director** | – | – | – | – | – | 15 |
| | | | | | | |
| **Total** | 1,462 | 126 | 51 | 5,783 | 7,422 | 6,143 |

#### Notes
[1] Other cash payments comprise one or more of: cash allowance in lieu of a company car and cash allowance in lieu of pension.

[2] The benefits-in-kind provided to Directors comprise one or more of: private use of company chauffeur, private use of taxis, life insurance and private healthcare.

[3] George Mallinckrodt received an annual fee of £42,500 as a Director, a fee of £57,000 in respect of his services as President of the Company, £7,000 of cash allowance and £6,000 in benefits-in-kind.

[4] Luc Bertrand was appointed to the Board on 1 March 2006.

[5] Bruno Schroder received an annual fee of £42,500 as a Director, a fee of £27,750 for his additional services to the Company plus £1,000 in benefits-in-kind.

**Directors' pension entitlements**

Defined Benefit

The following table gives details of the accrued pension benefit at 31 December 2006 for Directors who have participated in the defined benefits section of the UK Scheme during the year to 31 December 2006. Further information concerning the Company's pension schemes is set out in note 4 in the Notes to the Accounts on pages 57 to 60.

| | Accrued pension at 31 Dec 2005 £'000 | Change in accrued pension due to inflation £'000 | Change in accrued pension excluding inflation | | Accrued pension at 31 Dec 2006 £'000 | Transfer value at 31 Dec 2005 £'000 | Increase in transfer value £'000 | Transfer value at 31 Dec 2006 £'000 |
| | | | Increase £'000 | Transfer value £'000 | | | | |
|---|---|---|---|---|---|---|---|---|
| **Executive Directors** | | | | | | | | |
| **Michael Dobson**[1] | 10 | 0 | 1 | 9 | 11 | 147 | 35 | 182 |
| **Massimo Tosato** | 17 | 1 | 3 | 54 | 21 | 224 | 100 | 324 |
| **Non-executive Director** | | | | | | | | |
| **Bruno Schroder**[2] | 29 | 1 | 1 | 17 | 31 | 360 | 18 | 378 |

The accrued pension represents the annual pension which each Director would be entitled to receive from normal retirement age after leaving service. The accrued pension would be increased each year until it became payable in accordance with statutory requirements.

The change in accrued pension represents the difference between the accrued pension at 31 December 2005 and 31 December 2006. This is broken down into inflationary increases and increases arising as a result of service for the year concerned, postponement of retirement or any change in salary, where appropriate.

The transfer value represents the current capital sum which would be required, using demographic and financial assumptions, to provide the accrued pension and ancillary benefits at the relevant date. The transfer values have been calculated in a manner consistent with 'Retirement Benefit Schemes – Transfer Values (GN11)' published by the Institute of Actuaries and the Faculty of Actuaries.

The accrued pension or transfer value shown above does not include any allowance for additional voluntary contributions made by a Director.

[1] Michael Dobson ceased further accrual in the Scheme on 31 March 2006 and in lieu of this he receives a taxable cash payment of £34,467 per annum.

[2] No contributions were paid by the Company during the year.

Defined Contribution

The following table gives details of the pension contributions paid or payable by the Company into defined contribution arrangements for the year to 31 December 2006.

| | 2006 Employer contributions £'000 | 2005 Employer contributions £'000 |
|---|---|---|
| **Executive Directors** | | |
| **Michael Dobson**[1] | 12 | 13 |
| **Jonathan Asquith**[2] | 105 | 18 |
| **Massimo Tosato** | 60 | 60 |
| **Former executive Director** | – | 7 |
| **Total** | 177 | 98 |

The contributions disclosed exclude any personal contributions made by a Director.

[1] Michael Dobson ceased to have 13 per cent. of his base salary in excess of the notional earnings cap paid into a funded approved retirement benefits scheme on 31 March 2006, and in lieu of this he receives a taxable cash payment of £11,882 per annum.

[2] Jonathan Asquith ceased further accrual in the Scheme on 31 March 2006, and in lieu of this he receives a taxable cash payment of £16,367 per annum.

**Summary of the deferred compensation earned in respect of 2006**

In respect of 2006 the executive Directors earned rights to deferred awards under the Equity Compensation Plan. These awards, split between fund awards and share awards, are subject to forfeiture and are not accessible for three years. They will vest in full on the third anniversary of the grant date provided the Director continues to be employed within the Group, in line with the rules of the Plan. Should the Director choose to leave the share awards within the Equity Compensation Plan for a further two years, the Director would be rewarded with additional shares of 11.1 per cent. of the number of shares which vested at the third anniversary of the grant date, in lieu of dividends foregone.

| | Equity Compensation Plan[1] | | | |
|---|---|---|---|---|
| | Fund awards £'000 | Share awards £'000 | 2006 Total award £'000 | 2005 Total award £'000 |
| **Executive Directors** | | | | |
| **Michael Dobson** | 967 | 1,220 | 2,187 | 2,700 |
| **Jonathan Asquith** | 429 | 575 | 1,004 | 1,660 |
| **Alan Brown** | 429 | 575 | 1,004 | 555 |
| **Massimo Tosato** | 609 | 791 | 1,400 | 1,660 |

[1] For further details in respect of the Equity Compensation Plan 2000 see box on page 27.

Further details in respect of the executive Directors' awards and previous years' awards are shown in the following two tables:

**Directors' rights to fund awards**

Fund awards are notional investments in a range of Schroders' investment funds. These are rights to deferred cash and do not give rise to any immediate entitlement on grant. The 'rights granted during year' refer to awards made in respect of the 2005 performance year. 'Rights granted 8 March 2007' were made in respect of the 2006 performance year. These rights are subject to forfeiture and the deferred cash awards are not accessible for three years. They become fully vested on the third anniversary of the grant date provided the Director continues to be employed within the Group, in line with the rules of the Plan.

The executive Directors had the following rights to deferred cash awards, under the Equity Compensation Plan.

| | Rights held as at 1 Jan 2006 £'000 | Rights granted during the year £'000 | Rights held as at 31 Dec 2006 £'000 | Rights granted 8 Mar 2007 £'000 | Vesting date |
|---|---|---|---|---|---|
| **Executive Directors** | | | | | |
| **Michael Dobson** | 100 | – | 100 | – | 6 March 2008 |
| | – | 1,200 | 1,200 | – | 5 March 2009 |
| | – | – | – | 967 | 7 March 2010 |
| **Jonathan Asquith** | 526 | – | 526 | – | 6 March 2008 |
| | – | 727 | 727 | – | 5 March 2009 |
| | – | – | – | 429 | 7 March 2010 |
| **Alan Brown** | – | 225 | 225 | – | 5 March 2009 |
| | – | – | – | 429 | 7 March 2010 |
| **Massimo Tosato** | 500 | – | 500 | – | 6 March 2008 |
| | – | 727 | 727 | – | 5 March 2009 |
| | – | – | – | 609 | 7 March 2010 |

[1] For further details in respect of the Equity Compensation Plan 2000 see box on page 27.

**Directors' rights to shares**

These rights to shares do not give rise to any immediate entitlement on grant. They are subject
to forfeiture and are not accessible for three years. They become fully vested on the third anniversary
of the grant date provided the Director continues to be employed within the Group, in line with
the rules of the respective plans.

The executive Directors had the following rights to ordinary and non-voting ordinary shares:

| | | Held at 1 Jan 2006 | Rights granted during year | Rights exercised during year | Held at 31 Dec 2006 | Rights granted 8 Mar 2007 | Exercise price of outstanding rights | Exercise dates Earliest | Latest |
|---|---|---|---|---|---|---|---|---|---|
| **Executive Directors** | | | | | | | | | |
| **Michael Dobson** | (2) | 250,000 | | | 250,000 | | £4.83 | 9 Dec 2005 | 8 Dec 2012 |
| | (2) | 150,000 | | | 150,000 | | £3.98 | 10 Mar 2006 | 9 Mar 2013 |
| | (2) | 500,000 | | | 500,000 | | £7.06 | 12 Nov 2006 | 11 Nov 2011 |
| | (3) | 352,186 | | | 352,186 | | – | 10 Mar 2006 | 9 Mar 2013 |
| | (3) | 502,386 | | | 502,386 | | – | 8 Mar 2007 | 7 Mar 2014 |
| | (3) | 305,499 | | | 305,499 | | – | 7 Mar 2008 | 6 Mar 2015 |
| | (4) | | 146,162 | | 146,162 | | – | 6 Mar 2009 | 5 Mar 2016 |
| | (4a) | | | | | 119,719 | | 8 Mar 2010 | 7 Mar 2017 |
| **Jonathan Asquith** | (2) | 150,000 | | | 150,000 | | £8.00 | 22 Apr 2005 | 21 Apr 2012 |
| | (2) | 150,000 | | | 150,000 | | £5.41 | 6 Nov 2005 | 5 Nov 2012 |
| | (2) | 100,000 | | | 100,000 | | £3.98 | 10 Mar 2006 | 9 Mar 2013 |
| | (3) | 133,969 | | | 133,969 | | – | 10 Mar 2006 | 9 Mar 2013 |
| | (3) | 81,466 | | | 81,466 | | – | 8 Mar 2007 | 7 Mar 2014 |
| | (3) | 98,931 | | | 98,931 | | – | 7 Mar 2008 | 6 Mar 2015 |
| | (4) | | 90,877 | | 90,877 | | – | 6 Mar 2009 | 5 Mar 2016 |
| | (4a) | | | | | 56,405 | | 8 Mar 2010 | 7 Mar 2017 |
| **Alan Brown** | (4) | | 32,154 | | 32,154 | | – | 6 Mar 2009 | 5 Mar 2016 |
| | (4a) | | | | | 56,405 | | 8 Mar 2010 | 7 Mar 2017 |
| **Massimo Tosato** | (1) | 18,963 | | | 18,963 | | £8.22 | 7 May 2004 | 6 May 2009 |
| | (1) | 62,499 | | | 62,499 | | £8.00 | 13 Mar 2005 | 12 Mar 2010 |
| | (2) | 165,350 | | | 165,350 | | £8.00 | 22 Apr 2005 | 21 Apr 2012 |
| | (2) | 100,000 | | | 100,000 | | £5.41 | 6 Nov 2005 | 5 Nov 2012 |
| | (2) | 65,000 | | 65,000 | – | | £3.98 | 10 Mar 2006 | 9 Mar 2013 |
| | (2a) | 91,185 | | 91,185 | – | | £9.87 | 13 Mar 2006 | 12 Mar 2011 |
| | (3) | 64,826 | | 64,826 | – | | – | 13 Mar 2004 | 12 Mar 2011 |
| | (3) | 16,294 | | | 16,294 | | – | 10 Mar 2005 | 9 Mar 2012 |
| | (3) | 80,381 | | | 80,381 | | – | 10 Mar 2006 | 9 Mar 2013 |
| | (3) | 80,447 | | | 80,447 | | – | 8 Mar 2007 | 7 Mar 2014 |
| | (3) | 103,856 | | | 103,856 | | – | 7 Mar 2008 | 6 Mar 2015 |
| | (4) | | 90,877 | | 90,877 | | – | 6 Mar 2009 | 5 Mar 2016 |
| | (4a) | | | | | 77,601 | | 8 Mar 2010 | 7 Mar 2017 |

The market price of the ordinary shares at 31 December 2006 was £11.16 and the range during 2006 was £8.72 to £12.73.
The closing market price of the ordinary shares on 7 March 2007 was £11.32.

The market price of the non-voting ordinary shares at 31 December 2006 was £10.46 and the range during 2006 was £8.21 to £11.95.

(1)   Share Option Plan 1999. Exercise of these options is conditional upon achieving a performance target of earnings per share growth
of at least the Retail Price Index plus two per cent. per annum over a minimum five-year period. The performance target has been achieved.

(2)   Share Option Plan 2000. Exercise of these options is conditional upon achieving a performance target of earnings per share
growth of at least the Retail Price Index plus four per cent. per annum over a minimum three-year period. In respect of the
awards exercisable from 22 April 2005, 6 November 2005 and 9 December 2005 the performance target has been achieved.
More detail is available on page 27.

(2a)  There were no performance conditions associated with these awards as Massimo Tosato was not an executive Director
at the time the awards were granted.

(3)   Equity Compensation Plan 2000. The figures shown above comprise the number of shares available on the third anniversary
plus additional shares of up to 11.1 per cent. assuming shares remain within the Plan until the fifth anniversary. Awards are
structured as nil-cost share awards over non-voting ordinary shares. Further detail is included in the box on page 27.

(4)   Equity Compensation Plan 2000. The number of rights granted in 2006 has been adjusted to reflect the approval by the shareholders at the Annual General
Meeting in April 2006, of the amendment to the Equity Compensation Plan 2000. This allowed for the conversion of the
rights over non-voting ordinary shares at £11.85 into rights over ordinary shares at £11.40.

(4a)  Equity Compensation Plan 2000. The figures shown above comprise the number of shares available on the third anniversary
plus additional shares of up to 11.1 per cent. assuming shares remain within the Plan until the fifth anniversary. Awards are
structured as nil-cost share awards over ordinary shares.

(5)   The market prices on the dates the rights were exercised during 2006 were: £11.16 for the Equity Compensation Plan award
and £9.30 and £11.13 for the share option awards. The aggregate gain on rights exercised amounted to £1,184,000 of which
£723,000 relates to gains on the Equity Compensation Plan award and £461,000 relates to the share option awards.

**Directors' share interests**

At 1 January 2006 (or date of appointment, if later) and at 31 December 2006, the Directors listed had the following interests in shares in the Company:

**Schroders
Remuneration report**

**32/33**

| | 31 Dec 2006 | | 1 Jan 2006 | |
|---|---|---|---|---|
| | Ordinary shares | Non-voting ordinary shares | Ordinary shares | Non-voting ordinary shares |
| **Beneficial** | | | | |
| **Executive Directors** | | | | |
| Michael Dobson | 2,243 | 561,105 | 2,000 | 561,105 |
| Jonathan Asquith | 278 | – | – | – |
| Alan Brown | 278 | – | – | – |
| Massimo Tosato | 1,243 | – | 1,000 | – |
| | | | | |
| **Non-executive Directors** | | | | |
| Michael Miles | 5,000 | – | 5,000 | – |
| George Mallinckrodt | 30,000 | 507,226 | 30,000 | 507,226 |
| Andrew Beeson | – | 15,000 | – | 15,000 |
| Luc Bertrand | – | – | – | – |
| Sir Peter Job | – | – | – | – |
| Merlyn Lowther | 1,000 | – | 1,000 | – |
| Kevin Parry | 5,000 | – | 5,000 | – |
| Bruno Schroder | 6,353,655 | 59,310 | 6,353,655 | 59,310 |
| | | | | |
| **Non-beneficial** | | | | |
| George Mallinckrodt | 213,631 | – | 213,631 | – |
| Kevin Parry | 333 | – | 333 | – |
| Bruno Schroder | 64,800 | 16,200 | 64,800 | 16,200 |

Additionally, at 31 December 2006, the executive Directors were potential beneficiaries of the Schroders Employee Benefit Trust, which held 6,610,454 non-voting ordinary shares (1 January 2006: 8,711,635) and 1,038,369 ordinary shares (1 January 2006: Nil) on behalf of all non-US based employees. Their own rights to shares held within this Trust are set out on page 32.

At 1 January 2006 Michael Dobson had a beneficial interest in £3,721,250 Schroders plc Floating Rate Unsecured Loan Notes 2007 which were redeemed at par on 30 June 2006. During the year no Director held an interest in the shares or loan stock of any subsidiary of the Company.

Since 31 December 2006 each of the executive Directors, Michael Dobson (32 shares), Jonathan Asquith (31 shares), Alan Brown (31 shares) and Massimo Tosato (32 shares) acquired ordinary shares under the terms of the Schroders Share Incentive Plan. There have been no other changes in the interests set out above between 31 December 2006 and the date of this report.

A resolution to approve this report will be put to shareholders at the Annual General Meeting on 24 April 2007.

Approved and signed on behalf of the Board

**Sir Peter Job**
Chairman, Remuneration Committee

8 March 2007

# Nominations committee report

In this section we set out the role of the Nominations Committee, its membership and what it considered during the year.

## Role of the Committee

The Board has delegated to the Committee responsibility for reviewing and proposing appointments to the Board and for recommending any other changes to the composition of the Board or of the Board Committees. The principal responsibilities of the Committee include:

- reviewing the size and composition of the Board;

- selecting candidates for appointment to the Board to meet the desired composition;

- the procedure for the appointment of new Directors to the Board; and

- ensuring succession plans are in place for key Board members.

The full terms of reference of the Committee are available on www.schroders.com or from the Company Secretary at the registered office.

## The composition of the Committee

The members of the Committee at the end of 2006 were:

Michael Miles (Chairman)
Andrew Beeson
Luc Bertrand
Sir Peter Job
Merlyn Lowther
George Mallinckrodt
Kevin Parry
Bruno Schroder

Luc Bertrand joined the Committee on 1 March 2006 on his appointment to the Board.

## Report on the Committee's activities in 2006

### Meetings and attendance

The Committee, which meets as often as necessary to discharge its duties, met in February and November. There was full attendance by all members at both meetings.

### Principal issues

The principal issues addressed during 2006 were:

- the appointment of Luc Bertrand as an additional independent non-executive Director; and

- the composition of the Board.

Following the Committee's review of the composition of the Board it was recommended that a search for an additional independent non-executive Director should be instigated. This process has now commenced and the Committee hopes that a further appointment will be recommended to the Board during 2007.

### Support

The Committee receives information and support from management and external sources as necessary to enable it to carry out its duties and responsibilities effectively.





## Audit committee report

In this section we set out the role of the Audit Committee, its membership and what it considered during the year.

### Role of the Committee
The Board has delegated to the Committee responsibility for overseeing the financial reporting and internal control of the Group and for maintaining an appropriate relationship with the Company's auditors. The main role of the Committee is to encourage and safeguard the highest standards of integrity, financial reporting, risk management and internal control. In doing this the principal responsibilities of the Committee include:

- reviewing the form and content and monitoring the integrity of the Company's and the Group's financial statements;

- monitoring and reviewing the effectiveness of the external and internal audit functions;

- recommending to the Board the appointment, re-appointment or removal of the external auditors;

- reviewing the adequacy and effectiveness of the Group's internal controls and risk management systems; and

- reviewing and monitoring the Group's ethical standards, procedures for ensuring compliance with regulatory and financial reporting requirements and its relationship with the relevant regulatory authorities.

The terms of reference of the Committee (as updated from time to time) are available on www.schroders.com or from the Company Secretary at the registered office.

### The composition of the Committee
The members of the Committee at the end of 2006 were:

Kevin Parry (Chairman)
Luc Bertrand
Andrew Beeson
Merlyn Lowther

All of the members are independent non-executive Directors. Luc Bertrand joined the Committee on 1 March 2006 on his appointment to the Board. The other members of the Committee served throughout the year. For the purposes of the Combined Code, Kevin Parry, a former partner in the accountancy firm KPMG LLP, is considered by the Board to have recent and relevant financial experience.

### Report on the Committee's activities in 2006
#### Meetings and attendance
The Committee met four times in 2006. Attendance by Committee members at each of those meetings is set out in the table below:

| | Maximum possible attendance | Meetings attended |
|---|---|---|
| **Kevin Parry** | 4 | 4 |
| **Andrew Beeson** | 4 | 4 |
| **Luc Bertrand** | 3 | 2 |
| **Merlyn Lowther** | 4 | 4 |

To assist the Committee in fulfilling its role, a number of senior executives are invited to attend Committee meetings. These include the Chief Financial Officer, the Group Compliance Director, the Group Risk Director, the Head of Group Internal Audit and the Group General Counsel. Each of these provided reports on their areas of responsibility to each Committee meeting. The Group's external auditors, PricewaterhouseCoopers LLP, are also represented at each meeting and presented a report on their activities.

During the year the Committee met separately on two occasions with the Group's external auditors and with the Head of Group Internal Audit without executive management present. This provides an opportunity for the external and internal auditors to raise matters of concern in confidence. No issues of significance were raised during 2006.

The Committee has a formal programme of issues which it covers during the year. This programme is formulated by the Committee Chairman and the Company Secretary and is designed to ensure that all matters that fall within the Committee's remit are reviewed at the appropriate time.





The principal issues considered during 2006 were:

- the annual financial statements for 2005 and interim financial statements for 2006;

- the external audit plan for 2006;

- Group Internal Audit's plans for 2006 and 2007;

- the Group's risk management process, including key risks facing the Group;

- the appropriateness of the accounting policies used in drawing up the Group's accounts;

- Group Internal Audit's quarterly and annual reports on internal audit activities and the control environment;

- the external auditors' year-end report and management letter;

- the performance, independence and objectivity of the external auditors, including a review of non-audit fees; and

- the arrangements for staff to raise concerns about possible improprieties relating to the Company's operations (the 'whistleblowing arrangements').

## Other issues

As well as the agreed schedule of issues the Committee also received reports and presentations on various subjects connected principally to the control environment within the Group. These included presentations on the management of investment risk, the implications for the Group of the Capital Requirements Directive, the regulatory framework for the establishment of a life assurance company within the Group, and the new regulations on provision of information to the Auditors. The Committee also reviewed the scope and level of cover provided by the Group's Directors' and Officers' liability insurance, the governance of the Group's pension arrangements, the governance of outsourced activities and the risk management framework. Each of these reports was discussed fully by the Committee.

## Non-audit services and auditor independence

The Group has adopted a policy covering the provision of non-audit services to the Group by the external auditors. This policy was adopted by the Committee in 2004 and was introduced to enhance further the governance around the provision of such services and provide a clear and transparent framework to ensure the objectivity and independence of the external auditors. Under the policy the provision of any service which might lead to a conflict of interests is not permitted unless other possible providers are themselves conflicted. In such exceptional cases the Audit Committee must approve each service and approval will only be given where the Committee is satisfied that appropriate measures are in place to manage or mitigate any potential conflict of interest. There were no such occurrences in 2006.

The policy also has strict rules in relation to the approval of contracts for non-audit services which do not present a possible conflict of interest. All contracts for non-audit services must be notified to the Group Head of Finance and contracts valued in excess of £5,000 require prior approval. The Group's external auditors are also required to provide a report to the Audit Committee every six months detailing all non-audit services, including the level of fees charged. The external auditors are also required to confirm annually that their firm, partners and staff are independent of the Group.

The policy was reviewed by the Committee in 2006 and the Committee was satisfied that the policy remained appropriate and was being adhered to. In 2006 the value of non-audit services provided by PricewaterhouseCoopers LLP to Group companies was £0.8 million.

To support the principles of independence, the auditors have a policy governing the length of time a partner can work on the Schroders' audit. During the year a new senior audit partner was appointed. The Committee also considered the reappointment of PricewaterhouseCoopers

LLP as auditors, taking into account the results of the auditor assessment process, the quality of work undertaken, the level of audit fees and the succession of the senior audit partner. The Committee concluded that it was appropriate to recommend the reappointment of the Auditors and that this recommendation be put to shareholders at the Annual General Meeting.

The Committee is satisfied that the external auditors remain independent.

## Committee evaluation

The annual evaluation of the Committee's effectiveness was undertaken as part of the overall Board evaluation process for 2006. The specific findings relating to the Audit Committee were discussed with the Committee Chairman. As a result, the Committee will be reviewing its role, responsibilities and terms of reference in the light of current best practice and making recommendations to the Board for changes as appropriate.

## Support to the Committee

The Committee received information and support from management during the year to enable it to carry out its duties and responsibilities effectively. The Committee's programme of business related presentations was integrated into the briefing sessions organised for the whole Board during the year. Details of these briefings are included in the Governance Report on page 25.

The Committee has access to external independent advice at the Company's expense, normally through the Board Secretary.







## Risk management and internal control

In this section we detail the work undertaken in connection with the Group's risk management process and system of internal controls.

### Risk management

The Board is accountable for risk and is responsible for oversight of the risk management process. The Board has considered the principal risks facing the Group and the exposure in relation to each of those risks.

The Group Management Committee has approved a risk management framework and structure established by the Group Risk function. The framework defines the principal risk categories and sets out the methodology for the identification, assessment, mitigation and reporting of risks. A risk management structure is in place which embeds risk management into the business.

The Group Management Committee reviews the key corporate risks facing the Group and receives regular reports as to the current status of each risk.

### Group Risk Committee

The Group Risk Committee oversees the key risks and the risk management process. The Committee is chaired by the Chief Financial Officer, and includes representatives from across the business and the control functions. Local management is responsible for operational risk controls where appropriate and, depending on the size and complexity of the business unit, risk and control maps have been prepared which have been captured on an on-line worldwide risk management system. The Group Risk Committee receives reports from line management regarding any matters giving cause for concern and ensures appropriate remedial action is taken. This includes reports on errors and omissions and 'near misses'. The Committee also receives regular presentations on key projects, products and business activities from senior management.

### Credit risk

In respect of credit risk, limits are reviewed and set centrally by the Group Agency and Principal Risk Committees, supported by a dedicated team of credit professionals. Local management is responsible for monitoring exposure against these limits and reporting to Group management by exception. In respect of principal risk, the Group sets the overall Group limit and delegates authority to set credit limits within the overall limit to the Group's banking businesses in London, Guernsey and Switzerland.

### Interest rate and market risk

The Group does not run a trading book. The Private Banking subsidiaries hold certain financial instruments (debt securities, forward foreign exchange contracts and interest rate swaps) for customer facilitation purposes. Group interest rate risk is largely mitigated by the short-term nature of our holdings of interest-bearing assets and liabilities. It is Group policy to hedge any residual interest rate risk. The Group has a number of overseas subsidiaries whose shareholders' funds, revenues and expenses are denominated principally in local currencies. Forward foreign exchange contracts with third parties are used to mitigate exposure to currency movements where it is considered that the sterling values of such amounts are at risk. The use of such instruments is limited and is subject to approval by the Group Capital Committee.

In addition, the Group's seed capital investments may also be hedged in respect of market risk where it is possible to construct an effective hedge and there is a perceived risk of volatility in the value of the investment due to market movements. The decisions to hedge market risk on seed capital investments, typically using futures, are taken by the Group Capital Committee in consultation with the business.







## Monitoring risk

The liquidity of the banking entities within the Group is monitored by the Principal Risk Committee and that of the Group by the Group Capital Committee. The Group Capital Committee monitors and controls the use of the Group's non-operating capital resources.

Dedicated personnel are responsible for producing and maintaining market and liquidity risk reports based upon the Financial Services Authority's methodologies under the Capital Adequacy Directive. The underlying methodologies and limits are reviewed and set centrally by the Principal Risk Committee. Local risk committees and the Principal Risk Committee review exposures against limits on a regular basis.

Group Compliance undertakes detailed monitoring activities to review compliance with legal and regulatory requirements. Group Internal Audit carries out a programme of audits approved by the Audit Committee, including reviews of the risk management process and advice and recommendations on improving the control environment.

## Internal control

The Board is responsible for the Group's system of internal control and for reviewing its effectiveness. Such a system can provide only reasonable and not absolute assurance against material financial misstatement or loss and is designed to mitigate, not eliminate, risk.

On behalf of the Board, the Audit Committee has carried out its annual assessment of the effectiveness of internal control during 2006 using the following to support its conclusions:

- the six-monthly assessments by the Group Management Committee of key corporate risks and responsibilities for those risks;

- reports from the Heads of Group Compliance and Group Risk on the results of the twice-yearly business risks and controls evaluation survey, summarising the work undertaken by the Group Risk Committee and highlighting any significant control issues arising;

- quarterly reports from the Heads of Group Compliance and Group Risk on the control environment and relevant issues arising within the Group, highlighting any major instances of non-compliance and the actions being taken to remedy such non-compliance;

- a twice-yearly report with interim updates from the Group General Counsel outlining the Group's legal risks;

- a report from the Head of Group Compliance on the fraud prevention measures in place within the Group;

- quarterly reports from the Head of Group Internal Audit on the key issues arising from Internal Audit's inspection programme;

- Group Internal Audit's review of the effectiveness and application of the risk management process; and

- annual and regular reports from the Head of Group Internal Audit on the control environment.

The Board is of the view that there is an ongoing process for identifying, evaluating and managing the Group's significant risks and that:

- it has been in place for the year ended 31 December 2006 and up to the date of approval of the Annual Report and Accounts;

- it is regularly reviewed by the Board and complies with the internal control guidance for directors in the Combined Code; and

- necessary actions have been or are being taken to remedy any significant failings identified as part of the ongoing risk management process.

The Board advocates, encourages and supports continuous improvements in all Group activities, systems and procedures.






## Corporate and social responsibility

Schroders' Board and senior management recognise the importance of corporate and social responsibility to our employees, investors, the community and those in whom we invest. We have put in place policies to ensure that we act in a responsible way. Schroders' corporate and social responsibility policies and activities are covered in more detail at www.schroders.com. Some of the activities undertaken in 2006 are highlighted in this report.

### Socially responsible investment
As a fund manager our investment decisions have a far greater impact on society and the environment than our direct operational activities. We recognise that the cumulative economic impact of the companies and buildings in which we invest will be far greater than our own.

Our investment process incorporates research into the corporate responsibility performance of companies. Schroders engages with and lobbies companies where the scope of environmental, social and ethical codes falls short of acceptable standards to encourage the adoption of best practice and decrease long-term risks to performance. Our socially responsible investment policy follows the requirements of the ABI Disclosure Guidelines on Socially Responsible Investment and endorses the Voluntary Code on Shareholder Activism issued by the Institutional Shareholders Committee.

In addition to our engagement activities we also utilise the research of the Ethical Investment Research Service. This enables us to screen investable universes in order to reflect clients' values in their investment portfolios. At its most basic this could, for example, exclude tobacco producers from the investable universe for a cancer charity.

### Environment
We are committed to continuous improvement in minimising the negative environmental impact of our operations and to the promotion of positive environmental practices.

We try to balance business needs with the aim of reducing our consumption of materials. In 2006, paper consumption reduced by 12.7 per cent. from the previous year through increased office automation. We also saw an 11 per cent. reduction in waste generation during the year. Recycling targets were met in 2006, with 92 per cent. of waste being recycled or reused (compared with 88 per cent. in 2005).

The City of London Corporation once again recognised our efforts in effective waste management by giving Schroders a platinum rating in its Clean City Awards scheme for the second consecutive year in 2006. The platinum award places Schroders in the top 20 out of 1,040 buildings which were entered into the scheme, the objective of which is to raise the profile of effective waste management by recognising and rewarding good practice and encouraging the wider adoption of the principles of Reduce, Reuse and Recycle.

In support of domestic and internationally agreed targets to cut greenhouse gas emissions, we monitor energy use and promote efficient use of energy in our buildings. In 2006 energy consumption increased slightly to 457.15 KWh/m$^2$ (2005: 449.13 KWh/m$^2$) due to extended air conditioning and ventilation plant running times in support of building works throughout the year. We do however continue to identify any opportunities we can to reduce our energy usage.

### Community involvement and charitable giving
We actively encourage all employees to participate in the community and in civic and charitable causes. Involvement is seen not only to be valuable to the community, but also as a means of increasing employee awareness and skills and assisting in personal development which can then be applied in the business context.

Schroders' charitable giving is focused on employee choice. UK employees are encouraged to make charitable donations through the payroll system and, at the end of 2006, 19 per cent. of UK employees were participating, making charitable donations totalling £257,000 through this scheme. In 2006 Schroders donated £616,000 globally to a wide variety of charitable causes, as a result of matched giving and the support of selected charities in the communities in which employees work.





