of Shares to be converted, calculated by reference to the Net Asset Value per Share by (b) the Net Asset Value per Share of the new Class. This calculation will be adjusted where appropriate by the inclusion of a conversion charge (see paragraph 20 below) or a delayed initial charge on Class A, Class D or Class E Shares (see paragraph 20 below). No conversion charge will be made when a delayed initial charge is payable. If applicable, the relevant exchange rate between the relevant Dealing Currencies of the Shares of the two Funds will be applied to the calculation.

The Net Asset Value(s) per Share used in this calculation may reflect any adjustment(s) to the Net Asset Value(s) of the relevant Fund(s) described in paragraph 16(c) above.

20. Except as set out under the section "Switching Between Funds and Share Classes" above, no conversions are permitted between different Classes of Shares of the same Fund or of different Funds.

Selected distributors may impose a charge on each conversion of those Shares acquired through it, which will be deducted at the time of conversion and paid to the relevant distributor. While other conversions between the same Class of Shares of two Funds are normally free of charge, the Investment Manager may, at its discretion (and without prior notice), make an additional conversion charge which would increase the amount paid to up to 1% if unduly frequent conversions are made. Any such charges will be deducted at the time of conversion and paid to the relevant distributor or the Investment Manager (as applicable).

When Class A, Class D or Class E Shares of a Reserve Fund resulting from a direct investment into that or any other Reserve Fund ("direct Shares") are converted for the first time into Class A, Class D or Class E Shares of a non-Reserve Fund, a delayed initial charge of up to 5% of the price of the new Class A Shares or up to 3% of the price of the new Class E Shares (where applicable), or up to 2% of the price of the new Class D Shares, may be payable to the Investment Manager. Where a Reserve Fund holding includes both direct Shares and Shares acquired as a result of a conversion from Shares in any Fund other than a Reserve Fund ("ordinary Shares") a partial conversion of the holding will be treated as a conversion of the direct Shares first and then of the ordinary Shares.

The Directors reserve the right to waive or vary these requirements and also to amend their policy if they consider it appropriate to do so, either generally or in particular circumstances.

### Settlement on Redemptions

21. Payment of an amount to a single shareholder in excess of US$500,000 may be deferred for up to seven Business Days beyond the normal settlement date. The redemption price may be payable in specie as explained in paragraph 23 below. Failure to meet money laundering prevention requirements may result in the withholding of redemption proceeds. The Company reserves the right to extend the period of payment of redemption proceeds to such period, not exceeding eight Business Days, as shall be necessary to repatriate proceeds of the sale of investments in the event of impediments due to exchange control requirements or similar constraints in the markets in which a substantial part of the assets of the Company are invested or in exceptional circumstances where the liquidity of the Company is not sufficient to meet the redemption requests.

### In Specie Applications and Redemptions

22. Shares of the Company may be allotted as consideration for the vesting in the Company of securities acceptable to it and having a value (after deducting any relevant charges and expenses) equal to the price payable for the Shares. Such securities will be independently valued in accordance with Luxembourg law by a special report of an independent auditor, such report being deposited with the Register of Commerce and Companies of Luxembourg.

23. The obligation to pay redemption proceeds may also be satisfied by payment in specie by allocating to the holder (subject to their prior consent) investments from the portfolio of the relevant Fund equal in value (calculated in the manner referred to in paragraphs 13 and 14 above) to the price of the relevant Shares to be redeemed (net of any applicable CDSC in the case of Class B, Class C and Class Q Shares). The nature and type of asset to be transferred in such case will be determined on an equitable basis and without prejudicing the interests of the other holders of Shares of the same Class, and the valuations used will be confirmed by a special report of an independent auditor, deposited with the Register of Commerce and Companies of Luxembourg.

### Dealings in Shares by the Investment Manager

24. The Investment Manager, acting in its capacity as Principal Distributor, may as principal acquire and hold Shares and may at its sole discretion satisfy, in whole or in part, an application or request for the issue, redemption or conversion of such Shares by selling Shares to and/or buying them from the applicant, as appropriate, provided that the applicant consents to such transaction. Shareholders will be deemed to have consented to deal with the Investment Manager unless they have expressly informed the Transfer Agent or the Investor Service Centre to the contrary. Any such transaction will be effected on the same terms as to price and settlement as would have applied in the case of a corresponding issue, redemption or conversion of Shares (as relevant) by the Company. The Investment Manager is entitled to retain any benefit arising from these transactions.

### Default in Settlement

25. Where an applicant for Shares fails to pay settlement monies on subscription or to provide a completed application form for an initial application by the due date, the Directors may, in accordance with the Company's Articles, cancel the allotment or, if applicable, redeem the Shares. Redemption or conversion instructions may be refused or treated as though they have been withdrawn if payment for the Shares has not been made or a completed initial application form has not been received by the Company. In addition, no dealings will be effected following a conversion instruction and no proceeds will be paid on a redemption until all documents required in relation to the transaction have been provided to the Company. **An applicant may be required to indemnify the Company or, as described below, the Investment Manager against any losses, costs or expenses incurred directly or indirectly as a result of the applicant's failure to pay for Shares applied for or to lodge the required documents by the due date.**

In computing any losses covered under this paragraph 25, account shall be taken, where appropriate, of any movement in the price of the Shares concerned between the transaction date and cancellation of the transaction or redemption of the Shares, and of the costs incurred by the Company or, if applicable, the Investment Manager in taking proceedings against the applicant.

The Investment Manager has agreed to exercise its discretion (specified in the Company's Articles) to take steps to avoid the Company suffering losses as a result of late settlement by any applicant. In cases where payment for Shares is not made on a timely basis, the Investment Manager may assume ownership of the Shares and it shall also have the right to give instructions to the Company to make any consequent alterations in its register of shareholders, delay the completion of the relevant

transaction, redeem the Shares in question, claim indemnification from the applicant and/or take proceedings to enforce any applicable indemnity, all to the same extent that the Company *itself may do so.*

The Company has instructed the Custodian that any interest benefit that may arise as a result of the early settlement of Share subscriptions and late clearance of redemption proceeds may be set off against any interest obligation that the Investment Manager may incur as a result of its arrangements to protect the Company from losses from the late settlement of Share subscriptions.

### Compulsory Redemption

26. If at any time the Net Asset Value of the Company is less than US$25 million (or equivalent), all Shares not previously redeemed may be redeemed by notice to all shareholders. There is a similar power to redeem Shares of any Class if the Net Asset Value of the Fund to which that Class is linked falls below US$15 million (or equivalent), or in the circumstances described in paragraph 8 above.

### Limits on Redemption and Conversion

27. The Company will not be bound to redeem or convert on any one Dealing Day more than 5% of the value of Shares of all Classes of a Fund then in issue or deemed to be in issue, as described in paragraph 30 below.

### Suspension and Deferrals

28. Valuations (and consequently issues, redemptions and conversions) of any Class of Shares of a Fund may be suspended in certain circumstances including:

    - the closure of or suspension or restriction of trading on any stock exchange or market on which are quoted a substantial proportion of the investments held in that Fund;
    - the existence of any state of affairs which constitutes an emergency as a result of which disposals or valuation of assets owned by the Company attributable to such Class of Shares would be impracticable;
    - any breakdown in the means of communication normally employed in determining the price or value of any of the investments of such Class of Shares or the current price or values on any stock exchange or other market;
    - any period when the Company is unable to repatriate funds for the purpose of making payments on the redemption of such Shares or during which any transfer of funds involved in the realisation or acquisition of investments or payments due on redemption of shares cannot in the opinion of the directors be effected at normal rates of exchange;
    - any period when the net asset value per share of any subsidiary of the Company may not be accurately determined;
    - where notice has been given or a resolution passed for the closure or merger of a Fund as explained in paragraph 8;
    - in respect of a suspension of the issuing of Shares only, any period when notice of winding up of the Company as a whole has been given.

29. Each period of suspension shall be published, if appropriate, by the Company. Notice will also be given to any shareholder lodging a request for redemption or conversion of Shares.

30. The Company will also not be bound to redeem or convert any Shares of a Fund on any one Dealing Day if there are redemption or outgoing conversion orders that day for all Classes of Shares of that Fund with an aggregate value exceeding a particular level (currently fixed at 5%) of the approximate value of that Fund. In addition, the Company may defer redemptions and conversions in exceptional circumstances that may, in the opinion of the Directors, adversely affect the interests of holders of any Class or Classes of Shares of that Fund. In either case, the Directors may declare at their discretion that some or all redemptions and conversions may be deferred until the Company has executed, as soon as possible, the necessary realisation of assets out of the Fund concerned or until the exceptional circumstances cease to apply. This may result in some shareholders having redemption or conversion orders deferred on a particular Dealing Day, whilst others do not. Redemptions and conversions so deferred will be dealt with in priority to later requests.

31. During a period of suspension or deferral a shareholder may withdraw his request, in respect of any transaction which is deferred or suspended, by notice in writing to the Company. Such notice will only be effective if received before the transaction is effected.

Shareholders may not redeem a holding of the Company's Shares unless and until cleared funds have been received by the Company in respect of that holding.

### Non-Acceptance of Orders

32. The Directors also have power to decline to accept any order for redemption or conversion into a particular Fund on any one Dealing Day where the aggregate value of orders for all Classes of Shares of that Fund exceeds a particular value (currently fixed by the Directors at 5% by approximate value of the Fund concerned) and the Directors consider that to give effect to such orders on the relevant Dealing Day would adversely affect the interests of existing shareholders. In addition, the Company may defer redemptions or conversions in exceptional circumstances that may, in the opinion of the Directors, adversely affect the interests of holders of any Class or Classes of Shares of that Fund. In either case, the Directors may declare at their discretion that some or all redemptions or conversions may be declined on a particular Dealing Day, and this may result in some shareholders having redemption or conversion orders declined whilst others do not. In such circumstances the Directors will inform each applicant as soon as practicable and if the applicant wishes alternative instructions can be given.

### Transfers

33. The transfer of Registered Shares may normally be effected by delivery to the Transfer Agent of an instrument of transfer in appropriate form. If a transfer or transmission of Shares results in a holding on the part of the transferor or the transferee having a value of less than a prescribed minimum the Directors may require the holding to be redeemed. The current minimum is US$5,000 or equivalent.

### Probate

34. Upon the death of a shareholder, the Directors reserve the right to require the provision of appropriate legal documentation to evidence the rights of the shareholder's legal successor.

### Dividends

35. The Articles impose no restriction on dividends other than the requirement to maintain the statutory minimum level of capital (currently the equivalent of €1,250,000). The Directors have the power to pay interim dividends in respect of any Fund. The current dividend policy of the Directors is explained on page 23.

**Changes of Policy or Practice**

36. Except as otherwise provided in the Articles, and subject to any legal or regulatory requirements, the Directors reserve the right to amend any practice or policy stated in this Prospectus.

**Intermediary Arrangements**

37. Where Shares are issued by the Company to financial institutions (or their nominees) which act as intermediaries, the benefits and obligations described in the Prospectus may be applied by the Company to each of the intermediary's clients as if such client were a direct shareholder.

## Appendix C – Additional Information

### History of the Company

1. The Company is registered under Number B.6317 at the Register of Commerce and Companies of Luxembourg where its Articles of Association are available for inspection and where copies thereof may be obtained upon request (and see also paragraph 33 below).

2. The Company's constitution is defined in the Articles. The original Articles were published in the Recueil des Sociétés et Associations du Mémorial (the "Mémorial") of the Grand-Duchy of Luxembourg on 21st July 1962. The Articles have been amended and restated several times, most recently on 16 September 2005, with publication in the Mémorial on 16 September 2005.

3. The Company was incorporated as Selected Risk Investments S.A. on 14th June 1962.

4. With effect from 31st December 1985 the name of the Company was changed to Mercury Selected Trust, the Company adopted the legal status of a société d'investissement à capital variable (SICAV) and was reconstituted to enable it to issue different classes of Shares. It qualifies as an Undertaking for Collective Investment in Transferable Securities.

   With effect from 1 July 2002 the name of the Company changed to Merrill Lynch International Investment Funds.

   With effect from 16 September 2005 the Company was submitted to Part I of the law of 20 December 2002 that implements Directives 2001/107/EC and 2001/108/EC.

   With effect from 16 September 2005 the Company has appointed BlackRock (Luxembourg) S.A. (previously named Merrill Lynch Investment Managers (Luxembourg) S.A. as its management company.

5. As from the date of this Prospectus, Shares are offered solely on the basis of this Prospectus, which supersedes all previous versions.

### Directors' Remuneration and Other Benefits

6. There are no existing or proposed service contracts between any of the Directors and the Company and the Articles contain no express provision governing the remuneration (including pension or other benefits) of the Directors. The Directors receive fees and out-of-pocket expenses from the Company. Directors who are not representatives of the BlackRock Group currently receive a fee of US$30,000 per annum.

### Auditor

7. The Company's auditor is PricewaterhouseCoopers of 400 route d'Esch, L-1471 Luxembourg.

### Administrative Organisation

8. **The Investment Manager and the Investment Advisers**

   The Management Company and the Company have entered into an Investment Management Agreement with the Investment Manager whereby the Investment Manager is responsible for managing the assets of the Company. The Investment Manager is entitled to delegate its investment management functions to any of its subsidiaries or associates and, with the approval of the Management Company, any other person. The Investment Manager has delegated some functions to the Investment Advisers, BlackRock Financial Management, Inc., BlackRock International, Ltd, BlackRock Investment Management, LLC and BlackRock Investment Management (UK) Limited as described on page 7. In the case of certain Funds, BlackRock Investment Management (UK) Limited has in turn sub-delegated some functions to BlackRock Japan Co., Ltd. whose registered office is at Nihonbashi 1-chome Building, 1-4-1, Nihonbashi, Chuo-ku, Tokyo 103-0027, Japan. BlackRock Financial Management, Inc. has sub-delegated some functions to BlackRock International, Ltd., and BlackRock Investment Management (Australia) Limited of Level 18, 120 Collins Street, Melbourne 3000, Australia, BlackRock Investment Management (UK) Limited and BlackRock Japan Co. Ltd..

   The Investment Manager, incorporated with limited liability in Jersey on 10th August 1972 for an unlimited period, has an issued and fully paid-up share capital of £530,000 and carries on the business of, inter alia, investment management. The directors of the Investment Manager are: Mr. A.J. Arnold, Mr. G. Bamping, Mr. T. Beck, Mr. F.P. Le Feuvre, Mr. R.E.R. Rumboll and Mr. I Webster.

   The registered office of the Investment Manager is at Forum House, Grenville Street, St. Helier, Jersey JE4 8RL, Channel Islands.

   DSP Merrill Lynch Fund Managers ("DSPML-FM") provides non-binding investment advice to the Subsidiary. DSPML-FM is duly registered with the SEBI as an asset management company to DSP Merrill Lynch Mutual Fund and as a portfolio manager. DSPML-FM is a well reputed mutual fund asset manager in India and as of 31 December 2005 had assets under management of approximately US$1.9 billion.

   The Subsidiary is registered as a sub-account of BlackRock Investment Management (UK) Limited which is an entity registered as a Foreign Institutional Investor with the Securities and Exchange Board of India under the SEBI (Foreign Institutional Investors) Regulations, 1995 and invests in India under the provisions of the said regulations.

9. **The Investor Service Centre**

   The Investment Manager has entered into an Investor Services Agreement with BlackRock Investment Management (UK) Limited for the provision of an Investor Service Centre to provide dealing facilities and related investor support functions. Other BlackRock local offices also serve as local Investor Service Centres for customer enquiries only, the dealing facilities being always provided by BlackRock Investment Management (UK) Limited.

10. **The Custodian**

    The Company has entered into a Custodian Agreement with the Custodian whereby the Custodian has agreed to act as custodian of the assets of the Company and to assume the functions and responsibilities of a custodian under the Luxembourg law of 20th December 2002.

    The Custodian and Fund Accountant (see paragraph 12 below) is The Bank of New York Europe Limited, Luxembourg Branch. Its office is at Aerogolf Center, 1A Hoehenhof, L-1736 Senningerberg, Luxembourg. The Bank of New York Europe Limited was incorporated with limited liability in England on 9th August 1996 with an issued and fully paid up share capital of £200 million. Its registered office is One Canada Square, London E14 5AL and its ultimate holding company is The Bank of New York Company, Inc. which is incorporated in the United States of America. The Custodian's and the Fund Accountant's principal business activity is the provision of custodial and investment administration services and treasury dealing.

11. **The Fund Accountant**

    The Management Company and the Investment Manager have entered into an agreement with the Fund Accountant whereby the Fund Accountant has agreed to provide fund accounting, Net Asset Value determination and services related to these functions. Subject to Luxembourg law and regulation the Fund Accountant is entitled to delegate specific functions to any other person, firm or company (with the approval of the Management Company and the regulatory authority).

12. **The Transfer Agent**

    The Management Company and the Investment Manager have entered into a Transfer Agency Agreement with the Transfer Agent whereby the Transfer Agent has agreed to provide all necessary transfer agency functions including application and transaction processing, maintaining the share register, and services related to these functions.

13. **Relationship of Custodian and Fund Accountant with BlackRock Group**

    The Custodian's and Fund Accountant's associates provide custody and fund accounting services to BlackRock Investment Management (UK) Limited and some of its associates in respect of their investment management business generally. Under agreements between companies in The Bank of New York Company, Inc. ("BNY") group and some companies in the BlackRock Group relating to the provision of these services, payments due from the relevant companies in the BlackRock Group to BNY companies will be abated by the fees paid by the Company to the Custodian and Fund Accountant in respect of custodian and fund accounting services.

14. **The Paying Agents**

    The Company has appointed the following as Paying Agents:

    *Austria*
    Raiffeisen Zentralbank
    Österreich AG
    Am Stadtpark 9
    1030 Vienna

    *Belgium*
    Citibank Bank nv/sa
    Boulevard General Jacques 263g
    1050 Brussels

    *Germany*
    Commerzbank AG
    Kaiserplatz
    60261 Frankfurt am Main

    *Luxembourg*
    (Central Paying Agent)
    J.P. Morgan Bank Luxembourg S.A.
    6C, route de Trèves
    L-2633, Senningerberg

    *Italy*
    Banca Intesa Spa
    Piazza Paolo Ferrari 10
    10121 Milan

    Banca Popolare Commercio e Industria Spa
    Via della Moscova 33
    20121 Milan

    BNP Paribas Securities Services
    Succarsale di Milano – Via Ansperto 5
    20123 Milan

    *Poland*
    Bank Handlowy w Warszawie S.A.
    ul. Senatorska 16
    00-923 Warsaw

    *Switzerland*
    HSBC Private Bank (Suisse) S.A.
    Paradeplatz 5
    CH-8022 Zürich

    *United Kingdom*
    UBS Warburg (a financial services group of UBS A.G.)
    1 Finsbury Avenue
    London EC2M 2PP
    Attention: Corporate Action - Paying Agency

15. **The Subsidiary**

    In normal conditions, the India Fund will invest in securities through the wholly-owned subsidiary of the Company, Merrill Lynch India Equities Fund (Mauritius) Limited. The Subsidiary is incorporated as a private company, limited by shares. The Subsidiary is organised as an open-ended multi-class fund and holds a Category 1 Global Business Licence for the purpose of the Financial Services Development Act 2001 and is regulated by the Financial Services Commission, Mauritius ("FSC"). It must be understood that in giving this authorisation, the FSC does not vouch for the financial soundness or the correctness of any of the statements made or opinions expressed with regard to the Subsidiary.

    The Subsidiary was incorporated on 1 September 2004, and has an unlimited life. It is a wholly-owned subsidiary of the Company. The Subsidiary is registered with the Registrar of Companies, Mauritius, and bears file number 52463/C1/GBL. The Constitution is available for inspection at the registered office of the Subsidiary.

    The authorised capital of the Subsidiary is US$ 5,000,000,100 and is divided into 100 management shares of nominal value US $1.00 each, which are issued to the Company; 4,000,000,000 class A redeemable participating shares of nominal value US $1.00 each of which may be issued as A shares ("A Shares"), which may only be issued to the Company; and 1,000,000,000 redeemable participating shares of nominal value US $1.00 each of which may be issued to the Company in such classes of participating shares as the directors may determine with such preferred or qualified or other special rights or restrictions whether in regard to voting, dividend, return of capital or otherwise. Additional classes of shares may be issued to the Company at a later stage in accordance with the Subsidiary's Constitution. The Subsidiary issues registered shares only.

    The board of directors of the Subsidiary may for efficient management authorise a committee of directors to issue participating shares of the Subsidiary on such terms as approved by the board.

    The business and affairs of the Subsidiary are managed by the directors. The directors of the Subsidiary are Mr. Geoff Radcliffe, Mr. Frank Le Feuvre and Mr. Jean-Claude Wolter as non-resident directors and Mr. Couldip Basanta Lala and Mr. Dev Joory as resident directors. At any time, the directors of the Subsidiary will comprise a majority of directors who are also Directors of the Company. The directors are responsible, inter alia, for establishing the investment objectives and policy of the

Subsidiary and for monitoring the Subsidiary's investments and performance.

The Subsidiary acts solely in favour of the Company and its sole object is to carry out activities in favour of the Company and the Funds.

The Subsidiary complies with the investment restrictions of the Company.

The Subsidiary has appointed BlackRock Investment Management (UK) Limited as its investment manager and DSP Merrill Lynch Fund Managers Ltd to act as its Indian Investment Adviser.

International Financial Services Limited ("IFSL"), Mauritius has been appointed by the Subsidiary as its administrator and secretary (the "Mauritian Administrator"). IFSL is a leading offshore management company incorporated in Mauritius and licensed by the Financial Services Commission (FSC) to provide advisory and management services for international businesses.

The Mauritian Administrator carries on the general administration of the Subsidiary, keeps or causes to be kept the accounts of the Subsidiary and such financial books and records as are required by law or otherwise for the proper conduct of its financial affairs. The Mauritian Administrator calculates the net asset value per share on each valuation day and the subscription price and redemption price in accordance with the Constitution. The Mauritian Administrator convenes meetings of the directors, keeps the statutory books and records of the Subsidiary, maintains the register of shareholders and makes all returns required to be made by the Subsidiary under the laws of Mauritius. The Mauritian Administrator is responsible for all tax filings in Mauritius relating to the Subsidiary.

The Subsidiary has entered into a Custodian Agreement with the Custodian and the Company whereby the Custodian has agreed to act as custodian of the assets of the Subsidiary and the Company.

The Subsidiary has appointed the Mauritian Auditor as auditor of the Subsidiary in Mauritius to perform the auditor's duties required by Mauritius law. The Company and the Subsidiary shall issue consolidated accounts. All assets and liabilities, income and expenses of the Subsidiary are consolidated in the statement of net assets and operations of the Company. All investments held by the Subsidiary are disclosed in the accounts of the Company. All cash, securities and other assets of the Subsidiary are held by the Custodian on behalf of the Company.

**Indian Investment Adviser to the Subsidiary**
DSP Merrill Lynch Fund Managers Ltd
Tulsiani Chambers, West Wing, 11th Floor, Nariman Point, Mumbai - 400 021, India

**Mauritian Auditor to the Subsidiary**
PricewaterhouseCoopers
6th Floor, Cerné House, Chaussée, Port Louis, Mauritius

**Mauritian Administrator to the Subsidiary**
IFS International Financial Services Limited
IFS Court, Twenty Eight, Cybercity, Ebene, Mauritius

---

[1] Education cess is an additional surcharge on income-tax and surcharge, introduced by the Finance (No.2) Act, 2004 and continued under the Finance Act 2005.

16. **Taxation of the Subsidiary and the India Fund**

**Mauritius**
The Subsidiary shall hold a Category 1 Global Business Licence for the purpose of the Financial Services Development Act, 2001 ("FSD Act") and is liable to tax in Mauritius at the rate of 15% on its net income. However, the Subsidiary will be entitled to a foreign tax credit equivalent to the higher of the actual foreign tax suffered or a deemed tax credit of 80% of the Mauritian tax on its foreign source income. This will result in a maximum effective income tax rate of 3% on foreign source income. The Subsidiary is not subject to capital gains tax in Mauritius.

No tax on capital gains will be payable in Mauritius on disposals by the Subsidiary of Indian securities. There is no withholding tax payable in Mauritius in respect of payments of dividends to shareholders or in respect of redemption or exchange of shares held in the Subsidiary.

The Subsidiary has obtained a tax residence certificate from the Mauritian authorities and such certification is determinative of its resident status for treaty purposes. Accordingly, the Subsidiary qualifies as a resident of Mauritius for the purposes of the India/Mauritius Double Tax Avoidance Treaty (the "Treaty"). On this basis, the Subsidiary is entitled to certain reliefs from Indian tax, subject to the continuance of the current terms of the Treaty.

Shareholders are not subject to any wealth, capital gains, income, withholding, gift, estate, inheritance or other tax in Mauritius (except for shareholders domiciled, resident or having a permanent establishment in Mauritius).

**India**
The following are the tax implications on the income earned by the Subsidiary or as the case may be, the India Fund from Indian portfolio companies.

The Subsidiary, or as the case may be, the India Fund, has income in the form of capital gains, income from dividends and income from interest.

A. The tax consequences for the Subsidiary on account of the application of the Treaty, read with the provisions of the Indian Income Tax Act, 1961 ("ITA") are as follows:

1. Capital gains resulting from the sale of Indian securities (including Foreign Currency Convertible Bonds) or Global Depositary Receipts ("GDRs") or American Depositary Receipts ("ADRs") issued by Indian companies will not be subject to tax in India, provided the Subsidiary does not have a permanent establishment in India; however, the purchase and sale of Indian securities in a recognised stock exchange in India is subject to a Securities Transaction Tax (STT) as discussed below. This tax has been recently introduced by the Finance (No.2) Act, 2004;

2. Dividends on shares received from an Indian company on which dividend distribution tax has been paid are exempt from tax in the hands of the shareholders. Thus, any dividends distributed by the Indian portfolio companies are not be subject to tax in India, provided the company paying the dividends pays a dividend distribution tax of 12.5% (plus surcharge and education cess [1]);

3. Interest income from Indian securities is taxed at the rate of 20% (plus surcharge and education cess); (if the interest income arises out of the Subsidiary's

subscription to Foreign Currency Convertible Bonds, the interest will be taxed at the rate of 10% (plus surcharge and education cess)];

B. The tax consequences for:

(i) The Subsidiary (in the event Treaty benefits are not available to the Subsidiary); or
(ii) The India Fund.

are governed by the provisions of the ITA which are as follows:

(i) Dividends on shares received from an Indian company on which dividend distribution tax has been paid are exempt from tax in the hands of the shareholders. Thus, any dividends distributed by the Indian portfolio companies to the Subsidiary or, as the case may be, the India Fund are not subject to tax in India, provided the company paying the dividends pays a dividend distribution tax of 12.5% (plus surcharge and education cess as applicable);

(ii) Interest income from Indian securities is taxed at the rate of 20% (plus surcharge and education cess as applicable); (if the interest income arises out of the Subsidiary's or, as the case may be, India Fund's subscription to Foreign Currency Convertible Bonds, the interest will be taxed at the rate of 10% (plus surcharge and education cess)];

(iii) Capital gains from the sale of Indian securities held for 12 months or less is taxed as short-term capital gains at the rate of 30% (plus surcharge and education cess);. However, if the short-term capital gains arises on the sale of a listed security in a recognised stock exchange in India, the rate of tax shall be 10% (plus surcharge and education cess) provided STT as discussed below has been paid on such transfer;

(iv) Capital gains from the sale of Indian securities held for more than 12 months are taxed as long-term capital gains at the rate of 10% (plus surcharge and education cess). However, if the long-term capital gains arise on the sale of a listed security in a recognised stock exchange in India, the same will not be subject to tax provided the STT as discussed below has been paid on such transfer.

All Indian taxes mentioned at A & B above are exclusive of the currently applicable surcharge of 2.5% (for companies) on the Indian tax and education cess at the rate of 2% on tax and surcharge. In respect of dividend distribution tax mentioned in A.2. and B(i) above, the applicable surcharge is 10% on the Indian tax.

The Subsidiary, or, as the case may be, the India Fund is liable to pay STT. The rates of STT with effect from 1 June 2005 are as follows:

- 0.1% on purchase of equity shares in a company or units of equity oriented funds in a recognised stock exchange in India.
- 0.1% on sale of equity shares in a company or units of equity oriented funds in a recognised stock exchange in India
- 0.02% on sale of equity shares in a company or units of equity oriented funds in a recognised stock exchange in India where the contract for sale is settled otherwise then by the actual delivery or transfer of share or unit.
- 0.0133% on sale of derivatives in a recognised stock exchange in India.
- 0.2% on sale of units of an equity oriented fund to the Mutual Fund.

In the event the gains on sale of shares is taxed under the head, "Profits and Gains of Business or Profession" the Subsidiary (in case the Subsidiary is held to have a permanent establishment in India and such gains are attributable to the permanent establishment) or, as the case may be, the India Fund, will be liable to tax at the rate of 40% (plus surcharge and education cess as indicated above). Credit for STT paid will be available against income tax on income arising from transactions on which STT has been paid.

### Special Risk Considerations for the India Fund

The India Fund invests through the Subsidiary, which invests in Indian portfolio companies under the SEBI (Foreign Institutional Investors) Regulations, 1995. The India Fund may also invest directly or through its Subsidiary in foreign securities issued by Indian companies.

Investors should note that the Subsidiary relies upon the provisions of the Treaty to minimise, so far as possible the taxation of the Subsidiary. No assurance can be given that the terms of the Treaty will not be subject to review in the future and any change could have a material adverse effect on the returns of the Subsidiary. The repeal or amendment of the Treaty, a change in the Mauritius or Indian domestic tax laws, or a change of policy of the Mauritian or Indian tax authorities may adversely affect the tax treatment of the investment of the India Fund and/or the taxation of the Subsidiary and, as a consequence, the value of the India Fund's shares. There can be no assurance that the Treaty will continue and will be in full force and effect during the life of the Subsidiary.

The current status of the Treaty is that following the issue of assessment orders against certain Mauritian resident companies deriving benefits under the Treaty during 2000, the Indian Central Board of Direct Taxes ("CBDT") issued Circular 789 [the "Circular"] on 13 April 2000. The Circular clarified that a certificate of tax residence issued by the Mauritian tax authorities was sufficient evidence for accepting the status of the residence as well as beneficial ownership for purposes of applying the Treaty. The Supreme Court has recently upheld the validity of the Circular. Accordingly, the Subsidiary should be eligible to claim the benefit of the Treaty. It is to be noted that a curative petition has been filed in the Supreme Court against the above order. The Supreme Court has not yet admitted this petition. The Directors will keep under review the progress of this petition and may at any time implement a policy to provide for any potential tax liability in the price of the Shares. Any such provision will be affected in the Net Asset Value of the Fund.

### Fees, Charges and Expenses

17. The Investment Manager is entitled to management fees based on the Net Asset Value of each Fund, as shown in Appendix E.

18. The Custodian receives annual fees, based on the value of securities, which accrue daily, plus transaction fees. The annual fees range from 0.011% to 0.608% per annum and the transaction fees range from US$13 to US$157 per transaction. The rates for both categories of fees will vary according to the country of investment and, in some cases, according to asset class. Investments in bonds and developed equity markets will be at the lower end of these ranges, while some investments in emerging or developing markets will be at the upper end. Thus the custody cost to each Fund will depend on its asset allocation at any time.

The Transfer Agent receives annual fees calculated according to (a) the number of holdings (ranging from US$9 to US$25 per holding), (b) transaction processing (ranging from US$2 to US$13.35 per transaction, depending on the transaction type), and (c) Fund/Share class annual maintenance fees (ranging from US$2,000 to US$20,000 depending on the number and type of Funds/Share Classes).

The Fund Accountant receives annual fees calculated according to the Net Asset Value of each Fund, ranging from 0.015% to 0.023%.

19. The Investment Manager, in its capacity as Principal Distributor, is entitled to receive:

- the initial charge of up to 5% of the price of the Class A Shares issued, where levied;

- the initial charge of up to 2% of the price of the Class D Shares issued, where levied;

- the initial charge of up to 3% of the Net Asset Value of the Class E Shares issued, where applicable and levied;

- the CDSC on redemptions if the Investment Manager is acting as distributor;

- any delayed initial charge on Class A or Class E Shares, respectively;

- the Investment Manager's charge on unduly frequent conversions of any Class of Shares (see paragraph 20 of Appendix B); and

- any distribution fees.

20. Subject to the approval of the board of Directors, the Management Fee for any Fund may be increased up to 2.25% by giving shareholders at least three months' prior notice. Any increase to the Management Fees above this level would require approval of shareholders at an extraordinary general meeting. At least one month's notice will be given to shareholders of any increase in the rates of other fees and charges specified in this Prospectus, unless prior shareholder consent is required under the Company's Articles when at least one month's notice will be given from the date of such consent.

21. The Investment Manager is entitled at its sole discretion and without recourse or cost to the Company to rebate all of or part of its fees and charges and to pay commission to any investors (including discounts on charges to directors and employees of the Investment Manager and its affiliates) or its distributor or agents in respect of any subscriptions for, redemption or holdings of, Shares.

22. The Company bears all expenses incurred in the operation of the Company (whether incurred directly or by the Management Company, the Custodian, the Paying Agents, the Fund Accountant, the Principal Distributor, the Transfer Agent, the Investment Manager and its affiliates, or the Investor Service Centre), including, without limitation, taxes, expenses for legal and auditing services, costs of printing proxies, share certificates, shareholders' reports and statements, prospectuses and other offering documents and other required documentation, the expenses of issue and redemption of Shares and payment of dividends, foreign exchange costs arising in the calculation of the dealing prices in the additional Dealing Currencies, registration fees due to supervisory authorities in various jurisdictions and other related expenses, fees and out-of-pocket expenses of the Directors of the Company, insurance, interest, listing and brokerage costs, and the costs of computation and publication of Net Asset Values and prices. The expenses borne by the Company also include costs incurred by distributors and agents in complying with local regulatory requirements and other costs specifically incurred by them with the approval of the Directors.

23. If a Fund is closed at a time when any expenses previously allocated to that Fund have not been amortised in full, the Directors shall determine how the outstanding expenses should be treated, and may, where appropriate, decide that the outstanding expenses should be met by the Fund as a liquidation expense.

24. The operating costs of the Subsidiary including the fees for the Mauritian Administrator, estimated at approximately US$ 36,800 per year, are borne by the Subsidiary. There are no management fees borne by the Subsidiary.

25. The India Fund was launched upon its merger with the Merrill Lynch Specialist Investment Funds – India Fund and the unamortized expenses of that fund of US$ 120,241.50 were carried over to the India Fund as part of the merger process.

**Relationships within the BlackRock Group and with the ML Group and the PNC Group**

26. The ultimate holding company of the Management Company, the Investment Manager and the Investment Advisers is BlackRock, Inc., a company incorporated in Delaware, USA. Merrill Lynch & Co., Inc. and PNC Bank N.A. are substantial shareholders in BlackRock, Inc.

27. Subject to any policies established by the Directors, when arranging investment transactions for the Company, the Investment Advisers will seek to obtain the best net results for the Company, taking into account such factors as price (including the applicable brokerage commission or dealer spread), size of order, difficulty of execution and operational facilities of the firm involved and the firm's risk in positioning a block of securities. Therefore, whilst the Investment Advisers generally seek reasonably competitive commission rates, the Company does not necessarily pay the lowest commission or spread available. In a number of developing markets, commissions are fixed pursuant to local law or regulation and, therefore, are not subject to negotiation.

28. When arranging transactions in securities for the Company, companies in the ML Group or the PNC Group may provide securities brokerage, foreign exchange, banking and other services, or may act as principal, on their usual terms and may benefit therefrom. Commissions will be paid to brokers and agents in accordance with the relevant market practice and the benefit of any bulk or other commission discounts or cash commissions rebates provided by brokers or agents will be passed on to the Company. The services of ML Group or PNC Group companies may be used by the Investment Advisers where it is considered appropriate to do so provided that (a) their commissions and other terms of business are generally comparable with those available from unassociated brokers and agents in the markets concerned, and (b) this is consistent with the above policy of obtaining best net results. Consistent with the above policies, it is anticipated that a proportion of the Company's investment transactions will be executed through ML Group or PNC Group broker dealers and that they will be amongst a relatively small group of global firms which may each be assigned a larger proportion of transactions than the proportion assigned to any other firm.

29. Subject to the foregoing, and to any restrictions adopted by the Directors or set forth in the Articles, the Investment Manager, the Investment Advisers and any other BlackRock Group company or an ML Group or PNC Group company, and any directors of the foregoing, may (a) have an interest in the Company or in any transaction effected with or for it, or a relationship of any description with any other person, which may involve a potential conflict with their respective duties to the Company, and (b) deal with or otherwise use the services of ML Group or PNC Group companies in connection with the performance of such duties; and none of them will be liable to account for any profit or remuneration derived from so doing.

    For example, such potential conflicts may arise because the relevant BlackRock Group company, ML Group company or PNC Group company:

    (a) undertakes business for other clients;

    (b) has directors or employees who are directors of, hold or deal in securities of, or are otherwise interested in, any company the securities of which are held by or dealt in on behalf of the Company;

    (c) may benefit from a commission, fee, mark-up or mark-down payable otherwise than by the Company in relation to a transaction in investment;

    (d) may act as agent for the Company in relation to transactions in which it is also acting as agent for the account of other clients of itself;

    (e) may deal in investments and/or currencies as principal with the Company or any of the Company's shareholders;

    (f) transacts in units or shares of a collective investment scheme or any company of which any ML Group company, BlackRock Group company or PNC Group company is the manager, operator, banker, adviser or trustee;

    (g) may effect transactions for the Company involving placings and/or new issues with another of its group companies which may be acting as principal or receiving agent's commission.

30. As described above, securities may be held by, or be an appropriate investment for, the Company as well as by or for other clients of the Investment Manager, the Investment Advisers or other BlackRock Group companies. Because of different objectives or other factors, a particular security may be bought for one or more such clients, when other clients are selling the same security. If purchases or sales of securities for the Company or such clients arise for consideration at or about the same time, such transactions will be made, insofar as feasible, for the relevant clients in a manner deemed equitable to all. There may be circumstances when purchases or sales of securities for one or more BlackRock Group clients have an adverse effect on other BlackRock Group clients.

31. With respect to the Funds (or portion of a Fund) for which they provide investment management and advice, BlackRock Financial Management, Inc., BlackRock International, Ltd., BlackRock Investment Management, LLC and any of their affiliates and connected persons may effect transactions by or through the agency of another person with whom BlackRock Financial Management, Inc., BlackRock International, Ltd., BlackRock Investment Management, LLC and any of their affiliates and connected persons have an arrangement under which that party will, in accordance with applicable law, from time to time provide to or procure for BlackRock Financial Management, Inc., BlackRock International, Ltd., and BlackRock Investment Management, LLC and any of their affiliates and connected persons goods, services or other benefits such as research and advisory services, computer hardware associated with specialised software or research services and performance measures etc., the nature of which is such that their provision can reasonably be expected to benefit the Funds as a whole and may contribute to an improvement in the Funds' performance and that of BlackRock Financial Management, Inc, BlackRock International, Ltd., BlackRock Investment Management, LLC and any of their affiliates and connected persons in providing services to the Funds and for which no direct payment is made but instead BlackRock Financial Management, Inc., BlackRock International, Ltd., BlackRock Investment Management, LLC and any of their affiliates and connected persons undertake to place business with that party. For the avoidance of doubt, such goods and services do not include travel, accommodation, entertainment, general administrative goods or services, general office equipment or premises, membership fees, employee salaries or direct money payments. Soft dollar commissions may be retained by BlackRock Financial Management, Inc., BlackRock International, Ltd., BlackRock Investment Management, LLC and any of their affiliates and connected persons provided that the brokerage rates are not in excess of customary institutional full-service brokerage rates.

32. For investments in the units of other UCITS and/or other UCIs that are managed, directly or by delegation, by any BlackRock Group company, no management, subscription or redemption fees may be charged to the Company on its investment in the units of such other UCITS and/or other UCIs.

33. With reference to Paragraph 3.5. of Appendix A, the Company has appointed BlackRock Investment Management, LLC as its stocklending agent. BlackRock Investment Management, LLC has the discretion to arrange stock loans with highly rated specialist financial institutions (the "counterparties"). Such counterparties can include associates of BlackRock Investment Management, LLC. Collateral, in the form of cash, could be subsequently invested in money market instruments with a rating of A-1 or equivalent. Collateral is marked to market on a daily basis and stock loans are repayable upon demand. At the cost of the Company, BlackRock Investment Management, LLC receives remuneration in relation to its activities above. Such remuneration shall not exceed 40% of the revenue from the activities.

**Statutory and Other Information**

34. Copies of the following documents (together with a certified translation thereof where relevant) are available for inspection during usual business hours on any weekday (Saturdays and Public Holidays excepted) at the registered office of the Company and at the offices of BlackRock (Luxembourg) S.A., 6D route de Trèves, L-2633 Senningerberg, Luxembourg:

    (a) the Articles of Association of the Company; and

    (b) the material contracts entered into between the Company and its functionaries (as varied or substituted from time to time).

    A copy of the Articles of Association of the Company may be obtained free of charge at the above addresses.

## Appendix D - Authorised Status

### Austria
The Company has notified the Financial Market Authority of its intention to distribute its Shares in Austria pursuant to Article 36 of the Investment Fund Act 1993. This Full Prospectus is available in a German language version, which includes additional information for Austrian investors.

### Bahrain
Approval has been granted by the Bahrain Monetary Agency to market the Company in Bahrain, subject to its Regulation, Governing Collective Investment Schemes including regulations and principles on the General Supervision, Operation and Marketing of Collective Investment Schemes. The Bahrain Monetary Agency takes no responsibility for the financial soundness of the Company or for the correctness of any statement made or expressed in relation thereto.

### Belgium
The Company has been registered with the Banking and Finance Commission in accordance with Article 130 of the Act of 20 July 2004 relating to financial transactions and the financial markets. The French language version of this Prospectus distributed in Belgium includes additional information for Belgian investors.

### Brunei
The Company's administrator in Brunei is The Hong Kong and Shanghai Banking Corporation Limited, Brunei Darussalam, who holds a license to distribute Shares of the Company pursuant to Section 7 of the Mutual Funds Order 2001. Shares may only be publicly distributed in Brunei by the Company's Brunei administrator.

### Chile
The Company has obtained the registration of certain Funds with the Risk Classification Commission in Chile following an application by a local pension fund manager. The Company's Shares may only be sold to certain Chilean pension funds.

### Denmark
Approval has been granted to the Company by the Danish Financial Supervisory Authority (Finanstilsynet) in accordance with Sections 11 and 12 of the Danish Act on Investment Associations, Special-Purpose Associations and other Collective Investment Schemes etc. (Consolidated Act no. 768 of 19 July 2005) to market its Shares to institutional investors in Denmark. The simplified prospectus as well as certain information on taxation is available in Danish.

### Finland
The Company has notified the Financial Supervision Authority in accordance with Section 127 of the Act on Common Funds (29.1.1999/48) and by virtue of confirmation from the Financial Supervision Authority the Company may publicly distribute its Shares in Finland. This Prospectus and all other information and documents that the Company must publish in Luxembourg pursuant to applicable Luxembourg Law are translated into Finnish and are available for Finnish investors at the offices of the appointed distributors in Finland.

### France
The requirements of General Regulation of the "Autorité des Marchés Financiers" (the "AMF") having been met, the Company has been authorised to market its Shares in France. Credit Agricole Indosuez will perform the services of Centralising Correspondent in France. This Prospectus is available in a French language version that includes additional information for French investors. The additional information for French investors should be read in conjunction with the Prospectus. Documentation relating to the Company can be inspected at the offices of Crédit Agricole Indosuez, 91-93, boulevard Pasteur, 75710 Paris Cedex 15, France, during normal business hours and copies of the documentation can be obtained from them if required.

### Germany
The requirements of Section 132 of the German Investment Act have been met and the Company's Shares may be distributed publicly in the Federal Republic of Germany. This Prospectus is available in a German language version, which includes additional information for German investors.

### Gibraltar
The Company has obtained the status of a recognised scheme under Section 24 of the Gibraltar Financial Services Ordinance, 1989. By virtue of a confirmation from the Financial Services Commission the Company may publicly distribute its Shares in Gibraltar.

### Greece
Approval has been granted to the Company by the Capital Markets Committee in accordance with the procedures of Articles 49a and 49b of the Law 1969/1991, to distribute its Shares in Greece. This Prospectus is available in a Greek language translation. It must be noted that the relevant Capital Markets Committee guidelines provide that "Mutual Funds do not have a guaranteed return and that previous performance does not secure future performance".

### Guernsey
Consent under the Control of Borrowing (Bailiwick of Guernsey) Ordinances, 1959 to 1989, has been obtained to the circulation of this Prospectus in Guernsey. Neither the Guernsey Financial Services Commission nor the States Advisory and Finance Committee takes any responsibility for the financial soundness of the Company or for the correctness of any of the statements made or opinions expressed with regard to it.

### Hong Kong
The Company is authorised as a mutual fund corporation by the Securities and Futures Commission in Hong Kong. The Commission takes no responsibility for the financial soundness of any schemes or for the correctness of any statements made or opinions expressed in this Prospectus. This Prospectus is available for Hong Kong residents in both English and Chinese. Investors using the English language Prospectus should read the Prospectus in conjunction with the Hong Kong addendum, which contains additional information for Hong Kong residents. This additional information is also contained in the English/Chinese Summary of Prospectus that is available for Hong Kong investors who are considering applying for Class A Shares other than through Merrill Lynch. The Company's representative in Hong Kong is BlackRock (Hong Kong) Limited.

### Ireland
The requirements of Regulations 86 and 90 of the European Communities (Undertakings for Collective Investment in Transferable Securities) Regulations, 1989 having been met, the Central Bank of Ireland has confirmed that the Company may market its Shares in Ireland (subject to the provisions of Regulation 87). AIB/BNY Fund Management Limited will perform the services of facility agent in Ireland. Documentation relating to the Company can be inspected at AIB/BNY Fund Management Limited's offices at Guild House, Guild Street, IFSC, Dublin 1, Ireland during normal business hours and copies of the documentation can be obtained from them if required. AIB/BNY Fund Management Limited will also forward any redemption or dividend payment requests or any complaints relating to the Company to the Transfer Agent.

### Iceland
The Company has notified the Icelandic Financial Supervision Authority (Fjármálaeftirliti) in accordance with Section 43 of the Act No. 30/2003 on Undertakings for Collective Investment in Transferable Securities