Jay S. Berke  (JB 6500)
A Member of the Firm
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
(212) 735-3000
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| BLACKROCK, INC., | : |
| | : 07 Civ. 3183 (PKL) |
| Plaintiff, | : |
| | : ECF CASE |
| - against - | : ELECTRONICALLY FILED |
| | : |
| SCHRODERS PLC. | : |
| | : |
| Defendant. | : |
| | : |
| | : |
| | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**COMPENDIUM OF UNREPORTED DECISIONS CITED IN PLAINTIFF
BLACKROCK, INC.'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

# INDEX

**CASES**                                                                                    **TAB**

Daewoo International (America) Corp. Creditor Trust v. SSTS America Corp., No. 02
    Civ. 9629 (NRB) 2004 WL 830079 (S.D.N.Y. Apr. 13, 2004)...................................1

Dagen v. CFC Group Holdings Ltd., No. OO Civ 5682 (DAB)(THK), 2002 U.S. Dist.
    LEXIS 25767 (Mar. 7, 2002)........................................................................................2

Dubied Machinery Co. v. Vermont Knitting Co., Inc., 1992 WL 142044 (S.D.N.Y. June
    3, 1992)........................................................................................................................3

Four Seasons Solar Products Corp. v. Solarium Systems, Inc., No. 86 C 3468, 1987 WL
    4818 (E.D.N.Y. May 6, 1987) ......................................................................................4

Georgiadis v. First Boston Corp., No. 90 Civ 7672 (PLK), 1994 WL 39229 (S.D.N.Y.
    July 27, 1994) ..............................................................................................................5

Haugh v. Schroders plc, No. Civ. 600651/03 (N.Y. Sup. Ct. Nov. 24, 2003)...................6

Kirch v. Liberty Media Corp., No. 04 Civ. 667(NRB), 2006 WL 3247363 (S.D.N.Y.
    2006)............................................................................................................................7

Klonis v. National Bank of Greece, No. 05 Civ. 6289 PKC DF, 2007 WL 959257
    (S.D.N.Y. Mar. 28, 2007).............................................................................................8

Manufacturing Technology, Inc. v. Kroger Co., No. 06 Civ. 3010(JSR), 2006 WL
    3714445 (S.D.N.Y. Dec. 13, 2006) ..............................................................................9

Self International (HK) Ltd. v. La Salle National Bank, Chicago, No. 01 CV 4291(RCC),
    2002 WL 500372 (S.D.N.Y. Mar. 29, 2002)...............................................................10

Sierra Rutile Ltd. v. Katz, No. 90 Civ. 4913 (JFK), 1992 WL 236208 (S.D.N.Y. Sept. 8,
    1992)...........................................................................................................................11

Tsegaye v. Impol Aluminum Corp., 01 Civ. 5943, 2003 WL 221743 (S.D.N.Y. Jan. 30,
    2003)...........................................................................................................................12

1

Westlaw.

Not Reported in F.Supp.2d                                                           Page 1
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Daewoo Intern. (America) Corp. Creditor Trust v.
SSTS America Corp.
S.D.N.Y.,2004.
Only the Westlaw citation is currently available.
    United States District Court,S.D. New York.
DAEWOO INTERNATIONAL (AMERICA) CORP.
    CREDITOR TRUST, Plaintiff,
                    v.
SSTS AMERICA CORP., and Shingsung Tongsang
        Co., Ltd. Defendant.
        **No. 02 Civ. 9629(NRB).**

            April 13, 2004.

Steven Har, Duane Morris LLP, New York, NY, for
Plaintiff.
Eric S. Weinstein, Feldman, Weinstein, LLP, New
York, NY, for Defendant.

        MEMORANDUM AND ORDER
BUCHWALD, J.
**\*1** Plaintiff, Daewoo International (America) Corp.
Creditor Trust ("Daewoo" or "Plaintiff") and defend-
ants SSTS America Corp. ("SSTS America") and
Shinsung Tongsan Co., Ltd. ("SSTS Korea")
(collectively, "defendants") cross-move for summary
judgment. Daewoo seeks an order awarding judgment
in its favor on all claims in the complaint and defend-
ants seek dismissal of plaintiff's complaint in its en-
tirety. For the following reasons, both plaintiff's and
defendants' motions are granted in part and denied in
part.

            BACKGROUND

A. Plaintiff's Allegations Against SSTS [FN1]

    FN1. Our summary of plaintiff's allegations
    is based on plaintiff's Complaint and the
    parties' Local Rule 56.1 Statements.

Plaintiff alleges that in or about July 1995, SSTS
entered into an agreement (the "Agreement") with
Daewoo wherein Daewoo would provide loans and
financing to SSTS America in order to help it set up
and operate its business in the state of New York.
Under the Agreement, Daewoo would provide SSTS
America with loans to be paid back on a monthly
basis plus interest. According to the plaintiff, the
Agreement also called for Daewoo to provide a line
of credit to SSTS America in the amount of up to
$2,500,000 per year, which was to be adjusted from
time to time. Under this provision, SSTS America
was to purchase all goods through Daewoo. Daewoo
would then invoice SSTS America for the goods and
SSTS America would pay Daewoo the invoiced
amount plus interest and a commission. While the de-
fendant made certain payments in accordance with
the Agreement, plaintiff alleges that it failed to pay
all monies owed.

        B. The Present Action

Plaintiff filed the instant action against defendants in
New York State Supreme Court asserting causes of
action for breach of contract, account stated, goods
sold and delivered, breach of guaranty, unjust enrich-
ment and quantum meruit. On December 4, 2002, the
case was removed to this Court, and on January 24,
2003 SSTS America filed its answer including as af-
firmative defenses the rights of recoupment and
setoff. On April 4, 2003 plaintiff filed a motion for
partial summary judgment seeking to dismiss these
affirmative defenses. This Court granted plaintiff's
motion on June 9, 2003.

On September 29, 2003, plaintiff filed the instant mo-
tion seeking summary judgment on all claims in its
complaint. Defendants responded with a cross-mo-
tion for summary judgment asserting defenses based
on the statute of limitations, personal jurisdiction and
plaintiff's alleged failure to state a prima facie case
with respect to any of its claims.

            DISCUSSION

    I. Summary Judgment Standard

Summary judgment is properly granted "if the plead-
ings, depositions, answers to interrogatories, and ad-
missions on file, together with the affidavits, if any,
show that there is no genuine issue as to any material

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The Federal Rules of Civil Procedure mandate the entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In reviewing the record, we must assess "the evidence in the light most favorable to the party opposing the motion, and resolve ambiguities and draw reasonable inferences against the moving party." *Frito-Lay, Inc. v. LTV Steel Co. (In re Chateaugay Corp.)*, 10 F.3d 944, 957 (2d Cir.1993). In order to defeat a motion for summary judgment, the non-moving party must affirmatively set forth facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). An issue is "genuine ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id. at 248* (internal quotation marks omitted). Where, as here, both parties seek summary judgment, the Court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer v. Board of Ed., 667 F.2d 305, 314 (2d Cir.1981).*

## II. Goods Sold and Delivered and Breach of Contract Claims

*2 Plaintiff claims that it is entitled to summary judgment on its claims for goods sold and delivered and breach of contract as asserted against SSTS America because there is no dispute that the goods were purchased, sold and delivered pursuant to a valid contract and that plaintiff was not fully paid for those goods. Defendants respond that plaintiff's motion fails because: (1) plaintiff has not stated a prima facie case for goods sold and delivered; (2) the loan obligation was SSTS Korea's not SSTS America's; and (3) the statute of limitations has expired.

### A. Goods Sold and DeliveredPrima Facie Showing

Plaintiff asserts that as part of their ongoing business dealings, Daewoo sold and delivered goods to SSTS America between 1997 and 1999 and that SSTS

America received and accepted the goods along with the applicable invoices, but that full payment for the goods remains outstanding. Defendant does not dispute that Daewoo sold and delivered goods at a certain price, but argues that there is no proof that Daewoo sold those goods to SSTS America. Defendants claim that the relevant invoices show on their face that they were not issued to SSTS America, but rather, that the goods were instead sold and delivered to SSTS Korea.

The essential elements of an action for goods sold and delivered are the purchase, sale and delivery of goods at an established price and nonpayment therefor. *See "21" Brands, Inc. v. R & J Emmet PLC,* No. 88 Civ. 8392, 1990 WL 180136 at *4 (S.D.N.Y. Nov. 13, 1990)(finding that action for goods sold and delivered existed where plaintiff had delivered the agreed upon goods in acceptable condition but was not paid); *Sunbeam Corp. v. Morris Distributing Co., 389 N.Y.S.2d 173, 174, 55 A.D.2d 722, 723 (3d Dep't 1976)* (citations omitted) (stating that an action for goods sold and delivered will lie where plaintiff establishes that there is a purchase, sale and delivery of goods at an established price and nonpayment therefor).

Contrary to defendants' assertions, the record clearly establishes that the goods at issue were sold and delivered to SSTS America. The record shows that Daewoo sent each invoice for the goods at issue to SSTS America, not SSTS Korea. It is undisputed that SSTS America was located at 1385 Broadway in New York, New York during the relevant time period. Plaintiff has provided the Court with copies of the invoices for the goods that were sold and delivered to SSTS America. Every invoice shows on its face that it was sent to Shinsung Tongsang at 1385 Broadway, New York, New York. *See Declaration of T. Steven Har ("Har Decl.") Ex. C.* Defendants themselves have conceded that SSTS Korea has not conducted business in the state of New York and does not maintain an office in New York. *See Defendants' Rule 56.1 Statement ¶¶ 3 and 4.* Defendants have also admitted that SSTS America has no power to accept orders on behalf of SSTS Korea. *See id. ¶ 5.* Finally, Mr. Sang Shin, Chief Financial Officer of Daewoo testified at his deposition that the invoices were is-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

sued only to SSTS America and that the customer code on the invoice refers to SSTS America. *See* Har Decl. Ex. H. Defendants' assertion that the invoices were issued to SSTS Korea is thus squarely contradicted by the record.

*3 Plaintiff has adequately demonstrated that the subject goods were sold and delivered to SSTS America for a stated price and that payment is outstanding. Accordingly, defendants' argument that plaintiff has failed to plead a prima facie case for goods sold and delivered is without merit.

### B. Breach of Contract and Breach of Guaranty Claims

Plaintiff also argues that it is entitled to summary judgment on its breach of contract claims against SSTS America and SSTS Korea, as well as on its breach of guaranty claim against SSTS Korea. Plaintiff asserts that in return for Daewoo's agreement to provide loans and financing to SSTS America, a wholly owned subsidiary of SSTS Korea, SSTS Korea agreed to unconditionally guarantee SSTS America's obligations to Daewoo. Daewoo alleges that after it performed all of its obligations under the Agreement, SSTS America breached the Agreement by failing to provide Daewoo with payment, and that SSTS Korea breached the Agreement by failing to pay Daewoo when SSTS America defaulted on its obligation. Plaintiff asserts that SSTS Korea should thus be ordered to pay it all monies currently outstanding on the Agreement. Defendants respond that SSTS America was not bound by the Agreement, and that SSTS Korea was bound as primary obligor rather than guarantor. Defendants further assert that SSTS Korea has satisfied any obligation that it had under the Agreement. Accordingly, defendants contend, plaintiff's breach of contract claims and its breach of guaranty claim must fail.

#### 1. Breach of Contract

Defendants' contention that plaintiff cannot recover for breach of contract against SSTS America is without merit. In order to recover for breach of contract under New York law, plaintiff must establish: (1) the existence of a contract; (2) the existence of

consideration; (3) performance by the plaintiff; (4) breach by the defendant; and (5) damages to plaintiff as a result of defendant's breach. *See Stephens v. American Home Assur. Co.,* 811 F.Supp. 937 (S.D.N.Y.1993). "Where the intent of the parties can be determined from the face of the agreement, interpretation is a matter of law, and the case is ripe for summary judgment." *American Express Bank, Ltd. v. Uniroyal, Inc.,* 562 N.Y.S.2d 613, 615, 164 A.D.2d 275, 277 (1st Dep't 1990).

The parties here do not dispute that Daewoo entered an agreement with SSTS America and SSTS Korea wherein Daewoo agreed to provide loans and financing to SSTS America, which would help it to set up and operate its business in New York. Similarly, there is no dispute as to the existence of consideration or performance by plaintiff. The dispute arises with respect to plaintiff's contention that SSTS America breached the Agreement, as defendants assert that SSTS Korea was the only obligor under the contract.

The record in this case establishes that, in fact, both SSTS America and SSTS Korea incurred obligations under the Agreement with Daewoo. The language of the Agreement makes clear that SSTS America was the primary obligor of the loan and that SSTS Korea was the guarantor of the loan. The preamble to the Agreement states that Daewoo shall provide SSTS America with certain general and export-import loans and that SSTS Korea shall "assume all responsibilities in the event that [SSTS America] defaults in its loan repayment." Har Decl. Ex. D. The contract further provides for Daewoo to send invoices to SSTS America and for SSTS America to pay interest to Daewoo. *See id.* at 4(2). Finally, referring to Daewoo as "A," SSTS America as "B" and SSTS Korea as "C," the Agreement states, "C, which is B's parent company, shall provide A with an unconditional guaranty of all of B's payment and performance obligations to A in the event that B delays or defaults in its loan repayment." *Id.* at Art. 6.

*4 In light of the plain language in the Agreement, it is simply disingenuous for defendants to argue that the meaning of this two-page contract is ambiguous. "A familiar and eminently sensible proposition of law is that, when parties set down their agreement in a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

clear, complete document, their writing should as a rule be enforced according to its terms." *Concord Finance Corp. v. Wing Fook, Inc.*, No. 96 Civ. 5293, 1997 WL 375679 at *4 (S.D.N.Y. July 7, 1997). Moreover, Defendants concede in their motion papers that SSTS Korea's obligations were to arise "in the event that [SSTS America]'s repayment of the loan [wa]s delayed," Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment and in support of Defendants' Cross-Motion ("Def.Mem.") p. 5 (bracket in original). Given the plain language of the contract, as well as defendants' own admissions, it is clear that SSTS America was the primary obligor under the Agreement. Accordingly, as there is no dispute that SSTS America did not pay plaintiff in full for the loans at issue, plaintiff's motion for summary judgment on its claim of breach of contract is granted with respect to SSTS America.

### 2. Guaranty of the Loan

As stated above, plaintiff asserts that SSTS Korea agreed unconditionally to guarantee SSTS America's obligations to Daewoo in the loan Agreement, and that when SSTS America failed to repay the loan, SSTS Korea wrongly defaulted on its obligation. Defendants assert that SSTS Korea cannot be liable for breaching a guaranty because it was not a guarantor of the Agreement, but rather the primary obligor.

A contract of guaranty is a promise to answer for the payment of some debt or the performance of some obligation owed by another. *See In re Drexel Burnham Lambert Group*, 151 B.R.674, 682 (Bkrtcy.S.D.N.Y.1993). "It is a secondary obligation in that it is collateral, and only meaningful in relation to, the independent obligation to pay (*i.e.*, the debt) of the primary obligor, and is contingent upon his default." *Michaels v. Chemical Bank*, 441 N.Y.S.2d 638, 640, 110 Misc.2d 74, 75 (N.Y.Sup.Ct.1993). An "absolute" guaranty is an unconditional undertaking that the debtor will pay, and on such guaranty the creditor may, upon default, proceed directly against the guarantor without taking any steps to collect the amount due from the debtor. *General Phoenix Corp. v. Cabot*, 300 N.Y. 87 (1949).

Here, SSTS America has defaulted on its payment obligations to Daewoo. The parties' agreement plainly states that SSTS Korea, "which is [SSTS America's] parent company, shall provide [Daewoo] with an unconditional guaranty of all of SSTS America's payment and performance obligations to [Daewoo] in the event that [SSTS America] delays or defaults in its loan repayment." Har Decl. Ex. D Art. 6. Pursuant to the unambiguous language of the parties' Agreement, SSTS Korea is the unconditional guarantor of SSTS America's obligations to plaintiff. Accordingly, SSTS Korea is liable to plaintiff for all monies still owed under the Agreement and plaintiff's motion for summary judgment on its breach of guaranty claim is granted.

### C. Statute of Limitations

*5 Defendants assert that plaintiff is barred from pursuing its claims related to breach of contract against defendants because the applicable statute of limitations has expired. Plaintiff responds that this action was brought within an acceptable amount of time because the statute of limitations was tolled by SSTS America's acknowledgment of debt.

Under Section 2-725 of the Uniform Commercial Code, the statute of limitations for an action based on breach of contract for any sale must be commenced within four years of the date of accrual of the cause of action. *See* U.C.C. § 2-725; *Port Authority of New York and New Jersey v. Allied Corp.*, 914 F.Supp. 960, 962 (S.D.N.Y.1995). "[A] cause of action accrues when the breach occurs." U.C.C. § 2-725(2). Under certain circumstances, however, the limitations period may be tolled. Under New York's General Obligation Law § 17-101, the borrower's acknowledgment of debt in its financial statements tolls or revives the limitations period. *See Clarkson Co. v. Shaheen*, 533 F.Supp. 905, 932 (S.D.N.Y.1982) (stating that debtor's acknowledgment of its obligation to creditor in its annual report and fact that it carried debt on its books for at least two years was "clear recognition of the continuing validity of the obligation" and therefore action was not barred by the statute of limitations); *Chase Manhattan Bank v. Polimeni*, 685 N.Y.S.2d 226, 258 A.D.2d 361 (1st Dep't 1999) (stating that debtor's financial statement

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

which carried its debt obligation to creditor constitutes an "acknowledgment or promise" of debts and was sufficient to revive creditor's time-barred claims on those debts).

Defendants argue that goods were last delivered in May 1998 and that the four-year limitations period thus ran out in May 2002. Plaintiff did not file its complaint in this action until November 2002. However, plaintiff has demonstrated that the statute of limitations was tolled by SSTS America's acknowledgment of debt. The record shows that SSTS America acknowledged its loan obligation to Daewoo in its financial statements and carried the debt on its books from at least 1999 through 2002. *See* Har Decl. Ex. A. For example, SSTS America's December 31, 1999 financial statements recorded the loan payable to Daewoo in the amount of $4,046,383. *See id.* The debt to plaintiff also appears in varying amounts on the financial statements for December 31, 2000, December 31, 2001, June 30, 2002 and December 31, 2002, reflecting an amount of $2,646,383 from December 2001 through December 2002. *See id.* The listings in these financial statements constitute "a clear recognition of the continuing validity of the obligation" to pay plaintiff. *Clarkson,* 533 F.Supp. at 932.

SSTS America also acknowledged its debt in a March 16, 2000 letter to plaintiff. In that letter, Mr. Ji Ho Kim, General Manager of SSTS America, states that SSTS America owes plaintiff approximately $4 million and proposes a schedule of paying back $100,000 per month starting from the month of April 2000. *See* Har Decl. Ex. B. Following Mr. Kim's letter, SSTS made thirteen monthly payments to Daewoo from April 2000 to April 2001. *See* Def. Rule 56.1 Stmt. ¶ 11.[FN2] Letters such as Mr. Kim's have been found to constitute an acknowledgment under § 17-101.[FN3] *See e.g. Popular Publications, Inc. v. McCall Corp.,* 321 N.Y.S.2d 308, 36 A.D.2d 927 (1st Dep't 1971) (finding that a letter stating that indebtedness was unpaid and making a promise to pay constituted acknowledgment under § 17-101). Moreover, partial payment of a debt also serves to toll the statute of limitations on that debt. *See United States v. Glens Falls Ins. Co.,* 546 F.Supp. 643, 645 (N.D.N.Y.1982) ("part payment of a debt starts the

statute of limitations running anew in that part payment is tantamount to a voluntary acknowledgment of the existence of the debt"); *Schmidt v. Polish People's Republic,* 579 F.Supp. 23, 29 (S.D.N.Y.1984).

> FN2. Defendants argue that this letter did not constitute an acknowledgment of debt because it acknowledged only "general indebtedness." The case on which defendants rely for this proposition, which was decided in 1912, also states however, that where the letter specifically references the debt at issue, rather than merely stating that the writer knows a debt exists, the letter will constitute an acknowledgment. Given that SSTS America specifically referenced a debt of approximately $4 million to plaintiff, defendants' argument that the letter was too general to constitute an acknowledgment is without merit.

> FN3. With respect to defendants' argument that Mr. Kim was incapable of acknowledging the debt on behalf of the company, the very case on which defendants rely for that proposition, *Renault v. L.N. Renault & Sons, Inc.,* 90 F.Supp. 630 (E.D.Pa.1950), was overturned on appeal, with the appellate court holding that a promise from an agent of the debtor company with implied authority may indeed function as an acknowledgment sufficient to toll the statute of limitations. *See Renault v. L.N. Renault & Sons, Inc.,* 188 F.2d 317 (3d Cir.1951).

*6 The applicable statute of limitations was thus tolled by defendants' financial statements, Mr. Kim's letter and the partial payment made by SSTS America. Given that defendants' financial statements continued to reflect its debt to plaintiff as late as December 2002, plaintiff's time to file its complaint had not yet expired in 2002 when it commenced this action. Accordingly, defendants' statute of limitations defense is without merit and does not defeat plaintiff's motion for summary judgment on its breach of contract claims.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d)**

### III. Account Stated

Plaintiff has also moved for summary judgment on its claim for account stated as asserted against SSTS America. Plaintiff contends that it had reached an agreement with SSTS America regarding the amount of the balance due and that it is thus entitled to the amount agreed upon. Defendants assert that the parties never reached any such an agreement and that plaintiff's account stated claim must therefore fail.

"An 'account stated' is an agreement, express or implied, that a statement of account has been asserted, and has been accepted as correct; both parties must express assent to the account as correct; assent may be inferred by silence when an account rendered remains unquestioned a reasonable time after receipt." *Navimex S.A. De C.V. v. S/S Northern Ice*, 617 F.Supp. 103, 105 (S.D.N.Y.1984). "An essential element of an account stated is an agreement between the parties showing that some fixed amount is due." *D.E.O., Inc. v. Durham*, No. 99 Civ. 0036, 2000 WL 1887830 at *2 (W.D.N.Y. Dec. 29, 2000). Under New York law, "[a]n agreement may ... be implied from the fact that the debtor makes a partial payment toward reducing the balance of the account." *Ally & Gargano, Inc. v. Comprehensive Accounting Corp.*, 615 F.Supp. 426, 429 (S.D.N.Y.1985).

In this case, plaintiff and SSTS America had previous business transactions pursuant to which Daewoo delivered goods and submitted invoices, and for which SSTS America made partial payment. Nothing in the record indicates that SSTS America ever objected to the quality of the goods or the amount stated in the invoices. Although defendants argue that there is no evidence of invoices issued to SSTS America, this argument is flatly contradicted by the record in this case, *see* Har Decl. Ex. C, which includes more than forty invoices clearly showing that they were sent to SSTS America.[FN4]

> FN4. Defendants also argue that plaintiff's account stated claim is based only on an approximation of the due amount and must therefore be dismissed. It is evident from plaintiff's complaint and motion papers, however, that plaintiff's claim is not based

upon an approximation. The claim is based on the multiple accounts represented by the invoices plaintiff sent to SSTS America, which show that SSTS America owed Daewoo $2,795,858.19 as of May 31, 2001. *See* Declaration of Sang Shin ("Shin Decl.") Ex. C; Har Decl. Ex. C.

Defendants do not dispute that SSTS America never objected to the invoices issued by plaintiff.[FN5] Similarly, defendants concede that SSTS made partial payment to plaintiff on the loan at issue. *See* Def. Rule 56.1 Stmt. ¶ 11. Where a defendant "has both acquiesced in the bills sent to him, and made partial payment against the outstanding balance, plaintiff has established its account stated claim." *Kramer, Levin, Nessen, Kamin & Frankel v. Aronoff*, 638 F.Supp. 714, 720 (S.D.N.Y.1986). Because defendant received and retained invoices without objecting to them and also made partial payment to plaintiff on the debt at issue, plaintiff is entitled to summary judgment on its account stated claim.

> FN5. Defendants also argue that only SSTS Korea, not SSTS America, was obligated to repay the loan. This argument has been addressed and disposed of *supra* pages 10-11. Additionally, as stated above, Mr. Ji Ho Kim, General Manage of SSTS America, acknowledged in his letter of March 16, 2000, the outstanding debt and agreed to pay $100,000 per month toward settling the account.

### IV. Unjust Enrichment and Quantum Meruit

*7 Plaintiff also seeks summary judgment on its claims against SSTS America for unjust enrichment and quantum meruit. Defendants assert that plaintiff cannot pursue these claims because the existence of a valid, written contract prevents recovery in quasi-contract for occurrences arising out of the same matter.

Quantum meruit and unjust enrichment are quasi-contractual theories employed by courts "when the absence of an enforceable contract would otherwise lead to unjust enrichment of a party." *Seiden Asso-*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                  Page 7
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

*ciates, Inc. v. ANC Holdings, Inc.*, 745 F.Supp. 37, 40 (S.D.N.Y.1991). "[T]he existence of a valid and enforceable contract governing the subject matter in issue ordinarily precludes recovery in quasi contract." *Nelson v. Stanley Blacker, Inc.*, 713 F.Supp. 107, 111 (1989). "A quasi contract only applies in the absence of an express agreement, and is not really a contract at all, but rather a legal obligation imposed in order to prevent a party's unjust enrichment...." *Violette v. Armonk Associates, L.P.*, 872 F.Supp. 1279, 1282 (S.D.N.Y.1995).

There is no dispute that there existed a valid and enforceable written contract which governed the issues which are also the subject of plaintiff's quantum meruit and unjust enrichment claims. In light of this written agreement, plaintiff is precluded from pursuing its quasi-contractual claims, and defendants' motion for summary judgment is granted with respect to these claims.

### V. Personal Jurisdiction

Defendants assert that this Court does not have personal jurisdiction over SSTS Korea because SSTS Korea was not properly served and because SSTS Korea has not submitted to jurisdiction in New York.[FN6]

> FN6. During a pre-motion conference on July 10, 2003, the Court entered a limited discovery schedule since the proposed summary judgment motion was to address only whether SSTS America owed money to plaintiff and whether SSTS Korea guaranteed the payments. Plaintiffs complain that because the issue of personal jurisdiction was never addressed at the pre-motion conference, plaintiff did not request to depose certain SSTS officials as it otherwise would have done. Even without the depositions of the SSTS officials, however, plaintiff has made a sufficient showing that this Court does indeed have personal jurisdiction over SSTS Korea.

New York law controls the issue of personal jurisdiction in this case. *See PC COM, Inc. v. Proteon, Inc.*,

906 F.Supp. 894, 904 (S.D.N.Y.1995) (stating that in determining whether a federal district court has personal jurisdiction over a party in a diversity case, the law of the forum state applies) (citing *National Cathode Corp. v. Mexus Co.*, 855 F.Supp. 644, 647 (S.D.N.Y.1994); *Glass v. Harris*, 687 F.Supp. 906, 908 (S.D.N.Y.1988)). Under New York C . P.L.R. § 301, "a foreign corporation is subject to general jurisdiction in New York if the corporation is 'doing business' in the state." *Jacobs v. Felix Bloch Erban Verlag Ver Bunhe Film und Funk KG*, 160 F.Supp.2d 722, 731 (S.D.N.Y.2000).

It is well-settled law in New York that jurisdiction over a parent company may be created under the "doing business" test by the activities of its subsidiary within New York. *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir.1984). While the presence of a local corporation does not alone create jurisdiction over a related, but independently managed, foreign corporation, *see id.*, the combination of four factors will allow for jurisdiction over the foreign parent in New York. Where the party advocating jurisdiction can show: (1) common ownership by the parent corporation of the New York subsidiary, (2) financial dependency of the subsidiary, (3) a lack of observance of corporate formalities; and (4) significant control by the parent over the subsidiary's marketing and operational policies, jurisdiction will exist in New York. *See id.* 121-123; *Weiss v. La Suisse*, 69 F.Supp.2d 449 (S.D.N.Y.1999); *Taca International Airlines S.A. v. Rolls Royce of England, Limited*, 256 N.Y.S.2d 129 (N.Y.1965).

*8 Plaintiff has adequately demonstrated the existence of the above factors such that jurisdiction properly exists over SSTS Korea, the foreign parent corporation in this case. With respect to common ownership, there is no dispute that SSTS America is a wholly owned subsidiary of SSTS Korea. The next factor, financial dependency of the subsidiary on the parent corporation, has also been adequately established by plaintiff. "Financial dependency of the subsidiary on the parent corporation exists where the parent ... guarantees the subsidiary's obligations...." *ESI, Inc. v. Coastal Corp.*, 61 F.Supp.2d 35, 53 (S.D.N.Y.1999) (citations omitted). As discussed

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

above, plaintiff has clearly demonstrated through the record that SSTS Korea guaranteed SSTS America's financial obligation to Daewoo. Furthermore, SSTS America's inventory reports show that most of its inventory consists of apparel manufactured by SSTS Korea's other wholly owned subsidiaries. *See* Har Decl. Ex. F. Financing of inventory is another factor which courts have considered in finding subsidiaries financially dependent on the parent corporation. *See Jerge v. Potter,* 99 Civ. 0312, 2000 WL 1160459 at *3 (S.D.N.Y., Aug. 11, 2000); *Taca,* 15 N.Y.2d 101-02. Accordingly, plaintiff has made a sufficient showing of financial dependency by SSTS America.FN7

> FN7. Further evidence of SSTS Korea's financial domination of SSTS America is that in 2001, SSTS Korea arbitrarily moved SSTS America's operating capital to SSTS Korea's subsidiary located in China and then sought to write off the withdrawn capital as a loss for United States tax purposes. *See* Har Decl. Ex. E.

The third factor courts look to in determining whether the subsidiary functions as a "mere department" of the parent corporation such that exercising jurisdiction is appropriate is the degree to which the parent interferes in the assignment of the subsidiary's executive personnel and fails to observe corporate formalities. *See Weiss,* 69 F.Supp. at 458. Here, defendants concede that SSTS America prepared annual financial statements in order to prepare its income tax returns and for submission to SSTS Korea, and for no other reasons. *See* Def. Rule 56.1 Stmt. ¶ 33. Additionally, Mr. Kim, General Manager of SSTS America, indicated that in order for SSTS America to make payments to Daewoo, SSTS Korea's authorization and approval was necessary. *See* Decl. of Ji Ho Kim ("Kim Decl.") ¶ 11. Decision making for the subsidiary by the parent is a factor that weighs in favor of finding the subsidiary to be a "mere department" of the parent. *See Bergesen d.v. A/S v. Lindholm,* 760 F.Supp. 976, 987 (D.Conn.1991).

As to the final factor, the degree of control over the marketing and operational policies of the subsidiary exercised by the parent, "the parent's degree of con-

trol over the marketing and operational policies of the subsidiary is satisfied where the parent's promotional materials or public documents hold out the subsidiary as a branch or division of the parent, or the parent determines the subsidiary's operational policies and strategy." *ESI, Inc.,* 61 F.Supp. at 55 (citations omitted). SSTS Korea's website holds out SSTS America as merely one of its international branches, rather than a separate entity, and represents that SSTS Korea conducts marketing and export operations through its overseas entities, including SSTS America. *See* Har Decl. Ex. G.FN8 Plaintiff has thus also made a prima facie FN9 showing as to this final element. As plaintiff has sustained its burden of making a prima facie showing that SSTS America is a mere department of SSTS Korea, this Court may properly exercise jurisdiction over defendant SSTS Korea.FN10

> FN8. Similarly, SSTS America and SSTS Korea use the same logo. *See* Def. Mem. at 11.

> FN9. Because plaintiff has not yet obtained any jurisdictional discovery, it is required to make only a prima facie showing that defendants are subject to jurisdiction in this Court. *See Jazini v. Nissan Motor Co.,* 148 F.3d 181, 186 (2d Cir.1998).

> FN10. Defendants' recent argument that this case should be dismissed because of a reorganization that SSTS Korea instituted in Korea in 1999 comes too late. Whether to abstain from a case based on principles of comity is a matter of discretion to be decided by the district court. *See United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 212 (S.D.N.Y.2002). The principles underlying the doctrine of comity include, *inter alia,* fairness to litigants and efficient use of scarce judicial resources. *See Goldhammer v. Dunkin' Donuts,* 59 F.Supp.2d 248, 253 (D.Mass.1999). Given that this case has been pending in this Court since December 2002 and that this Court has already devoted sufficient resources to its resolution, includ-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

ing the issuance of a prior written opinion in June 2003, the Court declines to dismiss this case on grounds of comity at this time.

### CONCLUSION

\*9 For the reasons stated above, plaintiff's motion for summary judgment is granted with respect to all claims except unjust enrichment and quantum meruit, as to which defendants' motion for summary judgment is granted. Plaintiff is directed to submit a judgment on notice.

IT IS SO ORDERED.

S.D.N.Y.,2004.
Daewoo Intern. (America) Corp. Creditor Trust v. SSTS America Corp.
Not Reported in F.Supp.2d, 2004 WL 830079 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2

LEXSEE 2002 U.S. DIST. LEXIS 25767

**DARRYL L. DAGEN, Plaintiff, -against- CFC GROUP HOLDINGS, LTD.; CFC SECURITIES, INC.; CFC INTERNATIONAL INC.; CFC SECURITIES ASIA LTD.; CFC TECHNOLOGY, LTD.; CFC SECURITIES HOLDINGS, LTD.; CFC ASSET MANAGEMENT HOLDINGS, LTD.; CFC SECURITIES, S.A.; AND BORIS MERKENICH, Defendants.**

**00 Civ. 5682 (DAB)(THK)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2002 U.S. Dist. LEXIS 25767*

**March 7, 2002, Decided**

**SUBSEQUENT HISTORY:** *Adopted by Dagen v. CFC Group Holdings, Ltd., 2003 U.S. Dist. LEXIS 1225* (S.D.N.Y. Jan. 24, 2003)

**DISPOSITION:** [*1] Magistrate recommended that defendants' motion to dismiss complaint be granted in part and denied in part.

**COUNSEL:** For Darryl L Dagen, PLAINTIFF: Chaim B Book, Moskowitz & Book, LLP, New York, NY USA.

For CFC Group Holdings Limited, CFC Securities, Inc, CFC International, Inc, CFC Securities Asia Limited, CFC Technology, Limited, CFC Securities Holdings Limited, CFC Asset Management Holdings Limited, CFC Securities, SA, Boris Merkenich, DEFENDANTS: Steven Michael Hecht, Lowenstein Sandler, PC, Roseland, NJ USA.

**JUDGES:** THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE. HONORABLE DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** THEODORE H. KATZ

**OPINION:**

**REPORT AND RECOMMENDATION**

**FROM: THEODORE H. KATZ, UNITED STATES MAGISTRATE JUDGE.**
**TO: THE HONORABLE DEBORAH A. BATTS, UNITED STATES DISTRICT JUDGE.**

This action was referred to me for a Report and Recommendation on dispositive motions. Currently be-fore the Court is Defendants' motion to dismiss the Complaint, pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure,* for lack of subject matter jurisdiction; pursuant to Rule 12(b)(2), for lack of personal jurisdiction; pursuant to Rule 12(b)(5), for insufficient service of [*2] process; pursuant to the doctrine of forum non conveniens; and pursuant to Rule 12(b)(6), for failure to state a claim upon which relief may be granted. For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**BACKGROUND**

This action arises out of the employment of Plaintiff, Darryl L. Dagen, by Defendants, a group of affiliated corporate entities specializing in the provision of financial services. In September, 1998, Plaintiff met with Defen-dant Boris Merkenich of CFC Group Holdings, and Steve Domney of CFC Securities, in New York City, to discuss the possibility of Plaintiff's employment by Defendants. (Complaint, PP 3, 19.) On November 3, 1998, Plaintiff again met with Merkenich and Domney in New York, in order to sign his employment contract. The employment agreement was signed by Plaintiff, Defendant Merkenich, on behalf of Defendant CFC Group Holdings, and Dom-ney, on behalf of Defendant CFC Securities. (Id. P 22.) Pursuant to the agreement, Dagen was hired to become president and a managing director of CFC's new Hong Kong affiliate, CFC Securities Asia. (Id. P 23.) His as-signment was to last a minimum of two years [*3] from the time of his arrival in Hong Kong. (Id. P 25.) The em-ployment agreement provided, inter alia, that Plaintiff was to receive an adjusted salary of $ 300,000 per annum, n1 a monthly apartment allowance of $ 6,000, an annual bonus equal to 35% of the total revenue generated by Plaintiff, and a 15% ownership interest in CFC Securities Asia. (Complaint P 24; Employment Contract ("Contract"),

attached as Exhibit ("Ex.") B to Affidavit of Steven Hecht ("Hecht Aff.").) The contract also provided that Plaintiff was to report to the Board of Directors of Defendant CFC International.

n1 Plaintiff's salary was to be adjusted to reimburse him for the amount paid in Hong Kong taxes.

Between November, 1998 and June, 1999, Plaintiff worked for Defendant CFC Securities in New York City. (Affidavit of Darryl L. Dagen, dated Feb. 8, 2001 ("Dagen Aff."), P 28.) While in New York, his salary was paid by CFC Securities; his insurance benefits and pension were paid by CFC Securities throughout his entire term of [*4] employment, even while he was in Hong Kong. (Id. P 29.)

In June, 1999, Plaintiff commenced his work in Hong Kong. Plaintiff contends that, beginning in March, 2000, Defendant Merkenich undertook actions that undermined Plaintiff's capacity to function professionally, and resulted in his constructive discharge--giving rise to a breach of his employment contract. Merkenich allegedly asked Plaintiff to fire some employees, thereby reducing the output of his office. In addition, Merkenich arranged for an employee in CFC's Swiss office to begin trading with consumers in Hong Kong, diverting profits from Plaintiff's Hong Kong office and reducing Plaintiff's profit-dependent bonus. (Dagen Aff. P 63.) Soon after, according to Plaintiff, Merkenich terminated Plaintiff's registrations with the National Association of Securities Dealers, without which he could not legally conduct business with any of his clients in the United States, severely hampering his ability to perform his duties. (Id. PP 64-65.)

Plaintiff alleges that in June, 2000, Merkenich's attempts to terminate Plaintiff's employment accelerated. Merkenich is purported to have had discussions with his numerologist about [*5] pressuring Plaintiff to quit. (Id. P 66.) He talked about such tactics as shutting off Plaintiff's mobile phone service and disrupting his living arrangements. (Id.) Merkenich subsequently terminated Plaintiff's apartment lease, without prior notice. (Id. P 71.) He also began talking with Mike Stein, a principal at CFC in New York, about falsifying documents and making misrepresentations to the board of directors to justify termination of Plaintiff's employment. (Id. PP 71-74.) At the June 21, 2000 board meeting, Merkenich is alleged to have restricted Plaintiff's business travel, terminated his position as a director of CFC Group Holdings, and threatened his position as president of CFC Securities Asia. (Id. P 76.)

Additionally, Plaintiff alleges that in June 2000, two instances of fraudulent business practices on the part of Merkenich came to his attention. One involved a kickback scheme to customers of CFC, the other misrepresentations to potential CFC Securities Asia customers regarding CFC's financial status. (Id. PP 67, 82, 85.)

In late June and July, according to Plaintiff, Merkenich alternately began requesting that Plaintiff quit his job, threatening [*6] to terminate his employment, and expressing to Plaintiff that he was an unwanted employee. (Id. PP 77, 79, 80, 81, 85.) Plaintiff contends that, in late July, Merkenich disabled Plaintiff's mobile phone and eliminated his signatory authority with CFC's bank. (Id. PP 83-84.) Soon after that, Plaintiff notified Merkenich that he considered himself constructively terminated and he requested the balance of monies owed to him under his employment agreement. (Id. P 86.)

On August 1, 2000, Plaintiff commenced the instant lawsuit. n2 (Id. P 89.) In his Complaint, Plaintiff alleges that Defendants' actions gave rise to a breach of his employment contract, a breach of the duty of good faith and fair dealing, intentional interference with his contract, unjust enrichment, a breach of fiduciary duty, and a violation of *New York Labor Law* 190 because of the failure to pay his wages.

n2 Defendants subsequently filed two lawsuits in Hong Kong against Plaintiff. (Id. PP 90-92.) One lawsuit is related to his continued possession of his apartment in Hong Kong, and the other is an action against Plaintiff for trespassing on the premises of the CFC Securities Asia office. (Id. PP 91-92.)

[*7]

Although Plaintiff's employment contract was entered into with CFC Group Holdings and CFC Securities, Inc., Plaintiff was hired to serve as President of CFC Securities Asia, Ltd. Moreover, it is alleged that there is such a unity of interest and ownership between Merkenich and all of the CFC companies that any individuality and separateness has ceased and the CFC companies serve as an alter ego of Merkenich. (Complaint P 13.) Merkenich controls operational policies for all CFC companies. (Dagen Aff. P 33.) This dominance by Merkenich leads Plaintiff to allege that the CFC companies are shell companies through which Merkenich carries out his business. (Id.)

Defendant CFC Group Holdings, Ltd. ("CFC Group") is a financial services company which owns 100% of Defendants CFC International, Inc. ("CFC International"), CFC Securities S.A. ("CFC Securities S.A."), CFC Technology, Ltd. ("CFC Technology"), CFC Securities Holdings, Ltd. ("CFC Holdings") and CFC Asset Management Holdings Ltd., Inc. ("CFC Asset Management"), as well as 85% of Defendant CFC Securities Asia, Ltd.

("CFC Asia"). CFC International, in turn, owns 85% of Defendant CFC Securities, Inc. (CFC Group Structure Charts [*8] 1 and 2, attached to Dagen Aff. as Ex. D.) Defendant Boris Merkenich is the 100% owner, Chairman, and Chief Executive Officer of CFC Group. (Dagen Aff. P 35 and CFC Group Profile, Attached as Ex. B to Dagen Aff.) Plaintiff was a director of CFC Group Holdings, Ltd., CFC Securities Holdings, Ltd., CFC Asset Management, Ltd., and CFC Securities Asia, Ltd. n3 (CFC Group Structure Chart 2, attached as Ex. D to Dagen Aff.)

> n3 It is unclear whether Plaintiff is still a director of any of the CFC companies. In his affidavit, he alleges that Merkenich terminated his position as a director of CFC group (Dagen Aff. P 76), and attempted to have him sign resignation papers for his position as a director of all of the CFC companies. Plaintiff refused to sign. (Id. P 81.)

## DISCUSSION

### I. Subject Matter Jurisdiction

Defendants contend that this Court does not have diversity subject matter jurisdiction over this action, under 28 U.S.C. 1332, because Plaintiff has failed to plead that [*9] he is a citizen of a state of the United States, or a citizen or subject of a foreign state. Plaintiff does not contest the fact that, in the Complaint, he failed to plead state citizenship. Plaintiff contends, however, that his claims should not be dismissed since he is, in fact, a citizen of Colorado.

It is firmly established that diversity of citizenship "'should be distinctly and positively averred in the pleadings, or should appear with equal distinctness in other parts of the record.'" Wolfe v. Hartford Life & Annuity Ins. Co., 148 U.S. 389, 389, 13 S. Ct. 602, 603, 37 L. Ed. 493 (1893); Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc., 87 F.3d 44, 46 (2d Cir. 1996). It is also clear that a statement of a party's residence is insufficient to establish its citizenship. Wolfe, 148 U.S. at 389, 13 S. Ct. at 603; Advani Enterprises, Inc. v. Underwriters at Lloyds, 140 F.3d 157, 161 (2d Cir. 1998); John Birch Soc'y v. Nat'l Broadcasting Co., 377 F.2d 194, 199 (2d Cir. 1967). For diversity purposes, citizenship equates with domicile, that is, the place of the true, fixed, and permanent home [*10] and principal establishment to which a person has the intention of returning whenever absent. See Wolfe, 148 U.S. at 389, 13 S. Ct. at 603; Palazzo ex rel. Delmage v. Corio, 232 F.3d 38, 42 (2d Cir. 2000). Domicile is established initially at birth and is presumed to continue in the same place, absent sufficient evidence of a change. See Palazzo, 232 F.3d at 42;

Linardos v. Fortuna, 157 F.3d 945, 948 (2d Cir. 1998). To effect a change of domicile, two things are indispensable: first, residence in a new domicile, and second, the intention to remain there. See Palazzo, 232 F.3d at 42.

If challenged, the party invoking federal diversity jurisdiction has the burden of proving diversity exists by a preponderance of the competent evidence. See Thomson v. Gaskill, 315 U.S. 442, 446, 62 S. Ct. 673, 675, 86 L. Ed. 951 (1942); Kvos, Inc. v. Associated Press, 299 U.S. 269, 278, 57 S. Ct. 197, 201, 81 L. Ed. 183 (1936); McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 190, 56 S. Ct. 780, 785, 80 L. Ed. 1135 (1936); Goodman v. Polyvinyl Films, Inc., No. 95 CIV. 3365 (PKL), 1999 U.S. Dist. LEXIS 705, 1999 WL 33030, at *1 (S.D.N.Y. Jan. 21, 1999). [*11] In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings, such as affidavits. See, e.g., Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986); Adjoyi v. Fed. Air (PTY) Ltd., 137 F. Supp. 2d 498, 500 (S.D.N.Y. 2001).

A failure to allege facts establishing jurisdiction need not prove fatal to a complaint. By statute, "defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." 28 U.S.C. 1653. Such amendments will be freely permitted where necessary to avoid dismissal on purely technical grounds. Unless the record clearly indicates that the complaint could not be saved by any truthful amendment, see, e.g., Baer v. United Servs. Auto. Ass'n, 503 F.2d 393, 397 (2d Cir. 1974), courts generally afford an opportunity for amendment. See Advani, 140 F.3d at 161 ("We have consistently recognized that section 1653 should be construed 'liberally to permit the action to be maintained if it is at all possible to determine from the record that [*12] jurisdiction does in fact exist.'")(quoting John Birch Soc'y, 377 F.2d at 198-99); Canedy v. Liberty Mut. Ins. Co., 126 F.3d 100, 103 (2d Cir. 1997).

In the instant case, Plaintiff alleges in his Complaint that "at all times hereinafter mentioned, Plaintiff Dagen was and still is an American citizen residing in Hong Kong." See Complaint P 1. Defendants are alleged to be either incorporated in New York, Delaware, or abroad. See id. PP 2-9. All Defendants, including Boris Merkenich, are alleged to transact business in New York. In addition, Defendants CFC Group, CFC Securities, Inc., CFC International, and Merkenich are alleged to maintain an office in New York.

By affidavit dated February 8, 2001, Plaintiff supplemented the jurisdictional allegations made in the Complaint. See Dagen Aff. PP 1-20. In particular, Plaintiff avers that, at the time the Complaint was filed, his domicile was Colorado. n4 Id. In addition, Colorado remains his domicile. From 1984 to 2000, Plaintiff main-

Case 1:07-cv-03183-PKL     Document 23-2     Filed 05/16/2007     Page 17 of 43

Page 4
2002 U.S. Dist. LEXIS 25767, *

tained a home in Colorado, to which he often returned. Plaintiff pays taxes, is registered to vote, and votes regularly in Colorado. Both he and his wife maintain [*13] valid Colorado driver's licenses. Plaintiff alleges that he currently owns land in Colorado, on which he plans to build a new home. In his affidavit, Plaintiff also states that he plans to return to Colorado following the completion of his work for the CFC entities. See id. P 20. Although he was a resident of Hong Kong at the time the Complaint was filed, Plaintiff claims that it was always his intention to return to the United States. He points out that he requested that, as a term of his contract with Defendants, he be reimbursed for the expenses he would incur when returning to the United States. See id. P 15. He also submits that neither he nor his wife ever purchased real estate in Hong Kong, and that he was in Hong Kong on a temporary work visa. See id. PP 16-17.

> n4 In the alternative, Plaintiff submits that his domicile could be considered to be Pennsylvania, since he was born there, and, in the absence of evidence to the contrary, his domicile must be considered to have remained the same.

[*14]

With these uncontested statements, there is prima facie evidence that Plaintiff was domiciled in Colorado at the time he filed the Complaint, since they show both that he resided in, and intended to return to, Colorado. n5 See *Palazzo, 232 F.3d at 42;* see also *Young v. Century House Historical Society, 117 F. Supp. 2d 277, 280 (N.D.N.Y. 2000)*("Objective indicators of a party's intent regarding domicile include current residence; voting registration and voting practices; location of personal and real property; location of brokerage and bank accounts; membership in unions, fraternal organizations, churches, clubs, and other associations; place of employment or business; driver's license and automobile registration; [and] payment of taxes.").

> n5 Defendants contend that these facts fail to establish that, at the time he filed the Complaint, Plaintiff was domiciled in Colorado. For example, Defendants point out that, at the time he filed the Complaint, Plaintiff was in Japan, and shortly thereafter, he and his family were in Pennsylvania. Nevertheless, a person's temporary location does not define his true domicile.

[*15]

Because the facts set forth in Plaintiff's affidavit are sufficient to sustain the diversity jurisdiction of the Court, I recommend that Defendants' motion to dismiss the Complaint, on the ground that the Court does not have subject matter jurisdiction in this action, be denied, and that Plaintiff be granted leave to amend the Complaint to assert he is a citizen of Colorado. See *Jacobs v. Patent Enforcement Fund, Inc., 230 F.3d 565, 568 (2d Cir. 2000)*("When a defendant moves, under *Fed. R. Civ. P. 12(b)(1)*, to dismiss a complaint that inadequately pleads diversity jurisdiction (under circumstances in which extrinsic or subsequently adduced evidence shows that diversity exists), then the court may [either] deny the motion and direct the pleader to amend, or it may dismiss with leave to amend.").

II. Personal Jurisdiction

Defendants, with the exception of CFC Securities, contend that Plaintiff has not established that the Court has personal jurisdiction over them. n6 Accordingly, they move to dismiss the Complaint pursuant to *Rule 12(b)(2) of the Federal Rules of Civil Procedure.* In particular, Defendants allege that the Complaint fails to establish that [*16] they are "doing business" in New York, within the meaning of *New York C.P.L.R.    301*, or that they "transact business" in New York, within the meaning of *New York C.P.L.R.    302(a)(1)*. Defendants also contend that the choice of law clause in Plaintiff's employment contract does not give rise personal jurisdiction over them.

> n6 Defendant CFC Securities does not contest the Court's assertion of personal jurisdiction over it, since it is a New York corporation.

In a diversity action such as this one, the law of the state in which the court sits governs whether personal jurisdiction exists over a Defendant. See *Whitaker v. Am. Telecasting, Inc., 261 F.3d 196, 200 (2d Cir. 2001)* ("In assessing whether personal jurisdiction is authorized, 'the court must look first to the long-arm statute of the forum state, in this instance New York.' 'If the exercise of jurisdiction is appropriate under that statute, the court must decide whether such exercise comports with the requisites of due process.'")(quoting [*17] *Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997)).*

The burden of establishing a court's personal jurisdiction over a defendant rests with the plaintiff. See *Robinson v. Overseas Military Sales Corp., 21 F.3d 502, 507 (2d Cir. 1994).* When personal jurisdiction is challenged with a Rule 12(b)(2) motion prior to an evidentiary hearing, however, the plaintiff need only make a prima facie showing that jurisdiction exists. See *DiStefano v. Carozzi N. Am., Inc., No. 00-7239, 286 F.3d 81, 2001 WL 1379852, at *2 (2d Cir. Oct. 18, 2001); Kronisch v. United States, 150 F.3d 112, 130 (2d Cir. 1998); Ball v. Metal-*

*Iurgie Hoboken-Overpelt, 902 F.2d 194, 197 (2d Cir. 1990); Beacon Enters., Inc. v. Menzies, 715 F.2d 757 (2d Cir. 1983); Marine Midland Bank, N.A., 664 F.2d 899, 904 (2d Cir. 1981).* In addressing a motion pursuant to Rule 12(b)(2), a court may consider materials outside the pleadings, such as affidavits. See *DiStefano, 286 F.3d 81, 2001 WL 1379852,* at *2. At this stage in a proceeding, all pleadings and affidavits are construed in the light most favorable to the [*18] plaintiff, and where doubts exist, they are resolved in the plaintiff's favor. See *DiStefano, 286 F.3d 81, 2001 WL 1379852,* at *2; *Hoffritz v. Amajac, 763 F.2d 55, 57 (2d Cir. 1985); Cornell v. Assicurazioni Generali, S.p.A., Nos. 97 Civ. 2262, 98 Civ. 9186 (MBM), 2000 U.S. Dist. LEXIS 11991, 2000 WL 28422,* at *1 (S.D.N.Y. Mar. 16, 2000); *Bluestone Capital Partners, L.P. v. MGR Funds Ltd., No. 98 Civ. 3128 (WHP), 1999 U.S. Dist. LEXIS 7518, 1999 WL 322658,* at *1 (S.D.N.Y. May 20, 1999).

A. Personal Jurisdiction Pursuant to C.P.L.R. 301

*New York C.P.L.R. 301* confers jurisdiction over a foreign corporation when it is "engaged in such a continuous and systematic course of 'doing business' [in New York] as to warrant a finding of its 'presence'" in the jurisdiction. *Frummer v. Hilton Hotels Int'l, Inc., 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851 (1967).* Because 301 jurisdiction exposes a corporation to lawsuits in New York arising from any cause of action, related or unrelated to activity in New York, a plaintiff must show that a defendant corporation does business in New York "with a fair measure of permanence and continuity." *Ball, 902 F.2d at 198* [*19] (quoting *Tauza v. Susquehanna Coal Co., 220 N.Y. 259, 267, 115 N.E. 915 (1917));* see also *Wiwa v. Royal Dutch Petroleum Co., 226 F.3d 88, 95 (2d Cir. 2000).* In order to establish "permanence and continuity," courts look to such factors as the existence of an office with employees of the corporation in New York; the solicitation of business in the state; and bank accounts and property in the state. See *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)*(citing *Hoffritz, 763 F.2d at 58); Hinsch v. Outrigger Hotels Hawaii, 153 F. Supp. 2d 209, 212 (E.D.N.Y. 2001);* see also *Frummer, 19 N.Y.2d at 537, 281 N.Y.S.2d at 44.*

Of the Defendants seeking to dismiss the Complaint pursuant to Rule 12(b)(2), only CFC Group, CFC International and Boris Merkenich are alleged in the Complaint to maintain offices in New York and, therefore, are directly claimed to do business with permanence and continuity in New York. See Complaint PP 2-4, 10. Plaintiff alleges in the Complaint that the other Defendants "transact business" in New York City. Plaintiff claims, [*20] however, that the other Defendants do business in New York through Merkenich, CFC Group, and CFC Securities--the New York based corporate af-filiate--since all of the corporate Defendants are alleged to be a single entity, under the umbrella of CFC Group and the control of Merkenich. See id. PP 11-14. Although Defendants deny that CFC Group, CFC International and Merkenich have offices in New York, see Affidavit of Boris Merkenich ("Merkenich Aff."), dated Dec. 6, 2000, attached as Ex. A to Defendants' Notice of Motion, at this stage of the proceedings, Plaintiff's allegations must be accepted as true. Moreover, Defendants' own promotional material describes the CFC Group as having an office in New York, and there is no dispute that CFC Securities is based in New York. See Dagen Aff., Ex. B.

Plaintiff asserts two theories under which personal jurisdiction may be extended from Merkenich, CFC Securities Inc., and CFC Group, to all of the other corporate Defendants: (1) that these Defendants are "mere departments" of CFC Group and CFC Securities, Inc., and (2) that CFC Group and CFC Securities, Inc. act as their agents in New York. See Plaintiff's Memorandum of Law, at [*21] 8-11.

It is well established that "the 'doing business' test does not subject a subsidiary corporation to personal jurisdiction simply because a state has jurisdiction over the parent, even if the parent is the sole shareholder of the subsidiary." *Saraceno v. S.C. Johnson & Son, Inc., 83 F.R.D. 65, 67 (S.D.N.Y.1979)* (citing cases); see also *Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998); Ross v. Colorado Outward Bound School, Inc., 603 F. Supp. 306, 310 (W.D.N.Y.1985)* (mere existence of "garden-variety" parent-subsidiary relationship is not sufficient to establish jurisdiction). Rather, the presence of the parent company may serve as a basis of jurisdiction over the subsidiary only if the parent is acting as the agent of the subsidiary, or if the control by the parent over the subsidiary is so complete that the subsidiary is a "mere department" of the parent. See *Grill v. Walt Disney Co., 683 F. Supp. 66, 69 (S.D.N.Y. 1988); Saraceno, 83 F.R.D. at 67;* cf. *Bialek v. Racal-Milgo, Inc., 545 F. Supp. 25, 32 (S.D.N.Y. 1982)* (discussing jurisdiction over parent through activities [*22] of subsidiary). Agency and "mere department" analyses also apply to affiliated corporate entities, whether or not they are in a "parent-subsidiary" relationship. See *Jacobs v. Felix Bloch Erben Verlag Fur Buhne Film Und Funk KG, 160 F. Supp. 2d 722, 733-34 (S.D.N.Y. 2001)*("Under New York law, a court may obtain jurisdiction over a foreign corporate defendant: 1) if it has a subsidiary or affiliate in New York which is a "mere department" of the foreign corporation or 2) if it employs or retains a local entity to act as its agent.").

1. Agency for Jurisdictional Purposes

In New York, personal jurisdiction may be asserted over a foreign corporation when that corporation affiliates itself with a New York representative entity which ren-

ders sufficiently important services on behalf of the foreign corporation, that the foreign corporation would perform itself absent the agent. *Wiwa, 226 F.3d at 95; Gelfand v. Tanner Motor Tours, Ltd., 385 F.2d 116, 121 (2d Cir. 1967); see also Frummer, 19 N.Y.2d at 533, 281 N.Y.S.2d at 41.*

Plaintiff argues that since New York City is a center of world finance, each of the Defendants [*23] would have been required to maintain a presence here in order to conduct their businesses. See Dagen Aff. P 21. The importance of CFC Securities, Inc.'s office in New York to the other CFC entities is illustrated by the emphasis it is given in the CFC Group's advertising materials. See CFC Group Profile, attached as Ex. B to Dagen Aff. Plaintiff further alleges that during the course of his employment with Defendants, Defendants utilized New York clearinghouses for some of their transactions, and required a clearing arrangement in New York in order to offer global services to clients. See Complaint P 23.

Courts have recognized the importance of New York as a financial center. See *Wiwa, 226 F.3d at 96.* It may, therefore, have been important for the CFC companies to maintain a presence in New York. However, Plaintiff fails to allege what, if any, specific services the New York-based CFC entities provided to the foreign CFC entities. Although Plaintiff alleges that CFC Securities, Inc. is registered with the National Association of Securities Dealers, he fails to explain the significance of this fact. Cf. *Jacobs v. Felix Bloch, 160 F. Supp. 2d at 737-39* [*24] (indicating that a plaintiff needs to show that the local corporation is primarily employed by the foreign defendant, that the purported agent has the authority to bind the defendant, and that the business conducted by the local corporation was a "main part" of the foreign defendant's business). Moreover, the mere statement that the CFC entities "required clearing arrangements in New York," see Dagen Aff. P 23, is insufficient to establish jurisdiction over them in New York. Cf. *Wiwa, 226 F.3d at 97* (activities necessary to maintain a stock exchange listing, without more, are insufficient to confer jurisdiction). Therefore, there is no basis to conclude that the services rendered by the New York entities were sufficiently important to the foreign Defendants so as to give rise to an agency relationship and justify the assertion of personal jurisdiction over the foreign Defendants.

2. "Mere Department" Jurisdiction

Plaintiff also alleges that Defendants CFC Securities, Inc., CFC International Inc., CFC Securities Asia, CFC Technology Ltd., CFC Securities Holdings Ltd., CFC Asset Management Holdings Ltd., and CFC Securities S.A., are "mere departments" of Defendant [*25] CFC Group, which does business in New York, and are therefore subject to personal jurisdiction in New York. He

alleges that Merkenich and CFC Group exercise such control over the other CFC corporations that they serve simply as departments, or alter egos, through which Merkenich and CFC Group conduct business throughout the world. See Complaint PP 11-14.

Jurisdiction over a foreign corporation may be established in New York if the foreign corporation has a New York subsidiary or affiliate which serves as its "mere department," or vice-versa, that is, if the foreign corporation is a "mere department" of the New York corporation. See *Jazini, 148 F.3d at 184 (2d Cir. 1998); Jacobs, 160 F. Supp. 2d at 733-34 (S.D.N.Y. 2001); Cornell, 2000 U.S. Dist. LEXIS 2922, 2000 WL 284222, at *3; ESI Inc. v. Coastal Corp., 61 F. Supp. 2d 35, 51 (S.D.N.Y. 1999)*(holding that jurisdiction can be asserted over a foreign subsidiary which is a "mere department" of a local parent corporation). While the existence of a related local corporation does not necessarily give rise to jurisdiction over an independently managed, foreign corporation, when the lines of separate [*26] corporate existence are blurred, personal jurisdiction over a foreign corporation may be appropriate. *Volkswagenwerk AktienGesellschaft v. Beech Aircraft Corporation, 751 F.2d 117, 120 (2d Cir. 1984).* There are four main factors to be considered when determining if the lines of corporate existence have been blurred and if jurisdiction founded on "mere department" analysis is appropriate. Common ownership is a requirement, and financial dependence, the level of control over selection of executive personnel, and the level of control over marketing and operational policies, are seen as important factors. *Jazini, 148 F.3d at 184-85; Beech, 751 F.2d at 120-22* ("Nearly identical ownership interests must exist before one corporation can be considered a department of another corporation for jurisdictional purposes."); see also *Jacobs v. Felix Bloch, 160 F. Supp. 2d at 734.*

In the instant case, CFC Securities does not deny doing business in New York and CFC Group Holdings, the parent corporation, is alleged to do business in New York, where it maintains an office. In addition, identical, or near identical, ownership is alleged [*27] here. Plaintiff contends that Merkenich owns 100% of CFC Group, which in turn owns 100% of CFC International, CFC Technology, CFC Securities Holdings Ltd., CFC Asset Management Holdings Ltd., and CFC Securities S.A., as well as 85% of CFC Securities Asia and CFC Securities, Inc. See Dagen Aff., P 35 and Ex. D. Plaintiff further alleges that Merkenich controlled the operational policies of all the CFC corporations, and that CFC Group and Merkenich were involved in personnel decisions made by the various CFC entities. See id. P 33. There are specific facts alleged that support these allegations. Merkenich, on behalf of CFC Group, and Domney, on behalf of CFC Securities, hired Plaintiff to work for CFC Asia, while

having him report to CFC International's board of directors. In addition, Plaintiff was made a director of CFC Securities, CFC Asset Management Holdings, CFC Technology, and CFC Group. See Dagen Aff. P 46. Subsequently, Merkenich took actions to remove him as a director. See Complaint P 36; Dagen Aff. P 81. Moreover, Plaintiff claims that his salary for work with CFC Group and CFC Securities, Inc. in New York, and his benefits while working for CFC Asia, were [*28] paid by CFC Securities, Inc. n7 See Dagen Aff. PP 28, 29. Thus, although Plaintiff's factual allegations center on Defendants CFC Group, CFC Securities Inc., CFC Asia, and Merkenich, Plaintiff alleges, and there is some evidence to support his allegations, that all of the corporate Defendants are, in effect, a single entity, under the control of Merkenich. n8

> n7 This suggests a commingling of corporate assets.

> n8 For example, Plaintiff alleges that Merkenich shifted assets from CFC Asia to the CFC Swiss affiliate, CFC Securities, S.A., and shifted expenses to CFC Asia from CFC Securities, S.A.. See Complaint PP 30-31. In addition, Plaintiff alleges that Merkenich attempted to organize a kickback scheme through CFC Securities, S.A.. See Dagen Aff. P 67.

Having alleged sufficient facts to show common ownership, commingling of assets, and coordinated hiring and termination of personnel, Plaintiff has made out a prima facie case for personal jurisdiction over all of the corporate Defendants, [*29] on the grounds that they were "mere departments" of CFC Group, and thus subject to personal jurisdiction in New York.

3. Jurisdiction over Defendant Merkenich

Defendants argue that even if Plaintiff can establish "doing business" jurisdiction over the corporate Defendants, this jurisdiction does not extend to the individual Defendant, Merkenich, because there are no allegations that he was "doing business" in New York in his individual capacity.

Defendant Merkenich is alleged to be the chairman and a member of the board of directors of all the CFC entities, the CEO of at least two of the CFC entities, CFC Group and CFC Asia, and he is alleged to maintain an office in New York City. He is named as an individual Defendant on the theory that all of the corporate Defendants are, in fact, mere instrumentalities and alter egos of Merkenich. See Complaint P 11. Accordingly, personal jurisdiction can be asserted over him if it can be shown

that the CFC companies doing business in New York are shell companies over which Merkenich exercises complete dominance. See *Kinetic Instruments, Inc. v. Lares, 802 F. Supp. 976, 985 (S.D.N.Y. 1992)*(When analyzing whether it is [*30] appropriate to pierce the corporate veil and hold an individual owner responsible for the actions of a corporation, "the critical question is whether the corporation is a shell being used by the individual shareowners to advance purely personal rather than corporate ends.")(citing *Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 138 (2d Cir. 1991))*; see also *Marine Midland, 664 F.2d at 903* ("If the corporation is merely a shell, it is equitable, even if the shell may not have been used to perpetrate a fraud, to subject its owner personally to the court's jurisdiction to defend the acts he has done on behalf of his shell."); Alter v. Bogoricin, No. 97 CIV. 0662(MBM), *1997 U.S. Dist. LEXIS 17369 , 1997 WL 691332*, at *5 (S.D.N.Y. Nov. 6, 1997)(a plaintiff must establish a relationship between the alleged wrong against him and the defendant's alleged abuse of the corporate form).

Plaintiff alleges sufficient facts to pierce the corporate veil by alleging Merkenich's complete ownership, control and dominance of CFC Securities and CFC Group, which do business in New York, as well as the other CFC entities. See *Kinetic Instruments, 802 F. Supp. at 986* [*31] ("The court may consider such factors as the lack of corporate formalities, the inadequate capitalization of the corporation, and the intermingling of corporate and individual finances."). As principal owner, chairman, and member of the board of directors of the CFC companies, and CEO of CFC Group, Plaintiff alleges that Merkenich disregarded corporate distinctions and commingled corporate funds. See Complaint P 14. Plaintiff further alleges that Merkenich made personnel decisions for the various CFC entities. See Dagen Aff. P 33. In addition, Plaintiff contends that Merkenich used his domination of the Defendant corporations to interfere with and breach Plaintiff's employment contract. For example, Merkenich is alleged to have diverted business from CFC Asia to other CFC entities. See Complaint PP 30-31. Although Plaintiff's allegations may turn out to be untrue, at this stage, before there has been an opportunity for discovery, sufficient facts are alleged to establish a prima facie case of personal jurisdiction over Merkenich.

Moreover, personal jurisdiction may be asserted over Merkenich under *New York C.P.L.R. 302 (a)(1)*. See discussion infra, at 27-29. [*32]

B. Personal Jurisdiction pursuant to C.P.L.R. 302 (a)(1)

Plaintiff also relies upon Section 302(a)(1) of New York's long-arm statute as another basis for personal

jurisdiction over Defendants. *New York C.P.L.R. 302(a)* provides, in relevant part,:

> "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:
>
> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state ...."

*N.Y. C.P.L.R. 302(a)*. While, under Section 301, a plaintiff must show that a defendant does business in the state, and therefore has an ongoing presence, under Section 302(a)(1), a plaintiff need only show that the defendant "transacted business" in New York, and that there is "some articulable nexus between the business transacted and the cause of action sued upon." *Beacon, 715 F.2d at 764* (citing *McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981)*; *see also Hoffritz, 763 F.2d at 58* ("The showing necessary for [*33] a finding that defendant 'transacted business' and is suable on a cause of action arising from that transaction is considerably less than that needed to establish the defendant's 'doing business,' which renders the defendant subject to suit even on an unrelated cause of action.").

In an action arising under a contract, whether an "out-of-state defendant transacts business in New York is determined by considering a variety of factors, including: (i) whether the defendant has an on-going contractual relationship with a New York corporation, (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship, (iii) what the choice-of-law clause is in any such contract, and (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state." *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)*. Although all are relevant, no one factor is dispositive. Other factors [*34] may also be considered, and the ultimate determination is based on the totality of the circumstances. See *PaineWebber Inc. v. Westgate Group, Inc., 748 F. Supp. 115, 118 (S.D.N.Y. 1990)*. The second prong of the 302(a)(1) test requires a court to determine whether the transaction of business in New York "bears a substantial relationship to the transaction out of which the instant cause of action arose." *Beacon, 715 F.2d at 764* (citing

*McGowan, 52 N.Y.2d at 272)*. There must be a "direct relation between the cause of action and the in-state conduct." *Fontanetta v. Am. Bd. of Internal Med., 421 F.2d 355, 357 (2d Cir. 1970)*.

Plaintiff has alleged that Defendants CFC Group, CFC Securities, Inc. and Merkenich negotiated and signed his employment contract in New York. There is no strict list of activities that constitute the transaction of business in New York, but where a breach of contract is alleged "the case in which the defendant was physically present in New York at the time the contract was made, in addition to sufficient other contacts, is ... 'the clearest sort of case in which [New York] courts would have 302 [*35] jurisdiction.'" *Hoffritz, 763 F.2d at 60* (citing *Parke-Bernet Galleries, Inc. v. Franklyn, 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340, 256 N.E.2d 506 (1970))*; *see also Agency Rent A Car, 98 F.3d at 29*. Moreover, the Defendants who negotiated and signed the contract are alleged to have maintained offices in New York and to have paid part of Plaintiff's salary and benefits from New York. In addition, Plaintiff's contract provided that it was governed by "New York law in New York courts." See, e.g., *ESI, 61 F. Supp. 2d at 59* ("Although not dispositive, New York choice of law provisions are significant considerations under a 'transacting business' analysis."). Thus, Defendants CFC Group and CFC Securities, Inc. can be said to have "transacted business" in New York. See Dagen Aff. PP 24-29.

Although not all of the Defendants were parties to Plaintiff's employment contract, if, as Plaintiff alleges, Defendants operate as a single unit, then all of the Defendants can be said to have "transacted business" in New York. Moreover, since Plaintiff's claims arise out of his contractual relationship with Defendants, a clear nexus [*36] exists between Defendants' acts in New York and the causes of action sued upon. See *Hoffritz, 763 F.2d at 59-60* (holding that, in order to assert personal jurisdiction under 302(a)(1), it is unnecessary for the acts constituting breach of contract to take place in New York; where the contract was negotiated and executed in New York, and defendant made frequent visits to New York, a substantial nexus existed between the defendant's activities in New York and the alleged breach of contract). Thus, Plaintiff has made a prima facie showing of personal jurisdiction over the corporate Defendants.

Section 302(a)(1) also provides a basis for asserting jurisdiction over the individual Defendant, Merkenich. Defendants claim that Merkenich did not transact any business in New York in his personal capacity, and that Merkenich does not maintain an office in New York for personal use, but merely in his capacity as an executive of the CFC companies. They therefore argue that he is not subject to personal jurisdiction in New York. However, the "fiduciary shield" doctrine, whereby foreign corporate

officers are shielded from personal jurisdiction in a state if the only basis [*37] for jurisdiction is the work they do for a local corporation, is no longer available under the New York long-arm statute. See *Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 470, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988).* Thus, to the extent that Merkenich transacted business in New York in his corporate capacity, sufficient to satisfy the Section 302(a)(1) test, he is subject to personal jurisdiction in New York, provided that the assertion of personal jurisdiction over him would satisfy due process requirements. See id.; *Reynolds Corp. v. Nat'l Operator Servs., Inc., 73 F. Supp. 2d 299, 303 (W.D.N.Y. 1999)*(holding that a corporate officer who engages in activities or conduct in New York that satisfies Section 302(a)(1), in his personal or corporate capacity, subjects himself to personal jurisdiction in New York); *Champion Motor Group, Inc. v. Visione Corvette of Mass., Inc., 992 F. Supp. 203, 206* (holding that a foreign corporate officer who was personally involved in negotiating and executing a contract between the corporation and a New York plaintiff in New York was subject to personal jurisdiction, even if the acts were performed [*38] in a corporate capacity). In addition, personal jurisdiction may be asserted over an officer of a foreign corporation transacting business in New York, where the corporation acted as the individual's agent. *Kreutter, 71 N.Y.2d at 467; In re Sumitomo Copper Litig., 120 F. Supp. 2d 328, 336 (S.D.N.Y. 2000).* To establish that the out-of-state defendant acted through an agent for jurisdictional purposes, a plaintiff must show that (1) the corporation engaged in purposeful activities in New York, (2) that its activities were for the benefit of and with the knowledge and consent of the defendant, and (3) that the defendant exercised some level of control over the corporation in the transaction out of which plaintiff's injury arises. See *In re Sumitomo Copper Lit., 120 F. Supp. 2d at 336; Karabu Corp. v. Gitner, 16 F. Supp. 2d 319, 323 (S.D.N.Y. 1998); Kinetic Instruments, 802 F. Supp. at 984; Kreutter, 71 N.Y.2d at 467.*

In the instant case, Plaintiff has alleged that Merkenich has complete control over the CFC entities, including the New York based CFC Securities, which hired Plaintiff, [*39] and that the CFC entities acted in Merkenich's interest. He has also alleged that Merkenich participated in the negotiation and execution of his employment contract in New York, as well as Plaintiff's constructive termination. Thus, the corporations transacting business in New York acted as Merkenich's agent because they acted with Merkenich's knowledge and consent, and in his interest. Plaintiff further alleges that Merkenich has substantial connections to New York, including maintaining an office in New York, frequently visiting New York, and acting as a director of a New York corporation. Thus, Merkenich is amenable to personal jurisdiction in New York, under Section 302(a)(1).

### C. Forum Selection Clause

Plaintiff also argues that personal jurisdiction over Defendants exists as a result of the forum selection clause contained in his employment contract. See Complaint P 17. The employment agreement states that "New York law in New York courts governs this agreement." See Dagen Aff., Ex. C, at 2. Defendants contend that this clause does not exclude other forums, and is permissive rather than mandatory. See Def. Mem. at 23-24. They also claim that even if the Court [*40] were to rule that they consented to personal jurisdiction in New York by including the forum selection clause in the contract, since only two of the Defendants were parties to the contract, it does not establish jurisdiction over the others. Finally, Defendants argue that the forum selection clause is unenforceable even against the parties to the employment contract, because enforcement would be "unreasonable and unjust."

Under New York law, a forum will not be considered the exclusive forum for litigation unless parties have demonstrated their clear intent to have it be the exclusive forum. See *John Boutari and Son, Wines and Spirits, S.A. v. Attiki Importers and Distribs. Inc., 22 F.3d 51, 52 (2d Cir. 1994)* (An agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion.); see also Bombardier Capital Inc. v. Solomon, No. 00 Civ. 0848(RMB), *2000 U.S. Dist. LEXIS 16711, 2000 WL 1721138,* at **11-12 (S.D.N.Y. Nov. 17, 2000); *Reliance Ins. Co. v. Six Star, Inc., 155 F. Supp. 2d 49, 57-58 (S.D.N.Y. 2001).* However, even where a non-exclusive forum selection provision is [*41] included in a contract, the parties to the contract shall be deemed to have consented to jurisdiction in the referenced forum, although not to the exclusion of all other fora. See *Nat'l Union Fire Ins. Co. of Pittsburg, P.A. v. Frasch, 751 F. Supp. 1075, 1078 (S.D.N.Y. 1990)*(holding that a permissive forum selection provision in a contract constitutes consent to the jurisdiction of the chosen forum); see also *Boutari, 22 F.3d at 53.*

In this case, the employment contract's language is not sufficiently precise so as to confer exclusive jurisdiction in New York. It merely states that "New York law in New York courts" shall govern the agreement. Although the meaning of this language with respect to forum selection is not entirely clear, it is sufficient to support a prima facie showing that its signatories, CFC Group and CFC Securities, Inc., consented to personal jurisdiction in New York. The other CFC entities, may also be deemed bound by the forum selection clause if, as Plaintiff has alleged, they are not distinct from CFC Group.

Finally, Defendants' assertion that enforcement of the forum selection clause would be "unreasonable or unjust,"

2002 U.S. Dist. LEXIS 25767, *

[*42] *M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 15, 92 S. Ct. 1907, 1916, 32 L. Ed. 2d 513 (1972)*, has no relevance. The Court is not enforcing the forum selection clause, but merely referring to it as evidence of Defendants' consent to personal jurisdiction in New York. In any event, enforcement of the provision would not be unjust. See discussion, infra at 38-47.

D. Due Process

In addition to satisfying the requirements of New York's long-arm statute, Plaintiff must show that the Defendants have "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95(1945)* (quoting *Milliken v. Meyer, 311 U.S. 457, 463, 61 S. Ct. 339, 343, 85 L. Ed. 278 (1940))*; see also *Wiwa, 226 F.3d at 99*. A plaintiff must show that the defendant "purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla, 357 U.S. 235, 253, 78 S. Ct. 1228, 1240, 2 L. Ed. 2d 1283 (1958)*; [*43] see also *Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 108-09, 107 S. Ct. 1026, 1030, 94 L. Ed. 2d 92 (1987)*; *Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75, 105 S. Ct. 2174, 2183-84, 85 L. Ed. 2d 528 (1985)*.

Defendants have not argued that the assertion of personal jurisdiction over them in New York would offend due process, nor could they reasonably do so. As discussed above, Defendants here are alleged to have "done," as well as "transacted" business in New York, including negotiating, signing, and partially performing Plaintiff's employment contract in New York. They are also alleged to maintain offices in New York and conduct financial transactions here. The contacts alleged by Plaintiff are clearly sufficient to conclude that the assertion of personal jurisdiction over the Defendants would not offend standards of constitutional due process.

\*\*\*\*

Thus, Plaintiff has made a prima facie showing that this Court has personal jurisdiction over all Defendants, under *N.Y.C.P.L.R. 301, N.Y.C.P.L.R. 302(a)(1)*, and by consent pursuant to the permissive forum selection clause contained in Plaintiff's employment contract. Accordingly, [*44] the Court recommends that Defendants' motion to dismiss for lack of personal jurisdiction be denied.

III. Insufficient Service of Process

Defendants also contend that this action should be dismissed for insufficient service of process, pursuant to *Rule 12(b)(5) of the Federal Rules of Civil Procedure.*

Defendants claim that the Court does not have jurisdiction over them because only CFC Securities Inc., in New York, was properly served by Plaintiff. According to Defendants, Plaintiff's service of process was defective, since service by mail is not available in Hong Kong under the Hague Convention. Alternatively, Defendants claim that Plaintiff's summonses were improperly sent to the six Hong Kong Defendants by Federal Express, rather than registered post through official channels, and by a process server, rather than the Clerk of the Court. See Def. Mem. at 17-19. In addition, Defendants contend that no summons or Complaint at all, much less one translated into French or German, as required by the Hague Convention, was sent to CFC Securities, S.A. in Switzerland. See id. at 18. In fact, Defendants claim that the only non-New York Defendant to receive service was Boris [*45] Merkenich, who received a single Federal Express mailing in Hong Kong, which contained six copies of the Complaint. Id.

Plaintiff concedes that Defendants CFC Group, CFC Asia, CFC Technology, CFC Securities Holdings Ltd., CFC Asset Management, and Merkenich were served by sending a Federal Express package containing a summons and six copies of the Complaint to Merkenich in Hong Kong, but claims that such service is proper under New York law and the Hague Convention. Moreover, Plaintiff contends that the parcel was sent by the Clerk of the Court. Finally, Plaintiff claims that the translation of the summons and Complaint into French or German was not required, since a representative of CFC Securities, S.A. accepted delivery voluntarily.

Service of process upon a foreign party is governed by *Rule 4(f) of the Federal Rules of Civil Procedure*, which cross-references to the Hague Convention On the Service Abroad of Judicial and Extrajudicial Documents ("Hague Convention"), *20 U.S.T. 361, 1969 U.S.T. Lexis 152 (1969)*. Rule 4(f) provides, in pertinent part:

"Unless otherwise provided by federal law, service upon an individual from whom a waiver has not been obtained [*46] and filed, other than an infant or an incompetent person, may be effected in a place not within any judicial district of the United States:

(1) by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents ...."

*Fed. R. Civ. P. 4(f).*

Defendants point to Hong Kong's objections (through China) to sub-paragraphs (b) and (c) of Article 10 of the Hague Convention as invalidating Plaintiff's method of service. However, in serving the Hong Kong Defendants, Plaintiff relied on Article 10(a) of the Hague Convention, which has not been objected to by Hong Kong. Article 10(a) states that, "the present Convention shall not interfere with (a) the freedom to send judicial documents, by postal channels, directly to persons abroad." *20 U.S.T. 361, 1969 U.S.T. Lexis 152 (1969).* Since the Second Circuit has interpreted "send" to include "service," Article 10(a) can be read to allow parties to serve process on foreign defendants through "postal channels." See *Ackermann v. Levine, 788 F.2d 830, 839 (2d Cir. 1986)*("reaching the 'inescapable' [*47] conclusion that use of 'send' rather than the otherwise consistently used 'service' 'must be attributed to careless drafting.'")(citing 1b. Ristau, International Judicial Assistance (Civil and Commercial) 4-10 at 132 (1984)); Silver Top Ltd. v. Monterey Indus. Ltd., No. 94 Civ. 5731(LMM), *1995 U.S. Dist. LEXIS 1981, 1995 WL 70599, at *2 (S.D.N.Y. Feb. 21, 1995).* Therefore, direct service by mail, rather than through a Central Authority, is valid service on a corporation in Hong Kong.

Moreover, it was not improper to serve Defendants by Federal Express rather than by regular mail. n9 "Service is constitutionally valid if it is in itself reasonably certain to inform those affected." *Silver Top Ltd., 1995 U.S. Dist. LEXIS 1981, 1995 WL 70599, at *2 (citing Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314, 94 L. Ed. 865, 70 S. Ct. 652 (1950))* (internal citations omitted); see also *Ackermann, 788 F.2d at 841.* The distinction between service through "postal channels" and Federal Express is not meaningful because Federal Express delivery through a courier is no less secure than regular mail. See, e.g., *R Griggs Group Ltd. v. Filanto SPA, 920 F. Supp. 1100, 1104-1107 (D. Nev. 1996)* [*48] (denying a motion to dismiss for improper service where defendant was served by Federal Express under Article 10(a) of the Hague Convention); *EOI Corp. v. Med. Mktg. Ltd., 172 F.R.D. 133, 143 (D.N.J. 1997)*(holding that mailing of the summons and complaint to the defendant corporation's office at the corporation's offices in Italy via Federal Express was sufficient notice and proper service under the Hague Convention); compare *Casio Computer Co. v. Sayo, No. 98 Civ. 3772 (WK), 2000 U.S. Dist. LEXIS 15411, 2000 WL 1877516, at *28 (S.D.N.Y. Oct. 13, 2000)*(express mail delivery by overnight courier was not a proper form of service because Japan had objected to service of process by postal channels under the Hague Convention). Furthermore, it appears that, contrary to Defendants' assertion, the Clerk of the Court did effect the Federal Express mailing to Hong Kong; Plaintiff's process server was merely listed as the shipper for tracking purposes. See Affidavit of Andrew Bartley, dated Feb. 8, 2001, PP 5-10 and Ex. 4.

n9 Defendants have not argued that they have not received notice of the action, nor do they argue that it was improper to serve them through Merkenich. They merely claim that the manner in which the summonses and Complaints were sent to Merkenich was improper.

[*49]

As for the Swiss Defendant, CFC Securities S.A., Plaintiff contends that it was properly served through the Central Authority in Switzerland, as required by the Hague Convention. Defendants' contention that there was no service on CFC Securities, S.A. in Switzerland is belied by the receipt of delivery attached to the affidavit of Andrew Bartley, indicating that such service was accepted voluntarily by Thierry Berguerand, Chief Operating Officer of CFC Securities, S.A. See Request for Service Abroad of Judicial or Extrajudicial Documents, attached as Exhibit 5 to Bartley Aff. Defendants' argument that the Hague Convention requires the translation of documents is also without merit. Although translation of a summons into the official language of the foreign State may be required under Article 5 of the Hague Convention, Switzerland does not require translation where service is accepted voluntarily. See Hague Convention, Reservations and Declarations of Switzerland P 3.

In conclusion, Defendants have not shown that they were not properly served, and their motion to dismiss under *Rule 12(b)(5) of the Federal Rules of Civil Procedure* should be denied.

IV. Forum Non [*50] Conveniens

Defendants argue that this action should be dismissed under the doctrine of forum non conveniens. They contend that this action should have been brought in Hong Kong, since most of the acts complained of in the Complaint took place in Hong Kong, and since the witnesses and documents required for trial are located principally in Hong Kong. Moreover, Defendants indicate that they would consent to jurisdiction in Hong Kong, should the action be brought there.

Plaintiff, on the other hand, contends that the action should be heard in New York since key witnesses and documents are located in New York, the Plaintiff and two of the Defendants are American, and because deference should be given to both Plaintiff's choice of forum and the forum selection clause contained in Plaintiff's employment contract.

2002 U.S. Dist. LEXIS 25767, *

Plaintiffs are generally granted great deference in their selection of a forum for the litigation of their suit. See *Piper Aircraft Co. v. Reyno, 454 U.S. 235, 242, 102 S. Ct. 252, 259, 70 L. Ed. 2d 419 (1981); Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 67 S. Ct. 839, 843, 91 L. Ed. 1055 (1947); Murray v. British Broad. Corp., 81 F.3d 287, 290 (2d Cir. 1996);* [*51] *Wiwa, 226 F.3d at 88.* The deference increases "where an American plaintiff brings suit against a foreign entity and the alternative forum is foreign." *David Tunick, Inc. v. Kornfeld, 813 F. Supp. 988, 992 (S.D.N.Y. 1993);* see also *Koster v. Lumbermens Mut. Cas. Co., 330 U.S. 518, 524, 67 S. Ct. 828, 832, 91 L. Ed. 1067 (1947).* n10 However, when a United States plaintiff sues in a United States forum different from the one in which he resides, "the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations." *Iragorri v. United Techs. Corp., 274 F.3d 65, 71 (2d Cir. 2001).* "The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to plaintiff's forum choice." *Id. at 71-72.* Under this analysis, the Second Circuit has indicated that "the factors that argue against forum non conveniens dismissal include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses [*52] or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." *Id. at 72.* In contrast, the more it appears that the plaintiff's choice of a U.S. forum was made for a tactical advantage, or the inconvenience or expense to the defendant resulting from litigation in that forum, less deference is due to plaintiff's choice of forum. See id.

> n10 Defendant's rely on a statement in *Dragon Capital Partners L.P. v. Merrill Lynch Capital Servs., Inc., 949 F. Supp. 1123, 1131 (S.D.N.Y. 1997),* which diminishes the presumption given to a plaintiff's choice of forum if the plaintiff, or the real parties in interest, are foreign. (Def. Mem. at 22.) This principle, however, is inapposite, as Plaintiff in the instant case is American, and is suing in his home forum. The "home forum" of an American citizen for forum non conveniens purposes is any United States court. *DiRienzo v. Philip Servs. Corp., 232 F.3d 49, 62 (2d Cir. 2000).*

[*53]

Although, in the instant case, Plaintiff is an American citizen suing in a district in which he does not reside, considerable deference must still be accorded to his choice of forum. Plaintiff's reasons for filing this action in the Southern District of New York are the type of bona fide reasons contemplated by the Second Circuit in *Iragorri, 274 F.3d at 72:* (1) Defendants' amenability to suit in the Southern District of New York, rather than in Plaintiff's home district; (2) the availability of witnesses and documentary evidence in New York; and, (3) the existence of a forum selection clause that refers to New York. Moreover, the action, and Defendants themselves, have significant contacts with New York. Id.

Defendants can rebut the presumption in favor of Plaintiff's choice of forum with strong evidence that a change of forum is necessary for a fair and judicious trial. See *Koster, 330 U.S. at 524, 67 S. Ct. at 831-32.* Initially, Defendants must establish that there is an adequate alternative forum, and then demonstrate, based upon relevant public and private interest factors, that the balance of convenience tips strongly in favor of trial [*54] in the alternative forum. See *Iragorri v. Int'l Elevator, Inc., 243 F.3d 678, 680 (2d Cir. 2001); Jacobs v. Felix Bloch, 160 F. Supp. 2d at 742;* see also *Gilbert, 330 U.S. at 506-07; Wiwa, 226 F.3d at 100; Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir. 1996).* A court must apply a strong presumption in favor of the plaintiff's chosen forum when weighing the public and private interest factors favoring each location, and in close cases should defer to plaintiff's choice of forum. See *Gilbert, 330 U.S. at 508, 67 S. Ct. at 839; DiRienzo, 232 F.3d at 62.*

Defendants have satisfied the first prong of the forum non conveniens test--requiring that an alternate forum exist--by representing that they would consent to jurisdiction in Hong Kong were the action in the United States dismissed. See Def. Mem. at 21-22; see also *Murray, 81 F.3d at 292.* n11 However, they cannot satisfy the second prong by showing that Hong Kong is a more convenient forum, and that allowing the action to proceed there would better serve the interests of justice.

> n11 Moreover, Plaintiff does not dispute that this action could be brought in Hong Kong, and acknowledges that two actions involving some of the same parties are currently being litigated in that forum.

[*55]

A. The Private Interest Factors

In Gilbert, the Supreme Court outlined the private interest factors that should play a role in a court's analysis. These factors are: 1) the relative ease of access to sources of proof; 2) the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; 3) the possibility of viewing the premises, if viewing them would be appropriate to the

action; 4) all other practical problems that make trial of a case easy, expeditious and inexpensive; and 5) questions as to the "enforceability of a judgment if one is obtained." *330 U.S. at 508-09, 67 S. Ct. at 839;* see also *Piper Aircraft, 454 U.S. at 241, n.65, 102 S. Ct. at 258, n.6; DiRienzo, 232 F.3d at 63.*

Here, Defendants' claim that a trial in Hong Kong would provide the greatest ease of access to the essential sources of proof. See Def. Mem. at 25. They claim that all of the acts giving rise to Plaintiff's claims of breach of his employment contract occurred in Hong Kong, and, therefore, all relevant documents and witnesses are in Hong Kong. See id. at 25-26. However, Plaintiff contends [*56] that the key documents will be available through CFC's New York-based company, and that those available in Hong Kong will not be so voluminous as to present undue hardship. Moreover, Plaintiff claims that two of the three main witnesses in this action are located in the United States--himself and Domney. n12 Given the conflicting assertions on this issue, and the fact that there has not yet been discovery in this action, the Court cannot conclude that this factor tips strongly in Defendants' favor.

> n12 According to Plaintiff, the other main witness would be Merkenich, who, as a Defendant, would have an independent interest in appearing.

Next, Defendants point to the disruption to their business and the prohibitive cost of obtaining the attendance of willing witnesses in New York, as reasons to dismiss this action in favor of a Hong Kong forum. See Def. Mem. at 28-29. Defendants identify nine Hong Kong-based witnesses they plan on calling. See id. at 26-27. Plaintiff questions whether most of these witnesses [*57] have any relevant information, see Pl.'s Mem. at 23, and identifies two witnesses from New York, in addition to himself and Domney, that he intends to call at trial. Thus, "wherever the trial takes place, witnesses will be forced to travel to provide testimony." *Peregrine, 89 F.3d at 46-47;* see also *ESI, Inc. v. Coastal Corp., 61 F. Supp. 2d 35, 37 (S.D.N.Y. 1999).* Again, the parties' conflicting contentions and their inability, at this early stage in the litigation, to demonstrate who the actual witnesses at trial will be, precludes the Court from concluding that Defendants' cost and inconvenience would so greatly outweigh Plaintiff's so as to justify depriving Plaintiff of his chosen forum.

Defendants next contend that the expense and length of the process for compelling unwilling witnesses to appear in New York make New York such an inconvenient forum as to render it unavailable. See Def. Mem. at 28-29. However, they do not contest that such process is avail-able in the United States. Their argument is further undermined if one considers the list of foreign witnesses whom they consider crucial. Of the nine individuals they list, only one [*58] is neither a Defendant nor an employee of Defendants. Thus, there would only be a minimal need for Defendants to compel the attendance of unwilling witnesses. In contrast, Plaintiff does not appear to have any control over his New York witnesses, and it is doubtful that they could be compelled to appear in Hong Kong.

Finally, Defendants claim that, should the trial be held in New York, Plaintiff would have difficulty in enforcing any judgment he might secure. See Def. Mem. at 29. If true, one would think that Plaintiff would share this concern. In any event, because one of the key defendants, CFC Securities Inc., is a New York company, the claim that any judgment obtained in New York would be difficult to enforce carries little weight.

In sum, the private interests in issue cannot be said to weigh strongly in Defendants' favor.

B. The Public Interest Factors

The Gilbert court also outlined four public interest factors for courts to weigh in the forum non conveniens inquiry: (1) administrative difficulties associated with court congestion; (2) the unfairness of imposing jury duty on a community with no relation to the litigation; (3) the "local interest in having [*59] localized controversies decided at home;" and (4) avoiding difficult problems in conflict of laws and the application of foreign law. See *Gilbert, 330 U.S. at 509, 67 S. Ct. at 839.*

Defendants point to the administrative difficulties flowing from court congestion in New York as a public interest factor to be considered by the Court. Since Defendants contend that all of the acts at issue in this case took place in Hong Kong, they argue that a Hong Kong court would not face the obstacles that would slow a New York proceeding. See Def. Mem. at 29-30. The court congestion factor has been consistently downplayed in Second Circuit decisions. See, e.g., *Guidi v. Inter-Continental Hotels Corp., 224 F.3d 142, 146, n.5 (2d Cir. 2000)* (noting that the recent filling of judicial vacancies in the Southern District of New York make the concern regarding court congestion of little or no present significance). Moreover, Defendants fail to make clear what it is they contend will cause the "inevitable" delay in New York, rather than in Hong Kong. See Def. Mem. at 30.

Defendants make a strong argument that this is a Hong Kong dispute, most of the Defendants [*60] are based in Hong Kong, and many of the events in issue took place in Hong Kong. They thus argue that a trial in Hong Kong would further the public interest in having localized

controversies decided at home, and would relieve a New York jury of the burden of having to adjudicate a case unrelated to its home forum. However, Plaintiff is an American citizen who negotiated, signed, and partially performed his employment contract in New York. Thus, New York and a New York jury also have a legitimate interest in adjudicating this dispute. Cf. *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 492 (2d Cir. 1998)*(a contract that was substantially negotiated and signed in New York, and was governed by New York law, suggests that New York is the proper venue for an action under the contract).

Finally, Defendants argue that in order to avoid a court having to deal with conflict of laws issues, this case should be moved to Hong Kong, because Hong Kong law will be applied to many of the claims. While it is true that some of Plaintiff's non-contractual claims potentially present the Court with a set of complex conflict of laws questions, and might require [*61] it to apply foreign law, this fact alone is insufficient to overcome the presumption in favor of Plaintiff's choice of forum. See *Peregrine, 89 F.3d at 47* ("Even if this case raises complicated choice of law questions and requires the exclusive application of foreign law as suggested by Segal, 'it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens.'") (quoting *R. Maganlal & Co. v. M.G. Chemical Co., 942 F.2d 164, 169 (2d Cir. 1991)); see also Boosey, 145 F.3d at 492*. Moreover, it appears that a Hong Kong court would be required to apply New York law with respect to most of Plaintiff's claims. Plaintiff's employment agreement states that it is governed by "New York law in New York courts." Thus, it appears that New York law governs at least Plaintiff's contract claims. See Dagen Aff., Ex. C at 2.

In sum, having weighed the public and private interest factors, this Court concludes that Defendants have failed to overcome the presumption in favor of Plaintiff's choice of forum; they have not shown that a trial in New York is inappropriate or would cause [*62] "oppressiveness and vexation ... out of all proportion to plaintiff's convenience." *Koster, 330 U.S. at 524, 67 S. Ct. at 831-832; see also Piper, 454 U.S. at 241, 102 S. Ct. at 258*. Accordingly, I recommend that Defendants' motion to dismiss the Complaint pursuant to the doctrine of forum non conveniens be denied.

IV. Failure to State a Claim

Defendants contend that Plaintiff has failed to state a claim upon which relief may be granted, and seek to have the Complaint dismissed pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure*. Defendants contend that each of Plaintiff's nine causes of action should be dismissed against all Defendants.

Dismissal of a complaint for failure to state a claim is proper only where "it appears beyond doubt that the plaintiff can prove no set of facts in support of [its] claim that would entitle [it] to relief." *ICOM Holding, Inc. v. MCI Worldcom, Inc., 238 F.3d 219, 221 (2d Cir. 2001)* (quoting *Harris v. City of New York, 186 F.3d 243, 247 (2d Cir. 1999))*. "At the Rule 12(b)(6) stage, the issue is not whether a plaintiff is likely to prevail ultimately, [*63] but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Sims v. Artuz, 230 F.3d 14, 20 (2d Cir. 2000)* (quoting *Chance v. Armstrong, 143 F.3d 698, 701 (2d Cir. 1998)* (quotation marks omitted)).

In deciding a 12(b)(6) motion to dismiss, a court must construe the allegations of the complaint in the plaintiff's favor. See *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 1686, 40 L. Ed. 2d 90 (1974); see also Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 67 (2d Cir. 1998); Branham v. Meachum, 77 F.3d 626, 628 (2d Cir. 1996); Hernandez v. Coughlin, 18 F.3d 133, 136 (2d Cir. 1994)*.

In order to survive a motion to dismiss, *Rule 8(a) of the Federal Rules of Civil Procedure* requires only that a plaintiff "give the defendant fair notice of what plaintiff's claim is and the grounds upon which it rests." *Swierkiewicz v. Sorema N. A., No. 00-1853, 534 U.S. 506, 152 L. Ed. 2d 1, 122 S. Ct. 992, 2002 WL 261807*, at *4 (Feb. 26, 2002) [*64] (quoting *Conley v. Gibson, 355 U.S. 41, 47, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957))*. "This simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." Id. "If a pleading fails to specify the allegations in a manner that provides sufficient notice, a defendant can move for a more definite statement under Rule 12(e) before responding. Moreover, claims lacking merit may be dealt with through summary judgment under Rule 56." *Id. 534 U.S. 506*, [WL] at *5. Nevertheless, "[a] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6)." *De Jesus v. Sears, Roebuck & Co., Inc., 87 F.3d 65, 70 (2d Cir. 1996)*(citing *Palda v. Gen. Dynamics Corp., 47 F.3d 872, 875 (7th Cir. 1995)); see also Blackburn v. City of Marshall, 42 F.3d 925, 931 (5th Cir. 1995)*.

In deciding a motion to dismiss, a court may properly consider the complaint and all appended papers. See *Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000)* ("For purposes [*65] of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference."). However, with respect to Rule 12(b)(6) motions, a court may not consider factual matters

2002 U.S. Dist. LEXIS 25767, *

submitted outside of the complaint unless the parties are given notice that the motion to dismiss is being converted to a motion for summary judgment under Rule 56, and are afforded an opportunity to submit additional affidavits. See *Festa v. Local 3 Int'l Bhd. of Elec. Workers, 905 F.2d 35, 38 (2d Cir. 1990)*. The Court addresses Defendants' arguments relating to each cause of action in turn.

A. Count One-Breach of Contract

Plaintiff's first cause of action alleges that Defendants CFC Group and CFC Securities, Inc. breached their contract with Plaintiff by, "inter alia, failing to insure that CFC Securities Hong Kong [was] in compliance with all applicable law, thereby making it impossible for Plaintiff to perform." Complaint P 48. Defendants contend that Count One of Plaintiff's Complaint must be dismissed because they were in compliance with all applicable law. In addition, Defendants [*66] argue that Plaintiff has failed to allege any specific law with which they were not in compliance, and to cite any provision of his employment contract relating to an obligation to comply with applicable laws.

It is well-settled under New York law that to establish a claim for breach of contract, a plaintiff must prove the following elements: (1) the existence of a contract; (2) breach by the other party; and (3) damages suffered as a result of the breach. See *Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000)*. In pleading such a claim, a plaintiff must provide specific allegations as to an agreement between the parties, the terms of that agreement, and what provisions of the agreement were breached as a result of the acts at issue. See *Americorp Fin., Inc. v. St. Joseph's Hosp. Health Ctr., 180 F. Supp. 2d 387, 390 (N.D.N.Y. 2001)*; Levy v. Bessemer Trust Co., N.A., No. 97 Civ. 1785(JFK), *1997 U.S. Dist. LEXIS 11056, 1997 WL 431079*, at *5 (S.D.N.Y. July 30, 1997).

The Complaint in the instant case fails to articulate which applicable laws were purportedly violated, and how their violation resulted in a breach of Plaintiff's employment contract. [*67] In the Complaint's summary of facts, Plaintiff alleges a number of illegal actions taken by Defendant Merkenich. For instance, Plaintiff alleges that Merkenich made false representations regarding CFC Group to prospective customers of CFC Securities Asia. See Complaint P 39. Plaintiff further alleges that Merkenich made kickback payments to customers of CFC and engaged in questionable tax activities on behalf of the CFC companies. See Complaint PP 40-41. These allegations have no apparent relevance to a breach of Plaintiff's employment contract by Defendants CFC Group and CFC Securities, Inc. Moreover, there is no way to know if these acts are the violations of law referred to in Count One, because Plaintiff does not explain how these acts violated

any provision of Plaintiff's contract or prevented him from performing his duties under the employment contract.

Thus, by failing to state what laws Defendants CFC Group and CFC Asia violated, and how these violations caused a breach of Plaintiff's employment contract, the breach of contract claim contained in Count One of the Complaint fails to state a claim for which relief can be granted.

In his memorandum of law, Plaintiff [*68] asserts that this claim is, in fact, merely an element of a constructive discharge claim. Even assuming that a constructive discharge claim were properly asserted in the Complaint, n13 Count One would fail to state a claim for which relief can be granted. Under New York law, "constructive discharge occurs when an employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Kader v. Paper Software, Inc., 111 F.3d 337, 339 (2d Cir. 1997)*(internal quotation omitted); see also *Spence v. Maryland Cas. Co., 995 F.2d 1147, 1156 (2d Cir. 1993); Stetson v. NYNEX Serv. Co., 995 F.2d 355, 360 (2d Cir. 1993); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987)*. Moreover, "constructive discharge requires deliberate action on the part of the employer." *Whidbee v. Garzarelli Food Specialists, Inc., 223 F.3d 62, 74 (2d Cir. 2000)*; see also *Mercury Air Group, Inc. v. Perez, No. 00 Civ. 2975 (HB), 2001 U.S. Dist. LEXIS 805, 2001 WL 88228*, at *3 (S.D.N.Y. Jan. 31, 2001).

---

n13 Plaintiff states in the summary of facts in his Complaint that Merkenich, acting on his own behalf and on behalf of all Defendants, made it impossible for Plaintiff to perform his duties, and therefore, constructively terminated Plaintiff. See Complaint P 43. Plaintiff has failed, however, to plead constructive termination as an independent cause of action; rather, he now suggests that his constructive discharge claim was the result of all of Defendants' wrongful acts asserted in his Complaint.

---

[*69]

Here, Plaintiff has failed to assert that any of Defendants' alleged violations of law were intended to create an intolerable working environment for him. Moreover, it is not reasonable to infer that Defendants engaged in violations of law that placed their companies in jeopardy simply to force Plaintiff to resign. n14

---

n14 Even if Plaintiff could make out a claim based upon these allegations, they are so vague as to make it impossible for Defendants to answer.

See *Swierkiewicz, 122 S. Ct. 992, 2002 WL 261807*, at *4.

It follows that Defendants' motion to dismiss Count One of the Complaint should be granted. Plaintiff should, however, be granted leave to replead, if he can in good faith assert an independent claim arising out of Defendants' purported breaches of law. n15

> n15 Unless amendment would be futile, "it is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding, L.P., 949 F.2d 42, 48 (2d Cir. 1991)*; see also *In re Deustche Telekom AG Securities Litigation, No. 00 Civ. 9475 (SHS), 2002 U.S. Dist. LEXIS 2627, 2002 WL 244597*, at *8 (S.D.N.Y. Feb. 20, 2002). "Although leave to replead is within the discretion of the district court, refusal to grant it without any justifying reason is an abuse of discretion." *Cortec, 949 F.2d at 48.*

[*70]

### B. Count Two-Breach of Contract

Plaintiff's second breach of contract claim, against Defendants CFC Group and CFC Securities, Inc., stems from their termination of his apartment lease. Plaintiff alleges that this action breached his employment agreement, which provided for a housing allowance for Plaintiff. See Complaint P 53. Defendants argue, as Plaintiff recognizes, that the Complaint itself avers that the employment agreement provided for a housing allowance, not a lease. See Def. Mem. at 33-34. Therefore, they argue that the breach of contract claim asserted in Count Two of the Complaint should be dismissed because it fails to allege how the termination of Plaintiff's apartment lease violated any term of Plaintiff's contract. Id. at 34.

Construing the allegations of Count Two in Plaintiff's favor, one might surmise that the termination of Plaintiff's lease in effect resulted in a loss of his housing allowance. Nevertheless, neither the Defendants nor the Court should be left to speculate about the meaning of the allegations in Count Two. Accordingly, I recommend that Count Two be dismissed, without prejudice to replead.

### B. Count Three-Breach of Contract [*71]

Plaintiff's final breach of contract claim alleges that when Merkenich terminated Plaintiff's registrations for his Series 3, Series 7, Series 24 and Series 63 licenses with the NASD, CFC Group and CFC Securities, Inc. breached the terms of the employment agreement. See Complaint P 58. The employment agreement required defendants to "obtain required licencing and registrations" for CFC Asia and Plaintiff. See id. P 23. Defendants respond to this

claim by arguing that CFC did, in fact, obtain necessary licensing for Plaintiff as promised in the employment agreement. Moreover, they contend that, under the contract, they were not required to maintain Plaintiff's licenses, simply to obtain them. See Def. Mem. at 34-35.

It is certainly reasonable to infer that the duty to obtain licenses for CFC Asia and Plaintiff included a duty to maintain the licenses. Construing the Complaint liberally, Defendants' argument, at most, raises a matter of contract interpretation and issues of fact that cannot be resolved on a motion to dismiss. Accordingly, I recommend that the motion to dismiss Count Three be denied.

### D. Count Four-Breach of the Duty of Good Faith and Fair Dealing [*72]

The Court agrees with Defendants' contention that the fourth count of the Complaint is conclusory and incomplete, failing to allege how Defendants CFC Group and CFC Securities, Inc. allegedly breached their duty of good faith and fair dealing. See Complaint P 63. n16 The Court, and Defendants, are thus left to surmise the basis for this cause of action, which they cannot do.

> n16 In fact, this is true on more than one level, as Plaintiff even fails to complete a critical sentence in this section. See Complaint P 63 ("Defendants breached their duty of good faith and fair dealing by").

In any case, a claim of breach of the duty of good faith and fair dealing is "merely a breach of the underlying contract." n17 *Fasolino Foods Co. v. Banca Nazionale Del Lavoro, 961 F.2d 1052, 1056 (2d Cir. 1992)*. Where the same facts are alleged in support of a claim of breach of contract and a breach of the duty of good faith and fair dealing, the latter claim cannot stand because the "cause of action alleging [*73] breach of good faith is duplicative of a cause of action alleging breach of contract." *OHM Remediation Servs. Corp. v. Hughes Envtl. Sys., Inc., 952 F. Supp. 120, 124 (N.D.N.Y. 1997)*(quoting *Apfel v. Prudential-Bache Sec. Inc., 183 A.D.2d 439, 583 N.Y.S.2d 386, 387 (1st Dep't 1992)*; see also Alter v. Bogoricin, No. 97 Civ. 0662(MBM), *1997 U.S. Dist. LEXIS 17369, 1997 WL 691332*, at *7 (S.D.N.Y. Nov. 6, 1997). Plaintiff recognizes the redundancy, but pleads breach of good faith in the event that his breach of contract claims fail. See Pl.'s Mem. at 34. However, Plaintiff pleads no additional grounds for his claim of breach of good faith. Therefore it would not be possible to fail on the breach of contract claims, but succeed on a breach of the duty of good faith claim arising from the same acts. See *Alter, 1997 U.S. Dist. LEXIS 17369, 1997 WL 691332*, at *8.

n17 A plaintiff claiming a breach of the covenant of good faith and fair dealing must show: (1) fraud, (2) malice, (3) bad faith, (4) other intentional wrongdoing, or (5) reckless indifference to the rights of others such as gross negligence. See *T.P.K. Constr. Corp. v. Southern American Ins. Co., 752 F. Supp. 105, 112 (S.D.N.Y.1990)* (citing *Kalisch-Jarcho, Inc. v. New York, 58 N.Y.2d 377, 461 N.Y.S.2d 746, 748, 448 N.E.2d 413 (1983)).*

[*74]

Accordingly, this claim should be dismissed pursuant to Rule 12(b)(6), with leave to replead, if Plaintiff can, in good faith, assert an independent claim for the breach of the duty of good faith and fair dealing based upon facts distinct from those relied upon in his breach of contract claims.

E. Counts Five and Six-Intentional Interference With Contractual Relations

In Count Five of the Complaint, Plaintiff alleges that Defendant Merkenich, acting on his own and through the CFC companies, interfered with Plaintiff's contract with CFC Group and CFC Securities, Inc. In Count Six, Plaintiff contends that CFC Asia interfered with his employment agreement with CFC Group and CFC Securities, Inc. n18 Defendants contend that Plaintiff's claim for intentional interference with contractual relations must be dismissed because he improperly alleges that Defendants interfered with a contract to which they are alleged to be parties. Plaintiff responds that the claim is properly asserted in the alternative, in the event that the Court determines that the non-signatories to the contract are not parties to the contract, as alter egos of the CFC Group and CFC Securities, Inc.

n18 Although Plaintiff was hired to work for CFC Asia, it was not a signatory to Plaintiff's employment contract.

[*75]

It is well-established that a plaintiff may not bring a claim for intentional interference with contractual relations against a party to the contract in question. n19 See *Finley v. Giacobbe, 79 F.3d 1285, 1295 (2d Cir. 1996); Israel v. Wood Dolson Co., 1 N.Y.2d 116, 120, 151 N.Y.S.2d 1, 5, 134 N.E.2d 97 (1956)*. However, *Rule 8(e)(2) of the Federal Rules of Civil Procedure* permits plaintiffs to "plead two or more statements of a claim, even within the same count, regardless of consistency." *Henry v. Daytop Village, Inc., 42 F.3d 89, 95 (2d Cir. 1994)*. n20

n19 Thus, no intentional interference with contractual relations claim is asserted against Defendants CFC Group and CFC Securities, who, as signatories, are clearly parties to Plaintiff's employment contract.

n20 *Rule 8(e)(2) of the Federal Rules of Civil Procedure* states, in relevant part, "[a] party may also state as many separate claims and defenses as the party has regardless of consistency and whether based on legal, equitable, or maritime grounds." Thus, Plaintiff is allowed to plead his theory of intentional interference with contractual relations in the alternative to his breach of contract claims. See *Alter, 1997 U.S. Dist. LEXIS 17369, 1997 WL 691332,* at *12 (plaintiff pleads both tortious interference with his employment contract and breach of contract). Even when allegations are not specifically pleaded as "in the alternative," Rule 8(e)(2) offers sufficient latitude to construe separate allegations in a complaint as alternative theories, at least when drawing all inferences in favor of the nonmoving party, as the Court must do in considering a motion to dismiss. See *Adler v. Pataki, 185 F.3d 35, 41 (2d Cir. 1999); MacFarlane v. Grasso, 696 F.2d 217, 224-25 (2d Cir. 1982).*

[*76]

Although Plaintiff has alleged that the CFC corporations are the alter egos of Merkenich, see Complaint P 11, Plaintiff contends, in Counts Five and Six of the Complaint, that if his alter ego theory is rejected, then CFC Asia and Merkenich, acting both as an individual and through the CFC companies, interfered with Plaintiff's employment contract with CFC Group and CFC Securities. See Complaint P 66. Moreover, Defendants contest Plaintiff's assertion that all the corporate Defendants are alter egos of Merkenich, and they argue that they are not parties to Plaintiff's employment contract. See Def. Mem. at 15. Accordingly, Plaintiff may plead intentional interference with contractual relations as an alternative ground for recovery.

Next, Defendants contend that the intentional interference claim against Defendant Merkenich should be dismissed, since, as a principal of CFC Group Holdings, Merkenich cannot be alleged to interfere with his own company's contract. See Def. Mem. at 37. In New York, officers, directors or employees of a corporation cannot be personally liable for inducing the corporation to breach a contract with a third party if they act on behalf of the [*77] corporation and within the scope of their duties. See *Mobile Data Shred, Inc. v. United Bank of Switzerland, No. 99 Civ. 10315 (SAS), 2000 U.S. Dist. LEXIS 4252,*

*2000 WL 351516,* at *7, n.9 (S.D.N.Y. Apr. 5, 2000); *Bon Temps Agency Ltd. v. Mittman,* 688 N.Y.S.2d 43, 44, 260 A.D.2d 191, 191-92 (1st Dep't 1999); *Nu-Life Constr. Corp. v. Bd. of Educ.,* 611 N.Y.S.2d 529, 530, 204 A.D.2d 106, 107 (1st Dep't 1994). Personal liability will be imposed only if the plaintiff shows that the officer or employee acted outside the scope of his employment by committing an independent tort or by pursuing a personal interest. See *Foster v. Churchill,* 87 N.Y.2d 744, 751, 642 N.Y.S.2d 583, 587, 665 N.E.2d 153 (1996); *Nu-life,* 611 N.Y.S.2d at 530, 204 A.D.2d at 107. Here, Plaintiff asserts that Merkenich undertook actions "on his own behalf and on behalf of [the corporate Defendants]" which resulted in a breach of Plaintiff's employment contract. See Complaint PP 30-44. Thus, it is alleged that Merkenich acted in his personal capacity, and not solely in his capacity as a principal of CFC Group Holdings. Moreover, by alleging Merkenich's ownership [*78] and control of the CFC entities, Plaintiff has indicated that Merkenich had a personal interest in Plaintiff's contract.

Finally, Defendants claim that Plaintiff's claim should be dismissed because he has failed to plead the required elements of knowledge and intent. See Def. Mem. at 37. The elements of intentional interference with a contract under New York law are, "(1) the existence of a contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional inducement of the third party to breach or otherwise render performance impossible; and (4) damages to plaintiff." *New Paradigm Software Corp. v. New Era of Networks, Inc.,* 107 F. Supp. 2d 325, 330 (S.D.N.Y. 2000) (quoting *Kronos, Inc. v. AVX Corp.,* 81 N.Y.2d 90, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993)).

While it may be true that Plaintiff's allegations of intentional interference are imprecise, inasmuch as the Complaint cites interference "by use of means that are dishonest, unfair or otherwise improper," see Complaint PP 66, 69, construed liberally, they meet the requirements to survive a 12(b)(6) motion. Plaintiff has alleged sufficient [*79] facts for the Court to infer both knowledge of the contract and intent to interfere with the contract by Merkenich. First, it is undisputed that Merkenich signed Plaintiff's employment contract on behalf of CFC Group. He therefore must have had knowledge of Plaintiff's contractual relationship with the CFC entities. Second, Plaintiff has alleged a course of conduct by Merkenich which, if true, could demonstrate an intent to interfere with Plaintiff's contract. See Complaint PP 12, 14, 38, 39, 41. Indeed, Plaintiff even alleges that Merkenich expressed his desire to terminate Plaintiff's employment. See id. P 32. Thus, the fifth count of the Complaint, alleging that Merkenich intentionally interfered with Plaintiff's contractual relations with CFC Group and CFC Securities, should not be dismissed with regard to Defendant

Merkenich. Moreover, since CFC Asia was not a party to Plaintiff's contract, assuming Plaintiff can show that Merkenich acted in his capacity as CEO of CFC Asia, sufficient facts are alleged to infer knowledge and intent by CFC Asia as well.

With respect to the other corporate Defendants, in his memorandum of law, Plaintiff asserts that Defendants CFC International, [*80] CFC Technology, CFC Securities Holding, and CFC Asset Management interfered with his contract by forcing Plaintiff to resign as a director. See Pl.'s Mem. at 35. This directly contradicts the assertion Plaintiff makes in the Complaint that "Boris Merkenich, acting on his own behalf and on behalf of CFC Group and CFC Securities Asia, has taken actions to remove Plaintiff as a director of several CFC affiliated companies." Complaint P 36. Furthermore, nothing in Plaintiff's contract, which is referenced in the Complaint, entitles him to be a director of any CFC entity except CFC Asia.

Accordingly, Defendants' motion to dismiss Counts Five and Six of the Complaint should be granted as to Defendants CFC International, CFC Technology, CFC Securities Holding, and CFC Asset Management, and should be denied with respect to Defendants Merkenich and CFC Asia.

F. Count Seven-Unjust Enrichment

Defendants argue that Plaintiff's claim for unjust enrichment should be dismissed, since Plaintiff cannot claim damages under a quasi-contract theory while alleging the existence of a valid contract. Plaintiff argues that his claim for unjust enrichment is pled in the alternative, in the event [*81] that his breach of contract claims fail against one or more of the Defendants.

Defendants are correct in their assertion that a claim for unjust enrichment is ordinarily unavailable when a valid and enforceable written contract governing the same subject matter exists. See *Reilly v. Natwest Mkts. Group, Inc.,* 181 F.3d 253, 262-63 (2d Cir. 1999)("Under New York law, the existence of an express contract governing a particular subject matter ordinarily precludes recovery in quantum meruit for events arising out of the same subject matter."); *Bridgeway Corp. v. Citibank, N.A.,* 132 F. Supp. 2d 297, 305 (S.D.N.Y. 2001); *New Paradigm,* 107 F. Supp. 2d at 329. However, this principle only applies when there is no dispute as to the existence, applicability, and validity of the contract in question. See *Bridgeway,* 132 F. Supp. 2d at 305; *New Paradigm,* 107 F. Supp. 2d at 329. Here, although Defendants agree that a valid employment contract existed between Plaintiff and Defendants CFC Group and CFC Securities, they do not agree that the other Defendants are parties to the contract. See Def. Mem. at 15. [*82] Therefore, with respect to Defendants CFC Asia, CFC Securities, S.A., and Merkenich, n21 Plaintiff

2002 U.S. Dist. LEXIS 25767, *

may properly assert a claim based on a quasi-contractual theory. See *Newman & Schwartz v. Asplundh Tree Expert Co., Inc., 102 F.3d 660, 663 (2d Cir. 1996)*(allowing an unjust enrichment claim to be pled in the alternative to a breach of contract claim, where one Defendant disputed being a party to the contract).

> n21 Although, in his Complaint, Plaintiff does not specify which of the Defendants were allegedly unjustly enriched, in his memorandum of law he limits this claim to Defendants CFC Asia, Boris Merkenich, and CFC Securities, S.A.

Defendants also contend that Plaintiff has failed to plead sufficient facts to sustain a claim for unjust enrichment. The elements of unjust enrichment under New York law are that (1) the defendant was enriched; (2) the enrichment was at plaintiff's expense; and (3) the defendant's retention of that benefit would be unjust. See *New Paradigm, 107 F. Supp. 2d at 328-29.* [*83] Plaintiff has alleged that he has not been fully paid for his work with CFC Asia, and that income earned by CFC Asia which should have been counted towards his bonus was improperly diverted from CFC Asia to CFC Securities, S.A. See Complaint PP 30-31. It is also claimed that CFC Asia, CFC Securities S.A. and Merkenich personally benefitted from these transfers and non-payments. As required, Plaintiff has also alleged that it would be unjust for CFC Securities Asia, CFC Securities S.A. and Merkenich to retain the benefits from their purported misdeeds. Id. at P 73. Based on the facts alleged in the Complaint, liberally construed, Plaintiff has stated a claim for unjust enrichment against Defendants Merkenich, CFC Asia, and CFC Securities, S.A.

Accordingly, Defendants' motion to dismiss Plaintiff's claim of unjust enrichment should be denied.

G. Count Eight-Breach of Fiduciary Duty

Plaintiff alleges that Merkenich breached his fiduciary duty to Plaintiff by perpetrating a kickback scheme and disseminating misinformation regarding CFC Securities Asia. Plaintiff claims that, as a director of CFC Securities Asia, Merkenich had a fiduciary duty toward him, as a 15% shareholder [*84] in the company. See Complaint PP 24, 77-79; Pl.'s Mem. at 37. Defendants argue that any action for breach of fiduciary duty must be brought as a derivative suit on behalf of the corporation, not as a personal claim by Plaintiff. See Def. Reply Mem. at 15. They contend that any harm that resulted from Merkenich's alleged breach of fiduciary duty would have befallen the corporation, and would not have been specific to Plaintiff. See id.

As an initial matter, the Court must determine what law would apply to Plaintiff's claim for breach of fiduciary duty. New York's choice of law rules dictate that the law of the state of incorporation governs a claim for breach of the fiduciary duty owed to a corporation and its shareholders. *Walton v. Morgan Stanley & Co., 623 F.2d 796, 798 n.3 (2d Cir. 1980);* Benjamin v. Kim, No. 95 Civ. 9597(LMM), *1999 U.S. Dist. LEXIS 6089, 1999 WL 249706,* at *n.13 (S.D.N.Y. Apr. 28, 1999). Since Plaintiff claims to bring his claim as a shareholder of CFC Asia, against Merkenich as a director of CFC Asia, and CFC Asia is a Hong Kong corporation, the law of Hong Kong applies to Plaintiff's claim.

Because Plaintiff's claim for breach of fiduciary [*85] duty derives from his status as a shareholder, Hong Kong law requires that his action be brought as a shareholder derivative suit. See Richcombe Inv. Ltd. v. Tin Fung & Anor, 2001-2 HKC 115, 2001 HKC Lexis 119, at *9 (Court of First Instance 2001) ("If wrongs are done to a company, the company is the only one who can sue in respect to those wrongs, save in the case of a derivative action brought by minority shareholders ...."); Maxgood Int'l Ltd. v. Hyran Holdings Ltd., 989 HKCU 1, 2000 HKCU Lexis 980, at **20-21 (Court of First Instance 2000)("As a matter of general principle, ... the loss sustained by a shareholder through a diminution in the value of his shares by reason of the misappropriation of the company's assets was a loss recoverable only by the company and not by the shareholder, who had suffered no personal loss distinct from that suffered by the company ...."). n22 Therefore, Plaintiff's claim of breach of fiduciary duty against Merkenich should be dismissed for failure to state a claim for which relief can be granted.

> n22 Even if New York law were to apply, Plaintiff would be required to bring this action as a shareholder derivative suit. See RMED Intern., Inc. v. Sloan's Supermarkets, Inc., No. 94 CIV 5587 (PKL)(RLE), *185 F. Supp. 2d 389, 2002 WL 252483,* at *12 (S.D.N.Y. Feb. 21, 2002) ("New York courts have found that a shareholder has no standing to file suit for a wrong committed against a corporation. Even if a stockholder has been injured by a diminution in the value of his shares, he can not proceed individually, but rather must bring a shareholder derivative action.")(internal citations omitted).

[*86]

H. Count Nine--Failure to Pay Wages Pursuant to New York Labor Law

Plaintiff claims that at the time of his termination he was owed over $ 600,000 in salary and benefits. See

Complaint P 81. Defendants have allegedly refused to pay Plaintiff the money owed, which Plaintiff argues violates *New York Labor Law* 190, et seq. Plaintiff further argues that this statute entitles him to attorney's fees and liquidated damages in the amount of 25% of wages withheld, in addition to the amount of the wages owed. See id. P 83. Defendants contend that this claim should be dismissed for lack of factual support. See Def. Mem. at 39.

The Court cannot evaluate the truthfulness of Plaintiff's allegations in deciding a motion to dismiss. Plaintiff need only make legally sufficient factual allegations to maintain his claim. See *Netrix, 2001 WL 228362*, at *1. Plaintiff has alleged that at the time of his termination, he was owed over $ 600,000 in wages and benefits that were never paid, and that Defendants CFC Asia, CFC Securities, and CFC Group willfully refused to pay the monies owed to Plaintiff. Based upon these allegations, the Court cannot conclude that Plaintiff [*87] will be unable to prove a set of facts in support of this claim which would entitle him to relief. Accordingly, Defendants' motion to dismiss Count Nine should be denied.

CONCLUSION

For the reasons cited above, I respectfully recommend that Defendants' motion to dismiss the Complaint for lack of personal jurisdiction, lack of subject matter jurisdiction, and insufficient service of process be denied, and that Plaintiff be granted leave to amend the Complaint to properly assert his citizenship. Defendants' motion to dismiss pursuant to the doctrine of forum non conveniens should also be denied. I further recommend that Defendants' motion to dismiss for failure to state a claim be granted with respect to Count Eight of the Complaint, and with respect to Defendants CFC International, CFC

Technology, CFC Securities Holding, and CFC Asset Management in Count Five of the Complaint. The motion should be denied with respect to Counts Three, Six, Seven, and Nine of the Complaint, as well as Count Five, as it relates to the remaining Defendants. Finally, I recommend that Counts One, Two, and Four of the Complaint be dismissed with leave to replead.

Pursuant to *28 U.S.C.* 636(b)(1)(C) [*88] and *Rule 72(b) of the Federal Rules of Civil Procedure*, the parties shall have ten days from service of this Report to file written objections. See also *Fed. R. Civ. P. 6(a)* and (e). Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, U.S.D.J., and to the chambers of the undersigned Room 1660. Any requests for an extension of time for filing objections must be directed to Judge Batts. Failure to file objections will result in a waiver of those objections for purposes of appeal. See *Thomas v. Arn, 474 U.S. 140, 149-52, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985)*, reh'g denied, *474 U.S. 1111 (1986); IUE AFL-CIO Pension Fund v. Hermann 9 F.3d 1049, 1054 (2d Cir. 1993)*, cert. denied, *513 U.S. 822 (1994); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.)* cert. denied, *506 U.S. 1038, 113 S. Ct. 825 (1992); Small v. Secretary of HHS, 892 F.2d 15, 16 (2d Cir. 1989)*.

SO ORDERED.

THEODORE H. KATZ [*89]

UNITED STATES MAGISTRATE JUDGE

Dated: March 7, 2002

New York, New York

3

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

**H**
Dubied Machinery Co. v. Vermont Knitting Co., Inc.
S.D.N.Y.,1992.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
DUBIED MACHINERY COMPANY, Plaintiff,
v.
VERMONT KNITTING CO., INC., Defendants.
VERMONT KNITTING CO., INC., Counter-
claimant,
v.
DUBIED MACHINERY COMPANY and Edouard
DUbied & CIE. S.A., Counterclaim Defendants.
No. 85 Clv. 8610 (PKL).

June 11, 1992.

Warshaw, Burnstein, Cohen, Schlesinger & Kuh,
New York City (Martin R. Lee, of counsel), for
plaintiff and counterclaim defendants.
Cohen, Shapiro, Polisher, Shiekman and Cohen, Phil-
adelphia, (Alan M. Lerner, David L. Hyman, Stephen
V. Yarnell, Alise Panitch, of counsel), Hall, Dickler,
Lawler, Kent & Friedman, New York City (Leonard
Wagman, of counsel), for defendant and counter-
claimant.

*OPINION AND ORDER*
LEISURE, District Judge,
*1 In this breach of contract action, with jurisdiction
founded on diversity of citizenship, counterclaim de-
fendant Edouard Dubied & Cie. S.A. ("Edouard Du-
bied"), now moves the Court, pursuant to
Fed.R.Civ.P. 12(b)(2), to dismiss the counterclaims
asserted against it by Vermont Knitting Co., Inc.
("Vermont Knitting"), for lack of personal jurisdic-
tion. For the following reasons, the motion to dismiss
is denied.

BACKGROUND

This action, which focuses on defendant/counter-
claim plaintiff Vermont Knitting's alleged breach of a
contract to purchase knitting machines, was com-
menced on October 31, 1985 by Dubied Machinery
Company ("Dubied"), a New York Corporation that

sells and services commercial knitting equipment. In
response to Dubied's claims, Vermont Knitting coun-
terclaimed for breach of warranty and moved to join
Edouard Dubied, a Swiss Corporation, as an addition-
al counterclaim defendant, based on the allegation
that Dubied was a wholly-owned subsidiary of Edou-
ard Dubied that acted as the latter's agent in the
United States with respect to the transaction that un-
derlies this suit. The motion to join Edouard Dubied
as a counterclaim defendant was granted by Magis-
trate Judge Naomi Reice Buchwald by Order dated
October 13, 1987.

Soon after the joinder motion was granted, progress
towards resolution of the merits of this action became
bogged down in a procedural quagmire. As a result of
Vermont Knitting's application for bankruptcy pro-
tection in November 1987, the action was entered on
this Court's suspense docket on December 21, 1987.
Thereafter, by Order dated January 12, 1988, the
bankruptcy court granted relief from the automatic
stay, see 11 U.S.C. § 362, so that the parties could
pursue their claims and counterclaims before this
Court, and the instant action was removed from the
suspense docket by Order of this Court dated Febru-
ary 2, 1988. Upon removal of the case from the sus-
pense docket, the parties began engaging in procedur-
al skirmishing. For example, by Opinion and Order
dated February 21, 1989, this Court denied Vermont
Knitting's motion under 28 U.S.C. § 1404(a) to trans-
fer this action to the District of Vermont, where the
bankruptcy action is pending. Subsequently, by Opin-
ion and Order dated June 12, 1990, Dubied's motion
for summary judgment on the main claims in the ac-
tion was denied. However, summary judgment on
Dubied's replevin action, which concerned a knitting
machine that was loaned to Vermont Knitting but
was not directly covered by the contract of sale at is-
sue in this case, was granted.

In addition to the aforementioned procedural dis-
putes, there is a lingering controversy concerning the
propriety of haling Edouard Dubied into court in
New York to defend against the counterclaims asser-
ted by Vermont Knitting. By Notice of Motion dated
October 22, 1990, Edouard Dubied moved to dismiss

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

the counterclaims asserted against it under Fed.R.Civ.P. 12(b)(2), for lack of personal jurisdiction. Thereafter, by Opinion and Order dated May 13, 1991, the Court rejected certain procedural arguments raised by Vermont Knitting in opposition to the motion to dismiss, stayed the motion pending discovery on the jurisdictional issue and referred the case to Judge Buchwald for supervision of the remaining discovery. At the close of discovery the parties filed supplemental briefs in support of and in opposition to the motion to dismiss, to which the Court now turns.FN1

## DISCUSSION

*2 In this action, Vermont Knitting bears the burden of establishing personal jurisdiction over Edouard Dubied. See Ball, supra, 902 F.2d at 197; Milgrim Thomajan & Lee P.C. v. Nycal Corp., 775 F.Supp. 117, 119 (S.D.N.Y.1991). However, to overcome the instant motion to dismiss for lack of personal jurisdiction, Vermont Knitting need only make a prima facie showing of jurisdiction. See Ball, supra, 902 F.2d at 197 ("If the defendant is content to challenge only the sufficiency of the plaintiff's factual allegation [s], in effect demurring by filing a Rule 12(b)(2) motion, the plaintiff need persuade the court only that its factual allegations constitute a prima facie showing of jurisdiction."); accord Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir.1986); Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 57 (2d Cir.1985). Since the Court has allowed discovery on the jurisdictional issue, "the prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." Ball, supra, 902 F.2d at 197. The Court must assume the truth of these factual averments and construe the allegations, together with Vermont Knitting's pleadings and affidavits, in the light most favorable to the non-moving party. See Landoil Resources Corp. v. Alexander & Alexander Services, Inc., 918 F.2d 1039, 1043 (2d Cir.1990). In a diversity action, " 'the amenability of a foreign corporation to suit in a federal court ... is determined in accordance with the law of the state where the court sits.' " Ball, supra, 902 F.2d at 198 (quoting Arrowsmith v. United Press International, 320 F.2d 219,

223 (2d Cir.1963) (en banc)). The Court thus turns to consider New York rules of personal jurisdiction.

N.Y.C.P.L.R. § 301 "provides for general jurisdiction over defendant corporations that are 'doing business' in New York." Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria, 937 F.2d 44, 50 (2d Cir.1991); accord Laufer v. Ostrow, 55 N.Y.2d 305, 310-11, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982).
Since a corporation amenable to jurisdiction under section 301 may be sued in New York on causes of action wholly unrelated to acts done in New York, its exposure to suit ... requires a showing that it is doing business in New York "with a fair measure of permanence and continuity."

Ball, supra, 902 F.2d at 198 (quoting Laufer, supra, 449 N.Y.S.2d at 458); accord McGowan v. Smith, 52 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321 (1981) (defendant must be "engaged in such a continuous and systematic course of 'doing business' here as to warrant a finding of its 'presence' in the jurisdiction." (quoting Simonson v. International Bank, 14 N.Y.2d 281, 285, 251 N.Y.S.2d 433, 436, 200 N.E.2d 427 (1964))). Section 301 thus imposes a requirement of " 'doing business here' in the traditional sense." Frummer v. Hilton Hotels Int'l, Inc., 19 N.Y.2d 533, 536, 281 N.Y.S.2d 41, 43, 227 N.E.2d 851 (emphasis in original), cert. denied, 389 U.S. 923 (1967).

*3 It is well-established that a principal can become subject to general jurisdiction in New York by the actions of its agents in New York. See Ball, supra, 902 F.2d at 199 (citing cases and listing factors giving rise to inference of agency sufficient to establish jurisdiction); Frummer, supra, 281 N.Y.S.2d at 45 (presence of principal "for the purposes of jurisdiction, is established by the activities conducted here on its behalf by its agent"). In addition, once continuous and systematic solicitation of business in New York has been found, very little else is required to establish jurisdiction pursuant to N.Y.C.P.L.R. § 301. See Landoil Resources, supra, 918 F.2d at 1043; Aquascutum of London, Inc. v. S.S. American Champion, 426 F.2d 205, 211 (2d Cir.1970) ("once solicitation is

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Page 3

found in any substantial degree very little more is necessary to a conclusion of 'doing business.' ").

A foreign corporation also can be subject to suit in New York based on the activities of its subsidiary within the state based on the factual question whether the subsidiary is "a really independent entity or a mere department of [the parent]." *Taca International Airlines, S.A. v. Rolls-Royce of England, Ltd.*, 15 N.Y.2d 97, 256 N.Y.S.2d 129, 132, 204 N.E.2d 329 (1965). The determination whether a subsidiary is a "mere department" of the parent for the purposes of section 301 requires examination of four factors. *See Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120-122 (2d Cir.1984). The essential factor is common ownership.... The second factor is financial dependency of the subsidiary on the parent corporation.... The third factor is the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities.... The fourth factor is the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.

*Id.* Thus, if "a subsidiary establishes and expands a parent's market position then, so long as that activity is being conducted, and with respect to those activities furthering the parent's ends, the parent is doing business in New York." *Bulova Watch Co. v. K. Hattori & Co.*, 508 F.Supp. 1322, 1344-45 (E.D.N.Y.1981); *accord Frummer, supra*, 281 N.Y.S.2d at 44 (finding jurisdiction over parent where subsidiary "does all the business which [the parent] could have done were it here by its own officials"); *Top Form Mills, Inc. v. Sociedad Nationale Industria Applicazioni Viscosa*, 428 F.Supp. 1237, 1245 (S.D.N.Y.1977) (finding jurisdiction over Italian fabric manufacturer based on performance of essential services by commonly owned subsidiary in New York).

In support of its claim that Edouard Dubied did business in New York for the purposes of section 301, Vermont Knitting has presented the following factual averments. According to Robert Schneider, who was the president of Dubied when this dispute arose, Dubied was a wholly owned subsidiary of Edouard Du-

bied at all times relevant to this action. *See* Exhibits in Support of Vermont Knitting Company's Memorandum of Law in Opposition to Motion of Edouard Dubied & Cie. S.A. to Dismiss Counterclaims for Lack of Personal Jurisdiction ("Vermont Knitting Exhibits"), Exh. A, at 11 (deposition of Robert J. Schneider, taken on July 10, 1986 ("1986 Schneider Deposition")). Between 1984 and 1987, over 90% of Dubied's revenue came from the sale of Edouard Dubied machinery and parts. *See* Vermont Knitting Exhibits, Exh. B, at 70-71 (deposition of Robert Schneider, taken on September 23, 1991 ("1991 Schneider Deposition")). In fact, Dubied only sold products that could be used in connection with Edouard Dubied knitting machines. 1986 Schneider Deposition, at 18. According to Vermont Knitting, Dubied did not maintain an inventory of Edouard Dubied knitting machines, which were its major product, during the time period relevant to this action. Rather, because of financial difficulties being experienced by the parent, the subsidiary only received machines that had been sold pursuant to purchase orders that could be verified by Edouard Dubied. 1991 Schneider Deposition, at 54-55, 57-58.

*4 Vermont Knitting alleges that all of Dubied's directors were selected by Edouard Dubied, that employees of the parent dominated the subsidiary's board of directors and that Edouard Dubied's head of manufacturing served as the president of Dubied immediately prior to the events leading up to this litigation. *See* Vermont Knitting Motion, at 3-4. Moreover, Vermont Knitting claims that Edouard Dubied reviewed and controlled Dubied's budget, *see id.*, and that payments from the subsidiary to the parent were timed to maximize the economic benefit to Edouard Dubied without regard to the potential economic benefit to its subsidiary. *See id.* at 10. However, there allegedly was no formal agreement governing the timing of payments. *See* 1991 Schneider Deposition, at 68.

The interrelationship between Dubied and Edouard Dubied allegedly extended to modification of machinery, training of personnel and establishment of marketing and sales strategies. For example, Vermont Knitting claims that Edouard Dubied conducted all modifications to machinery sold by the subsidiary on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 4
Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

its parent's behalf, and that Edouard Dubied provided the warranty for these machines. *See* 1991 Schneider Deposition, at 83. Edouard Dubied also purportedly maintained control of the training curricula used by Dubied, *see id.* at 33, and produced most of the sales and technical literature used by its subsidiary. *See id.* at 109-10. In fact, Edouard Dubied and Dubied shared identical logos and used substantially similar corporate names. *See id.*

In light of these factual averments, it cannot be disputed that Vermont Knitting has made a *prima facie* showing sufficient to overcome the instant motion to dismiss. In relevant part, Vermont Knitting has alleged that Dubied and Edouard Dubied were commonly owned, that the subsidiary was financially dependent on the parent, that there was a disregard of corporate formalities and that Edouard Dubied controlled Dubied's marketing and operational policies. Thus, Vermont Knitting has made the requisite showing that Dubied was a mere department of Edouard Dubied. *Compare Palmieri v. Estefan, 1992 WL 108569, at * 4-5, 1992 U.S. Dist. LEXIS 7309, at * 16-17 (S.D.N.Y. May 18, 1992)* (rejecting conclusion that subsidiary is mere department of parent based on lack of financial dependency) *with Volkswagenwerk, supra, 751 F.2d at 122* (finding mere department status based on four factor analysis).

In response to this factual showing, Edouard Dubied attempts to rebut and discount the probative value of Vermont Knitting's factual averments. *See* Supplemental Reply Memorandum of Law of Counterclaim Defendant Edouard Dubied & Cie. S.A., at 9-16. However, the current procedural posture of this case requires the Court both to assume the truth of the non-movant's factual allegations and to draw all inferences in the non-movant's favor. Edouard Dubied's factual arguments with respect to the proper weight to be assigned to Vermont Knitting's allegations therefore must be rejected, and the motion to dismiss must be denied.[FN2] In fact, careful examination of the litigants' various factual contentions reveals the existence of disputed issues of material fact on the jurisdictional issue. Thus, to resolve finally the jurisdictional question, the Court will ultimately have to conduct an evidentiary hearing, "at which the plaintiff must prove the existence of jurisdiction by a

preponderance of the evidence." *Ball, supra,* 902 F.2d at 197.

*5 Before concluding, the Court pauses to address Vermont Knitting's request for additional discovery. As described, *supra,* the instant motion to dismiss was held in abeyance pending discovery on the jurisdictional issue, which was supervised by Judge Buchwald. Following the close of discovery, Vermont Knitting argued under Fed.R.Civ.P. 56(f) that additional discovery is necessary, because documents requested by the counterclaim plaintiff have been transferred between Dubied, William Cotton Ltd., Monk Dubied America's and Edouard Dubied by Edouard Dubied's liquidators, and have not been produced. *See* Vermont Knitting Motion, at 31-33.

Given that the Court has declined to treat the instant motion to dismiss as a summary judgment motion, Rule 56(f) is not directly applicable to the case at bar. However, in reviewing Vermont Knitting's request for additional discovery, it is useful to turn to Rule 56(f) by analogy. If inadequate discovery prevents presentation of facts necessary to oppose a summary judgment motion, Rule 56(f) allows a court to deny summary judgment or order a continuance until discovery is complete. To obtain this relief, the party seeking additional discovery must file an affidavit explaining what facts are sought, how they will create a factual issue precluding summary judgment, what efforts have been made to obtain these facts and why these efforts have failed. *See Hudson River Sloop Clearwater, Inc. v. Department of the Navy, 891 F.2d 414, 422 (2d Cir.1989).* Other mechanisms for enforcing the right to discovery include motions to compel discovery and for sanctions under Fed.R.Civ.P. 37. *See, e.g., Daval Steel Products, Division of FrancoSteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1365-67 (2d Cir.1991).* This Court has stressed that these mechanisms must be used: a party cannot defeat a summary judgment motion by belatedly asserting that discovery efforts have been frustrated and by vaguely asserting that further discovery may yield unspecified facts that could plausibly defeat summary judgment. *See Bank of America National Trust and Savings Association v. Envases Venezolanos, S.A., 740 F.Supp. 260, 269 (S.D.N.Y.),* aff'd, *923 F.2d 843 (2d Cir.1990); Lawford v. New York Life Ins. Co., 739*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

F.Supp. 906, 917 n. 12 (S.D.N.Y.1990).

Because of the protracted nature of this litigation, the Court views Vermont Knitting's request for additional discovery with skepticism. However, in light of the alleged transfers of the records being sought by Vermont Knitting, and because of Edouard Dubied's apparent seizure by British liquidators, the Court must hesitate before rejecting the request for additional discovery on the instant record. Moreover, given the referral of this action to Judge Buchwald for supervision of discovery, it is apparent that this discovery dispute should be addressed by Judge Buchwald in the first instance. The Court therefore refers this action to Judge Buchwald, pursuant to 28 U.S.C. § 636 and Fed.R.Civ.P. 72, for supervision of discovery and for resolution of lingering discovery disputes.

## CONCLUSION

*6 For the foregoing reasons, Edouard Dubied's motion to dismiss for lack of personal jurisdiction pursuant to Fed.R.Civ.P. 12(b)(2) hereby is denied. This action hereby is referred to Magistrate Judge Naomi Reice Buchwald for supervision of discovery and resolution of remaining discovery disputes.

SO ORDERED.

FN1. Vermont Knitting Company's Memorandum of Law in Opposition to Motion of Edouard Dubied & Cie. S.A. to Dismiss Counterclaims for Lack of Personal Jurisdiction ("Vermont Knitting Motion") argues that the Court should treat the instant motion as a motion for summary judgment pursuant to Fed.R.Civ.P. 56. See Vermont Knitting Motion, at 13-14. However, because it is clear that Edouard Dubied is entitled to challenge the sufficiency of the counterclaim plaintiff's allegations under Fed.R.Civ.P. 12(b)(2), and because disposition of the jurisdictional question ultimately will require a hearing on the merits of parties' positions, the Court declines to treat the instant motion as one for summary judgment as provided by Fed.R.Civ.P. 12(b). See Ball v. Metallurgie Hoboken-Overpelt, S.A., 902 F.2d 194,

197 (2d Cir.), cert. denied, 111 S.Ct. 150 (1990).

FN2. This result also comports with the constitutional criteria of the Due Process Clause, which requires " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and the protection of its laws.' " Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475 (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)); accord Chase Manhattan Service Corp. v. National Business Systems, Inc., 766 F.Supp. 203, 205 (S.D.N.Y.1991) (Leisure, J.). If Vermont Knitting's factual allegations are proved to be true, then it will be clear that Edouard Dubied's "conduct and connection with the forum state [were] such that [it] should reasonably [have] anticipate[d] being haled into court" in New York, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980), and the assertion of jurisdiction will not offend "our traditional conception of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 320 (1945).

S.D.N.Y.,1992.
Dubied Machinery Co. v. Vermont Knitting Co., Inc.
Not Reported in F.Supp., 1992 WL 142044 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

4

Westlaw.

Not Reported in F.Supp.                                                                          Page 1
Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Four Seasons Solar Products Corp. v. Solarium Systems, Inc.
E.D.N.Y., 1987.
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.
FOUR SEASONS SOLAR PRODUCTS CORPORATION and FOUR SEASONS MARKETING CORP., Plaintiffs,
v.
SOLARIUM SYSTEMS, INC. and JAMES PETANO, Defendants.
No. 86 C 3468.

May 6, 1987.

ROBERTS, SPIECENS & COHEN (Alan K. Roberts, of counsel) New York City for plaintiffs.
FREDRIKSON & BYRON, P.A. (Kent G. Harbison, of counsel), Minneapolis, Minnesota, BUTLER, FITZGERALD & POTTER (Claudia C. Conway, of counsel), New York City for defendants.

MEMORANDUM AND ORDER
NICKERSON, District Judge.
**\*1** Plaintiffs (collectively 'Four Seasons'), which manufacture and sell prefabricated greenhouses and solaria, brought this diversity action against defendants Solarium Systems, Inc. ('Solarium'), a Minnesota corporation, which manufactures and sells the same type of products, and against James Petano, an Illinois resident and a former employee of Four Seasons now employed by Solarium. The complaint, seeking an injunction and damages, asserts against Solarium claims of unfair competition, interference with contracts and business relations, and wrongful appropriation of trade secrets.

Defendant Solarium now moves to dismiss the complaint for lack of personal jurisdiction. The critical issue is whether the court has personal jurisdiction over Solarium under New York C.P.L.R. § 302(a)(3), which, in relevant part, reads as follows.
(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jur-

isdiction over any non-domiciliary, . . . who . . . through an agent:
. . .
3. commits a tortious act without the state causing injury to person or property within the state, . . . if he
(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . .
..

Solarium contends that Four Seasons has not shown that any of the alleged tortious acts Solarium committed without the state 'caus[ed] injury to person or property within the state.'

The complaint, so far as pertinent, alleges, in substance, the following. Four Seasons employed Petano from June 13, 1983 to April 27, 1986 as its Midwest Regional Sales Manager, and from the latter date to May 23, 1986 as its National Accounts Manager. In these posts Petano was responsible for servicing the national accounts and for soliciting prospective dealers and franchisees and negotiating contracts with them. He was privy to and used confidential information of Four Seasons, under the direction that he keep it confidential.

In the course of his employment Petano signed an agreement stating that he would (a) for two years after leaving Four Seasons not take employment requiring him to disclose confidential information, and (b) for one year after leaving would not try to divert customers from Four Seasons or try to induce its employees to leave.

While still employed at Four Seasons, Petano conspired with Solarium to approach franchisees, dealers and employees of Four Seasons to convince them to terminate their relations with Four Seasons. After May 23, 1986, Solarium employed Petano, and they approached some of Four Season's employees, dealers and franchisees, using confidential information, to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

try to induce them to break their ties to Four Seasons and work for Solarium.

*2 The affidavits for Solarium state that (a) it has and has had no offices, employees or agents based in New York, (b) a mere 3-1/2 percent of its products have been sold in New York, (c) it has received orders from only six of approximately two hundred independent dealers in New York, and (d) Petano is based in Chicago, Illinois, and has performed no services for Solarium in New York.

Four Seasons submits affidavits from its President Christopher Esposito, its Eastern Regional Sales Manager Anthony Russo, and its Midwest Regional Manager John Gapa. Esposito says that in July 1985 Petano was in New York for Four Seasons' regional manager training meetings and there received confidential information about new products, company strategy, distribution, marketing and the like. Again in January 1986 Petano attended additional meetings in New York and acquired similar information.

Shortly after Petano's departure from Four Seasons Esposito began receiving reports that Petano was soliciting its suppliers, dealers and employees. In particular Esposito heard that Petano had approached Russo, who was based in New York. According to Esposito he was thus 'forced' to offer more bonuses and better incentive plans to keep Russo as an employee.

Esposito also says that Solarium contacted Southwall Technologies in California to induce it to sell to Solarium an insulating glass which Southwall manufactures in New York and is under exclusive license to sell to Four Seasons. Esposito in addition claims that in August 1986 Petano and other Solarium officials visited Four Seasons' Chicago franchisee, Bob Mulder, to induce him to switch to Solarium. Mulder, whose francise agreement is governed by New York law, declined to terminate his agreement with Four Seasons at that time. Gapa confirms that Mulder informed him of this incident.

Russo's affidavit recites Petano's call to him advising him that Solarium 'needed someone in the Northeast and that there might to a position available for

someone like me.' Russo told Petano he intended to honor his contract with Four Seasons.

The New York case most closely in point is Sybron Corp. v. Wetzel, 46 N.Y.2d 197, 385 N.E.2d 1055, 413 N.Y.S.2d 127 (1978). There Sybron, a manufacturer of glass-lined vessels, sued its former employee, Wetzel, and a competitor corporation, De Dietrich, to enjoin it from employing Wetzel and to prevent him from divulging trade secrets which he acquired while working in New York.

The court considered the application of C.P.L.R. § 302(a)(3), quoted above, and held that (despite the literal language of the section) a tort need not 'already have been committed for jurisdiction to be available under the statute.' Id. at 204, 385 N.E.2d at 1058, 413 N.Y.S.2d at 131. To hold that the plaintiff had to show a completed tort would mean that the section 'would never be usable by a plaintiff seeking anticipatory injunctive relief.' Id. It was thus enough that the facts gave 'rise to the probable inference that there is a conscious plan to engage in unfair competition and misappropriation of trade secrets.' Id.

*3 Solarium tries to distinguish this holding on the ground that Four Seasons has made no motion for a preliminary injunction and therefore is not serious about seeking such relief. That argument presupposes that Solarium will have accomplished all of its allegedly tortious objectives prior to entry of any final injunction. Jurisdiction does not depend on such a presupposition.

The court in the Sybron case found the more difficult question to be whether the out of state acts of De Dietrich 'will result in injury in New York.' Id. at 205, 385 N.E.2d at 1058, 413 N.Y.S.2d at 131. De Dietrich approached Wetzel in Florida, where he had retired after working for many years in New York, and asked him to supervise De Dietrich's facility in New Jersey. As to this issue of injury in New York the court said that the 'critical' facts were that 'it is New York where plaintiff manufactures and relines glass-lined equipment and the alleged trade secrets were acquired, and the economic injury plaintiff seeks to avert stems from from the threatened loss of important New York customers.' Id. at 205, 385 N.E.2d at

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**

1059, 413 N.Y.S.2d at 131.

The Four Seasons' affidavits in the present case certainly permit the inference that should its alleged trade secrets be disclosed some business from its New York sales could suffer. In contrast with what occurred in the Sybron case, Four Seasons has not pointed to the solicitation by Solarium of a large Four Seasons customer in New York. But Solarium admits to having made sales in New York through dealers, and the Four Seasons' affidavits assert, and Solarium does not deny, that it sells its products through dealers in at least Queens, Albany, and Port Jervis.

Four Seasons and Solarium are competitors for customers in New York. The confidential information is alleged to be useful in that competition. This case is thus not distinguishable from the Sybron decision. Here the expectation of consequences within the state is not merely limited to 'the indirect financial loss resulting from the fact' that Four Seasons 'is domiciled there.' Fantis Foods, Inc. v. Standard Importing Co., Inc., 49 N.Y.2d 317, 326-27, 402 N.E.2d 122, 126, 425 N.Y.S.2d 783, 787 (1980), and cases cited.

Solarium's motion to dismiss is denied. So ordered.

E.D.N.Y., 1987.
Four Seasons Solar Products Corp. v. Solarium Systems, Inc.
Not Reported in F.Supp., 1987 WL 4818 (E.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.