5

Westlaw.

Not Reported in F.Supp.                                                                                      Page 1
Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

**H**
Georgiadis v. First Boston Corp.
S.D.N.Y.,1994.
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Hourmouzis G. **GEORGIADIS**, Plaintiff,
v.
The **FIRST BOSTON** CORP. and Credit Suisse
**First Boston**, Ltd., Defendants.
No. 90 CIV. 7672 (PKL).

July 27, 1994.

Walker & Hill, New York City, Stephen R. Hill, of
counsel, for plaintiff.
Shaw, Pittman, Potts & Trowbridge, New York City
(Kenneth A. Caruso, of counsel), for defendants.

*OPINION AND ORDER*

LEISURE, District Judge:
*1 This is an action for breach of contract, unjust en-
richment and quantum meruit. Defendant Credit
Suisse First Boston, Ltd. ("CSFB") now moves to
dismiss the claims against it on the grounds of *forum
non conveniens.* CSFB originally moved to dismiss
plaintiff's Second Amended Complaint for *forum non
conveniens* in December of 1992. Since then, the
Court granted plaintiff leave to replead claims against
defendant First Boston. *Georgiadis v. First Boston
Corp. and CS First Boston, Inc.,* 90 Civ. 7672, 1992
WL 18270, at *3, 1992 U.S.Dist. LEXIS 787, at *9
(S.D.N.Y. Jan. 29, 1992) (Leisure, J.). Plaintiff reas-
serted his claims by way of the Third Amended Com-
plaint. While CSFB has not amended its December,
1992 motion to dismiss plaintiff's Third Amended
Complaint for *forum non conveniens,* the Court
grants CSFB's request to construe the instant motion
as a motion to dismiss plaintiff's Third Amended
Complaint (hereinafter "Complaint"). *See* CSFB's
Reply Memorandum in Support of Motion to Dismiss
("CSFB Reply"), at 3. For the reasons set forth be-
low, CSFB's motion is denied.[FN1]

BACKGROUND

As a general matter, for the purposes of a motion to

dismiss, the allegations in the plaintiff's complaint are
assumed to be true. *See Easton v. Sundram,* 947 F.2d
1011, 1014-15 (2d Cir.1991), *cert. denied,* 112 S.Ct.
1943 (1992); *Allen v. Westpoint-Pepperell, Inc.,* 945
F.2d 40, 44 (2d Cir.1991). However, it does not ne-
cessarily follow that the Court must slavishly accept
plaintiff's allegations in his complaint as true in a mo-
tion to dismiss. The Second Circuit has held that it is
entirely appropriate for a court to look beyond the
complaint and examine any evidence before it, such
as affidavits, in resolving a jurisdictional dispute. *See
Cargill Intern. S.A. v. M/T Pavel Dybenko,* 991 F.2d
1012, 1019 (2d Cir.1993) (citations omitted); *Antares
Aircraft, L.P. v. Federal Republic of Nigeria,* 948
F.2d 90, 96 (2d Cir.1991) ( "On a motion under
Fed.R.Civ.P. 12(b)(1) challenging the district court's
subject matter jurisdiction, the court may resolve dis-
puted jurisdictional fact issues by reference to evid-
ence outside the pleading, such as affidavits"). 
Presently before this Court is defendant's motion to
dismiss for *forum non conveniens,* which raises a dis-
puted factual issue relating to the appropriateness of
this Court serving as the forum. Accordingly, this
Court has invoked the aforementioned principles in
resolving the factual disputes surrounding the instant
motion.

Applying these principles, the facts of the case are as
follows. Plaintiff alleges that CSFB is a British cor-
poration which maintains an office and does business
in New York. Complaint at 2. Plaintiff's counsel af-
firms under penalty of perjury facts which tend to
substantiate this allegation. Affidavit at ¶ 5. The
Court notes that CSFB's counsel denies that CSFB
maintains an office in New York. Reply at 4.
However, while CSFB does provide the Court with
affidavits of various CSFB employees, it does not
present any sworn deposition testimony or affidavits
that directly impugn plaintiff's contention. *See, e.g.,*
CSFB Motion at Exhibit A, B. Finding that plaintiff's
contention that CSFB maintains an office in New
York has some evidentiary support, and that
plaintiff's counsel has submitted a sworn affidavit
supporting this contention, the Court also finds that
CSFB has not presented sufficient evidence to con-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                              Page 2
Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

trovert the factual contention advanced by plaintiff.

*2 In January of 1989, CSFB sought plaintiff's assistance to obtain a contract with the Halkis Cement Company ("Halkis") for advice regarding the sale of equity interest in Halkis and the financial restructuring of the company's indebtedness.[FN2] Plaintiff agreed to assist CSFB, and the parties entered into an oral agreement by which plaintiff was to be compensated for his services to CSFB in the amount of six percent (6%) of the amount Halkis paid CSFB, starting in February, 1989. Plaintiff was also to be reimbursed for expenses incurred in working to obtain a contract between CSFB and Halkis. On November 6, 1989, this oral agreement between plaintiff and CSFB was reduced to a writing. *See* Defendant CSFB's Motion to Dismiss, filed December 9, 1992, ("CSFB Motion"), at Exhibit E.

In carrying out his obligations to CSFB, plaintiff incurred $57,677.28 in out-of-pocket expenses. In February of 1989, CSFB and Halkis entered into an oral contract, confirmed in writing on February 24, 1989, whereby Halkis retained the financial services of CSFB. *See* CSFB Motion at Exhibit D. To date, Halkis has paid CSFB in excess of 950,000 pounds sterling for their financial services, and continues to pay CSFB 42,500 pounds sterling per month. However, plaintiff has only received a sum of 4,080 pounds sterling ($6,400.40) from CSFB. *See* Complaint at ¶¶ 28-37.

### DISCUSSION

Under the doctrine of *forum non conveniens*, "when an alternative forum has jurisdiction to hear [a] case, and when trial in the chosen forum would 'establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience,' or when the 'chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems,' the court may, in the exercise of its sound discretion, dismiss the case." *American Dredging Co. v. Miller*, 114 S.Ct. 981, 985 (1994) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981)). *Accord Blanco v. Banco Indus. De Venezuela, S.A.*, 997 F.2d 974, 994 (2d Cir.1993). Therefore, there is a strong presumption in favor of a

plaintiff's choice of forum, although dismissal nevertheless may be appropriate where certain private and public factors point towards trial in an alternative forum. *Allstate Life Ins. Co. v. Linter Group Ltd.*, 994 F.2d 996, 1001 (2d Cir.1993) (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-509 (1947) and *Reyno*, 454 U.S. 235, 255 (1981)).

The private and public interest factors that constitute the "uniform standard" for *forum non conveniens* determinations in the Second Circuit include: (1) the ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the cost of obtaining attendance of willing witnesses; (4) practical problems affecting the efficiency and expense of a trial; (5) enforceability of judgments; (6) administrative difficulties flowing from court congestion; (7) imposing jury duty on citizens of the forum; (8) the local interest in having controversies decided at home; and (9) the avoidance of unnecessary problems in the application of foreign law. *Alcoa S.S. Co. v. M/V Nordic Regent*, 654 F.2d 147, 156 (2d Cir.1980) (*en banc* ), *cert. denied*, 449 U.S. 890. *Accord Allstate*, 994 F.2d at 1001 (citing *Gilbert*, 330 U.S. at 508-509). The Second Circuit relies heavily on the discretion of the district courts in weighing these factors, and has held that they will reverse a *forum non conveniens* determination only where a court fails to carefully consider the *Gilbert* factors. *Allstate*, 994 F.2d at 1001 (quoting *Borden, Inc. v. Meiji Milk Prods. Co.*, 919 F.2d 822, 828 (2d Cir.1990)). *See Blanco*, 997 F.2d at 978. Accordingly, this Court now turns to an evaluation of the *Gilbert* factors in the instant case.

### I. Existence of an Alternative Forum and Enforceability of Judgments

*3 As a threshold matter, a defendant seeking to dismiss a complaint for *forum non conveniens* "must demonstrate that an adequate alternative forum exists." *Maganlal & Co. v. M.G. Chemical Co.*, 942 F.2d 164, 167 (2d Cir.1991). By way of affidavits of an expert in English law, CSFB claims that the instant action may be brought in the High Court of Justice in London, England under British jurisdictional law. *See* CSFB's Memorandum in Support of Motion to Dismiss, filed December 9, 1992, at 5.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                  Page 3
Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

Plaintiff does not contest this opinion. *See* Affidavit at ¶¶ 10-12. Although CSFB has not explicitly consented to suit in England, the Court finds that an alternative forum for plaintiff's claims against CSFB does exist. Since CSFB is a corporation organized and existing under the laws of the United Kingdom, this Court need not question whether the alternative forum in the instant case could grant and enforce an adequate remedy against it. *See Evans v. Cunard Line Limited,* 93 Civ. 5745, 1994 WL 150826, at *1, 1994 U.S.Dist. LEXIS 5029, at *2 (S.D.N.Y. Apr. 19, 1994) (Leisure, J.) (holding that England constitutes an alternative forum with adequate remedies for a maritime action).

## II. Availability of Witnesses and Ease of Access to Sources of Proof

CSFB contends that Harry Adamopoulos ("Adamopoulos"), the principle witness for CSFB in the instant case, resides and works in London. Plaintiff claims, however, that Adamopoulos travels frequently to New York. Affidavit, at ¶ 5. Additionally, it is undisputed that, Adamopoulos has travelled to Greece to represent CSFB in its affairs with Halkis. The Court sees no reason why Adamopoulos, as a CSFB employee, would be unable to travel to this forum to represent CSFB in the instant case. CSFB has not demonstrated that its difficulty in obtaining Adamopoulos as a witness in New York is sufficient to tip the balance of the instant *forum non conveniens* determination in their favor. *See also Calavo Growers v. Belgium,* 632 F.2d 963, 969 (2d Cir.1980) (Newman, J. concurring) ("It will often be quicker and less expensive to transfer a witness or a document than to transfer a lawsuit"), *cert. denied,* 449 U.S. 1084 (1981).

Furthermore, CSFB alleges that all documents relating to Halkis are stored in London. CSFB Motion at Exhibit B. However, the Court notes that, in contrast to the airplane wreckage that constituted the central evidence required to adjudicate *Reyno,* 454 U.S. 235, contractual documents can more easily be transferred from one forum to another. Nor would a jury in this case be required to view a specific location, or to have knowledge of a specific locality. *Cf. Blanco,* 997 F.2d at 982. CSFB's reliance on British treaties

relating to the taking of Greek evidence abroad is inapposite since the record does not reveal substantial reasons why plaintiff would need to rely on Greek evidence to prove his claims. *Cf. Abiaad v. General Motors Corp.,* 538 F.Supp. 537, 542-43 (E.D.Pa.1982). Accordingly, this factor does not weigh in favor of CSFB's motion to dismiss for *forum non conveniens.*

## III. Cost and Practical Problems affecting the Efficiency of Trial

*4 CSFB does not claim that the cost or practical difficulties of transferring documents and witnesses to New York for trial would be "oppressive," "vexatious" or "harassing." As the documentary evidence is in the English language, no translation costs will be imposed on the parties or the Court in the instant case. *See Blanco,* 997 F.2d at 983 (necessity of translating documentary evidence, depositions and trial testimony weighs in favor of dismissal for *forum non conveniens*). Additionally, it is undisputed that CSFB's parent company, CS First Boston, Inc., maintains an office in New York. Affidavit at ¶ 5; Reply at 4. Therefore, the practical difficulties of conducting litigation in a foreign nation are diminished by CSFB's pre-existing connections with this forum, and it cannot be inferred from the record that litigating the instant case would constitute an oppressive financial burden to the defendant. *See Calavo Growers,* 632 F.2d at 969 ("the realities of modern transportation and communications ... have significantly altered the meaning of non conveniens.")

Furthermore, the Court must take into consideration that plaintiff has related claims pending against defendant First Boston in this forum. The Second Circuit has noted that "[t]here is a strong policy favoring the litigation of related claims in the same tribunal in order that pretrial discovery can be conducted more efficiently, duplicitous litigation can be avoided, thereby saving time and expense for both parties and witnesses, and inconsistent results can be avoided." *Wyndham Associates v. Bintliff,* 398 F.2d 614, 619 (2d Cir.1968), *cert. denied* 393 U.S. 977. Therefore, while CSFB's private interest in avoiding the cost of litigation in a foreign country supports its motion, the public interest in the efficient administration of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

justice constitutes a counter-balancing consideration. Evaluated together, these factors do not weigh in favor of the instant motion to dismiss for *forum non conveniens*.

### V. Avoidance of the Application of Foreign Law

A federal court sitting in diversity must apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 497 (1941); *Machleder v. Diaz*, 801 F.2d 46, 51 (2d Cir.1986), *cert. denied* 479 U.S. 1088 (1987). Following the constitutional standards for choice-of-law determinations established by the Supreme Court in *Allstate Ins. Co. v. Hague*, 449 U.S. 302 (1981), New York may assert its law only if a sufficient nexus with the case exists so that such an assertion would not be arbitrary or fundamentally unfair. *See Bader v. Purdom*, 841 F.2d 38, 39 (2d Cir.1988); *Cooney v. Osgood Mach., Inc.*, 81 N.Y.2d 66, 71, 612 N.E.2d 277, 279, 595 N.Y.S.2d 919 (1993) (Kaye, C.J.) (citing *Allstate Ins. Co. v. Hague*, 449 U.S. at 312-313).

Having rejected the traditional choice-of-law doctrine of *lex loci delicti* long ago in *Babcock v. Jackson*, 12 N.Y.2d 473, 484, 191 N.E.2d 279, 285, 240 N.Y.S.2d 743, 751 (1963), New York has developed a "center of gravity" or "grouping of contacts" approach to choice-of-law issues in contract cases to determine whether New York has a sufficient interest in a dispute to justify the assertion of its own law. *Matter of Allstate Ins. Co.*, 81 N.Y.2d 219, 226, 613 N.E.2d 936, 939, 597 N.Y.S.2d 904 (1993) (Kaye, C.J.) (citations omitted). In applying New York law to cases involving transnational financial transactions, the New York Court of Appeals has noted that New York is a "financial capital of the world" and "in order to maintain its pre-eminent financial position, it is important that the justified expectations of the parties to [a New York contract] be protected." *J. Zeevi and Sons, Ltd. v. Grindlays Bank (Uganda) Ltd.*, 37 N.Y.2d 220, 227, 333 N.E.2d 168, 172-73, 371 N.Y.S.2d 892, 898 (1975), *cert. denied* 423 U.S. 866.

*5 As previously noted, the instant defendant allegedly breached a contract that was negotiated in its own office in New York. This consideration supports the application of New York law. *See Passalacqua Builders, Inc. v. Resnick Developers South, Inc.*, 933 F.2d 131, 137 (2d Cir.1991) (negotiation of contract within New York establishes New York's interest in breach of contract case, as does place of business of the parties) (citing *Intercontinental Planning Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 248 N.E.2d 576, 581, 300 N.Y.S.2d 817, 825 (1969)). While CSFB is an English corporation, neither plaintiff nor CSFB conducted business in England. Affidavit at ¶ 8. The Court finds that England's competing interest in asserting its own laws over the instant case is outweighed by New York's interest in regulating the contractual obligations of corporate agents within its territory. *See Totalplan Corp. of America v. Colbourne*, 14 F.3d 824, 832 (2d Cir.1994) (holding that New York law applies to a contractual dispute where the interests of California and New York are equally divided). Accordingly, New York law applies in the instant case and thus this factor weighs against the instant motion to dismiss for *forum non conveniens*. *See Gilbert*, 330 U.S. at 508.

### VI. Administrative Difficulties and Imposition of Jury Duty

The Southern District of New York regularly adjudicates cases involving issues similar to the one at bar. The Court therefore anticipates no special administrative difficulties that would weigh significantly in favor of CSFB's motion to dismiss. *See Hatzlachh Supply Inc. v. Savannah Bank of Nigeria*, 649 F.Supp. 688, 693 (S.D.N.Y.1986) ("In terms of court congestion, it is true that the Southern District of New York is a very busy jurisdiction but this is only one factor and when balanced against the other public and private interests is not persuasive.") Plaintiff's allegations establish a meaningful nexus with the instant forum, and touch upon New York's interest in remaining a financial capital of the world by providing a forum for the instant dispute. *See J. Zeevi and Sons, Ltd.*, 37 N.Y.2d at 227. Accordingly, the Court concludes that the resolution of this case in a New York forum does not constitute an unreasonable imposition on a New York jury. *See Gilbert*, 330 U.S. at 508-509.

### Conclusion

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                          Page 5
Not Reported in F.Supp., 1994 WL 392229 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.)**


After a careful consideration of the *Gilbert* factors,
the Court concludes that not only does the balance
fail to tip strongly in favor of CSFB, but also that the
calculus of convenience favors trial in this forum.
Accordingly, the instant motion to dismiss for *forum
non conveniens* is hereby denied.

SO ORDERED

> FN1. As an initial matter, it should be noted
> that plaintiff did not file the Third Amended
> complaint until July 18, 1994, although
> plaintiff served a copy of the Third
> Amended Complaint, along with an Affi-
> davit in Opposition to CSFB's Motion to
> Dismiss (the "Affidavit"), on CSFB's coun-
> sel on September 17, 1993. *See* CSFB Reply
> at 2. Plaintiff's failure to file its opposition
> papers until after this Court specifically re-
> quested that it do so clearly violates Local
> Civil Rule 3(b), and thereby constitutes
> grounds for this Court entering default judg-
> ment in favor of the defendant. *See Wash-
> ington Square Post No. 1212 v. City of New
> York,* 808 F.Supp. 264, 269 (S.D.N.Y.1992)
> (Leisure, J.). However, since CSFB received
> plaintiff's papers, and had an opportunity to
> respond to the Third Amended Complaint
> and Affidavit in their Reply, it suffered no
> prejudice as a result of plaintiff's failure to
> file its papers. Accordingly, the Court shall
> consider plaintiff's arguments made in op-
> position to this motion despite plaintiff's ini-
> tial failure to file them with the Court. As
> the instant motion was filed just months
> after CSFB was named a party to the action,
> plaintiff's contention that the motion is un-
> timely is without merit.

> FN2. Halkis is a Greek cement company for
> which plaintiff had previously provided con-
> sulting services. Complaint at ¶ 28.

S.D.N.Y.,1994.
Georgiadis v. First Boston Corp.
Not Reported in F.Supp., 1994 WL 392229
(S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 56
---------------------------------------------------------------------X

SHARON HAUGH,

                        Plaintiff,

          -against-

SCHRODERS PLC, SCHRODERS INCORPORATED,
and SCHRODER INVESTMENTS (BERMUDA)
LIMITED,

                        Defendants.

---------------------------------------------------------------------X

Index No. 600651/03

FILED

DEC - 4 2003

COUNTY CLERK'S OFFICE
NEW YORK

**RICHARD B. LOWE III, J.:**

       Motion sequence numbers 001 and 002 are consolidated for disposition.

       This action alleges breach of contract and breach of fiduciary duty, and seeks a

declaratory judgment that certain partnership units be reallocated.  In motion sequence number

001, defendant Schroders plc moves to dismiss the complaint as against it for lack of personal

jurisdiction.  In motion sequence number 002, all defendants move for an order admitting

Christine N. Kearns and Matthew A. Anzaldi, pro hac vice, for all purposes in conjunction with

this action.  Plaintiff opposes and cross-moves to disqualify Robert Robbins, Esq. and Shaw

Pittman LLP from serving as counsel in this action.

FACTS (Motion Sequence 001)

       Plaintiff Sharon Haugh (Haugh) is a limited partner in an Internet venture called Internet

Finance Partners LP (IFP), which was formed in late 1999.  Defendants Schroders Incorporated

(Schroders GP) and Schroders Investments (Bermuda) Limited (Schroders Bermuda LP) are the

1

general partner and a limited partner, respectively, of IFP. Schroders GP is a corporation organized under the laws of Delaware, and is administered in Bermuda. Schroders Bermuda LP is a corporation organized under the laws of Bermuda, with its principal place of business in Bermuda. Both of these companies expressly consented to the personal jurisdiction of New York state and federal courts.

Schroders plc is a United Kingdom public limited company, with its principal office in London. According to defendants, Schroders plc is the ultimate parent of the Schroders group of companies worldwide, and is a holding company that owns the other defendants through several intermediate subsidiaries. Defendants maintain that Schroders plc's subsidiary, Schroders Holdings plc (also a UK corporation) owns Schroders International Holding Limited (also a UK corporation), which owns Schroders Bermuda LP. According to defendants, each of them maintains separate corporate formalities. When IFP was formed, and to date, Schroders Bermuda LP had no directors in common with Schroders plc. Schroders GP had only one director in common with Schroders plc. Defendants further maintain that Schroders plc was not a signatory to the agreements involving IFP, and is not even mentioned in them.

Plaintiff contends that Schroders plc was very much involved with the actions that are the subject of her complaint, and that it directly conducts substantial and profitable business in New York through three separate entities. Among the allegations, plaintiff states that Schroders plc caused Schroders LP (another related entity) to refuse to fund $8 million of its obligations, and forced Schroders GP to shut down IFP's business. It then failed to reallocate IFP's partnership interest among IFP's other limited partners, despite the fact that the allocation was based upon funding the partnership in accordance with the agreements. Haugh also contends that Schroders

2

plc was a party to the binding Memorandum of Understanding with respect to IFP, and attaches a copy of the Memorandum to her papers.

In response, Schroders plc contends that it is not the signatory to the Memorandum of Understanding, and submits several documents indicating that the corporation changed its name several times between January and April 2000. First incorporated as Granard Public Limited Company on January 14, 2000, the company changed its name to Schroder Holdings PLC on January 19, 2000, then to New Schroders plc on February 18, 2000, and finally to Schroders plc on April 18, 2000. The Memorandum of Understanding was signed by one David M. Salisbury on February 4, 2000, on behalf of Schroders plc. Schroders plc avers that at that time, it was not Schroders plc. Defendants do not offer any explanation regarding what entity did, in fact, sign the Memorandum of Understanding, or what the relationship is between the various entities. Another confusing aspect is that Schroders plc claims that Schroders Holding plc is its subsidiary, whereas, according to the documents submitted, it is a previous name of Schroders plc. Another area of confusion is that defendants contend that Schroders plc is the ultimate parent of the Schroders group of companies worldwide, yet its predecessor did not incorporate until January 2000, while at least some of its subsidiaries are alleged to have existed before that time, e.g., Schroders plc is alleged to have formed IFP in 1999.

<u>DISCUSSION (Motion sequence no. 001)</u>

The parties discuss the various requirements for finding that a party is subject to jurisdiction pursuant to CPLR 301 and 302. However, in view of the confusing and contradictory allegations regarding the identity of Schroders plc itself, much less its activities in New York and through New York entities, it is impossible, at this juncture, for the court to

3

determine whether jurisdiction can be asserted over Schroders plc. The parties must complete discovery on that issue. Following discovery, the matter can be considered based upon evidence, and, if needed, the court will conduct a hearing on the issue of jurisdiction. However, any determination would be premature at this time.

FACTS (Motion Sequence 002)

Defendants move to admit two attorneys, pro hac vice, so that they can participate in argument and trial in this action. Both are members in good standing of the bars of their respective states, and both are employed by the Washington, D.C. law firm of Shaw Pittman LLP (Shaw Pittman).

Haugh opposes the motion, and cross-moves to disqualify Robert Robbins, a partner with Shaw Pittman, as well as the Shaw Pittman firm, from representing defendants. Haugh maintains that disqualification is warranted because Robbins and other attorneys at Shaw Pittman will be material witnesses in this action, based upon their direct participation in the matters at issue. Haugh further maintains that Robbins and Shaw Pittman were counsel to defendants with respect to the formation of IFP, and rendered legal advice to the limited partners, including Haugh, in connection with the formation of IFP and the execution of the partnership agreements. They also continued to provide certain legal advice to IFP. After Schroders plc decided to shut down IFP's business, and to cease funding through Schroders LP, Haugh had numerous conversations and correspondence with Robbins concerning the funding obligation.

Robert Robbins submits an affidavit in opposition to the cross motion, in which he states that he and other attorneys in Shaw Pittman represented IFP, and its general partner, Schroders GP. Schroders GP had the complete right to operate, manage, and control the affairs of IFP.

4

Haugh was a limited partner, and a member of the Governing Board for IFP. Shaw Pittman did
not represent any of the individual limited partners, and communicated that fact to Haugh. Shaw
Pittman also did not represent Haugh in connection with any other matter. Haugh was
represented by separate legal counsel with respect to her employment agreement with IFP, and
with respect to the terms of the letter dated June 23, 2000, which constitutes part of the
agreement on which Haugh brings this action. Robbins maintains that Haugh was occasionally a
party to communications, due to her position as a member of the Governing Board and
Chairperson of the Management Committee of IFP, but was never given legal advice in any other
capacity. Robbins also states that he is not going to appear on behalf of defendants in this
litigation, and those attorneys who have appeared are part of Shaw Pittman's litigation group, and
have not represented IFP or Schroders GP in connection with the formation and business of IFP.

Christine Kearns also submits an affidavit in opposition, in which she asserts that, in a
related federal action, Haugh did not object to defendants' motion that she and another Shaw
Pittman attorney be admitted pro hac vice, nor did Haugh, at any time, object to Shaw Pittman
representing defendants in that action.

<u>DISCUSSION (Motion sequence 002)</u>

Haugh does not base her motion to disqualify on a violation of the Code of Professional
Responsibility, but rather on general equity notions based upon the particular circumstances.
Haugh points out that Robbins and other attorneys from Shaw Pittman will, in all likelihood, be
called to testify. She argues that there is danger that the jury may accord the testifying attorneys'
arguments and testimony undue weight.

Defendants point out that Haugh did not object to Shaw Pittman's representation of

5

defendants for more than eight months, even when Shaw Pittman moved, in the federal action, to disqualify Haugh's former counsel on the basis of conflict of interest. They also note that Haugh requested that Shaw Pittman accept service of the summons and complaint in this action on behalf of defendants.

Disqualification of a law firm implicates the substantive rights of the litigants to counsel of their choice. *S & S Hotel Ventures Ltd. Partnership v 777 S.H. Corp.*, 69 NY2d 437, 443 (1987). Motions to disqualify can become tactical decisions for strategic advantage. *Jamaica Publ. Serv. Co. v AIU Ins. Co.*, 92 NY2d 631, 638 (1998). Therefore, the court must carefully scrutinize such requests, and the party seeking such relief bears the burden of demonstrating why disqualification is necessary. *Id.*

Haugh had not demonstrated any compelling reason for disqualification. Shaw Pittman is not acting in violation of any disciplinary rules, and Haugh has not demonstrated that it represented her at any time, other than as a beneficiary of its representation of IFP. Nor is the attorney who may testify in this action the same attorney as the one who will be conducting the litigation. Thus, there is no danger that his testimony will be accorded greater weight than that of any other witness. The delay in seeking such disqualification also raises the question of whether it is being sought for tactical reasons. Haugh contends that she did not make this motion earlier because there had been no activity directed to the substance of Haugh's claims until defendants' recent service of discovery requests. However, this explanation ignores the fact that there were prior motions made in the federal action, and discovery was conducted in that action, including a deposition of Haugh. Nonetheless, no formal or informal objection was ever made to Shaw Pittman representing defendants.

6

The combination of plaintiff's delay in seeking disqualification, and the failure of Haugh to demonstrate any compelling need to disqualify Shaw Pittman, militates in favor of denying the cross motion.

Haugh does not raise any objection to admitting Kearns or Anzaldi, pro hac vice, other than the alleged conflict of interest. Since that argument is rejected, the motion to admit them is granted.

CONCLUSION

Accordingly, it is hereby

ORDERED that defendant Schroders plc's motion (motion sequence 001) to dismiss for lack of personal jurisdiction is denied, without prejudice to renew following the completion of discovery on this issue; and it is further

ORDERED that defendants' motion (motion sequence no. 002) to admit Christine N. Kearns and Matthew A. Anzaldi pro hac vice is granted; and it is further

ORDERED that plaintiff's cross motion (motion sequence no. 002) to disqualify Robert Robbins and Shaw Pittman LLP from serving as counsel to defendants is denied.

Dated: November 24, 2003

FILED

DEC - 4 2003

COUNTY CLERK'S OFFICE
NEW YORK

ENTER:

J.S.C.

RICHARD B. LOWE III

7

7

Westlaw.

Slip Copy

Slip Copy, 2006 WL 3247363 (S.D.N.Y.)

**(Cite as: Slip Copy)**

**H**

Kirch v. Liberty Media Corp.

S.D.N.Y.,2006.

Only the Westlaw citation is currently available.

United States District Court,S.D. New York.

Dr. Leo KIRCH, Individually and as assignee, KGL

Pool GmbH, and International Television Trading

Corp., Plaintiffs,

v.

LIBERTY MEDIA CORP., John Malone, Deutsche

Bank AG, and Dr. Rolf Ernst Breuer, Defendants.

**No. 04 Clv. 667(NRB).**

Nov. 8, 2006.

Alan B. Vickery, Boies, Schiller & Flexner, LLP, New York, NY, for Plaintiff.

Jeffrey Barist, Josh Porter, Milbank, Tweed, Hadley & McCloy, LLP, New York, NY, for Deutsche Bank and Dr. Rolf-Ernst Breuer.

Paul Anthony Ragusa, Baker Botts, LLP, New York, NY, Michael Calhoon, Robert Kry, R. Stan Mortenson, Baker Botts, LLP, Washington DC, for Liberty Media Corp. and John Malone.

MEMORANDUM AND ORDER

BUCHWALD, J.

*1 Dr. Leo Kirch ("Dr.Kirch"), KGL Pool GmbH ("KGL") and International Television Trading Corporation ("ITTC") brought this suit against Liberty Media Corporation ("Liberty"), John Malone ("Malone"), Deutsche Bank AG and Dr. Rolf-Ernst Breuer ("Dr.Breuer"),[FN1] asserting various tort claims under New York law [FN2] arising out of an alleged conspiracy among defendants to ensure the breakup of Kirch's mass media empire.[FN3] Upon two separate motions, one by the Deutsche Defendants and one by the Liberty Defendants, this Court dismissed the complaint in its entirety for failure to state a claim upon which relief could be granted. *See Kirch v. Liberty Media, No. 04 Civ. 667(NRB), 2004 WL 2181383 (S.D.N.Y. Sept. 27, 2004).* On appeal, the Second Circuit affirmed this Court's decision to dismiss all claims brought by plaintiff ITTC, as well as the dismissal of the tortious interference with contract claim. However, the Second Circuit concluded

that, in light of the dismissal of the only American plaintiff, the case should be remanded for further consideration of defendants' motions to dismiss pursuant to the *forum non conveniens* doctrine. Thus, without addressing the merits of the defamation, tortious interference with prospective economic advantage, or civil conspiracy claims alleged by the remaining plaintiffs, the panel vacated the judgment and remanded for our determination of the *forum non conveniens* issue and, if appropriate, the issue of *res judicata. See Kirch v. Liberty Media, 449 F.3d 388, 404 (2d Cir.2006).* For the reasons discussed below, we find that this case should be dismissed for *forum non conveniens,* subject to a single condition.[FN4]

> FN1. Dr. Breuer served as the Chief Executive Officer and Spokesman of the managing directors of Deutsche Bank during the time of the events at issue here. Accordingly, we will refer to defendants Breuer and Deutsche Bank together as the "Deutsche Defendants." Similarly, given that Mr. Malone served as the Chairman of Liberty's Board of Directors during the relevant time period, we shall refer to defendants Malone and Liberty Media Corp. together as the "Liberty Defendants."

> FN2. These claims included causes of action for defamation, tortious interference with contract, tortious interference with prospective economic advantage, and civil conspiracy.

> FN3. Plaintiffs initiated the American action in February of 2003, when Dr. Kirch filed a complaint against Deutsche Bank and Breuer in New York State Supreme Court, New York County. Plaintiffs' complaint was subsequently amended to include plaintiff ITTC on January 14, 2004, and then removed to federal court on January 28, 2004.

> FN4. The Liberty Defendants also moved to dismiss the claims against them outright so as to "facilitate the *forum non conveniens*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 2

analysis." *See* Liberty Defendants' Supplemental Memorandum in Support of Motion to Dismiss ("Liberty Supp. Mem.") at 2. To that end, the Liberty Defendants proffered several reasons why the claims against them lack merit. *Id.* at 2-6. However, we understand that the Second Circuit limited the scope of our inquiry to the *forum non conveniens* and *res judicata* issues, and thus decline to separately evaluate the merits of the claims against the Liberty Defendants.

*BACKGROUND* [FN5]

FN5. Except where indicated, there are no genuine issues regarding the following facts.

Dr. Leo Kirch, the founder of KirchGroup, a German mass media conglomerate, alleges that Liberty and Deutsche Bank conspired to bring financial ruin upon the KirchGroup so as to benefit themselves .[FN6] Plaintiffs' complaint focuses on a Feburary 3, 2002 German-language interview of defendant Dr. Rolf-Ernst Breuer, the CEO of Deutsche Bank, which was broadcast on German Bloomberg TV. In the interview, Dr. Breuer doubted whether the financial community would be willing to lend KirchGroup the requisite funds to survive its liquidity crisis. Dr. Kirch contends not only that the statement was false, but that Dr. Breuer was aware of its falsehood when he made it. Less than three months after the interview, KirchGroup sought bankruptcy protection under German Law.

FN6. The two previous opinions in this case explore, in greater detail, the factual background of this dispute. *See Kirch v. Liberty Media,* 449 F.3d 388 (2d Cir.2006); *Kirch v. Liberty Media,* 2004 WL 2181383 (S.D.N.Y. Sept 27, 2004). We limit our discussion here to those facts which are of relevance to the issues before us on remand.

The only remaining plaintiffs, Dr. Kirch and KGL Pool GmbH, a German citizen and a German company, have brought two separate actions in Germany against the German defendants who are also parties in this case. In the first German action, which was

filed by plaintiff Dr. Kirch prior to the initiation of the present action, plaintiff has prevailed on the issue of liability for the German equivalents of claims for defamation and tortious interference. Since the instant action was filed, two developments have transpired which implicate our decision here. First, in the initial German action, the highest court in Germany has issued a detailed ruling, discussing at length the factual allegations against the Deutsche Defendants and the claims under German law. Second, plaintiff KGL subsequently brought a second action against the Deutsche Defendants in Munich district court, on behalf of the same assignors it represents here, and based on the same fact pattern. We shall discuss each of these German actions in turn.

A. The First German Action-Dr. Kirch as Plaintiff

*2 Dr. Kirch, individually and as assignee of TaurusHolding GmbH & Co. KG ("Taurus") and of PrintBeteiligungs GmbH ("Print"), brought the first German action against the Deutsche Defendants on May 7, 2002. Declaration of Dr. Hans-Dirk Krekeler dated March 5, 2004 ("Krekeler Decl. I") ¶ 12. On February 18, 2003, the Munich district court held that, under German law, Deutsche Bank and Dr. Breuer were jointly and severally liable for any potential economic losses to Dr. Kirch which resulted from the interview at issue. *Id .* ¶ 13. In December of 2003, an intermediate appellate court upheld the decision as to Deutsche Bank, but disagreed with the lower court with regard to Dr. Breuer's liability, and thus declined to hold Dr. Breuer personally liable for the statements he made over the course of the interview. *See* Declaration of Hans-Peter Kirchhof dated March 3, 2004 ("Kirchhof Decl. I") ¶¶ 29-30.

On January 24, 2006, the *Bundesgerichtshof* ("BGH"), Germany's Federal High Court, issued a final decision with regard to the Deutsche Defendants' liability under German law. Certified Translation of BGH Decision ("BGH Decision") at 1. The BGH reversed the intermediate appellate court's decision as to Dr. Breuer's liability, holding that the Deutsche Defendants "are jointly and severally liable to Plaintiff pursuant to the rights assigned to it and shall compensate Plaintiff for the losses to PrintBeteiligungs GmbH that have resulted and shall result from

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

the statements made by [Dr. Breuer] in an interview on the Bloomberg TV broadcasting station on February 3/4, 2002." *Id.* at 3-4. The BGH concluded that Dr. Breuer had violated the German tort rule against interference with an established and operating business. *Id.* at 57-63. However, the BGH expressly limited the scope of compensable losses to potential losses incurred by KirchGroup subsidiary Print, which had a contractual relationship with Deutsche Bank: any resultant harm suffered by Dr. Kirch individually and as assignee for KirchGroup holding company Taurus, concluded the BGH, was too attenuated to constitute a viable claim. *Id.* at 26-32.

### B. The Second German Action-KGL as Plaintiff

On December 31, 2005, over a year after we issued our original decision in this case and while plaintiffs pursued their appeal before the Second Circuit, plaintiff KGL, as assignee of a number of Kirch-Group companies,[FN7] filed a complaint in Munich district court against the Deutsche Defendants. The Munich complaint is 143 pages long, written in German, and the Deutsche Defendants submitted a 68 page response in German on May 31, 2006. *See* Krekeler Decl. II ¶¶ 3-4.

> FN7. These KirchGroup companies include KirchMedia GmbH & Co.KGaA, Kirch-PayTV GmbH & Co.KGaA, and TaurusTV GmbH. Declaration of Dr. Hans-Dirk Krekeler dated June 28, 2006 ("Krekeler Decl. II") ¶ 3.

### DISCUSSION

Under the doctrine of *forum non conveniens,* a district court has broad discretion to decline to exercise its jurisdiction to adjudicate a case where "dismissal would 'best serve the convenience of the parties and the ends of justice." ' *Murray v. British Broadcasting Corp., 81 F.3d 287, 290 (2d Cir.1996)* (quoting *Koster v. (American) Lubermens Mut. Casualty Co., 330 U . S. 518, 527 (1947)).* This Circuit follows a three-step inquiry in deciding a *forum non conveniens* motion, as set forth in *Iragorri v. United Technologies Corp., 274 F.3d 65 (2d Cir.2001)* (en banc). First, we must determine the degree of deference that

should properly be accorded the plaintiffs' choice of forum. *Id. at 73.* Second, we are to consider whether the alternative forum proposed by the defendants is adequate to adjudicate the dispute at issue. *Id.* Third, we are to balance the private and public interests implicated in the choice of forum. *Id.* We shall discuss each of these in turn.

#### A. Plaintiffs' Choice of Forum

**\*3** Since plaintiffs are nationals of Germany, which has a reciprocal treaty with the United States providing for full access of each country's citizens to the courts of the other, *see* Treaty of Friendship, Commerce and Navigation, U.S.-F.R.G., art. VI, ¶ 1, Oct 29, 1954, *7 U.S.T. 1839,* plaintiffs aver that they are entitled to maintain their suit here. We are cognizant of the fact that the "plaintiff's choice of forum should rarely be disturbed," *see Gulf Oil Corp v. Gilbert, 330 U.S. 501, 508 (1947),* and that in cases where plaintiffs come from a country which has a treaty with the United States according that country's nationals access to our courts equivalent to that provided to American citizens, no less regard may be shown to the plaintiff's initial choice of a New York forum solely because plaintiffs are foreign. *See Blanco v. Banco Indus. de Venezuela, S.A., 997 F.2d 974, 981 (2d Cir.1993)* (citations omitted). However, a plaintiff's choice of forum may still be overturned when "the balance [of relevant considerations] is strongly in favor of the defendant." *Id.* (concluding that despite existence of reciprocal treaty ensuring Venezuelans full access to American courts, the presence of an adequate Venezuelan forum and the strong adverse balance of *Gilbert* private and public factors outweighed plaintiff's initial choice of a New York forum) (citing *Gilbert, 330 U.S. at 508).*

Second Circuit case law teaches that "the degree of deference to be given a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations." *Iragorri, 274 F.3d at 71.* The *Iragorri* court noted that the degree of deference that is due to a foreign plaintiff's choice of forum is stronger if that choice "has been dictated by reasons that the law recognizes as valid." *Id.* at 71-72. In other words, "the greater the plaintiff's or the lawsuit's bona fide connection to the United States and to the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
(Cite as: Slip Copy)

forum of choice and the more it appears that considerations of convenience favor the conduct of the lawsuit in the United States, the more difficult it will be for the defendant to gain dismissal for *forum non conveniens.*" *Id.* at 72. Factors to be considered in ascertaining whether a court should favor a plaintiff's choice of forum include: (1) the convenience of the plaintiff's residence in relation to the chosen forum; (2) the availability of witnesses or evidence to the forum district; (3) the defendant's amenability to suit in the forum district; (4) the availability of appropriate legal assistance; and (5) other reasons relating to convenience or expense. *Id.* at 72. However, the Second Circuit has observed that "the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons-*such as attempts to win tactical advantage, resulting from local laws that favor the plaintiff's case* ... or the inconvenience and expense to the defendant resulting from litigation in that forum-the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would best be served by litigating in another country's courts." FN8 *Id.* at 72 (emphasis added). Further, the Second Circuit in *Norex Petroleum Ltd. v. Access Industries, Inc.* noted in its discussion of *Iragorri*'s sliding scale analysis its concern with regard to forum shopping, "that is, plaintiff's pursuit not simply of justice but of 'justice blended with some harassment.' " 416 F.3d 416, 155 (2d Cir.2005) (quoting *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 507 (1947)).

> FN8. The other examples given by the Second Circuit for indicia of forum-shopping motivations included the habitual generosity of juries in the United States or the forum district and the plaintiff's popularity or the defendant's unpopularity in the region, neither of which we believe is applicable here. *Id.* at 72.

*4 Applying these factors to the case before us, we conclude that the plaintiffs' choice of this forum is not to be afforded great deference, in light of the inherently German nature of this dispute. As described by the Second Circuit, this case turns on an "allegedly defamatory statement ... presented to us in

the form of an English translation of an interview conducted in German, couched in tentative and nuanced phrases, about events primarily affecting the German media and German persons and entities, and disseminated initially-and in large part-to an audience of German bankers and financiers." *Kirch,* 449 F.3d at 403. The vast majority of the non-party witnesses-29 out of 34-identified in the complaint and pleadings to be called in this dispute are German. *See* Declaration of Jeffrey Barist in Support of Motion of Defendants Deutsche Bank AG and Dr. Rolf-Ernst Breuer to Dismiss Plaintiffs' First Amended Complaint ("Barist Decl.") Ex. K. (list of potential non-party witnesses, of which only two reside in the United States-one in California and the other in Massachusetts).

Further, it seems as though a major motivation behind the plaintiffs' pursuit of the present action is to take advantage of the substantive and procedural benefits of this forum in relation to those available to plaintiffs in Germany. Many of the arguments plaintiffs set forth in order to show the inadequacy of the German alternative forum, an issue we shall turn to next, are based on two fundamental premises: (1) that the substantive law in Germany does not favor plaintiffs' claim of civil conspiracy; and (2) that German procedural rules, namely their pleading requirements and evidentiary burdens, would make litigating the claims there functionally impossible for plaintiffs. Even if we were to take these assertions as true, they point toward the fact that plaintiffs, in pursuing this case in this forum, seek to take advantage of the differences in the legal system here versus our German counterpart. Thus, we conclude that although plaintiffs' choice of forum is due some deference, this degree of deference is minimal in light of the factors discussed in *Iragorri.*

### B. Adequate Alternative Forum

In order to succeed on their motion, defendants must show that there is an available and adequate alternative forum in which plaintiffs may pursue relief. *See Norex,* 416 F.3d at 157. For defendants to meet their burden under this step, they must demonstrate a basis upon which we can form a "justifiable belief" in the existence of the adequate alternative forum by citing

Slip Copy
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 5

evidence in the record which supports that belief. *See Bank of Credit & Commerce International (Overseas) Ltd. v. State Bank of Pakistan,* 273 F.3d 241, 248 (2d Cir.2001). If defendants fail to meet this burden, then their motion must be denied "regardless of the degree of deference accorded to plaintiff's forum choice." *Id* . (citing *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 73 (2d Cir.1998)).

*5 Generally, "[a]n alternative forum is adequate if defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Norex,* 416 F.3d at 157 (quoting *Pollux Holding Ltd. v. Chase Manhattan Bank,* 329 F.3d 64, 75 (2d Cir.2003)). All defendants, including the non-German Liberty Media Corp. and John Malone, have represented to this Court that they would consent to the jurisdiction of the German courts in any comparable action filed by plaintiffs. Thus, the only remaining issue to resolve is whether the German courts would allow for adequate litigation of the consequences of the interview at issue here.

We start by noting that the fact that plaintiffs have brought two similar actions against the German defendants, alleging similar injuries stemming from the same interview at question here, is strong evidence that the German forum is hospitable to plaintiffs' claims. It should be noted that "[t]he availability of an adequate alternate forum does not depend on the existence of the identical cause of action in the other forum." *PT United Can,* 138 F.3d at 74 (citing *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 250 (1981)); *accord Norex,* 416 F.3d at 158. In their first amended complaint, plaintiffs allege: (1) tortious interference with prospective economic advantage; (2) tortious interference with contract; (3) civil conspiracy to tortiously interfere with contract and with prospective economic advantage; (4) slander; and (5) libel. *See generally* First Amended Complaint ("Am.Compl.") ¶¶ 76-98. Defendants proffer two experts, Mr. Hans-Peter Kirchhof, a former judge to the BGH at Karlsruhne, i.e., the German Supreme Court for civil and criminal law matters, and Mr. Abbo W. Junker, Professor of Law at Goettingen University, who both conclude that all of plaintiffs' claims are cognizable under German law. First, the unlawful, intentional, and malicious interference with specific contracts of

other persons are torts recognized by the German Civil Code. *See* Kirchhof Decl. I ¶ 53 (describing similar cause of action under German law for plaintiffs' first three claims); Junker Decl. I ¶¶ 37-39; Declaration of Hans-Peter Kirchhof dated June 11, 2004 ("Kirchhof Decl. II") ¶¶ 9-10; Declaration of Abbo W. Junker dated June 10, 2004 ("Junker Decl. II") ¶¶ 37-39. Plaintiffs' claims of slander and libel are similarly recognized under German civil law. *See* Kirchhof Decl. I ¶¶ 56-57; Junker Decl. I ¶¶ 33-34; Kirchhof Decl. II ¶¶ 11-15; Junker Decl. II ¶ 18.

Further, the defendants' experts note that there is a cognizable cause of action, analogous to plaintiffs' claim for civil conspiracy, which provides for recovery if damage is inflicted intentionally and against *bonos mores,* which includes acting in conspiracy with other persons or by the use of dishonest, unfair, anti-competitive, improper or wrongful means.[FN9] Kirchhof Decl. I ¶ 54; Junker Decl. I ¶¶ 40-41; Kirchhof Decl. II ¶¶ 5-8; Junker Decl. II ¶¶ 10-15. Given that the Second Circuit agreed with our conclusion that, under New York law, there is no independent tort of civil conspiracy, *see Kirch,* 449 F.3d at 401, plaintiffs, far from being substantively prejudiced by dismissal for *forum non conveniens,* might be better able to pursue their civil conspiracy claims in Germany than they would be able to here.

> FN9. We note that plaintiffs submitted a declaration from Professor John H. Langbein, a comparative law professor at Yale University, who has particular knowledge of the German legal system. Professor Langbein concludes that in neither the German Civil Code nor in case law is there any analogue to civil conspiracy, and declares that "[i]t is logically difficult to supply authority for that which does not exist." Declaration of Professor John H. Langbein ("Langbein Decl.") ¶ 13. This contention is supported by plaintiffs' experts Harald Koch and Helmut Kohler. *See* Declaration of Harald Koch dated May 7, 2004 ("Koch Decl.") ¶¶ 17-18; Declaration of Helmut Kohler dated May 7, 2004 ("Kohler Decl .") ¶ 20. However, we credit the conclusions of the German experts proffered by the defendants, as they detail

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                     Page 6
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
(Cite as: Slip Copy)

the similarities of the civil remedy available to plaintiffs under German civil law with that of conspiracy under American law.

*6 Apart from their substantive argument, plaintiffs also contend that they would be unable to litigate their claims adequately in the alternate forum due to the "demanding pleading requirements of German law." Consolidated Supplemental Memorandum of Law of Plaintiffs Dr. Leo Kirch and KGL Pool GmbH in Opposition to Defendants' Motions to Dismiss the Amended Complaint ("Pl.Suppl.Mem.") at 1. Plaintiffs argue that a German court would not afford them adequate discovery, thus "making it nearly impossible for them to uncover evidence of the conspiracy at the heart of this action." *Id.* at 9. In their words, the fact that "[d]efendants control nearly all of the information relevant to [p]laintiffs' claims, [means] the doors of the German legal system are effectively shut." *Id.*

We are not persuaded that the differences in pleading requirements and discovery are so severe as to render Germany an inadequate forum. First, courts have frequently found Germany to be an adequate alternative forum, despite the differences in pleading and discovery procedures. *See, e.g., NCA Holding Corp. v. Norddeutsche Landesbank Girozentrale,* No. 96 Civ. 9321(LMM), 1999 WL 39539, at *2 (S.D.N.Y. Jan. 28, 1999)* ("That the German legal system is different than that of the United States does not render Germany an inadequate forum."); *Fagan v. Deutsche Bundesbank,* 438 F.Supp.2d 376, 382 (S.D.N.Y.2006)* (noting that "numerous courts have found Germany to be an adequate alternative forum" in dismissing defamation action brought by Floridian plaintiffs against German banks on *forum non conveniens* grounds); *Opert v. Schmid,* 535 F.Supp. 591 (S.D.N.Y.1982)* (dismissing defamation suit on *forum non conveniens* basis, on condition that defendant consent to jurisdiction in Germany).

Second, even recognizing differences in the systems, "some inconvenience or the unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate." *Blanco,* 997 F.2d at 982 (citing *Borden, Inc. v. Meiji Milk Products Co., Ltd.,*

919 F.2d 822, 829 (2d Cir.1990)). In *Piper Aircraft,* the Supreme Court observed that "discovery is more extensive in American than in foreign courts," but held that such legal differences may not be accorded "substantial weight" in the *forum non conveniens* analysis. 454 U.S. at 247, 252 & n. 18; *see also Panama Processes, S.A. v. Cities Service Co.,* 650 F.2d 408, 415, 416 (2d Cir.1981)* (affirming dismissal despite dissent's objection that "no discovery would be available" in Brazil, the alternative forum); *Potomac Capital Inv. Corp. v. K.L.M.,* No. 97 Civ. 8141, 1998 WL 92416, at *5 (S.D.N.Y. Mar. 4, 1998)* ("[W]ere a forum considered inadequate merely because it did not provide for federal style discovery, few foreign forums could be considered 'adequate'-and that is not the law.").

Third, German's civil law structure does not, as plaintiffs assert, require that "the plaintiff provide a full and complete recital of the facts" and that "all relevant documents much be attached to the complaint." Pl. Suppl. Mem. at 1. Indeed, the authority on which plaintiffs rely concludes that the judge-supervised German legal system's "information-exchange period" is "in many respects similar to Anglo-American discovery." Richard L. Marcus, *Putting American Procedural Exceptionalism into a Globalized Context,* 53 Am. J. Comp. L. 709, 719 (2005)* (cited by plaintiffs in Pl. Suppl. Mem. at 9 as describing German fact pleading as being "much more exacting" than its American counterpart). Contrary to plaintiffs' description of the German pleading requirements, written pleading is only required to designate "the means of proof which would serve to prove the factual assertions in the pleading" and need include only those relevant documents "in the possession of the pleader." *See id.* at 718-19. Plaintiffs' own experts explain that the German judges, upon receipt of pleadings, extensively investigate presently undiscovered evidence relevant to a plaintiffs' well-pleaded case. *See, e.g.,* Koch Decl. ¶ 28; Langbein Decl. ¶ 21. Defendants' experts further explain that German civil procedure allows plaintiffs to allege facts as long as they have sufficient reason to believe them to be true, Kirchhof Decl. II ¶¶ 23-25, and provides an opportunity for parties to present further evidence at trial. *See id.* ¶

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                           Page 7
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
(Cite as: Slip Copy)

18; *see also generally id.* ¶¶ 16-25 (describing in de-
tail the German system). Thus, while the German
system obviously differs from our own, these differ-
ences do not constitute a bar to plaintiffs' pursuit of
their claims in Germany.

\*7 Fourth, to the extent plaintiffs' argument relies
upon the plaintiffs' pursuit of their conspiracy claims,
as we noted above, civil conspiracy is not an inde-
pendent cognizable tort claim under New York law.
Accordingly, we are reluctant to rely on plaintiffs' ar-
gument that Germany's rigorous pleading require-
ments make it comparably more difficult to prove a
conspiracy among the defendants as a reason to con-
clude the German forum is not an available and ad-
equate alternate forum.

Plaintiffs also rely on *Norex Petroleum Ltd., 416 F.3d
146 (2d Cir.2005)* in further support of their argu-
ment that there is not a presently-available alternative
forum. *See* Pl. Suppl. Mem. 8-9. We find *Norex* inap-
posite to the present case. The *Norex* plaintiffs had
filed suit alleging violations of the Racketeer Influ-
enced and Corrupt Organizations Act ("RICO").
While the plaintiffs in *Norex* acknowledged that Rus-
sia, the proposed alternative forum, recognized
causes of action for fraud and conspiracy analogous
to their civil RICO claims, *id.* at 158, they pointed to
a previous default judgment which had been rendered
against them in a Russian forum. *Id.* This default,
plaintiffs argued, would as a practical matter bar
plaintiffs from prosecuting their claims in Russia. *Id.*
at 159-60. Accepting the preclusion argument, the
Second Circuit concluded in *Norex* that Russia was
not a presently available alternative forum because a
Russian court would not "permit litigation of the dis-
puted issues at the core of [plaintiff's] ... complaint."
*Id.* at 157. Here, by contrast, German courts would
permit, have permitted, and are currently permitting
litigation of the facts in dispute. Indisputably plaintiff
Kirch has already received a judgment in his favor
against the Deutsche Defendants, and litigation is
proceeding in the case filed by KGL against the
Deutsche Defendants in the district court in Munich.

Thus, we conclude that Germany is an available and
adequate alternative forum for the disputes present
before us here.

C. Balancing of Private and Public Interests

Given our finding that Germany is an adequate al-
ternative forum, our inquiry now turns to the balance
of public and private interests "to determine whether
the convenience of the parties and the ends of justice
would best be served by dismissing the action." *Mur-
ray, 81 F.3d at 293* (citing *Gilbert, 330 U.S. at
508-09).* We are mindful of the fact that "[a] defend-
ant does not carry the day simply by showing the ex-
istence of an adequate alternative forum. The action
should be dismissed only if the chosen forum is
shown to be genuinely inconvenient and the selected
forum significantly preferable." *Iragorri, 274 F.3d at
74-75.* Based on our examination of the private and
public interests implicated in the present case, we
conclude that defendants have met this high burden.

The first set of factors we are charged to consider are
the private interest factors-those which reflect the
convenience with which the parties may litigate here.
These include "the relative ease of access to sources
of proof; availability of compulsory process for at-
tendance of unwilling, and the cost of obtaining at-
tendance of the willing, witnesses; possibility of view
of premises, if view would be appropriate to the ac-
tion; and all other problems that make the trial of a
case easy, expeditious, and inexpensive." *Iragorri,
274 F.3d at 73-74* (quoting *Gilbert, 330 U.S. at 508).*
Our examination of these factors should culminate in
a "comparison between the hardships defendant
would suffer through the retention of jurisdiction and
the hardships the plaintiff would suffer as the result
of dismissal and the obligation to bring suit in anoth-
er country." *Id.* at 74.

\*8 As the remaining plaintiffs in this case are citizens
and domiciliaries of Germany, we can discern no
reason why the consideration of all aspects of this
dispute by a German forum would be inconvenient,
difficult, or costly for the plaintiffs. This is especially
so given their previous and successful German litiga-
tion. To support their position that the action should
remain here, plaintiffs submit that the *"key acts* giv-
ing rise to plaintiffs' claims-Breuer's defamatory in-
terview and the formulation of the conspiracy-took
place in New York." Pl. Suppl. Mem. at 3 (emphasis
in original). We cannot agree with this assessment.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 8

Although it is true that the interview plaintiffs focus on took place in New York, this was little more than happenstance: Dr. Breuer was in town attending the World Economic Forum, the interview itself was conducted in German, and Dr. Breuer's statements were broadcast via German media outlets. Am. Compl. ¶ 63. In addition, even assuming that the intended audience of the allegedly defamatory comments made in German were, as plaintiffs posit, New York banks and American investors who subsequently abandoned their support of Dr. Kirch's restructuring plan, this argument is not a sufficient basis for sustaining jurisdiction in New York. Given New York's status as the epicenter of the financial world, such a rule would open the doors of the Southern District to a plethora of international commercial and banking disputes with tangential connections to the district. *See, e.g., First Union Nat. Bank v. Paribas,* 135 F.Supp.2d 443, 453 (S.D.N.Y. March 29, 2001) (noting that despite the importance of New York as a world financial capital, the existence of a letter of credit with "some tangential connection to New York does not alone require a denial of a *forum non conveniens* dismissal, particularly where there is an adequate alternative forum in which related litigation is pending").

We now turn to the public interest factors. The public interest factors we should consider include: (1) the administrative difficulties flowing from court congestion; (2) the local interest in having controversies decided at home; (3) the interest in having the trial in a forum that is familiar with the law governing the action; (4) the avoidance of unnecessary problems in conflict of laws or in application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.* (citing *Piper Aircraft,* 454 U.S. at 241 n. 6; *Gilbert,* 330 U.S. at 509). These factors point decisively towards a German forum. Focusing initially on the second factor,[FN10] Germany has an extensive interest in this case, given that Germany's most prominent media conglomerate and its founder is suing Germany's largest bank, asserting that the bank had orchestrated a conspiracy, which included the former Chancellor of Germany, designed to extinguish the German syndicate. The motivation behind the alleged conspiracy between the Deutsche Defendants and the Liberty Defendants was to ensure "dominance of the German cable sector", Am. Compl. ¶ 27, and to acquire "KirchGroup's prized media assets" in Germany. *Id .* ¶ 55. In contrast, New York has no unique interest in the matter. Plaintiffs argue that New York ties are evident from the fact that New York financial institutions ceased to invest in the restructuring of KirchGroup, and that the allegedly tortious conduct occurred and had an "immediate and present effect in New York." Transcript of Oral Argument dated October 31, 2006 ("Tr.") at 10-11. However, as mentioned above, the interview occurred in New York because Dr. Breuer was coincidentally in town, and plaintiffs' assertions that the location was carefully chosen to address the "sophisticated financial institutions in New York," Pl. Suppl. Mem. at 17, is not supported by any evidence. Indeed, in this day and age of instantaneous transmission of any piece of news to the far corners of the earth, it seems unlikely that the location of New York was chosen deliberately because it housed the "intended targets of Breuer's message", *id.,* which, as we noted, was delivered in German.

> FN10. We note that the first factor is not implicated here and that the fifth factor does not merit specific discussion.

*9 Further, applying the third factor, the German forum is preferable given its greater familiarity with principles of German conflict of laws and *res judicata* under German law.[FN11] *See, e.g., Odyssey Re (London) Ltd. v. Stirling Cooke Brown Holdings Ltd.,* 85 F.Supp.2d 282, 307 (S.D.N.Y.2000) (granting dismissal on basis of *forum non conveniens* where "[t]he interest in having forums interpret their own laws also weighs in favor of England serving as the forum"); *Monegasque de Reassurances S.A.M. v. Nak Naftogaz of Ukraine,* 158 F.Supp.2d 377, 387 (S.D.N.Y.2001) (action to confirm Russian arbitration award and to direct entry of judgment against Ukraine and Ukrainian company) (noting, in concluding that public interest concerns weigh heavily in favor of dismissal of case on basis of *forum non conveniens,* that "Ukraine has a great interest in applying its own laws, especially with respect to establishing the ownership interests of [the Ukrainian company] while this Court has an interest in avoiding the intric-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                          Page 9
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
(Cite as: Slip Copy)

acies attendant to the application of Ukrainian law"). Experts from both sides agree that the BGH's decision will have some *res judicata* effect under German law.[FN12] *See* Junker Decl. I ¶ 15; Junker Decl. II ¶ 38; Kirchhof Decl. I ¶ 48; Declaration of Professor Dr. Horst Hagen dated April 26, 2004 ("Hagen Decl.") ¶ 7; Koch Decl. ¶¶ 21-22; Kohler Decl. ¶¶ 7-8. If this case were to proceed in this Court, we would be faced with the complicated task of determining the preclusive effect of the first German action. As jurisdiction here is based on diversity, we would be required to apply New York law regarding recognition of a foreign nation's judgment,[FN13] which in turn would require a determination of the preclusive effect that the foreign jurisdiction would give its own judgment.[FN14]

> FN11. Plaintiffs object to the inclusion of what plaintiffs describe as "the issue of international comity" by both Deutsche Defendants and Liberty Defendants into a *forum non conveniens* analysis. *See* Pl. Suppl. Mem. at 23. Citing *Bigio v. Coca-Cola Co.,* 448 F.3d 176 (2d Cir.2006), and *Jota v. Texaco, Inc.,* 157 F.3d 153, 159 (2d Cir.1998), plaintiffs assert that dismissal on a *forum non conveniens* analysis and a dismissal in recognition of principles of international comity are separate inquiries. We do not take issue with that broad proposition. Rather, our conclusions here as to the undesirability of our delving into the complexity of German law do not rest on principles of international comity *per se.* Instead, our focus is on the necessity of determining the preclusive effect to be accorded the German decisions should the present case should it continue in this court.

> FN12. We also note that much of the dispute among the experts on the *res judicata* issue has been mooted by the rendition of a final decision by the BGH after many of the declarations by the experts from both sides were filed.

> FN13. *See Voreep v. Tarom Romanian Air Transport,* No. 96 Civ. 1384(LMM), 1999

> WL 311811, at *2 (S.D.N.Y. May 18, 1999) (citing *Clarkson Co. v. Shaheen,* 544 F.2d 624, 629-32 (2d Cir.1976); *Alesayi Beverage Corp. v. Canada Dry Corp.,* 947 F.Supp. 658, 664 (S.D.N.Y.1996), *aff'd,* 122 F.3d 1055 (2d Cir.1997)).

> FN14. *See, e.g., Watts v. Swiss Bank Corp.,* 27 N.Y.2d 270, 275, 317 N.Y.S.2d 315, (1970) ("[T]he law of the rendering jurisdiction, insofar as it limits the effect of its own judgments, would also limit elsewhere the preclusive effect of the judgment and the definition of the parties bound.... *A fortiori,* the limitation should apply to extranational judgments."); *Schoenbrod v. Siegler,* 20 N.Y.2d 403, 409, 283 N.Y.S.2d 881 (1967) (concluding that collateral attack upon Mexican judgment in New York court is permissible because it would be permitted under Mexican rules of res judicata, and because "[g]enerally, there is no reason to give more conclusive effect to a foreign judgment than it would be accorded by the courts of the jurisdiction which rendered it.")

Factor four discourages such a foray into foreign laws. Moreover, the fact that there is considerable dispute between the experts on both sides as to the preclusive effect of the prior decision upon this case further weighs in favor of a German forum. *See, e.g., Stewart v. Adidas A.G.,* 96 Civ. 6680(DLC), 1997 WL 218431, at *7 (S.D.N.Y. Apr. 30, 1997) (noting, in dismissal for *forum non conveniens,* that "the complexity of applying German copyright law is illustrated in this case by the fact that the parties' German law experts cannot even agree whether plaintiff's designs are copyrightable under German law"). Here, disagreement exists with regard to: (1) whether the present action for damages would be precluded by a German judgment which plaintiffs characterize as providing solely for declaratory relief;[FN15] (2) whether there is privity between the plaintiffs here and the plaintiffs in the first German action;[FN16] and (3) whether the judgment in the first German action covers the claims raised in the instant action.[FN17]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 10
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
**(Cite as: Slip Copy)**

> FN15. *Compare* Pl. Mem. at 14; Kohler De-
> cl. ¶ 16; Koch Decl. ¶ 27; Hagen Decl. ¶¶
> 11-13 *with* Memorandum of Law of
> Plaintiffs Dr. Leo Kirch and KGL Pool
> GmbH in Opposition to Defendants
> Deutsche Bank AG and Dr. Rolf-Ernst
> Breuer's motion to Dismiss the Amended
> Complaint ("Def.Mem.") at 10; Kirchhof
> Decl. I ¶ 33; Junker Decl. I ¶¶ 42-45; Reply
> Memorandum of Law in Further Support of
> Defendants Deutsche Bank AG and Dr.
> Rolf-Ernst Breuer's Motion to Dismiss
> Plaintiffs' First Amended Complaint
> ("Def.Repl.Mem.") at 22-23; Junker Decl. II
> ¶ 41-44; Kirchhof Decl. II ¶¶ 41-46.

> FN16. *Compare* Koch Decl. ¶¶ 25-26;
> Kohler Decl. ¶¶ 13-15; Hagen Decl. ¶¶ 9-10,
> 12 *with* Kirchoff Decl. II ¶ 39; Junker Decl.
> II ¶ 40.

> FN17. *Compare* Pl. Mem. at 15-16; Koch
> Decl. ¶¶ 16-20, 28-30; Kohler Decl. ¶¶
> 16-23; Hagen Decl. ¶¶ 9, 11, 14-17 *with*
> Def. Mem. 10-12; Kirchhof Decl. I ¶¶
> 48-57; Junker Decl. ¶¶ 31-47; Def. Repl.
> Mem. at 22-23; Kirchhof Decl. II ¶¶ 34-55;
> Junker Decl. II ¶¶ 37-50.

In sum, Germany's interest in this dispute, the prefer-
ence for the forum familiar with the governing law,
and the preference to avoid unnecessary application
of foreign law are all public interest factors militating
in favor of dismissal on *forum non conveniens*
grounds.

### D. Conditions for Dismissal

*10 Finally, plaintiffs ask that this Court condition
any order of dismissal on the basis of *forum non con-
veniens* on the following: (1) the Liberty Defendants
consenting to personal jurisdiction in Germany; (2)
defendants waiving any defenses based on statutes of
limitations, laches, or similar grounds; and (3) de-
fendants providing rather extensive discovery, essen-
tially affording plaintiffs the benefits of federal court
discovery. FN18 *See* Pl. Suppl. Mem. at 23-24. Al-
though the Liberty Defendants have represented to

this Court that they would consent to personal juris-
diction in the civil courts of Germany, *see* Liberty
Defendants' Supplemental Memorandum in Support
of Motion to Dismiss at 6, we find that formally con-
ditioning our dismissal of this case on the Liberty De-
fendants' consent is the prudent course.

> FN18. Specifically, plaintiffs request that
> this Court condition dismissal on the defend-
> ants providing discovery of documents and
> witnesses within their control, including at
> least (a) production of all relevant docu-
> ments within the possession, custody, or
> control of defendants that relate to the
> claims made in the Amended Complaint or
> any alleged defenses thereto; (b) depositions
> of Rolf-Ernst Breuer, Josef Ackermann,
> Datlev Rahmsdorf, John Malone, Michael
> Cohrs, and Hilmar Kopper; and (c) depos-
> itions of Deutsche Bank and Liberty Media
> pursuant to Federal Rule 30(b)(6). Plaintiffs
> also request that, "[g]iven the contentious
> nature of this case," this Court retain juris-
> diction to hear discovery disputes or defer
> dismissal until discovery, as ordered by this
> Court, is completed. Pl. Suppl. Mem. at
> 24-25.

In addition, we decline to grant plaintiffs' request to
condition our dismissal on defendants' waiving any
statute of limitations defense, for several reasons.
First, the only statute of limitations issue that has
been raised is whether the plaintiffs' claims against
the Liberty Defendants are barred under New York
Law. Thus, were we to grant this condition and de-
prive the Liberty Defendants of a determination on
the merits of this argument, it would only result in a
windfall for plaintiffs. Second, there is no need to im-
pose this condition, since the change in forum ought
not to affect the applicable statute of limitations law.

Finally, we decline to grant plaintiffs' requested con-
ditions with regard to discovery. We share the view
expressed in *Doe v. Hyland Therapeutics Div., 807
F.Supp. 1117, 1132-33 (S.D.N.Y.1992),* that "this
District [should] not become a way-station for
plaintiffs world-wide, who choose to stop at Foley
Square just long enough to obtain a grant of federal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)
**(Cite as: Slip Copy)**

discovery with their *forum non conveniens* dismissal." Permitting the extensive discovery requested would only encourage "the filing of suits in a forum known to be inconvenient, under hopes of being guaranteed certain procedural advantages in conjunction with a dismissal order" and would serve "only to waste valuable judicial resources, and further congest an already crowded docket." *Id.* at 1133.

### CONCLUSION

For the aforementioned reasons, this case is dismissed on the basis of *forum non conveniens,* on the condition that all defendants consent to personal jurisdiction in Germany.

IT IS SO ORDERED.

S.D.N.Y.,2006.
Kirch v. Liberty Media Corp.
Slip Copy, 2006 WL 3247363 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

8

Westlaw.

Slip Copy
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 1

**H**
Klonis v. National Bank of Greece, S.A.
S.D.N.Y.,2007.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Nicholas KLONIS and Mary Klonis, Plaintiffs,
v.
NATIONAL BANK OF GREECE, S.A., Defendant.
**No. 05 Civ. 6289 PKC DF.**

March 28, 2007.

*MEMORANDUM AND ORDER*
CASTEL, J.
*1 Plaintiffs Nicholas and Mary Klonis, a married couple, have sued the National Bank of Greece, S.A. ("NBG") for failure to pay the principal and interest due on three accounts that plaintiffs opened with the National Mortgage Bank of Greece ("NMBG") in the 1980s. NBG is the defendant in this action because NMBG-which had been a wholly-owned subsidiary of NBG-merged completely into NBG in 1998, and thereafter ceased to exist as a separate entity. Mr. Klonis opened the first account, a certificate of deposit account, in 1981 in Athens, Greece ("Athens Account" or "CD Account"). While there is some confusion in the submissions to this Court as to the date on which the later accounts were opened, the complaint alleges that plaintiffs opened the two other accounts, both passbook savings accounts, in 1987 in New York ("New York Accounts" or Passbook Accounts"). Plaintiffs allege that they have never withdrawn the funds deposited into these accounts, and when they tried to do so, NBG refused to pay.

The complaint in this action was filed on July 11, 2005, and alleged breach of contract, fraud and negligence. On May 5, 2006, defendant moved to dismiss the complaint or alternatively for a stay on various grounds, but that motion was withdrawn without prejudice on May 19, 2006. (Docket Nos. 13, 20) On July 11, 2006, defendant filed an amended motion to dismiss or for a stay.[FN1] Defendant moved to dismiss the complaint in its entirety on the basis of *forum non conveniens* and/or international comity, the latter of which was predicated on a related litigation

between the parties in Greece. Alternatively, NBG sought a stay of this action pending the resolution of the Greek action, which had been commenced first. Defendant also sought dismissal under Rule 12(b)(2), Fed.R.Civ.P., of plaintiffs' claim on the Athens Account. NBG admits that it is amenable to personal jurisdiction in New York for claims relating to the New York Accounts.

> FN1. The original motion to dismiss asserted grounds for dismissal that were not reasserted in the amended motion, such as failure to properly serve process on NBG under the Hague Convention. NBG withdrew these defenses in exchange for plaintiffs' agreement to withdraw their fraud and negligence claims, which were allegedly time-barred. (Docket Nos. 22-24.) Therefore, only the breach of contract claim remains in the case.

Discovery was stayed except for that relating to personal jurisdiction. In the briefing on the motion, plaintiffs raised the issue of defendant's compliance with discovery requests and production orders, and a hearing on those issues was held on December 21, 2006. At the hearing, I set a schedule for supplemental discovery and briefing, and the discovery issues are now resolved.

On December 27, 2006, I entered a Memorandum and Order denying defendant's motion to dismiss or for a stay on the basis of *forum non conveniens* or international comity, but reserved decision on personal jurisdiction until the supplemental discovery and briefing was completed. *See Klonis v. National Bank of Greece, S.A., No. 05 Civ. 6289(PKC), 2006 WL 3851146 (S.D.N.Y. Dec. 27, 2006).*

Supplemental discovery is now complete, and the parties have submitted supplemental briefing informed by the results of that discovery. For the reasons set forth below, I grant defendant's motion to dismiss for lack of personal jurisdiction over NBG, except to the extent that claims are asserted arising from the Passbook Accounts. The amended motion to dismiss is now resolved in its entirety, and the case will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 2

proceed on plaintiffs' breach of contract claims relating to the Passbook Accounts.

## I. BACKGROUND

**\*2** Defendant does not contest its amenability to suit in New York with respect to claims arising from the Passbook Accounts, which were opened by plaintiffs with NMBG in New York. The accounts were opened during a time when NMBG was operating a foreign representative office in New York, between the years 1983 and 1992. (Erlanger Decl. Exs. 6, 9) After 1992, NMBG ceased to conduct any banking business in New York, and in 1998 it was absorbed into its corporate parent, NBG.

NBG is a financial institution incorporated under the laws of the Hellenic Republic, and is headquartered in Athens, Greece. (Compl. ¶ 4; Erlanger Decl. Ex. 5 at 16) It has never directly conducted any banking business in New York, and consequently NBG argues that it is not generally present here for the purposes of personal jurisdiction under N.Y. C.P.L.R. § 301. NBG also argues that the CD Account, which was opened in Athens, has no connection with New York sufficient to establish long-arm jurisdiction under N.Y. C.P.L.R. § 302.

Plaintiffs concede that there is no basis for long-arm jurisdiction over the CD Account, but seek to establish that NBG is generally present in New York because it is "doing business" here. The primary basis for this claim is that certain of NBG's subsidiaries, which are indisputably present in New York, are allegedly "mere departments" or "agents" of NBG. Therefore, the relevant facts for the purposes of this motion concern NBG's contacts with New York, and its relationship with its subsidiaries that are present here.

As there has been extensive discovery on the issue of personal jurisdiction, the record on this motion goes beyond the complaint. Plaintiffs and defendant have submitted affidavits describing the relationship between NBG and its subsidiaries, as well as NBG's other contacts with New York. The facts as set forth below draw on the undisputed facts in those submissions, and the materials are interpreted in the light

most favorable to plaintiffs, the nonmovants. *See DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir.2001).

### A. NBG's Direct Contacts with New York

NBG has never directly operated a branch in New York. According to a declaration by Athanassios Panagopoulos, a Deputy Manager of NBG, the corporation does not own or lease any real property in New York, does not regularly conduct meetings in New York, and does not employ officers or staff in New York in its regular course of business. (3/10/06 Panagopoulos Decl. ¶ 7) NBG does have one officer, Thomas O'Brien, who is in New York on a full-time basis, although not in furtherance of NBG's business. O'Brien is also an officer and director of a New York based subsidiary of NBG called the Atlantic Bank of New York ("ABNY"), and his employment here is in furtherance of ABNY's business. (*Id.*) O'Brien is, however, NBG's agent for service of process in the United States. (Erlanger Decl. Ex. 5 at 16)

The record discloses scant other direct contacts between NBG and New York. American Depository Receipts for shares of NBG stock are listed on the New York Stock Exchange ("NYSE"), and NBG retains lawyers and has a depository bank account in New York in connection therewith. (*Id.* at 145) Plaintiffs have supplied the Court with a NBG printed advertisement from a New York newspaper from 1983 that advertised ABNY as NBG's affiliated bank in New York. (Erlanger Decl. Ex. 10) While the record shows that NMBG operated a branch in New York for nine years, plaintiffs reside in and are domiciliaries of Florida, and the record does not indicate that NBG currently maintains NMBG accounts for any New York residents. The parties appear to agree that NBG is maintaining two other NMBG accounts that were presumably opened in New York, but it is not clear who owns those accounts or where the owners reside.

### B. NBG's Subsidiaries

**\*3** The focus of plaintiffs' case for general in personam jurisdiction over NBG in New York is on NBG's network of subsidiaries that are or were present in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 3

New York at the time this action was commenced. According to plaintiffs, Greek banking regulations and historical practices require that Greek financial institutions take the form of several specialized corporations organized around one principal bank. NBG is one such principal bank, and the corporations discussed *infra* are specialized subsidiaries that are part of the so-called "NBG Group." There are three subsidiaries on which discovery has been taken: ABNY, NBG International, Ltd. ("NBGI Ltd.") and NBG International, Inc. ("NBGI Inc."). Of the three, ABNY is most central to plaintiffs' jurisdictional argument.

ABNY is a New York corporation that was a wholly owned subsidiary of NBG when this action was commenced. NBG subsequently sold its interest in ABNY to another, unaffiliated bank. (1/22/07 Panagopoulos Decl. ¶ 17) ABNY is and has always been headquartered in New York. Although there is some confusion in the record, it appears that ABNY and NBG had at most three directors and/or officers in common. As noted, O'Brien was an ABNY officer and director, and also an officer of NBG. Takis Arapoglou was a member of ABNY's Board of Directors, and was also the Chairman, CEO, and a director of NBG. Agis Leopoulos was also a member of ABNY's Board of Directors, and was a General Manager of NBG. The two NBG board members, Arapoglou and Leopoulos, typically attended ABNY board meetings in New York via telephone or videoconference. It appears that one final NBG officer, Constantinos Othonoeos, attended ABNY board meetings on occasion, although he was neither a director nor officer of ABNY. The number of directors on ABNY's board-of which there were ten when this action was commenced-appears to have been established directly by NBG. (NBG 277) [FN2]

> FN2. Citations to "NBG" followed by a page number refer to the stamped numbers on the documents submitted with plaintiffs' supplemental brief on personal jurisdiction.

With respect to the financial and managerial interaction between NBG and ABNY, the record discloses some coordination between the corporations in monitoring credit and market risk. (Erlanger Decl. Ex. 5 at 75-76) NBG has established a "Risk Management

Council" for the corporations in the NBG Group to ensure consistent risk management strategies. (*Id.*) While all subsidiaries in the NBG Group are subject to the oversight of the Risk Management Council, each subsidiary, including ABNY, is responsible for crafting its own credit/risk assessment procedures. Each subsidiary separately undertakes the review process on its own. (*Id.*) The record shows that ABNY and NBG had very different internal procedures for risk assessment and management. (*Id.*)

ABNY controls considerable assets in its own name, and those assets are valued in the billions of dollars. (Sullivan Reply Decl. Ex. 1) ABNY meeting minutes from 2004 and 2005 indicate that the subsidiary conducted its own business affairs autonomously. (NBG 245-46, 251-52, 263-65, 270, 276-77, 280) For the year 2004, ABNY earned a pre-tax profit of €42,979,000. (NBG 171) The parties dispute the total pre-tax profits for the NBG Group in 2004, with plaintiffs putting the figure at €261,349,000, while defendant claims the number is € 386,367,000. (Pls. Supp. Br. at 3; Panagopoulos Reply Decl. ¶ 2) In any event, ABNY accounted for either 16.4 or 11.1% of the NBG Group's total profits, depending on whose figures are used.

*4 NBG and ABNY did, on occasion, engage in business transactions between themselves. In 1999, for instance, ABNY acquired NBG branch banks in Boston and Cambridge, Massachusetts, and Chicago, Illinois. (1/22/07 Panagopoulos Decl. ¶ 12) NBG has also guaranteed various loans made by ABNY over the years, although ABNY was liable to NBG for fees and commissions as it would have been to any other bank. (Panagopoulos Reply Decl. ¶ 3-4) In those transactions, NBG guaranteed third-party debtors for the benefit of ABNY.

The record discloses fewer facts relating to NBGI Ltd. and NBGI Inc., and, although those entities were discussed in the complaint, their significance to plaintiffs' theory of jurisdiction appears to have receded since. NBGI Ltd. is a wholly-owned subsidiary of NBG, and is organized under the laws of England, where it is headquartered. (North Decl. ¶¶ 3-4) NBGI Ltd. is engaged in investment banking, but not in traditional commercial banking. (*Id* . at ¶ 5) The com-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
**(Cite as: Slip Copy)**

pany shares one director in common with NBG, but claims that ethical screens are maintained to avoid potential conflicts of interest. (*Id.* at ¶¶ 8-10) It is not clear what direct contacts, if any, NBGI Ltd. has with New York.

NBGI Ltd. is, however, the parent company of NBGI Inc., which is a Delaware corporation that is headquartered in New York. (Schinkel Decl. ¶ 3) NBGI Inc. is a holding company for two other corporations, NBGI Securities Inc. and NBGI Asset Management. (*Id.* ¶ 7) Facts relating to these companies are not well developed in the record, but it seems that they primarily facilitate U.S. investments in the Athens Stock Exchange. (*Id.* ¶ 9)

## II. *DISCUSSION*

### A. *Plaintiff's Burden to Establish Personal Jurisdiction*

"Motions to dismiss under Rule 12(b)(2) may, in part, test plaintiff's theory of jurisdiction and, in part, test the facts supporting the jurisdictional theory." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara,* 183 F.3d 151, 153 (2d Cir.1999). On a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction. *See In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir.2003) (per curiam). However, the nature of "the plaintiff's obligation varies depending on the procedural posture of the litigation." *Ball v. Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.), *cert. denied,* 498 U.S. 854 (1990). Prior to discovery, a plaintiff may defeat a Rule 12(b)(2) motion by "pleading in good faith legally sufficient allegations of jurisdiction." *Id. at 197.* Where, as here, "the parties have conducted extensive discovery regarding the defendant's contacts with the forum state, but no evidentiary hearing has been held[,] the plaintiff's prima facie showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited ..., would suffice to establish jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999) (internal quotation marks omitted); *see also Credit Lyonnais,* 183 F.3d at 153 (noting that district courts

have " 'considerable procedural leeway" ' in deciding Rule 12(b)(2) motions) (quoting *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir.1981)).

**\*5** After discovery, a plaintiff "cannot rely merely on conclusory statements or allegations" to defeat a motion to dismiss for lack of personal jurisdiction; rather, "the prima facie showing must be factually supported." *Melnick v. Adelson-Melnick,* 346 F.Supp.2d 499, 502 & n. 17 (S.D.N.Y.2004) (internal quotation marks omitted). Because the question of personal jurisdiction is "inherently a matter requiring the resolution of factual issues outside of the pleadings ... all pertinent documentation submitted by the parties may be considered in deciding the motion." *St. Paul Fire and Marine Ins. Co. v. Eliahu Ins. Co.,* No. 96 Civ. 7269(MBM), 1997 WL 357989, at *1 (S.D.N.Y. June 26, 1997), *aff'd,* 152 F.3d 920 (2d Cir.1997) (internal quotation marks omitted).

### B. *Personal Jurisdiction in New York*

The Federal Rules of Civil Procedure authorize the exercise of personal jurisdiction in federal court over any defendant "who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located." Rule 4(k)(1)(A), Fed.R.Civ.P. If plaintiffs are able to establish a factual predicate for jurisdiction under the laws of the forum state-here, New York-then the court must consider whether the exercise of jurisdiction violates due process. *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88, 94 (2000). Because I conclude that plaintiffs have not met their burden to offer facts which, if credited, would allow for the exercise of general jurisdiction over NBG in New York, there is no need to engage in the due process analysis.

#### 1. *Doing Business in New York*

Under New York's general jurisdiction statute, N.Y. C.P.L.R. § 301, "a foreign corporation is subject to general jurisdiction in New York if it is 'doing business' in the state." *Wiwa,* 226 F.3d at 95. " '[A] corporation is "doing business" and is therefore "present" in New York and subject to personal jurisdiction with respect to any cause of action, related or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                          Page 5
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
(Cite as: Slip Copy)

unrelated to the New York contacts, if it does business in New York, "not occasionally or casually, but with a fair measure of permanence and continuity." " ' *Id.* (quoting *Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267 (1917)) (alteration in *Wiwa* ). The corporation must be engaged in "a continuous and systematic course of 'doing business' here...." *Frummer v. Hilton Hotels Int'l, Inc.,* 19 N.Y.2d 533, 536 (1967). There is no precise test for "doing business" in the state, and courts must look to the "aggregate of the corporation's activities in the State...." *Laufer v. Ostrow,* 55 N.Y.2d 305, 310 (1982). There are, however, several traditional factors that courts consider when undertaking this analysis, and they are "whether the company has an office in the state, whether it has any bank accounts or other property in the state, whether it has a phone listing in the state, whether it does public relations work there, and whether it has individuals permanently located in the state to promote its interests." *Wiwa,* 226 F.3d at 98. While a corporation's decision to list its stock on the NYSE is not devoid of jurisdictional significance, such listings and "ancillary steps in support of ... listing" are not sufficient to confer jurisdiction "absent other substantial contacts...." *Id.* at 97-98.

*6 Measured against these standards, NBG is not "doing business" in New York. On the facts of record, the traditional indicia of doing business do not support the conclusion that NBG is present in New York on a continuous and systematic basis. *See Wiwa,* 226 F.3d at 98. NBG does not have offices in the state, there is no evidence to suggest it owns any property in the state, it has no New York phone listings, and it does no public relations work here. While NBG does have one officer, Mr. O'Brien, who is stationed in New York and who is NBG's U.S. agent for service of process, the only evidence relating to his employment in New York shows that he works here exclusively in furtherance of ABNY's business.

It is true that NBG's American Depository Receipts trade on the NYSE, and NBG does have attorneys here and a depository account in connection with its listing. However, it is well established that such activities are not legally sufficient to establish jurisdiction "absent other substantial contacts...." *Id.* As noted, NBG's other contacts with New York are in-

substantial, and do not reveal the types of connections to New York that are required to find that it is doing business in the State.

### 2. *"Mere Departments"* of Foreign Corporations

Under certain circumstances, a foreign corporation may be subject to general jurisdiction in New York on account of its relationship with a subsidiary that is doing business in the state. Under these theories, the foreign parent is said to be doing business here because a domestic entity is either a "mere department" or "agent" of the foreign parent, and so attribution of the subsidiary's contacts to the parent is warranted. *Koehler v. Bank of Bermuda Ltd.,* 101 F.3d 863, 865 (2d Cir.1996).

Under New York law, a domestic subsidiary is said to be a "mere department" of a foreign parent when "the activities of the parent show a disregard for the separate corporate existence of the subsidiary...." *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.,* 751 F.2d 117, 120 (2d Cir.1984). There are four factors that courts look to in making this determination: (1) common ownership, which is essential; (2) "financial dependency of the subsidiary on the parent corporation"; (3) "the degree to which the parent corporation interferes in the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities"; and (4) "the degree of control over the marketing and operational policies of the subsidiary exercised by the parent." *Id.* at 120-122; *see also Jazini v. Nissan Motor Company, Ltd.,* 148 F.3d 181, 184-85 (2d Cir.1998) (quoting same). When engaging in this analysis, it is important to bear in mind that "[t]he officers of any corporation that owns the stock of another necessarily exercise a considerable degree of control over that corporation and the discharge of that supervision alone is not enough to subject the parent to New York jurisdiction." *Beech Aircraft,* 751 F.2d at 120.

*7 Plaintiffs have argued that ABNY and the NBGI corporations are "mere departments" of NBG. With respect to the NBGI corporations, despite the full opportunity to conduct jurisdictional discovery, there is a lack of information on the relationship between NBG and the NBGI corporations in New York; there-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 6

fore, there is no factual basis on this record to find that those corporations are mere departments of NBG. Conclusory statements are insufficient at this stage of the proceedings.

With respect to ABNY, it is not disputed that the first and necessary factor of common ownership is present-NBG owned 100% of ABNY stock when this action was commenced. Consideration of the other factors, however, does not reasonably support the conclusion that NBG's control over ABNY is more extensive than that usually present in the parent-subsidiary relationship.

First, there is no indication that ABNY is financially dependent on NBG. Its yearly pre-tax profits are in the tens of millions of dollars, and it controls over a billion dollars in assets. The only evidence of financial support whatsoever of ABNY by NBG is that NBG has guaranteed loans made by ABNY over the years. This service is very different from the type of financial support that courts have relied upon in finding a New York corporation to be "financially dependent" on a foreign parent. For instance, in *Beech Aircraft*, the parent corporation made several no-interest loans to its subsidiary, and the subsidiary could not have stayed in business without the parent's support. 751 F.2d at 121. By contrast, in this case, the record shows that ABNY is a solvent corporation that occasionally does business with its parent; there is nothing in the record to suggest that ABNY is dependent in whole or in part on NBG for its continued existence.

Second, the record does not indicate that NBG interferes with ABNY's selection and assignment of executive personnel, or that ABNY fails to observe corporate formalities. While NBG establishes the number of directors on ABNY's board, the majority of those directors-seven out of ten-are not affiliated with NBG. This overlap is not highly probative of "mere department" status, however, since some amount of overlap between officers and directors of corporations under common ownership is to be expected. *See Beech Aircraft*, 751 F.2d at 121 ("Of course, the officers of a parent normally control the board of directors of a subsidiary in their capacity as representatives of the controlling stockholder."); *see also Jazini*,

148 F.3d at 185; *Porter v. LSB Industries, Inc.*, 192 A.D.2d 205, 213-14 (N.Y.App.Div. 4th Dep't. 1993). The majority of ABNY's board is independent from NBG, and the board observes the corporate "formality" of holding regular meetings, at which the board conducts ABNY's business.

Finally, NBG exercises only minimal control over the marketing and operational policies of ABNY. While the credit and market risk assessment strategies of ABNY are subject to the oversight of the NBG Group's Risk Management Council, ABNY develops its own procedures and engages in its own risk analysis. The minutes from the meetings of the board of directors that have been submitted in connection with this motion reveal that ABNY autonomously conducted its own affairs without any significant intrusion by NBG. There is no evidence that NBG directed ABNY policies to any significant degree.

*8 Therefore, plaintiffs have failed to come forward with evidence which, if credited, could support the conclusion that ABNY is a mere department of NBG.

### 3. Agency

To establish that a domestic corporation is an agent for a foreign parent, "the plaintiff must show that the subsidiary 'does all the business which [the parent corporation] could do were it here by its own officials.' " *Jazini*, 148 F.3d at 184 (quoting *Frummer*, 19 N.Y.2d at 537) (alteration in original). This "mean[s] that a foreign corporation is doing business in New York ... when its New York representative provides services beyond 'mere solicitation' and these services are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar activities." *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir.1967). "To come within the rule, a plaintiff need demonstrate neither a formal agency agreement, nor that the defendant exercised direct control over its putative agent." *Wiwa*, 226 F.3d at 95.

In *Frummer v. Hilton Hotels International, Inc.*, 19 N.Y.2d 533 (1967)-the case which gave rise to this

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                          Page 7
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
(Cite as: Slip Copy)

doctrine-a foreign corporation, Hilton (U.K.), was subjected to general jurisdiction in New York because of the activities of its reservation agent here. In that case, the Hilton Reservation Service ("Service") did "public relations and publicity work for the defendant Hilton (U.K.), including maintaining contacts with travel agents[ ] and tour directors," and generated business for Hilton (U.K.); such booking services were "the very purpose for which [the Service] was established." 19 N.Y.2d at 537 (internal quotations omitted). The Court of Appeals concluded that "the Service [did] all the business which Hilton (U.K.) could do were it here by its officials." *Id.*

The *Frummer* case has been interpreted to require that the "agent" be engaged in activities which are sufficiently important to the foreign corporation's business that the parent would be likely to perform them directly if the domestic entity were unavailable. *Gelfand,* 385 F.2d at 120-21. In *Wiwa v. Royal Dutch Petroleum Co.,* 226 F.3d 88 (2d Cir.2000), two foreign corporations were found to be present in New York because of an Investor Relations Office ("Office") which was created to facilitate the defendants' relationships with the investment community. *Id.* at 93. Although the Office was nominally owned by one of the defendants' subsidiaries, the Office devoted 100% of its business to the defendants, and the defendants reimbursed the subsidiary for its costs, which totaled over $500,000 per year. *Id.* at 93, 95-96. Since both defendants were "huge publicly-traded companies with a need for access to capital markets," the Court found that the Office's services were sufficiently important that they would have to be performed by the defendants if the Office did not exist. *Id.* at 96.

*9 The record in this case does not show that ABNY-or any other subsidiary-is an agent for NBG for the purposes of establishing general jurisdiction. The only evidence proffered by plaintiffs in support of the agency theory is that ABNY has occasionally touted its affiliation with the NBG Group. To the extent that ABNY has advertised its relationship with NBG, however, its advertising has only suggested that ABNY's business is well-positioned to serve customers' international banking needs. The nature of this advertising by ABNY starkly contrasts with that in

*Frummer* and *Wiwa*. Those cases featured domestic companies that were established only to market, coordinate, or otherwise facilitate a foreign corporation's business interests in New York. By contrast, the only apparent purpose for ABNY's broadcasting of its affiliation with NBG is to recruit customers *for itself,* not NBG.

More significantly, however, there is no evidence showing that ABNY actually did market any of NBG's services. There is no evidence in the record of any sort which describes the nature of ABNY's marketing of services at all. Plaintiff's only submission in this regard is a newspaper article from 1995, which states:

Atlantic Bank focuses on businesses that export and import goods, offering shipping-finance services through the National Bank of Greece's network of offices throughout Europe. But it has also been active in providing construction loans to several innovative redevelopment projects in New York City, including a 1991 state-and city-financed project in the Manhattan Valley section of the city's Upper West Side and a "turnkey" project in Harlem.

(Erlanger Decl. Ex. 7) Corresponding to this lack of evidence on ABNY's marketing of NBG's services, there is no evidence to suggest that any marketing done by ABNY was sufficiently important to NBG's business that it would have been here by its own officials had ABNY not existed. In this connection, it is also worth noting that subsequent to the commencement of this action, NBG sold its interest in ABNY, and has not undertaken to perform any of ABNY's functions in its absence. Therefore, the record does not contain evidence which, if credited, could support a finding that ABNY was NBG's agent for jurisdictional purposes in New York.

Therefore, since plaintiffs have failed to show that NBG's contacts with New York are substantial, and have failed to demonstrate that any of NBG's New York subsidiaries may be attributed to NBG for jurisdictional purposes, plaintiffs have failed to meet their burden to prove that NBG was doing business in New York when this action was commenced.

III. *CONCLUSION*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 959257 (S.D.N.Y.)
**(Cite as: Slip Copy)**

For the foregoing reasons, defendant's motion to dis-
miss for lack of personal jurisdiction those claims in
the complaint relating to the CD Account is granted.
The action will proceed before me with respect to the
Passbook Accounts, over which personal jurisdiction
is conceded.

SO ORDERED.

S.D.N.Y.,2007.
Klonis v. National Bank of Greece, S.A.
Slip Copy, 2007 WL 959257 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

9

Westlaw.

Slip Copy
Slip Copy, 2006 WL 3714445 (S.D.N.Y.)
(Cite as: Slip Copy)

Manufacturing Technology, Inc. v. Kroger Co.
S.D.N.Y.,2006.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
MANUFACTURING TECHNOLOGY, INC.,
Plaintiff,
v.
THE KROGER CO., ATR Distributing Company,
Inc. and Fosdick & Hilmer, Inc., Defendants.
No. 06 Civ. 3010(JSR).

Dec. 13, 2006.

*MEMORANDUM*

RAKOFF, J.

*1 By respective motions dated September 6, 2006 and September 8, 2006, defendants Fosdick & Hilmer, Inc. ("F & H") and ATR Distributing Company, Inc. ("ATR") moved pursuant to Fed.R.Civ.P. 12(b)(2) to dismiss plaintiff's Amended Complaint for lack of personal jurisdiction. By Order dated September 22, 2006, the Court denied these motions. This Memorandum serves to reconfirm that ruling and briefly states the reasons therefor.

The pertinent allegations are as follows. Plaintiff Manufacturing Technology, Inc. is a New York corporation that develops computer programs to collect, record, and analyze production information at manufacturing facilities. Am. Compl. ¶¶ 1, 10. Defendant The Kroger Co. ("Kroger") is an Ohio corporation that operates supermarkets, convenience stores, and jewelry stores throughout the United States. *Id.* ¶ 2. Between 1998 and 2004, Kroger purchased plaintiff's main offering, the "FACTory Information System" ("FACTory"), for use at 36 different facilities and agreed to abide by licenses that prohibited Kroger from disclosing FACTory to third parties. *Id.* ¶¶ 18-31. The licenses are governed by Connecticut law. *Id.* ¶ 31. Plaintiff alleges that Kroger, *inter alia,* breached these license agreements and violated Connecticut's trade secrets law when it disclosed FACTory to competing software developers with the purpose of developing a competing non-proprietary version of FACTory. *Id.* ¶¶ 43-59.

After filing its original Complaint against Kroger on or about April 19, 2006, plaintiff learned from Kroger's initial production of documents that F & H and ATR were involved in Kroger's attempts to develop its own version of FACTory. Pl. Opp'n Mem. at 3. In an Amended Complaint, dated August 21, 2006, plaintiff named F & H and ATR as additional defendants. The Amended Complaint acknowledged that both companies are organized under the laws of Ohio and have their principal places of business in Ohio, Am. Compl. ¶¶ 3-4, but asserted that ATR and F & H "are subject to the jurisdiction of this Court since each: (i) has committed tortious acts without the state causing injury to Plaintiff within the State of New York (and within this judicial district); (ii) should have reasonably expected its tortious acts to have consequences within the State of New York (and within this judicial district); and (iii) derives substantial revenue from interstate or international commerce." *Id.* ¶ 8.

In a diversity case, a federal court applies the personal jurisdiction rules of the forum state, here, New York. *Arrowsmith v. United Press Int'l, 320 F.2d 219, 223 (2d Cir.1963).* Although the plaintiff must ultimately "establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial," where an evidentiary hearing has not taken place "the plaintiff need make only a prima facie showing of jurisdiction through its own affidavits and supporting materials." *Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir.1981).* At this stage, the Court must construe such documents in the light most favorable to the plaintiff, resolving all doubts in the plaintiff's favor. *Cutco Industries, Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir.1986).* Under New York law, personal jurisdiction does not require that a tort be committed within the state; it is sufficient that the defendant's tortious act causes "injury to person or property within the state," the defendant "expects or should reasonably expect the act to have consequences in the state," and the defendant "derives substantial revenue from interstate or international commerce." N.Y. C.P.L.R. § 302(a)(3)(ii).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3714445 (S.D.N.Y.)
(Cite as: Slip Copy)

*2 Here, plaintiff has made a prima facie showing of each of these requirements. First, because plaintiff (and its intellectual property) is based in New York, the injury from the alleged trade secret theft is felt within New York State no matter where the theft took place. *See, e.g., Sybron Corp. v. Wetzel, 46 N.Y.2d 197, 204-06 (1978)* (finding financial injury to be felt in New York where defendant's out-of-state act of misappropriation of trade secrets threatened loss of New York sales).

Second, a string of emails makes out a prima facie showing that F & H and ATR should reasonably have expected their actions to have consequences in New York. In the first email in the string, dated October 24, 2003, Paul Kissner of plaintiff Manufacturing Technologies wrote to Greg Terhune of defendant Kroger, responding to various questions about plaintiff's programs. Declaration of James M. Andriola, Esq., dated September 14, 2006 ("Andriola Declaration"), Ex. D at FH005270-72. Mr. Kissner's email includes, at the bottom, a five-line warning that "[t]his document may include proprietary and confidential information of Manufacturing Technology Inc. and may only be read by those person or persons to whom it is addressed," and "may not be ... furnished to third parties" *Id.* at FH005272. Immediately above this short, clear warning is Mr. Kissner's name, email address, and the address of Manufacturing Technology at "3663 Lee Blvd. # 501 / Jefferson Valley, N.Y. 10535." *Id.* In spite of the warning, in the second email in the string, also dated October 24, 2003, Mr. Terhune forwarded the original email to David Bell at ATR, and wrote "[p]lease see Paul's response below to my earlier note." *Id.* at FH005269. In the third email in the string, dated October 28, 2003, Mr. Bell forwarded both of the prior emails to Joel Grubbs at F & H, with the message "[h]ere is the write up from Kroger on how the system actually works for the time stamping." *Id.*

In the light most favorable to plaintiff, the email string shows that agents at F & H and ATR received a forwarded email from Kroger containing plaintiff's information that F & H and ATR intended to steal. In these circumstances, it is reasonably to be inferred that the agents at F & H and ATR would have read the clear warning at the bottom of the original email

explaining that the email contained plaintiff's proprietary information, and would also have seen, immediately above the warning, plaintiff's New York address. This email string, therefore, constitutes a prima facie showing that both F & H and ATR should have expected their actions to have consequences in New York.

Third, plaintiff has made an adequate prima facie showing with respect to whether F & H and ATR derive substantial revenue from interstate commerce. With respect to F & H, plaintiff points to F & H's proposal to Kroger in which F & H wrote that
[f]rom our headquarters in Cincinnati, we conduct business across the nation.... [W]e have successfully conducted projects in the states of Alaska, California, Colorado, Georgia, Indiana, Maine, New Hampshire, New York, North Carolina, Ohio, Pennsylvania, and South Carolina. Additionally, we perform work for institutional and industrial clients in Indiana, Kentucky, Michigan, New Mexico, Ohio, Virginia, and West Virginia. We have experienced no difficulty in managing projects in any area of the country.

*3 Andriola Declaration Ex. A at FH000190. Plaintiff also points to a document showing that F & H received or would receive $7.4 million in revenue from Kroger in connection with the assignment at issue in this case, and plaintiff argues that because this revenue would come from Kroger's 41 facilities, only 4 of which are in Ohio, F & H necessarily was set to receive substantial revenue from interstate commerce. Pl. Opp'n Mem. at 12; Andriola Decl. Ex. E at K006750; Transcript, September 20, 2006 ("Tr."), at 17.

F & H admitted at oral argument that its total gross revenue over the last five years was $40 million and that F & H derived $3.2 million (8 percent) of this total revenue from interstate commerce. Tr. at 9, 28. But F & H asserts that all but $480,000 (1.2 percent of total revenue) of this $3.2 million was derived from the neighboring states of Kentucky and Indiana and must therefore be considered "local in character." Tr. at 6-7. F & H relies principally on *United Bank of Kuwait, PLC v. James M. Bridges, Ltd., 766 F.Supp. 113 (S.D.N.Y.1991)*, where the court did not consider revenues a Virginia company derived from the neigh-

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3714445 (S.D.N.Y.)
(Cite as: Slip Copy)

Page 3

boring state of Maryland and from the District of Columbia in its determination of whether the Virginia company derived substantial revenue from interstate commerce. *Id.* at 117. But in that case, after excluding revenue derived from Maryland and the District of Columbia, the court found that the Virginia company derived only $2,000 (1 percent of revenues) in one year, and $22,600 (8 percent of revenues) in another year from interstate commerce. *Id.*

In the present case, even excluding revenue from neighboring states, F & H admits that it derived $480,000, or 1.2 percent of its gross revenue over five years, from interstate commerce, and in the present circumstances, at this early stage, this amount is "is too large to be considered insubstantial." *Allen v. Canadian General Elec. Co.,* 410 N.Y.S.2d 707, 708-09 (N.Y.App. Div.3d Dep't 1978) (holding that even "a mere 1% of total gross revenue" of $879 million can be considered substantial). Accordingly, plaintiff has made an adequate prima facie showing that F & H derives substantial revenue from interstate commerce.

As for ATR, it has provided no evidence that it does not derive substantial revenue from interstate commerce. ATR admitted at oral argument that the company derives revenue from interstate commerce, and that it serves at least Ohio, Kentucky, and Indiana. ATR claimed that the amount of revenue it derives from interstate commerce is not substantial, but ATR could not say specifically what percentage or amount of its revenue came from interstate commerce. Tr. at 20-22. The only number ATR offered was that its gross profits were $1.4 million last year. Tr. at 21. Dismissal is inappropriate even where "there is no proof" that a defendant "derives substantial revenue from interstate or international commerce," where "that knowledge is peculiarly under the control of [the defendant]," and may come to light in the course of "[s]ubsequent discovery." *Tonelli v. Chase Manhattan Bank, N. A.,* 372 N.Y.S.2d 662, 663 (N.Y.App. Div. 1st Dep't 1975). Accordingly, dismissal of ATR is inappropriate at this stage.

*4 Finally, there is no due process concern in this case because, based on plaintiff's allegations, both ATR and F & H have had sufficient contacts with New York and the exercise of jurisdiction is reasonable. *See generally Asahi Metal Indus. Co. v. Superior Court of Cal.,* 480 U.S. 102, 113-15 (1987) (defining standards for assessing the twin due process requirements of minimum contacts and reasonableness).

Accordingly, the Court, by Order dated September 22, 2006, denied the motions to dismiss filed by ATR and F & H.

S.D.N.Y.,2006.
Manufacturing Technology, Inc. v. Kroger Co.
Slip Copy, 2006 WL 3714445 (S.D.N.Y.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.